```
 1                   UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF NEW YORK

 3

 4

 5   - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA          18-CR-6094(G)
 6
     vs.
 7                                      Rochester, New York
     XAVIER TORRES,                     October 19, 2021
 8            Defendant.                8:30 a.m.
     - - - - - - - - - - - - - -X
 9                                      VOLUME 1

10                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                 UNITED STATES DISTRICT JUDGE

12
                      JAMES P. KENNEDY, JR., ESQ.
13                    United States Attorney
                      BY: ROBERT A. MARANGOLA, ESQ.
14                        CASSIE M. KOCHER, ESQ.
                      Assistant United States Attorneys
15                    500 Federal Building
                      Rochester, New York 14614
16                    Appearing on behalf of the United States

17
                      MAURICE J. VERRILLO, ESQ.
18                    3300 Monroe Avenue
                      Suite 301
19                    Rochester, New York 14618
                      Appearing on behalf of the Defendant
20

21

22

23   COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                         Christimacri50@gmail.com
24                       Kenneth B. Keating Federal Building
                         100 State Street, Room 2640
25                       Rochester, New York 14614
```

## I N D E X

| | |
|---|---|
| Preliminary instructions by Judge Geraci | Page   9 |
| Opening statement by Ms. Kocher | Page 15 |
| Opening statement by Mr. Verrillo | Page 27 |

**WITNESS FOR THE GOVERNMENT**

Joseph Briganti
    Direct examination by Mr. Marangola      Page   32

| **EXHIBIT** | **RECEIVED** |
|---|---|
| Government 3 | 37 |
| Government 35 | 41 |
| Government 1 | 43 |
| Government 44 | 55 |
| Government 85 | 57 |
| Government 36 | 59 |
| Government 348-351 | 68 |
| Government 90-91 | 73 |
| Government 92-93 | 75 |
| Government 94-105 | 77 |
| Government 106-107 | 83 |
| Government 109 | 93 |
| Government 108 | 95 |
| Government 29 | 98 |
| Government 19 | 100 |
| Government 45 | 101 |
| Government 114 | 102 |
| Government 115-132 | 106 |
| Government 134-135 | 115 |
| Government 137 & 137A | 116 |

<u>**P R O C E E D I N G S**</u>

*   *   *

1  
2  
3          **(WHEREUPON**, the defendant is present).

4          **THE COURT:** Good morning.

5          **MR. MARANGOLA:** Good morning, Judge.

6          **MS. KOCHER:** Good morning.

7          **MR. VERRILLO:** Good morning.

8          **THE COURT:** Last evening the Court was provided with
9  stipulations signed by the Government, by the defendant, and
10 by defense counsel Mr. Verrillo that relate to certain drug
11 exhibits, a number of drug exhibits regarding both the
12 substance contained within those exhibits and the weight of
13 those exhibits that were retrieved from a number of different
14 locations; stipulation regarding firearms again seized from
15 various locations indicating both a description of the weapon
16 along with a serial number of the weapon; a stipulation
17 regarding cell phones and specifically device data reports
18 containing the data that was retrieved from those exhibits, I
19 believe there were six separate cell phones; and, finally, an
20 autopsy report regarding John Gonzalez, a stipulation that the
21 report reflects that the cause of death was multiple gunshot
22 wounds and agreeing to the admissibility of that certified
23 copy of the autopsy report.

24          Mr. Torres, have you had a chance to review the
25 stipulations with your attorney?

1          **THE DEFENDANT:** Yes, Your Honor.

2          **THE COURT:** Do you understand all the stipulations?

3          **THE DEFENDANT:** Yes, Your Honor.

4          **THE COURT:** Do you understand by stipulating what

5     you're agreeing to is the receipt and entry of each of these

6     exhibits as identified in this stipulation?

7          **MR. VERRILLO:** Judge, we had agreed to the

8     foundation for each of those exhibits, but we had reserved our

9     substantive objections.  So we were trying to avoid a, you

10    know, laying a foundation on those items.  So we reserved our

11    right to object on relevance or other substantive grounds

12    except for the report, which we've agreed to a summary -- a

13    two page summary of the coroner's report, which we do agree to

14    its admission absent the manner of death being taken out.

15         **MR. MARANGOLA:** Judge, essentially the parties have

16    discussed that the stipulation identifies these items and so

17    that the parties are agreeing that chemists and chain of

18    custody, those type of witnesses, would not have to be called.

19         The Court will recall there had been a previous

20    motion to preclude certain evidence, and I think Mr. Verrillo

21    wanted to be clear that in stipulating to the foundation and

22    authenticity of these items he wasn't waiving that prior

23    argument that he raised concerning the admissibility, okay?

24         So that the stipulation essentially is foundation

25    and authenticity so that there's not a need to have chemists

1  or other chain of custody witnesses for those items, but it

2  eliminates the fact he previously asked to have excluded

3  certain evidence.  That's all.

4           I think the point there so we would plan to stip --

5  for example, if we're putting in an item of a search warrant

6  and there's a drug seizure in it, I would identify it, read

7  pursuant to the stipulation what it is, and then I would offer

8  it.

9           My understanding is there's not going to be an

10 objection to that.  Any previous objection that had been

11 raised in the motion, for example, that pretrial motion is not

12 waived based on the stipulation.

13          **THE COURT:**  Is that correct, Mr. Verrillo?

14          **MR. VERRILLO:** Judge, that was my concern, not to

15 waive any objection.  Obviously there were some subsequent act

16 evidence and so forth.

17          So if the Court's ruling that I don't need to keep

18 repeating my previous objection and that's preserved, that

19 would help -- obviously that would help me in my position.

20          **THE COURT:** Okay.  I think that's -- from what

21 Mr. Marangola stated and what you stated, I think that's

22 clearly the case, you're reserving your right to preserve

23 those issues for any appeal.

24          **MR. VERRILLO:** Okay, thank you.

25          **MR. MARANGOLA:** And then the medical examiner

1  report, Judge, we do have a redacted report.  As Mr. Verrillo

2  indicated, that we've redacted the -- just the two pages that

3  we're putting in, it redacts the manner of death; just sets

4  forth the cause of death.  Eliminates the necessity of the

5  medical examiner coming in and testifying.

6              THE COURT: That includes Exhibit 200 is the report

7  and Government Exhibit 193 is a photograph?

8              MR. MARANGOLA: Yes.

9              THE COURT: Is that correct?

10             MR. VERRILLO: Photograph has been authenticated.

11 We've previously filed a motion related to, you know,

12 prejudicial effect of the photograph, so I don't think that

13 has been determined yet in terms of -- but we don't dispute

14 the authenticity of the photograph.

15             THE COURT: Okay, all right, good.  We will mark

16 this as Court Exhibit 1 and I believe both parties need copies

17 of it as well, right?

18             MR. MARANGOLA: Yes, thank you, Judge.  Then when

19 we're offering items, if I can, I'll just ask for permission

20 of the Court to read from a portion of the stipulation and

21 identify it as Court Exhibit 1.

22             THE COURT: Yes, that seems the most practical

23 approach.

24             MR. MARANGOLA: One other thing, Judge, with respect

25 to -- Mr. Verrillo mentioned his prior motion about excluding

1   evidence outside of a period that he's alleging his client was

2   not in the conspiracy.  We had previously indicated April of

3   2017 there had been a meeting with the defendant and the

4   police and attorney John Molloy.

5           Subsequent to that filing, in that argument we also

6   learned of a meeting that occurred in October of 2016.  I

7   advised Mr. Verrillo of that, which was -- I don't know, I

8   want to say a couple weeks ago.  And I spoke to Mr. Molloy

9   about it, he advised me he had spoken to Mr. Verrillo about

10  it.

11          So he had been aware of it as well, but I had not

12  been aware of it at the time I submitted my filing to the

13  Court, mentioning that there was a meeting in April of 2017.

14  There had, in fact, been one prior to that.

15          So I just wanted to correct that for the record.  I

16  don't think that changes our position on the matter at all,

17  but I just wanted to let the Court know that.  Thank you.

18          **THE COURT:** Anything further on that?

19          **MR. VERRILLO:** No, Your Honor.

20          **THE COURT:** Okay, thank you. We'll bring the jury up

21  and we will proceed with preliminary instructions to the jury

22  and then the opening statements by the parties.

23          Because we're not -- we're no longer using two

24  courtrooms for jury trials, we're going to be utilizing the

25  cafeteria downstairs as a jury assembly room, we're going to

1  try to minimize breaks.  We're going to have to have the jury

2  escorted by CSOs.

3          Are you aware of that?

4          **COURT SECURITY OFFICER:** Yes.

5          **THE COURT:** Down to the cafeteria.  We don't want to

6  have that happen.  We want to minimize that as much as

7  possible.  So traveling back and forth and run the risk of

8  jurors running into other witnesses, family members, or

9  members of the public that could be a problem.  So I just

10 wanted to make everybody aware of that, okay?

11         **MR. MARANGOLA:** Is the Court still going to --

12 planning to do the witness cleaning and all that?

13         **THE COURT:** Yes, I am.

14         **MR. MARANGOLA:** So we'll have to break in between?

15         **THE COURT:** Break after every witness.

16         **MR. MARANGOLA:** Okay.  All right. Judge, Ms. Kocher

17 is going to be doing the openings for the Government. I

18 wanted to let the Court know.

19         **THE COURT:** All right, thank you.  All right, bring

20 the jury up.

21         **MR. MARANGOLA:** Judge, are we going to take a break

22 after openings so I can get our first witness, or should I

23 have him come down?

24         **THE COURT:** How long are your openings?

25         **MS. KOCHER:** About 20 minutes.

1          **THE COURT:** Mr. Verrillo?

2          **MR. VERRILLO:** Ten or so.

3          **THE COURT:** Let's have the witness ready so we don't

4    have to break.

5          **MR. MARANGOLA:** Okay.

6          (**WHEREUPON**, there was a pause in the proceeding).

7          (**WHEREUPON**, the defendant is present; the jury is

8    present).

9          **THE COURT:** Good morning, members of the jury.

10   Members of the jury, now that you have been sworn I'm about to

11   provide you with some preliminary instructions that will help

12   guide you regarding this trial.

13          It will be your duty to find from the evidence what

14   the facts are.  You and you alone are the judges of the facts.

15   You will then have to apply those facts to the law as I will

16   instruct you.

17          Nothing that the Court may say during the course of

18   the trial is intended to indicate or should be taken by you as

19   indicating what your verdict should be.

20          The evidence from which you will find the facts

21   will consist of the testimony of witnesses who will take this

22   witness stand; documents and other things that may be received

23   into the record as exhibits; and any facts that the attorneys

24   agree or stipulate to.

25          There are certain things that are not evidence and

1  you must not consider as evidence.  Any statements, arguments

2  or questions by the attorneys are not evidence.  Objections to

3  questions are not evidence.

4          The attorneys have an obligation to their clients

5  to make objections when they believe that the evidence being

6  offered is improper under our rules of evidence.  You should

7  not be influenced by the objection or the Court's ruling on

8  the objection.

9          If the objection is sustained, you can ignore that

10  question.  If it's overruled, treat the answer like any other.

11          If you are instructed that some item of evidence is

12  received for a limited purpose, you must follow that

13  instruction.

14          Testimony that the Court excludes or tells you to

15  disregard is not evidence and must not be considered.

16          Anything you may have seen or heard outside of this

17  courtroom is not evidence and must be disregarded.  You are to

18  decide this case solely on the evidence presented in this

19  courtroom.

20          There are two kinds of evidence: Direct and

21  circumstantial evidence.  Direct evidence is direct proof of a

22  fact such as the testimony of an eyewitness.  Circumstantial

23  evidence is proof of facts from which you may infer or

24  conclude that other facts exist .

25          I will give you further instructions on this at the

1   end of the case, but keep in mind you may consider both types

2   of evidence.

3              It will be up to you to decide which witnesses to

4   believe, which witnesses not to believe, and how much of a

5   witness's testimony to accept or to reject.

6              Again I'll give you some guidelines on judging this

7   type of testimony and the credibility of witnesses at the end

8   of the case.

9              As you know, this is a criminal case.  There are

10  three basic rules about a criminal case you are to keep in

11  mind.  First, the defendant is presumed innocent until proven

12  guilty beyond a reasonable doubt.  The indictment brought by

13  the Government against the defendant is only an accusation,

14  nothing more.  It is not proof of guilt or anything else.

15  Therefore, the defendant starts out with a clean slate.

16             Second, the burden of proof is on the Government

17  until the very end of the case.  The defendant has no burden

18  to prove his innocence or to present any evidence or to

19  testify.  Since the defendant has a right to remain silent,

20  the law prohibits you from arriving at your verdict by

21  considering that the defendant may not have testified.

22             Third, the Government must prove the defendant's

23  guilt beyond a reasonable doubt.  Again at the end of the case

24  I'm going to give you a detailed definition of what that

25  means, but bear in mind that in this respect the criminal case

1  is different from a civil case.

2          As I indicated when you were selected as jurors,

3  the defendant is charged with narcotics conspiracy and

4  possession, discharge, brandishing of a firearm in furtherance

5  of a drug trafficking crime.  Again I'll give you detailed

6  instructions on the law regarding those charges at the end of

7  the case.  Those instructions will control your deliberations.

8          As we left yesterday I instructed you about certain

9  rules you have to follow as far as your conduct as jurors.  I

10  instruct you that during the trial you're not to discuss this

11  case with anybody or permit anybody to discuss the case with

12  you until you retire to the jury room and the Court instructs

13  you it's time to begin your discussions.

14          You're not to read or listen to any accounts of

15  this case if reported by any news media.

16          You're not to talk to anybody about this case.  If

17  anybody tries to talk to you about this case, you must bring

18  it to the Court's attention by notifying the court security

19  officer or my courtroom deputy.

20          You're not to research any issues regarding this

21  case -- facts, law, parties, defendant, locations.  The reason

22  for that obviously is because you have to base your decision

23  only on what you hear in this courtroom and not something that

24  you received outside the courtroom.

25          You're not to form any opinion until all the

1   evidence is in, I've provided you with instructions and tell

2   you then to begin your deliberations.

3          If you want to take notes during the course of the

4   trial, you'll be provided materials for that purpose.

5   However, it's difficult to take detailed notes and pay

6   attention to witnesses which is the most important thing for

7   you to do.

8          If you do take notes, make sure that your notes do

9   not interfere with your listening and considering all the

10  evidence.  If you do take notes, do not discuss them with

11  anybody before you begin your deliberations.

12         Those of you who do not take notes before you

13  begin -- excuse me, do not take notes -- I'm sorry, do not

14  take your notes with you at the end of the day.  They will be

15  collected by the courtroom deputy, and at the end of the trial

16  the notes will be collected and they will be destroyed.

17         If you choose not to take notes, remember that it

18  is your own individual responsibility to listen to the

19  evidence in the case.  You cannot give this responsibility to

20  somebody else who is taking notes.

21         We depend on the judgment of all members of the

22  jury; all of you must remember the evidence in the case.

23         The trial will shortly begin first with a statement

24  by the Government regarding an outline of the proof they

25  expect to present.  Next the defense attorney may, but is not

1    required, to make an opening statement.  The opening

2    statements are not evidence or arguments.  The Government will

3    then present its witnesses; counsel for the defense may

4    cross-examine those witnesses.

5              Following the Government's case, the defendant may

6    but, again, is not required to present witnesses, which the

7    Government may then cross-examine.

8              After all the evidence is in the attorneys will

9    present their closing arguments to summarize and interpret the

10   evidence you've heard; and then the Court will instruct you on

11   the law of the case that you must follow.  After that you will

12   retire for your deliberations on your verdict.

13             A couple of additional instructions.  We previously

14   were using two courtrooms for the jury.  We're now using the

15   basement, jury assembly room, which used to be our cafeteria.

16   So you'll be escorted by a court security officer from this

17   floor down to into a particular room.

18             We'll try to minimize the breaks so we don't have a

19   lot of movement back and forth.  It's very important that you

20   not have any contact during those movements or any time with

21   any members of the public, any potential witnesses or anybody

22   else you may see in the hall situation.

23             In addition, you may run into the attorneys in the

24   elevator, coming into the building or when you're walking in

25   the building at some point.  If they don't acknowledge you,

1    they're not being rude.  They're simply following the Court's

2    instructions to avoid any contact with the juror to avoid even

3    the appearance of impropriety.  So please understand that as

4    well.

5              With that understanding, you may proceed with the

6    opening statements by the Government.

7              **MS. KOCHER:** Thank you, Your Honor.  May I remove my

8    mask during openings?

9              **THE COURT:** Yes.  And that's -- the attorneys are

10   allowed to remove their masks when they're speaking, asking

11   questions, when they're presenting either opening statements

12   or summations.

13             **MS. KOCHER:** Thank you, Your Honor.

14             Xavier Torres, also known as Pistolita, was a

15   member of a violent drug trafficking organization who was

16   headed by Carlos Javier Figueroa or Javi.

