1                UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF NEW YORK

3

4

5    - - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA              18-CR-6094(G)
6
     vs.
7                                          Rochester, New York
     XAVIER TORRES,                        October 20, 2021
8            Defendant.                    8:30 a.m.
     - - - - - - - - - - - - - -X
9                                          **VOLUME 2**

10

11                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
12                 UNITED STATES DISTRICT JUDGE

13                    JAMES P. KENNEDY, JR., ESQ.
                      United States Attorney
14                    BY: ROBERT A. MARANGOLA, ESQ.
                          CASSIE M. KOCHER, ESQ.
15                    Assistant United States Attorneys
                      500 Federal Building
16                    Rochester, New York 14614
                      Appearing on behalf of the United States
17

18                    MAURICE J. VERRILLO, ESQ.
                      3300 Monroe Avenue
19                    Suite 301
                      Rochester, New York 14618
20                    Appearing on behalf of the Defendant

21

22

23
     COURT REPORTER:       Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
24                         Christimacri50@gmail.com
                           Kenneth B. Keating Federal Building
25                         100 State Street, Room 2640
                           Rochester, New York 14614

1                                    I N D E X
WITNESS FOR THE GOVERNMENT
2
Joseph Briganti
3        Direct examination by Mr. Marangola          Page 122
         Cross-examination by Mr. Verrillo            Page 208
4        Redirect examination by Mr. Marangola        Page 235

5    EXHIBIT                    RECEIVED

6    Government 142-144         134
     Government 145-146         135
7    Government 149             137
     Government 147             139
8    Government 152-153         140
     Government 156,156A        142
9    Government 157, 157A       142
     Government 161             143
10   Government 160             144
     Government 174-176         147
11   Government 181             151
     Government 51-52           153
12   Government 48              155
     Government 235             156
13   Government 236             157
     Government 234             159
14   Government 20              161
     Government 22              162
15   Government 24              163
     Government 23              164
16   Government 37              172
     Government 303             173
17   Government 304-307         175
     Government 312             177
18   Government 285-297         179
     Government 327-332         183
19   Government 316-323         189
     Government 313             191
20   Government 54-55           193
     Government 16              195
21   Government 53              196
     Government 335             197
22   Government 57              199
     Government 43              200
23   Government 269-275         202
     Government 59-60           205
24   Government 62              206
     Government 63              207
25   Government 38              207
     Government 278             208

<u>**P R O C E E D I N G S**</u>

\*     \*     \*

1

2

3        (**WHEREUPON**, the defendant is present).

4        **THE COURT:** Good morning.

5        **MR. MARANGOLA:** Good morning, Judge.

6        **MS. KOCHER:** Good morning.

7        **MR. VERRILLO:** Good morning, Your Honor.

8        **THE COURT:**  Anything before we begin?

9        **MR. MARANGOLA:** No, Your Honor.

10        **MR. VERRILLO:** No, Your Honor.

11        **THE COURT:** Bring the jury out.

12        (**WHEREUPON**, the jury is present).

13        **THE COURT:** Good morning, members of the jury.

14   Ready to proceed, you may continue.

15        **MR. MARANGOLA:** Thank you, Your Honor.

16   **BY MR. MARANGOLA:**

17   Q.   Good morning, Investigator Briganti.

18   A.   Good morning.

19   Q.   I'm going to remind you that you're still under oath,

20   okay?

21   A.   Yes, sir.

22   Q.   All right. Yesterday we talked about a number of events in

23   2015 in connection with your investigation.  If we could pull

24   up Government's Exhibit 35?  I think you talked yesterday

25   about some search warrants that occurred on Burbank Street.

1  Do you recall that?

2  A.   Yes.

3  Q.   And one of those search warrants occurred on July 30th,

4  2015 at 6 Burbank I believe you testified?

5  A.   Yes.

6  Q.   All right. Was there another search warrant that was

7  anticipated to be executed on that same day July 30th, 2015?

8  A.   Yes.

9  Q.   At what location?

10  A.   14 Burbank Street.

11  Q.   And was that going to be at the same time and same day as

12  the warrant was going to be executed at 6 Burbank?

13  A.   Yes.

14  Q.   Can you tell us what happened in connection with 14

15  Burbank on July 30th, 2015?

16  A.   Yes.   There was an indication that individuals inside of

17  14 Burbank Street had observed the surveillance team, the SWAT

18  team surveillance team.   So once the SWAT time hit the house,

19  entered the location, observed the toilet was running and it

20  appeared any evidence was flushed down the toilet.   So there

21  was no search, there was no continuous -- we didn't continue a

22  search there, we went down to 6 Burbank Street.

23  Q.   That's when you executed a warrant at 6?

24  A.   They were entered simultaneously, the entry team hadn't

25  entered into 6 Burbank Street until we went -- the search team

1    hadn't entered in until our team went down and we all entered

2    together.

3    Q.    After being at 14?

4    A.    Yes.

5    Q.    So by the time you got into 14 were there any occupants

6    inside 14?

7    A.    There were three occupants inside.

8    Q.    Who were the individuals inside 14 Burbank when the team

9    entered?

10   A.    Raphael Rodriguez, also known as Rafi; Reynaldo Rodriguez,

11   who is known as Green Eyes; and than Jonathan Gonzalez - Flaco

12   or Palito, he was inside also.

13   Q.    There was no full search done of the premises based on the

14   observations of the toilet running and the rest of the

15   condition of the location; is that right?

16   A.    Yes, the house was bare other than we could see the toilet

17   was running.

18   Q.    Okay. If we could pull up Government's Exhibit 1?  Are any

19   of the individuals that were in the house at 14 Burbank on

20   July 30th, 2015, are they shown in Government's Exhibit 1?

21   A.    Yes.

22   Q.    And I think -- I believe the touch screen is working

23   today, maybe you can touch over the photo and identify who was

24   in the location at 14 Burbank on July 30th, 2015?

25   A.    So this person, this is Raphael Rodriguez, also known as

1  Rafi; and this is Jonathan Gonzalez, also known as Flaco or

2  Palito.

3  Q.    All right. For the record you've circled the bottom two

4  photographs on the left of Government's Exhibit 1; is that

5  correct?

6  A.    Yes, sir.

7  Q.    All right. Now, were any of the individuals who were in 14

8  Burbank on July 30th, 2015, caught during any other search

9  warrants in connection with your vehicles?

10  A.    The three individuals that I just mentioned -- Raphael

11  Rodriguez - Rafi; Jonathan Gonzalez - Flaco; and Reynaldo

12  Figueroa - Green Eyes, they were all in 11 Burbank Street on

13  August 12th, 2015 when we executed that search warrant.

14  Q.    All right. That was one of the warrants you described

15  yesterday in your testimony; is that right?

16  A.    Yes.

17  Q.    All right. If you can clear your mark?  Thank you.  We'll

18  put up Government's Exhibit 35 again.  Did you continue to

19  investigate members of this operation on Burbank Street after

20  the searches at 6 Burbank, 14 Burbank and 11 Burbank in 2015?

21  A.    Yes.

22  Q.    And were any additional or other sellers of the operation

23  targeted in the later part of 2015?

24  A.    Yes.  So we used a different CI to make purchases from an

25  individual by the name of Jean Karlos Pizarro, who is also

1  known as Yankee.  He was selling cocaine and heroin from a GMC

2  Envoy with other individuals that were parked on Burbank

3  Street.

4  Q.   All right.  If we could go back to Government's Exhibit 1?

5  Do you see the person in Government's Exhibit 1 that you

6  targeted also known as Yankee, Jean Karlos Pizarro?

7  A.   Yes.

8  Q.   Could you touch the screen and identify his photograph?

9  A.   So he's the individual with the dark colored clothes on,

10 with the beard, third row down, second from the right.

11 Q.   That's the photograph you circled?

12 A.   Yes, sir.

13 Q.   And you targeted him as one of the sellers of the

14 operation.  He was selling where?

15 A.   He was selling from a GMC Envoy that was parked on Burbank

16 Street close to 6 Burbank Street.

17 Q.   All right.  If you can clear your marks, we'll go back to

18 Government's 35.  All right, can you tell us what you did in

19 connection with targeting Yankee?

20 A.   Yes, again we utilized a separate CI to make purchases

21 from Yankee and other individuals from the GMC Envoy that was

22 parked on Burbank Street.

23 Q.   And can you show us in Government's 35 the general area

24 where the GMC Envoy was when the CIs went to make purchases?

25 A.   It never parked in the same place, it was anywhere between

1    here and here.

2    Q.    All right. And you've made a mark between approximately 6

3    and 14 Burbank; is that right?

4    A.    Yes.

5    Q.    Okay. And when -- when were these buys generally?   When

6    did they occur?

7    A.    They were the late fall, early winter in 2015.

8    Q.    All right. After making those controlled buys what

9    happened?

10   A.    So we got a search warrant for the vehicle and the

11   occupants inside of the vehicle and on December 16th of 2015

12   we decided we were going to execute the search warrant on that

13   vehicle.

14   Q.    All right. Can you tell us what happened on December 16,

15   2015?

16   A.    Yes.  So we requested the assistance from uniformed police

17   officers to stop the vehicle.  We were going to do what's

18   called a confirmation buy from the vehicle to determine

19   whether there were drugs in the vehicle.

20           So we gave the -- we searched the CI, gave the CI

21   money, CI walked from -- we were parked on Leo Street and

22   Remington Street, but we could see down Burbank Street.

23           CI walked down to the vehicle, and then returned.

24   It was indicated that there was no drugs, they didn't have any

25   drugs, they were waiting for drugs.

1          So it wasn't long after that we observed a red

2    Honda four door turn the corner from Remington Street and park

3    in the street next to the Envoy.

4    Q.   If you can clear your marks and first show us where you

5    observed the GMC Envoy approximately on December 16, 2015?

6    A.   Approximately here.

7    Q.   All right. And you've made a mark just to the right of the

8    driveway next to 6 Burbank; is that right?

9    A.   Yeah, my mark is a little bit -- my mark is a little bit

10   to the left of where it was.  Almost right in front of -- it

11   was just to the edge of the driveway at 6 Burbank Street.

12   Q.   Okay.  And you --

13   A.   There's another driveway next door to the house next door,

14   it was parked just after that driveway.

15   Q.   Okay. You said the CI went up to the vehicle, got an

16   indication that there were -- they did not have drugs?

17   A.   Yes.

18   Q.   And then can you describe -- show us the path you observed

19   this other vehicle.

20   A.   Yes.  So the other vehicle came from Remington Street and

21   turned down Burbank Street and stopped in front of the GMC

22   Envoy -- I'm sorry, stopped alongside of it.

23   Q.   Were you able to observe the other vehicle as it traveled

24   that path from your position of surveillance?

25   A.   Yes.

1  Q.   Can you describe the other vehicle that you observed to

2  meet with the GMC?

3  A.   It was a red Honda four door.  It had a sunroof.

4  Q.   All right. What happened after you observed the red Honda

5  come down Remington and travel up Burbank and park next to the

6  GMC?

7  A.   Observed Yankee enter the rear of that vehicle and the

8  vehicle left.

9  Q.   Can you show us where the -- when you say that vehicle,

10  you're referring to the red Honda?

11  A.   Yes.

12  Q.   Can you show us where you observed the red Honda go?

13  A.   So the red Honda just continued down Burbank Street and we

14  lost sight of it once it got to Clinton Avenue.

15  Q.   Did there come a time when you made other observations of

16  that red Honda?

17  A.   Yes.  So it was probably less than a minute the Honda came

18  back around Remington Street and continued back down -- so it

19  appeared it went around the block and then came back down

20  Burbank Street and again stopped next to the Envoy.

21  Q.   All right.  And you're making these observations from a

22  position near the corner of Remington and Leo Street?

23  A.   Yes.

24  Q.   After the second time the red Honda pulled up next to the

25  GMC Envoy, what happened?

1  A.   So when the vehicle turned the corner on Remington Street

2  we let the CI out of the vehicle.  We wanted the CI to go and

3  buy from the car -- buy from the individuals in the Envoy

4  after the Honda arrived.

5  Q.   Why did you make a decision to send the CI to the GMC

6  Envoy after observing the Honda?

7  A.   Because we wanted to confirm the Honda was the vehicle

8  that was dropping off the drugs.

9  Q.   All right. What happened after you send the CI up Burbank

10  Street?

11  A.   Well, I indicated to the uniformed officers that if it

12  appeared that the CI made a purchase, we weren't going to let

13  the CI get back to the vehicle.  We were going to move on the

14  car.

15  Q.   When you say get back to the vehicle --

16  A.   Get back to our vehicle.

17  Q.   Okay.

18  A.   So the CI approached the -- well, the vehicle came around

19  the corner and we observed Yankee exit the rear of the vehicle

20  and walk back towards the Envoy.  The CI approached Yankee

21  outside of the vehicle and --

22  Q.   Outside of which vehicle?

23  A.   I'm sorry, outside of the Envoy.  They had interaction

24  outside of the vehicle at which time I told uniformed officers

25  let's roll on it.  So I went down the street first in my

1    undercover vehicle, the uniforms followed me, uniformed cars

2    followed me, I pulled up in front of the Envoy to pin it in

3    and then they came in behind it.

4    Q.    All right. What happened after that?

5    A.    Yankee was taken into custody in the vehicle or just

6    outside of the vehicle.  And there was a female that was

7    sitting inside the vehicle by the name of Anna Lebron and she

8    was also taken into custody.

9    Q.    All right.  What was done with the vehicle?

10   A.    The vehicle was transported back to the Public Safety

11   Building to be searched.

12   Q.    And that was pursuant to the search warrant that you had

13   previously obtained?

14   A.    Yes.

15   Q.    All right.  Prior to searching that vehicle, what was done

16   after it was towed back to the Public Safety Building?

17   A.    Photographs were taken of the vehicle first.

18   Q.    All right.  If I can show you -- if you could clear your

19   marks, then we can show you what is not in evidence

20   Government's 142.  You see that?

21   A.    I do.

22   Q.    And 143.  And 144.  Do you recognize those three

23   photographs?

24   A.    Yes, I do.

25   Q.    Can you describe what those three photographs are

1  generally?

2  A.   Those are what are referred to as before photographs.

3  They photographed the vehicle prior to it being searched, so

4  that was -- those are the photographs of the exterior of the

5  vehicle.

6  Q.   Do those three exhibits 142 through 144 fairly and

7  accurately show the GMC Envoy as it existed prior to the

8  search of it?

9  A.   Yes.

10 Q.   Just the exterior of that vehicle, correct?

11 A.   Yes.

12           **MR. MARANGOLA:** At this time I'd offer Government's

13 142 through and including 144.

14           **MR. VERRILLO:** No objection.

15           **THE COURT:** Exhibits 142, 143 and 144 will be

16 received.

17           (**WHEREUPON**, Government Exhibits 142-144 were

18 received into evidence).

19 **BY MR. MARANGOLA:**

20 Q.   All right, 142, what are we looking at here?

21 A.   This is the passenger side of the GMC Envoy.

22 Q.   All right.  And if we could go to 143, what are we looking

23 at here?

24 A.   That's the driver's side of the GMC Envoy.

25 Q.   And who is the gentleman in the front of the photograph

1  there?

2  A.   That's me with hair.

3  Q.   That picture was taken in December of 2015?

4  A.   Yes.

5  Q.   All right.  Who took it?

6  A.   Investigator Dave Swain.

7  Q.   Okay. If we could go to Government's 144, that's the rear

8  of the vehicle; is that right?

9  A.   Yes, sir.

10 Q.   Okay. If I could ask you to take a look now at what is not

11 in evidence as Government's 145 and 146.  Do you recognize

12 what's shown in those two photographs?

13 A.   Yes.

14 Q.   What are those?

15 A.   Those are again before photographs of the interior of the

16 GMC Envoy.

17 Q.   Do those two photographs fairly and accurately show the

18 interior of the GMC Envoy prior to the search?

19 A.   Yes.

20          **MR. MARANGOLA:** At this time I'd offer Government's

21 145 and 146.

22          **MR. VERRILLO:** No objection.

23          **THE COURT:** Exhibits 145 and 146 will be received.

24          (**WHEREUPON**, Government Exhibits 145-146 were

25 received into evidence).

1  BY MR. MARANGOLA:

2  Q.   What are we looking at in Government's 145?

3  A.   That's the front passenger compartment of the GMC Envoy.

4  Q.   All right.  And Government's 146?

5  A.   That's the rear seats of the GMC Envoy.

6  Q.   All right.  What, if any, items of evidence did you find

7  during the search of the GMC Envoy?

8  A.   There was a cigarette pack on the floor behind the

9  driver's seat just alongside the door; inside of that was 26

10  bags of cocaine and 46 bags of heroin.

11            Inside the glove compartment there was 30 bags of

12  cocaine and 149 bags of heroin.

13            There was $189 in cash that was recovered and a

14  number of cell phones.

15  Q.   All right. Showing you first in Government's Exhibit 146

16  here, does this show any location where any of those items of

17  evidence that you just testified about were recovered?

18  A.   Shows the general location, but the picture's cut off.

19  It's closer to the bottom, like when you immediately open the

20  door, it's right there.  So it's not shown in this picture.

21  Q.   The item that you're talking about specifically that's not

22  shown would be what?

23  A.   I'm sorry, it's the cigarette pack.

24  Q.   Okay.

25  A.   With 26 bags of cocaine and 46 bags of heroin.

1    Q.    And that's where?

2    A.    It's behind the driver's seat -- behind the driver's seat,

3    but it's right alongside the rail where the door closes.

4    Q.    On the floor?

5    A.    Yes.

6    Q.    Okay. If we could show you Government's Exhibit 149, which

7    is not in evidence.  Do you recognize what's shown in that

8    photograph?

