1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5    - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA              18-CR-6094(G)
6
     vs.
7                                          Rochester, New York
     XAVIER TORRES,                        October 22, 2021
8              Defendant.                  8:30 a.m.
     - - - - - - - - - - - - -X
9                                          **VOLUME 4**

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                 UNITED STATES DISTRICT JUDGE

12
                       JAMES P. KENNEDY, JR., ESQ.
13                     United States Attorney
                       BY: ROBERT A. MARANGOLA, ESQ.
14                         CASSIE M. KOCHER, ESQ.
                       Assistant United States Attorneys
15                     500 Federal Building
                       Rochester, New York 14614
16                     Appearing on behalf of the United States

17
                       MAURICE J. VERRILLO, ESQ.
18                     3300 Monroe Avenue
                       Suite 301
19                     Rochester, New York 14618
                       Appearing on behalf of the Defendant
20

21

22

23   COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                         Christimacri50@gmail.com
24                       Kenneth B. Keating Federal Building
                         100 State Street, Room 2640
25                       Rochester, New York 14614

1                    **I N D E X**

2

**WITNESS FOR THE GOVERNMENT**

3

Stephen Hunt
4       Direct examination by Ms. Kocher          Page 430
        Cross-examination by Mr. Verrillo         Page 448
5
Thomas Luciano
6       Direct examination by Ms. Kocher          Page 453
        Cross-examination by Mr. Verrillo         Page 479
7       Redirect examination by Ms. Kocher        Page 481

8

9   **EXHIBIT              RECEIVED**

10  Government 67-84          438
    Government 15             463
11  Government 179            473
    Government 178            476

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

\*    \*    \*

1

2

3          **(WHEREUPON**, the defendant is present).

4          **THE COURT:** Good morning.

5          **MR. MARANGOLA:** Good morning, Your Honor.

6          **MS. KOCHER:** Good morning.

7          **MR. VERRILLO:** Good morning, Judge.

8          **THE COURT:** Ready to proceed?

9          **MS. KOCHER:** Yes, Judge.

10          **THE COURT:** Mr. Verrillo?

11          **MR. VERRILLO:** Yes.

12          **THE COURT:** Mr. Verrillo, you did indicate that

13 you're requesting to break early on October 28th; is that

14 right?

15          **MR. VERRILLO:** Yes, Judge.

16          **THE COURT:** What time is that?

17          **MR. VERRILLO:** The session is at 12, so I thought

18 maybe if I got out at 11:30 I should be okay.

19          **THE COURT:** Any objection to that?

20          **MS. KOCHER:** No, Your Honor.

21          **MR. MARANGOLA:** No, Your Honor.

22          **THE COURT:** We'll just change the schedule.  I'll

23 let the jury know October 28th we'll be in session 8:30 until

24 11:30.  Great.

25          **MR. VERRILLO:** Thank you, Judge.

1          **THE COURT:** Bring the jury out.

2          (**WHEREUPON**, the jury is present).

3          **THE COURT:** Good morning, members of the jury.

4   Ready to proceed, you may call your next witness.

5          **MS. KOCHER:** Thank you, Your Honor.  The Government

6   calls Investigator Stephen Hunt.

7          <u>**GOVERNMENT'S WITNESS, STEPHEN HUNT, SWORN**</u>

8                  <u>**DIRECT EXAMINATION**</u>

9          **THE CLERK:** Please state your full name and spell

10   your last name for the record.

11          **THE WITNESS:** Stephen with a P-H, S-T-E-P-H-E-N;

12   Hunt, H-U-N-T.

13          **THE REPORTER:** Thank you.

14          **THE COURT:** You can remove your mask since you're

15   behind plexiglas.

16          **THE WITNESS:** Thanks, Judge.

17          **THE COURT:** There's a second microphone over there

18   if you want to put a cover on that as well.

19          **THE WITNESS:** You got it.

20          **THE COURT:** You may proceed.

21          **MS. KOCHER:** Thank you.

22   **BY MS. KOCHER:**

23   Q.   Good morning.

24   A.   Good morning.

25   Q.   Could you please introduce yourself to the jury?

1   A.    My name is Steve Hunt.  I'm an investigator with the

2   Brighton Police Department.

3   Q.    And, Investigator, how long have you been employed with

4   the Brighton Police Department?

5   A.    Since March of 2001.  So just over 20 years.

6   Q.    And how long have you been an investigator with the

7   department?

8   A.    As of October 1st it's been five years.

9   Q.    Before becoming an investigator, what was your job with

10  the department?

11  A.    Road patrol.  Uniform road patrol.

12  Q.    Okay.  And what were some of your duties as a road patrol

13  officer?

14  A.    Hmmm.  Calls for service, anything from crimes in-progress

15  to crimes that have already happened, taking the initial

16  report, doing investigations, vehicle and traffic law

17  accidents, dealing with people with mental health issues and

18  just everything -- everything that comes across -- if a turkey

19  went through your plate glass window they would call me to go,

20  things like that, everything.

21  Q.    Investigator, if you could hold that microphone to your

22  right a little closer?  I think that might be -- thank you.

23  A.    Testing, testing.

24  Q.    There we go.  I think that one to the left is not great.

25  Thank you.  Now that you're an investigator what are some of

1  your duties with the police department?

2  A.    So as an investigator with the Brighton Police Department

3  we get all the high level crimes, felonies and above,

4  sometimes we get some misdemeanors as well.  But everything

5  from homicides, robberies, burglaries, grand larcenies, I'll

6  do assessments on people in the community that are a threat,

7  I'll do background investigations on new hires, everything

8  from police officers to clerks, just everything that comes

9  through that's a little bit higher level, might need a little

10 finessing.  That's the kind of stuff I deal with.

11 Q.    More follow-up investigations?

12 A.    A lot.  Some cases can take months to years to complete,

13 so a little bit more intense than being on the road.

14 Q.    Now, back in 2015 were you assigned to any specific

15 specialized unit?

16 A.    I was.  Every 18 months Brighton Police Department will

17 send a representative down to the Greater Rochester Area

18 Narcotics Enforcement Team and we'll work there for 18 months

19 in a unit comprised of multiple agencies from Monroe County.

20          So I'll be working with -- I worked with RPD, the

21 DEA, East Rochester was there, Monroe County Sheriff's Office.

22 So everybody that works together to combat drugs and narcotics

23 in Monroe County.

24 Q.    Okay. Is that unit commonly referred to as GRANET?

25 A.    Yes.

1  Q.   And you were focusing particularly on drug investigations

2  in that assignment?

3  A.   Yes.

4  Q.   And I think you mentioned that was for about 18 months?

5  A.   Yes.

6  Q.   Can you explain some of the training you received to

7  become a police officer and an investigator?

8  A.   So go to the Academy, like six months' worth of the

9  academy, learn everything from defensive tactics, firearms,

10 vehicle and traffic law, penal law, how to deal with mentally

11 disturbed people.

12         You take all that great knowledge and you go to

13 your police department and you do field training for a couple

14 months, you work with an officer and they graduate you through

15 the steps of, you know, first part of your training you're

16 working with another person, you're doing like 50% of the work

17 and amp it up as you go through this field training process.

18 So you're always learning.

19         I will tell anybody you don't know how to do the

20 job when you're there a good five years.  It's a lot of book

21 stuff, but I think people can relate to a lot of the book

22 stuff is not what the real stuff is.  So you're always

23 learning, so I'm still learning today.  But all kinds of

24 training, everything, school, bookwork, on the job.

25 Q.   Okay. So there was training in a classroom and also on the

1    job?

2    A.    Oh, yeah.

3    Q.    And you successfully completed all that training?

4    A.    I did.

5    Q.    Okay. Now, I'd like to direct your attention back to

6    April 22nd of 2015.  Were you assigned to the GRANET Unit on

7    that day?

8    A.    I was.

9    Q.    And were you a police officer or an investigator at that

10   point?

11   A.    Police officer.

12   Q.    Now, on April 22nd of 2015 did you assist with the

13   execution of a search warrant?

