485

1                   UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF NEW YORK

3

4

5    - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA            18-CR-6094(G)
6
     vs.
7                                        Rochester, New York
     XAVIER TORRES,                      October 25, 2021
8             Defendant.                 9:30 a.m.
     - - - - - - - - - - - - - -X
9                                        **VOLUME 5**

10                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                   UNITED STATES DISTRICT JUDGE

12
                     JAMES P. KENNEDY, JR., ESQ.
13                   United States Attorney
                     BY: ROBERT A. MARANGOLA, ESQ.
14                       CASSIE M. KOCHER, ESQ.
                     Assistant United States Attorneys
15                   500 Federal Building
                     Rochester, New York 14614
16                   Appearing on behalf of the United States

17
                     MAURICE J. VERRILLO, ESQ.
18                   3300 Monroe Avenue
                     Suite 301
19                   Rochester, New York 14618
                     Appearing on behalf of the Defendant
20

21   ALSO PRESENT:       Carlos Aguirre, Spanish Interpreter

22

23   COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                         Christimacri50@gmail.com
24                       Kenneth B. Keating Federal Building
                         100 State Street, Room 2640
25                       Rochester, New York 14614

1                          **I N D E X**

2

**WITNESS FOR THE GOVERNMENT**

3

Jose Figueroa
     Direct examination by Ms. Kocher              Page 493

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

*    *    *

**(WHEREUPON**, the defendant is present).

**THE COURT:** Good morning.

**MR. MARANGOLA:** Good morning, Judge.

**MS. KOCHER:** Good morning.

**MR. VERRILLO:** Good morning, Judge.

**THE COURT:** Good morning.  You have an issue to discuss before we begin?

**MS. KOCHER:** Yes, Your Honor.  We intend on calling Jose Figueroa as our witness today.  He does have a criminal history.  That includes one felony conviction.  That was a 2016 conviction for attempted criminal possession of a weapon in the second degree.

I anticipate asking him about that on my direct examination, so I have no objection to Mr. Verrillo cross-examining him on that.

However, he does have several misdemeanor convictions that I don't think would be appropriate for Mr. Verrillo to cross-examine him on.  That includes a 2009 criminal contempt in the second degree; a 2013 criminal contempt in the second degree; a 2016 attempted petty larceny; and a 2016 criminal possession of a controlled substance in the seventh degree.

None of those were felony convictions and I don't

1  think based upon the elements of any of those charges that

2  there's an element of truthfulness or voracity.  So I would

3  just ask for a ruling on that because I do think Mr. Verrillo

4  does intend to question the witness.

5          **THE COURT:** What was the criminal possession

6  controlled substance seventh date again?

7          **MS. KOCHER:** Conviction date was September 28th,

8  2016.

9          **THE COURT:** Okay.

10          **MS. KOCHER:** The arrest date was August 25th of

11  2016.

12          **THE COURT:** Okay.

13          **MS. KOCHER:** I did -- I'm sorry, I also wanted to

14  mention I did provide Mr. Verrillo some paperwork regarding

15  that arrest.  It totals about 16 pages and includes police

16  reports.

17          **THE COURT:** Okay.  And the attempted petit larceny,

18  what did that involve?

19          **MS. KOCHER:** That was in 2016.  I'm not sure what --

20  what was taken.

21          **THE COURT:** Don't they usually go to voracity,

22  larceny charges?

23          **MS. KOCHER:** I don't think there's an element in

24  there about truth or voracity.  And that was an attempted

25  petty larceny.

1          **THE COURT:** Mr. Verrillo?

2          **MR. VERRILLO:** Your Honor, there are a couple

3   criminal contempt convictions.  I think that item is relevant

4   to the credibility of the witness.  There's an attempted petty

5   larceny conviction that would go to honesty.  Obviously

6   stealing is a dishonest act.

7          There's some issues related to his being on

8   probation, violating probation.  He had a few bench warrants.

9          The incident in August of '16 was when he was

10  under -- I believe he was under the agreement, the cooperation

11  agreement, and also during the time of the alleged conspiracy.

12  So I think that would be relevant as well.

13          He gave a false name to Probation, which was a part

14  of the violation -- or false address to Probation, which was a

15  part of the violation as well.

16          And recently he had a criminal contempt conviction

17  in December of 2020.  So I think all those are relevant to the

18  witness's credibility.

19          **THE COURT:** Okay.  Regarding the violation of

20  probation, you indicated he provided a fake address to

21  Probation?

22          **MR. VERRILLO:** That was one of the claims, yeah.

23          **THE COURT:** Okay.  I believe that would be -- could

24  be subject to cross-examination on that information.

25          **MS. KOCHER:** Judge, I would ask Mr. Verrillo what

1  information he has received.  I was not aware of that.

2          THE COURT: What do you have, Mr. Verrillo?

3          MR. VERRILLO: Just give me a second, Judge.  I have

4  a copy of an amended information for delinquency that refers

5  to a failure to truthfully answer reasonable inquiries by

6  Probation related to a change of address or employment.

7          And he had given an address at St. Jacobs Street

8  and no longer resided there.   He resided at Remington Street.

9  This was in December of '16.

10          MS. KOCHER: Was that something -- did he actually

11  plea to that allegation in the BOP?

12          MR. VERRILLO: I don't know.  It's one of the

13  charges in the violation.

14          THE COURT: Okay.  I'll allow ask to ask about it.

15  During the time of the cooperation; is that right?

16          MS. KOCHER: Judge --

17          THE COURT: This was while he was under the

18  cooperation agreement.  Finally, do you know anything about

19  the attempted petty larceny?

20          MR. VERRILLO: Let's see, what year was that?

21          THE COURT: 2016.

22          MR. VERRILLO: Let me see what I have here.  I don't

23  have anything further on that, Judge, on the petty larceny.

24          THE COURT: Not having a factual basis, then I will

25  not allow that.  I will not allow any questions about the

1   criminal contempts in 2009, '13 and '20; or criminal

2   possession controlled substance seventh in '16; or the

3   attempted petty larceny in '16 as well since there's no

4   factual basis for that.

5           I will allow the defense to ask about the violation

6   of probation particularly about the providing false

7   information to Probation; and of course the felony criminal

8   possession weapon second degree.

9           **MR. VERRILLO:** Judge, if I could just add, the

10  August event was during the supervision; and I believe he

11  also -- one of these claims was a false name, he gave a false

12  name during his arrest.

13          **THE COURT:** Which one are you talking about now?

14          **MR. VERRILLO:** August of '16.

15          **MS. KOCHER:** The possession of controlled substance

16  seventh he was ultimately convicted of.

17          **THE COURT:** The information is he provided a false

18  name at that point as well?

19          **MR. VERRILLO:** This is in the police report, it was

20  just given to me, he gave a name of Luis Rodriguez when he was

21  arrested on August 25th of 2016.

22          **THE COURT:** If you have a good faith basis for that,

23  I'll allow you to ask about that as well.

24          August of '16; is that right?

25          **MR. VERRILLO:** Yes.

1              **MS. KOCHER:** He was not convicted of that.

2              **THE COURT:** He provided false information.  He can

3   deny it.  Anything else?

4              **MR. VERRILLO:** Judge, his current detention is

5   related to a violation of parole, which I don't know if the

6   Government's going to discuss that, but --

7              **THE COURT:** What's the basis for that violation?  Do

8   you know?

9              **MR. VERRILLO:** I believe it's the criminal

10  conviction.

11             **MS. KOCHER:** The criminal contempt second from 2020

12  will be part of that violation.