17             During 2015 and up until January 29th, 2018, this

18   organization sold street level quantities of heroin and

19   cocaine in the area of Burbank Street in the City of

20   Rochester.

21             Now, the organization involves many people that

22   included drug testers, people involved in packaging the drugs

23   for sale, the people that sold the drugs on the street,

24   lookouts; and just like any business, customers.

25             Now, the defendant was one of those employees.  He

1  packaged cocaine and heroin for sale; he delivered those drugs

2  to the people selling them; he himself sold drugs; and he

3  collected money from the profits of those drug sales.

4          Now, like any street level drug operation, the

5  organization used violence and even murder to control the

6  territory on Burbank Street.  Throughout this case you'll hear

7  about the many people involved, but ultimately this case is

8  about the defendant's role in that ongoing narcotics

9  conspiracy.

10          After you consider all the evidence that you hear

11  and apply it to the law that Judge Geraci will give you at the

12  end of the case, it will be clear to you that the defendant

13  was involved and helped further a very lucrative and dangerous

14  drug trafficking organization in the Western District of

15  New York.

16          My name is Cassie Kocher, I'm an Assistant United

17  States Attorney.  And I along with Assistant United States

18  Attorney Robert Marangola and our paralegal Michelle McCreedy

19  will represent the United States throughout this trial.

20          Now, this opening statement is my opportunity to

21  discuss with you a few things.  First I'd like to talk to you

22  about the nature of the charges and the allegations contained

23  in the indictment; I'll talk to you about what we intend to

24  prove throughout this trial; and how we intend to prove it to

25  you.

1          So first beginning with the nature of the charges.

2    You've heard from the judge that the indictment contains two

3    counts.  Count 1 is the narcotics conspiracy, and Count 2 is a

4    firearms offense which is possession, brandishing and

5    discharge of a firearm in furtherance of a drug trafficking

6    crime.

7          Starting with Count 1, the narcotics conspiracy,

8    our job throughout this trial is to prove to you beyond a

9    reasonable doubt the following elements:

10          First, that starting in 2015 in the City of

11    Rochester, Western District of New York, there was an

12    agreement between the defendant and others to distribute

13    heroin and cocaine.

14          And, secondly, that the scope of that agreement or

15    the conspiracy involved at least 1 kilogram of heroin, or at

16    least 5 kilograms of cocaine.  That's Count 1.  There was an

17    agreement between the defendant and others to distribute

18    heroin and cocaine, and that it involved at least 1 kilogram

19    of heroin and at least 5 kilograms or more of cocaine.

20          After we prove those essential elements beyond a

21    reasonable doubt, we will have established the defendant's

22    guilt of Count 1 of the indictment.

23          Now, Count 2, the firearms charge, we must prove a

24    few elements beyond a reasonable doubt to you throughout this

25    trial beyond a reasonable doubt.

 1              First, that also beginning in 2015 in the City of

 2   Rochester, Western District of New York, the defendant

 3   committed a federal drug trafficking crime -- that's Count 1,

 4   the narcotics conspiracy.

 5              Second, we must prove beyond a reasonable doubt

 6   that during the conspiracy the defendant, an accomplice or a

 7   co-conspirator possessed, brandished -- which means displayed,

 8   or discharged -- meaning fired, a firearm in furtherance of

 9   that narcotics conspiracy.

10              So that's Count 2, that the defendant participated

11   in a narcotics conspiracy charged in Count 1 of the

12   indictment; and that he, an accomplice or a co-conspirator

13   possessed, displayed or fired a firearm in furtherance of the

14   conspiracy.

15              Once we prove those essential elements to you

16   beyond a reasonable doubt, we will have established the

17   defendant's guilt of Count 2 of the indictment.

18              So that's the nature of the charges and the

19   allegations contained in the indictment.

20              Now, what exactly are we going to prove to you

21   throughout this trial?  Well, you're going to hear some law

22   enforcement officers, that they had investigated and attempted

23   to infiltrate the drug sales on Burbank Street for years.

24              You will hear that part of the investigation they

25   made controlled buys using confidential informants from street

1    level sellers on Burbank Street; you'll hear they executed

2    several search warrants at homes on Burbank Street; and you

3    will hear about surveillance that they conducted in the area.

4              Now, the operation was highly organized and

5    compartmentalized and ultimately quite lucrative based upon

6    the high volume of drug sales that were happening on Burbank

7    Street every day.

8              Now, the investigation revealed and the evidence

9    will show the defendant's drug organization controlled the

10   sale of cocaine and heroin on Burbank Street, which is a very

11   small one way, one block street in the City of Rochester.

12             You will learn about the scope of the conspiracy;

13   how members of the organization, including the defendant,

14   broke down kilogram quantities of cocaine and heroin into

15   smaller bags to be sold on the street.

16             Now, once those kilogram quantities of drugs were

17   broken down into the smaller bags, those were delivered to

18   street level sellers.  And I expect that you will hear that

19   the group sold thousands of those bags every day.

20             Now, the evidence will also show the defendant's

21   role in the conspiracy.  I mentioned how he assisted with

22   bagging drugs for sale.  You'll also hear about how he

23   assisted in delivering those drugs to the sellers, how he

24   would collect money, and how he had access to firearms.

25             The evidence will show the conspiracy involved many

1   people.   In addition to the defendant, you will hear about

2   Leitscha Poncedeleon, who was Javi's -- the boss's mainly his

3   right-hand man or woman.   She was in charge of finding

4   apartments to store their drugs; she assisted with the

5   deliveries of kilogram quantities of cocaine.

6           You'll also hear about Roberto Figueroa, Javi's

7   brother, who also assisted in moving around those kilogram

8   quantities of cocaine and packaging drugs for sale, among

9   other things.

10          You'll hear about Obed Torres Garcia and Axel

11  Aponte Camacho, who assisted in bagging drugs for sale and

12  also sold drugs on the street.

13          You'll hear about Victor Nunez and Jonathan

14  Cruz-Carmona, also known as Tapon, who were shooters for the

15  organization.

16          You will hear that the drug trafficking

17  organization on Burbank Street employed firearms and violence

18  to continue on with that conspiracy.

19          So this is essentially how the organization worked.

20  They would consistently obtain kilogram quantities of cocaine

21  and heroin and store them at various locations which changed

22  over the span of the conspiracy.

23          They included an apartment up at 736 Carter Street,

24  145 Liberty Pole Way, 699 East Main Street, and 899 Culver

25  Road, among some other locations.

1        Now, members of the operation, including the

2   defendant, and some of the other people I mentioned -- Roberto

3   Figueroa, Obed, Axel and Victor -- were paid to work the

4   table, which means they would sit around at a table, break

5   down those kilogram quantities of cocaine and heroin into

6   small individual bags for hours packaging those bags one at a

7   time, sealing them up, and putting them together in packages.

8        After the drugs were put together into smaller bags

9   and grouped in packages, they were delivered to the people

10  selling on Burbank Street or from one of the drug houses on

11  Burbank Street that the organization controlled.  Those bags

12  would be sold for 5 or $10 apiece.

13       Now, I mentioned that the drugs were sold on the

14  street on Burbank, which is near North Clinton Avenue.  Some

15  of the houses that you'll hear about where the drugs were sold

16  from include 11 Burbank Street, 14 Burbank Street and 16

17  LaForce, which is another area that the organization used.

18       And you'll hear about how the locations of the

19  sales changed.  If the area was getting too hot or the police

20  were involved, they would move the sales location to avoid

21  police detection.

22       Once the heroin and cocaine were sold, runners like

23  the defendant would then go collect the money from the drug

24  sales and resupply the people that were selling the drugs on

25  the street or from the houses.

1        Now, the evidence will show that on a weekly basis

2   the operation sold thousands and thousands of these 5 and $10

3   bags of cocaine and heroin.  And over the span of the

4   conspiracy, it far exceeded over a kilogram of heroin and over

5   5 kilograms of cocaine.

6        You'll even hear about how the defendant, who

7   sometimes went by P or Pepe, sold drugs on Burbank Street as

8   well in furtherance of this organization; specifically when a

9   customer wanted more than just that 5 or $10 bag, they would

10  deal with the defendant directly and that's because he was

11  higher up in the organization hierarchy; he had access to

12  larger quantities of drugs than the street level sellers had

13  who were just selling 5 and $10 bags.

14       During the life of this operation the specific

15  location of activities changed and some of the co-conspirators

16  changed; not everybody was part of the conspiracy the entire

17  time. Some died, some were murdered, some just left town,

18  others came and went.  And I expect that you'll hear that

19  includes the defendant.

20       I expect that you'll hear that he traveled back and

21  forth between Rochester and Buffalo.  But keep in mind this is

22  not just a case where the defendant came to Burbank to visit

23  some friends who happened to be drug dealers.  This is not a

24  case where the defendant was just hanging out on Burbank.

25       This is a case where the defendant was actively

1 involved in furthering this narcotics conspiracy.

2          Now, that's a summary of some of the things that we

3 will prove throughout the trial regarding Count 1, the

4 defendant's participation in that narcotics conspiracy and the

5 scope of it being more than a kilo of heroin and more than 5

6 kilograms of cocaine.

7          Now turning to Count 2, the firearms offense, it's

8 well-known to all of us that drug dealing is a dangerous

9 business, particularly street level sales, and this case is no

10 exception.

11          The operation on Burbank was a very violent, highly

12 territorial organization that maintained its power and control

13 over the area by instilling fear and using violence.

14          Now, to that end the organization maintained an

15 arsenal of firearms and those firearms were kept with the

16 drugs at the various locations where they stored the drugs and

17 firearms.

18          And they had those firearms for obvious reasons: To

19 protect members of the organization, to protect their product,

20 the cocaine and heroin, and to protect their proceeds from the

21 drug sales.

22          You will hear testimony about the firearms that the

23 organization kept and maintained and you will see some of that

24 arsenal for yourself throughout this trial.

25          So don't be fooled by the defendant's small stature

1 | because he and other members of the organization were not

2 | afraid to use firearms.  You're going to hear about specific

3 | shootings that members of the organization, including the

4 | defendant, were involved in.  Because if somebody tried to

5 | compromise the conspiracy either by selling on their territory

6 | on Burbank Street, by trying to take customers or by

7 | potentially working with law enforcement, they could pay the

8 | ultimate price.

9 | You will hear about several homicides that happened

10 | in the area of Burbank and North Clinton Avenue in Rochester,

11 | and also one that occurred in Buffalo.

12 | Now, what links all of these homicides is the

13 | Burbank drug trafficking organization.  They were all

14 | committed in furtherance of the conspiracy.  That is the

15 | summary of some of what we will prove to you throughout this

16 | trial regarding Count 2, the firearms offense.

17 | Now, how are we going to prove all this to you?

18 | Well, you're going to hear from witnesses who will take the

19 | witness stand and they include accomplices and

20 | co-conspirators; a potential customer or two; and law

21 | enforcement.

22 | Now, beginning with the accomplices, why would we

23 | -- we call them?  Well, the best way to truly know how a

24 | criminal organization works and what's going on is to call

25 | people that are involved, those that are on the inside.

1          And you will hear from several from such insiders,

2     people who were workers of the organization.  They will tell

3     you about their roles in the organization, how they assisted

4     in transporting drugs, working the table like I described

5     earlier, selling drugs in the street or from houses, they will

6     tell you about other's roles in the organization, including

7     the defendant's role, and how they worked with him and even

8     for him in furtherance of the conspiracy's objectives.

9          I mentioned you'll hear from at least one customer

10     who will tell you about how they began purchasing heroin and

11     cocaine on Burbank Street and then ultimately started dealing

12     with the defendant directly and buying from him.

13          Now, I don't expect that you're going to like all

14     of our witnesses.  They're not being called because they're

15     priests or nuns; some of them have been arrested, they've pled

16     guilty and are testifying -- or have agreed to testify

17     truthfully in the hope that Judge Geraci will give them a more

18     beneficial sentence.

19          I'm not asking you to invite any of our witnesses

20     to dinner, but I am asking that you do what you promised to do

21     yesterday, which is listen to them.  And you also promised to

22     not just listen to them, but evaluate their testimony as you

23     would any other witness.

24          Keep in mind these are the people that the

25     defendant chose to work with.  These are his accomplices and

1 | people that he conspired with.

2 |       Now, you also will hear from some law enforcement

3 | officers who will tell you about their surveillance in the

4 | area, they will tell you about arrests of co-conspirators and

5 | the execution of search warrants in the area of Burbank

6 | Street.

7 |       You'll also hear about the defendant was arrested

8 | in July of 2015 at 6 Burbank which was a house owned by Carlos

9 | Javier Figueroa, Javi, the boss of the entire organization.

10 |       And you'll also hear about how the defendant was

11 | again arrested on Burbank Street in February of 2016.  During

12 | that arrest a car he was associated with had hundreds of bags

13 | of cocaine and heroin packaged for sale.

14 |       Now, this isn't television, so get that out of the

15 | way.  You're not going to hear about any DNA evidence or

16 | fingerprints -- the defendant's fingerprints or DNA are on

17 | kilos or anything like that, but you will hear from the very

18 | people that the defendant conspired with.

19 |       You will also have testimony of police officers who

20 | arrested the defendant and executed warrants which will

21 | corroborate much of what you will hear from the accomplices

22 | and cooperating witnesses.

23 |       You will hear about that arrest of the defendant

24 | and the drugs seized from the car and how those drugs were

25 | packaged in the exact same manner as other co-conspirators.

1          And throughout this trial I ask that you keep in
2  mind that the defendant is charged with conspiracy, which is
3  an agreement of two or more people to work together to commit
4  a crime, in this case sell drugs.  One particular way to prove
5  a conspiracy is to call the people that the defendant himself
6  conspired with.

7          Now, at the end of the case I will return again
8  before you and on behalf of Mr. Marangola and Ms. McCreedy and
9  the United States, I will ask that you consider all of the
10  evidence that you hear throughout this trial and using your
11  common sense and applying it to the law that Judge Geraci will
12  give to you, I believe you will come to the only reasonable,
13  logical conclusion there is and that is that the defendant is
14  guilty of both counts in the indictment.

15          Thank you very much for your time.  Mr. Marangola,
16  Ms. McCreedy and I are all looking forward to presenting the
17  evidence in this -- this case and I appreciate your attention.
18  Thank you.

19          **THE COURT:** Thank you very much.  Mr. Verrillo?

20          **MR. VERRILLO:** Good morning, may it please the
21  Court, counsel, Mr. Torres, ladies and gentlemen.

22          My name is Maurice Verrillo, I'm appearing on
23  behalf of Xavier Torres in this matter.  I want to thank you,
24  first of all, for serving as jurors.  We know you act as
25  jurors not only because you have a civic obligation to be

1    jurors, but you want to see justice administered in the

2    courtroom.   So we appreciate your time and your availability.

3           The opening statement gives you an opportunity to

4    get a preview of what we expect the issues are in this case

5    and what the evidence will show.

6           We ask you to keep an open mind throughout this

7    process until this case is presented for your deliberations.

8           The testimony you're going to hear is something you

9    can consider along with the cross-examination, all of that is

10   significant in the process.

11          Although Mr. Torres has no obligation to present

12   evidence, we would point out he doesn't have that obligation.

13   He doesn't have to prove anything.   We don't have to -- on the

14   defense side we don't have to establish anything as it relates

15   to this case.

16          Mr. Torres is presumed to be innocent of the

17   charges and has no burden of proof.

18          Obviously, as we said yesterday, since there's been

19   no evidence, there can be no determination of his guilt

20   because no evidence has been presented.

21          The Government's going to provide a large amount of

22   documentation, large amount of evidence before you.   That's

23   mainly going to be coming through cooperating witnesses, and

24   we would ask that you obviously consider with great care the

25   fact that they are cooperating witnesses and we would submit

1  their testimony is not a basis, sufficient basis to make a

2  determination in this case, that they're not worthy of

3  reliance as it relates to a conviction.

4           What does the benefit of cooperation mean?  That

5  means they weren't charged with an offense they should have

6  been charged with or could have been charged with; that

7  they're receiving a lesser charge; or they're being given the

8  opportunity to seek a reduced sentence for testifying against

9  Mr. Torres.

10          We will have more to say about the cooperating

11 witnesses in our closing statement.  Again, we ask you to keep

12 an open mind, give me the opportunity to be heard when we get

13 down to the closing statements.

14          The Government and Mr. Torres have a fundamental

15 disagreement about who he is, and whether the six year

16 investigation justifies the charges in this case.

17          Xavier is 36 years old, he was raised in Buffalo,

18 has three children.  He's a short person, he's five feet one

19 inches tall, not very heavy as you can obviously see.

20          And he admits he's had a drug addiction, he had

21 heroin as a drug addiction.  And that he knew some of the

22 individuals that we're talking about.

23          He acknowledges that he sold drugs to maintain his

24 drug habit.  He denies he was part of this conspiracy.  Any

25 sales that he had to assist him in his drug usage were

1   independent of this alleged conspiracy.  He did not agree to

2   participate in the conspiracy and was not acting in

3   furtherance of its objectives.