9    A.    Yes.

10   Q.    What's that?

11   A.    That's the cigarette pack that contained the cocaine and

12   heroin.

13   Q.    All right. And that's behind the driver's seat floor?

14   A.    Yes.

15   Q.    Does this photograph fairly and accurately show that item

16   as it existed during the search of the vehicle on December 16,

17   2015?

18   A.    Yes, it does.

19            **MR. MARANGOLA:** All right, offer Government's 149.

20            **MR. VERRILLO:** No objection.

21            **THE COURT:** Exhibit 149 will be received.

22            (**WHEREUPON**, Government Exhibit 149 was received

23   into evidence).

24            **MR. MARANGOLA:** Your Honor, at this time I'm going

25   to read from the stipulation between the parties with respect

1 | to Government's Exhibit 153, which is here.

2 |          Government Exhibit 153 was seized from a 2003 GMC

3 | Envoy bearing New York registration GYZ 8705 at 6 Burbank

4 | Street, Rochester, New York on December 16, 2015.

5 |          Government Exhibit 153 contains 26 blue plastic

6 | bags with an off-white powder containing cocaine.

7 |          The aggregate weight of the cocaine is 0.806 grams.

8 |          Government Exhibit 153 also contains 46 glassine

9 | bags stamped Magoo, M-A-G-O-O, with tan powder containing

10 | heroin.

11 |          The aggregate weight of the heroin is approximately

12 | 1.472 grams.

13 | **BY MR. MARANGOLA:**

14 | Q.   If we could go to -- if I could show you Government's

15 | Exhibit 147, which is not in evidence.  Do you recognize

16 | what's shown in Government's Exhibit 147?

17 | A.   Yes.

18 | Q.   And what are we looking at in Government's 147?

19 | A.   It's the drugs that we found in the glove compartment of

20 | the -- it's a photograph of it that we found in the glove

21 | compartment of the GMC Envoy.

22 | Q.   Does Government's Exhibit 147 fairly and accurately show

23 | the drugs in the glove compartment that were found during the

24 | search of the GMC Envoy on December 16, 2015?

25 | A.   Yes.

1          **MR. MARANGOLA:** At this time I'd offer Government's

2  147.

3          **MR. VERRILLO:** No objection.

4          **THE COURT:** Exhibit 147 will be received.

5          (**WHEREUPON**, Government Exhibit 147 was received

6  into evidence).

7          **MR. MARANGOLA:**  And I'm going to read, Your Honor,

8  from stipulation with regard to Exhibit Government's

9  Exhibit 152, which is right here.

10         Government's Exhibit 152 was seized from a 2003 GMC

11  Envoy bearing New York registration GYZ 8705 at 6 Burbank

12  Street, Rochester, New York on December 16, 2015.

13         Government Exhibit 152 contains 30 blue plastic

14  bags with an off-white powder containing cocaine.

15         The aggregate weight of the cocaine is

16  approximately 0.96 grams.

17         Government Exhibit 152 also contains 149 glassine

18  bags stamped Magoo, M-A-G-O-O, with tan powder containing

19  heroin and one glassine bag with tan residue containing

20  heroin.

21         The aggregate weight of the heroin is approximately

22  4.768 grams.

23         At this time, Your Honor, I would offer

24  Government's 152 and 153.

25         **MR. VERRILLO:** No objection.

1          **THE COURT:** Exhibit 152, Exhibit 153 will be

2    received.

3          (**WHEREUPON**, Government Exhibits 152-153 were

4    received into evidence).

5    **BY MR. MARANGOLA:**

6    Q.   Investigator Briganti, from my math it appears that

7    approximately 195 bags of heroin then were seized?

8    A.   Yes.

9    Q.   Total?

10   A.   Yes.

11   Q.   And 56 bags of cocaine?

12   A.   Yes.

13   Q.   And the stamp on the bags of heroin was written in blue

14   and it was Magoo; is that correct?

15   A.   Yes.

16   Q.   Was that the same stamp on all of the bags of heroin?

17   A.   I believe so, yes.

18   Q.   Okay.  And I believe if we can go to Government's 149.

19   See if we can enlarge that.  All right, Investigator, do you

20   see the enlarged portion on Government's Exhibit 149?

21   A.   I do, yes.

22   Q.   Can you make out any of the area where the Magoo stamp is

23   written?

24   A.   Yes, I can.

25   Q.   Can you touch your screen and show us any of the letters

1  that you can tell?

2  A.   Here.   And this is the O in the other one, I'm sorry.

3  Q.   Okay. All right, thank you, Investigator.   You can clear

4  your marks.   Did you also seize cell phones from the GMC

5  Envoy?

6  A.   Yes.

7  Q.   I have Government's Exhibit 156 and Government's

8  Exhibit 157.

9          **MR. MARANGOLA:**   I'm going to read from the

10  stipulation between the parties.

11          Government's Exhibit 156 is a blue AT&T flip phone,

12  phone number with 585-485-9736 that was seized from a 2003 GMC

13  Envoy bearing New York registration GYZ 8705 in the area of 6

14  Burbank Street, Rochester, New York on December 16, 2015.

15          Government Exhibit 156A is a device data report

16  containing the data forensically retrieved from Government

17  Exhibit 156.

18          And Government's Exhibit 157 is an LG smart phone

19  with phone number 585-414-9739 that was seized from a 2003 GMC

20  Envoy bearing New York registration GYZ 8705 in the area of 6

21  Burbank Street, Rochester, New York, on December 16, 2015.

22          Government Exhibit 157A is the device data report

23  containing the data forensically retrieved from Government

24  Exhibit 157.

25          Your Honor, I would offer Government's 156, 156A,

1 | as well as 157 and 157A.

2 |        **MR. VERRILLO:** No objection.

3 |        **THE COURT:** Exhibit 156, 156A will be received.

4 | 157, 157A will be received.

5 |        (**WHEREUPON**, Government Exhibits 156, 156A, 157 and

6 | 157A were received into evidence).

7 | **BY MR. MARANGOLA:**

8 | Q.   Investigator, was anyone charged with any crimes that day?

9 | A.   Yes.

10 | Q.   Who was charged?

11 | A.   Jean Karlos Pizarro - Yankee.

12 | Q.   All right. At this time I'd ask you to take a look at your

13 | screen, which is not in evidence Government's Exhibit 161.  Do

14 | you see Government's 161 there?

15 | A.   Yes.

16 | Q.   Can you describe what Government's 161 is?

17 | A.   Yes, it's a certified copy of conviction.

18 | Q.   That's for Jean Karlos Pizarro; is that correct?

19 | A.   Yes.

20 | Q.   And does it indicate an arrest date on the Certificate of

21 | Conviction?

22 | A.   Yes, 12/16 of 2015.

23 | Q.   All right. And the DOB is 12/20/1989; is that correct?

24 | A.   Yes.

25 | Q.   The judge is Honorable Melchor E. Castro; is that right?

1  A.   Yes.

2           **MR. MARANGOLA:**  This is a certified copy of a

3  Certificate of Conviction.  Based on that, Your Honor, the

4  Government would offer Government's 161.

5           **MR. VERRILLO:** Your Honor, I'd object on relevance

6  basis.

7           **THE COURT:** Overruled.  Exhibit 161 will be.

8           (**WHEREUPON**, Government Exhibit 161 was received

9  into evidence).

10 **BY MR. MARANGOLA:**

11 Q.   And, Investigator Briganti, there's a pled guilty date on

12 here; is that correct?

13 A.   Yes.

14 Q.   And what's the date?

15 A.   March 15th of 2016.

16 Q.   All right. And the original offense is CPCS fifth with

17 intent; is that right?

18 A.   Yes.

19 Q.   Is that criminal possession of a controlled substance with

20 intent to sell?

21 A.   Yes, it is.

22 Q.   And it indicates custody/time.  Do you see that?

23 A.   Yes, I do.

24 Q.   And it says 10 M/custody?

25 A.   Yes.

1  Q.   Okay. All right.  Now, if you could look at what is not in

2  evidence as Government's Exhibit 160.  And that's a multi-page

3  exhibit; is that correct?

4  A.   Yes, it is.

5  Q.   Can you tell us what Government's Exhibit 160 is?

6  A.   Yes, it's a transcript of the plea for Jean Karlos Pizarro

7  DeJesus in state court.

8  Q.   All right. And this is on March 15th, 2016; is that right?

9  A.   Yes.

10  Q.   And in front of Judge Melchor E. Castro; is that correct?

11  A.   Yes.

12  Q.   And if we could show you the last page of the exhibit

13  there.  Does it reflect that transcript is certified to be a

14  true and accurate transcript of those proceedings?

15  A.   Yes.

16  Q.   All right.

17          **MR. MARANGOLA:** At this time I'd offer Government's

18  Exhibit 160.  Again as with the other transcript, Your Honor,

19  just the cover sheet and the certification page.

20          **MR. VERRILLO:** Objection, Your Honor, relevance.

21          **THE COURT:** Overruled.  Exhibit 160 will be received

22  for the first and last pages only.

23          (**WHEREUPON**, Government Exhibit 160 was received

24  into evidence).

25  **BY MR. MARANGOLA:**

1    Q.    Investigator Briganti, does the cover sheet of

2    Government's Exhibit 160 reflect the appearance of an attorney

3    for the defendant Jean Pizarro DeJesus during the plea on

4    March 15th, 2016?

5    A.    Yes, it does.

6    Q.    Who is the attorney for the defendant?

7    A.    Mark Young, esquire.

8    Q.    Okay. And I believe you previously identified a picture of

9    Mr. Young; is that right?

10   A.    Yes.

11   Q.    Okay. All right, now you said that -- if we could go back

12   to Government's 135?  I'm sorry, 35.  You said that just

13   before you directed the patrol officers to come up to the car

14   to take Yankee into custody on December 16, 2015, he was

15   picked up in a red Honda?

16   A.    Yes.

17   Q.    Had -- you described it as -- can you describe it again

18   for us?

19   A.    It was a red, like a reddish/maroonish four door Honda,

20   had a sunroof on it.

21   Q.    Had you seen that vehicle before December 16, 2015?

22   A.    No.

23   Q.    Could you see who was driving it when Yankee got into it

24   from where you were on Leo Street?

25   A.    No.  I could only tell it was occupied by more than one.

1  I just couldn't see who they were.

2  Q.   All right. Did you see that vehicle again after December

3  16, 2015?

4  A.   Yes.

5  Q.   The red Honda?

6  A.   Yes.

7  Q.   Can you tell us where and approximately when you saw it?

8  A.   Yes.  I saw it sometime around February -- either February

9  6th or February 7th of 2016.  I saw photographs of it at the

10  Public Safety Building.

11  Q.   All right. What were the photographs that you saw?

12  A.   Uniformed officers made an arrest and they photographed

13  that vehicle at the time of the arrest and we found out that

14  that arrest was made, so we wanted to take a look at the --

15  the ongoing investigation down there, we wanted to take a look

16  at the photographs to see what the vehicle looked like.

17  Q.   All right.  Do you recall who was the patrol officer --

18  one of them that made the arrest that day?

19  A.   Yes, Thomas Luciano.

20  Q.   All right. When you saw the photographs did you recognize

21  the vehicle?

22  A.   Yes.

23  Q.   What did you recognize the vehicle to be?

24  A.   That was the same car that picked up Yankee on February 16

25  I'm sorry, on December 16th.

1   Q.   All right. If we could show you what is not in evidence as

2   and ask you to look at Government's 174, 175 and 176.  Can you

3   tell us do you recognize those photos that you just observed?

4   A.   Yes, that's the red Honda.

5   Q.   Those photographs show the red Honda?

6   A.   Yes.

7   Q.   Are those the photos that you saw on either February 6th

8   or February 7th, 2016?

9   A.   Yes, I believe they are, yes.

10  Q.   And are they the photos of the vehicle that you observed

11  Yankee get into and out of just before you stopped him at the

12  GMC Envoy?

13  A.   Yes.

14  Q.   All right. How do you recognize the vehicle in these

15  photos as the same one from December 16th, 2015?

16  A.   It's identical.  It's a four door red maroon Honda.  I

17  recognize the wheels.  It's the identical vehicle.

18  Q.   All right. And it's fairly and accurately shown in

19  Government's 174 through 176?

20  A.   Yes.

21          **MR. MARANGOLA:** At this time I'd offer Government's

22  174, 175 and 176.

23          **MR. VERRILLO:** No objection.

24          **THE COURT:** Exhibit 174, 175 and 176 will be

25  received.

1              (**WHEREUPON**, Government Exhibits 174-176 were

2    received into evidence).

3    **BY MR. MARANGOLA:**

4    Q.   Investigator Briganti, can you show us in Government's 174

5    here the vehicle that you recognize that picked up Yankee on

6    February -- I'm sorry, on December 16, 2015?

7    A.   Yes.  It's the red Honda -- red Honda.  I just put a red

8    mark on.

9    Q.   Do you recognize the location of this photograph?

10   A.   Yes.

11   Q.   Where is this photograph taken?

12   A.   It's on Burbank Street just a little bit east of the

13   corner of Clinton Avenue.  So that address it's parked in

14   front of is approximately 2 Burbank Street.

15   Q.   Are you able to see 6 Burbank Street in this photograph?

16   A.   Yes.

17   Q.   Can you touch it on your screen?  You've touched the white

18   house sort of just to the left of the center of the screen; is

19   that right?

20   A.   Yes.

21   Q.   Can we clear your marks and go to the next photograph 175?

22   And that's a closer up photograph of the red Honda; is that

23   right?

24   A.   Yes.

25   Q.   All right. In Government's Exhibit 175 do you recognize

1    any of the houses that warrants were executed on during 2015?

2    A.    Yes.

3    Q.    Could you touch them and identify any of those locations?

4    A.    Where I put the mark is 11 Burbank Street.

5    Q.    That looks like a white blue or greenish house next to the

6    red house?

7    A.    Yes, it's got a white bottom and blue at the top.

8    Q.    Do you see the driveway for 6 Burbank in this photograph?

9    A.    I see the apron to the driveway, yes.

10   Q.    What's the apron to the driveway?

11   A.    I'm sorry, yeah, it's the area between the street and the

12   sidewalk, yes.

13   Q.    And can you touch the screen and identify that for us?

14   Where in relation to that was Yankee taken into custody and

15   the GMC Envoy seized?

16   A.    Approximately where this vehicle was parked, this green

17   vehicle.

18   Q.    All right. And that was after he got out of the red

19   vehicle, the red Honda shown in 175?

20   A.    Yes.

21   Q.    Okay. In Government's Exhibit 175 it shows the license

22   plate of that vehicle.  Can you read that for us?

23   A.    Yes, it's HDN 5250.

24   Q.    All right, at this time I'd like to show you what's not in

25   evidence as Government's Exhibit 181.  Government's

1  Exhibit 181, do you recognize this to be a certified abstract

2  of a DMV registration record for a particular vehicle?

3  A.   Yes.

4  Q.   And is there a license plate for the vehicle on the

5  certified DMV abstract marked Government's Exhibit 181?

6  A.   Yes.

7  Q.   What is that license plate?

8  A.   HDN 5250.

9  Q.   That's for the same vehicle that we just saw a picture of

10  in Government's 174, 175; is that right?

11  A.   Yes.

12  Q.   And does it reflect that license plate is for a particular

13  car?

14  A.   Yes, it does.

15  Q.   What is that vehicle?

16  A.   Honda red.

17  Q.   Does it list a year?

18  A.   I believe it's '01.

19  Q.   2001?

20  A.   Yes.

21  Q.   All right.

22          **MR. MARANGOLA:** Your Honor, at this time I'd offer

23  Government's 181, the certified abstract of the registration

24  for the 2001 Honda with plate HDN 5250.

25          **MR. VERRILLO:** No objection.

1          **THE COURT:** Exhibit 181 will be received.

2          (**WHEREUPON**, Government Exhibit 181 was received

3   into evidence).

4   **BY MR. MARANGOLA:**

5   Q.   Investigator Briganti, according to the DMV abstract

6   record for this vehicle, the HDN 5250, 2001 Honda red, does it

7   list the registered owner?

8   A.   Yes, it does.

9   Q.   Who is the registered owner?

10  A.   Obed Torres Garcia.

11  Q.   What's the date of birth?

12  A.   8/25/1997.

13  Q.   And is there an address for the registration for this

14  vehicle registered to Obed Torres Garcia?

15  A.   Yes, there is.

16  Q.   What is that?

17  A.   It's 145 Liberty Pole Way, apartment No. 5, Rochester, New

18  York.

19  Q.   And were you familiar with Obed Torres Garcia as part of

20  your investigation?

21  A.   Yes.

22  Q.   As well as 145 Liberty Pole Way?

23  A.   Yes.

24  Q.   At this time I'd ask to show you Government's Exhibit 1.

25  And if you can touch the photo of the individual you know as

1  Obed Torres Garcia in Government's Exhibit 1?

2  A.   The individual on the third row all the way to the left

3  with the dark straight hair and dark clothing on.

4  Q.   You previously identified Yankee as the second from the

5  right in that same row; is that correct?

6  A.   Yes.

7  Q.   All right.  I'd like to show you what is not in evidence

8  as Government's 51.  If you can clear your mark.  Thanks.  And

9  Government's Exhibit 52.  Do you recognize what's shown in

10  Government's Exhibits 51 and 52?

11  A.   Yes, I do.

12  Q.   Can you tell us what you recognize in those photographs?

13  A.   Those are the Lincoln apartments at 145 Liberty Pole Way.

14  Q.   All right.  That's the same address that was on the

15  registration for that 2001 Honda we just saw?