14   A.    I did.

15   Q.    And was that one of the things that you commonly did in

16   the GRANET Unit?

17   A.    Yes.

18   Q.    Okay. Where was the search warrant or what location was

19   the search warrant for?

20   A.    14 Burbank Street.

21   Q.    And is that in the City of Rochester, Monroe County?

22   A.    It is.

23   Q.    I'd like to show you what's already been received into

24   evidence as Exhibit 35.  Investigator, do you recognize the

25   area depicted in this map?

A.    I do.

Q.    And what area of the city is this?

A.    That's Burbank Street between Clinton and Remington.

Q.    And the location that you searched on April 22nd of 2015, is that depicted on this map?

A.    It is.  There's a number 14 over the house on Burbank Street.

Q.    Okay. If you wouldn't mind -- hopefully the monitor is working -- just put a circle around that house.  You've placed a yellow circle essentially in the middle of the map around the number 14?

A.    I did.

Q.    Okay.  And that house is on the north side of Burbank Street?

A.    Correct.

Q.    Now, what was the basis for the search warrant that you obtained for 14 Burbank Street?

A.    Drug buys, heroin drug buys using a confidential informant.

Q.    Are those commonly referred to as controlled purchases?

A.    Correct.

Q.    Now, what were you wearing to execute the search warrant that day?

A.    Black outfit: Black pants, black shirt and we put masks on our heads to hide our identity.

1  Q.    Why were you trying to hide your identity?

2  A.    Because we were working in the community with confidential

3  informants and people in the drug/narcotics world don't want

4  them to know who we are.

5  Q.    Were there also some members of your team that did

6  undercover buys?

7  A.    Absolutely.

8  Q.    So they would be concerned about hiding their identity for

9  that person?

10 A.    For sure.

11 Q.    Do you remember about what time you arrived at 14 Burbank

12 that day?

13 A.    Approximately 9:57 in the morning.

14 Q.    And can you describe the building at 14 Burbank Street?

15 A.    Single family home, north side of the street and we made

16 entry on the east side of the house on the side door.

17 Q.    Once you made entry into the house were there any people

18 inside?

19 A.    There were six people inside.

20 Q.    What did you do after you made entry in the location?

21 A.    Everybody is secured for everybody's safety, handcuffed,

22 people that were in the house, those six people.  Then from

23 there when everybody is safe and secure you take pictures of

24 the house, all the interior rooms, outside of the house as

25 well and then you do a search.

1              Then after you're done with the search you take

2    more pictures and collect any evidence; and if there's any

3    arrests made that happens as well.

4    Q.   Now, Investigator, there's a binder in front of you.   If

5    you could flip to Exhibit 67 and take a look at Exhibit 67

6    through and including 84.   And let me know when you're done.

7    A.   I made it to 84.

8    Q.   Thank you.   You mentioned photographs were taken that day

9    at 14 Burbank?

10   A.   Yup.

11   Q.   Do you recognize the photographs depicted in Government's

12   Exhibit 67 through and including 84?

13   A.   Yes, I took those photos.

14   Q.   Okay. Just generally what are those photographs of?

15   A.   Exterior of the home, interior of the home, the people

16   that were detained in the home and things that were seized

17   from the home.

18   Q.   And do those photographs fairly and accurately depict the

19   location, the people that you encountered and some of the

20   items of evidence that you observed?

21   A.   They do.

22              **MS. KOCHER:** Your Honor, I'd offer Exhibit 67

23   through and including 84.

24              **MR. VERRILLO:** I have no objection.

25              **THE COURT:** Exhibit 67, 68, 69, 70, 71, 72, 73, 74,

1   74, 76, 77, 78, 79, 80, 81, 82, 83 and 84 will be received.

2            (**WHEREUPON**, Government Exhibits 67-84 were received

3   into evidence).

4   **BY MS. KOCHER:**

5   Q.   Investigator, would you mind closing that binder so you're

6   not hiding behind anything there.  If you could -- also if you

7   hit the monitor in the upper right corner, there should be a

8   little arrow.  If you could then hit the clear button at the

9   bottom to clear your mark.  Thank you.

10           Investigator, I'd like you to take a look at

11   Exhibit 67 that's been received into evidence.  Do you

12   recognize the house in this photo?

13   A.   That's the house that we served the search warrant on on

14   that date we talked about.

15   Q.   Okay. That's 14 Burbank Street?

16   A.   It is.

17   Q.   And you made entry into a side door?

18   A.   Correct.

19   Q.   What side of the house?

20   A.   The east side.  As we're looking at it, it would be the

21   right side.

22   Q.   Okay. Next I'd like you to take a look at Exhibit 68.

23   What's in this photograph?

24   A.   The east side of the home and the door that was entered on

25   the house.

1  Q.   Okay. And if you wouldn't mind circling the door that you

2  made entry through?  All right, so you've circled the door on

3  the side of the house that has a little roof over the top of

4  it?

5  A.   Right by that big screen TV.

6  Q.   Okay. And does there also appear to be a police officer in

7  this photograph?

8  A.   Yes.

9  Q.   Okay. Was that someone that was a part of your search

10 team?

11 A.   Yes.

12 Q.   Okay. If you could clear your circle, please.  If you can

13 hit the arrow it will remove the menu.  Thank you.

14           Moving on to Exhibit 69, what is this a photograph

15 of?

16 A.   That's the door on the east side of the home that was

17 entered.

18 Q.   Okay.  So when you made entry into the house, this is what

19 you were looking at initially?

20 A.   Yes.

21 Q.   And you had to go up some steps to get inside?

22 A.   Yes.

23 Q.   Moving on to Exhibit 70, what is this a photograph of?

24 A.   The kitchen area of the home.

25 Q.   Okay. We can move on to Exhibit 71.  What is this a

1  photograph of?

2  A.   I would call that the dining room.

3  Q.   Was there any furniture or a dining table in the room?

4  A.   No.

5  Q.   Moving on to Exhibit 72, what's depicted in this photo?

6  A.   One of the bedrooms on the second floor.

7  Q.   And there appears to be a mattress on the floor?

8  A.   Yeah, yes.

9  Q.   Moving on to Exhibit 73, is this another bedroom in the

10  house?

11  A.   Yes, on the second floor.

12  Q.   What, if any, furniture was in this room?

13  A.   Just that Pack 'n Play it looks like.

14  Q.   Moving on to Exhibit 74, this is another bedroom?

15  A.   Yes.

16  Q.   And what, if any, furniture was in this room?

17  A.   Just a mattress and blankets.

18  Q.   All right.  Next Exhibit 75, you mentioned that there were

19  six people in the house?

20  A.   Yes.

21  Q.   And what is depicted in Exhibit 75?

22  A.   Four of the six.

23  Q.   And did you come to learn the names of those four

24  individuals in this photograph?

25  A.   I did.

1  Q.    Starting at the left, who is that person?

2  A.    Do you want me to circle them too?

3  Q.    Sure.

4  A.    First one is going to be Mr. Davis.

5  Q.    You've circled --

6  A.    Scott Davis, excuse me.

7  Q.    You've circled the individual to the left of the photo who

8  is seated on the floor in a gray zip up hooded sweatshirt?

9  A.    Yes.

10 Q.    And who is to the right of that person seated in a chair?

11 A.    That's going to be Raphael Rodriguez with the Kings coat

12 on with the purple and black.

13 Q.    If you could circle him just to be clear.  So you've

14 circled the person second from the left in the plaid pants

15 seated in the chair?

16 A.    Yes.

17 Q.    Okay. And who is the individual to the right of Mr.

18 Rodriguez?

19 A.    I just circled Bruce Washington.

20 Q.    Okay. And that is the male seated with his -- on the floor

21 with his back to the couch in a green plaid T-shirt and jeans?

22 A.    Yes.

23 Q.    Okay. And who is the fourth individual who is seated on

24 the floor in the most foreground in the photograph?

25 A.    Eric Arroyo Cruz.

1  Q.   And so you placed a yellow circle around Mr. Arroyo Cruz

2  seated on the floor and has dark hair in a bun?