13             **THE COURT:** Okay.

14             **MR. VERRILLO:** I'd like to discuss that.

15             **THE COURT:** I wouldn't allow the criminal contempt.

16  However, I will allow the violation of parole.

17             **MS. KOCHER:** Judge, I do anticipate asking him why

18  he's in custody.  He's in custody for a parole violation.  And

19  asking him what were you on parole for.

20             **THE COURT:** Okay.

21             **MS. KOCHER:** I expect him to say a weapons offense.

22             **THE COURT:** That should resolve the issue.  Anything

23  else?

24             **MR. VERRILLO:** No, Your Honor.

25             **THE COURT:** Okay, thank you. Ready to proceed?

1           **MS. KOCHER:** Yes.

2           **THE COURT:** Bring the jury in.

3           (**WHEREUPON**, the jury is present).

4           **THE COURT:** Good morning, members of the jury.

5    Ready to proceed?

6           **MS. KOCHER:** Yes, Your Honor, good morning.

7           **THE COURT:** You may call your next witness.

8           **MS. KOCHER:** Government calls Jose Figueroa.

9           (**WHEREUPON**, the interpreter was sworn).

10          **GOVERNMENT'S WITNESS, JOSE FIGUEROA, SWORN**

11                      **DIRECT EXAMINATION**

12          **THE CLERK:** Please state your full name for the

13   record and spell your last name.

14          **THE WITNESS:** Jose Figueroa, F-I-G-U-E-R-O-A.

15          **THE COURT:** Mr. Figueroa, you may remove your mask

16   because you're behind the plexiglas testifying.  Thank you.

17          You may proceed.

18          **MS. KOCHER:** Thank you.

19   BY MS. KOCHER:

20   Q.   Good morning, Mr. Figueroa.  Could you pull your mask all

21   the way down?  Why don't you take it off completely so we can

22   see your face.  Thank you.

23          Could you please introduce yourself to the jury?

24   A.   Yes, my name is Jose Figueroa.

25   Q.   And do you go by any nicknames?

1   A.   Yes.

2   Q.   What nicknames do you go by?

3   A.   Che.

4   Q.   Any nicknames other than Che?

5   A.   Che or Che Che.

6   Q.   Mr. Figueroa, do you speak Spanish?

7   A.   Yes.

8   Q.   You appear here with a Spanish speaking interpreter?

9   A.   Yes.

10  Q.   Mr. Figueroa, you are appearing today with a Spanish

11  speaker interpreter; is that correct?

12  A.   Yes.

13  Q.   Do you understand the interpreter?

14  A.   Yes.

15  Q.   If at any point you don't understand him, please let me or

16  Mr. Verrillo the defense attorney know, okay?

17  A.   Yes.

18  Q.   Do you speak any English?

19  A.   Very little.

20  Q.   Okay. Spanish is your first language?

21  A.   Yes.

22  Q.   Are you able to read and write in Spanish?

23  A.   Yes.

24  Q.   How about in English, can you read and write in English?

25  A.   Not much.

```
 1   Q.    Now, you appear this morning in custody?

 2   A.    Yes.

 3   Q.    What are you in custody for?

 4   A.    Parole violation.

 5   Q.    And were you on parole for an attempted criminal

 6   possession of a weapon in the second degree conviction?

 7   A.    I'm sorry.

 8   Q.    You were on parole?

 9   A.    Yes.

10   Q.    For a felony conviction?

11   A.    Yes.

12   Q.    And was that felony conviction for attempted criminal

13   possession of a weapon in the second degree?

14   A.    Yes.

15   Q.    Now, what was your sentence for?  Your parole violation?

16   A.    Five years of probation, and for the violation three

17   years.

18   Q.    Okay. So on your felony drug conviction you were first

19   sentenced to a term of probation?

20   A.    Yes.

21   Q.    That was a five year term of probation?

22   A.    Yes.

23   Q.    And did you violate the terms and conditions of your

24   probation?

25   A.    Yes.
```

1   Q.   And were you resentenced to a term of incarceration in the
2   New York State Department of Corrections?
3   A.   Yes.
4   Q.   Was that a three year term of incarceration?
5   A.   Yes.
6   Q.   And did you serve that time in state prison?
7   A.   Yes.
8   Q.   Now, after serving the time in state prison were you then
9   placed on parole supervision?
10  A.   I'm sorry?
11  Q.   After you served your time, your three years in state
12  prison, were you released but you had to report to parole?
13  A.   Yes.
14  Q.   And you violated the terms of that parole supervision?
15  A.   Yes.
16  Q.   And that's why you're in custody today?
17  A.   Yes.
18  Q.   Okay. Now, have you been charged in federal court for your
19  involvement in drug sales on Burbank Street between 2015 and
20  January of 2018?
21  A.   If I was charged?
22  Q.   Right.  Have you ever been charged in federal court?
23  A.   No.
24  Q.   Are you testifying today pursuant to a cooperation
25  agreement?

1  A.   Yes.

2  Q.   Now, Mr. Figueroa, that binder in front of you should be

3  turned to what's marked as Exhibit 344.  Do you see that

4  there?

5  A.   Yes.

6  Q.   And do you recognize that document?

7  A.   Yes.

8  Q.   Is that the cooperation agreement that I was just asking

9  you about?

10 A.   Yes.

11 Q.   Now, if you could turn to the last page or two of that

12 document in the binder?  Let me know if you recognize any

13 signatures.

14 A.   Yes.

15 Q.   What signatures do you recognize?

16 A.   There's my signature and my lawyer's.

17 Q.   Now, I believe if you turn the page again, is there also

18 an interpreter's signature?

19 A.   Yes.

20 Q.   So that document was translated from English into Spanish

21 for you?

22 A.   Yes.

23 Q.   Mr. Figueroa, how old are you?

24 A.   32.

25 Q.   How far did you go in school?

1   A.   10th.

2   Q.   And where did you go to school?

3   A.   In Puerto Rico.

4   Q.   Are you married or single?

5   A.   Single.

6   Q.   Do you have any children?

7   A.   Yes.

8   Q.   How many children do you have?

9   A.   Six.

10   Q.   Now, you mentioned you went to school in Puerto Rico?

11   A.   Yes.

12   Q.   Is that where you were born?

13   A.   Yes.

14   Q.   Did there come a time you moved to Rochester?

15   A.   Yes.

16   Q.   And about when was that?

17   A.   2005.

18   Q.   How old were you when you moved to Rochester?

19   A.   Like 18 or so.

20   Q.   You were a teenager?

21   A.   Yes.

22   Q.   Now, after moving to Rochester did there come a time that

23   you began selling drugs?

24   A.   Yes.

25   Q.   Do you recall about when that began?

1  A.   2013, 2014.

2  Q.   Okay. And did you sell at various locations throughout the

3  City of Rochester?

4  A.   Yes.

5  Q.   Did there come a time you eventually began selling on

6  Burbank Street?

7  A.   Yes.

8  Q.   And that's in the City of Rochester?

9  A.   Yes.

10  Q.   Near North Clinton Avenue?

11  A.   Yes.

12  Q.   About when did you start selling drugs on Burbank Street?

13  A.   I think it was around 2015 or '16. I don't remember very

14  well the date.