4           So we disagree as to the Government's case as it

5   relates to Mr. Torres or is charged against Mr. Torres.

6           Xavier met Carlos Figueroa in Buffalo and was given

7   the opportunity to move to Rochester for a job with Mr.

8   Figueroa, who had many properties.  In March of 2015 a lease

9   was entered between his girlfriend and Carlos and rent was

10  paid associated with that property.

11          He lived in Rochester for periods in 2015; his

12  family left in August of 2015 and he left by November of 2015

13  and went back to Buffalo, which is where he was raised.

14          The Government claims that this conspiracy lasted

15  until January of 2018, but you'll see that the allegations --

16  many of these allegations in 2016, '17 and '18, he was nowhere

17  around, he wasn't in Rochester.  So we'd ask you to note that.

18          The Government's claims are accusations.  You're

19  going to hear accusations from the various people that are

20  going to be presented, but we ask you to think about what

21  makes sense to you.  These allegations, what these claims --

22  what would naturally flow if it was the case that Mr. Torres

23  was a part of this alleged conspiracy, what evidence would you

24  expect and what evidence was not presented.

25          The credibility and reliability of the evidence is

1   at issue in any case and that's something you're going to have

2   to consider.  Not just that someone says something, but is

3   there credible, reliable evidence to back up what is being

4   claimed.

5           We expect the Government will show a chart where

6   they contend there's various cast of characters in this story.

7   Yet you will have the opportunity to assess whether the role

8   they claim Mr. Torres played is credible or not; whether the

9   claims of the cooperators as to Mr. Torres' involvement makes

10  sense or if there's some other reason for their claims.

11          You also have to determine whether reasonable doubt

12  has been raised as to the Government's claims, including

13  consideration of the absence of evidence, absence of evidence

14  that would naturally flow from the allegations that are being

15  made here.

16          Ladies and gentlemen, we believe that the

17  prosecution will not be able to prove its case beyond a

18  reasonable doubt against Mr. Torres and at the end of this

19  case we will ask you to find him not guilty of these charges.

20  Thank you.

21          **THE COURT:** Thank you, Mr. Verrillo.

22          Government may proceed, call your first witness.

23          **MR. MARANGOLA:** Thank you, Your Honor, Government

24  calls Investigator Joe Briganti.

25          **GOVERNMENT'S WITNESS, JOSEPH BRIGANTI, SWORN**

1                    <u>**DIRECT EXAMINATION**</u>

2              **THE CLERK:** Please state your name and spell your

3   last name for the record.

4              **THE WITNESS:** Joseph Briganti, B-R-I-G-A-N-T-I.

5              **THE REPORTER:** Thank you.

6              **THE CLERK:** You can have a seat up there.

7              **THE COURT:** Good morning.  You may remove your mask

8   since you're behind the plexiglas.

9              **THE WITNESS:** Thank you, Your Honor.

10             **THE COURT:** Thank you.  You may proceed.

11  **BY MR. MARANGOLA:**

12  Q.   Good morning, sir.  Would you please introduce yourself to

13  the jury?

14  A.   Yes, my name is Joe Briganti.  And I'm an investigator

15  with the Rochester Police Department.

16  Q.   Investigator Briganti, where are you assigned as an

17  investigator within the Rochester Police Department?

18  A.   I am assigned to the Special Investigation Section.

19  Q.   And how long have you been with the Rochester Police

20  Department?

21  A.   I've been with the Rochester Police Department over 24

22  years.

23  Q.   And prior to that were you also with another law

24  enforcement agency?

25  A.   Yes, I was with the City of Niagara Falls Police

1  Department.

2  Q.    How long were you there?

3  A.    A little bit short of three years.

4  Q.    So you've got a little over 27 years as a police officer?

5  A.    27 years, yes.

6  Q.    All right.  Can you tell us what unit are you currently

7  assigned to within SIS at the Rochester Police Department?

8  A.    I'm currently assigned to the Alcohol Tobacco Firearms and

9  Explosives, also known as ATF's Violent Crimes Task Force.

10  Q.    Can you explain what the ATF's Violent Crime Task Force

11  is?

12  A.    Yes, so it's made up of federal, state and local agencies

13  and the focus of the investigations are firearms related

14  offenses.  So most commonly those are like gun trafficking

15  investigations or violent crimes that involved firearms.  We

16  also investigate large scale drug trafficking organizations

17  where there's an indication that firearms are being used by

18  members.

19  Q.    How long have you been a member of the Violent Crimes Task

20  Force of ATF?

21  A.    Since November of 2015.

22  Q.    Do you have a partner that you work with in the Violent

23  Crimes Task Force at ATF?

24  A.    Yes, currently my partner is Special Agent Patrick

25  Hoffmann.  And prior to Special Agent Hoffmann it was

1    Rochester Police Department Investigator David Swain, who has
2    since retired.
3    Q.   All right. Can you tell the jury a little bit about your
4    educational background, training and experience?
5    A.   Yes.  So I graduated from Alfred State College in 1995.  I
6    was hired by the Niagara Falls Police Department.  I went
7    through an academy in Niagara County and that was generally
8    where they would teach state laws, criminal procedure laws,
9    vehicle and traffic law, firearms training, defensive tactics
10   training.  Once I graduated from that academy, I went into the
11   Patrol Division in Niagara Falls.
12            In 1997 I transferred to Rochester Police
13   Department.  I went to a brief academy in Rochester.  That was
14   generally Rochester Police Department's policies and
15   procedures.  When I graduated from that academy I went into
16   the Patrol Division on the southwest side of the city which
17   was known as the Genesee Section.
18            I served in the Patrol Division until 2001 when I
19   was reassigned to the Special Investigation Section.  I went
20   directly to the Narcotics Division of the Special
21   Investigation Section.  That was generally writing search
22   warrants, executing narcotics search warrants, working with
23   confidential informants, surveillance operations, undercover
24   buys.
25            Then there was some large scale investigations that

1    involved wiretapping telephones, Title III wiretaps.  After

2    narcotics I went to a unit called Project Safe Neighborhoods.

3    In that division what would happen is they would analyze the

4    worst areas of the city, they would compile a list of those

5    areas and then we would go into those areas and attempt to

6    target the individuals that were causing the problems in those

7    areas or the most violent individuals in those areas and we

8    would attempt to take them off the street.

9            From there I went to the Intelligence Unit.  That

10   was mostly dealing with corruption, corruption crimes by city

11   employees.  I spent a short time there before I went to a unit

12   called VEST.  VEST was an acronym that stood for the Violent

13   Enforcement and Suppression Team.

14           So the idea behind VEST was the Monroe County Crime

15   Analysis Center would compile a list of the ten most violent

16   individuals in Rochester, we would take that list and then we

17   would target those individuals and attempt to get them off the

18   street.

19           At the conclusion of VEST, I had an opportunity to

20   go to a unit called GRANET.  GRANET was an upper-level unit

21   that investigated large scale drug trafficking organizations.

22           But at the same time I received information that I

23   probably would be able to go to the Violent Crimes Task Force,

24   the ATF Violent Crimes Task Force.  So I just decided to go

25   back to narcotics for a short period of time and then in

1  November of 2015 I was assigned to ATF's Violent Crimes Task
2  Force which I'm currently assigned.
3  Q.   All right. Can you describe, you mentioned it a little
4  bit.  Can you describe some of the training you've had with
5  respect to -- in the education with respect to investigating
6  drug cases, narcotics cases?
7  A.   Yes.  So I have on-the-job training.  Also formal training
8  in writing narcotics search warrants, executing narcotics
9  search warrants, working with confidential informants,
10  conducting surveillance operations, and doing undercover buys.
11  And also with larger scale Title III wiretap investigations.
12  Q.   All right.  What types of drugs have you been involved in
13  investigating during your career?
14  A.   Most commonly cocaine, heroin, fentanyl, marijuana.
15  Q.   All right. Investigator Briganti, as part of your work
16  with the Violent Crimes Task Force, did you become involved in
17  a narcotics trafficking investigation that eventually led to
18  the arrest of Carlos Javier Figueroa, also known as Javi, and
19  others?
20  A.   Yes.
21  Q.   If we could put up what is not in evidence on your screen
22  as Government's Exhibit 3?  Is that up on your screen yet?
23  A.   Yes, it is.
24  Q.   All right.  Do you see the individual shown in
25  Government's Exhibit 3?

1   A.    I do.

2   Q.    Do you recognize that individual?

3   A.    Yes, I do.

4   Q.    Who is that?

5   A.    That's Carlos Javier Figueroa.

6   Q.    All right.   Does Government's Exhibit 3 fairly and

7   accurately show the person you know as Carlos Javier Figueroa?

8   A.    Yes, it does.

9            **MR. MARANGOLA:** At this time I'd offer Government's

10  Exhibit 3.

11           **MR. VERRILLO:** No objection, Your Honor.

12           **THE COURT:** Exhibit 3 will be received.

13           (**WHEREUPON**, Government Exhibit 3 was received into

14  evidence).

15  **BY MR. MARANGOLA:**

16  Q.    All right. Investigator, Mr. Figueroa who is shown here in

17  Government's Exhibit 3, he was arrested as part of that

18  investigation; is that right?

19  A.    Yes, he was.

20  Q.    Who were some of the other individuals arrested as part of

21  that investigation besides Javi?

22  A.    So Leitscha Poncedeleon, also known as La Flaca.   Roberto

23  Figueroa.   Xavier Torres, also known as Pistolita or P or

24  Pepe.

25           **MR. VERRILLO:** Objection.

1          **THE COURT:** Overruled.  Go ahead.

2          **THE WITNESS:** Victor Nunez.  Jonathan Cruz-Carmona,

3    also known as Tapon.  Axel Aponte.  Obed Torres.  There

4    were -- and Jean Karlos Pizarro, also known as Yankee.

5    **BY MR. MARANGOLA:**

6    Q.   All right. Those were some of the other individuals also

7    arrested in connection with the investigation?

8    A.   Yes.

9    Q.   You mentioned Xavier Torres with some a/k/a's.  Do you see

10   the individual who you know as Xavier Torres who you described

11   as also known as Pistolita and P or Pepe that was arrested in

12   connection with this investigation?

13   A.   Yes.

14   Q.   Can you point to him and describe what he's wearing for

15   the record?

16   A.   Yes, he's sitting at the table over there, he has a white

17   button up shirt on, short dark hair.

18          **MR. MARANGOLA:** Your Honor, may the record reflect

19   Investigator Briganti's identification of the defendant in

20   court?

21          **THE COURT:** Yes, the record will note the

22   identification of the defendant Xavier Torres.

23          **MR. MARANGOLA:** Thank you.

24   **BY MR. MARANGOLA:**

25   Q.   Investigator, when did you first become involved in the

1  investigation that eventually led to the arrest of Javi and

2  the defendant and others?

3  A.   It was in the early part of 2015, so the early months of

4  2015.

5  Q.   And what agencies participated in that investigation?

6  A.   Well, initially it was the Rochester Police Department,

7  ATF and Monroe County Sheriff's Department, but eventually the

8  DEA, the FBI, and the law enforcement division of the United

9  States Postal Service became involved once there was OCDETF

10 designation, OCDETF designation in this case.

11 Q.   When you say OCDETF, that's an acronym?

12 A.   Yes, that's an acronym.

13 Q.   Who is -- what are those initials OCDETF?  OCDETF, what do

14 those stand for?

15 A.   The Organized Crime Drug Enforcement Task Force.

16 Q.   What is that?

17 A.   Well, the definition of it is it's a federal initiative

18 that assists law enforcement in detecting and dismantling

19 large scale drug trafficking organizations.

20 Q.   All right. And what was the goal of creating -- first of

21 all, what was the operation created as a result of this OCDETF

22 investigation?

23 A.   Well, the goal was to stop the heroin and cocaine sales

24 and the violence associated with them in the area of Clinton

25 Avenue, North Clinton Avenue and Burbank Street.

1    Q.    Was there a name of the OCDETF operation created in order

2    to stop the heroin and cocaine and violent crime associated

3    with the drug trafficking in Burbank?

4    A.    Yes, it was.  It was Operation Burbank Bust.

5    Q.    All right. I'd like to show you what is not in evidence as

6    Government's Exhibit 35.  Can you tell us is that visible on

7    your monitor there?

8    A.    Yes, it is.

9    Q.    All right.  Do you recognize what's shown in Government's

10   Exhibit 35?

11   A.    Yes.

12   Q.    Can you describe it for the jury?

13   A.    Yes, it's an aerial view of the area of Burbank Street and

14   North Clinton Avenue.

15   Q.    Are you familiar with that area?

16   A.    Yes.

17   Q.    How are you familiar with that area?

18   A.    I've done hundreds of investigations in this area.  I've

19   been through the area thousands of times.

20   Q.    All right. Does Government's Exhibit 35 fairly and

21   accurately show Burbank Street, North Clinton Avenue and the

22   surrounding streets as they existed during your investigation?

23   A.    Yes.

24   Q.    Are there streets as well as houses that are identified by

25   house number on Government's Exhibit 35?

1  A.   Yes.

2  Q.   And are those houses and numbers accurately labeled on the

3  exhibit?

4  A.   Yes, they are.

5  Q.   And there are also some arrows reflecting travel of

6  traffic on Burbank Street.  Do you see those?

7  A.   Yes.

8  Q.   Do those accurately reflect the flow of traffic on Burbank

9  Street?

10 A.   Yes, they do.

11 Q.   All right.

12           **MR. MARANGOLA:** At this time I'd offer Government's

13 Exhibit 35.

14           **MR. VERRILLO:** No objection.

15           **THE COURT:** Exhibit 35 will be received.

16           (**WHEREUPON**, Government Exhibit 35 was received into

17 evidence).

18 **BY MR. MARANGOLA:**

19 Q.   Investigator Briganti, does the -- is the area that's

20 shown in Government's 35 show the area that Operation Burbank

21 Bust was targeting?

22 A.   Yes.

23 Q.   All right. Can you describe Burbank Street in general

24 based on your investigation?

25 A.   Yes, so it's a residential street, it's a one way

1  residential street from Remington Street to North Clinton

2  Avenue.  Is that what you're asking me? I'm sorry.

3  Q.   Sure.  How many blocks long is it?

4  A.   It's a single block.

5  Q.   Okay. What was your role in investigation Operation

6  Burbank Bust?

7  A.   I was what was considered a co-case agent along with

8  Special Agent Hoffmann and Investigator Swain.

9  Q.   Can you explain to the jury what's a co-case agent?

10 A.   Yes, so I guess the easiest way to say it, it's the agents

11 that are in charge of the investigation.

12 Q.   All right.  Who were the targets of the investigation?

13 A.   Carlos Javier Figueroa and members of his drug

14 organization.

15 Q.   All right. If I can show you what is not in evidence as

16 Government's Exhibit 1.  Do you see Government's Exhibit 1 on

17 your screen?

18 A.   I do.

19 Q.   All right. Government's Exhibit 1, is a document with

20 photographs of several individuals on it; is that right?

21 A.   Yes.

22 Q.   And do you recognize any of the individuals shown in

23 Government's Exhibit 1?

24 A.   I recognize all of them.

25 Q.   All right.  Are you familiar with each of those

1  individuals based on your investigation?

2  A.   Yes.

3  Q.   Does each of the photos in Government's Exhibit 1 fairly

4  and accurately show individuals that you identified as part of

5  your investigation?

6  A.   Yes.

7          **MR. MARANGOLA:** At this time I'd offer Government's

8  Exhibit 1.

9          **MR. VERRILLO:** No objection, Your Honor.

10          **THE COURT:** Exhibit 1 will be received.

11          (**WHEREUPON**, Government Exhibit 1 was received into

12  evidence).

13  **BY MR. MARANGOLA:**

14  Q.   All right, Investigator Briganti, starting at the top, if

15  you can take us through each of the individuals shown in

16  Government's Exhibit 1 and identify them?

17  A.   Yes.   The individual at the top is Carlos Javier Figueroa.

18  Q.   He's also known as what?

19  A.   Also known as Javi.

20  Q.   All right.

21  A.   The second row from the left is Leitscha Poncedeleon also

22  known as La Flaca.   And next to her picture is Roberto

23  Figueroa on the same line.   The next line down from the left

24  is Obed Torres.

25  Q.   If you could maybe touch your screen, it will leave a mark

1   so we know exactly which person you're referring to?

2   A.   I'm sorry.

3   Q.   Third row on the left.

4   A.   Third row down on the left.  It's not working.

5   Q.   When you touch your screen?

6   A.   When I touch the screen it's not doing anything.

7   Q.   If it's not working we'll keep moving along then.  The

8   first person on the left on the third row with the black hair,

9   that's who?

10  A.   That's Obed Torres.

11  Q.   All right.  And who is next to Obed?

12  A.   Photograph next to him is Axel Aponte Camacho.

13  Q.   All right.  And then number three from the left on the

14  third row?

15  A.   Yes, the individual in the black shirt that's Victor

16  Nunez.

17  Q.   All right. Does he have any a/k/a's you're aware of?

18  A.   No.  He does.  I can't remember what his nickname was,

19  though.