16  A.   Yes.

17  Q.   Do -- are you familiar with these apartments based on your

18  investigation?

19  A.   Yes.

20  Q.   Do Government's 51 and 52 fairly and accurately show the

21  apartments at Liberty Pole Way -- 145 Liberty Pole Way as they

22  existed during your investigation?

23  A.   Yes.

24          **MR. MARANGOLA:** At this time I'd offer Government's

25  51 and 52.

1          **MR. VERRILLO:** No objection.

2          **THE COURT:** Exhibits 51 and 52 will be received.

3          (**WHEREUPON**, Government Exhibits 51-52 were received

4   into evidence.

5   **BY MR. MARANGOLA:**

6   Q.    There's 51.  And if we can show you 52.  Investigator, was

7   Obed Torres Garcia arrested in connection with Operation

8   Burbank Bust?

9   A.    Yes, he was.

10  Q.    When?

11  A.    He was arrested on July 31st of 2016 on LaForce Street.

12  He was also arrested on January 29th, 2018 which was the date

13  of the takedown where he shot at the police in front of 6

14  Burbank Street.

15  Q.    All right. When he was arrested on July 31st, 2016, he was

16  charged with what crimes, state or federal crimes?

17  A.    State.

18  Q.    When he was arrested in January of 2018, he was charged

19  with what crimes?

20  A.    Federal.

21  Q.    All right.  The arrest on July 31st, 2016, are you

22  familiar with what happened to that arrest?

23  A.    Yes.

24  Q.    All right. Can you tell us what happened?

25  A.    Yes.  Uniformed officers attempted to stop Obed Torres

1   Garcia on LaForce Street and he fled from officers and

2   discarded cocaine and heroin and ultimately was arrested by

3   uniformed officers on that date in front of 16 LaForce Street.

4   Q.   Are you familiar with 16 LaForce Street as part of your

5   investigation?

6   A.   Yes.

7   Q.   All right. At this time I'd like to show you Government's

8   Exhibit 48, which is not in evidence.  Do you recognize what's

9   shown in Government's Exhibit 48?

10  A.   16 LaForce Street.

11  Q.   And there actually looks like three houses total in this

12  photograph; is that correct?

13  A.   Yes.

14  Q.   Which house is 16 LaForce?

15  A.   It's the house I just put a mark on, it's the white house

16  or the light colored house behind the tree, the small tree.

17  Q.   In the center of the photograph?

18  A.   Yes.

19  Q.   Does Government's 48 fairly and accurately show 16 LaForce

20  as it existed during your investigation?

21  A.   Yes, it does.

22           **MR. MARANGOLA:** At this time I'd offer Government's

23  Exhibit 48.

24           **MR. VERRILLO:** No objection.

25           **THE COURT:** Exhibit 48 will be received.

1           (**WHEREUPON**, Government Exhibit 48 was received into

2    evidence).

3    **BY MR. MARANGOLA:**

4    Q.   You indicated Obed Torres Garcia was arrested in the area

5    of 16 LaForce Street on July 31st, 2016; is that correct?

6    A.   Yes.

7    Q.   And charged in state court?

8    A.   Yes.

9    Q.   With drug offenses?

10   A.   Yes.

11   Q.   I'd like to show you what's not in evidence as

12   Government's 235.  Do you recognize what Government's 235 is?

13   A.   Yes, it's a certified copy of a Certificate of Conviction.

14   Q.   For what?

15   A.   Obed Torres Garcia.

16   Q.   And does it list the arrest date for Obed Torres Garcia?

17   A.   Yes.

18   Q.   And what's the arrest date?

19   A.   July 31st, 2016.

20   Q.   And does it list the date of birth for Obed Torres Garcia?

21   A.   Yes.

22   Q.   What's that?

23   A.   8/25/1997.

24           **MR. MARANGOLA:** At this time, Your Honor, I'd offer

25   the certified copy of the Certificate of Conviction for Obed

1  Torres Garcia marked Government's Exhibit 235.

2          **MR. VERRILLO:** Objection, Your Honor.

3          **THE COURT:** Overruled.  Exhibit 235 will be

4  received.

5          (**WHEREUPON**, Government Exhibit 235 was received

6  into evidence).

7  **BY MR. MARANGOLA:**

8  Q.   Investigator Briganti, does this portion that we've

9  enlarged here indicate that Obed Torres Garcia pled guilty on

10 January 31st, 2017?

11 A.   Yes.

12 Q.   And says sentenced 3/30/2017 five years probation?

13 A.   Yes.

14 Q.   And, again, it's got the arrest date of July 31st, 2016,

15 correct?

16 A.   Yes.

17 Q.   All right. And the charge is criminal possession narcotic

18 drugs; is that correct?

19 A.   Yes.

20 Q.   Okay. Is the judge listed on the top of the Certificate of

21 Conviction above the area that's highlighted?

22 A.   Yes.

23 Q.   Who is that?

24 A.   Francis A. Affronti.

25 Q.   The plea date is 1/31 of '17, correct?

1   A.   Yes.

2   Q.   All right.  At this time I'd like to show you what is not

3   in evidence as Government's 236.  And can you tell us what

4   Government's Exhibit 236 is?

5   A.   Yes, it's a transcript of the plea in state court by Obed

6   Torres Garcia.

7   Q.   And if you could go to the last page of this document,

8   does that reflect that it's a certified true and accurate

9   transcript of those proceedings?

10  A.   Yes.

11  Q.   If we could go back to the first page.  Is the transcript

12  from proceedings on January -- from a plea proceeding on

13  January 31st, 2017?

14  A.   Yes.

15  Q.   Who is the judge that it's in front of?

16  A.   Honorable Francis A. Affronti.

17          **MR. MARANGOLA:** At this time, Your Honor, the

18  Government would offer the certified transcript marked

19  Government's Exhibit 236, again just the cover sheet and the

20  certification page as the last page.

21          **MR. VERRILLO:** Objection, Your Honor.

22          **THE COURT:** Overruled.  Exhibit 236 will be received

23  for the first and last pages only.

24          (**WHEREUPON**, Government Exhibit 236 was received

25  into evidence).

1  **BY MR. MARANGOLA:**

2  Q.   If we could show just the first page.  And the --

3  Investigator, does it indicate the attorney appearance for the

4  defendant Obed Torres Garcia on his guilty plea January 31st,

5  2017?

6  A.   Yes, it does.

7  Q.   Who is it?

8  A.   It's Mark Young, esquire.

9  Q.   All right.

10              **MR. MARANGOLA:**  At this time, Your Honor, I'm going

11  to read from the stipulation between the parties with respect

12  to Government's Exhibit 234, which I have here.

13              Government's Exhibit 234 was seized from 16 LaForce

14  Street on July 31st, 2016.  Government Exhibit 234 contains

15  seven empty plastic bags, three plastic vials with rock-like

16  material containing cocaine, and 36 plastic bags with white

17  powder containing cocaine.

18              The aggregate weight of the cocaine is

19  approximately 1.656 grams.

20              Government Exhibit 234 also contains a plastic pill

21  bottle with 77 glassine bags stamped blue magic with brown

22  powder containing heroin.

23              The aggregate weight of the heroin is approximately

24  4.259 grams.

25              At this time, Your Honor, I would offer

1  Government's Exhibit 234.

2          **MR. VERRILLO:** Your Honor, based on the Court's

3  prior ruling, I have no further objections to that exhibit.

4          **THE COURT:** Exhibit 234 will be received.

5          (**WHEREUPON**, Government Exhibit 234 was received

6  into evidence).

7  **BY MR. MARANGOLA:**

8  Q.   All right, Investigator, if we could put up Government's

9  Exhibit 35.  You mentioned that part of the goal of Operation

10 Burbank Bust was to investigate and stop the violence

11 associated with the heroin and cocaine trafficking in the

12 Burbank and North Clinton area; is that right?

13 A.   Yes.

14 Q.   As your investigation progressed from 2015 into 2016, did

15 you investigate any specific violent crimes?

16 A.   Yes.

17 Q.   Can you describe them?

18 A.   Yes.  So on January 20th Luis Garcia Pizarro was murdered

19 at 15 Leo Street.

20 Q.   Can you identify the location on Government's 35?

21          **THE COURT:** What year was that?

22          **THE WITNESS:** I'm sorry, Your Honor, 2016.

23          **THE COURT:** Thank you.

24 **BY MR. MARANGOLA:**

25 Q.   And if we can -- if you can continue.

1  A.    Caesar Lopez Quinones was murdered on March 31st of 2016

2  in a driveway across the street from 6 Burbank Street.  He was

3  sitting in his vehicle at the time.

4  Q.    Can you identify that location on Government's 35?  Caeser

5  Lopez Quinones, is that who you indicated?

6  A.    Yes.

7  Q.    Did he have an a/k/a you're aware of?

8  A.    Yes, Gargola.

9  Q.    All right.  Any other violent crimes that you investigated

10  in connection with this operation?

11  A.    Yes, so on June 6th, 2016, Jonathan Gonzalez, also known

12  as Flaco or Palito, was murdered in Osborn Alley in Buffalo,

13  New York.

14  Q.    All right. Obviously that's not going to be visible on

15  Government's 35, correct?

16  A.    Correct.

17  Q.    That location.  Any other murders or violent crimes that

18  you investigated the area of which is shown on Government's

19  35?

20  A.    Yes.  So on September 12th of 2016 Walter Ross was

21  murdered in his vehicle at the corner of Burbank Street and

22  North Clinton Avenue.

23  Q.    Can you identify that location, mark it on Government's

24  Exhibit 35?  All right, each of these individuals, how were

25  they murdered?

1  A.    They were shot.

2  Q.    All four of the murders that you just testified about they

3  were individuals that were shot with firearms?

4  A.    Yes.

5  Q.    All right. The first murder you testified about was in

6  January 20th at Leo Street?  At 15 Leo Street?

7  A.    Yes.

8  Q.    The victim of that murder was who?

9  A.    Was Luis Garcia Pizarro.

10  Q.    If we could -- if you could clear your marks?  And we can

11  show Government's Exhibit 20, which is not in evidence.  Do

12  you recognize the individual shown in Government's Exhibit 20?

13  A.    Yes, I do.

14  Q.    Who is that?

15  A.    Luis Garcia Pizarro.

16  Q.    Does that photograph fairly and accurately show Luis

17  Garcia Pizarro?

18  A.    Yes, it does.

19          **MR. MARANGOLA:** At this time I offer Government's

20  Exhibit 20.

21          **MR. VERRILLO:** No objection.

22          **THE COURT:** Exhibit 20 will be received.

23          (**WHEREUPON**, Government Exhibit 20 was received into

24  evidence).

25  **BY MR. MARANGOLA:**

1  Q.    And the individual Mr. Lopez Quinones, also known as

2  Gargola, you indicated was shot to death on what day?

3  A.    March -- I think March 31st of 2016.

4  Q.    That was on Burbank Street?

5  A.    Yes.

6  Q.    I'd like to show you what is not in evidence as

7  Government's Exhibit 22.  Do you recognize the individual

8  shown in Government's Exhibit 22?

9  A.    Yes.

10 Q.    Who is that?

11 A.    That's Caesar Lopez Quinones, also known as Gargola.

12 Q.    Does that photograph fairly and accurately depict Caesar

13 Lopez Quinones also known as Gargola?

14 A.    Yes.

15             **MR. MARANGOLA:** Offer Government's Exhibit 22.

16             **MR. VERRILLO:** No objection.

17             **THE COURT:** Exhibit 22 will be received.

18             (**WHEREUPON**, Government Exhibit 22 was received into

19 evidence).

20 **BY MR. MARANGOLA:**

21 Q.    And you indicated that an individual named Walter Ross was

22 shot on the corner of Clinton and Burbank Street and he was

23 murdered as well in his car?

24 A.    Yes.

25 Q.    And approximately when was that?

1  A.    September 12, 2016.

2  Q.    Like to show you what's not in evidence as Government's

3  Exhibit 24.  Do you recognize the individual shown in

4  Government's 24?

5  A.    Yes.

6  Q.    Who is that?

7  A.    That's Walter Ross.

8  Q.    Does Government's 24 fairly and accurately show Walter

9  Ross?

10  A.    Yes, it does.

11          **MR. MARANGOLA:** At this time I offer Government's

12  Exhibit 24.

13          **MR. VERRILLO:** No objection.

14          **THE COURT:** Exhibit 24 will be received.

15          (**WHEREUPON**, Government Exhibit 24 was received into

16  evidence).

17  **BY MR. MARANGOLA:**

18  Q.    Finally you said there was one murder you investigated

19  that did not occur in the area of Burbank Street and that was

20  the murder of John Gonzalez, also known as Flaco?

21  A.    Yes.

22  Q.    And when did that occur?

23  A.    June 6th of 2016.

24  Q.    And that was where?

25  A.    That was on Osborn Alley in Buffalo, New York.

1  Q.   All right. If we could show you what is not in evidence as

2  Government's Exhibit 23.  Do you recognize the person shown in

3  Government's 23?

4  A.   Yes.

5  Q.   Who is that?

6  A.   That's Jonathan Gonzalez, also known as Flaco or Palito.

7  Q.   Does that photograph fairly and accurately show Jonathan

8  Gonzalez, also known as Flaco and Palito?

9  A.   Yes.

10           **MR. MARANGOLA:** At this time I'd offer Government's

11  23.

12           **MR. VERRILLO:** No objection.

13           **THE COURT:** Exhibit 23 will be received.

14           (**WHEREUPON**, Government Exhibit 23 was received into

15  evidence).

16  **BY MR. MARANGOLA:**

17  Q.   And, Investigator Briganti, is the person in 23 also the

18  same person in Government's Exhibit 1?  Show you that.

19  A.   Yes.

20  Q.   And he was the person you previously testified was at 14

21  Burbank and 11 Burbank during those search warrants?

22  A.   Yes.

23  Q.   Or those raids, okay.  You testified I think at the

24  beginning of the case that at some point the investigative

25  team attempted or obtained wiretap authorization in the case?

1  A.    Yes.

2  Q.    Approximately when was that?

3  A.    It was December 21st, 2017.

4  Q.    All right. Did you wiretap just one phone line or multiple

5  phone lines?

6  A.    We started on one phone line and we progressed on to other

7  phone lines.

8  Q.    All right.  Were cell phones that were used by anyone on

9  Government's Exhibit 1 phones that you obtained authorization

10  to wiretap in connection with this investigation?

11  A.    Yes.

12  Q.    And who was that?

13  A.    Carlos Javier Figueroa; Leitscha Poncedeleon; Roberto

14  Figueroa.

15  Q.    All right.  If you can just touch each of their

16  photographs?

17  A.    Okay, so Javier Figueroa is the photograph at the top;

18  Leitscha Poncedeleon is the line right below to the left; and

19  Roberto Figueroa is next to Leitscha Poncedeleon.

20  Q.    All right. How did the -- can you explain how the wiretap

21  investigation progressed?

22  A.    Yes.  So initially we would corroborate individuals and

23  their roles in the organization.  So that was anybody from the

24  top of the organization, the leader, to mid-level members of

25  the organization, all the way down to people who were actually

1  selling on the streets.

2         We would also identify buyers, people who were

3  buying large scale amounts of cocaine, all the way down to

4  people that were buying street level narcotics.

5         Once we were able to identify those individuals, we

6  also identify vehicles and locations.  Vehicles were the

7  vehicles that they were traveling around in, that they would

8  transport drugs or money in.

9         And the locations were locations where they were

10  storing drugs, where they were selling drugs, where they were

11  bagging drugs or packaging drugs for sale and money.

12         And then once we identified those -- we

13  corroborated the information we already had, then we would

14  attempt to identify their patterns, the way they actually did

15  their business.

16         In this particular case it was packages that were

17  coming from Puerto Rico that were being mailed to various

18  locations throughout the City of Rochester and then members

19  would go pick those packages up, bring them back to 292

20  Barrington Street where they would open the packages; there

21  were oftentimes either two or three kilos of cocaine in those

22  packages.

23         Those packages were either sold as kilogram

24  quantities or they were broken down into smaller quantities

25  and sold from that location; or they were distributed to --

1  they were taken to another location at 820 East Main Street

2  where they were broken down into smaller quantities which were

3  street level sale quantities, then taken to houses in the

4  Burbank Street area or on the street to sell to -- they were

5  given to street level sellers to sell to users, street level

6  users.

7  Q.   All right. And this is end of December into early 2018; is

8  that right?

9  A.   Yes.

10 Q.   All right. Once you had accomplished that, what was the

11 next step in the investigation?

12 A.   The next step in the investigation was to coordinate a

13 takedown of the -- once we listened to the phones, we

14 coordinated a takedown to arrest the individuals who were in

15 Rochester, local individuals in Rochester.

16 Q.   All right. How did you go about deciding when to

17 coordinate the takedown?

18 A.   So there was an indication that there were packages that

19 were going to be delivered later part of January, they were

20 supposed to be delivered January 27th, but we contacted the

21 United States Postal Service and asked the Postal Service if

22 they would hold one of the packages and then do what's called

23 a controlled delivery of the other package.

24        The package we were asking them to hold was at 4

25 Ritz Street and we asked them to do a controlled delivery at

1    15 Harwood Street.  A controlled delivery is basically they

2    deliver the package for us.  Their law enforcement portion of

3    the Postal Service would deliver the package.

4                    And then we were going to intercept the one from 4

5    Ritz and hold onto that package.

6    Q.   All right. So there were two packages coming from where?

7    A.   Puerto Rico.

8    Q.   And the 4 Ritz Street package you asked Postal to do what?

9    A.   Hold it.

10   Q.   Okay.  Not deliver it?

11   A.   Correct.

12   Q.   And the law enforcement portion of Postal Service held

13   onto it?