3  A.   Yes.

4  Q.   Thank you.  If you wouldn't mind clearing your mark?  All

5  right.  Now, Investigator, I'd like to show you what's been

6  received into evidence as Government's Exhibit 1.  All right,

7  there appear to be several people on this exhibit, photographs

8  of several people?

9  A.   Yes.

10 Q.   Do you recognize any of the individuals on Government's

11 Exhibit 1 as somebody that was in 14 Burbank Street when you

12 executed the search warrant on April 22nd of 2015?

13 A.   I do.

14 Q.   Could you circle the individual that you recognize?  So

15 you've circled the person in the bottom row, to the far left,

16 in a blue hooded sweatshirt?

17 A.   Yes, with a little mustache.

18 Q.   And who is that individual?

19 A.   Raphael Rodriguez.

20 Q.   Okay. If you could clear your mark, please.  Thank you.

21         All right, if we could go back to your search

22 warrant photos.  I'd ask you to take a look at Government's

23 Exhibit 76.  So you have previously identified four

24 individuals in the last photograph.  Are these two additional

25 individuals that were in the house?

1  A.    Yes.

2  Q.    And who are these people?

3  A.    Francisco Rivera.  I'll circle him.

4  Q.    You've circled the individual on the left.

5  A.    Yup, with the black T-shirt and the goatee.  And then

6  Kathryn Figueroa, black female with white hoodie with the hood

7  up on her head.

8  Q.    That's the female on the right side of the screen you've

9  circled?

10  A.    Correct.

11  Q.    Thank you.  If you could clear those circles.

12          All right.  Now, Investigator, after you secured

13  the individuals that were in the house did you ultimately

14  search the location?

15  A.    After photographs were taken, yup.

16  Q.    And what were some of the items that you found?

17  A.    Found some heroin packaged in purple little glassine

18  baggies with some writing on them; there was a Chinese symbol

19  that said good luck.  There was 169 of those.

20          And there was 32 small ziplock -- clear ziplock

21  style baggies with cocaine in it.

22  Q.    And where did you recover the cocaine and heroin?

23  A.    They were in two floor vents in the dining room on the

24  wall that boarded the living room.

25  Q.    Okay. I'd like to show you Exhibit 77, what are we looking

1  at in this photograph?

2  A.   That's one of those floor vents I was just describing.

3  Q.   All right.  And the cocaine and heroin that you seized, is

4  that depicted in this photograph?

5  A.   Yes.

6  Q.   And where are some of those baggies?

7  A.   They're all over.  Looks like some in that plastic bag up

8  top, and then little baggies that are falling into the vent.

9  Q.   Okay. Those are those white and purple baggies?

10  A.   Yes.

11  Q.   In the photo?

12  A.   Yes.

13  Q.   Moving on to Exhibit 78, what's this a photograph of?

14  A.   That is a photograph of some of the heroin and cocaine and

15  you also have a fanny pack that contained some of it; some of

16  that heroin is also repackaged into packs of ten, which is

17  called a bundle, and those are in the plastic bags as well.

18  Q.   Okay. And are these bags similar to what we just viewed in

19  Exhibit 77 that were in the vent?

20  A.   Yes.

21  Q.   Now, did you ultimately collect the heroin and cocaine

22  that you recovered from the vent and the fanny pack that day?

23  A.   Yes.

24  Q.   Okay. Next I'd like to show you Exhibit 79, what is this a

25  photograph of?

1  A.   It's another one of those vents and there's that fanny

2  pack, that black fanny pack that contained some of the

3  narcotics.

4  Q.   All right. So the fanny pack we just viewed in Exhibit 78,

5  is that the same fanny pack in this photograph?

6  A.   Yes.

7  Q.   So you recovered the fanny pack from the vent?

8  A.   Correct.

9  Q.   Okay. Moving on to Exhibit 80, is this another photograph

10  of some drugs that you recovered that day?

11  A.   Yes.

12  Q.   Okay. Now, you mentioned that you collected the drugs?

13  A.   Yes.

14  Q.   Investigator, I know I'm a bit of a distance away from

15  you.  I am holding Exhibit 85.  Have you had a chance to look

16  at this before testifying today?

17  A.   Yes, I have.

18  Q.   Are these the drugs you seized from 14 Burbank Street on

19  April 22nd of 2015?

20  A.   Yes, ma'am.

21        MS. KOCHER: Your Honor, I believe this was already

22  received into evidence.  If I may just read from the

23  stipulation, it's on page 1.

24        It's Government's Exhibit 85 was seized from 14

25  Burbank Street, Rochester, New York on April 22, 2015.

1          Government's Exhibit 85 contains 32 plastic bags

2   with white powder containing cocaine.

3          The aggregate weight of the cocaine is

4   approximately 3.178 grams.

5          Government's Exhibit 85 also contains 169 glassine

6   bags with tan powder containing heroin.

7          The aggregate weight of the heroin is approximately

8   38.953 grams.

9   **BY MS. KOCHER:**

10  Q.   Now, Investigator, in addition to the items that you

11  recovered from the vents in that house, did you search any

12  other areas of the home?

13  A.   Yeah, the whole house.

14  Q.   Okay.  Did that include the attic area?

15  A.   It did.

16  Q.   What, if anything, did you recover in the attic?

17  A.   There was some note pads, there was some new baggies that

18  were consistent with the bags that drugs were housed in that I

19  found downstairs; and there was a cell phone; and some --

20  there was also some mail.

21  Q.   I'd like to show you Exhibit 81, do you recognize what's

22  in this photograph?

23  A.   Yes.

24  Q.   What's in this photo?

25  A.   That was just some pills, unknown pills that were seized

1  from upstairs in the house.

2  Q.   Is this in the attic area?

3  A.   Correct.

4  Q.   Okay. Moving on to Exhibit 82, now you mentioned you

5  recovered some baggies that are commonly used for packaging

6  drugs?

7  A.   Yes.

8  Q.   Are those in this photograph Exhibit 82?

9  A.   They are, they're the clear bags with the apple on them.

10 Q.   Next Exhibit 83, what's depicted in this photograph?

11 A.   That's the note pad and notebook that we recovered.

12 Q.   And why were you particularly interested in the note pad

13 or the notebook?

14 A.   It looks like there's some numbers and subtraction and

15 adding going on and looked like it might be from drug sales.

16 Q.   All right. Next if we could move on to Exhibit 84, what's

17 in this photo?

18 A.   Same thing.  Small little note pad with some adding, looks

19 like adding on there.

20 Q.   All right. That also was significant to you based upon

21 your previous testimony that it appeared to be related to drug

22 sales?

23 A.   Correct.

24 Q.   Now, Investigator, I'd like to have you take a look at

25 what's been received into evidence as Government's Exhibit 44.

1  Do you recognize any of the houses depicted in Government's

2  Exhibit 44?

3  A.   I do.  The house directly in the middle.

4  Q.   How do you recognize that house?

5  A.   That's 14 Burbank Street, but not when we entered it back

6  in 2015.

7  Q.   Does the condition of 14 Burbank Street in Exhibit 44

8  appear different from the day you executed the search warrant?

9  A.   Yes.

10 Q.   What's different about the appearance of 14 Burbank

11 Street?

12 A.   Primarily the fire damage on the second floor window

13 there; and all the wood it seems in the front lawn was not

14 there either.

15 Q.   The pile of debris in the front yard?

16 A.   Yeah.

17 Q.   Okay.

18            **MS. KOCHER:** Thank you, Investigator.

19            **THE WITNESS:** Thank you.

20            **THE COURT:** Mr. Verrillo?

21                     **CROSS-EXAMINATION**

22 BY MR. VERRILLO:

23 Q.   Good morning, Investigator.

24 A.   Good morning, sir.

25 Q.   When you went to the property at 14 Burbank Street on

1  April 22nd, 2015, was Xavier Torres present there?

2  A.    No.

3  Q.    And you indicated that as a part of your search you had

4  acquired some notebooks and some mail, correct?