15  Q.   And what sort of drugs were you selling on Burbank Street?

16  A.   Heroin and cocaine.

17  Q.   How did you come to start selling heroin and cocaine on

18  Burbank Street in 2015 or '16?

19  A.   Because my dad use to sell there, my stepdad.

20  Q.   And what was your stepdad's name?

21  A.   Rafi.

22  Q.   Did Rafi introduce you to the Burbank area?

23  A.   Yes.

24  Q.   Can you describe how he introduced you to the Burbank

25  area?

1  A.   I went to visit him one day and that same afternoon he

2  introduced me to Pistolita.   And he said that I was going to

3  work with him.

4  Q.   Who said that you were going to work with him?

5  A.   With my stepdad.

6  Q.   So Rafi told Pistolita that you were going to work with

7  him?

8  A.   Yes.

9  Q.   Where was it that you visited Rafi that day?

10  A.   The brown house on Burbank.

11  Q.   Mr. Figueroa, I'd like to ask you to look at your monitor

12  and look at the exhibit that has already been received into

13  evidence as Exhibit 44.   Do you recognize any of the houses in

14  this photograph?

15  A.   Yes.

16  Q.   What house do you recognize?

17  A.   The middle one, the white and brown.

18  Q.   And how do you recognize that house?

19  A.   Because that's where we used to sell drugs.

20  Q.   And who is we?

21  A.   Me, I mean different people, Rafi.

22  Q.   Okay. Is that the house where you visited Rafi on the day

23  you were just describing?

24  A.   Yes.

25  Q.   Okay. Now, I'd like to ask you to take a look at

1    Exhibit 1, which has also been received into evidence.  Do you

2    see the person that you were describing as Rafi on this

3    document?

4    A.    Yes.

5    Q.    Could you please circle his photograph?  You should be

6    able to touch the monitor and it will make a mark.  Not

7    working?

8    A.    I think the first of the last line, has a blue hoodie.

9    Q.    Okay.  Are you able to circle the photograph?  If you

10   touch the monitor it will make a mark.

11   A.    Mmm-hm.

12   Q.    No?  Okay.  So the person that you knew as Rafi was your

13   stepfather you said was on the bottom row, the first

14   photograph wearing a blue sweatshirt?

15   A.    Yes.

16   Q.    Now, the person that you met that day, Pistolita, do you

17   see that individual on this document as well?

18   A.    Yes.

19   Q.    And where is that person's photograph?

20   A.    Third row, fourth person.  Third row, fourth person.

21   Q.    Is that the fourth person from the left?

22   A.    What do you mean left?

23   Q.    When you're counting the numbers of photographs, you start

24   at the left and count four over?

25   A.    No, from right back.

1   Q.   Okay. So we're talking about the third row?

2   A.   Yes.

3   Q.   What is the person wearing?

4   A.   I think it's a cream uniform.

5   Q.   Okay. And does he have any facial hair?

6   A.   Yes, he has a beard and a lock.

7   Q.   A beard and a what?

8   A.   A lock.

9   Q.   Like a goatee?

10  A.   Yeah, something like that.

11  Q.   So he has a full beard?

12  A.   Yes.

13  Q.   And dark hair?

14  A.   Yes.

15  Q.   Is his photograph to the right of the individual in the

16  black T-shirt?

17  A.   He's in the middle of the two with the black shirt.

18  Q.   Okay. Do you see that individual that you've identified as

19  Pistolita in Government's Exhibit 1 in court today?

20  A.   Yes.

21  Q.   Could you please identify about where he's seated in the

22  courtroom and what he's wearing?

23  A.   Yes, blue shirt, he's back there.

24          **MS. KOCHER:** Your Honor, could you please let the

25  record reflect the witness as identified the defendant?

1           THE COURT: Yes, the record will note the

2    identification of the defendant.

3    BY MS. KOCHER:

4    Q.   And the individual you just identified in court is who you

5    knew as Pistolita?

6    A.   Yes.

7    Q.   And that's a person that you met when you visited Rafi

8    that day at the brown house?

9    A.   Yes.

10   Q.   Had you met the defendant before that day?

11   A.   Before that day, no.

12   Q.   Now, when Rafi told the defendant that you were going to

13   be working with him, did he mean that you would be selling

14   drugs with him?

15           MR. VERRILLO: Objection, leading.

16           THE COURT: Sustained.

17   BY MS. KOCHER:

18   Q.   When Rafi told Pistolita that you would be working with

19   him, what did he mean?

20           MR. VERRILLO: Objection, speculation.

21           THE COURT: Yes, sustained.

22   BY MS. KOCHER:

23   Q.   When Rafi told Pistolita that you would be working with

24   him, what did he say?

25   A.   Yeah.

1   Q.    Who said yeah?

2   A.    Pistolita said it was okay.

3   Q.    What was okay?

4   A.    To sell drugs.

5   Q.    Okay.

6   A.    That I could sell drugs with Rafi.

7   Q.    Okay. And where were you going to be selling drugs with

8   Rafi?

9   A.    In the brown house on Burbank.

10  Q.    Now, did the defendant mention anybody else during that

11  meeting when you were discussing how you would sell drugs with

12  Rafi?

13  A.    He said that later on he was going to talk to -- talk to

14  Javier so that he knew that I was going to be working there.

15  Q.    Who is Javier?

16  A.    Javier was the boss.

17  Q.    Did you know who Javier was at the time?

18  A.    No.

19  Q.    Okay. Do you see the individual that you came -- did you

20  come to know who Javier was?

21  A.    Yes.

22  Q.    And do you see that individual in Government's Exhibit 1?

23  A.    Yes.

24  Q.    Where is his photograph?

25  A.    He's the first one with the black hoodie.

1  Q.   At the very top of the sheet?

2  A.   Yes, the first one.

3  Q.   And is his photograph the only photograph in that row?

4  A.   Yes.

5  Q.   Now, you mentioned that Javi was the boss.  How did you

6  know that?

7  A.   Because it had been said before.

8  Q.   Who had said that before?

9  A.   Rafi had said it.

10  Q.   Now, the defendant mentioned that he was going to tell

11  Javi that you would be working at that brown house with Rafi?

12  A.   Yes.

13  Q.   Did there come a time that did, in fact, happen?

14  A.   Like a week later I was working with Pistolita and Javier

15  arrived that morning and that's when he told him that I was

16  working with him.  And so he told him that he didn't know who

17  I was or my file, that he had to check me.  And then Pistolita

18  told me not to worry about it, to stay working with him.

19  Q.   Okay. So you were working with Pistolita when you met

20  Javi?

21  A.   That morning, yes.

22  Q.   Where were you working?

23  A.   On 6 Burbank, the brown from Burbank.

24  Q.   The brown house?

25  A.   Yes, the brown one.

1    Q.   Okay. If we could go to Exhibit 44?  When you say the

2    brown house, you're referring to the house in the middle of

3    Government's Exhibit 44?

4    A.   Yes, the white and brown.

5    Q.   And what type of work were you and Pistolita doing that

6    morning at the brown house?

7    A.   We were selling drugs.

8    Q.   What kind of drugs?

9    A.   Heroin and cocaine.

10   Q.   And Javi came while you were working that day with

11   Pistolita?

12   A.   That morning, yes.

13   Q.   Now, you mentioned Javi said he needed to check your file?

14   A.   Mm-hmm.

15   Q.   What did you take that to mean?

16   A.   Like my file, to see if I have any cases, if there were

17   drug cases, you know, who am I.

18   Q.   Why would that matter if you had any cases open?

19   A.   I would not know what to say.

20   Q.   Okay. Had you met Javi before this day?

21   A.   No.

22   Q.   Okay. Now, after Javi left did you continue working with

23   Pistolita that day, the defendant?

24   A.   Yeah, we stayed working.

25   Q.   All right. And did you come to learn that you were allowed

1  to continue working at that house with the defendant?