20  Q.   Okay. How about next to Victor Nunez?

21  A.   Next to Victor Nunez is Xavier Torres also known as

22  Pistolita or P or Pepe.

23  Q.   And that's the person you previously identified in court?

24  A.   Yes.

25  Q.   All right.  And who is next to the right of the

1   defendant's photograph in Government's Exhibit 1?

2   A.   That's Jean Karlos Pizarro, also known as Yankee.

3   Q.   All right.  And, finally, the last person on the right on

4   the third row?

5   A.   That's Jonathan Cruz-Carmona also known as Tapon.

6   Q.   All right.  How about the bottom row starting to the left?

7   A.   Starting at the left the individual with the blue hooded

8   sweatshirt on, that's Raphael Rodriguez also known as Rafi.

9            Next to him the individual with the red shirt is

10   Jonathan Gonzalez also known as Flaco, Palito.

11           Next to him the gentleman with the bald head is

12   Bernardino Burgos, also known as Dino.

13           And the individual next to him is Gancarlos and his

14   last name escapes me.  He's also known as Cino or Cano.

15   Q.   All right. If we can put back up Government's Exhibit 35,

16   please?  Investigator, can you describe to the jury how you

17   conducted Operation Burbank Bust?  How you conducted that

18   investigation?

19   A.   Yes.  So we began by buying street level narcotics from

20   either street level dealers or dealers from drug houses.

21   Q.   I'm sorry to interrupt.  That was when?

22   A.   That was in 2015.

23   Q.   Okay.

24   A.   Early part of 2015.

25   Q.   Okay.

1  A.   And we used those buys to execute search warrants, give

2  probable cause to execute search warrants at the locations and

3  gather intelligence from those search warrants, gather

4  evidence from them.

5         We would also debrief informants on the activities

6  on Burbank Street.  We would also speak with patrol officers

7  that encountered these individuals often.

8         We would read officer reports that documented some

9  of the incidents on the street.  We also spoke to concerned

10  citizens who lived on Burbank Street that wanted to eradicate

11  the drug trafficking on the street.

12         We conducted surveillance operations on the street.

13  Sometime in later part of 2017 we began to buy larger

14  quantities of cocaine from a mid-level member of the

15  organization.  We were buying 31 grams and 62 grams of cocaine

16  from an individual by the name of Roberto Figueroa with a DEA

17  informant.

18  Q.   All right. That was the person you previously identified

19  in that -- one of the top rows of the document with all the

20  pictures on it; is that right?

21  A.   Yes.

22  Q.   You said you were buying -- using a different informant to

23  buy 31 and 62 gram quantities of cocaine?

24  A.   Yes.

25  Q.   And that was the later part of the investigation?

A.    Yes.

Q.    How much were you -- how much was the informant having to pay or were you giving the informant to pay for 31 grams or 62 grams of cocaine approximately?

A.    62 grams of cocaine was approximately between $2,000 and $2,400.

Q.    And compare that to when you had the other informants in 2015 making the controlled buys from the street level sellers or the drug houses on Burbank, how much were they paying for the drugs they were purchasing?

A.    They were paying anywhere between $5 and $10 per bag of cocaine or heroin.

Q.    Okay. All right. And those informants were buying the drugs from where, the 5 and $10 bag, where were they making those purchases from?

A.    They were either making them from individuals on the street or they were making them from individuals in drug houses on Burbank Street.

Q.    All right. And when you say drug house, can you tell us what you mean by that?

A.    Yeah, a drug house is just a house that's primarily used to sell drugs from.

Q.    All right. All right, so we get up to -- when was it that you made those buys from the upper-level member Roberto Figueroa?

1  A.   It was in the later months of 2017, so it was about the
2  fall of 2017.
3  Q.   All right. What did that enable you to do as part of the
4  investigation?
5  A.   So the informant was able to obtain a telephone number for
6  Roberto Figueroa which we ultimately presented that
7  information to a judge and began to listen to Mr. Figueroa's,
8  Roberto Figueroa's, telephone.
9  Q.   When you say listen, what do you mean?
10 A.   We wrote a wiretap, Title III wiretap for Mr. Figueroa's
11 phone.
12 Q.   The judge authorized that wiretap?
13 A.   Yes, yes, he did.
14 Q.   All right.  And you were on a wiretap from when?
15 A.   We began the wiretap December 21st I believe of 2017 and
16 it ended on January 29th of 2018.
17 Q.   Okay. Let's talk about some of the steps that you just
18 described in a little bit more detail.  First with the
19 controlled buys during the initial part of that investigation
20 in the 2015 timeframe.
21         Can you describe for the jury what exactly is a
22 controlled buy or a controlled purchase of drugs?
23 A.   Yes, so a controlled buy is utilizing a confidential
24 informant to make a buy of evidence for law enforcement.  So
25 generally what we would do is we would meet with the

1  informant, we would search the informant to make sure they
2  didn't have any drugs or money or weapons on them.  We would
3  provide the informant with money and direction on what we were
4  asking them to do.
5          They would leave, go purchase drugs, and when they
6  were done they would come back to us, give us whatever they
7  purchased and then advise us as far as what happened during
8  the buy.  So we would gather intelligence every time an
9  informant would make a buy, generally how the sales were done
10 on the street by different individuals.
11 Q.   All right. And what's the reason in those initial stages
12 of the investigation in the 2015 timeframe, what was the
13 reason to execute or to engage in those controlled buys?
14 A.   Well, number one, they gave us intelligence.  And then
15 they also provided probable cause for us to be able to write
16 search warrants for drug houses.
17 Q.   All right. And you testified earlier I think about
18 executing search warrants on some of the drug houses in the
19 earlier part of the investigation; is that right?
20 A.   Yes.
21 Q.   Are any of the locations that you executed search warrants
22 on as part of Burbank Bust, and we'll limit it just to the
23 earlier stages of the investigation, are any of those shown on
24 Government's Exhibit 35 here?
25 A.   Yes.

1   Q.   Can you identify them?  I don't know if the screen is

2   still not working.  If it doesn't work, just identify if you

3   can either by number or the location on the exhibit.

4   A.   Yes.  So one of the locations was 6 Burbank Street.

5   Q.   Is that the house with the 6 on it?

6   A.   Yes, it is.  Another one of the locations on the same side

7   of the street and it's indicated by the 14, that's 14 Burbank

8   Street.

9            And then another location is the location across

10  the street from 14 Burbank Street, it's indicated by 11.  11

11  Burbank Street.

12  Q.   When were search warrants executed as part of Operation

13  Burbank Bust on those three locations?

14  A.   So 14 Burbank Street was executed on April 22nd of 2015.

15  6 Burbank Street was executed on -- I believe it was July 30th

16  of 2015.  And 11 Burbank was executed on August 12th of 2015.

17  Q.   All right. The -- now, did you as -- did in the

18  investigative team have buys or confidential informant

19  controlled purchases from any of these locations prior to the

20  execution of the search warrants there?

21  A.   We had buys from all of the locations, but not all of

22  those buys were used as probable cause in the application for

23  the search warrants.

24  Q.   All right. And you say used as probable cause.  These

25  warrants were authorized by judges?

1  A.    Yes.

2  Q.    As part of information you provided them?

3  A.    Yes.

4  Q.    From your investigation?

5  A.    Yes.

6  Q.    And that could be either from the CI buys or from other

7  either informant information or police information that you

8  learned; is that right?

9  A.    Yes.

10              **MR. VERRILLO:** Objection, leading.

11              **THE COURT:** Overruled.  Go ahead.

12  **BY MR. MARANGOLA:**

13  Q.    All right. Were you present for any of the execution of

14  the search warrants that you just testified about?

15  A.    Yes, I was present for the execution of 14 -- I'm sorry, 6

16  Burbank Street and 11 Burbank Street.

17  Q.    All right. How many search warrants have you executed in

18  your career if you can estimate?

19  A.    I would say high hundreds maybe conservatively.  I mean,

20  maybe close to a thousand, but at least high hundreds

21  conservatively.

22  Q.    Okay. Before we talk specifically about some of the

23  warrants that were executed in this case, can you describe for

24  the jury what's the process generally of executing a search

25  warrant at a drug house?

1   A.   Are you asking me what we have to maintain -- what we have

2   to do to get a search warrant?

3   Q.   Well, what types of search warrants do you obtain or seek

4   to obtain to execute at a drug house?

5   A.   Commonly with drug houses we'll request what's called a

6   no-knock search warrant.  There's two types of search

7   warrants: A knock search warrant and a no-knock search

8   warrant.  Oftentimes we'll request a no-knock search warrant.

9   Q.   Who has to authorize a no-knock search warrant?

10  A.   A judge does.

11  Q.   What do you have to demonstrate to the judge in order to

12  obtain a no-knock search warrant?

13  A.   So it's either destruction of evidence inside a location;

14  or by knocking and announcing, that there would be a danger to

15  officers that were entering the location by announcing your

16  presence prior to entering a location.

17  Q.   All right.  And a danger based on what?

18  A.   Based on by announcing the fact that you're -- law

19  enforcement is there and going to enter the house.

20  Q.   All right. And how could that present a danger to law

21  enforcement at a drug house?

22  A.   The individual running the drug house could attempt to be

23  violent against police officers.

24  Q.   All right.  Describe the process of executing one of those

25  no-knock search warrants.

1  A.   So generally we would -- once we had authorization to

2  enter a location, we would put together a team to execute the

3  search warrant to make an entry into the location.  We would

4  request the assistance of uniformed police officers and their

5  job would be to stand at the exterior of the location to make

6  sure that no individuals leave the location or any items of

7  evidence are thrown from the location.

8          Once the entry team arrives at the location, we'll

9  enter through into the location using a battering ram, that's

10 just a tool that we use to get the door open.

11         Some of the officers that are making the entry will

12 have masks on and those officers are usually the ones that are

13 in a -- they're confidential officers, so they're still doing

14 undercovers buys so they don't want their identities to be

15 known.

16         Once we enter into a location we search the

17 location for suspects inside.  Once those suspects are

18 secured, photographs are taken of the interior and exterior of

19 the location and then a search is conducted for evidence.

20         When evidence is located, the officer whose case it

21 is or the case agent will photograph that item and collect

22 that item of evidence.  Once the items are collected, they're

23 turned into the Property Clerk's Office at the Rochester

24 Police Department or at ATF.

25 Q.   All right. You said there was a search of 14 Burbank in

1   2015; is that right?

2   A.    Yes.

3   Q.    And do you recall the date of that?

4   A.    Yes, it was April 22nd of 2015.

5   Q.    All right.  I'd like to show you what is not in evidence

6   as Government's Exhibit 44.  Do you recognize any of the

7   houses shown in Government's Exhibit 44?

8   A.    Yes.

9   Q.    What houses do you recognize?

10  A.    I recognize the house in the middle of the photograph.

11  Q.    What do you recognize that house to be?

12  A.    That's 14 Burbank Street.

13  Q.    Does Government's Exhibit 44 fairly and accurately show 14

14  Burbank Street in the center of the photograph as it existed

15  during your investigation?

16  A.    No.  I mean, it's the same house, but the photograph shows

17  it after there was a fire at the location.  So there's burn

18  marks on the front of the house, there's boards on the front

19  door and window that were not there when the warrant was

20  executed.

21  Q.    Okay. So that was going to be my next question then.  So

22  do -- does Government's Exhibit 44 fairly and accurately show

23  14 Burbank as it existed during the investigation after the

24  search warrant was executed in April of 2015?

25  A.    It's accurate after the search warrant was done, yes.

1  Q.   All right.  And so on the day of the warrant and before,

2  it didn't exist in that condition?  And by that condition I'm

3  referring to the burn marks; is that correct?

4  A.   Yes.

5  Q.   But after the warrant with the burn marks and as reflected

6  in Government's Exhibit 44, does that show how -- accurately

7  how it appeared?

8  A.   Yes.

9          **MR. MARANGOLA:** At this time I'd offer Government's

10  Exhibit 44.

11          **MR. VERRILLO:** No objection.

12          **THE COURT:** Exhibit 44 will be received.

13          (**WHEREUPON**, Government Exhibit 44 was received into

14  evidence).

15  **BY MR. MARANGOLA:**

16  Q.   Is the house shown in the center of this photograph with

17  the burn marks, the house previously shown -- if we can go

18  back to Government's 35 in evidence?  Does that show the house

19  that's labeled 14 in Government's Exhibit 35?

20  A.   Yes.

21  Q.   All right. Are you familiar with what happened during the

22  execution of the search warrant at 14 Burbank on April 22nd,

23  2015?

24  A.   Yes.

25  Q.   Was anyone arrested at that location during the search in

1   April of 2015 at 14 Burbank?

2   A.   Yes, there were two individuals that were arrested.

3   Raphael Rodriguez also known as Rafi, and Eric Arroyo Cruz.

4   Q.   If we could put up Government's Exhibit 1?  Are either of

5   those individuals who were arrested at 14 Burbank on

6   April 22nd, 2015 reflected in Government's Exhibit 1?

7   A.   Yes.

8   Q.   Who is that?

9   A.   Raphael Rodriguez.

10  Q.   And you said he's also known as what?

11  A.   He's also known as Rafi.

12  Q.   And which individual in Government's Exhibit 1 is Rafi?

13  A.   So he's the -- he's the bottom row all the way to the

14  left, gentleman with the blue hooded sweatshirt on and the

15  dark hair.

16  Q.   All right. Was there any evidence recovered during the

17  raid at 14 Burbank on April 22nd, 2015?

18  A.   Yes.  There was 169 bags of heroin, 32 bags of cocaine,

19  and I believe there was some paperwork also.

20  Q.   All right.

21          **MR. MARANGOLA:** If I could have just a minute,

22  Judge?  Your Honor, at this time if I could read from Court

23  Exhibit 1 which is a stipulation signed by the parties with

24  respect to Government's Exhibit 85?

25          **THE COURT:** Yes.  Members of the jury, there is

1    certain evidence the parties have agreed to stipulate to or

2    agreed to.  Like any other evidence, you will determine what

3    credibility to give to that particular item of evidence.

4              You may proceed.

5              **MR. MARANGOLA:** Thank you, Your Honor.  And I'm

6    reading from page 1 of Court Exhibit 1 which states that

7    Government Exhibit 85, which I'm holding in my hand here, was

8    seized from 14 Burbank Street, Rochester, New York on

9    April 22nd, 2015.

10             Government Exhibit 85 contains 32 plastic bags with

11   white powder containing cocaine.  The aggregate weight of the

12   cocaine is approximately 3.178 grams.

13             Government Exhibit 85 also contains 169 glassine

14   bags with tan powder containing heroin.  The aggregate weight

15   of the heroin is approximately 38.953 grams.

16             At this time, Your Honor, the Government would

17   offer Government's Exhibit 85.

18             **MR. VERRILLO:** No objection.

19             **THE COURT:** Exhibit 85 will be received.

20             (**WHEREUPON**, Government Exhibit 85 was received into

21   evidence).

22   BY MR. MARANGOLA:

23   Q.   All right. Investigator Briganti, after the raid at 14

24   Burbank in April of 2015, what did you do as far as the

25   investigation?

1   A.   We continued our surveillance operations.  We continued to

2   make drug purchases in the area of Burbank Street, North

3   Clinton Avenue.

4   Q.   All right. After the raid at 14 Burbank in April of 2015,

5   where did you -- where did the investigative team make CI buys

6   from?

7   A.   We primarily made them from locations at 6 Burbank Street

8   and 14 Burbank Street.

9   Q.   All right. Was that just one or two or did you make

10  multiple buys between those two locations?

11  A.   No, we made multiple buys.

12  Q.   They're the locations shown on Government's Exhibit 35

13  with the 6 and 14; is that right?

14  A.   Yes.

15  Q.   All right. If we could show what's not in evidence as

16  Government's Exhibit 36?  Investigator, do you recognize

17  what's shown in Government's Exhibit 36?

18  A.   Yes.

19  Q.   What is that?

20  A.   That's 6 Burbank Street.

21  Q.   Does Government's Exhibit 36 fairly and accurately show 6

22  Burbank Street as it existed during the investigation?

23  A.   Yes.

24           **MR. MARANGOLA:** At this time I'd offer Government's

25  Exhibit 36.

1          **THE COURT:** Any objection?

2          **MR. VERRILLO:** No objection.

3          **THE COURT:** Exhibit 36 will be received.

4          (**WHEREUPON**, Government Exhibit 36 was received into

5   evidence).

6   **BY MR. MARANGOLA:**

7   Q.   Now, Investigator, how did you choose as a case agent

8   which locations to buy or to make buys from using the

9   informants at any given stage during the investigation?  How

10  did you choose which locations?

11  A.   Well, generally they were either locations that the

12  informants would tell us about; or when we would send the

13  informants into the area, they were locations that the

14  informants were directed to by members of the organization.

15  Q.   And how?  How were they directed?

16  A.   They were told those locations were locations that drugs

17  were being sold from in the area.

18  Q.   Okay. Let's talk about the CI buys involving 6 and 14

19  Burbank.  Can you give us the approximate timeframe during

20  which those occurred?