14   A.   Yes.

15   Q.   And then what about the package from Puerto Rico destined

16   for 15 Harwood?

17   A.   We asked them to deliver that, to do a controlled delivery

18   of that package.  So that would mean we would tell them what

19   time to deliver it so we were prepared to execute search

20   warrants at the time that package was delivered.

21   Q.   And that wouldn't be done by like a regular mailman?

22   A.   No.  That again was one of their Postal inspectors which

23   is part of their law enforcement portion of the U.S. Postal

24   Service.

25   Q.   All right. Why did you want time to takedown in that

1  fashion?

2  A.   Because we wanted to intercept the cocaine that was coming

3  in from Puerto Rico.

4  Q.   In anticipation of that did you obtain any search

5  warrants?

6  A.   Yes.

7  Q.   Approximately how many search warrants did you obtain?

8  A.   I wrote 15 search warrants for that day.

9  Q.   And those included warrants for -- just for locations or

10 vehicles or --

11 A.   No.  There were -- there were warrants for locations, for

12 vehicles and for individuals; people's bodies.

13 Q.   All right. When you say wrote them, you wrote applications

14 to a judge and a judge authorized those search warrants; is

15 that correct?

16 A.   Yes.

17 Q.   What day was the takedown?

18 A.   It was on January 29th of 2018.

19 Q.   All right.  Can you tell us what your role on that day

20 was?

21 A.   Yes.  So my role was to brief the rest of law enforcement

22 that was going to execute the search warrants.  And this is --

23 this is hundreds of police officers.  And to give them details

24 on the different locations they were going to to let them know

25 whether there was any violence associated with those locations

1  or any individuals that may be inside of those locations, any

2  dogs or kids that may be inside.

3           And then once that brief was done, we asked

4  officers to raid teams to actually position themselves at

5  certain locations and we would give them the indication as to

6  when to hit those search warrants.

7           From that point I went and spoke to the United

8  States Postal Service and I organized when the package would

9  be delivered, what time the package -- we wanted the package

10 to be delivered.

11 Q.   All right. And when you say hundreds of members of law

12 enforcement, is this just one agency?

13 A.   No.  This is multiple agencies.

14 Q.   All right. All coordinating the same takedown?

15 A.   Yes.

16 Q.   All right. What happens after you reach out to the folks

17 at Postal for the controlled delivery?

18 A.   So I requested that they deliver the package sometime

19 between 11 o'clock and 11:30 on that date in the morning.

20 They agreed to do that.

21           So I took a position at 15 Harwood Street to do

22 surveillance at 15 Harwood Street when the package was being

23 delivered.

24 Q.   Tell us what happened.  What you observed.

25 A.   So sometime between 11 o'clock and 11:30 I saw the Postal

1    truck pull up and a package taken out of the Postal truck and

2    brought inside of 15 Harwood Street.

3            Short time after that I observed a Nissan Altima

4    pull up and Leitscha Poncedeleon exited that vehicle and

5    started to walk towards 15 Harwood Street.

6            Again a male came out of the house carrying a

7    package, brought it over to her vehicle, put it in the trunk

8    of her vehicle, she got back inside, he went back inside of 15

9    Harwood Street and she left.

10           When she left she was parked on Harwood Street.

11   Harwood Street like bends around to the point of a crescent,

12   then comes back out to Monroe Avenue.  So I followed her back

13   to wherever she was going, which we anticipated was going to

14   be 292 Barrington Street.

15           Unfortunately, because of traffic she got in behind

16   me so I just decided to drive right to 292 Barrington Street;

17   she was the car directly behind me.

18           As we turned onto Barrington Street I indicated to

19   the other raid teams that when I gave the go, if she pulled

20   into the driveway, we were going to hit all the warrants.

21           I drove past 292 Barrington Street, she pulled into

22   the driveway of 292 Barrington Street, at which time I told

23   the other teams to execute those warrants.

24   Q.   All right.  And Leitscha Poncedeleon is pulling into 292

25   Barrington Street in what vehicle?

1  A.    It was a grayish blue Nissan Altima.

2  Q.    All right. And if you can clear your marks.  Can we show

3  you Government's Exhibit 37, which is not in evidence?  Do you

4  recognize what's shown in Government's Exhibit 37?

5  A.    Yes.

6  Q.    What is that?

7  A.    292 Barrington Street.

8  Q.    Does Government's 37 fairly and accurately show 292

9  Barrington Street as it existed during the investigation?

10  A.    Yes.

11          **MR. MARANGOLA:** At this time I'd offer Government's

12  37.

13          **MR. VERRILLO:** No objection.

14          **THE COURT:** Exhibit 37 will be received.

15          (**WHEREUPON**, Government Exhibit 37 was received into

16  evidence).

17  **BY MR. MARANGOLA:**

18  Q.    Investigator Briganti, is 292 Barrington a two family

19  house?

20  A.    Yes, it's a side-by-side residence, yes.

21  Q.    And which driveway did Leitscha Poncedeleon pull up in in

22  the Nissan Altima?

23  A.    She pulled up in the driveway to the left.  This one.

24  Q.    All right. If we could show you Government's Exhibit --

25  which is not in evidence -- 303.  You recognize what's shown

1  in Government's 303?

2  A.   Yes.

3  Q.   What is that?

4  A.   It's a photograph of the rear of the Nissan -- of Leitscha

5  Poncedeleon's Nissan Altima.

6  Q.   Does that photograph fairly and accurately show the Nissan

7  Altima as it existed on the day of the takedown January 29th,

8  2018?

9  A.   Yes, it does.

10 Q.   Does that photograph actually show the vehicle in the

11 driveway at 292 Barrington Street?

12 A.   Yes.

13           **MR. MARANGOLA:** At this time I'd offer Government's

14 303.

15           **MR. VERRILLO:** No objection.

16           **THE COURT:** Exhibit 303 will be received.

17           (**WHEREUPON**, Government Exhibit 303 was received

18 into evidence).

19 **BY MR. MARANGOLA:**

20 Q.   All right. After Leitscha Poncedeleon pulled into 292

21 Barrington in this vehicle, what happened?

22 A.   Again, once she pulled in I indicated to the other raid

23 teams that they hit their locations and the ATF Violent Crimes

24 Task Force team hit 292 Barrington Street.

25           So there were uniformed officers that came up the

1  driveway, they took Leitscha Poncedeleon in custody in the

2  vehicle, and the rest of the team went inside the house and

3  executed the search warrant.

4  Q.   All right. Was this vehicle, the one shown in Government's

5  303, was that also searched in addition to the residence at

6  292 Barrington Street?

7  A.   Yes.

8  Q.   All right. Were you present for that?

9  A.   Yes, I was.

10 Q.   As officers were searching the van -- I'm sorry, the

11 Altima and 292 Barrington, what were the remaining teams

12 doing?

13 A.   They were executing search warrants at other locations.

14 Q.   All right. Can you describe generally what happened?  Was

15 evidence seized at those other locations?

16 A.   Yes, there was guns, drugs, money.

17 Q.   All right.

18 A.   Documentary material, yeah.

19 Q.   Was anyone taken into custody at any of those other

20 locations?

21 A.   Yes.

22 Q.   Who was arrested that day?

23 A.   Carlos Javier Figueroa was arrested at 6 Burbank Street;

24 Obed Torres was arrested at 6 Burbank Street after he shot at

25 the police.

1  Q.   Who was arrested, if anyone, at 292 Barrington?

2  A.   292 Barrington Street was Roberto Figueroa and Leitscha

3  Poncedeleon, who was in the vehicle.

4  Q.   All right. Let's talk about the execution of the search at

5  292 Barrington Street and the Altima.  I'd like you to look --

6  I'm going to show you Government's Exhibit 304 -- actually,

7  this may be a good time for your binder.  Might be quicker to

8  flip through it that way.  If you can look through 304 to 307

9  first.

10  A.   Okay.

11  Q.   What do Government's 304 through 307 show?

12  A.   Shows the package in the rear -- in the trunk of Leitscha

13  Poncedeleon's Nissan Altima and it also shows the contents of

14  that package in the other pictures.

15  Q.   All right. Do Government's 304 through 307 fairly and

16  accurately show the contents of the trunk of this Nissan

17  Altima at the time it was searched at 292 Barrington Street on

18  January 29th, 2018?

19  A.   Yes.

20       **MR. MARANGOLA:** At this time I'd offer Government's

21  304 through 307.

22       **MR. VERRILLO:** Based on the Court's prior ruling, I

23  have no further objections.

24       **THE COURT:** Exhibits 304, 305, 306 and 307 will be

25  received.

1          (**WHEREUPON**, Government Exhibits 304-307 were

2 received into evidence).

3 **BY MR. MARANGOLA:**

4 Q.   And what are we looking at in 304?

5 A.   We're looking at the trunk of Leitscha Poncedeleon's

6 Nissan Altima and the package that was sent from Puerto Rico

7 is in the trunk.

8 Q.   And that package was addressed to what location?

9 A.   It was addressed to 15 Harwood Street.

10 Q.   All right.  If we could go to Government's 305?  And what

11 does 305 show?

12 A.   Those are candy boxes that were packaged inside of that

13 box.

14 Q.   All right. So the previous photo showed the box before it

15 had been opened; is that correct?

16 A.   Yes.

17 Q.   And Government's 305 shows the box after it had been

18 opened?

19 A.   Yes.

20 Q.   If we can go to 306?  Can you tell us what we're looking

21 at in Government's 306?

22 A.   Yes, we're looking at a box of M&M's and there's a kilo of

23 cocaine wrapped in carbon paper.

24 Q.   That's the black object in the center of that box?

25 A.   Yes.

1  Q.   All right. And that came out of the box from the trunk at

2  of the Altima, correct?

3  A.   Yes.

4  Q.   And can we go to 307?  What are we looking at in 307?

5  A.   Again that's a kilogram of cocaine wrapped in carbon paper

6  and a Skittles box that was inside that box that was sent from

7  Puerto Rico.

8  Q.   All right.

9           **MR. MARANGOLA:** Your Honor, at this time I'm going

10  to read from the stipulation between the parties marked Court

11  Exhibit 1 regarding Government's Exhibit 312, which is right

12  here.

13           Government Exhibit 312 was seized from a 2012

14  Nissan Altima at 292 Barrington Street, Rochester, New York on

15  January 29, 2018.

16           Government Exhibit 312 is a sealed plastic bag

17  containing two bricks of compressed off-white powder

18  containing cocaine.

19           The aggregate weight of the cocaine is

20  approximately 2003.07 grams.

21           At this time I'd offer Government's Exhibit 312.

22           **MR. VERRILLO:** Based on the Court's ruling, I have

23  no further objection.

24           **THE COURT:** Exhibit 312 will be received.

25           (**WHEREUPON**, Government Exhibit 312 was received

1   into evidence).

2   **BY MR. MARANGOLA:**

3   Q.   Investigator Briganti, was anyone inside 292 Barrington

4   Street when the officers raided the location?

5   A.   Yes, Roberto Figueroa and his small child was inside.

6   Q.   All right.  And was he taken into custody?

7   A.   Yes.

8   Q.   And was the location thereafter photographed and searched?

9   A.   Yes.

10  Q.   Were you present during the search of that location?

11  A.   Yes.

12  Q.   All right. Did you observe evidence that was found during

13  the search of that location?

14  A.   Yes.

15  Q.   Can you tell us first generally what was recovered from

16  the search of 292 Barrington Street on January 29th, 2018,

17  some of the items?

18  A.   So there was approximately 720 grams of cocaine located

19  inside; there was approximately $230,000 in cash; there were

20  six long guns and two handguns located inside; there were also

21  packaging materials like unused baggies, stamps; and then just

22  like documentary materials and cell phones.

23  Q.   All right. If you can flip through in your binder

24  there starting at Government's Exhibit 285, look at 285

25  through 297.

A.    Okay.

Q.    Do those photographs Government's Exhibit 285 through and including 297 fairly and accurately show the interior of 292 Barrington Street and evidence that was collected from the interior of 292 Barrington Street on January 29, 2018?

A.    Yes.

          **MR. MARANGOLA:** At this time I'd offer Government's 285 through 297.

          **MR. VERRILLO:** Based on the Court's prior ruling, I have no further objections.

          **THE COURT:** Exhibit 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 295, 296, and 297 will be received.

          (**WHEREUPON**, Government Exhibits 285-297 were received into evidence).

**BY MR. MARANGOLA:**

Q.    Investigator Briganti, what are we looking at in 285 here?

A.    This is the living room at 292 Barrington Street and in that photograph is Roberto Figueroa.

Q.    And he's wearing what?

A.    He's wearing a white undershirt and red shorts.

Q.    If we could go to 286.  What is this?

A.    That's the kitchen at 292 Barrington Street.

Q.    Was any evidence recovered from the kitchen?

A.    I believe there were packaging -- some packaging material that was located in the kitchen.

1  Q.   All right.  Let's go to 287.  And if we could go to 291.
2  What are we looking at in Government's 291?
3  A.   So that's the table that you saw in the previous
4  photograph in the middle of the photograph.  This is a drawer
5  from that.  There's a bag in the middle that has little black
6  rubber bands in it.  There's also some spoons along the side
7  that are hard to see here, but there's little like McDonald's
8  spoons, razor blade.
9  Q.   Are there a couple of scales in that photograph as well?
10 A.   Yes, at the top there's a scale -- there's a digital
11 scale, yes.
12 Q.   Those were items that were in that draw inside the kitchen
13 table at 292 Barrington Street?
14 A.   Yes.
15 Q.   All right.  If we could go to Government's 288.  Do you
16 recognize what's in 288?
17 A.   Yes, it's a Home Depot bucket in the basement of 292
18 Barrington Street.  Inside that bucket was approximately 720
19 grams of cocaine.
20 Q.   All right. Let's look at 289.  What are we looking at in
21 Government's 289?
22 A.   That's the quantity of cocaine that was removed from the
23 Home Depot bucket.
24 Q.   All right.  And there was approximately -- do you recall
25 how these quantities of cocaine were organized?

1   A.   Yeah, they were in -- I believe one of them was half a

2   kilo.  Then the other ones were broken down into 62 gram and

3   31 gram quantities.

4   Q.   All right.  All right, can we go to Government's 290?

5   What's in -- what are we looking at in 290?

6   A.   This is a package that contained -- I can't think of the

7   name of it.  I think it's Albuterol.

8   Q.   Albuterol?

9   A.   I believe that's what it is.

10  Q.   What is that?

11  A.   It's an additive they were putting in the -- mixing

12  together with the cocaine.

13  Q.   All right. If we can go to 294.  What are we looking at in

14  294?

15  A.   This is a suitcase that was located inside that had had

16  grinders inside of it, and I believe in this particular one

17  there were some plastic vials.

18  Q.   All right.  And if we could go to 292.  And 293.  Let's go

19  back to 292.  What are we looking at in 292?

20  A.   That's a red organizer that had documentary material in

21  it; also had a pink and white thumb drive located in it

22  located in the laundry room; and there were some -- these

23  other two items that are sitting out are drug ledgers.

24  Q.   The two notebooks?

25  A.   Yes.

1  Q.   All right.  If we could go to 293?  What are we looking at

2  in 293?

3  A.   It's a Pampers box that contained approximately $230,000

4  in cash.

5  Q.   Was the cash packaged in any particular way?

6  A.   Yes, it was vacuum sealed.

7  Q.   And that was found inside 292 Barrington as well?

8  A.   Yes.

9  Q.   All right.  If we could go to Government's 295?  Do you

10  recognize what's shown in Government's 295?

11  A.   There was a bag that contained six long guns.

12  Q.   Is that what -- where was that?

13  A.   That was in Leitscha Poncedeleon's bedroom underneath her

14  bed.

15  Q.   And were the contents of that bag, those individual

16  firearms, taken out and examined?

17  A.   Yes.

18  Q.   Photographed?

19  A.   Yes, they were.

20  Q.   All right. At this time I'd ask you to take a look at

21  Government's 327 through 332, which is not in evidence.

22  A.   Okay.

23  Q.   All right. Can you describe generally what's contained in

24  Government's 327 through 332?

25  A.   Yes, these are individual photographs of the firearms, the

1   long guns that were taken out of the bag that are depicted in

2   Exhibit -- in Exhibit 295.

3   Q.   Do Government's 327 through 332 fairly and accurately

4   reflect the individual firearms after they were removed from

5   the bag shown in Government's 295?

6   A.   Yes.

7          **MR. MARANGOLA:** At this time I'd offer Government's

8   327 through and including 332.

9          **MR. VERRILLO:** Based on the Court's prior ruling, I

10  have no further objection.

11         **THE COURT:** Exhibit 327, 328, 329, 330, 331 and 332

12  will be received.

13         (**WHEREUPON**, Government Exhibits 327-332 were

14  received into evidence).

15  **BY MR. MARANGOLA:**

16  Q.   All right. At this time can we go to Government's 327?

17  Investigator, do you recognize Government's 327?

18  A.   Yes.

19  Q.   And what's in Government's -- what's Government's 327?

20  A.   So this is an AR-15 type rifle or M4.  It's a Bushmaster

21  rifle.

22         **MR. MARANGOLA:** Judge, if I could, I have several

23  firearms here I want to offer into evidence.  I'd like to just

24  put on the record for the Court and the jury all the firearms

25  have been rendered safe, they are unloaded, there are zip ties

1  through them rendering them inoperable at the moment.  So they

2  have been checked and are safe.

3            **THE COURT:** Yes, members of the jury, these

4  particular weapons have been rendered safe by zip ties and

5  being unloaded as well for display in the courtroom.