5  A.    Correct.

6  Q.    And did you find any indication that any of the mail or

7  notes were related to Xavier Torres?

8  A.    No, sir.

9  Q.    And as a part of your conducting the search warrant, did

10 you videotape any of that execution of the search warrant?

11 A.    No, sir.

12 Q.    Okay.

13            **MR. VERRILLO:** Nothing further.

14            **THE COURT:** Anything further?

15            **MS. KOCHER:** No, Your Honor.  Thank you.

16            **THE COURT:** Thank you.  You may step down.  Thank

17 you very much.

18            **THE WITNESS:** Thank you, Judge.

19            (**WHEREUPON**, the witness was excused).

20            **THE COURT:** Ladies and gentlemen, at this time we're

21 going to take a short recess in order to clean the witness

22 stand.  In the meantime, do not discuss the matter or allow

23 anybody to discuss the matter with you.  Jury may step down.

24            (**WHEREUPON**, there was a pause in the proceeding).

25            (**WHEREUPON**, the defendant is present).

1          **THE COURT:** We're ready, bring the jury out.

2          **MS. KOCHER:** Judge, before we bring the jury in can

3    we go over a few things?  First regarding the stipulation, the

4    parties did agree to foundation evidence for Exhibit 178 and

5    179.

6          We did realize this morning Exhibit 178 is

7    described in the stipulation as being seized from a 2001 red

8    Honda Civic.  That is not accurate.  It was actually seized

9    from Jose Rodriguez.

10         So I discussed this with Mr. Verrillo, I don't

11   think there's any objection to just handwriting in that change

12   and I'm willing to initial and date that.  So on page 3 at the

13   bottom the stipulation would read Government Exhibit 178 was

14   seized from Jose Rodriguez at 2 Burbank Street, Rochester, New

15   York.

16         **THE COURT:**  Is that correct, Mr. Verrillo?

17         **MR. VERRILLO:** Yes, Judge.

18         **THE COURT:**  Therefore, the stipulation on page 3

19   would be amended, first sentence to read Government Exhibit

20   178 was seized from Jose Rodriguez at 2 Burbank Street,

21   Rochester, New York.

22         **MS. KOCHER:** Thank you.

23         **THE COURT:** Is that, Mr. Torres, you agree with that

24   as well?

25         **THE DEFENDANT:** Yes, Your Honor.

1          **THE COURT:** Yes?

2          **THE DEFENDANT:** Yes.

3          **THE COURT:** Thank you.  Is that it?

4          **MS. KOCHER:** Judge, just briefly, Officer Luciano

5 will be testifying about an encounter with the defendant on

6 February 6th of 2016 where drugs were seized.  He was arrested

7 on state charges that day that were ultimately no billed by

8 the Monroe County grand jury and it was dismissed.

9          I would just -- I don't know if Mr. Verrillo

10 anticipates asking about -- asking Officer Luciano if he knows

11 about the disposition of that charge, but it's my position

12 that would be hearsay and not admissible and not an

13 appropriate question to ask.

14          **THE COURT:** Mr. Verrillo?

15          **MR. VERRILLO:** Judge, Officer Luciano was the one

16 who filed the charge and I understand it was dismissed.  So

17 that was the basis of me asking the question.  He did file it.

18          **THE COURT:** How is it not hearsay?

19          **MR. VERRILLO:** I don't know what he knows or whether

20 he knows or not, but that would be -- I assume they were going

21 to say he was arrested.  I don't know if they're going to ask

22 him whether he was arrested or not.

23          **THE COURT:** We'll hear the question.  If there's an

24 objection I'll --

25          **MS. KOCHER:** Thank you.  And one other matter

1  regarding the cross-examination of Officer Luciano, I'm not

2  sure if Mr. Verrillo has any impeachment material that he

3  anticipates cross-examining him on.

4         I know New York State has recently changed and

5  there are quite a few records available online about Rochester

6  Police Department officers.

7         If there's any disciplinary issues that he intends

8  to cross-examine him on, I would just ask for an offer of

9  proof on that, they go to his truth and voracity as a witness

10 before doing so.

11        **THE COURT:** Mr. Verrillo?

12        **MR. VERRILLO:** There was -- there were no records

13 provided to me by the Government, and I have no impeachment

14 evidence of that kind.

15        **THE COURT:** Okay.

16        **MS. KOCHER:** Thank you.

17        **THE COURT:** Thank you.

18        (**WHEREUPON**, the jury is present).

19        **THE COURT:**  You may call your next witness.

20        **MS. KOCHER:** Thank you, Your Honor.  The Government

21 calls Investigator Thomas Luciano.

22          **GOVERNMENT WITNESS, THOMAS LUCIANO, SWORN**

23                     **DIRECT EXAMINATION**

24        **THE CLERK:** Please state your full name for the

25 record and spell your last name.

1          **THE WITNESS:** Thomas Luciano, L-U-C-I-A-N-O.

2          **THE REPORTER:** Thank you.

3          **THE WITNESS:** Good morning, Your Honor.

4          **THE COURT:** Good morning.  You may remove your mask

5    since you're behind plexiglas.  Thank you.

6          You may proceed.

7          **MS. KOCHER:** Thank you.

8    BY MS. KOCHER:

9    Q.   Good morning.

10   A.   Good morning.

11   Q.   Could you please introduce yourself to the jury?

12   A.   My name is Tom Luciano.  I'm a police investigator for the

13   Rochester Police Department.  I'm currently assigned to patrol

14   section investigations, and I work 2nd Platoon daytime hours.

15   Q.   Now, Investigator, how long have you been an investigator?

16   A.   Over three years.

17   Q.   Before becoming an investigator, how were you employed?

18   A.   I was a police officer for a little over 15 years.

19   Q.   Was that with the Rochester Police Department?

20   A.   That's correct.

21   Q.   And do you have any prior law enforcement experience

22   before joining the Rochester Police Department?

23   A.   I worked for the Monroe County Sheriff's Office as a

24   deputy working in the jail.

25   Q.   And how long did you work in the jail?

1  A.    Over five years.

2  Q.    So you have over 20 years experience in law enforcement?

3  A.    That's correct.

4  Q.    Now, what are your duties as an investigator?

5  A.    I respond to in-progress crimes while I'm at work and I

6  also carry a caseload of crimes for follow-up.

7  Q.    Okay. And when you were a parole officer what were your

8  duties in that position?

9  A.    I responded to 911 calls, investigated all types of

10  crimes; and I also worked in the Tactical Unit doing a lot of

11  proactive policing.

12  Q.    Okay.  Investigator, would you pull the microphone close

13  to you to make sure we can all hear you.  Thank you.

14           All right.  Now, you mentioned you would respond to

15  service as a road patrol officer.

16  A.    That's correct.

17  Q.    Were you assigned to a particular area of the city?

18  A.    Most of my career I was assigned to Clinton Section.

19  Q.    And about how long were you assigned to the

20  Clinton Section?

21  A.    I would say approximately 12 years of my career was spent

22  exclusively in that area.

23  Q.    Okay. Can you explain some of your training to become a

24  police officer and an investigator?

25  A.    I attended the basic training academy.  I also attended

1   many in-services throughout the year.  I have attended

2   investigative schools, search warrant schools.

3   Q.   Okay.  Now, Investigator, you mentioned when you were on

4   the road you worked in the Clinton Section for about 12 years;

5   is that correct?

6   A.   That's correct.

7   Q.   And did that include the area of North Clinton Avenue and

8   Burbank Street in the City of Rochester?

9   A.   It did.

10  Q.   Now, during your about 12 years working that area of the

11  city, did you become familiar with that intersection?

12  A.   I did.

13  Q.   How did you become familiar with that particular

14  intersection?

15  A.   I responded there for numerous calls of vice activity

16  taking place, mainly hand-to-hand drug transactions, many

17  shots fired, shootings, homicides, right there in that

18  immediate block.

19  Q.   About how often do you think you were in that area of the

20  city during your days on the road?