2  A.   Yes, he just told me not to worry about it, to stay

3  working with him.

4  Q.   Who told you not to worry about it?

5  A.   Pistolita.

6  Q.   And what would you have been worried about?

7  A.   Waiting for Javier to check who I was, not to worry about

8  it.

9  Q.   So you were waiting for approval to continue working?

10  A.   Kind of, yes, but his voice -- I mean, he also kind of got

11  to say what to do or not to do.

12  Q.   Who got to say what to do or not to do?

13  A.   Pistolita.

14  Q.   So if Pistolita had told you to stop working, stop selling

15  drugs, what would you have done?

16  A.   I would have left.

17  Q.   Why would you have left?

18  A.   Well, I can't -- if he says I can't, I can't.

19  Q.   You wouldn't have been allowed to sell drugs if -- unless

20  Pistolita or Javi said it was okay?

21  A.   Yes.

22  Q.   Now, after that did you continue selling drugs on Burbank

23  Street?

24  A.   Yes.

25  Q.   That included cocaine and heroin?

1   A.    Yes.

2   Q.    About how long did you sell at this brown house in

3   Government's Exhibit 44?

4   A.    Not long time.

5   Q.    How did the drug sales work at this brown house?  Where

6   would the customers go?

7   A.    To the side door.

8   Q.    Okay. And what side of the house?

9   A.    The right one.

10  Q.    Looks like there's a little sidewalk on the right side of

11  the house.  Is that about where they would go?

12  A.    Yes.

13  Q.    And were they actually allowed inside the house?

14  A.    Yes, they had to go in.

15  Q.    Where would the drug supply be stored in the brown house?

16  A.    Almost always we had -- we had them on us.

17  Q.    On your person?

18  A.    Yes.

19  Q.    Did you sell from any other houses on Burbank Street?

20  A.    After the brown we went to the one across.

21  Q.    Okay. I'd like to show you what's been received into

22  evidence as Government's Exhibit 45.  Do you recognize any of

23  the houses in this photograph?

24  A.    Yes, the middle one.

25  Q.    Okay. When you say the "middle one," is that the one with

1  blue on the top floor and white on the first floor?

2  A.    The one that has the sign in the middle of the balcony.

3  Q.    There's a front porch on the house?

4  A.    Yes, the porch.

5  Q.    How do you recognize the house in the middle of

6  Government's Exhibit 45?

7  A.    Because after the brown house we moved there to sell

8  drugs.

9  Q.    And why did you move from the brown house to this house in

10  the middle of Government's Exhibit 45 to sell drugs?

11  A.    Brown police knew about it, they went in and closed it.

12  Q.    The police searched the brown house?

13  A.    Yes.

14  Q.    Were you there when the police searched the location, the

15  brown house?

16  A.    No, I wasn't there that time.  I think I had gone to my

17  house.

18  Q.    Do you know who was there?

19  A.    My stepdad was there, I think Palito and Green Eyes were

20  there as well I think.

21  Q.    Okay. If we could go to Government's Exhibit 1.  Your

22  stepdad, that's who you previously identified as Rafi in the

23  bottom row in the blue hooded sweatshirt to the left?

24  A.    Yes.

25  Q.    You also mentioned an individual by the name of Palito.

1  Do you see that person in this chart?

2  A.    Yes.

3  Q.    Where is that person's photograph situated?

4  A.    Next to my stepfather with the red shirt.

5  Q.    Okay. That's in the bottom row as well?

6  A.    Yes.

7  Q.    Okay. Now, how do you know that that brown house was

8  searched that day?

9  A.    When I arrive my stepfather had told me that the police

10  had arrived, they locked it up and we were not going to be

11  selling drugs from there anymore.

12  Q.    Were there any other houses searched on the same day as

13  the brown house?

14  A.    I think I heard that they had also gone to Pistolita's

15  house.

16  Q.    Okay. Did you hear that from your stepdad as well?

17  A.    Yes.

18  Q.    I'd like to show you what's been received into evidence as

19  Government's Exhibit 36.  Do you recognize that house?

20  A.    Yes.

21  Q.    And how do you recognize that house?

22  A.    That's where Pistolita used to live.

23  Q.    And did he live there while you were working on Burbank

24  selling cocaine and heroin?

25  A.    Yes.

1    Q.    Did Pistolita own that house?

2    A.    No, it was rented.   I heard that that was -- that house

3    belong to Javier.

4    Q.    Okay. And the defendant was renting the house from Javier?

5    A.    Yes.

6    Q.    Did you talk to the defendant about him living at this

7    house in Government's Exhibit 36?

8    A.    Yes, he had told me that he rented that house from Javier.

9    Q.    Did he tell you why he was renting that house from Javier

10   or why he was living there?

11   A.    No, no, he didn't specify that.

12   Q.    Did you talk to the defendant about the house in

13   Government's Exhibit 36 being searched that day?

14   A.    No.

15   Q.    Now, once you moved to that house across the street -- if

16   we could go to Exhibit 45?   Once you started selling in this

17   house in Government's Exhibit 45, did sales continue happening

18   at the brown house across the street?

19   A.    Yes.

20   Q.    You could buy cocaine and heroin from both houses at the

21   same time?

22   A.    No, when they close the brown house, we moved to the white

23   house and then we continue to sell from there.

24   Q.    So sales were only happening from this house depicted in

25   Exhibit 45 after the brown house was closed?

1  A.    Yes.

2  Q.    Who decided to move the drug sales from the brown house

3  across the street?

4  A.    I don't -- I don't know who made the decision itself, but

5  two or three days Pistolita told me that we were gonna be

6  moving to that house across the street.

7  Q.    Pistolita is who you previously identified as the

8  defendant in court today?

9  A.    Yes.

10  Q.    Now, when the cocaine and heroin sales were occurring at

11  the house in Government's Exhibit 45, how did the sales work?

12  Where would the customers go?

13  A.    To the house next door, the white one, and we will sell

14  through the fence.

15  Q.    Okay. So would the customers go to the -- behind the white

16  house that's on the left?

17  A.    Yes.

18  Q.    So the customers would stay outside when you were selling

19  on this side of the street?

20  A.    They will stay in the back and we will sell through the

21  fence.

22  Q.    What fence would you sell over?  There appears to be a

23  fence behind the white house.

24  A.    The brown fence.

25  Q.    Okay. Is that fence behind the white house on the left?

1  A.   Yeah, it goes from the end of the house until the post --

2  the pole.

3  Q.   So there's a driveway on the left side of the blue and

4  white house that's in the middle.  You see that driveway?

5  A.   Yes.

6  Q.   If you walk to the end of that driveway, would the fence

7  that you would sell through be on your left side?

8  A.   Yes.

9  Q.   And when you were selling on this side of the street,

10 where would you keep the supply of drugs that you were

11 selling?

12 A.   Throughout the whole house.

13 Q.   Throughout which house?

14 A.   That one there, the white one.

15 Q.   The white one on the left of the screen or the one in the

16 middle?

17 A.   The middle one.

18 Q.   Okay. So you would sell to the customers outside by that

19 back fence which is behind the white house?

20 A.   Yes.

21 Q.   But the drug supply you would sell would actually be kept

22 in the house that's in the middle of the photograph?

23 A.   Yes.

24 Q.   Now, would you sell cocaine and heroin at the brown house

25 as well as on this side of the street?