21  A.   Yes, July -- early July 2015, I believe there was a buy in

22  July 2nd of 2015; July 10th, 2015; July 14th, of 2015; and

23  July 21st of 2015.

24  Q.   Were you present for each of the buys that you just

25  testified about?

1  A.    Yes.

2  Q.    All right. Can we go through those and you tell us what

3  happened?

4  A.    Sure.  On July 2nd we met with an informant, the informant

5  was searched, after the search we gave the informant money and

6  directed the informant to 6 Burbank Street.

7           The informant walked from our undercover vehicle to

8  6 -- up the driveway of 6 Burbank Street and a short time

9  later returned and he had five bags of cocaine, five bags of

10 heroin that he purchased from 6 Burbank Street.

11 Q.    All right.

12           **MR. MARANGOLA:** Your Honor, at this time I'm going

13 to read from Court Exhibit 1 with respect to the stipulation

14 regarding Government's Exhibit 348 on page 2.

15           States Government Exhibit 348, which is here, is

16 five wax paper envelopes with dog heads with tan powder

17 containing heroin seized during a controlled buy on July 2nd,

18 2015.

19           The aggregate weight of the heroin is approximately

20 0.771 grams.

21           Government Exhibit 348 also contains five plastic

22 bags with white powder containing cocaine seized during a

23 controlled buy on July 2nd, 2015.

24           The aggregate weight of the cocaine is

25 approximately 0.501 grams.

1  BY MR. MARANGOLA:

2  Q.   All right.  Let's talk about the next buy, Investigator --

3  A.   July 10th.

4  Q.   July 10th, tell us what happened on that buy?

5  A.   So the informant again was searched, given money and

6  directed to 6 Burbank Street.  The informant walked to 6

7  Burbank Street, a short time later returned.

8           Indication nobody was at the location so we sent

9  the informant to 14 Burbank Street.  CI exited our vehicle,

10  went to 14 Burbank Street and returned a short time later with

11  approximately three bundles of heroin that they purchased from

12  14 Burbank Street.

13  Q.   And what's supposed -- what's a bundle?

14  A.   The quantity is supposed to be ten individual decks of

15  heroin.  So ten individual bags of heroin makes a bundle.  I

16  believe these -- a few of these only had -- only had nine bags

17  in the bundle.

18  Q.   All right. So the CI was supposed to have 30 but didn't

19  have 30?

20  A.   That's correct.

21  Q.   In terms of individual bags?

22  A.   That's correct.

23  Q.   All right. Do you recall how many he had?

24  A.   I believe it was 29 bags, but I'm not positive.

25  Q.   All right.  Could have been 28?

1  A.    Yes.

2              **MR. MARANGOLA:** At this time, Your Honor, with

3  respect to Government's 349, I'm going to read from page 2 of

4  the stipulation.

5              Government's Exhibit 349, which is right here, is

6  28 wax paper envelopes with pirates with tan powder containing

7  heroin seized during a controlled buy on July 10, 2015.

8              The aggregate weight of the heroin is

9  approximately 3.275 grams.

10 **BY MR. MARANGOLA:**

11 Q.    All right. Let's talk about the next controlled buy.

12 A.    So the next controlled buy would have been on July 14th of

13 2015.  Again, the informant was searched and provided money,

14 directed to 6 Burbank Street.

15             CI exited the vehicle and was directed by someone

16 on the street to 14 Burbank Street.  So the informant went to

17 14 Burbank Street, then a short time later returned to us and,

18 again, provided us with three bundles of heroin -- which

19 should have been three bundles of heroin that they purchased

20 from 14 Burbank Street.

21 Q.    All right. Three bundles -- when you say should have been,

22 that should have been 30 bags?

23 A.    Should have been 30 bags, yes.

24 Q.    It was again short?

25 A.    Yes, it was short, yes.

1  Q.   All right.

2            **MR. MARANGOLA:** At this time I'm going to read from

3  page 2 of the stipulation with respect to Government's

4  Exhibit 350, which is here.

5            Government's Exhibit 350 is 28 wax paper envelopes

6  with red devils with tan powder containing heroin seized

7  during a controlled buy on July 14th, 2015.

8            The aggregate weight of the heroin is approximately

9  3.140 grams.

10 **BY MR. MARANGOLA:**

11 Q.   All right. Let's talk about the next buy.

12 A.   The next buy was on July 21st.  So we again searched the

13 CI, provided the CI with money and directed the CI to 6

14 Burbank Street.

15            This time the CI exited the vehicle, walked down

16 the street to 6 Burbank Street, and during the other buys we

17 would park -- we would park our undercover vehicle closer to

18 Remington Street, Burbank Street and Remington Street, and

19 there were -- the reasons we would do that is because there

20 were individuals that were on the street that were acting as

21 what we call lookouts.

22            Lookouts, their number one job is to try to find

23 law enforcement.  So we didn't want to get too close.  So

24 oftentimes when we're doing buys at a location we'll try to

25 get closer on maybe one or two times just to see -- just to

1  try to gather more intelligence ourselves.  So we'll attempt

2  to get closer.

3            On this particular day prior to letting the CI out

4  of the vehicle, we traveled down Burbank Street and we didn't

5  observe anyone standing on the street.  So we let the CI off

6  at Remington Street and Burbank Street, CI walked down the

7  street and we moved our undercover vehicle up and parked in

8  the driveway, it was across the street a little bit, was a

9  little bit east of 6 Burbank Street so we could see the

10 driveway of 6 Burbank Street.

11 Q.   Can you show us here in Government's 35, which we put up

12 that may assist you, and describe your position in the prior

13 buys and in this buy on July 21st.

14 A.   Yes, I believe that the driveway on this one is right

15 where the B starts, there's a driveway right there and we

16 pulled into that driveway.

17 Q.   Right where the?

18 A.   I'm sorry, where the B in Burbank is, right in the

19 beginning of that.  It's across the street from 6 Burbank

20 Street and a little bit to the east maybe one, two houses to

21 the east and it's right where the B starts.

22 Q.   The capital B?

23 A.   Yes, the capital B.

24 Q.   That was your position of surveillance during the buy on

25 July 21st?

1  A.    Yes.

2  Q.    Okay. And that was -- you took up that position

3  different -- that position was different than the previous

4  buys because you had not seen any lookouts that day?

5  A.    Yes.  We traveled down the street the first time, we

6  didn't see anybody on the street.

7  Q.    Okay.

8  A.    So we thought it was safe to actually get closer on that

9  day.

10 Q.    You dropped the informant out where approximately?

11 A.    We dropped the informant off closer to the corner of

12 Remington Street and Burbank Street and the informant walked

13 west and we traveled west and pulled into that driveway.

14 Q.    So the informant walks west down Burbank and you drove

15 separately your, I assume, unmarked police vehicle?

16 A.    Yes.

17 Q.    And you parked in the area near the capital B?

18 A.    Yes.

19 Q.    Across the street from and slightly to the east of 6

20 Burbank?

21 A.    Yes.

22 Q.    From that vantage point tell us what you observed on

23 July 21st, 2014.

24 A.    So we observed the informant walk up the driveway of 6

25 Burbank Street and appear to be having a conversation with

1    someone through the door, screen door was closed, but appeared
2    to be having a conversation with somebody.
3    Q.   Which door?  I'm sorry to interrupt.
4    A.   I'm sorry, it's the side door right off the driveway of
5    the house.
6    Q.   So the door -- as you're looking at the house, not the
7    front door but the door on which side?
8    A.   The door on the east side of the house.
9    Q.   All right.  For those of us directionally challenged,
10   that's on the right side of this photograph?
11   A.   Yes.
12   Q.   Okay.
13   A.   Yeah.  I mean, in this photograph you can see a little
14   white car next to 6 Burbank Street.  It would be on that side
15   of the house.
16   Q.   Okay. So tell us what you observed happening at that
17   location.
18   A.   Again I observed a conversation or I observed the CI
19   standing.  It appeared he was talking to someone inside.  A
20   short time later I observed Xavier Torres, Pistolita, exit the
21   location and Pistolita and the informant walked down to 14
22   Burbank Street and walked up the east side or the right-hand
23   side of 14 Burbank Street.
24              Short time later they came back out from that
25   house.  Pistolita walked back down to 6 Burbank Street, walked

1   back up into the driveway and back inside the side door and

2   the CI walked -- continued to walk to Clinton Avenue where we

3   ultimately went and picked the CI up on Clinton Avenue.

4   Q.   All right.  So we're clear, the person that you saw exit

5   the side door at 6 and walk with the CI to 14 and then walk

6   back down to the area of 6, is that person in court here

7   today?

8   A.   Yes.

9   Q.   And is that the person you previously identified as the

10  defendant Xavier Torres?

11  A.   Yes, the gentleman sitting with the white button up shirt

12  on.

13  Q.   Okay. And you observed him from your vantage point just

14  across the street where you previously described it; is that

15  right?

16  A.   Yes.

17  Q.   Pistolita, all right.  When you met with the informant

18  immediately after that, what did the informant provide you?

19  A.   Provided us four bundles of heroin that was purchased at

20  14 Burbank Street.

21  Q.   All right.

22          **MR. MARANGOLA:** At this time I'm going to read from

23  page 2 of the stipulation with respect to Government's

24  Exhibit 351, which is here.

25          Government Exhibit 351 is 40 wax paper envelopes

1 | with pirates with tan powder containing heroin seized during a
2 | controlled buy on July 21st, 2015.
3 |          The aggregate weight of the heroin is approximately
4 | 3.196 grams.
5 |          At this time, Your Honor, pursuant to the
6 | stipulation, I would offer Government Exhibits 348, 349, 350
7 | and 351.
8 |          **MR. VERRILLO:** No objection.
9 |          **THE COURT:** Exhibit 348, 349, 350 and 351 will be
10 | received.
11 |          (**WHEREUPON**, Government Exhibits 348-351 were
12 | received into evidence).
13 | **BY MR. MARANGOLA:**
14 | Q.   Now, if we could go back to Government's Exhibit 1?  So
15 | the person that you saw that day with the informant is in the
16 | third row.  Which picture?
17 | A.   So if you go from the left, it's the fourth picture from
18 | the left.  Directly above his photograph is Roberto Figueroa,
19 | the gentleman with the tattoos and the muscle type shirt on,
20 | the undershirt on.
21 | Q.   All right.  And Xavier Torres is wearing what color
22 | clothing in this photograph in Government's 1?
23 | A.   A brown colored shirt.
24 | Q.   He has a beard; is that right?
25 | A.   Yes.

Q.   Had you seen him before the buy on July 21st, 2015 that
you just testified about observing him with the informant?
Had you seen --

A.   On that date?

Q.   -- had you seen the defendant before that date?

A.   Before that date, oh, yes, I had seen him several times.

Q.   All right. Over what timeframe had you seen him?  You said
you had seen him several times.  Over what period of time?

A.   From the beginning months of 2015 up until the search
warrant.  I mean, I saw him after that also, but yeah, I saw
him several times prior to the search warrant.

Q.   All right.  And the search warrant you're talking about is
after this buy, correct?

A.   Yes.

Q.   Okay. And you saw him -- can you describe the area?  Where
did you see him on these occasions prior to the buy?

A.   I would see him on Burbank Street, I would see him on
North Clinton Avenue.  I believe there was one time I saw him
on Geneva Street.  Generally in that area.

Q.   All right.  Did you know his name at the time of the buy
on July 21st, 2015?

A.   I'm not sure if we -- if somebody had told us his name,
but I know we had not confirmed his name until the execution
of the search warrant on July 30th.

Q.   All right.  We're going to get to that in one minute.

1  The -- now, the CI purchased on this occasion July 21st, it

2  was 40 bags of heroin; is that right?

3  A.   Yes.

4  Q.   That was much more than the previous buys; is that

5  correct?

6  A.   That was, yes, that was more than the previous buys, yes.

7  Q.   Why did the CI purchase so many more on this occasion

8  July 21st, 2015, than the previous occasions?

9  A.   We directed the CI -- we started out buying -- buying --

10  excuse me, buying a small amount and then progressed on to

11  larger amounts to see if they sold that amount at those

12  locations.

13  Q.   You need a minute?  You okay?  Don't answer that.  Get

14  some more water.  I think I'll take some too.

15  A.   Sorry.

16         **MR. MARANGOLA:** Judge, I'm going to move on to some

17  descriptions of the search warrant with photos and other

18  exhibits.  I don't know if the Court wants to take a break

19  now.

20         **THE COURT:** We'll take a recess.  Ladies and

21  gentlemen, at this time we're going to stand in recess for

22  approximately 15, 20 minutes.  In the meantime, I'd ask you

23  not discuss the matter or allow anybody to discuss the matter

24  with you.  You can go out the back door with Ms. Rand, you'll

25  be escorted by the CSOs downstairs.  Thank you.

1                (**WHEREUPON**, there was a pause in the proceeding.)

2                (**WHEREUPON**, the defendant is present; the jury is

3  present).

4                **THE COURT:** Ready to proceed.  Members of the jury,

5  sorry about the delay.  We had some technical issues we were

6  trying to resolve during the break, so that's what took so

7  long.

8                You may continue.

9                **MR. MARANGOLA:** Thank you, Your Honor.

10 BY MR. MARANGOLA:

11 Q.   Investigator Briganti, you had just testified regarding a

12 number of buys involving 6 and 14 Burbank in July of 2015?

13 A.   Yes.

14 Q.   And you testified regarding the last one on July 21st that

15 you saw the defendant walk with the informant from 6 over to

16 14 Burbank?

17 A.   Yes.

18 Q.   Now, on any of the buys that you just testified about, did

19 you ever actually see the defendant hand drugs to the

20 informant?

21 A.   No.

22 Q.   Okay. All right. After those buys, based on that

23 information and other information, what did you do in

24 connection with the investigation?

25 A.   We obtained a search warrant for 6 Burbank Street.

1  Q.   All right.  And did you also continue to utilize the CI to

2  make additional buys?

3  A.   Yes.

4  Q.   All right.  When did you execute the search warrant at 6

5  Burbank Street?

6  A.   On July 30th of 2015.

7  Q.   All right. And were you present for the execution of the

8  search warrant at 6 Burbank on July 30th, 2015?

9  A.   Yes.

10 Q.   At this time if I could show you what is not in evidence

11 Government's Exhibit 90 -- oh, we need actually -- maybe you

12 can, since Ms. Rand isn't here, can you flip over the binder,

13 Investigator, that's in front of you?  That's a binder of the

14 exhibits.  Maybe we can start with that.  If you could go to

15 Exhibit 90 and 91?

16 A.   Okay.

17 Q.   All right. Have you looked at Exhibits 90 and 91?

18 A.   Yes.

19 Q.   And what are -- what do those two exhibits show?

20 A.   They show the front door at 6 Burbank Street and they show

21 the side door on the driveway side of 6 Burbank Street.

22 Q.   Do both of those photographs show the exterior of 6

23 Burbank as you just testified about fairly and accurately as

24 it existed on the day of the search warrant on July 30th,

25 2015?

1  A.   Yes.

2           **MR. MARANGOLA:** At this time I'd offer Government's

3  90 and 91.

4           **MR. VERRILLO:** No objection.

5           **THE COURT:** Exhibits 90 and 91 will be received.

6           (**WHEREUPON**, Government Exhibits 90-91 were received

7  into evidence).

8  **BY MR. MARANGOLA:**

9  Q.   Investigator, we have 90 up on the screen for the jury.

10  That's which door of 6 Burbank?

11  A.   That's the front door.

12  Q.   All right. And if we could show 91?  That's the side door

13  of 6 Burbank?

14  A.   Yes.

15  Q.   And as you're looking from the street at the house this is

16  on the left or right side?

17  A.   This door?

18  Q.   Yes.

19  A.   This door is on the right-hand side of the house.

20  Q.   As you're on the street looking at it, it's on the right

21  side of the house; is that correct?

22  A.   Yes.

23  Q.   Okay. Who was inside, if anyone, at the time of the raid

24  at 6 Burbank on July 30th, 2015?

25  A.   Xavier Torres and a female by the name of -- I believe her

1  name was Ziomara Rosado; and then there were two children

2  also.

3  Q.   All right.  I'd like to show you what is not in evidence

4  as Government's Exhibit 92.  It's not on your screen?  You

5  can't see anything?

6  A.   I was referring to the microphone.  It's not working.

7  Q.   Oh, the microphone.  Is the other microphone working?

8  A.   The other microphone works, yes.

9            **MR. MARANGOLA:**  Ms. Macri, can you hear okay?

10            **THE REPORTER:** Yes, thank you.

11  **BY MR. MARANGOLA:**

12  Q.   Investigator, we'll use the book right now maybe,

13  Exhibit 92 and 93.  If you could take a look at those?  Have

14  you seen those?

15  A.   Yes.

16  Q.   All right.  Can you tell us what's in Government's

17  Exhibit 92?

18  A.   Yes, that's Ziomara Rosado and the children sitting on the

19  sofa in Exhibit 92.