6  **BY MR. MARANGOLA:**

7  Q.   All right, Investigator, rather than continue to walk back

8  and forth, you see Government's 319 in my hand?

9  A.   Yes.

10  Q.   Is that the same firearm that we're looking at in

11  Government's 327?

12  A.   Yes, it is.

13            **MR. MARANGOLA:** Your Honor, at this time I'll read

14  from the stipulation regarding Government's 319.

15            Government Exhibit 319 contains one 223 Remington

16  5.56 by 45 millimeter caliber Bushmaster XM-15 E2S

17  semi-automatic rifle, serial number BF1415396, seized from 292

18  Barrington Street, Rochester, New York on January 29, 2018.

19  **BY MR. MARANGOLA:**

20  Q.   Investigator, can you -- we'll go to the next photograph,

21  Government's 328.  Do you recognize what's in Government's

22  328?

23  A.   Yes.

24  Q.   What is that?

25  A.   That's a Hi-Point 9 millimeter rifle.

1   Q.   Is that the same rifle that's in my hands here marked as

2   Government's 321?

3   A.   Yes.

4            **MR. MARANGOLA:**   I'll read from the stipulation

5   regarding Government's Exhibit 321.

6            Government Exhibit 321 contains one 9 millimeter

7   Luger 9 by 19 millimeter caliber Hi-Point 995 semi-automatic

8   rifle, serial number E49282, seized from 292 Barrington

9   Street, Rochester, New York on January 29, 2018.

10  **BY MR. MARANGOLA:**

11  Q.   If we could go to Government's 329?  Investigator

12  Briganti, do you recognize what's Government's 329?

13  A.   Yes, that's a SKS variant.  It's a 7.62 caliber rifle.

14  Q.   Is the firearm shown in Government's 329 Government's

15  Exhibit 322 which is in my hands here?

16  A.   Yes.

17           **MR. MARANGOLA:**   I'll read from the stipulation

18  regarding Government's Exhibit 322.

19           Government's Exhibit 322 contains one 7.662 by 39

20  millimeter caliber Norinco SKS semi-automatic rifle, serial

21  number 1812272J, seized from 292 Barrington Street, Rochester,

22  New York on January 29, 2018.

23  **BY MR. MARANGOLA:**

24  Q.   If we could go to Government's 330?  Investigator, can you

25  tell us what's in Government's 330?

1  A.   Yeah, that's another SKS variant.  Another 7.62 millimeter

2  rifle.

3  Q.   All right. Is the firearm shown in Government's 330 the

4  same firearm I'm holding in my hands here marked Government's

5  Exhibit 318?

6  A.   Yes, it is.

7  Q.   All right, and the difference there's a stock on this

8  that's been pulled back; is that correct?  As shown here?

9  A.   Yes.

10  Q.   In my hand?

11  A.   Yes.

12  Q.   All right.

13        **MR. MARANGOLA:** I'll read from the stipulation

14  regarding Government's Exhibit 318.

15        Government Exhibit 318 contains one 7.62 x 39

16  millimeter caliber Norinco SKS semi-automatic rifle, serial

17  number N as in Nancy, 8769, seized from 292 Barrington Street,

18  Rochester, New York on January 29, 2018.

19  **BY MR. MARANGOLA:**

20  Q.   If we could go to the next photograph Government's 331?

21  Investigator Briganti, can you tell us what we're looking at

22  in Government's 331?

23  A.   Yeah, that's a Mack 90.  It's an AK-47 type rifle.

24  Q.   Is the firearm shown in Government's 331 the same firearm

25  I'm holding in my hand here marked Government's 323?

1 A.   Yes.

2           **MR. MARANGOLA:** I'm going to read from the

3 stipulation regarding Government Exhibit 323.

4           Government Exhibit 323 contains one 7.62 x 39

5 millimeter caliber Norinco Mack 90 Sporter semi-automatic

6 rifle, serial number 9496997, seized from 292 Barrington

7 Street, Rochester, New York on January 29th, 2018.

8 **BY MR. MARANGOLA:**

9 Q.   If we could go finally to Government's 332?  Can you tell

10 us what we're looking at in Government's 332?

11 A.   Yes, that's a Kel-Tec either a 9 millimeter or .40 caliber

12 rifle.

13 Q.   Is the firearm shown in Government's 332 the same one I'm

14 holding in my hand here marked Government's 320?

15 A.   Yes.

16 Q.   All right. Why does the firearm in my hand appear so much

17 shorter than in that photograph marked 332?

18 A.   It has a collapsable stock on it.

19 Q.   The stock has been collapsed here?

20 A.   Yes.

21 Q.   All right.

22           **MR. MARANGOLA:** At this time I'm going to read from

23 the stipulation regarding Government's Exhibit 320.

24           Government Exhibit 320 contains one 9 millimeter

25 Luger 9 by 19 millimeter caliber Kel-Tec Sub 2000

1  semi-automatic rifle, serial number E0238, seized from 292

2  Barrington Street, Rochester, New York on January 29th, 2018.

3  **BY MR. MARANGOLA:**

4  Q.   Investigator Briganti, you indicated there were six long

5  guns as well as other firearms recovered from 292 Barrington

6  Street?

7  A.   There were also two handguns.

8  Q.   All right. I'd like to show you if we could go to

9  Government's 296?  What are we looking at in Government's

10 Exhibit 296?

11 A.   That's a Hi-Point .40 caliber handgun.

12 Q.   That was seized inside 292 Barrington; is that right?

13 A.   Yes.

14 Q.   And having looked at this before mis the firearm shown in

15 Government's 296 the same firearm marked as Government's

16 Exhibit 316?

17 A.   Yes, it is.

18         **MR. MARANGOLA:** I'll read from the stipulation

19 regarding Government's Exhibit 316.

20         Government's Exhibit 316 contains one 40 S&W

21 caliber Hi-Point JCP semi-automatic pistol, serial number

22 X7153954, seized from 292 Barrington Street, Rochester, New

23 York on January 29, 2018.

24 **BY MR. MARANGOLA:**

25 Q.   If we could go to Government's 297?  What are we looking

1 | at in Government's 297, Investigator?

2 | A.   It's a Ruger .44 magnum revolver.

3 | Q.   And where was that seized from?

4 | A.   292 Barrington Street.

5 | Q.   I'll hand up, display it so you can see.  Is Government

6 | Exhibit 317 the same firearm that's shown in the photograph

7 | marked Government's Exhibit 297?

8 | A.   Yes, it is.

9 | **MR. MARANGOLA:** At this time I'll read from the

10 | stipulation regarding Government's 317.

11 | Government Exhibit 317 contains one .44 magnum

12 | caliber Sturm Ruger Red Hawk double action revolver, serial

13 | number 501-51770, seized from 292 Barrington Street,

14 | Rochester, New York on January 29, 2018.

15 | **MR. MARANGOLA:** Your Honor, at this time I would

16 | offer Government's Exhibit 316, 317, 318, 319, 320, 321, 322,

17 | and 323.

18 | **MR. VERRILLO:** Based on the Court's prior ruling, I

19 | have no further objections.

20 | **THE COURT:** Exhibit 316, 317, 318, 319, 320, 321,

21 | 322 and 323 will be received.

22 | (**WHEREUPON**, Government Exhibits 316-323 were

23 | received into evidence).

24 | **THE COURT:** I think this is a good time for a break.

25 | Ladies and gentlemen, we're going to take a recess

1  approximately 20 minutes.  In the meantime do not discuss the

2  matter or allow anybody to discuss the matter with you.  Jury

3  may step down, we'll stand in recess.

4          (**WHEREUPON**, there was a pause in the proceeding.).

5          (**WHEREUPON**, the defendant is present).

6          **THE COURT:**  You may proceed.  Bring the jury out.

7          (**WHEREUPON**, the jury is present).

8          **THE COURT:**  You may continue.

9          **MR. MARANGOLA:** Thank you, Your Honor.

10  BY MR. MARANGOLA:

11  Q.   Investigator Briganti, we have Government's 289 on the

12  screen.  I believe you testified earlier that that was the

13  inside of the contents of a Home Depot bucket that was found

14  at 292 Barrington Street; is that right?

15  A.   Yes.

16  Q.   And inside that was -- what was inside that bucket?

17  A.   There was approximately 720 grams of cocaine.

18  Q.   All right.

19          **MR. MARANGOLA:** Your Honor, I'm going to read from

20  the stipulation between the parties at this time with respect

21  to Government's Exhibit 313, which I have here.

22          Government Exhibit 313 was seized from 292

23  Barrington Street, Rochester, New York on January 29, 2018.

24          Government Exhibit 313 is a sealed plastic bag with

25  compressed white powder containing cocaine in five plastic

1    bags containing cocaine weighing 62.17 grams; 62.43 grams;

2    61.83 grams; and 36.82 grams; and one partial brick weighing

3    499.66 grams.

4              And 17 plastic bags with ying-yang logos containing

5    cocaine weighing approximately 0.799 grams.

6              The aggregates weight of the cocaine is

7    approximately 723.7 grams.

8              Your Honor, at this time I offer Government's

9    Exhibit 313.

10             **MR. VERRILLO:** Based on the Court's prior ruling, I

11   have no further objection.

12             **THE COURT:** Exhibit 313 will be received.

13             (**WHEREUPON**, Government Exhibit 313 was received

14   into evidence).

15   **BY MR. MARANGOLA:**

16   Q.   All right, if we could go to Government's 292 in evidence?

17   Investigator, you testified earlier regarding the red file

18   organizer in this photograph.  Do you recall that?

19   A.   Yes.

20   Q.   Do you remember examining the contents of that file

21   organizer shown in Government's 292?

22   A.   Yes.

23   Q.   And what, if anything, did you observe in it?

24   A.   There was paperwork inside of it; there was also a pink

25   and white thumb drive was located inside.

1    Q.   What, if anything, did you do with the white and pink

2    thumb drive that was found in the red file organizer at 292

3    Barrington?

4    A.   Ultimately I placed it in my computer at my desk and

5    observed the contents of the thumb drive.

6    Q.   After viewing the contents of it what did you do?

7    A.   I put it in a property bag and turned it into the Property

8    Clerk's Office.

9    Q.   All right. Can you describe for the jury what you saw on

10   that white and pink thumb drive from the red file organizer at

11   292 Barrington Street?

12   A.   There were two video clips on it.  I think they were -- I

13   think they were marked as Culver thumb, something like that,

14   Culver Road thumb drive; first video clip showed two

15   individuals, one of which I identified as Axel Aponte Camacho,

16   and then the second video clip showed two males running from

17   the back through the backyard with backpacks.

18   Q.   Do you recall were those videos dated?

19   A.   They were dated, yes.

20   Q.   Do you remember at this point what the date was?

21   A.   I don't.

22   Q.   Okay. The -- where -- you said there was a location that

23   was shown in the video?

24   A.   Yes.

25   Q.   What was that location?

1  A.    It was 899 Culver Road.

2  Q.    All right.  If we could show you what is not in evidence

3  as Government's Exhibit 54.  Do you recognize what's shown in

4  Government's Exhibit 54?

5  A.    Yes, that's 899 Culver Road, the front of it.

6  Q.    That's the front of the building?

7  A.    Yes.

8  Q.    And I'd like you to look at -- we could show you now

9  Government's 55.  What is shown in Government's 55?

10  A.    That's the rear of 899 Culver Road.

11  Q.    The building that's the rear of Culver Road is which of

12  the two buildings shown in Government's 55?

13  A.    Taller building.

14  Q.    All right.

15  A.    Brown taller building.

16  Q.    Do Government's 54 and 55 fairly and accurately reflect

17  the building known as 899 Culver Road as it existed during

18  your investigation?

19  A.    Yes.

20            **MR. MARANGOLA:** At this time I'd offer Government's

21  54 and 55.

22            **MR. VERRILLO:** No objection.

23            **THE COURT:** Exhibits 54 and 55 will be received.

24            (**WHEREUPON**, Government Exhibits 54-55 were received

25  into evidence).

1   **BY MR. MARANGOLA:**

2   Q.   All right.  We're looking at 54, this is the front of the

3   building; is that right?

4   A.   Yes.

5   Q.   At Culver Road?  And then let's go to 55.  If you could

6   just touch your screen so we know which is the rear of 899

7   Culver Road.  All right, you've marked a red -- large red

8   building on the right side of the photograph?

9   A.   Yes.

10  Q.   Investigator Briganti, I'd like to show you what is not in

11  evidence now as Government's Exhibit 16.  Do you recognize the

12  individual shown in Government's Exhibit 16?

13  A.   Yes, I do.

14  Q.   And who is that?

15  A.   That's Bishmallah Holloway.

16  Q.   Holloway?

17  A.   Holloway.

18  Q.   What's his first -- what's he go by?

19  A.   Ishmael.

20  Q.   Ishmael.  Have you ever spoken to this individual?

21  A.   Yes.

22  Q.   All right.  Does Government's Exhibit 16 fairly and

23  accurately show the person you referred to as Ishmael?

24  A.   Yes, it does.

25  Q.   When did you speak to Ishmael in connection with your

1    investigation?

2    A.   Sometime around 2019, 2020, beginning of 2020.

3    Q.   All right.

4              **MR. MARANGOLA:** At this time I'd offer Government's

5    Exhibit 16.

6              **MR. VERRILLO:** No objection.

7              **THE COURT:** Exhibit 16 will be received.

8              (**WHEREUPON**, Government Exhibit 16 was received into

9    evidence).

10   **BY MR. MARANGOLA:**

11   Q.   And who is Ishmael?

12   A.   He's the superintendent that was the superintendent of the

13   building at 699 West Main Street, and he was also the

14   superintendent of the building at 899 Culver Road.

15   Q.   So he was the superintendent of the building we just

16   looked at a moment or two ago, 899 Culver?

17   A.   Yes.

18   Q.   And what was the other building that he was the

19   superintendent for?

20   A.   699 West Main Street.

21   Q.   West Main Street?

22   A.   I'm sorry, East Main Street.

23   Q.   If I could show you Government's Exhibit 53, which is not

24   in evidence.  You recognize what's shown in Government's 53 in

25   the center of this photograph?

1  A.    Yes.

2  Q.    What is that?

3  A.    That's 699 East Main Street.

4  Q.    Are you familiar with this building as part of your

5  investigation?

6  A.    Yes.

7  Q.    Does Government's 53 fairly and accurately show 699 East

8  Main as it existed during your investigation?

9  A.    Yes.

10  Q.    For the record, it's -- can you describe which of the

11  buildings shown in this photograph is 699 East Main?

12  A.    Building in the middle of the photograph, the taller brown

13  building.

14         **MR. MARANGOLA:** At this time I'd offer Government's

15  Exhibit 53.

16         **MR. VERRILLO:** No objection.

17         **THE COURT:** Exhibit 53 will be received.

18         (**WHEREUPON**, Government Exhibit 53 was received into

19  evidence).

20  **BY MR. MARANGOLA:**

21  Q.    You indicated the person you previously identified as

22  Ishmael was the superintendent of this building in

23  Government's 53 as well as the other one?

24  A.    Yes.

25  Q.    Are both 899 Culver Road and 699 East Main Street, are

1  both of those buildings multi-apartment buildings?

2  A.   Yes.

3  Q.   All right. If we can go back to that white and pink thumb

4  drive you testified about earlier.  I'm holding up in my hand

5  Government's Exhibit 35.  I don't know if you can see --

6  A.   I can see.

7  Q.   You viewed it previously?

8  A.   Yes.

9  Q.   Do you recognize this?

10  A.   Yes.  The white and pink thumb drive I removed from the

11  file organizer that we took from 292 Barrington Street.

12  Q.   All right. And how do you recognize it as that?

13  A.   It's in the evidence bag that I sealed it in.

14  Q.   Okay. Is it in the same condition as when you found it in

15  that red organizer at 292 Barrington Street on January 29,

16  2018?

17  A.   Yes.

18  Q.   All right. That's the one you played and observed files

19  under Culver or Culver thumb category; is that right?

20  A.   Yes.

21          **MR. MARANGOLA:** At this time I'd offer Government's

22  Exhibit 335.

23          **THE COURT:** 335, not 35; is that right?

24          **MR. MARANGOLA:** I'm sorry.  335, yes.

25          **MR. VERRILLO:** I'd object to that exhibit.

1          **THE COURT:** Overruled.  Exhibit 335 will be received

2   subject to connection.

3          (**WHEREUPON**, Government Exhibit 335 was received

4   into evidence).

5          **MR. MARANGOLA:** Your Honor, we have uploaded the

6   digital contents of this to the trial laptop so we can play it

7   for the jury.

8   **BY MR. MARANGOLA:**

9   Q.   Before we offer to do that, Investigator, if we could go

10  back to Government's Exhibit 1.  Is the person you previously

11  testified that you observed on the files in Government's 335,

12  is that person shown in Government's Exhibit 1?

13  A.   Yes.

14  Q.   And can you identify him by name and touch the screen to

15  show us which photograph is him?

16  A.   Yes.  His name is Axel Aponte Camacho, and he's third row,

17  second from the left, wearing a brown shirt.

18  Q.   Okay. All right.

19          **MR. MARANGOLA:** Your Honor, we will wait until later

20  in the trial to play that for the jury based on the Court's

21  ruling, but having subject to connection.

22          **THE COURT:** Thank you.

23          **MR. MARANGOLA:** Thank you.

24  **BY MR. MARANGOLA:**

25  Q.   All right. Investigator, we were talking about the items

1  seized at 292 Barrington Street on the day of the takedown

2  January 29, 2018.

3  A.   Yes.

4  Q.   Can you tell us -- identify some of the other locations

5  that were searched on that specific day January 29, 2018, and

6  some of the items of evidence that were collected?