21  A.   I was there daily.  My car beat was centrally located

22  right there on Clinton Avenue and right in the area of Burbank

23  Street.

24  Q.   I'd like to show you what's been received into evidence as

25  Government's Exhibit 35.  It should pop up on your screen

1  there.  Do you recognize the area depicted in this map?

2  A.    I do.

3  Q.    And what is it?

4  A.    This is a overhead view of Clinton Avenue and the

5  intersection of Burbank Street.

6  Q.    So this is the area of the city that we've just been

7  discussing?

8  A.    That's correct.

9  Q.    All right.  Now, Investigator, while you were going to

10  that area daily did you make observations in the area?

11  A.    All the time.

12  Q.    And did you also make arrests in the area?

13  A.    I had.

14  Q.    Now, based upon your observations and some of the arrests

15  and calls you responded to in the area of Clinton and Burbank

16  Street, what were some of the things that you observed?

17  A.    Hand-to-hand drug sales, I made many arrests for narcotics

18  near that intersection; also for weapons; responded to

19  shootings; homicides right there near that intersection.

20  Q.    When you say hand-to-hand drug sales, what specifically

21  would you see that would be indicative of a hand-to-hand drug

22  sale?

23  A.    Individuals meeting in locations that were not visible to

24  the public, going around corners, money being exchanged for

25  drugs.

1  Q.   Okay. Was there any area in particular near Clinton and

2  Burbank where you observed that kind of activity?

3  A.   Yes.  There's a vacant field near that intersection that

4  was specifically an area where that type of activity would

5  take place daily.

6  Q.   Okay. Is that field depicted on the map in Government's

7  Exhibit 35?

8  A.   It is.

9  Q.   Could you please mark with an X the approximate area of

10  that field?  So you've placed an X on the north side of

11  Burbank Street just to the left of the house marked 6?

12  A.   That's correct.

13  Q.   And then to the left of your X there's a building and

14  North Clinton Avenue?

15  A.   Correct.

16  Q.   What type of drugs were typically sold in this area of the

17  city?

18  A.   Mainly heroin and cocaine.

19  Q.   Now, Investigator, when you were working this area of the

20  city would you generally operate a marked patrol vehicle?

21  A.   I would.

22  Q.   When you were operating in your marked patrol vehicle in

23  this area did you make any observations of people in the area?

24  A.   I did.

25  Q.   When they would see your marked patrol car what were some

1  of the things that you would see?

2  A.   They would quickly turn around, vacate the area, they

3  would yell to other individuals who were around and alert them

4  that the police were in the area.

5  Q.   All right.  Now I'd like to more specifically direct your

6  attention to February 6th of 2016.  Were you working as a

7  police officer in the Clinton Section on that day?

8  A.   I was.

9  Q.   And do you recall what your shift was?

10 A.   It was 2nd Platoon.  I would work from approximately

11 7 a.m. to 3 p.m..

12 Q.   Okay. And were you operating a marked patrol vehicle that

13 day?

14 A.   I was.

15 Q.   Wearing an RPD issued uniform?

16 A.   I was.

17 Q.   Did you have a body worn camera at that time?

18 A.   I did not.

19 Q.   And why was that?

20 A.   At that time they were not issued.

21 Q.   So you didn't have one assigned to you at that time?

22 A.   No, ma'am.

23 Q.   Now, at about 9:48 a.m. on February 6th, 2016, where were

24 you?

25 A.   I was traveling in my marked patrol car in uniform

1    westbound down Burbank Street at a slow rate of speed.

2    Q.    Okay. So you were traveling from Remington Street towards

3    North Clinton?

4    A.    Yes, ma'am.

5    Q.    And is Burbank a one-way street?  Does traffic only go one

6    way?

7    A.    I believe it just goes west.

8    Q.    Okay. So you were traveling lawfully as you were supposed

9    to on that street?

10   A.    That's correct.

11   Q.    As you traveled slowly westbound on Burbank Street what,

12   if anything, did you see?

13   A.    I observed a red Honda Civic parked right in the area of

14   this field just slightly in front of that building at the

15   corner of Burbank and Clinton.

16   Q.    Okay.  Is that in the area where you marked that X?

17   A.    It is, yes.

18   Q.    Okay. And why was your attention drawn to that red Honda?

19   A.    I saw an individual standing just outside of that vehicle

20   and he quickly walked away when my patrol vehicle became

21   visible.

22   Q.    What happened next?

23   A.    That male walked through that vacant lot northbound

24   towards Oscar Street and shortly after that I observed two

25   individuals exit that Honda, one from the driver's seat and

1  another from the front passenger seat.

2  Q.   Did you later learn the identity of those two individuals

3  that exited the red Honda?

4  A.   I did.

5  Q.   And who exited the driver's seat?

6  A.   Xavier Torres.

7  Q.   Do you see that individual in court today?

8  A.   I do.

9  Q.   Would you please point him out by an article of clothing

10 that he's wearing?

11 A.   He's wearing the white button up shirt with the blue mask.

12         **MS. KOCHER:** Your Honor, could you let the record

13 reflect the witness has identified the defendant?

14         **THE COURT:** Yes, the record will note the

15 identification of the defendant Xavier Torres.

16         **MS. KOCHER:** Thank you.

17 **BY MS. KOCHER:**

18 Q.   All right.  Investigator, I'd ask you to take a look at

19 Exhibit 1 that's been received into evidence.  If you could

20 hit the upper right corner of your screen, a menu should pop

21 up.  Hit that arrow and then if you could hit the clear button

22 at the bottom of that arrow, it will erase the X that you

23 made.  Thank you.

24         All right, Investigator, we have Government's

25 Exhibit 1 up on the display.  Do you recognize the defendant

1  in any of these photographs on Exhibit 1?

2  A.    I do.

3  Q.    Would you please circle him?  All right, so you've circled

4  a photo in the third row, it would be the fourth from the

5  left; is that correct?

6  A.    Yes, ma'am.

7  Q.    And the defendant appears to be wearing a brown or tan

8  collar shirt?

9  A.    That's correct.

10 Q.    Did there come a time you learned the defendant went by

11 any nicknames?

12 A.    I did.

13 Q.    What was that nickname?

14 A.    Pistolito.

15 Q.    Had you seen the defendant in the Burbank area before

16 February 6th of 2016?

17 A.    I had.

18 Q.    Particularly where on Burbank Street?

19 A.    On the X that I indicated on the map and also near the

20 area of number 6 Burbank.

21 Q.    If we could go back to Exhibit 35, if you could clear the

22 circle you just made?  Would you place that X again in the

23 area where you would generally see the defendant?

24 A.    And also in this area as well.

25 Q.    So you've placed two X's.  One on the house with the 6 on

1  the roof and the second X is where you had previously marked

2  the vacant lot just to the left of that house, correct?

3  A.    That's correct.

4  Q.    Okay. And on that day February 6th the defendant exited

5  the driver's seat of the red Honda?

6  A.    He did.

7  Q.    Was it actually the driver's seat?

8  A.    Yes, it was the driver's seat, yes.

9  Q.    You also mentioned a second person exited the red Honda,

10  correct?

11  A.    Correct.

12  Q.    What seat did that individual exit from?

13  A.    The front passenger seat.

14  Q.    Did you learn who that person was?

15  A.    Mr. Jose Rodriguez.

16  Q.    I'd like to show you what's not in evidence as Exhibit 15.

17  Do you recognize the individual depicted in Exhibit 15?

18  A.    I do.

19  Q.    And who is in that photograph?

20  A.    Mr. Rodriguez.

21  Q.    Is that the same person that exited the front passenger

22  seat of the red Honda that day?

23  A.    Yes, ma'am.

24  Q.    And does this photograph fairly and accurately depict the

25  way that he looked back then?

1  A.   Yes, ma'am.

2          **MS. KOCHER:** Your Honor, I'd offer Exhibit 15 into

3  evidence.

4          **MR. VERRILLO:** No objection.

5          **THE COURT:** Exhibit 15 will be received.

6          (**WHEREUPON**, Government Exhibit 15 was received into

7  evidence).