1    A.    Yes.

2    Q.    How was the heroin packaged?

3    A.    They were little baggies.  And this little house, the one

4    in the middle, they were like pirate baggies.

5    Q.    So there was a marking like a pirate on the bag?

6    A.    Yes.

7    Q.    Okay. Would you sell the bags just individually or would

8    you sell them as a group as well?

9    A.    It depends on what the client wanted.  If they wanted a

10   bundle, a bag, or two bags.

11   Q.    What is a bundle?

12   A.    Ten bags.

13   Q.    And how would those ten bags be packaged?

14   A.    You would take ten of those little baggies and put them

15   inside of a black baggie.

16           MS. KOCHER: Your Honor, may I approach the

17   visualizer?  I'd like to place Government's Exhibit 134 that's

18   been received into evidence.

19           THE COURT: Yes.

20           MS. KOCHER: Thank you.

21   BY MS. KOCHER:

22   Q.    Before I do that, I'd just like to remind the jury and

23   read again from the stipulation again this is an agreement

24   between the parties that Government Exhibit 134 was seized

25   from 11 Burbank Street, Rochester, New York on August 12th,

1   2015.

2           Government Exhibit 134 contains 76 plastic bags

3   with white powder containing cocaine.

4           There's an aggregate weight given there.

5           And Government Exhibit 134 also contains 114 wax

6   paper envelopes with pirates with tan powder containing

7   heroin.

8           Mr. Figueroa, are you able to see -- I zoomed in on

9   Government's Exhibit 134.  Are you able to see some of those

10  stamps that you just described?

11  A.   Yes.

12  Q.   And what is that stamp again?

13  A.   Those are the heroin bags.

14  Q.   And those have that pirate that you were just describing,

15  the stamp on them?

16  A.   Yes, those are the ones, those are it.

17  Q.   All right.  I've moved the exhibit around a little bit.

18  Do you see what you described previously as the bundles in the

19  dark ziplock bags now on the visualizer?

20  A.   Yes.

21  Q.   Okay. And those dark ziplock bags, those would contain

22  approximately ten of the individual stamped bags with the

23  pirate stamps?

24  A.   Yes.

25  Q.   Okay. How much would you sell a bundle of heroin for?

1   A.    How much what?

2   Q.    What was the price for a bundle of heroin?

3   A.    For ten bags -- one of those of ten, 50.

4   Q.    Okay. So each bag is about $5?

5   A.    Yes, each bag is $5.

6   Q.    How is the cocaine packaged?

7   A.    The cocaine was in some little clear bags that, if I

8   remember correctly, they had like little dice.  Some were

9   green, some were red.  It depends.

10  Q.    Mr. Figueroa, I'd next like to place on the visualizer

11  what's been received into evidence as Government's Exhibit

12  135.

13          And reading from the stipulation which has been

14  agreed upon by the parties, Government's Exhibit 135 was

15  seized from 11 Burbank Street, Rochester, New York on

16  August 12th, 2015.

17          Government Exhibit 135 contains 28 plastic bags

18  with white powder containing cocaine.

19          There's an aggregate weight given.

20          Government Exhibit 135 also contains 40 wax paper

21  envelopes with pirates with tan powder containing heroin.

22          Mr. Figueroa, I've placed Government's Exhibit 135

23  on the visualizer.  Do you see those bags that you just

24  described as having dice on them?

25  A.    Yes, those are it.

1   Q.   Okay. Those were the type of bags that you were selling

2   that contained cocaine from that house across the street and

3   across from the brown house?

4   A.   Yes.

5   Q.   Now, how often were you working in either of those houses

6   on Burbank Street selling cocaine and heroin?

7   A.   I also wasn't there much.

8   Q.   You weren't where much?

9   A.   On the white house.

10  Q.   You didn't sell from that location very long?

11  A.   Not for very long.

12  Q.   While you were working on Burbank Street, how many days a

13  week would you work?

14  A.   Almost always every day.

15  Q.   Okay. About how many hours a day would you work?

16  A.   Shifts were of eight.

17  Q.   The shifts were of eight?  So you would work an eight-hour

18  shift?

19  A.   Yes.

20  Q.   Who told you when to work?

21  A.   Pistolita almost always tell us who was going to work.

22  Q.   Now, you would work an eight-hour shift.  Were there other

23  people that would work after you were done?

24  A.   Yes.

25  Q.   Were the houses always open to sell cocaine and heroin?

1  A.    Yes.

2  Q.    Now, you mentioned that Pistolita would almost always tell

3  us when to work.  Who were some of the other people that you

4  sold with on Burbank?

5  A.    At least at that time it was me, my stepfather, Green Eyes

6  and Palito.

7  Q.    If we could go to Government's Exhibit 1.  Now, you've

8  previously identified your stepfather Rafi as being the bottom

9  row in the blue hooded sweatshirt, correct?

10  A.    Yes.

11  Q.    And Palito is next to him in the red T-shirt in the bottom

12  row?

13  A.    Yes.

14  Q.    Did Palito go by any other nicknames?

15  A.    Paulo or Palito.

16  Q.    Now, you've also previously identified the defendant and

17  Javi on this chart.  Do you recognize any of the other

18  individuals photographed in Government's Exhibit 1?

19  A.    Yes.

20  Q.    Who do you recognize?

21  A.    There's Robert, the second line, the second person with

22  the white shirt.

23  Q.    And he appears to have tattoos and is next to the female?

24  A.    Yes, he has tattoos on his shoulder.

25  Q.    Do you recognize anybody in the third row?  You've already

1  said the defendant.  Do you recognize any of the other

2  individuals?

3  A.   Yes, there's Axel, the second one from the third line.

4  Q.   And he's the second one in on the third line, he appears

5  to be wearing a tan shirt?

6  A.   Yes, he has the brown thing and the white shirt.

7  Q.   Okay. How did you know Axel?

8  A.   He's a barber.

9  Q.   Okay. So he would cut people's hair?

10 A.   Yes, he worked at a barber shop where I used to get a hair

11 cut.

12 Q.   Where was that barber shop?

13 A.   On Avenue D and Clinton.

14 Q.   Okay. Do you recognize anyone else in this third row?

15 A.   Yes.

16 Q.   Who is that?

17 A.   There's Pistolita, fourth one on that same line.

18 Q.   That's the same person you identified as the defendant in

19 court?

20 A.   Yes.

21 Q.   Do you recognize anyone else on that third line?

22 A.   Yankee.

23 Q.   How do you know Yankee?

24 A.   I know Yankee from Burbank as well.  He was one of the

25 ones who brought drugs to Pistolita.

1  Q.    And how do you know he would bring drugs to Pistolita?

2  A.    Because sometimes when we had nothing, my stepdad would

3  say Yankee is there, we're gonna be fine.

4  Q.    Okay. So what do you mean sometimes when we had nothing?

5  A.    When we had no drugs left and we finished everything.

6  Q.    So when you were selling out of one of those houses and

7  you didn't have anymore drugs to sell, he would mention Yankee

8  was there?

9  A.    Yes.

10  Q.    Did you ever talk to the defendant about Yankee?

11  A.    No.

12  Q.    All right. Now, do you know whether or not Yankee was ever

13  arrested on Burbank Street?

14  A.    I had heard that, yes, that he had gotten caught with 19

15  bundles or something like that.

16  Q.    Who did you hear that from?

17  A.    I saw him -- I came across him in jail.

18  Q.    What did he tell you about the arrest other than he got

19  caught with about 19 bundles?