20            In Exhibit 93 is Xavier Torres sitting at the

21  dining room table inside 6 Burbank Street.

22  Q.   Do each of those photographs show the inside of 6 Burbank?

23  A.   Yes.

24  Q.   And each of them fairly and accurately show the occupants

25  of 6 Burbank on July 30th, 2015 at the time of the search

1  warrant?

2  A.   Yes.

3          **MR. MARANGOLA:** At this time I'd offer Government's

4  92 and 93.

5          **MR. VERRILLO:** No objection.

6          **THE COURT:** Exhibits 92 and 93 will be received.

7          (**WHEREUPON**, Government Exhibit 92-93 were received

8  into evidence).

9  **BY MR. MARANGOLA:**

10 Q.   If we could show Government's 92.  And Government's 93.

11 For the record, Investigator, the individuals shown in

12 Government's 93, do you see him in court today?

13 A.   Yes.

14 Q.   Would you point to him and describe what he's wearing?

15 A.   Sitting at the table, has a white button up shirt on, he

16 has short dark hair.

17 Q.   All right. Is that the person you previously identified as

18 the defendant?

19 A.   Yes.

20 Q.   And he's shown in Government's Exhibit 93?

21 A.   Yes.

22 Q.   All right.  After the team made entry at 6 Burbank on

23 July 30th, can you tell the jury what happened?  If you want

24 you can tip that binder cover down for now.  I don't know if

25 it will let you.  Tell us what happened after the team made

1  entry.

2  A.    After the entry photographs were taken of the interior and

3  exterior of the location, then the team began to search the

4  location for evidence.

5  Q.    Was there any evidence that was recovered during the raid

6  at 6 Burbank on July 30th, 2015?

7  A.    Yes.

8  Q.    Can you describe the evidence that was recovered during

9  that search warrant?

10 A.    Yes, so there was 13 bags of heroin, $3,300 in cash, there

11 were two Ruger rifle magazines, there were over 70 rounds of

12 .22 caliber ammunition, there was packaging materials for

13 narcotics which were scales, unused baggies, stamps, there was

14 also paperwork addressed to Ziomara Rosado and Xavier Torres

15 and there was also paperwork for Carlos Javier Figueroa and

16 Nisharya Gutierrez.

17 Q.    Who is Nisharya Gutierrez?

18 A.    Nishayra Gutierrez is Carlos Javier Figueroa's children's

19 mother.

20 Q.    All right.  You said two Ruger magazines.  When you say

21 "magazine," what do you mean?

22 A.    Clip for a Ruger rifle.  So that holds the bullets that

23 you would insert into a rifle.

24 Q.    For what caliber rifle were they?

25 A.    .22 caliber rifle.

1  Q.   The same caliber as the ammunition?

2  A.   Yes.

3  Q.   All right.  If you could look through Government's -- in

4  the binder there 94 to 105.

5  A.   Okay.

6  Q.   Okay.  Have you looked through those?

7  A.   Yes.

8  Q.   All right.  Do you recognize the photos marked

9  Government's 94 through 105?

10  A.   Yes, I do.

11  Q.   And generally are the photos of the inside of 6 Burbank

12  where evidence was collected on July 30th, 2015?

13  A.   Yes.

14  Q.   Do each of those photographs fairly and accurately show

15  those areas as they existed on July 30th, 2015?

16  A.   Yes.

17         **MR. MARANGOLA:** At this time I'd offer Government's

18  94 through and including 105.

19         **MR. VERRILLO:** I have no objection.

20         **THE COURT:** Exhibits 94, 95, 96, 97, 98, 99, 100,

21  101, 102, 103, and 104 and 105 will be received.

22         (**WHEREUPON**, Government Exhibits 94-105 were

23  received into evidence).

24  **BY MR. MARANGOLA:**

25  Q.   All right. Investigator, what are we looking at here in

1  Government's Exhibit 94?

2  A.    This is a photograph of the kitchen at 6 Burbank Street.

3  Q.    All right.  Was there any evidence recovered from the

4  kitchen at 6 Burbank Street during the search warrant?

5  A.    Yes.

6  Q.    Can you tell us first what was recovered and describe

7  where it was recovered from?

8  A.    Yes.  So there was $76 in cash that was on the counter, on

9  the kitchen counter.  There were four bags of heroin on top of

10 the refrigerator.  And there were $1,400 in cash in one of the

11 drawers, in the kitchen drawers.

12 Q.    All right. Let's go to -- I guess the monitor is still not

13 working.  Can you describe -- do you see in the photograph 94

14 any of the evidence that was recovered?

15 A.    Yes.

16 Q.    What do you see?

17 A.    I see the $76 in cash.  It's -- it's on the counter, the

18 counter is on the left side of the photograph.  There's a pack

19 of cigarettes and a yellow and red container.  It's right

20 between those two items.

21 Q.    All right.  And that's -- that was the $76 in cash?

22 A.    Yes.

23 Q.    All right.  The -- can you tell us where the kitchen

24 drawer was that the $1,400 was recovered from?

25 A.    Yes.  It's right in front of that.

1    Q.    There's a drawer in front of --

2    A.    Yes.

3    Q.    -- where the cash was?

4    A.    Yes.

5    Q.    Okay. All right. We can see the fridge in the photo where

6    there was heroin on top of; is that right?

7    A.    Yes.

8    Q.    All right. If we could go to Government's 95.  That's the

9    close-up of what?

10   A.    That's a close-up of the $76 in cash that was located on

11   top of the kitchen counter.

12   Q.    All right. And if we can go to Government's Exhibit 96.

13   What are we looking at in Government's Exhibit 96?

14   A.    There was the heroin that was located on top of the

15   refrigerator.

16   Q.    All right.  And specifically where is the heroin in this

17   photograph numbered 96?

18   A.    It's in the center of the photograph.  It's in a dark

19   ziplock baggie and inside that dark ziplock baggie were

20   smaller what are considered wax paper envelopes that contained

21   heroin.

22   Q.    All right. If we could go to Government's Exhibit 98.  And

23   do you recognize what's shown in Government's Exhibit 98?

24   A.    Yes.

25   Q.    And what's shown in Government's Exhibit 98?

1   A.   That's the drawer that there was $1,400 in cash in.

2   Q.   And where do you see the cash in the photograph?

3   A.   Yes.

4   Q.   Where is the cash in the drawer?

5   A.   At the front of the drawer, it's stacked up in front of

6   the drawer.  If you're looking at the front of the drawer from

7   the garbage can, it's to the left-hand side of the drawer.

8   Q.   All right.  And this drawer -- if we could go back to 94?

9   Is where in this photograph?

10  A.   In front of the money all the way at the end.  You can see

11  where the money is on the counter.

12  Q.   Yes.

13  A.   It's in -- the drawers are in front of that.  They're in

14  front of the countertop.  The drawer -- the actual drawer is

15  closest to the wall.

16  Q.   Closest to the wall and --

17  A.   Yes.  If you look at the money, there's drawers in front

18  of where the money is.  Those are the drawers.

19  Q.   Then you said the drawer we just observed is the one

20  closest to the wall?

21  A.   It's the one closest to the wall where the brick is, yes.

22  Q.   Okay. Near where the garbage can is?

23  A.   Yes.

24  Q.   If we could go back to 98.  That's the garbage can we saw

25  in the previous photo?

1    A.    Yes.

2    Q.    Okay. All right. Can we go to 97?  Do you recognize what's

3    shown in Government's Exhibit 97?

4    A.    Yes.  This is a lease agreement where the tenant's name is

5    Ziomara Rosado.  So it has her name on it and also has the

6    name of Carlos Javier Figueroa as the landlord of 6 Burbank

7    Street.

8    Q.    The name Carlos Figueroa as the landlord is where on the

9    lease?

10   A.    At the top, it's the very top and it has his address at

11   59 Fernwood Avenue, Rochester, New York 14621, and a telephone

12   number underneath that.

13   Q.    All right. We've just enlarged it.  It also states for

14   rental of the apartment located at 6 Burbank Street; is that

15   right?

16   A.    Yes.

17   Q.    And the beginning and end dates on the lease that was in

18   the house on July 30th, 2015, are those reflected on

19   Government's Exhibit 97?

20   A.    Yes, they are.

21   Q.    What's the lease period as documented in this lease?

22   A.    March 1st of 2015 to February 28th of 2016.

23   Q.    And the name for the tenant is Ziomara Rosado; is that

24   correct?

25   A.    Yes.

1   Q.   Was that the young lady we saw in the previous photograph

2   with the children?

3   A.   Yes.

4   Q.   Okay. Let's move to Government's Exhibit 99.  Do you

5   recognize what's shown in that?

6   A.   Yes.

7   Q.   Tell us what we're looking at.

8   A.   This bag contained nine bags of -- individual bags of

9   heroin.

10  Q.   That was also recovered from inside 6 Burbank on the day

11  of the search warrant?

12  A.   Yes.

13          **MR. MARANGOLA:** Your Honor, at this time I'd like to

14  read from the stipulation between the parties regarding

15  Exhibits 106 and 107.

16          Government's Exhibit 106, which I have here, is

17  four wax paper envelopes with red devils with tan powder

18  containing heroin seized from 6 Burbank Street, Rochester, New

19  York on July 30, 2015.

20          The aggregate weight of the heroin is approximately

21  0.144 grams.

22          And Government's Exhibit 107, which is right here,

23  is 50 methadone pills and nine yellow wax paper envelopes with

24  tan powder containing heroin seized from 6 Burbank Street,

25  Rochester, New York on July 30th, 2015.

1            The aggregate weight of the heroin is 0.306 grams.

2  **BY MR. MARANGOLA:**

3  Q.   Investigator, was the -- there was a quantity of methadone

4  pills recovered from that location as well?

5  A.   Yes.

6  Q.   That was a controlled substance that was also submitted to

7  property?

8  A.   Yes.

9            **MR. MARANGOLA:** Your Honor, at this time I'd offer

10 Government's 106 and 107.

11           **MR. VERRILLO:** No objection, Your Honor.

12           **THE COURT:** Exhibit 106 and 107 will be received

13 into evidence.

14           (**WHEREUPON**, Government Exhibits 106-107 were

15 received into evidence).

16 **BY MR. MARANGOLA:**

17 Q.   Investigator, you mentioned there was money and we saw a

18 picture of the money on the counter and then there was the

19 quantity of cash in the kitchen drawer.  Was there money

20 seized from any other location inside of 6 Burbank during the

21 search warrant?

22 A.   Yes.  There was $700 in cash in a safe in the master

23 bedroom.  There was $8 -- I believe it was $838 in a dresser

24 drawer in the upstairs bedroom.  And then approximately $370

25 in a drawer in a dresser that was actually in the hallway

1  right near the door of the attic.

2  Q.   All right. If we could go to Government's Exhibit 100.   Do

3  you recognize what's shown in Government's Exhibit 100?

4  A.   Yes.

5  Q.   What is that?

6  A.   That's the money that was found in the drawer in the

7  master bedroom.

8  Q.   All right. And how about Government's 101?

9  A.   That was the money.

10  Q.   What are we looking at in Government's 101?

11  A.   I'm sorry, that's the safe that was in the master bedroom.

12  The photograph shows the safe is open and inside of it is the

13  cash that was found.  I believe there was $700 in that safe.

14  Q.   All right. And if we can look at 102?  What are we looking

15  at in 102?

16  A.   That's the $370 that was located in the dresser drawer.

17  Q.   All right. And you testified that I think there was some

18  $3,300 and change recovered from the location?

19  A.   Yes, it was approximately $3,300.

20  Q.   And that's the aggregate of all those quantities?

21  A.   Yes.

22  Q.   Okay. Where was the drug trafficking paraphernalia that

23  you mentioned was recovered, where was that found?

24  A.   It was located in a blue bin in the attic.

25  Q.   All right. Was there drug trafficking paraphernalia

1   located anywhere else in the residence beside the blue bin in

2   the attic?

3   A.    Yes.

4   Q.    Where was that?

5   A.    On top of the cabinet in the -- in the dining room.

6   Q.    Okay. All right, let's start with the attic.  I'd like to

7   show you Government's 105.  Do you recognize what's in that

8   photograph?

9   A.    Yes.

10  Q.    All right.  And what are we looking at here?

11  A.    This was the blue bin that was located in the attic.

12  Inside the bin were new and unused glassine type baggies;

13  there was also a scale, a digital scale; and stamps.

14  Q.    All right. Now, was the attic at this house, was that

15  accessible from the upstairs?

16  A.    Yes.

17  Q.    Was it locked or secured in any way?

18  A.    No.

19  Q.    All right. So the -- if we could blow up the contents or

20  enlarge I guess the contents of 105 a little bit?  All right.

21  Investigator, you mentioned or can you point -- well, I guess

22  describe since we can't touch the screen, can you describe

23  some of the drug trafficking paraphernalia that you observed

24  in the enlarged area shown in Government's 105?

25  A.    Yes.  So it's kind of hard to see, but in the center of

1 that gallon size ziplock baggie are smaller baggies, there's

2 stacks of smaller ziplock style baggies.  They're actually

3 right next to the two items that one is in blue and one is

4 like a reddish pink color.

5 Q.   What are the reddish pink and blue items that you're

6 referring to?

7 A.   They're to the -- to the left side of the baggie.  Is that

8 what you're asking, where they were?

9 Q.   Yes.  And what they are.  Do you know what they are?

10 A.   I'm not certain what they are, no.

11 Q.   What else can you identify in the enlarged portion of

12 Government's 105?

13 A.   Towards the top near what looks like a bar of deodorant,

14 right underneath that is a digital scale, pocket scale.  And

15 right next to that scale, to the right side of that scale is a

16 stamp.

17 Q.   What is the -- can you blow it up even more?  Do you see

18 that portion that's enlarged there?

19 A.   Yes, I do.

20 Q.   All right.  What are we looking at in that portion, just

21 that portion alone?

22 A.   That's the scale; that's the box that the scale was in.

23 Q.   All right. And you see the word scale?  Is that written in

24 black letters?  You see that?

25 A.   Yes, I do.

1   Q.   All right.   If we can pull that out.   And then you said

2   the stamp was to the right of that scale?

3   A.   Yes.

4   Q.   If we could enlarge that area?   Is what's shown in this

5   enlargement here, the black and white object, what you're

6   referring to as the stamp?

7   A.   Yes.

8   Q.   All right. Now, why were these items collected and

9   photographed?

10   A.   These items were commonly used to package narcotics for

11   distribution, street level distribution.

12   Q.   All right.   If we could show you Government's Exhibit 93?

13   This is the dining room; is that right?

14   A.   Yes.

15   Q.   And you said there was drug trafficking paraphernalia

16   recovered in this room as well?

17   A.   Yes.

18   Q.   What was recovered here?

19   A.   There's a digital scale located on top of the cabinet

20   that's shown in this photograph.

21   Q.   Can you tell us is it visible in this photograph here or

22   is the area where it was recovered visible?

23   A.   The cabinet is visible, but the scale is not visible in

24   this photograph.

25   Q.   All right. Can you describe where in the photograph the

1  scale actually was recovered?

2  A.   Yes.  So on top of the cabinet, looks like there appears

3  to be like a stick that's on top of that cabinet.  It's right

4  near there.  It's right underneath where that is.

5  Q.   Okay. If we could go to Government's 103.  Tell us what

6  we're looking at here.

7  A.   That's the digital scale that was located on top of the

8  cabinet.

9  Q.   All right. So that's the second scale that was recovered

10 from 6 Burbank that day?

11 A.   Yes.

12 Q.   Do you recognize the stick type object next to it?

13 A.   I recognize the stick, yes.  It's the stick that's shown

14 in the photograph.

15 Q.   All right. And the one we just saw in Government's 93?

16 A.   Yes.

17 Q.   Okay. All right.  If we could go to 93.  Anything else

18 recovered in the dining room area where the defendant is

19 sitting in this photograph Government's 93?

20           **MR. VERRILLO:** Objection, leading.

21           **THE COURT:** Overruled.

22           **THE WITNESS:** Yes.  There was a shoebox that was

23 located inside of the -- inside of this cabinet.  Inside of

24 that shoebox contained the two Ruger rifle .22 caliber rifle

25 magazines.  And then 70 rounds of .22 caliber ammunition.

1  BY MR. MARANGOLA:

2  Q.   All right. If we could show you Government's 104.  Can you

3  tell us what we're looking at in Government's Exhibit 104?

4  A.   Yes.  Those are the two Ruger rifle magazines.

5  Q.   Where are the two clips?  Can you describe -- I know you

6  can't circle.  Can you describe them where they are and what

7  they look like?

8  A.   Yes.  So they're in the center of the box.  And one is

9  facing in one direction, facing towards the top of -- it is

10 facing to the left; the other one is in the opposite direction

11 facing to the right.  They're together, they're both black.

12 And one of them you can see a red portion of it at the top of

13 the magazine.

14 Q.   All right.  What else is in that same shoebox next to the

15 two Ruger magazines?

16 A.   A box of .22 caliber ammunition.

17 Q.   And approximately how many rounds of .22 caliber

18 ammunition were in that box?