7  A.   Yes.  So 6 Burbank Street was searched, that was the home

8  of Javier Figueroa and his wife and his children.  Also his

9  Mercedes SUV, his GMC pick-up truck; there was approximately

10  $100,000 in cash located inside.

11             There was 60 Malling Street, which was the home of

12  Javier Figueroa's mother.  There was over $400,000 in cash

13  found in that location.

14  Q.   If we can show you what's not in evidence as Government's

15  57.  Do you recognize what's shown in that photograph?

16  A.   Yes, that's 60 Malling Street.

17  Q.   Does that photograph fairly and accurately show 60 Malling

18  Street as existed during your investigation?

19  A.   Yes.

20             **MR. MARANGOLA:** At this time I'd offer Government's

21  57.

22             **MR. VERRILLO:** No objection.

23             **THE COURT:** Exhibit 57 will be received.

24             (**WHEREUPON**, Government Exhibit 57 was received into

25  evidence).

1  BY MR. MARANGOLA:

2  Q.   And there was -- what was recovered from that location?

3  A.   There was over $400,000 in cash located there.

4  Q.   What other locations were searched in connection with the

5  takedown on January 29, 2018?

6  A.   So there was an apartment at 820 East Main Street where we

7  recovered packaging materials.

8          Then there was a drug house at 15 Burbank Street

9  where we recovered quantities of street level heroin and

10  cocaine and money.

11  Q.   If we could show you Government's Exhibit 43, which is not

12  in evidence.  Do you recognize any of the houses in

13  Government's Exhibit 43?

14  A.   Yes.

15  Q.   Which house do you recognize?

16  A.   So it's the house -- the gray house with the Puerto Rican

17  flag in the top window, it's the gray one.  That's 15 Burbank

18  Street.

19  Q.   And you placed a mark on that photograph?

20  A.   Yes.

21  Q.   Or on that house.  Does the photograph marked Government's

22  43 fairly and accurately reflect the premises 15 Burbank

23  Street as existed during your investigation?

24  A.   Yes.

25          **MR. MARANGOLA:** At this time I'd offer Government's

1   43.

2            **MR. VERRILLO:** No objection.

3            **THE COURT:** Exhibit 43 will be received.

4            (**WHEREUPON**, Government Exhibit 43 was received into

5   evidence).

6   **BY MR. MARANGOLA:**

7   Q.   Investigator, you testified that in connection with the

8   takedown you asked the law enforcement folks at the Postal

9   Service to hold onto a package addressed to 4 Ritz Street; is

10  that right?

11  A.   Yes.

12  Q.   Now, and you also talked to us about the controlled

13  delivery of the package addressed to 15 Harwood; is that

14  right?

15  A.   Yes.

16  Q.   How did you know to ask Postal to stop or to intercept the

17  4 Ritz package or do a control delivery of the 15 Harwood

18  package?

19  A.   Because we intercepted text messages over the wiretap with

20  tracking numbers for those packages from Puerto Rico.

21  Q.   And that's how you just learned which -- where the package

22  was coming from Puerto Rico to those locations?

23  A.   Yes.

24  Q.   All right. I'd like you to look at -- you said the 4 Ritz

25  Street package was held by the Postal Service; is that right?

1    A.    Yes.

2    Q.    Was that ultimately searched?

3    A.    Yes, it was.

4    Q.    I'd like you to look at Government's Exhibit 269 through

5    275.

6    A.    Okay.

7    Q.    Do those exhibits 269 through 275 fairly and accurately

8    show the package that was held by Postal from Puerto Rico

9    addressed to 4 Ritz Street and searched in connection with the

10    takedown in this case?

11    A.    Yes.

12           **MR. MARANGOLA:** At this time I'd offer Government's

13    269 through 275.

14           **MR. VERRILLO:** Your Honor, based on the Court's

15    prior ruling, I have no further objections.

16           **THE COURT:** Exhibits 269, 270, 271, 272, 273, 274

17    and 275 will be received.

18           (**WHEREUPON**, Government Exhibits 269-275 were

19    received into evidence).

20    **BY MR. MARANGOLA:**

21    Q.    Investigator, if we can show you Government's 269.  What

22    are we looking at here?

23    A.    That's the label on the package that was held that was

24    supposed to be going to 4 Ritz Street.

25    Q.    From Puerto Rico?

1   A.    Yes.

2   Q.    All right.  If we could go to 270.  That's the -- is that

3   the package before it was opened?

4   A.    Yes.

5   Q.    If we could go to 271.  What are we looking at here?

6   A.    That's the contents of the package once it was opened.

7   Q.    All right. Go to 272.  What are we looking at in 272?

8   A.    That's the box of M&M's and the box of Skittles that were

9   observed in the previous photograph, and inside of each one of

10  those boxes are a kilo of cocaine wrapped in carbon paper.

11  Q.    That's what's visible in the black object in each of the

12  boxes, one containing M&M's and one containing Skittles?

13  A.    Yes.

14  Q.    If we could go to 273.  What are we looking at in 273?

15  A.    That's one of the kilos -- kilograms of cocaine that

16  they -- the outer wrapping of carbon paper is being removed.

17  Q.    All right.  And 274.  Is that another photograph of a kilo

18  unwrapped from the carbon paper?

19  A.    Yes.

20  Q.    Finally 275.  What are we looking at in 275?

21  A.    Those are the 2 kilograms of cocaine after they were --

22  the carbon paper was removed from.  These are the 2 kilos that

23  were removed from the package that was being delivered to 4

24  Ritz Street.

25  Q.    All right, there's some marking and -- handwritten marking

1    on the kilogram on the bottom; is that right?

2    A.    Yes.

3    Q.    In marker?

4    A.    Yes.

5    Q.    All right.  Is that from law enforcement or lab personnel

6    after they were removed?

7    A.    Yes.

8    Q.    All right.

9             **MR. MARANGOLA:** At this time, Your Honor, I'd like

10   to read from the stipulation regarding Government Exhibit 278.

11            I forgot to bring it down, we'll come back to that.

12   **BY MR. MARANGOLA:**

13   Q.    All right. Investigator, you have identified a number of

14   locations in connection with your investigation, including

15   899 Culver Road and 699 East Main Street.  I'd like to show

16   you some other locations to see if you can identify them for

17   us, okay?

18   A.    Okay.

19   Q.    First can we show you what is not in evidence as

20   Government's 59 and 60.  We'll go back to 59.  Do you

21   recognize what's shown in Government's 59 and 60?

22   A.    Yes.

23   Q.    What is that?

24   A.    It's an apartment complex that's located at 736 Carter

25   Street which is just adjacent to the Rochester General

1    Hospital.

2    Q.   Do Government's 59 and 60 fairly and accurately show the

3    apartment complex at 736 Carter Street as they existed during

4    your investigation?

5    A.   Yes.

6              **MR. MARANGOLA:** At this time I'd offer Government's

7    59 and 60.

8              **MR. VERRILLO:** I have no objection.

9              **THE COURT:** Exhibits 59 and 60 will be received.

10             (**WHEREUPON**, Government Exhibits 59-60 were received

11   into evidence).

12   **BY MR. MARANGOLA:**

13   Q.   Where is the apartment complex shown in Government's 59 in

14   relation to the Rochester General Hospital?

15   A.   It's right next door to Rochester General Hospital.

16   Q.   Okay. All right. If we can show you what is not in

17   evidence as Government's 62.  Do you recognize what's shown in

18   Government's Exhibit 62?

19   A.   Yes.

20   Q.   What is that?

21   A.   These are the Loft apartments that are located in the 1600

22   block of North Clinton Avenue.

23   Q.   That's in the City of Rochester as well?

24   A.   Yes.

25   Q.   Does this photograph fairly and accurately show the Loft

1  apartments -- what did you say, 1600 block?

2  A.   Yes, I believe it's 1600 -- 1614 to 1624, I think that's

3  the block of the address, yes.

4  Q.   All right.  Does this photograph fairly and accurately

5  show those apartments as they existed during your

6  investigation?

7  A.   Yes.

8         **MR. MARANGOLA:** At this time I'd offer Government's

9  62.

10         **MR. VERRILLO:** No objection.

11         **THE COURT:** Exhibit 62 will be received.

12         (**WHEREUPON**, Government Exhibit 62 was received into

13  evidence).

14  **BY MR. MARANGOLA:**

15  Q.   Investigator, is there any highway near the apartments

16  here shown in Government Exhibit 62?

17  A.   Yes, these apartments are located just south of the on

18  ramp to 104 from Clinton Avenue, the off ramp and the on ramp

19  to 104.

20  Q.   To 104, okay.  And next I'd like to show you what is not

21  in evidence as Government's Exhibit 63.  Do you recognize the

22  house shown in Government's Exhibit 63?

23  A.   Yes.

24  Q.   What house is that?

25  A.   5 Thomas Street.

1  Q.    5 Thomas Street?

2  A.    Yes.

3  Q.    That's in the City of Rochester?

4  A.    Yes.

5  Q.    Does Government's Exhibit 63 fairly and accurately show 5

6  Thomas Street as it existed during your investigation?

7  A.    Yes, it does.

8          **MR. MARANGOLA:** At this time I'd offer Government's

9  63.

10          **MR. VERRILLO:** No objection.

11          **THE COURT:** Exhibit 63 will be received.

12          (**WHEREUPON**, Government Exhibit 63 was received into

13  evidence).

14  **BY MR. MARANGOLA:**

15  Q.    And I'd like to show you Government's Exhibit 38, which is

16  not in evidence.  Do you recognize the house in the center of

17  this photograph marked Government's Exhibit 38?

18  A.    Yes.

19  Q.    What house is that?

20  A.    59 Fernwood Avenue.

21  Q.    Does Government's 38 fairly and accurately show

22  59 Fernwood Avenue as it existed during your investigation?

23  A.    Yes.

24          **MR. MARANGOLA:** At this time I'd offer Government's

25  38.

1              **MR. VERRILLO:** No objection.

2              **THE COURT:** Exhibit 38 will be received.

3              (**WHEREUPON**, Government Exhibit 38 was received into

4  evidence).

5  **BY MR. MARANGOLA:**

6  Q.   Investigator, do you recall is 59 Fernwood that's shown

7  here in Government 38 the same or different address listed for

8  Carlos Figueroa on that lease that was found in Ziomara

9  Rosado's name at 6 Burbank on July 30th, 2015?

10 A.   It's the same location.

11 Q.   All right. Ms. Kocher has come to the rescue here.

12             **MR. MARANGOLA:** At this time, Your Honor, now that I

13 have Government's Exhibit 278, I'd like to read from the

14 stipulation between the parties.

15             Government's Exhibit 278, which I have here, was

16 seized from a package addressed to 4 Ritz Street, Rochester,

17 New York on January 29, 2018.

18             Government Exhibit 278 is two bricks of compressed

19 off-white powder containing cocaine.

20             The aggregate weight of the cocaine is

21 approximately 1998.22 grams.

22             At this time, Your Honor, I'd offer Government's

23 Exhibit 278.

24             **MR. VERRILLO:** Your Honor, based on the Court's

25 prior ruling, I have no further objection.

1          **THE COURT:** Exhibit 278 is received.

2              (**WHEREUPON**, Government Exhibit 278 was received

3     into evidence).

4     BY MR. MARANGOLA:

5     Q.   All right, Investigator, you said that you arrested Javi

6     and several other people on January 29, 2018 at the takedown

7     on federal narcotics and firearms charges; is that right?

8     A.   Yes.

9     Q.   Can you describe who you arrested that day?

10    A.   Yes.  We arrested Carlos Javier Figueroa; Leitscha

11    Poncedeleon; Roberto Figueroa; and Obed Torres Garcia.

12    Q.   All right.  Were any other -- let me ask you this, did you

13    continue the investigation to make additional arrests of

14    members of the operation after January 29, 2018?

15    A.   Yes.

16    Q.   All right.  Can you tell us are any of the individuals

17    that you arrested on federal charges shown in Government's

18    Exhibit 1 that you have not yet identified?

19    A.   Yes.

20    Q.   All right. Can you tell us who on Government Exhibit 1 was

21    also charged federally?

22    A.   So Axel Aponte Camacho was arrested on state charges prior

23    in December -- I believe it was December of 2016, prior to the

24    takedown.

25    Q.   Where was he arrested?

1   A.   54 Miller Street in the City of Rochester.

2   Q.   Okay.

3   A.   Victor Nunez was arrested in June of 2019 in Redding,

4   Pennsylvania.

5              Xavier Torres was arrested in December of 2018 in

6   Buffalo, New York.

7              Jean Karlos Pizarro, also known as Yankee, he was

8   arrested in April of 2019 in Puerto Rico.

9              Jonathan Cruz-Carmona, also known as Tapon, he was

10  arrested in March of 2018 in Rochester.

11  Q.   All right.

12             **MR. MARANGOLA:** May I have just a moment, Judge?

13             **THE COURT:** Yes.

14             **MR. MARANGOLA:** Thank you, Investigator.  At this

15  time I have no further questions.

16             **THE COURT:** Go ahead.

17             **MR. VERRILLO:** Thank you.

18                      **CROSS-EXAMINATION**

19  **BY MR. VERRILLO:**

20  Q.   Good afternoon, Investigator.

21  A.   Good afternoon, sir.

22  Q.   Can you hear me okay?

23  A.   Yes.

24  Q.   Okay. Now, you previously testified that you are acting as

25  a co-case agent in this case?

1  A.    Yes, sir.

2  Q.    And is it your role as a case agent to assist the

3  Government in prosecuting Mr. Torres?

4  A.    It is my role to assist, yes, with the prosecution of the

5  case, yes.

6  Q.    Okay. And can you explain what your role has been in terms

7  of assisting the Government in prosecuting the case?  What do

8  you do?

9  A.    I'm not sure I understand, sir.

10  Q.    Okay. Well, you've testified to the charges being brought

11  against the various defendants in this case, correct?

12  A.    Yes.

13  Q.    And since the charges were filed have you assisted the

14  Government in prosecuting the case?

15  A.    Well, I guess any evidence that we obtained I would

16  provide to the prosecution.  Any information that we obtained

17  I would provide to the prosecution.  Any assistance with

18  talking to individuals that are witnesses in the case, yes, I

19  would be part of that, yes.

20  Q.    Okay. So one of the roles would be you would participate

21  with meeting with the Government and cooperating witnesses,

22  right?

23  A.    Yes.

24  Q.    Over the course of the investigation of the prosecution of

25  this case, how many hours of meetings have you participated in

1 | with cooperators?

2 | A.    Oh, a lot.  I can't put a number on it, but a lot.

3 | Q.    Okay. Be in the hundreds of hours?

4 | A.    Yes.

5 | Q.    And you started as a co-case agent at what time in 2015?

6 | A.    It was early 2015.  I'm not -- I'm thinking towards the

7 | end of January of 2015.

8 | Q.    Okay. In your role as a co-case agent, are you required to

9 | fully investigate claims that are brought to your attention?

10 | A.    Yes.

11 | Q.    So in this case you investigated claims of drug sales and

12 | homicides in the area of Burbank and North Clinton; is that

13 | right?

14 | A.    Yes.

15 | Q.    And did you try to corroborate the case with surveillance?

16 | A.    Yes.

17 | Q.    Okay. With respect to Mr. Torres -- and when I say

18 | Mr. Torres, I'm referring to Xavier Torres.

19 | A.    Yes, sir.

20 | Q.    Do you have any videos of Mr. Torres?

21 | A.    Videos, no.

22 | Q.    Okay. And do you have any audio recordings of him?

23 | A.    No.

24 | Q.    Okay. And you had testified earlier that you had wiretaps

25 | of various phones during the course of your investigation; is

1  that right?

2  A.   Yes, sir.

3  Q.   And do you have any recordings of Mr. Torres on any of

4  those phones?

5  A.   Not that I'm aware of, no.

6  Q.   All right. How many calls did you listen to on the

7  wiretaps?

8  A.   Thousands.

9  Q.   Okay. Both yourself and your assistants, your law

10 enforcement assistants?

11 A.   Yes, the phone calls were intercepted -- I mean were

12 listened to by Spanish speaking law enforcement and

13 contractors that we had.

14 Q.   Okay. And did you also utilize pole cameras in the bust

15 area as part of your investigation?

16 A.   Yes, later on in 2016 we did, yes.

17 Q.   Okay. How many drug investigations have you participated

18 in in your career?

19 A.   Oh, I would say thousands.  Thousands.

20 Q.   So would it be fair to say you have some general

21 familiarity with how a drug business takes place?

22 A.   Yes, sir.

23 Q.   Okay. Is it common for a drug business to have a leader?

24 A.   It's common for a drug organization to have a leader.

25 There are independent drug dealers, but for the most part for

1  an organization there is.  It's -- it's not -- I wouldn't say

2  it's common.  I would say that drug organizations have a

3  leader, but then there's some individuals that will sell drugs

4  on their own.

5  Q.   Okay. If we're assuming an organization or a group of

6  people working together, would there generally be a leader of

7  that organization in the drug business?

8  A.   Yes.

9  Q.   Okay. And then you need to have workers underneath that

10  person or persons, correct?

11  A.   Yes.  I mean, every organization has a hierarchy, so

12  there's a leader and then, you know, I mean mid-level members

13  of it and then lower level members of it.

14  Q.   Okay.

15  A.   In my experience, that's what I've experienced.

16  Q.   Okay.  And during the course of the drug business, I'm

17  assuming there's multiple people involved.  Would there be

18  someone generally that would maintain the money that's

19  received?