8  **BY MS. KOCHER:**

9  Q.   Now, Investigator, based upon your familiarity with the

10  area, the fact that you observed somebody standing outside of

11  that red Honda, and the observations of the people fleeing the

12  area as your marked patrol car made its way down Burbank

13  Street, what did you suspect?

14  A.   I suspected that some type of criminal activity,

15  specifically drug activity, was taking place.

16  Q.   Okay. And what did you do?

17  A.   I then observed both the driver and passenger enter the

18  side door of an apartment building at 1264 North Clinton.

19  They quickly entered the building and shut the door behind

20  them.  I then exited my patrol vehicle and followed them

21  inside.

22  Q.   When you say the driver and the passenger, was that the

23  defendant and Mr. Rodriguez that's depicted in Exhibit 15?

24  A.   Yes, ma'am.

25  Q.   If we could go back to Exhibit 35, the map of the area?

1  Is the building that the defendant and Mr. Rodriguez entered

2  depicted on this map?

3  A.    It is.

4  Q.    And where is that?  You've circled the building on the

5  north side of Burbank Street at the intersection with North

6  Clinton?

7  A.    Correct.

8  Q.    Where was that red Honda parked in relation to that

9  building?

10 A.    Want me to make another X on there?

11 Q.    Sure.

12 A.    In this area here.

13 Q.    So you've placed a little X at the end of the building,

14 the right side of the building?

15 A.    Correct.

16 Q.    Now, after you observed the defendant and Mr. Rodriguez

17 make entry into that apartment building, what did you do?

18 A.    I followed them inside.

19 Q.    And what happened when you got inside?

20 A.    Upon entering the location I observed both Mr. Rodriguez

21 and Mr. Torres standing in the common hallway that led to a

22 number of apartments.

23 Q.    And did you speak with them?

24 A.    I did.

25 Q.    Who did you speak with?

1  A.    Mr. Torres.

2  Q.    The defendant?

3  A.    That's correct.

4  Q.    What did he tell you?

5  A.    I asked him who he came to visit at the location.

6              He stated that he was there to visit an aunt.

7              I also asked him how he got to the location.

8              And he then informed me that he had walked there.

9  Q.    Okay. What else did you talk to him about?

10 A.    I asked him about a Honda that was out front.  And he

11 stated that he had no possession of that Honda prior to me

12 entering the building.

13 Q.    Did you ask him if he had driven to the location?

14 A.    I did.

15 Q.    What did he tell you?

16 A.    He stated that he had not.

17 Q.    Okay. Did he tell you where he had walked there from?

18 A.    He said he had walked from his brother's house on Dewey

19 Avenue.

20 Q.    Now, did any of what the defendant told you inside that

21 apartment building correspond to what you had seen on the

22 street?

23 A.    It did not.

24 Q.    Okay. What didn't make sense to you?

25 A.    I had just seen him exit that vehicle and he denied

1  exiting it.  He stated that he had walked there from Dewey

2  Avenue, and I know Dewey Avenue to be on the opposite side of

3  the city and in the opposite direction of where I had seen him

4  walk from the vehicle to the apartment door.

5  Q.    While you were speaking with him did you make any

6  observations of him?

7  A.    He appeared nervous to me, I could see him breathing

8  heavily and his chest rising and fall at a rapid pace.

9  Q.    Did there come a time that you conducted a pat-frisk of

10  the defendant?

11  A.    I did.

12  Q.    And what is a pat-frisk?

13  A.    It's just a quick frisk to determine if someone is in

14  possession of weapons that may be an immediate threat to

15  officers.

16  Q.    Okay. Did he have any weapons on him?

17  A.    He did not.

18  Q.    Okay. Did you recover anything during that pat-frisk?

19  A.    I recovered a Honda key.

20  Q.    And did you confront the defendant with the recovery of

21  the key?

22  A.    I did.

23  Q.    What happened then?

24  A.    He stated that it belonged to a Honda that was parked at

25  his brother's house on Dewey Avenue.

1  Q.   Okay. What happened next?

2  A.   Because of what I described before, his nervousness, his

3  breathing heavily, all the lies that he had told me, I placed

4  him into handcuffs and had him sit on the doorstep of the

5  entryway to the apartment building on Clinton Avenue while I

6  walked over to the vehicle that he had just left.

7  Q.   At this point were there other officers with you?

8  A.   There were.

9  Q.   Were they also in RPD uniforms?

10  A.   They were.

11  Q.   After the defendant was handcuffed and you had him sit on

12  the step there, what did you do?

13  A.   I then walked over to the vehicle that I had observed

14  Mr. Torres exit from.

15  Q.   Okay. And as you walked over to that vehicle what

16  happened?

17  A.   I heard my partner Officer Pike yell that Mr. Torres was

18  attempting to flee.

19  Q.   Okay. And did you see the defendant fleeing?

20  A.   I saw him running in the direction of Clinton Avenue

21  handcuffed behind his back.

22  Q.   Okay. So he's running while he was handcuffed?

23  A.   That's correct.

24  Q.   Okay. Was he apprehended nearby?

25  A.   Very quickly and in a very short distance, yes, he was

468

1    taken into custody.

2    Q.    All right.  Now, Investigator, I'd like to have you look

3    at Exhibit 174 that's already in evidence.  If you could clear

4    that circle and the little X's that you've made.  Thank you.

5              Investigator, do you recognize the area depicted in

6    this photograph?

7    A.    I do.

8    Q.    And what are we looking at?

9    A.    Am I allowed to draw on this screen?

10   Q.    Sure.

11   A.    This door here is the door that I observed them enter.

12   Q.    Okay. And just before you move on, you've made a circle

13   around the door on the left side of the photograph?

14   A.    Correct.

15   Q.    And that's the apartment building that you described

16   earlier?

17   A.    Yes, ma'am.

18   Q.    Okay. What street is depicted in this photograph?

19   A.    That's Burbank Street.

20   Q.    Okay. And would we be looking towards Remington from this

21   vantage point?

22   A.    Looking towards Remington in an eastbound direction.

23   Q.    North Clinton would be behind the photographer?

24   A.    Yes, ma'am.

25   Q.    And is the red Honda depicted in this photograph?

1  A.   It is positioned on the north side of the roadway behind

2  that white Chevy with the yellow plate.

3  Q.   Okay. You've made a circle around a red vehicle behind the

4  white car that's parked on the road?

5  A.   Yes, ma'am.

6  Q.   Okay. And is that the vehicle that you saw the defendant

7  and Mr. Rodriguez exit?

8  A.   Yes.

9  Q.   Okay. Moving on to Exhibit --

10  A.   I'm sorry, the defendant Torres exit?

11  Q.   Yes.

12  A.   Yes.

13  Q.   And did you see Mr. Rodriguez exit the front passenger

14  seat?

15  A.   I did.

16  Q.   Okay. Moving on to Exhibit 175 -- if you could clear those

17  circles.  Is this another photograph of that same vehicle that

18  you just circled?

19  A.   Yes, ma'am.

20  Q.   And what was the license plate of the car?

21  A.   H as in Henry, D as in David, N as in Nora, 5250.

22  Q.   Now, once Mr. Torres -- after he had fled and was detained

23  again, did you have a chance to approach the vehicle?

24  A.   I did along with Officer Romeo.

25  Q.   What were some of the things that you observed as you

1   approached the car?

2   A.   Officer Romeo had alerted me that he had seen hyperdermic

3   needles in the back seat.  I also observed that the plate on

4   the vehicle did not match the sticker of registration in the

5   window.

6   Q.   Okay. Now, Investigator, I'd like to show you what's been

7   received into evidence as Exhibit 181.  Does this appear to be

8   a DMV abstract registration record?

9   A.   Yes, ma'am.

10  Q.   Okay. And does this registration record correspond to the

11  license plate HDN 5250?

12  A.   It does.

13  Q.   Okay. Who was the registered owner of that license plate?

14  A.   Obed Torres Garcia with a date of birth of August 25th,

15  1997.