20  A.    We didn't talk much because we didn't know each other

21  that well or anything, but that he had got caught at

22  Burbank.

23  Q.    Did he tell you where on Burbank, if he was in a house or

24  on the street?

25  A.    On the street.

1   Q.   Was he with anybody?

2   A.   I think with his wife.

3   Q.   Now, do you recognize the last person in the third row on

4   Government's Exhibit 1?

5   A.   Yes, Tapon.

6   Q.   And how do you know Tapon?

7   A.   I met Tapon on Geneva.  And then I was -- it was when I

8   was asked to work with him on Conkey, but I had already gone

9   previously to Conkey so I just stayed at Geneva and done

10  Geneva.

11  Q.   Who asked you to work on Conkey?

12  A.   Well, first I was already working with him because Javier

13  had already send me to Conkey.

14  Q.   Okay. So you worked with Tapon on selling cocaine and

15  heroin on Conkey Avenue?

16  A.   Yes, like three days was all I was there.

17  Q.   Okay. And whose drugs were you selling on Conkey Avenue?

18  A.   I didn't ask many questions either.

19  Q.   Okay.  Who was it that told you to go work on Conkey

20  Avenue?

21  A.   Javier had seen me and he said to go work at Conkey.

22  Q.   Okay. Did you see Tapon on Burbank Street while you were

23  working there?

24  A.   No.

25  Q.   How about the bottom row?  You've already identified your

1   stepdad or Rafi, and Flaco.  Do you recognize the other two

2   individuals in the bottom row?

3   A.   Yes, Dino and Canito.

4   Q.   Which individual is Dino?

5   A.   The bald one with a white shirt.

6   Q.   And he's in the bottom row, that would be third from the

7   left?

8   A.   Left to right, third, yes.

9   Q.   Okay. How do you know Dino?

10  A.   He was a user, and I have heard that he had worked around

11  there selling.

12  Q.   He had worked around Burbank?

13  A.   Yes, I heard so, yes.

14  Q.   Did you ever sell with him on Burbank?

15  A.   No.

16  Q.   And the last individual on the bottom row, what did you

17  say his name was?

18  A.   Canito.

19  Q.   Okay. Would that be C-A-N-I-T-O?

20  A.   Yes.

21  Q.   And how do you know Canito?

22  A.   I met Canito smoking, but I never worked with him.  He

23  worked there before me already.

24  Q.   Where did he work before you?

25  A.   Burbank.

1   Q.   You never sold with him on Burbank?

2   A.   No.

3   Q.   How do you know he worked on Burbank before you?

4   A.   Like I told you, I used to smoke with him and he had told

5   me that he had already worked at Burbank.

6   Q.   Okay. Now, you mentioned that Dino was a drug user.  Did

7   anybody else on Government's Exhibit 1 use drugs that you know

8   of?

9   A.   My stepdad and Palito.

10  Q.   Did anyone on Government's Exhibit 1 work as a tester?

11  A.   Palito and my stepdad almost always tested it.

12  Q.   And what does a tester do?

13  A.   Test the drugs and they says if it's good or bad.

14  Q.   What type of drugs would your stepdad Rafi and Palito

15  test?

16  A.   The heroin.

17  Q.   And who would provide them the drugs to try?

18  A.   Sometimes Pistolita will come and give it to them to try.

19  Q.   Did Palito ever try drugs from other areas of the city or

20  use drugs from other areas other than Burbank?

21  A.   Yeah, when there were no drugs on Burbank, we would go to

22  another spot to buy.

23  Q.   Did the defendant ever find out about Palito getting drugs

24  from another area of the city?

25  A.   Yes, once, yes.

1   Q.   And tell us about that time.

2   A.   There were no drugs on Burbank, so we went to Lang Street.

3   We were getting held up behind a house, but Palito was taking

4   too long, so I turned around quickly, back to Burbank when --

5   and then Pistolita asked Palito why was he going over there

6   because we was lying about saying that the drug was good if it

7   wasn't, why was he going to the other spot.

8   Q.   Okay. So there's a day -- let me ask first.  When you were

9   selling drugs on Burbank Street, did you struggle with drug

10  addiction?

11  A.   Yes.

12  Q.   What type of drugs did you use?

13  A.   Heroin and cocaine.

14  Q.   For about how long were you using heroin and cocaine?

15  A.   I'd been using for a long time at that point.

16  Q.   I'm sorry, I couldn't hear the answer.

17  A.   I'd been using for a long time at that point.

18  Q.   So by the time you were selling on Burbank, you had been

19  using for quite some time?

20  A.   Yes.

21  Q.   How often were you consuming cocaine and heroin when you

22  were selling on Burbank Street?

23  A.   Every day.

24  Q.   If you didn't have any drugs to take, would you get sick?

25  A.   Yes.

1  Q.   What type of symptoms would you experience if you didn't

2  have any cocaine or heroin?

3  A.   I would get chills, nausea.  Many of those were the

4  symptoms I will get.  I felt no stamina.

5  Q.   Tired?

6  A.   Yes.

7  Q.   Are you clean now?

8  A.   Yes.

9  Q.   And for how long have you been sober from cocaine and

10  heroin?

11  A.   Thank God I've been five years without using drugs.

12  Q.   Okay. All right, so you were telling us earlier about how

13  there came a time there were no drugs on Burbank and you and

14  Palito went to Lang Street.

15  A.   Mm-hmm.

16  Q.   Is that a yes?

17  A.   Yes.

18  Q.   Lang is L-A-N-G?

19  A.   Yes.

20  Q.   Then did you take those drugs back to the Burbank area to

21  use?

22  A.   Yes.

23  Q.   Okay. How would you use the drugs?

24  A.   I will inject them.

25  Q.   How would Palito consume the cocaine and heroin?

1  A.    He would also inject it.

2  Q.    So you went behind a house to use the drugs you had got on

3  Lang Street?

4  A.    Yes.

5  Q.    And did the defendant find you two back there?

6  A.    No.  I arrived first.

7  Q.    All right. How did the defendant find out that you had

8  purchased drugs on Lang Street?

9  A.    Because he caught Palito.

10 Q.    Okay. Did he catch Palito behind the house?

11 A.    No.  When Palito turned around, he had seen him there, so

12 that's when he told him about it.

13 Q.    Okay. And how did the defendant know that drugs that you

14 had were not purchased on Burbank Street?

15 A.    I'm sorry?

16 Q.    How did the defendant know those drugs were not from

17 Burbank Street?

18 A.    He was paying attention to everything, and the color of

19 the bags was different.

20 Q.    Different than what was being sold on Burbank?

21 A.    Yes.

22 Q.    Now, you mentioned that Pistolita said something to Palito

23 about being a tester in that incident?

24 A.    Yes.

25 Q.    Can you explain that conversation again?

1  A.   He had said why did he lie?  Why was he buying drugs in

2  another place if he had said that the drug here was good.

3  Q.   Okay. So at that time Palito had tested some heroin that

4  was being sold on Burbank?

5  A.   Yes.

6  Q.   Okay. And he said that that heroin was okay and was good?

7  A.   Yes, he had said that it was good, but in reality it was

8  no good.

9  Q.   So the defendant got upset with Palito because he thought

10 he had lied to him about the quality of the heroin?

11            **MR. VERRILLO:** Objection, asked and answered.

12            **THE COURT:** Sustained.

13 **BY MS. KOCHER:**

14 Q.   What was the defendant's reaction when Palito made it

15 known that the drugs that he had tested for Burbank were not

16 as good?