19 A.   Approximately 70 rounds.

20 Q.   And that's the same type of -- that's the same caliber

21 ammunition those two clips were meant for; is that right?

22 A.   Yes.

23 Q.   Did you ever find the .22 caliber gun?

24 A.   No, we did not.

25 Q.   All right. And that shoebox with the clips and that ammo,

1  they were found in the cabinet shown here in Government's 93?

2  A.   Yes.

3  Q.   Is that right?

4  A.   Yes.

5  Q.   All right. If we could go back to Government's 100?  I

6  forgot to ask you.  Investigator, is there any -- you

7  mentioned previously there was paperwork with the defendant's

8  name on it; is that right?

9  A.   Yes.

10  Q.   Do you see any paperwork with the defendant's name on it

11  in Government's Exhibit 100?

12  A.   Yes, I do.

13  Q.   Can you describe where in the photograph it is?

14  A.   Yes.  So it's at the top right-hand corner of the

15  photograph.

16  Q.   All right.

17  A.   Right -- I mean yeah.

18  Q.   We just enlarged that portion of the photograph.  Can you

19  tell us what we're looking at here?

20  A.   Yes.  It appears to be a return address on the top of the

21  envelope that was located in that dresser drawer.

22  Q.   And can you read the name and address listed on the return

23  address portion of the white envelope shown here in

24  Government's 100?

25  A.   Yes.  It's Xavier Torres, 297 Prospect Street, Buffalo,

1   New York  14201.

2   Q.   All right. And for the first name it appears only the

3   A-V-I-E-R are visible; is that right?

4   A.   Appears like the bottom portion of the X is visible, and

5   then yes, correct, A-V-I-E-R is visible.

6   Q.   All right.  Investigator Briganti, was anyone arrested in

7   connection with the search warrant at 6 Burbank on July 30th,

8   2015?

9   A.   Yes.

10  Q.   Who?

11  A.   Xavier Torres.

12  Q.   All right. What charge was the defendant arrested for that

13  day?

14        **MR. VERRILLO:** Objection.

15        **THE COURT:** Overruled.  Go ahead.

16        **THE WITNESS:** He was arrested for criminal

17  possession of a controlled substance in the third degree.

18  **BY MR. MARANGOLA:**

19  Q.   All right. I'd like to ask you to take a look at

20  Government's Exhibit -- which is not in evidence --

21  Government's Exhibit 109.  Do you have 109 on your screen

22  there?

23  A.   I do.

24  Q.   All right.  And Government's 109 is a Certificate of

25  Conviction; is that right?

1    A.    Yes, it is.

2    Q.    And that's a certified copy of a Certificate of Conviction

3    from Rochester City Court, correct?

4    A.    Yes.

5    Q.    And that's for the People of the State of New York

6    vs. Who?

7    A.    Xavier Torres.

8    Q.    And what's the date of birth?

9    A.    11/7 of 1984.

10   Q.    All right. And does it list an arrest date on the -- I'm

11   sorry, incident date on Government's Exhibit 109?

12   A.    I'm sorry, did you say arrest date or incident date?

13   Q.    Incident date.  Thank you.

14   A.    Yes, it does.

15   Q.    What's the incident date?

16              **MR. VERRILLO:** Objection.

17              **THE COURT:** Overruled.  Go ahead.

18              **THE WITNESS:** July 30th, 2015.

19   **BY MR. MARANGOLA:**

20   Q.    That was the day of the execution of the search warrant at

21   the defendant's residence at 6 Burbank; is that right?

22   A.    Yes.

23              **MR. MARANGOLA:** At this time, Your Honor, I'd offer

24   the certified self-authenticating conviction -- Certificate of

25   Conviction marked Government's Exhibit 109.

1          **MR. VERRILLO:** Your Honor, I'd like to have a

2 sidebar on this issue.

3          **THE COURT:** Sure.

4          (**WHEREUPON**, a discussion was held at side bar out

5 of the hearing of the jury.)

6          **THE COURT:** Go ahead, Mr. Verrillo.

7          **MR. VERRILLO:** Your Honor, I just wanted to note

8 that I think the offer of this certificate is prejudicial to

9 my client in terms of his having a fair trial and I would

10 object to Exhibit 109.

11          **MR. MARANGOLA:** Judge, the Second Circuit has

12 affirmed on numerous occasions the admission of guilty pleas

13 to substantive narcotics offenses which occurred during the

14 conspiracy in which they're charged.  This conviction is based

15 on an incident of July 30th, 2015, it's within the scope of

16 the conspiracy, and it's an admission to possession of

17 narcotics that are the object of the conspiracy.  So I would

18 offer it.

19          **THE COURT:** It is certified?

20          **MR. MARANGOLA:** It is.

21          **THE COURT:** Yes, the objection is overruled.  109

22 will be received.

23          **MR. MARANGOLA:** Thank you.

24          (**WHEREUPON**, side bar discussion concluded.)

25          **THE COURT:** Exhibit 109 is received.

1                    (**WHEREUPON**, Government Exhibit 109 was received

2  into evidence).

3  **BY MR. MARANGOLA:**

4  Q.   All right. Investigator, we're looking at the Certificate

5  of Conviction; is that correct?

6  A.   Yes.

7  Q.   And under conviction type it says pled guilty; is that

8  right?

9  A.   Yes.

10 Q.   And for the conviction date it's October 8th of 2015; is

11 that right?

12 A.   Yes.

13 Q.   Okay. So we're clear, this is a Certificate of Conviction

14 for a criminal possession of a controlled substance in the

15 seventh degree; is that right?

16 A.   Yes, it is.

17 Q.   That was a misdemeanor?

18 A.   Yes.

19 Q.   Okay. The conviction date again was October 8th, 2015?

20 A.   Yes.

21 Q.   All right. And it indicates that the defendant pled guilty

22 and on the sentence highlight on the right portion indicates

23 imprisonment 45 days?

24 A.   Yes.

25 Q.   Okay. At this time I'd offer -- I'm sorry, I'd like you to

1  take a look at Government's Exhibit, which is not in evidence,

2  108.  And 108 is a multi-page document; is that right?  Or

3  multi-pages when you get there.

4  A.   Yes, it is.

5  Q.   Can you tell us what Government's Exhibit 108 is?

6  A.   Yes.  It's a transcript of the Xavier Torres pleading

7  guilty in state court.

8  Q.   What's the date of the transcript?  You see it on the

9  first page there?

10 A.   Yes, I do.  It's October 8th of 2015.

11 Q.   All right. If you can go to the last page of the exhibit?

12 Does that indicate it's a certified to be a true and accurate

13 transcript?

14 A.   Yes, it does.

15 Q.   All right.

16          **MR. MARANGOLA:** At this time, Your Honor, I'd offer

17 Government's 108 and the only portion of this that we're

18 offering, Judge, is the cover page regarding the attorney

19 appearance and the last page which indicates that it is a

20 certified true and accurate transcript of the proceedings.

21          **MR. VERRILLO:** Based on that limitation I would not

22 object.

23          **THE COURT:** 108 will be received for the cover sheet

24 and the last page which indicates certification.

25          (**WHEREUPON**, Government Exhibit 108 was received

1  into evidence).

2  **BY MR. MARANGOLA:**

3  Q.   Investigator Briganti, does it list the appearances of the

4  attorneys at that plea proceeding for the defendant?

5  A.   Yes, it does.

6  Q.   And who is the attorney listed for the defendant on

7  October 8th, 2015?

8  A.   Mark Young.

9  Q.   Are you familiar with attorney Mark Young?

10 A.   Yes, I am.

11 Q.   All right. How are you familiar with him?

12 A.   I've had cases with him over the course of my career.

13 I've seen him a number of times.

14 Q.   Okay. Can you describe him physically?

15 A.   Yeah, he's tall, thin, Caucasian male.

16 Q.   I can show you what's not in evidence as Government's

17 Exhibit 29.  Do you recognize the individual shown in

18 Government's Exhibit 29?

19 A.   Yes, I do.

20 Q.   And who is that?

21 A.   That's Mark Young.

22 Q.   The attorney that you mentioned?

23 A.   Yes.

24 Q.   All right. Does Government's Exhibit 29 fairly and

25 accurately show the person you know as attorney Mark Young?

```
1   A.    Yes.

2              MR. MARANGOLA: At this time I'd offer Government's

3   Exhibit 29.

4              MR. VERRILLO: Your Honor, I'd object on relevance

5   basis.

6              THE COURT: Sidebar.

7              (WHEREUPON, a discussion was held at side bar out

8   of the hearing of the jury.)

9              THE COURT: What's the relevance of this?

10             MR. MARANGOLA: Judge, the Government will establish

11  through cooperating witness testimony and corroborated by

12  other court documents that Mr. Young was the attorney that

13  Javi paid to represent members of the conspiracy when they

14  were arrested.  He represented Mr. Young (sic) in this

15  proceeding, he represented Obed Torres Garcia during an

16  arrest, and he represented Carlos -- I'm sorry, Jean Karlos

17  Pizarro, Yankee, during one of his state arrests as well, all

18  which will be proven up at the trial.

19             And, finally, the defendant when he spoke to law

20  enforcement in April of 2017 stated that Javi had an attorney

21  named Mark and he was a tall guy that he would get to

22  represent individuals.

23             So the fact that the witnesses will testify that

24  the head of the drug organization used one individual to

25  represent members of the drug organization when they were
```

1    arrested establishes and supports their participation together

2    in a conspiracy.

3              **THE COURT:** Mr. Verrillo?

4              **MR. VERRILLO:** Your Honor, the evidence has come in

5    that Mr. Young was the attorney.  I don't think a picture is

6    necessary.

7              **MR. MARANGOLA:** Other witnesses will identify the

8    picture as well.

9              **THE COURT:** Okay.  The objection is overruled.  It

10   will be admitted subject to connection of course.

11             **MR. MARANGOLA:** Thank you.

12             (**WHEREUPON**, side bar discussion concluded.)

13             **THE COURT:** Objection is overruled.  Exhibit 29 will

14   be received subject to connection.

15             (**WHEREUPON**, Government Exhibit 29 was received into

16   evidence).

17   **BY MR. MARANGOLA:**

18   Q.   All right. If we could go to show Government's Exhibit 35.

19   Oh, sorry, we never published 29.  Paula, would you publish

20   29?

21             All right. Can we now go to Government's

22   Exhibit 35, which is in evidence?  Investigator Briganti, a

23   couple of weeks after this search warrant that you just

24   testified about at 6 Burbank was there another search warrant

25   that was executed at a house on Burbank Street?

A.    Yes.

Q.    And which house?

A.    At 11 Burbank Street.

Q.    Is that the house shown on Government's 35 with the 11
over it?

A.    Yes, it is.

Q.    All right. What date was the search warrant conducted at
11 Burbank?

A.    It was on August 12th of 2015.

Q.    All right.  And can you describe generally what
information or a portion of the information that was used to
obtain the search warrant for 11 Burbank on August 12th, 2015?

A.    Yes.  So we received information from a confidential
informant that there was a large quantity of --

          **MR. VERRILLO:** Objection.

          **THE WITNESS:** -- heroin.

          **MR. VERRILLO:** Objection.

          **THE COURT:** Hang on, there's an objection.

          **MR. VERRILLO:** Hearsay.

          **THE COURT:** Basis?

          **MR. VERRILLO:** It's hearsay, objection hearsay.

          **THE COURT:** Overruled.  Go ahead.

          **THE WITNESS:** That there was a large quantity of
heroin and cocaine located inside the residence.

**BY MR. MARANGOLA:**

Q.   All right. The informant gave you the information about the drugs being present inside 11 Burbank was who?

A.   His name was Jose Figueroa, he also went by the street name of Che Che.

Q.   All right.  I'd like to show you what is not in evidence as Government's Exhibit 19.  Do you recognize the individual shown in Government's 19?

A.   Yes, I do.

Q.   And who is that?

A.   That's Jose Figueroa also known as Che Che.

Q.   All right.  And was he an individual who was providing you information?

A.   Yes, he was.

Q.   And was a portion of the information that you used to obtain the search warrant at 11 Burbank based on information he provided you?

A.   Yes.

Q.   All right.

         **MR. MARANGOLA:** At this time I'd offer Government's Exhibit 19.

         **MR. VERRILLO:** No objection.

         **THE COURT:** Exhibit 19 will be received in evidence.

         (**WHEREUPON**, Government Exhibit 19 was received into evidence).

**BY MR. MARANGOLA:**

1    Q.   Were you present for the search of 11 Burbank on

2    August 12th, 2015?

3    A.   Yes.

4    Q.   If we could show you what is not in evidence as

5    Government's Exhibit 45.  Do you recognize any of the houses

6    shown in Government's Exhibit 45?

7    A.   Yes.  So the house in the middle of the photograph, it's

8    white at the bottom and like greenish at the top, is 11

9    Burbank Street.

10   Q.   Does Government's Exhibit 45 fairly and accurately show

11   that location as it existed during the investigation?

12   A.   Yes, it does.

13   Q.   All right.

14              **MR. MARANGOLA:** At this time I'd offer Government's

15   45.

16              **MR. VERRILLO:** No objection.

17              **THE COURT:** Exhibit 45 will be received.

18              (**WHEREUPON**, Government Exhibit 45 was received into

19   evidence).

20   **BY MR. MARANGOLA:**

21   Q.   If I could show you -- for the record here in Government's

22   45, 11 Burbank is the house in the center of the photograph;

23   is that right?

24   A.   Yes, it is.

25   Q.   I'd like to show you what's not in evidence as

1  Government's Exhibit 114.  Do you recognize what's shown in
2  Government's 114?
3  A.   Yes.
4  Q.   What is it?
5  A.   It's a close-up view of the front porch and the number 11
6  attached to the post on the porch.
7  Q.   Of 11 Burbank?
8  A.   Yes.
9  Q.   And does there also appear to be a portion of a patrol
10 officer in the bottom left corner of that photograph?
11 A.   Yes, there does.
12 Q.   Do you know what day Government's Exhibit 114 was taken?
13 A.   Yes, it was taken the day of the search warrant on
14 August 12th of 2015.
15 Q.   Does Government's 114 fairly and accurately show the
16 exterior as it existed -- exterior of 11 Burbank as it existed
17 on the day of the search warrant on August 12th, 2015?
18 A.   Yes.
19          **MR. MARANGOLA:** At this time I'd offer Government's
20 114.
21          **MR. VERRILLO:** No objection.
22          **THE COURT:** Exhibit 114 will be received.
23          (**WHEREUPON**, Government Exhibit 114 was received
24 into evidence).
25 **BY MR. MARANGOLA:**

1  Q.    Investigator Briganti, can you describe generally the

2  location of 11 Burbank?

3  A.    Yes.  So the location is on the south side of Burbank

4  Street.  Has a front door and a rear door to it.  There's a

5  door in the back.  Inside the location there wasn't -- not

6  very much furniture.  There was mattresses that were on the

7  floor.  Appeared there wasn't a lot of food or clothing inside

8  the location, so it didn't appear that anyone lived at the

9  location for any period of time.

10  Q.    What happened during the execution of the search warrant

11  at 11 Burbank on August 12th, 2015?

12  A.    So when we approached the location we went to the rear of

13  the location, the back door.  When we came around the corner

14  of the building, there was an individual standing in the

15  doorway by the name of Reynaldo Figueroa.

16              As we walked up the stairs Reynaldo Figueroa fled

17  into the house.  We pursued him into the house and observed

18  him throw one of those fanny packs that he had around his

19  waist.  He threw it on the floor.  We apprehended him inside;

20  he was inside along with three other individuals.

21  Q.    Who else was inside?

22  A.    So Raphael Rodriguez, Rafi, was inside; Jonathan Gonzalez

23  also known as Flaco or Palito, he was inside; then Jose

24  Figueroa, again also known as Che Che, he was inside.

25  Q.    If we could show you Government's Exhibit 1.  Show us on

1    Government's Exhibit 1 if any of the individuals shown there
2    were inside the house at 11 Burbank during the execution of
3    the search warrant.  If you can describe the clothing they're
4    wearing.
5    A.   Okay.  The bottom row from the left, the individual with
6    the blue hooded sweatshirt on, dark hair, that's Raphael
7    Rodriguez, Rafi, he was inside the location.
8              And then to his immediate right is Jonathan
9    Gonzalez.  He has the red shirt on, small goatee and dark
10   hair.
11   Q.   All right. And then you indicated there was Reynaldo
12   Figueroa as well as Jose Figueroa also known as Che Che?
13   A.   Yes.
14   Q.   All right.  Was there any evidence seized during the
15   execution of the search warrant at 11 Burbank?
16   A.   Yes.  There was over 100 bags of cocaine, over 150 bags of
17   heroin, I believe there was $1,160 in cash, some cell phones,
18   and a drug ledger.
19   Q.   All right. At this time I'd ask you to go through using
20   your binder Government's 115 through 132.
21   A.   Okay.
22   Q.   Have you reviewed those?
23   A.   I did.
24   Q.   Do Government's 115 through 132 fairly and accurately show
25   the occupants and the evidence that was inside at 11 Burbank

1   during the execution of the search warrant on August 12th,

2   2015?