20  A.   I'm not certain what you're asking me, sir.

21  Q.   Well, if there are sellers -- people selling drugs for an

22  organization, would they generally have someone who would

23  collect the money associated with those sales?

24  A.   From street level dealers?

25  Q.   Yes.

1  A.    Yes.

2  Q.    Okay. Would there be someone generally that would keep

3  records related to those transactions?

4  A.    Yes.

5  Q.    And I think in your direct testimony you referred to

6  notebooks.  You found some notebooks during the course of your

7  investigation?

8  A.    Yes, on the takedown day we did, yes, sir.

9  Q.    Okay. And during some of the searches, right?  Search

10 warrants?

11 A.    Yes.

12 Q.    And is it common for people operating in a drug business

13 that you've investigated to have a record of transactions in a

14 notebook or on a computer?

15 A.    Yes.

16 Q.    And you would call that a ledger?

17 A.    Yes.

18 Q.    Okay. And your investigation went from early 2015 to

19 January of 2018; is that right?

20 A.    Well, the investigation went from early 2015 until trial

21 time, until right before the trial.

22 Q.    Let me rephrase the question.  The charge that you have in

23 this case goes from 2015 to early 2018; is that correct?

24 A.    That's correct, sir, yes.

25 Q.    So if records were being kept, they should be quite

1  significant in number, correct?

2          **MR. MARANGOLA:** Objection to the form of the

3  question.

4          **THE COURT:**  Overruled.  He can answer that.

5          **THE WITNESS:** I'm not certain I understand the

6  question, sir.

7  **BY MR. VERRILLO:**

8  Q.   If we assume there was a drug organization taking place

9  between 2015 and early 2018, and records were kept of those

10 various transactions, would you agree that would involve a

11 significant amount of records?

12         **MR. MARANGOLA:** Objection to the form, Judge.

13         **THE COURT:** Overruled.  He can answer that.

14         **THE WITNESS:** I would say if records were kept from

15 those throughout that period of time, then yes, we would --

16 you would assume that there would be a large volume of record.

17 **BY MR. VERRILLO:**

18 Q.   Okay.  Based on your training and experience, would you

19 agree that records were generally kept in order to account for

20 who should receive a portion of the proceeds of the drug

21 sales?

22 A.   Well, I believe the records were kept so that they

23 could -- they knew the money that was coming in and the amount

24 of drugs that were going out.

25 Q.   Yeah.  So those transactions could be accounted for,

1  correct?

2  A.   Yes.

3  Q.   And you had performed a search at Mr. Torres' residence in

4  July of 2015, correct?

5  A.   Yes.

6  Q.   And did you find any drug ledgers at his residence?

7  A.   Not that I'm aware of, no.

8  Q.   In 2015 did you find any notebooks or ledgers related to

9  drug activity that were associated with Mr. Torres?

10  A.   No.

11  Q.   How about in 2016?

12  A.   Did I find any ledgers in 2016?

13  Q.   Yes.

14  A.   No.

15  Q.   Okay. And you did find some ledgers in -- strike that.

16          You did find some notebooks in 2018 at Leitscha's

17  residence?

18  A.   Yes.

19  Q.   Now, would you agree that the employees or the people that

20  worked in a drug organization would generally get paid out of

21  the proceeds of the drug sales?

22          **MR. MARANGOLA:** Judge, I'm going to object.  Are we

23  talking about the organization at trial or are we talking

24  about in theory a hypothetical drug organization?

25          **THE COURT:** I think it's a proper question.

1  Overruled.  Go ahead.

2          **THE WITNESS:** I would say overall hypothetically, I

3  don't know if I can answer that.  In this particular case I

4  know that that's the case.  In this particular organization I

5  know that that's how they were being paid. I can't say that

6  for every one of them.

7  **BY MR. VERRILLO:**

8  Q.   Okay.  Well, would you agree that people who were employed

9  in the drug business are expecting to get paid if they're

10  selling drugs?

11  A.   Yes.

12  Q.   It's not a voluntary organization?

13  A.   No.

14  Q.   Okay. So -- okay.  So as a part of your investigation

15  generally, and you indicated you handled a number of drug

16  investigations, when you have a suspect that is alleged to be

17  involved in a drug organization, is it common for you to

18  investigate whether they have any assets?

19  A.   Yes, throughout the investigation, yes, as it gets to the

20  later portion of the investigation, yes, we would do that,

21  yes.

22  Q.   And is it common for persons involved in the drug business

23  to acquire assets that they purchase from the drug proceeds

24  they received?

25  A.   No, not -- I wouldn't say that's common.  I mean,

1    there's -- I mean, there's a number of individuals I deal with

2    that make a lot of money and have nothing to show for it.

3    Q.   You've had occasions where people have acquired a lot of

4    money and have acquired a lot of assets as well, correct?

5    A.   Oh, yes.

6    Q.   That's something you would notice if you were doing an

7    investigation, correct?

8    A.   Yes.

9    Q.   Whether they owned a home or not?

10   A.   Correct.

11   Q.   Whether they had a lot of jewelry or not?

12   A.   Yes.

13   Q.   Whether they had a lot of cash or not?

14   A.   Yes.

15   Q.   Okay. Now, in Xavier Torres' case, did you become aware of

16   any assets that he owns?

17   A.   No.

18   Q.   Do you know whether he owns any houses?

19   A.   Not that I'm aware of.

20   Q.   Do you know whether he owns any vehicles?

21   A.   No, I don't know that.

22   Q.   Okay. When you act upon an arrest warrant, which you

23   testified you had arrested a number of people in this case, do

24   you generally tell the person whom you are conducting the

25   arrest that you'll be coming to their home?

1  A.    You mean before we arrest them?

2  Q.    Yes.

3  A.    No.

4  Q.    And law enforcement arrested Mr. Torres.  Do you know

5  approximately when?

6  A.    You mean in this case?

7  Q.    Yes.

8  A.    I think it was his -- he was arrested in December of 2018.

9  Q.    Okay. And he was arrested at his apartment in Buffalo,

10  correct?

11  A.    Yes, he was.

12  Q.    And as part of that arrest do you know whether -- were you

13  present during that arrest?

14  A.    I wasn't present during the entry at his house, but I was

15  present outside of his residence, yes.

16  Q.    You were in the area at that time?

17  A.    Yes, sir.

18  Q.    And you were aware they did a search of his home at that

19  time?

20  A.    No, I'm not aware of that, no.

21  Q.    Did you -- but he would have been searched?  His person

22  would have been searched, correct?

23  A.    His person would have been searched, yes.

24  Q.    Okay.  Did he have any cash on him at that time?

25  A.    Not that I can recall, but I believe -- I believe that the

1    people -- the SWAT team that took Mr. Torres into custody put

2    his clothes on him.  So he didn't have those clothes on when

3    he was inside.

4    Q.    But as part of that arrest in 2018, you didn't acquire any

5    cash or any contraband from him, correct?

6    A.    From him, no.

7    Q.    Okay. Now, when you went to Leitscha's house as a part of

8    the takedown, is it your testimony that as a result of the

9    search of her residence you acquired cash or there was cash

10   there?

11   A.    At Barrington Street?

12   Q.    Yes.

13   A.    Yes, sir.

14   Q.    And there also were firearms there, correct?

15   A.    Yes, sir.

16   Q.    And Mr. Torres was not there at that residence, correct?

17   A.    No, he was not.

18   Q.    Okay. And then I believe you also testified about the

19   premises -- is it Malling Drive?  Malling Drive?

20   A.    60 Malling Drive, yes, sir.

21   Q.    And there was a search of that premises as well, correct?

22   A.    Yes.

23   Q.    In January of 2018?

24   A.    Yes, sir.

25   Q.    And was cash acquired there?

1  A.    Yes.

2  Q.    And how much was that?

3  A.    That was over $400,000 in cash.

4  Q.    Okay. And Mr. Torres did not reside there, correct?

5  A.    I'm sorry, I didn't hear your question.

6  Q.    Was Mr. Torres residing there when --

7  A.    No.

8  Q.    Okay. Now, in your direct testimony -- in your direct

9  testimony you had referenced Xavier Torres as Pistolita,

10 correct?

11 A.    Yes.

12 Q.    As one of his nicknames?

13 A.    Yes, sir.

14 Q.    And you also referenced him as P?

15 A.    Yes.

16 Q.    One of his nicknames?  What is the basis for that

17 testimony?

18 A.    That was information that we were provided by confidential

19 informants that knew -- that knew Xavier Torres.

20 Q.    Okay. You also referenced Mr. Torres as Pepe, correct?

21 A.    Yes.

22 Q.    And what's the basis of your testimony as to that

23 nickname?

24 A.    Again that was another cooperating individual that gave us

25 that name.

1  Q.   Do you know any other individuals who are referenced as

2  Pepe?

3  A.   I do, yes.

4  Q.   Okay. Who would that be?

5  A.   Victor Pizarro.

6  Q.   Okay. Okay.  You had testified in direct about a search of

7  11 Burbank.  Do you recall that?

8  A.   Yes, sir.

9  Q.   That was in 2015?

10 A.   Yes.

11 Q.   And did you find any drug ledgers there?

12 A.   Yes, we did.

13 Q.   Okay. And was there any reference to Xavier Torres in any

14 of those documents?

15 A.   Not that I'm aware of, sir.

16 Q.   Okay. And then there was a search of 11 Burbank.  Was that

17 in August of 2015?

18 A.   Yes.

19 Q.   And I believe you testified there was a note that you

20 referenced as a drug ledger?

21 A.   I think there were a few of them.  There were two of them

22 in a drawer, and then one of them in one of the individual's

23 pocket.

24 Q.   Okay. And that did not reference Mr. Torres, did it?

25 A.   I can't remember what was on those, but -- not that I can

1  recall.

2  Q.   Okay. You had testified that in July of 2015 there were

3  small quantities of drugs purchased on Burbank Street.  Do you

4  recall that testimony?

5  A.   Yes.

6  Q.   And by small, how much an amount were you dealing with?

7  A.   I'm talking about decks of heroin or dime bags of cocaine.

8          **MR. VERRILLO:** Your Honor, if we could have a

9  sidebar?

10          **THE COURT:** Yes.

11          (**WHEREUPON**, a discussion was held at side bar out

12  of the hearing of the jury.)

13          **MR. VERRILLO:** Judge, I just have one exhibit that

14  had been admitted, but I wasn't able to hook up my computer

15  so -- as far as getting into the system.  So I just wanted

16  some assistance to -- it's already been admitted, just to get

17  that reviewed.

18          **THE COURT:** It's already been admitted?

19          **MR. VERRILLO:** Exhibit 91, it's a photograph.

20          **THE COURT:** Okay.  You have the same photograph, is

21  that what you're saying?

22          **MR. VERRILLO:** Yes.  I don't have the plug.  I

23  haven't hooked up my laptop.

24          **THE COURT:** Any reason we can just display --

25          **MR. MARANGOLA:** Yes, Judge, we can display it for

1  him.

2            **MR. VERRILLO:** Please.

3            **THE COURT:** Thank you.

4            (**WHEREUPON**, side bar discussion concluded.)

5            **THE COURT:** Exhibit 91, which has been received.

6  BY MR. VERRILLO:

7  Q.   Investigator, I wanted to ask you before showing an

8  exhibit, you had testified about having some contacts with the

9  area of 6 Burbank on July 21st of 2015.  Do you recall that

10 testimony?

11 A.   On July -- I'm sorry.

12 Q.   July 21st of 2015 there was a controlled buy?

13 A.   I believe it was July 14th.

14 Q.   You testified about making some observations of 6 Burbank

15 Street.  Do you recall that?

16 A.   Yes.

17 Q.   At the side of the home?

18 A.   Yes.

19 Q.   At that time?

20 A.   Yes.

21 Q.   And you indicated that you saw the confidential informant

22 talking to someone at a screen door.  Do you recall that?

23 A.   Yeah, the side door of the residence, yes.

24 Q.   When you see Exhibit 91, you would agree there's no screen

25 door there?

1  A.   Not in that photograph, no.

2  Q.   Okay. So can you describe how you -- what you observed

3  taking place as it relates to the CI and the door that we see

4  here now?

5  A.   Yes, so the CI was standing in the driveway past the fence

6  and talking to somebody through the door.  From my vantage

7  point I couldn't tell whether the door was open or not.  It

8  was an interior door, I couldn't tell whether it was open or

9  not.  It appears they were having a conversation with

10 somebody.

11 Q.   But you weren't able to identify who that was?

12 A.   Not when they were having a conversation; the person was

13 still inside, no.

14 Q.   I'm all set with that, thank you.

15              You testified, Investigator, about the search

16 warrant of July 30th, 2015 at 6 Burbank.  Do you recall that?

17 A.   Yes.

18 Q.   And you indicated that Mr. Torres was there along with a

19 female and some children?

20 A.   Yes.

21 Q.   And was Mr. Torres cooperative with you when you arrived?

22 A.   So while I was inside he was cooperative, yes.  I don't

23 know -- we didn't execute the search warrant, we weren't the

24 entry team.  The SWAT team hit the house, so I don't know what

25 happened at that point, but when we were inside he was

1  relatively cooperative, yes.

2  Q.   Okay. And you testified earlier about a lease being

3  acquired, Exhibit 97, related to 6 Burbank, correct?

4  A.   Yes.

5  Q.   Do you know who owned 6 Burbank Street?

6  A.   I do.

7  Q.   Who owned the property?

8  A.   Carlos Javier Figueroa.

9  Q.   Okay. And did Carlos Figueroa and his family reside at 6

10  Burbank Street?

11  A.   Yes, they did, yes.

12  Q.   What time period did they reside there?

13  A.   So they resided there some time -- some time in the middle

14  of 2016 until the time of the takedown in 2018.

15  Q.   Okay. All right. And with respect to 6 Burbank Street, how

16  many floors does that have?

17  A.   Well, there's two floors that are living space.  There's a

18  basement and an attic.

19  Q.   Okay. And you had observed -- you made observations of the

20  attic, correct?

21  A.   Yes, sir.

22  Q.   And did you see any mail or any documentation from Carlos

23  Figueroa in the attic area?

24  A.   Yes.

25  Q.   And what kind of documents did you see there for Mr.

1   Figueroa?

2   A.    There was a lot of mail addressed to Javier Figueroa and

3   Nishayra Gutierrez.

4   Q.    And you also looked at the basement -- the basement area,

5   correct?

6   A.    Yes.

7   Q.    Did you see any items of Carlos Figueroa in the basement?

8   A.    Not that I can recall.

9   Q.    Now, when you indicated you started on this investigation

10  in early 2015, were you conducting any surveillance of the

11  area between early 2015 and July of 2015?

12  A.    Yes.

13  Q.    And what would surveillance mean?  Can you explain what

14  you mean by that?

15  A.    Surveillance would mean -- well, could be a couple things.

16  We would actually make observations or we would send

17  individuals down on to the street to make observations and

18  then come back and indicate to us what was happening.  So it

19  was both.

20  Q.    Okay. And would you drive by?  Would you walk around?

21  What would surveillance involve for you I'm talking about?

22  A.    We would drive by -- periodically we would drive down the

23  street; wouldn't happen often.  And then we would take

24  positions at Leo Street, North Clinton Avenue where we could

25  actually view the activities through binoculars where we would

1  be a distance away from any of the individuals on the street

2  or lookouts on the street.

3  Q.    During the time period of early 2015 to July of 2015, did

4  you see Carlos Figueroa in the area of 6 Burbank Street?

5  A.    Yes.

6  Q.    What activity did you see him doing at that residence?

7  A.    Well, I saw him in the area, I saw his vehicles arrive.

8  Handful of occasions I saw him go inside 6 Burbank Street or

9  in the area of 6 Burbank Street.

10 Q.    Okay. Were you aware that he had items in the garage of 6

11 Burbank Street?

12 A.    I know he had like four wheelers and motorcycles.

13 Q.    Okay. You testified on your direct that you had observed

14 cash at the residence of 6 Burbank Street when you had the

15 search?

16 A.    You mean on the takedown date?

17 Q.    Yes -- no.  I'm talking about July 30th of 2015.

18 A.    Yes.

19 Q.    Do you know the source of the cash at the residence?

20 A.    The source?  No, sir.

21 Q.    Okay. And what was the amount of drugs that you found at 6

22 Burbank Street on the July 30th search?

23 A.    I believe there were 13 bags of heroin.

24 Q.    How much in terms of quantity was that?

25 A.    They're .06 grams each one.

228

1   Q.   So that's -- what does that add up to?  7 grams?

2   A.   No, no, no, no.  That's like  .9 grams.

3   Q.   Less than 1 gram?

4   A.   Yes. Or a gram maybe.

5   Q.   A kilo was how many grams?

6   A.   1,000.

7   Q.   Okay. And you referenced a blue bin in the attic as part

8   of your testimony.  Do you recall that?

9   A.   Yes, sir.

10  Q.   And do you know who owned that blue bin?

11  A.   Who owned it?

12  Q.   Yes.

13  A.   No.

14  Q.   Okay. You testified about -- and you were asked to

15  testify -- testify about a misdemeanor conviction in City

16  Court.  Do you recall that related to Mr. Torres?

17  A.   Yes, sir.

18  Q.   And that was a possession of a controlled substance

19  offense?

20  A.   Yes.

21  Q.   Okay. And you also read the information that attorney Mark

22  Young represented Xavier Torres in that proceeding?

23  A.   Yes.

24  Q.   Okay. Did you verify as part of your investigation who

25  paid Mr. Young for Mr. Torres' representation?