16  Q.   Is there an address associated with Mr. Torres Garcia?

17  A.   145 Liberty Pole, apartment No. 5.

18  Q.   Okay. And that's in Rochester, New York?

19  A.   Correct.

20  Q.   And this registration record is also for a red Honda?

21  A.   Yes, ma'am.

22  Q.   Okay. That license plate is the same license plate as the

23  vehicle you saw the defendant exit on February 6th, 2016?

24  A.   Yes, ma'am.

25  Q.   If we could go to Exhibit 176, is this another photograph

1 of that same vehicle?

2 A.   It is.

3 Q.   We're looking at the driver's side of the car in this

4 photo?

5 A.   That's correct.

6 Q.   Okay. Now, in addition to the mismatched registration

7 sticker and the needles that were in plain view, was there

8 anything else in plain view in the vehicle?

9 A.   I observed a set of trimmers and I just responded earlier

10 in the morning to the report of stolen trimmers being taken

11 from a Rite-Aid.

12            **MR. VERRILLO:** Objection, hearsay.

13            **THE COURT:** Overruled.  He said he responded to a

14 report, so overruled.  Go ahead.

15            **THE WITNESS:** I responded to a report of hair

16 trimmers being stolen from the Rite-Aid at 1000 North Clinton

17 Avenue.

18 **BY MS. KOCHER:**

19 Q.   Now, based upon your observations of the items in plain

20 view of the car, was it ultimately searched?

21 A.   It was.

22 Q.   Was the car locked?

23 A.   It was.

24 Q.   How were you able to get inside the vehicle?

25 A.   With the key that Mr. Torres had on his person.

1    Q.    Okay. Do you recall where that key was on his person?

2    A.    It was in his jacket pocket.

3    Q.    All right. What, if anything, did you observe during the

4    search of the car?

5    A.    On the driver's floorboard I observed a clear plastic

6    sandwich bag.  It contained 67 bags of heroin and over 100

7    bags of cocaine.

8    Q.    I'm sorry, was that from the drive's floorboard?

9    A.    That's correct.

10   Q.    Did you search any other areas of the car?

11   A.    I also searched the center console.

12   Q.    What, if anything, was in the center console?

13   A.    In the center console were a few hundred individually

14   packaged bags of heroin and cocaine as well.

15   Q.    Now, the driver floorboard area where you observed the

16   quantity of drugs, was that the same seat that the defendant

17   had exited?

18   A.    It is.

19   Q.    Now, Investigator, I have in my hand here Exhibit 179.

20   Have you had a chance to look at this exhibit before

21   testifying today?

22   A.    I have.

23   Q.    And are these the drugs that you received -- that you

24   recovered from the vehicle both the center console and from

25   the floorboard area?

1  A.   Yes, ma'am.

2            **MS. KOCHER:** Your Honor, if I may read from the

3  stipulation on page 4.  It states Government's Exhibit 179 was

4  seized from a 2001 red Honda Civic bearing New York

5  registration HDN 5250 at 2 Burbank Street, Rochester, New York

6  on February 6th, 2016.

7            Government's Exhibit 179 contains 25 yellow plastic

8  bags with white powder containing cocaine.

9            The aggregate weight of the cocaine is

10  approximately 0.325 grams.

11            Government Exhibit 179 also contains 174 gray

12  plastic bags with white powder containing cocaine.

13            The aggregate weight of the cocaine is

14  approximately 8.352 grams.

15            Government Exhibit 179 also contains 266 glassine

16  bags stamped Magoo with tan powder containing heroin.

17            The aggregate weight of the heroin is approximately

18  13.3 grams.

19            And, Your Honor, if I may offer Government's

20  Exhibit 179.

21            **MR. VERRILLO:** No objection.

22            **THE COURT:** Exhibit 179 will be received.

23            (**WHEREUPON**, Government Exhibit 179 was received

24  into evidence).

25  **BY MS. KOCHER:**

1    Q.   Now, Investigator, when you recovered these drugs that are

2    in Exhibit 179 from the vehicle, did you notice any markings

3    on it?

4    A.   There were markings on the wax paper envelopes that had

5    heroin, was contained inside.

6    Q.   And what were those markings?

7    A.   The bags -- the envelopes were white with blue markings,

8    and those blue markings said the word Magoo, M-A-G-O-O.

9            **MS. KOCHER:** Your Honor, may I place Exhibit 179 on

10   the visualizer so the jury may see those markings?

11           **THE COURT:** Yes.

12           **MS. KOCHER:** Thank you.

13   **BY MS. KOCHER:**

14   Q.   All right, Investigator, I've placed Exhibit 179 on the

15   visualizer.  Are these some of those bags that you described

16   as being white and having the Magoo stamp?

17   A.   Yes, ma'am.

18   Q.   And that's in a blue font?

19   A.   Correct.

20   Q.   Now, in addition to searching the vehicle that day, were

21   the defendant and Mr. Rodriguez also searched?

22   A.   They were.

23   Q.   And what did you recover, if anything, from their person?

24   A.   From Mr. Rodriguez an additional amount of cocaine and

25   heroin, approximately 100 bags were recovered from his person;

1   and United States currency was recovered from the both of

2   them.

3   Q.   Okay. Do you know how much currency was recovered from Mr.

4   Rodriguez and the defendant?

5   A.   The defendant had approximately $500 in cash; and Mr.

6   Rodriguez had approximately $100 in cash.

7   Q.   And what were the denominations of that amount of money?

8   A.   They were in small denominations consistent with the sale

9   of narcotics.

10          **MR. VERRILLO:** Objection.

11          **THE COURT:** Yes, sustain the last part of the

12   answer.

13   **BY MS. KOCHER:**

14   Q.   Now, did the defendant have any needles on his person or

15   other items indicative of drug use?

16   A.   No, ma'am.

17   Q.   Okay. Did he have any drugs on his person?

18   A.   No, ma'am.

19   Q.   Now, you mentioned that Mr. Rodriguez did, in fact, have

20   drugs on his person, though?

21   A.   That's correct.

22   Q.   Were those collected as evidence?

23   A.   Yes, ma'am.

24   Q.   Investigator, I have in my hand what's been marked as

25   Government's Exhibit 178.  Have you had a chance to look at

1 | this before testifying today?

2 | A.    I have.

3 | Q.    And are these the drugs seized from Mr. Rodriguez's

4 | person?

5 | A.    They are.

6 |           **MS. KOCHER:** Your Honor, if I may read from the

7 | stipulation?  This is beginning on the bottom of page 3 and

8 | onto page 4.

9 |           The stipulation the parties have agreed to states

10 | Government's Exhibit 178 was seized from Jose Rodriguez at 2

11 | Burbank Street, Rochester, New York on February 6th, 2016.

12 |           Government Exhibit 178 has 46 glassine bags stamped

13 | Magoo with tan powder containing heroin.

14 |           The aggregate weight of the heroin is approximately

15 | 2.346 grams.

16 |           Government Exhibit 178 also contains 50 gray

17 | plastic bags with white powder containing cocaine.

18 |           The aggregate weight of the cocaine is

19 | approximately 5.75 grams.

20 |           Your Honor, I would offer Government's Exhibit 178.

21 |           **MR. VERRILLO:** No objection.

22 |           **THE COURT:** Exhibit 178 will be received will be

23 | received in evidence.

24 |           (**WHEREUPON**, Government Exhibit 178 was received

25 | into evidence).

1  **BY MS. KOCHER:**

2  Q.    If we can go back to Government's Exhibit 35.

3  Investigator, can you explain some of the addresses that we've

4  discussed here and that were included in the stipulation,

5  particularly 2 Burbank Street versus -- I believe you gave a

6  North Clinton Avenue address earlier?

7  A.    2 Burbank Street I believe is this location here.

8  Q.    Okay. So is that at the back of the apartment building

9  that you described earlier?

10  A.    Yes.

11  Q.    And what is the address of the apartment building, if you

12  know?