17 A.   He got mad.

18 Q.   And what happened?

19 A.   He got mad with him, but nothing happened at that time.

20 He left and I don't think he put him to work.

21 Q.   Who left?

22 A.   Pistolita.

23 Q.   Okay. How do you know that the defendant got mad?  What

24 did you see him do?

25 A.   Because I was there when he told him about it, why he

1    lied.

2    Q.    Okay. And what did the defendant do or what was his

3    demeanor like that made you think that he was mad?

4    A.    He was upset.

5    Q.    Okay. Did he yell at Palito?

6    A.    Yes.

7    Q.    All right.  I'd like to show you what's not been

8    received -- or, actually, I'm sorry, it has been received into

9    evidence as Government's Exhibit 19.  Do you recognize who is

10   in that photograph?  Who is that?

11   A.    That's me.

12   Q.    Okay. Going back to Government's Exhibit 1, you previously

13   identified the defendant in the third row, fourth from the

14   left.  What was his role in the drug sales on Burbank Street?

15   A.    He was the one in charge of giving us the shifts, drugs.

16   Q.    So he assigned shifts and would give you drugs to sell?

17   A.    Yes.

18   Q.    That included cocaine and heroin?

19   A.    Yes.

20   Q.    Okay. The people that you've identified on Government's

21   Exhibit 1, would you speak to them mainly in Spanish or

22   English?

23   A.    I'm sorry?

24   Q.    The people you've identified on Government's Exhibit 1

25   that you know, would you usually speak to them in Spanish or

1  in the English language?

2  A.    Spanish.

3  Q.    And do you have any family relationship to Javi or

4  Roberto?

5  A.    No.

6  Q.    Now, you mentioned that the defendant would assign the

7  shifts that you would work.  Was there ever a time that

8  somebody was late for their shift or left during it?

9  A.    Palito left once and he disappeared for one hour.

10  Q.    And what happened?  Well, after an hour did he come back?

11  A.    Pistolita got very upset.

12  Q.    Okay. What happened?

13  A.    That day Palito left me working by myself.  When Pistolita

14  arrive, he didn't see him.  And when Palito turned around an

15  hour later, he caught him behind the house and assaulted him

16  and he hit him like twice with a broomstick.

17  Q.    You said that Palito left you to sell by yourself that

18  day?

19  A.    Yes.

20  Q.    What house were you selling from at that time?

21  A.    That day we were selling from the one next to the white

22  one from the back.

23  Q.    I'll show you Government's Exhibit 45.  Is this the area

24  that you were selling that day?

25  A.    Yes, behind the first white house.

1  Q.   And Palito left you to work by yourself?

2  A.   Yes, he left and left me alone.

3  Q.   Okay. Now, you mentioned that the defendant hit him with a

4  broomstick?

5  A.   Yes.

6  Q.   Where did he hit him with a broomstick?

7  A.   I think it was on the ribs and I think he got --

8             **MR. VERRILLO:** Objection.

9             **THE WITNESS:** -- hit him on the head.

10            **MR. VERRILLO:** He used the word "think."  It's not

11  based on personal knowledge.

12            **THE COURT:** Sustained.  That will be stricken.

13  **BY MS. KOCHER:**

14  Q.   Mr. Figueroa, were you there when the defendant beat

15  Palito with a broomstick?

16  A.   Yes.

17  Q.   What areas of Palito's body did the defendant hit him with

18  a broomstick?

19  A.   I'm sorry?

20  Q.   Where did he hit Palito with the broomstick?

21  A.   First he hit him like around the ribs, and then on the

22  head.  He put up the hands and started running.

23  Q.   Palito put up his hands and started running?

24  A.   Yes.

25  Q.   Did Palito have any injuries from that?

1  A.    I think he had like a crack on the head.

2  Q.    Okay. Did you see any blood?

3  A.    He turned back around -- he turned back around that same

4  night and he had like a little cut.

5  Q.    And what happened to the broomstick?  Was there any damage

6  to the broomstick?

7  A.    It broke.

8  Q.    It broke?

9  A.    (Nods head).

10  Q.    Was there an answer?

11  A.    Yes.

12  Q.    Now, you mentioned that the defendant would supply cocaine

13  and heroin to the houses you were selling from?

14  A.    I'm sorry?

15  Q.    You said the defendant, part of his job was to sell -- or

16  to bring you cocaine and heroin to sell?

17  A.    Yes.

18  Q.    Okay. How would the defendant know if your supply of drugs

19  was low?

20  A.    If I what?

21  Q.    How did you tell the defendant you needed more drugs when

22  you were working in the houses?

23  A.    Oh, my stepfather will call him.

24  Q.    Okay. And what type of phone would he use to call the

25  defendant?

1   A.   It was a small one with the cover.

2   Q.   I'm sorry.  A small one?

3   A.   The cover.

4   Q.   With a cover? Like a flip phone?

5   A.   Yes, like a flip phone.

6   Q.   How did the phones work?  Would there be a phone assigned

7   to you when you were working at one of the houses?

8   A.   Just one phone -- there was always one phone.

9   Q.   Would that phone be shared among the workers?

10  A.   Yes.

11  Q.   Do you know what contacts were saved in the phone, if any?

12  A.   I didn't specifically look.

13  Q.   Would the defendant's phone number be saved in the phone?

14  A.   Yeah, because when the drugs ran out, my stepdad will call

15  him.

16  Q.   Okay. And do you know how the defendant -- if the

17  defendant's contact number was saved in the phone?

18  A.   I don't know.

19  Q.   When you would use the phones to talk to the defendant,

20  would you talk in code?

21  A.   Yes.

22  Q.   Why is that?

23  A.   In case the police were listening to the conversation so

24  they would not know what we were talking about.

25  Q.   What were some of the code you would use?

1  A.   When we needed heroin, we would ask for coffee.   When we

2  were asking for cocaine, we ask for milk.

3  Q.   Now, when the defendant would supply or he would get

4  called and told that you needed more drugs to sell --

5  A.   Yes.

6  Q.   -- how much would he bring to you?

7  A.   Depends.   If the day was good, he would bring us like 20

8  little packages.

9  Q.   When you say "packages," what do you mean by a package?

10 A.   Like the clear bags with 20 bundles.

11 Q.   So one package would have about 20 bundles of cocaine or

12 heroin?

13 A.   Heroin.

14 Q.   Okay.

15 A.   The cocaine packages were of 50s.

16 Q.   50 bundles?

17 A.   No, 50 bags.

18 Q.   Okay. Were you selling more cocaine or heroin on Burbank

19 Street?

20 A.   Cocaine was sold more.

21 Q.   So a package would have 20 bundles of heroin?

22 A.   One package could have 20 bundles.

23 Q.   And there's ten individual bags in a bundle?

24 A.   Mm-hmm, yes.

25 Q.   Okay. So that's about 200 bags, individual bags of heroin

1  in a package?

2  A.    Yes.

3  Q.    And those are sold at $5 a bag?

4  A.    Each bag, yes.

5  Q.    And then a package of cocaine would be about 50 bags of

6  cocaine?

7  A.    Yes, it was one small bag with 50 small cocaine bags.

8  Q.    Why wouldn't the defendant bring anymore drugs than that?

9  A.    I don't know.  Maybe -- I don't know, I mean, maybe if

10  given more, there's a better chance of one throwing around

11  selling, it might be able to steal some more -- sorry, the

12  interpreter needs the repetition of the last part.

13          Sometimes the days were slow and we would use more

14  drugs than what we would sell.