3   A.   Yes, shows some of the occupants and then the evidence

4   that was recovered, yes.

5   Q.   Okay. It doesn't show all the occupants, correct?

6   A.   Correct.

7   Q.   Which occupant does it not -- which occupant is not shown

8   in those photographs?

9   A.   Jose Figueroa, Che Che is not shown in here.

10  Q.   All right.  Now the photographs 115 through 132, those

11  were photos taken during the time of the search warrant; is

12  that right?

13  A.   Yes.

14  Q.   Was there a photo taken of Che Che during the execution of

15  that search warrant?

16  A.   Not that I'm aware of.

17  Q.   All right.  And was there -- what was the reason that the

18  other occupants were photographed but that Che Che was not

19  photographed in connection with the execution of that warrant?

20  A.   Because Che Che was working with us, he was inside that

21  location to gather information for us.  The other individuals

22  were suspects in this case.

23  Q.   All right. Was Che Che arrested that day?

24  A.   No, he was not.

25  Q.   Okay. The other individuals that you mentioned who were

1 present in the house, were they arrested that day?

2 A.   Two of the four individuals were arrested, yes.

3 Q.   Okay. In any event, of the photos that are there, 115

4 through 132, do they fairly and accurately show the occupants

5 that are in the photos and the evidence that was seized during

6 the execution of the warrant that day?

7 A.   Yes, they do.

8           **MR. MARANGOLA:** At this time I'd offer Government's

9 115 through and including 132.

10           **MR. VERRILLO:** Your Honor, if I could just have one

11 moment?  No objection.

12           **THE COURT:** Exhibit 115, 116, 117, 118, 119, 120,

13 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, and 132

14 will be received.

15           (**WHEREUPON**, Government Exhibits 115-132 were

16 received into evidence.)

17 **BY MR. MARANGOLA:**

18 Q.   Investigator Briganti, before we get into those photos,

19 the person in the blue sweatshirt here shown in Government's

20 Exhibit 1, is the individual you identified as Rafi earlier?

21 A.   Yes.

22 Q.   He was present during the search warrant at 11 Burbank on

23 April 22nd -- I'm sorry, on August 12th, 2015; is that right?

24 A.   Yes.

25 Q.   Is that the same or different person that was also present

1  during the raid on April 22nd, 2015 across the street at 14

2  Burbank?

3  A.   Same person.

4  Q.   Okay. All right.  If we could go now to Government's 115?

5  Can you tell us what we're looking at here?

6  A.   Yeah, this is a photo showing the front door of 11 Burbank

7  Street and one of the officers that assisted in the execution

8  of the search warrant standing in the door; then an individual

9  sitting on the floor next to the door who was Jonathan

10  Gonzalez also known as Flaco or Palito.

11  Q.   All right.  And he was the individual shown in

12  Government's Exhibit 1 that you previously identified?

13  A.   Yes.

14  Q.   Do you remember what color shirt he was wearing in

15  Government's Exhibit 1?

16  A.   Red.

17  Q.   He's the one next to Rafi in Government's Exhibit 1?

18  A.   Yes.

19  Q.   Okay. All right. If we could go to the next photograph

20  116?  Can you tell us what we're looking at here?

21  A.   Yes, so this is the kitchen at 11 Burbank Street.  And

22  also shows the -- the rear door, the one we actually entered

23  the location through.  And then an individual lying on the

24  floor in the kitchen, that's Raphael Rodriguez.

25  Q.   Rafi?

1  A.    Rafi.

2  Q.    And he's laying on the floor there.  There's something

3  appears to be wrapped around his shins, is it?

4  A.    Yes.

5  Q.    All right. Can you tell us -- let's go to the next

6  photograph 117.  Can you tell us what we're looking at here?

7  A.    Yes.  This is a photograph of the fanny pack, the black

8  and blue fanny pack Reynaldo Figueroa threw when he -- when he

9  ran through the house.

10  Q.    That's the black object in the middle of the photograph we

11  just enlarged; is that right?

12  A.    Yes.

13  Q.    Can we go to Government's 118?  And what are we looking at

14  in 118?

15  A.    So in this photograph Raphael Rodriguez, Rafi, was placed

16  in a chair in one of the rooms and there's a mattress propped

17  up behind him in that room.

18  Q.    Why was he placed in that chair?

19  A.    Because he had a debilitating disease of his legs.  He

20  complained of his legs, so we put him in a chair.

21  Q.    Do you know what was -- can you describe what you observed

22  in terms of the condition of his legs?

23  A.    Well, on this particular date all I could tell you his

24  legs were wrapped, but I had seen his legs prior to this.

25  Q.    On other occasions you had seen his legs?

1   A.   Yes.

2   Q.   Can you describe what you observed when you saw his legs

3   on those other occasions?

4   A.   Yes.  He had like a flesh eating disorder on his legs.

5   So, I mean, the flesh was actually gone on his legs right down

6   to the bone, some places right down to the bone.

7   Q.   Okay. Can we go to Government's Exhibit 119?  What are we

8   looking at in Government's Exhibit 119 here?

9   A.   This is money that was taken that Raphael Rodriguez

10  possessed at the time of the search warrant.

11  Q.   All right. And did he have anything else in his pockets at

12  the time?

13  A.   Yes, he had heroin in his pockets also.

14  Q.   All right. At this time -- he had the cash as well as a

15  quantity of drugs in his pocket as well?

16  A.   Yes.

17  Q.   This is a photograph of those items being removed from his

18  pocket; is that correct?

19  A.   Yes.

20          **MR. MARANGOLA:** At this time I'd like to read from

21  the stipulation between the parties regarding Government's

22  Exhibit 135, which is right here.

23          Government's Exhibit 135 was seized from 11 Burbank

24  Street Rochester, New York on August 12th, 2015.  Government

25  Exhibit 135 contains 28 plastic bags with white powder

1  containing cocaine.

2          The aggregate weight of the cocaine is

3  approximately 0.868 grams.

4          Government Exhibit 135 also contains 40 wax paper

5  envelopes with pirates with tan powder containing heroin.

6          The aggregate weight of the heroin is 1.6 grams.

7  **BY MR. MARANGOLA:**

8  Q.   All right. If we can go to the next photograph 120?  What

9  are we looking at in 120?

10 A.   This is a sandwich type baggie that was knotted at the top

11 and inside that baggie contains some smaller baggies that

12 contained narcotics.

13 Q.   All right. And if we could go to Government's 121?  Can

14 you tell us what we're looking at in Government's 121?

15 A.   Yes, those are drug ledgers that were right on a drawer.

16 Q.   Inside 11 Burbank?

17 A.   Yes.

18 Q.   And there appear to be different columns on those pieces

19 of paper; is that right?

20 A.   Yes.

21 Q.   And numbers and letters; is that right?

22 A.   Yes.

23 Q.   All right. Can we go to the next photograph 122?  What are

24 we looking at here?

25 A.   Those are two ziplock style baggies, smaller ziplock style

1   baggies, that contain a white residue inside each one of them.

2   There's also a hyperdermic needle cap to the top of the

3   photograph.

4   Q.   All right. And 123.   And 124.   And 125.   And 126.   Each of

5   those photographs that we just saw, those are different rooms

6   inside 11 Burbank at the time of the search warrant; is that

7   right?

8   A.   Yes.

9   Q.   Those show the condition of the premises at the time of

10  the search warrant?

11  A.   Yes.

12  Q.   All right. Let's go to 127.   What are we looking at in

13  Government's 127?

14  A.   That's the drugs that were contained -- the cocaine and

15  heroin that were contained inside of the blue and black fanny

16  pack Reynaldo Figueroa threw inside of 11 Burbank Street.

17  Q.   All right.   And if we could go to 128?   Actually, I'm

18  sorry, before we move out of there, can we enlarge the portion

19  of the bag for a moment?   Investigator Briganti, do you see

20  the enlarged portion of this photograph here?

21  A.   Yes.

22  Q.   And can you tell us do you recognize any -- can you

23  describe the stamp you see on the bags in there?

24  A.   Yeah, there's a pirate on the bag on those bags.

25  Q.   That was inside the fanny pack?

1  A.    Yes.

2  Q.    Okay. Can we go to the next photograph?

3  A.    Just -- I'm sorry, Mr. Marangola.

4  Q.    You want to go back to 127?

5  A.    Yes.  So you refer to this as a stamp.  And oftentimes the

6  bags would -- there wasn't a stamp on the bag.  It was a bag

7  that was -- that had come from the factory with it on it.  So

8  it was purchased that way.  So this isn't a stamp.  This is

9  a -- this is a bag that was purchased with those -- those

10 designs on the bag.

11 Q.    Okay. So that --

12 A.    Which is different than some of the bags that actually had

13 a stamp on the bag.

14 Q.    Okay. All right. So that design is on the bag, but it

15 wasn't a stamped design; fair to say?  It wasn't stamped on

16 the bag?

17 A.    Correct.

18 Q.    Okay. Thank you.  All right, let's go to 128.  What are we

19 looking at here?

20 A.    This is the cash that was located inside the blue fanny

21 pack Reynaldo Figueroa threw, the same fanny pack that the

22 drugs were in.

23 Q.    All right. Approximately -- do you recall approximately

24 how much cash was seized?

25 A.    I believe there was $1,160 in cash.

1    Q.   All right. If we can go to Government's Exhibit 129?   And

2    what are we looking at in Government's 129?

3    A.   Again that's a drug ledger that was located inside of the

4    fanny pack.

5    Q.   All right.   Then if we could go to Government's 131?   What

6    are we looking at here?

7    A.   That's just a photograph of the fanny pack and then the

8    contents, the drug contents of the fanny pack that were taken

9    out to be photographed.

10   Q.   All right.   If we could enlarge the drugs there?   Now, the

11   pirate design, do you see that on any of these bags?

12   A.   I do.

13   Q.   And which of the bags had that pirate design on there?

14   A.   So there's a larger black colored glassine baggie.   Inside

15   of that glassine baggie -- or inside that glassine baggie were

16   ten wax paper envelopes, and you can see those I guess towards

17   the -- when you blow it up, towards the right-hand side of

18   that screen, those have the pirate design on the bag.

19   Q.   All right. Do you see any other designs on bags in the

20   enlarged portion of Government's 131?

21   A.   Yes, there's a -- there's bags to the left-hand side and

22   there's a red design on those bags, but I can't tell what they

23   are.

24   Q.   Okay. All right.

25           **MR. MARANGOLA:** Your Honor, at this time I'd like to

1  read from the stipulation regarding Government's Exhibit 134,

2  which is right here.

3  **BY MR. MARANGOLA:**

4  Q.   Investigator, did you take into custody -- before I read

5  from the stipulation, did you take into custody both the fanny

6  pack as well as the narcotics that were seized from it?

7  A.   Yes, sir.

8  Q.   All right.  Is that contained in this evidence bag here

9  marked Government's Exhibit 134?

10  A.   Yes, it is.

11           **MR. MARANGOLA:** All right, if I could read from the

12  stipulation between the parties which states that Government

13  Exhibit 134 was seized from 11 Burbank Street, Rochester, New

14  York on August 12th, 2015.

15           Government Exhibit 134 contained 76 plastic bags

16  with white powder containing cocaine.

17           The aggregate weight of the cocaine is

18  approximately 2.508 grams.

19           Government Exhibit 134 also contains 114 wax paper

20  envelopes with pirates with tan powder containing cocaine --

21  I'm sorry, tan powder containing heroin.

22           The aggregate weight of the heroin is approximately

23  4.964 grams.

24  **BY MR. MARANGOLA:**

25  Q.   So, Investigator, the total number of bags of heroin and

1    cocaine that you seized were ballpark what during that search

2    warrant?

3    A.    There were over 100 bags of cocaine, and over 150 bags of

4    heroin.

5    Q.    All right.

6              **MR. MARANGOLA:** At this time I'd offer Government's

7    134 and 135.

8              **MR. VERRILLO:** No objection.

9              **THE COURT:** Exhibits 134 and 135 will be received.

10              (**WHEREUPON**, Government Exhibits 134-135 were

11    received into evidence).

12    **BY MR. MARANGOLA:**

13    Q.    If we could go to Government's 130?  What are we looking

14    at in this photograph?

15    A.    It's a photograph of one of the mattresses that was in the

16    room and some of the items that were located on the mattress,

17    one of which is a cellular telephone.  It's right in the

18    center of the photograph near the eye of the Minion character.

19    Q.    That's a flip phone there in the center of that

20    photograph?

21    A.    Yes.

22    Q.    All right.

23              **MR. MARANGOLA:** At this time I'm going to read from

24    page 10 of the stipulation between the parties regarding

25    Government Exhibit 137, which is right here.

1              Government Exhibit 137 is a black Kyocera,

2    K-Y-O-C-E-R-A, flip phone with phone number 585-851-6540 that

3    was seized from 11 Burbank Street, Rochester, New York on

4    August 12th, 2015.

5              Government Exhibit 137A is the device data report

6    containing the data forensically retrieved from Government

7    Exhibit 137.

8              At this time, Your Honor, I'd offer Government's

9    Exhibit 137 and 137A.

10             **MR. VERRILLO:** No objection.

11             **THE COURT:** Exhibit 137 and 137A will be received.

12             (**WHEREUPON**, Government Exhibit 137 and 137A were

13   received into evidence).

14   **BY MR. MARANGOLA:**

15   Q.   At this time we're displaying Government's 137A, the

16   extraction from the flip phone, Kyocera flip phone from 11

17   Burbank.  I'd like to go to the page with the contacts.  All

18   right, Investigator, do you see, first of all, on the very

19   first page at the top it states my phone number?

20   A.   Yes.

21   Q.   And it says 585-851-6540; is that right?

22   A.   Yes.

23   Q.   Then if we can go below it to the next one in the

24   contacts.  Can you read starting at the top the contacts that

25   are in red and then the contact that's in white at the bottom?

1  A.    Yes.  So the first contact says Canales; second one says

2  Danny El Oso; third one down says Doug; the next one says

3  Flanbo; the next one is Gringo; and the one that's highlighted

4  in white with blue says Javi.

5  Q.    All right.  If we could go to the next -- keep going

6  through those contacts.  Do you see the next contacts -- I

7  won't ask you to read the first one, appears to be in Spanish;

8  is that right?

9  A.    Yes.

10  Q.    I think the second one is too; is that right?

11  A.    Yes.

12  Q.    What's the next one after that?

13  A.    My love.

14  Q.    And then after that?

15  A.    Nena.

16  Q.    Then?

17  A.    Nick.

18  Q.    What's the last one?

19  A.    P.

20  Q.    What's the number associated with P?

21  A.    585-230-5812.

22  Q.    All right.  If we can keep going down?  And what's the

23  contact after P that's in white with blue?

24  A.    Pepe.

25  Q.    And what's the number there?

1  A.    585-489-2759.

2  Q.    All right.  If we can keep going?  You see there's some

3  more contacts in red including Rey and Reyna; is that right?

4  A.    Yes.

5  Q.    And Radio?

6  A.    Yes.

7  Q.    Is there a street by any of those names in the area?

8  A.    Yes, there's a street by the name of Radio Street.

9  Q.    Okay. And what's the contact -- the last contact there in

10 white with blue?

11 A.    Ron.

12 Q.    R-O-N?

13 A.    R-O-N, Ron.

14 Q.    And what's the number?

15 A.    585-590-1860.

16 Q.    Okay. All right. And the last photograph -- if we could

17 move, too, from this search warrant was 132.  And that's a

18 photograph of what?

19 A.    That's a photograph of Reynaldo Figueroa and the cash that

20 was removed from Reynaldo Figueroa's pocket along with a drug

21 ledger.

22 Q.    All right.

23         **MR. MARANGOLA:** Your Honor, I see it's a little

24 after 12:30.

25         **THE COURT:** Good time to break.

1          **MR. MARANGOLA:** Thank you.

2          **THE COURT:** Ladies and gentlemen, at this time we're

3 going to recess until 9:30 tomorrow morning.  You can report

4 again directly downstairs.  You'll hear me say this every

5 break and at the end of every day, it's important you not

6 discuss the matter or allow anybody to discuss the matter with

7 you.

8          Jury may step down, stand in recess until 9:30

9 tomorrow morning.  Have a good day.

10         (**WHEREUPON**, the jury was excused).

11         **THE COURT:** Thank you have a good day.

12         **MR. MARANGOLA:** Thank you, Judge.

13         (**WHEREUPON**, proceedings adjourned at 12:34 p.m.)

14                    *    *    *

15              **CERTIFICATE OF REPORTER**

16

17         In accordance with 28, U.S.C., 753(b), I certify that

18 these original notes are a true and correct record of

19 proceedings in the United States District Court for the

20 Western District of New York before the Honorable Frank P.

21 Geraci, Jr. on October 19th, 2021.

22

23 S/ Christi A. Macri

24 Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
   Official Court Reporter
25