1   A.   Well, at that point it was indicated to us who had paid.

2   Q.   Okay.  Let me ask it this way: Did you contact Mr. Young

3   and get any written verification of who paid him for

4   Mr. Torres' representation?

5   A.   No, I never contacted Mr. Young, no.

6   Q.   Okay. All right. There was a search conducted at 11

7   Burbank in August of 2015, correct?

8   A.   Yes.

9   Q.   And was Mr. Torres present during that search?

10  A.   No, he was not.

11  Q.   Okay. Now, during your career in dealing with federal drug

12  investigations, is it common for law enforcement to use

13  cooperators as a part of the prosecution of the case?

14  A.   I'm sorry, I don't really understand it.

15  Q.   In drug cases -- and this is when there's allegation of

16  drug distribution -- is it common for the Government to use

17  cooperators as part of the prosecution of the case?

18  A.   It's common to talk to cooperators to see if they're

19  telling the truth, yes.

20  Q.   Based on your experience, and obviously we have a trial

21  here where there's a prosecution of a case, is it common for

22  cooperators to be used in the prosecution of a drug case?

23  A.   To testify in trial, yes.

24  Q.   Yes.

25  A.   Yes.

1  Q.    And as a part of your acting as a co-case agent, would you

2  be involved in discussing with -- with potential cooperators

3  what is involved in cooperating in a case?

4  A.    I'm not sure I understand your question, sir.

5  Q.    Okay. You have a drug prosecution in this case and as part

6  of that there's some cooperators that are going to testify in

7  this case, correct?

8  A.    Yes, sir.

9  Q.    All right. Prior to them testifying what kind of contact

10  would you have with them?

11  A.    We have what's called a proffer.  So during the proffer

12  they will tell law enforcement and the Government what they

13  know about this particular case.

14  Q.    Okay. And as part of your working as a co-agent, would you

15  generally discuss with them what the benefits would be of

16  cooperation?

17  A.    Well, that's not -- that's not a job that I would do, no.

18  Q.    Okay. So you generally wouldn't discuss that?

19  A.    Not in my capacity, no.

20  Q.    Okay. You had testified that as a part of this

21  investigation you have looked into some homicide cases?

22  A.    Yes, sir.

23  Q.    And would -- can you just explain without getting into any

24  specific cases, but generally what would an investigation of a

25  homicide claim involve?

1  A.   Well, an investigation of a homicide involved?

2  Q.   Yes.

3  A.   So for us it would involve working together with the

4  Homicide Unit, whether it was Rochester or somewhere else, to

5  get the details -- we would get the details from them on the

6  homicide after the homicide happened, and then we would follow

7  up some of that information as far as our investigation went.

8         So the initial investigation is conducted by the

9  Homicide Unit and then once it's done, again we would kind of

10  take it from there.  We would take our portion of it from

11  there.

12  Q.   As a part of that investigation would you seek medical

13  evidence as to the cause of death?

14  A.   Yes.

15  Q.   And you testified about a couple investigations that

16  you've looked into related to this federal case.  Are you

17  satisfied that you fully investigated each claim of homicide?

18  A.   Well, again, our job -- my job as co-case agent in this

19  narcotics case wasn't to investigate the homicide.  It was to

20  investigate the organization, and the homicide was part of it,

21  yes.

22  Q.   Okay.  But are you satisfied that the homicide claims have

23  been fully investigated?

24  A.   Yes, yes, I am, yeah.

25  Q.   And is it true that Mr. Torres has not been charged in

1  federal or state court with any homicide?

2  A.    Charged?   No, he hasn't been charged.

3  Q.    Okay. You also testified -- read the Certificate of

4  Conviction related to the possession of drugs, that Mr. Torres

5  had a 45 day sentence.   Do you recall that?

6  A.    Yes, I do.

7  Q.    And after that sentence was served, did you have any

8  contacts with Mr. Torres after November of 2015?   I'm talking

9  about in the area of Burbank Street.

10  A.    Did I have any contacts with him?

11  Q.    Yes.

12  A.    You mean like speaking to him?

13  Q.    Observe.

14  A.    I observed him, I observed him until I would say late

15  spring of 2016.

16  Q.    Okay. All right. During the times you observed him you

17  never took any photographs of him, correct?

18  A.    No, sir.

19  Q.    You didn't take any videos of him?

20  A.    No.

21  Q.    And you did not purchase drugs from Mr. Torres; is that

22  right?

23  A.    Myself?

24  Q.    Yes.

25  A.    No.

1  Q.   And you did not witness Mr. Torres sell drugs to anyone?

2  A.   You mean like hand somebody drugs and hand him money?

3  Q.   Yes.

4  A.   No, I never saw that.

5  Q.   Okay. And based on your investigation you're not aware of

6  Mr. Torres receiving any package of drugs from Puerto Rico or

7  anywhere else?

8  A.   Not that I'm aware of.

9  Q.   Investigator, you had testified about the December 2015

10  charges -- charge that Yankee received?

11  A.   Yes.

12  Q.   And you had made some observations during that date of the

13  offense related to Yankee having contact with this red Honda,

14  person in the red Honda.  Do you recall that?

15  A.   I remember the red Honda.  I don't know who was inside the

16  red Honda, but I remember the red Honda.

17  Q.   Where you were positioned you had seen the red Honda come

18  by you, correct?

19  A.   Yes.

20  Q.   And I believe you testified on direct that you had

21  observed it had a sunroof?

22  A.   Yes.

23  Q.   All right. But you were not able to observe who was in the

24  vehicle?

25  A.   No.  I could tell how many occupants were in the vehicle,

1   I just couldn't see who it was.

2   Q.   Did you take the license plate when the vehicle came by?

3   A.   No, because the back of the car was towards us, the back

4   of the car was covered with snow so I couldn't see it.

5   Q.   Okay.  All right. Now, you're aware that there was an

6   arrest of Mr. Torres on February 6th, 2016?

7   A.   Yes, I am.

8   Q.   Okay. And he was -- did you verify who was his attorney in

9   that case?

10   A.   I'm not sure if I did, no, sir.

11   Q.   Okay. How many -- how many properties were involved in the

12   takedown in January of 2018?

13   A.   I believe there was six.

14   Q.   Okay. And isn't it true none of these -- none of the

15   persons in those properties knew that you were coming or that

16   there was going to be a takedown, correct?

17   A.   Not that I'm aware of, no.

18   Q.   All right.  And isn't it true that Xavier Torres was not

19   present in any of these premises that were involved in the

20   takedown?

21   A.   No, he was not present.

22   Q.   Okay.

23           **MR. VERRILLO:** Your Honor, if I could just have one

24   moment?

25           **THE COURT:** Sure.

1   BY MR. VERRILLO:

2   Q.   Investigator, as part of preparation for the trial in this

3   case, have you met with each of the persons who are going to

4   testify in this case?

5   A.   Yes.

6   Q.   Okay. And you've been involved with the preparation of

7   those witnesses?

8   A.   Well, I should say I've met with the majority of them.

9   Q.   Okay.

10  A.   There's some law enforcement that I have not met with.

11  Q.   Okay. Okay, you have indicated that you've observed

12  Mr. Torres in the area of Burbank Street as a part of your

13  investigation, correct?

14  A.   Yes.

15  Q.   Did you ever see him with a firearm?

16  A.   Did I ever see him?

17  Q.   Did you ever see him with a firearm?

18  A.   No, no.

19           **MR. VERRILLO:** I have nothing further.

20           **THE COURT:** Mr. Marangola?

21           **MR. MARANGOLA:** Thank you, Your Honor.

22                    **REDIRECT EXAMINATION**

23  BY MR. MARANGOLA:

24  Q.   Investigator, Mr. Verrillo asked you a number of questions

25  regarding drug organizations and your experience in general.

1    He asked you about if you would expect individuals -- would it

2    be common for you to investigate whether they have assets.

3              Could we put up Government's Exhibit 1, please?

4    Mr. Verrillo asked you if the defendant had any assets that

5    you were aware of.  I'd like you to take a look at the third

6    row in which the defendant is.  Are you aware of any assets of

7    any of those individuals in the third row?

8    A.   The only one that may have had a vehicle registered to him

9    was Obed Torres.  Other than that, that's the only asset I

10   know that any of them had.

11   Q.   All right.  And in your experience investigating drug

12   organizations, is it common for members of the organization to

13   agree to put vehicles in their name to distance themselves or

14   distance others from a particular vehicle?

15   A.   Yes.

16              **MR. VERRILLO:** Objection.

17              **THE COURT:** Overruled.  Go ahead.  You can answer.

18              **THE WITNESS:** I'm sorry, yes.

19   **BY MR. MARANGOLA:**

20   Q.   Okay.  Mr. Verrillo asked you about how you became aware

21   of the defendant's nicknames of Pistolita and P and Pepe.  Do

22   you recall that?

23   A.   I do.

24   Q.   And you told him that that was how CIs knew him; is that

25   right?

1  A.    They knew him by those nicknames, yes.

2  Q.    How did the CIs know the defendant?

3  A.    They purchased drugs from him.

4  Q.    Okay.

5  A.    They knew he provided drugs on the street.

6  Q.    All right. The -- Mr. Verrillo asked you about during that

7  controlled purchase where you saw the CI in the driveway of 6

8  Burbank.

9  A.    Yes.

10 Q.    And he appeared to be standing near the side door talking

11 to somebody inside?

12 A.    Yes.

13 Q.    And you weren't able to see or observe inside 6 Burbank

14 during that controlled purchase; is that right?

15 A.    That's correct.

16 Q.    Who did you see exit 6 Burbank with the CI?

17 A.    Xavier Torres.

18 Q.    The CI was already out in the driveway, correct?

19 A.    Xavier Torres, Pistolita, exited that same door, that side

20 door.

21 Q.    Where did Pistolita accompany the CI?

22 A.    To 14 Burbank Street.

23 Q.    Which was a drug house?

24 A.    Yes.

25 Q.    And what did the CI do after coming out of the drug house

1  that he had been escorted to by the defendant?

2  A.   Well, once they came out Xavier Torres walked back up in

3  to 6 Burbank Street, the CI went to Clinton Avenue, we picked

4  the CI up on Clinton Avenue and the CI gave us four bundles of

5  heroin that he purchased from 14 Burbank Street.

6  Q.   Okay. Mr. Verrillo asked you some questions regarding your

7  presence during meetings with cooperating witnesses in the

8  case.  Do you recall that?

9  A.   I do.

10  Q.   Investigator Briganti, in any of those witness meetings

11  did you ever tell one cooperating witness what to say?

12  A.   No.

13  Q.   Did you ever tell any cooperating witness what another

14  cooperating witness had said?

15  A.   No.

16  Q.   Did you provide one cooperating witness with information

17  that another had provided?

18  A.   No.

19  Q.   Mr. Verrillo asked you about pole camera footage in the

20  Burbank area.

21  A.   Yes.

22  Q.   Can you tell the jury was there a time when there were --

23  when there was a pole camera up in the area of 6 Burbank?

24  A.   Yes, there was.

25  Q.   What is a pole camera?

1  A.   A pole camera is a covert camera that's installed so we

2  can observe the activities going on on the street without

3  being seen, without us personally being seen.

4  Q.   And that's a camera that's installed and pointed at a

5  particular area?

6  A.   Well, it's pointed at a certain area, but it can be moved;

7  we have the ability to be able to move it left to right, up

8  and down, we can view a large area with it.

9  Q.   Excuse me?

10  A.   I'm sorry, sir.

11  Q.   You had one in the area of 6 Burbank for a period of time?

12  A.   Yes.

13  Q.   Do you recall how long that pole camera was up?

14  A.   Well, it was up for a fairly lengthy time.

15  Q.   Did it record -- let me ask you some foundation questions.

16  Did it record footage of the area in front of 6 Burbank?  Or

17  if it was moved, whatever other area it was facing?

18          Did the pole camera record that footage?

19  A.   It recorded it, yes.

20  Q.   Is that audio or just video?

21  A.   Just video.

22  Q.   And is that -- do those cameras look inside the windows at

23  a particular house?  They do not?

24  A.   No.

25  Q.   What do they capture?

1  A.    They capture activities going on on the street.

2  Q.    Okay.   Areas that are viewable only by the public?

3  A.    Yes.

4  Q.    Okay. What happened to the pole camera footage from the

5  pole camera that was installed in the area of 6 Burbank?

6  A.    So originally when it was installed -- we didn't recognize

7  the fact that when the disk got to the end of the disk, what

8  it did was automatically erased everything and went back and

9  started over again.

10          So the footage that was obtained from up until

11  mid-2016 was erased and then it was -- it continued on from

12  there.  So the camera was up for -- it was up for a while, but

13  it was only portions -- it was only from mid-2016 on that we

14  received the video.

15  Q.    And then did there come a time when you went to obtain

16  that video and there was no longer any video?

17  A.    We were notified by the technicians that it happened.  So

18  we knew right away that it happened.  Once the video started

19  to record over, then they indicated to us that that's what

20  happened with it.

21  Q.    So do you recall the timeframe of when the video

22  footage -- when you actually had video footage for the 6

23  Burbank area?

24  A.    I believe it's mid -- mid-2016, somewhere in the late

25  spring 2016.

1  Q.   Is the time period that you have video footage from the

2  pole camera at 6 Burbank?

3  A.   Yes, we have -- oh, you mean the full video?

4  Q.   Or portions of the video?

5  A.   No, we have the full video after -- I believe after

6  September we got the full video.  So the uninterrupted video

7  is after September of 2016.

8  Q.   What happened to the video before that?

9  A.   That's the part that was erased.

10 Q.   That's what I was asking.  How did you come to -- when was

11 it that you found out that the video was erased?

12 A.   Again, it was -- we found out sometime around the end --

13 the fall of 2016 that it was erased.

14 Q.   Was that in connection with any particular investigation?

15 A.   The camera?

16 Q.   Yes.

17 A.   The camera was installed for, yeah, the narcotics

18 investigation that we were conducting.

19 Q.   I mean -- I'm sorry to interrupt.  I mean, did you find

20 out about the footage being erased when in connection with a

21 specific investigation for a crime that occurred in the

22 Burbank area?

23           **MR. VERRILLO:** Objection, leading.

24           **THE COURT:** Overruled.

25           **THE WITNESS:** Yeah, so the murder of Walter Ross was

1   when -- around the time we found out that the footage had been

2   erased after that murder.

3   **BY MR. MARANGOLA:**

4   Q.   All right. So you found out after that murder; is that

5   right?

6   A.   Yeah, we found out after the murder that the video had

7   been erased, yes.

8   Q.   Okay. So there was no video footage from the pole camera

9   before the murder in 2016 accessible anymore as far as you

10  know?

11  A.   No, there was.  So the Homicide Unit was investigating

12  that murder and the pole camera that we had up at the time,

13  they pulled some of the video from that.  So it was still

14  running on the old -- the old portion of the video.

15           So we have portions of the video from

16  September 12th of 2016, which is the Walter Ross murder.  And

17  then that's the only portion we have from the first part of

18  it.

19           Then once it was erased and started over again, we

20  have it from again late -- like late fall on to the takedown

21  date in 2018.

22  Q.   So other than the day of the Walter Ross murder, the only

23  footage that's available because it was erased is from the

24  late fall of 2016?

25  A.   That's correct.

1   Q.   Okay. All right. That's what I wanted to clear up.

2               Mr. Verrillo also asked you about assuming records

3   had been kept in a drug organization between 2015 and 2018,

4   wouldn't there be a large volume of those records.  Do you

5   recall that?

6   A.   Yes.

7   Q.   Did you examine the ledgers that were seized at 292

8   Barrington Street?

9   A.   Yes, I did.

10  Q.   All right. Can you describe the transactions that they

11  documented?

12  A.   Yeah, they documented large quantities of transactions.

13  So 31 gram quantities, 62 gram quantities, kilo quantities

14  that were being distributed, yes.

15  Q.   All right. Did those ledgers mark down sales of 5 or $10

16  bags of heroin and cocaine?

17  A.   No.

18  Q.   All right. And Mr. Verrillo asked you if those ledgers --

19  any of the ledgers found referenced Xavier Torres.  Did you

20  see ledgers with the name Carlos Javier Figueroa in them?

21  A.   No.

22  Q.   Did you see ledgers with Leitscha Poncedeleon written in

23  them?

24  A.   No.

25  Q.   Did you see ones with Roberto Figueroa written in them?

1  A.   No.

2  Q.   Yet those transactions were recorded in those ledgers --

3  I'm sorry, those ledgers recorded transactions involving those

4  individuals?

5  A.   Yes.

6  Q.   All right.

7           **MR. MARANGOLA:** Nothing further, Your Honor.   Thank

8  you.

9           **THE COURT:** Anything further?

10          **MR. VERRILLO:** Nothing further, Your Honor.

11          **THE COURT:** Thank you very much.   You may step down.

12          **THE WITNESS:** Thank you, Your Honor.

13          (**WHEREUPON**, the witness was excused).

14          **THE COURT:** Ladies and gentlemen, we'll stand in

15  recess until 8:30 tomorrow morning.   In the meantime, I'd ask

16  you not discuss the matter or allow anybody to discuss the

17  meat with you.   Jury may step down.   Have a good day.

18          (**WHEREUPON**, the jury was excused).

19          **THE COURT:** Okay, we'll stand in recess.

20          (**WHEREUPON**, proceedings adjourned at 1:41 p.m.)

21                        *    *    *

22

23

24

25

1                    **CERTIFICATE OF REPORTER**

2

3           In accordance with 28, U.S.C., 753(b), I certify that

4    these original notes are a true and correct record of

5    proceedings in the United States District Court for the

6    Western District of New York before the Honorable Frank P.

7    Geraci, Jr. on October 20th, 2021.

8

9    S/ Christi A. Macri

10   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25