13  A.    1264 North Clinton.

14  Q.    Okay. So the front of that building would actually be on

15  North Clinton as opposed to Burbank Street?

16  A.    That's correct.

17  Q.    All right.  Now, Investigator, the drugs that were seized

18  from Mr. Rodriguez's person that have been received as

19  Government's Exhibit 178, did those have any stamps or

20  markings on them?

21  A.    They did, they had the same markings, the blue lettering

22  with the word Magoo stamped on it.

23  Q.    Okay.  And those are the same markings that we just saw

24  the exhibit I placed on the visualizer?

25  A.    Yes, ma'am.

1          **MS. KOCHER:** Judge, I have one additional exhibit

2     that's been received, that is Exhibit 152, that I'd like to

3     place on the visualizer if I may?

4          **THE COURT:** Yes.

5          **MS. KOCHER:** Thank you.

6     **BY MS. KOCHER:**

7     Q.   Just to orient the jury, Government's Exhibit 152 that's

8     been received into evidence and stipulated to by the parties

9     is evidence that was seized from a 2003 GMC Envoy bearing

10    New York registration GYZ 8750 at 6 Burbank Street on December

11    16 of 2016.

12          I've placed a slit in Government's Exhibit 152 and

13    I am removing some of the exhibits.  I think it will be easier

14    to see.  Investigator, I've placed a bag that was removed from

15    Exhibit 152 on the visualizer.  Are you able to see that item?

16    A.   I am.

17    Q.   Okay. And do you recognize any of the markings on the bags

18    that I just placed on the visualizer?

19    A.   The markings on the bags are the same markings that I

20    observed from the heroin recovered both from Mr. Rodriguez and

21    from the Honda out front of No. 2 Burbank Street.

22    Q.   Those appear to be the white envelope with the blue Magoo

23    written on it?

24    A.   That's correct.

25          **MS. KOCHER:** Thank you, Investigator.  I don't have

1 | any further questions.

2 | **CROSS-EXAMINATION**

3 | **BY MR. VERRILLO:**

4 | Q.   Investigator, did you have any further contact with the

5 | person who left the area?

6 | A.   I did not.

7 | Q.   On that date did you find out where that person was or who

8 | it was?

9 | A.   I did not.

10 | Q.   So you were driving down Burbank Street and you saw the

11 | red Honda which was parked at the time, right?  When you first

12 | got there?

13 | A.   That's correct.

14 | Q.   And so the vehicle was not operational when you had

15 | observed it?

16 | A.   It was not.

17 | Q.   Okay. And you didn't observe any criminal activity prior

18 | to getting out of your vehicle; is that right?

19 | A.   That's correct.

20 | Q.   And you indicated that Mr. Torres and this other gentleman

21 | had gone to the apartment complex and entered it.  Is there

22 | anything illegal about leaving the area and going into an

23 | apartment complex?

24 | A.   No, sir.

25 | Q.   And was Mr. Torres obligated to wait for you to talk to

1  him?

2              **MS. KOCHER:** Objection.

3              **THE COURT:** Overruled.  Go ahead, you can answer

4  that.

5              **THE WITNESS:** He had no obligation to talk to me.

6  **BY MR. VERRILLO:**

7  Q.   And he had no obligation to wait for you, correct?

8  A.   That's correct.

9  Q.   Okay. And after you got the key from Mr. Torres, you had

10  searched the vehicle, correct?

11  A.   I had first made some observations into the vehicle before

12  I searched it.

13  Q.   Okay. But you didn't ask for anyone's consent to go into

14  the vehicle, correct?

15  A.   Mr. Torres gave no indication that he possessed the car

16  and, no, I did not get consent.

17  Q.   Okay. And while you were there did you find out who the

18  registered owner of the vehicle was?

19  A.   I did not.

20  Q.   Okay. And you didn't have a search warrant to enter the

21  vehicle, correct?

22  A.   That's correct.

23  Q.   And when you did search Mr. Torres, is it true that he did

24  not have any drugs on him?

25  A.   He did not have any drugs on him, no.

1  Q.   Okay. And at the time that Mr. Torres was in your

2  presence, isn't it true that he hadn't committed any crime?

3  A.   He did not commit a crime, no.

4  Q.   Okay. Now, after going into the vehicle do you know

5  whether the police department did any testing inside the

6  vehicle for any fingerprints?

7  A.   There were no fingerprints taken.

8  Q.   Okay.

9          **MR. VERRILLO:** Your Honor, if I could just have one

10  moment?

11          **THE COURT:** Sure.

12  **BY MR. VERRILLO:**

13  Q.   At the time that you had the stop on -- of Mr. Torres, you

14  didn't know who he was, correct?

15  A.   I didn't know his name.

16  Q.   Okay. All right. But you had seen him in the neighborhood

17  before?

18  A.   That's correct.

19  Q.   Okay.

20          **MR. VERRILLO:** I have nothing further.

21                    <u>**REDIRECT EXAMINATION**</u>

22  **BY MS. KOCHER:**

23  Q.   Investigator, Mr. Verrillo asked you if the -- when you

24  saw the car it was not operational.  It wasn't moving,

25  correct?

1  A.   It was not moving.

2  Q.   It was parked?

3  A.   Parked.

4  Q.   You don't know if the car actually worked?

5  A.   I don't know if it worked or not, no.

6  Q.   And when you spoke with the defendant in the apartment

7  building, he denied any possession of that vehicle?

8         **MR. VERRILLO:** Objection.

9         **THE COURT:** Overruled.

10        **THE WITNESS:** He did.  He denied any possession of

11  that vehicle.

12        **MS. KOCHER:** All right, thank you.

13        **THE COURT:** Anything further?

14        **MR. VERRILLO:** No, Your Honor.

15        **THE COURT:** You may step down.  Thank you very much.

16        **THE WITNESS:** Thank you.

17        (**WHEREUPON**, the witness was excused).

18        **THE COURT:** Ms. Kocher, you don't have any

19  additional witnesses today; is that right?

20        **MS. KOCHER:** No, Judge.  We did indicate to the

21  Court yesterday we are moving a little quicker than we

22  anticipated.  Our next witness we have some scheduling issues

23  with, so unfortunately we don't have any additional witnesses

24  today.

25        **THE COURT:** Ladies and gentlemen, I don't think

1   anybody is going to be broken hearted if we break early today.

2          Sometimes this happens because of the availability,

3   unavailability of certain witnesses and, therefore, we are

4   going to conclude the testimony today and come back on Monday

5   at 9:30.

6          There's one change in the schedule next week.

7   Thursday we'll be in session from 8:30 until 11:30 instead

8   of -- currently it says 1:30, we're going to be leaving early

9   on that date as well.  Next Thursday, October 28th you'll be

10  8:30 to 11:30.

11         Now, this week you've heard a lot of evidence in

12  this case.  It's important you not make up your mind or

13  discuss the case with anybody.  Obviously you'll have a long

14  weekend.  You may see other people who want to ask you what

15  was going on during the trial.

16         Please remember that under your oath you promised

17  not to make any statements to anybody, talk to anybody or do

18  any research or find out any information regarding this case.

19  To do so would be unfair to both of the parties in this case.

20  So we know you'll abide by that admonition, but I have to

21  remind you of that as well.

22         With that understanding the jury may step down

23  until Monday morning, October 25th at 9:30.  Have a great

24  weekend.

25             (**WHEREUPON**, the jury was excused).

484

1            **THE COURT:** Have a good weekend, everybody.

2            **MS. KOCHER:** Thank you.

3            **MR. VERRILLO:** Thank you.

4            (**WHEREUPON**, proceedings adjourned at 11:53 a.m.)

5                        *    *    *

6                   <u>**CERTIFICATE OF REPORTER**</u>

7

8            In accordance with 28, U.S.C., 753(b), I certify that

9    these original notes are a true and correct record of

10   proceedings in the United States District Court for the

11   Western District of New York before the Honorable Frank P.

12   Geraci, Jr. on October 22nd, 2021.

13

14   <u>S/ Christi A. Macri</u>

15   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter
16

17

18

19

20

21

22

23

24

25