15  Q.    Okay. So while you and some of the others that you sold

16  were selling on Burbank, you were also using drugs?

17  A.    Yes, majority -- most of us were users.

18  Q.    Would the defendant always bring those packages of cocaine

19  and heroin to the houses you were selling from or did you ever

20  go get it from him?

21  A.    Most times he will bring it.

22  Q.    And the house located in Government's Exhibit 45 and the

23  brown house that you previously identified in Government's

24  Exhibit 44, was the defendant bringing packages of heroin and

25  cocaine to both of those houses for you to sell?

1  A.    Yes.

2  Q.    During one of your eight-hour shifts about how often would

3  the defendant bring you a new supply of cocaine and heroin?

4  A.    Two or three times.

5  Q.    Was that -- were there times it would be more and times it

6  might be less?

7  A.    It depends how the day was, if it was fast or if it were

8  selling little.

9  Q.    How long were you selling at the houses that we've shown

10 you photos of in Government's Exhibit 45 and 44?

11 A.    I personally wasn't much at the brown house.  I also

12 wasn't long at the white house as well.  I didn't go even past

13 five months.

14 Q.    Okay. But it was a few months that you were selling from

15 these two locations?

16 A.    Yes.

17 Q.    All right. Now, you mentioned that the cocaine and heroin

18 were sold for $5 a bag?

19 A.    Yes.

20 Q.    What would you do with the money that you made from the

21 drug sales?  The profits?

22 A.    Well, when I started Pistolita would save it for me.  And

23 sometimes I will keep some so that I can use it for drugs.

24 Q.    Okay, let me rephrase my question.  So you would get paid

25 to sell drugs?

1  A.    Yes.

2  Q.    Okay. Would the defendant ever come pick up money from the

3  locations after you sold your supply?

4  A.    Yes.

5  Q.    And what would he do with that money?

6  A.    He will take it and -- I don't know what he would do after

7  that.  We didn't see that.

8  Q.    Okay. Did you ever take money to the defendant from the

9  drug sales?

10  A.    Like twice.

11  Q.    Where did you take it to him?

12  A.    To the house where he was living on Burbank.

13  Q.    If I can show you Government's Exhibit 36.  Is this the

14  house that you would take the proceeds from the drug sales to

15  the defendant?

16  A.    Yes.

17  Q.    About -- during your eight-hour shift, about how many

18  times would the defendant come and pick up money from the drug

19  sales?

20  A.    Like two or three times.

21  Q.    Would he pick up the money when he came and brought you a

22  new supply of cocaine and heroin?

23  A.    Yes.

24  Q.    When the defendant would pick up the money, would he ever

25  count it?

1   A.    Sometimes he will count it, but it depended.  Like if my

2   stepdad was working, he would count it.

3   Q.    And your stepdad being Rafi?

4   A.    Yes.

5   Q.    Why would he count it when Rafi was working?

6   A.    Rafi was always short.  There was always money missing

7   with him.

8   Q.    Okay. When Rafi was short on the money, what would happen?

9   A.    He had to pay it off, he had to continue working to pay it

10  off.

11  Q.    Okay. Did you ever see anybody yell at Rafi for being

12  short on the money?

13  A.    Yes, Pistolita.  Sometimes he will tell him off, he will

14  talk to him stern.

15  Q.    Did you have more to say?

16          I'm not sure if the interpreter caught the end of

17  that.

18          **THE INTERPRETER:** I'm sorry?

19          **MS. KOCHER:** I thought you had stopped him mid

20  answer.

21          **THE INTERPRETER:** No.

22  **BY MS. KOCHER:**

23  Q.    Do you have anything to add to that, Mr. Figueroa?

24  A.    No, that's all I saw from him.  On other occasions I saw

25  it was somebody else, but that wasn't Pistolita.  It was with

1  my stepfather.

2  Q.   So you saw Pistolita yell at your stepfather Rafi?

3  A.   Yes.

4  Q.   Did you ever see anyone else discipline Rafi for being

5  short on the money?

6  A.   That I saw him myself, no.  But my stepfather told me that

7  he had seen it once of Javier hit him in the ribs.

8  Q.   So your stepfather told you that Javier hit him in the

9  ribs?

10  A.   Yes.

11  Q.   And that was because he was short on the money?

12  A.   He was already owing a lot.

13  Q.   When your stepfather Rafi told you about that, did he have

14  any injuries that you saw?

15  A.   Yes, he was living with me at that time and he had the

16  ribs a little bit swollen.

17  Q.   When the defendant would come pick up money from the drug

18  sales and supply you with more cocaine and heroin, he was

19  picking up several hundred dollars worth of drug proceeds; is

20  that right?  Based upon the amount of drugs that you were

21  selling?

22  A.   Yes, it was a lot.

23  Q.   Okay. Did you or anybody else ever take any steps to

24  protect him when he would pick up that amount of money?

25  A.   Almost always my stepfather will come out and watch him as

1  he leave the house to go away.

2  Q.   Okay. Did you ever keep any guns in either of the houses

3  that you sold from?

4  A.   In the brown, yes.

5  Q.   And if we can show you Government's Exhibit 44.  This is

6  the first house that you began selling from on Burbank Street?

7  A.   Yes.

8  Q.   When you were selling from it did it have -- well, in this

9  photograph it appears to have some damage to it, some burn

10  marks; is that correct?

11  A.   Well, when I was working there it wasn't like that.

12  Q.   So that damage was not there when you were working there?

13  A.   No.

14  Q.   Okay. What type of gun was kept at the house, the brown

15  house in Government's Exhibit 44?

16  A.   All I got to see was just one shown to me by my

17  stepfather.

18  Q.   Do you remember what type of gun that was?

19  A.   I don't remember exactly what caliber it was.

20  Q.   Was it a handgun?  A rifle?

21  A.   No, a handgun.

22  Q.   Why did your stepfather show you that gun?

23          **MR. VERRILLO:** Objection, speculation.

24          **THE COURT:** Yes, sustained.

25  **BY MS. KOCHER:**

1   Q.   Where was the gun kept in the house?

2   A.   In the kitchen.

3   Q.   Where in the kitchen?

4   A.   Underneath the sink.

5   Q.   Did your stepfather tell you why he was showing you the

6   gun that was under the sink?

7   A.   Yes.

8   Q.   What did he tell you?

9   A.   In case somebody came to rob us or hit us that night, we

10  got something to defend ourselves.

11  Q.   Okay. Did he tell you who provided that gun for the house?

12  A.   I did not ask him that question.

13              **THE COURT:** Yes?

14              **THE JUROR:** Can I get a restroom break?

15              **THE COURT:** We were going to break in a few minutes,

16  we might as well break for the day then in any event.

17              Ladies and gentlemen, we are breaking today because

18  I have another commitment and, therefore, we'll stand in

19  recess until 8:30 tomorrow morning.  In the meantime, I'd ask

20  you not discuss the matter or allow anybody to discuss the

21  matter with you.  Jury may step down, we'll stand in recess

22  until 8:30 tomorrow morning.  Thank you.

23              (**WHEREUPON**, proceedings adjourned at 11:28 a.m.)

24                        *   *   *

25

1                            **CERTIFICATE OF REPORTER**

2

3            In accordance with 28, U.S.C., 753(b), I certify that

4 these original notes are a true and correct record of

5 proceedings in the United States District Court for the

6 Western District of New York before the Honorable Frank P.

7 Geraci, Jr. on October 25th, 2021.

8

9 S/ Christi A. Macri

10 Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25