1                    UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF NEW YORK

3

4

5   - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA            18-CR-6094(G)
6
    vs.
7                                       Rochester, New York
    XAVIER TORRES,                      November 1, 2021
8            Defendant.                 8:30 a.m.
    - - - - - - - - - - - - - -X
9                                       **VOLUME 9**

10                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                    UNITED STATES DISTRICT JUDGE

12
                    JAMES P. KENNEDY, JR., ESQ.
13                  United States Attorney
                    BY: ROBERT A. MARANGOLA, ESQ.
14                     CASSIE M. KOCHER, ESQ.
                    Assistant United States Attorneys
15                  500 Federal Building
                    Rochester, New York 14614
16                  Appearing on behalf of the United States

17
                    MAURICE J. VERRILLO, ESQ.
18                  3300 Monroe Avenue
                    Suite 301
19                  Rochester, New York 14618
                    Appearing on behalf of the Defendant
20

21
    ALSO PRESENT:       Nicolas Penchaszadeh, Spanish Interpreter
22

23   COURT REPORTER:    Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                        Christimacri50@gmail.com
24                      Kenneth B. Keating Federal Building
                        100 State Street, Room 2640
25                      Rochester, New York 14614

1                        **I N D E X**

2
    **WITNESS FOR THE GOVERNMENT**

3
    Axel Aponte Camacho

4       Cross-examination by Mr. Verrillo        Page 774
        Redirect examination by Mr. Marangola    Page 797

5       Recross-examination by Mr. Verrillo      Page 807
        Redirect examination by Mr. Marangola    Page 809

6
    Robert Standish

7       Direct examination by Ms. Kocher         Page 810

8

9
    **EXHIBIT**              **RECEIVED**

10
    Government 341              799

11  Government 30               814
    Government 214              849

12  Government 226A             853
    Government 226B             853

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

*   *   *

1
2
3          **(WHEREUPON**, the defendant is present; the jury is
4 present).
08:11:51AM 5          **THE COURT:** Good morning.  Good morning, members
6 of the jury.  Ready to proceed?
7          **MR. MARANGOLA:** Yes, Judge.
8          **MR. VERRILLO:** Yes, Your Honor.
9          **THE COURT:** Recall the witness.
09:54:22AM 10          **MR. MARANGOLA:** Your Honor, I believe we're in
11 cross-examination of Mr. Aponte Camacho.  May he be recalled?
12          **THE COURT:** Yes, he may be recalled.
13          (**WHEREUPON**, the interpreter was sworn).
14          **THE COURT:** Good morning.  I remind you you remain
09:55:05AM 15 under oath.  Thank you.
16          Mr. Verrillo, you may proceed.
17          **MR. VERRILLO:** Thank you, Judge.
18 **BY MR. VERRILLO:**
19 Q.   Mr. Aponte Camacho, when did you meet Obed Torres?
09:55:24AM 20 A.   You mean the first time?
21 Q.   Yes.
22 A.   We went to school together in Puerto Rico.
23 Q.   All right. And when you came to the Rochester area, Mr.
24 Obed Torres was in the Rochester area as well?
09:55:54AM 25 A.   First I went to New Jersey and then when I came back

1  that's when I saw him.

2  Q.   Okay. That was around April of 2015; is that right?

3  A.   Yes.

4  Q.   And from April of 2015 to December of '16, how often did

09:56:11AM 5  you speak to Obed?

6  A.   Almost every day, every day.

7  Q.   Okay. And what did you discuss with him?

8  A.   Many things.  Like what are you -- what are you talking

9  about?

09:56:41AM 10  Q.   Okay. During this time period did you talk about the

11  activities that Javi's operation was involved in?

12  A.   Yes.

13  Q.   Did you know anyone with the name of Pepe?

14  A.   Yes.

09:57:01AM 15  Q.   Who was Pepe?

16  A.   Before I started working at the table, he use to sell at

17  Burbank.

18  Q.   Do you know him -- do you know his name other than Pepe?

19  A.   No.

09:57:25AM 20  Q.   Okay. And did Pepe have a brother?

21  A.   Yes.

22  Q.   And what was his name?

23  A.   I don't know.

24  Q.   Okay. Do you recall being asked questions on direct about

09:57:44AM 25  statements made by individuals during the time period of May

1   2015 to December 2016?

2   A.   If I recall questions -- I couldn't understand what --

3   your question.

4   Q.   During your testimony on your direct testimony do you

09:58:10AM 5   recall testifying about statements various people made?

6   A.   Yes.

7   Q.   Okay. And did you take any notes of what these people told

8   you during this time period?

9   A.   Like if I wrote them down?

09:58:34AM10   Q.   Yes.

11   A.   You mean people in the organization?

12   Q.   Yes.

13   A.   No, I did not write them down.

14   Q.   But you were able to recall what these individuals told

09:58:49AM15   you without any hesitancy; is that right?

16   A.   Some things, yes.  Some things I don't remember.

17   Q.   Okay. Do you recall testifying on your direct that you

18   began selling in the spring of 2016; is that correct?

19   A.   In the spring of 2016 -- I left LaForce, yes, I started

09:59:32AM20   selling.

21   Q.   You testified on your direct that the group moved to

22   LaForce from Burbank because someone was killed in the area of

23   Leo and Burbank; is that right?

24   A.   Can you repeat the question?

09:59:48AM25   Q.   Was it your testimony that the group moved from Burbank to

786

1  LaForce because someone was killed in the area of Leo and

2  Burbank?

3  A.   Yes.

4  Q.   Did you know about someone getting killed on Leo Street in

10:00:11AM 5  January of 2016?

6  A.   I don't remember the date exactly, but I do know someone

7  was killed on Leo.

8  Q.   Okay. And do you know whether Mino was killed?

9  A.   I don't really know who Mino was.

10:00:57AM 10  Q.   Okay. Did you know someone named Gargola?

11  A.   I knew two people known by Gargola.  One person who sold

12  on Burbank, one person who was killed on Burbank; and then

13  another Gargola who worked with me at the barber shop who also

14  sold.

10:01:42AM 15  Q.   So I'm asking about the Gargola that was killed near

16  Burbank.

17  A.   I didn't know him personally.

18  Q.   Did you speak to Obed Torres about that shooting?

19  A.   Yes.

10:02:04AM 20  Q.   And did Obed say that Domi shot Gargola?

21  A.   Can you repeat the question?

22  Q.   Did you Obed tell you that Domi shot Gargola?

23  A.   Yes.

24  Q.   I believe you testified in your direct that you saw

10:02:32AM 25  Pistolita almost every day; is that right?

787

1    A.    I saw him for a time almost every day.

2    Q.    Okay. And what time period was that?

3    A.    So from around May of 2015 until the end of the summer of

4    2016.

10:03:15AM 5    Q.    And do you know when Pistolita left Rochester?

6    A.    I don't know exactly.  One time he had left, but then he

7    quickly came back.  I think the last time I think it was

8    around the end of the summer of 2016.

9    Q.    When did you see -- when did you become aware that

10:04:07AM10    Pistolita first left the area?

11    A.    In 2015 sometime, maybe May or June of 2015, but I'm not

12    sure what month it was.

13    Q.    Do you recall testifying on direct about your contacts

14    with Roberto Figueroa?

10:04:56AM15    A.    When you refer to direct, you mean here?

16    Q.    Okay. Sir, when I'm referring to direct I'm referring to

17    the other day when you testified.

18    A.    Okay, yes.

19    Q.    Okay. Was one of the roles that Robert had was that as a

10:05:19AM20    runner?

21    A.    Yes, on LaForce.

22    Q.    And you also testified on direct that Robert would be

23    involved if there were problems on the street; is that right?

24    A.    Yes.

10:05:39AM25    Q.    And when I say Robert or Roberto, they're one in the same

1   person just so you understand.

2   A.    Okay.

3   Q.    Did you ever see Roberto with a gun?

4   A.    Yes.

10:06:02AM 5   Q.    Okay. And what guns did you see him have?

6   A.    A .44 and a .40.

7   Q.    Sir, do you recall in your direct that you testified about

8   some events on Miller Street in December of 2016?

9   A.    Yes.

10:06:38AM 10   Q.    And isn't it true that Pistolita was not there on Miller

11   Street in December of 2016?

12   A.    Are you asking me if it's true that he was not there?  Is

13   that your question?

14   Q.    Yes.

10:06:56AM 15   A.    Yes.

16   Q.    Okay. You also testified during your direct testimony that

17   you had gone to Rafi's wake.  Do you recall that testimony?

18   A.    Yes.

19   Q.    Where was Rafi's wake held?

10:07:28AM 20   A.    If I'm not mistaken, I'm not sure, I think it was on Lake.

21   Q.    When was the wake held?

22   A.    In 2015.  I don't know the month.

23   Q.    Did you know Rafi's stepson?

24   A.    No.

10:07:55AM 25   Q.    And how long after Rafi's death was the wake held?

789

A.    I don't know honestly.

Q.    Isn't it true that Rafi was cremated?

A.    Yes, he was cremated.

Q.    Do you recall testifying on direct that you had sold drugs
on LaForce Street?

A.    Yes.

Q.    And is it true that within a 24-hour period you would make
$3,000?

A.    Some days.  Not every day.

Q.    Okay. What would you average in sales on LaForce Street in
a 24-hour period?

A.    Maybe 2,000 bags, 3,000 bags.  It depended.

Q.    Okay. So if you sold between 2,000 to 3,000 bags, would
you get paid $1 for each bag?

A.    It was $1 for a bag of heroin, it was $1 for a bag of
cocaine, it was -- it was $1 for a heroin bag, $1 for a
cocaine bag, and $2 for a capsule with crack.

Q.    Okay. So when you sold -- you say you sold between 2,000
and 3,000 bags, what drugs are you referring to?

A.    Honestly, all of them in total.  I'm referring to total.

Q.    And that was during a time that you and Obed were selling
on LaForce Street?

A.    Yes.

Q.    Okay. Sir, do you recall testifying in a trial on May
14th, 2021?

1   A.    If I remember testifying what?

2   Q.    Do you recall testifying in a trial on May 14th, 2021,

3   involving Carlos Javier Figueroa?

4   A.    Yes.

10:11:34AM 5   Q.    And you gave testimony under oath at that time, correct?

6   A.    Yes.

7   Q.    Okay.

8           **MR. VERRILLO:** Your Honor, at this time I would like

9   to reference Exhibit 520, which I'd like to reference -- this

10:11:59AM10   is not admitted into evidence.

11   **BY MR. VERRILLO:**

12   Q.    Now, I'm referencing page 53 beginning with line 16.  So

13   I'm going to ask you to listen and ask you if I correctly

14   read the questions and -- your answers to the following

10:12:31AM15   questions.

16           Question: Now, you testified earlier about being

17   paid to work the table.  Were you paid to sell drugs --

18           **THE INTERPRETER:** Can you speak slowly?

19           **MR. VERRILLO:** I'm sorry, I'll slow down.

10:12:43AM20   **BY MR. VERRILLO:**

21   Q.    Now, you testified earlier about being paid to work the

22   table.  Were you paid to sell drugs at 16 LaForce?

23           Answer: Yes.

24           Question: How were you paid?

10:13:05AM25           Answer: It was a dollar for each bag of drugs and

1 cocaine.

2        Question: A dollar for each bag of what?

3        Answer: Of heroin and cocaine, and for crack $2.

4 And that Obed and I will -- will split it half and half of

10:13:24AM 5 whatever we sell.

6        Question: So in a typical 24-hour shift selling

7 bags of heroin, cocaine and crack at LaForce, how much would

8 you make?  Continuing on page 54.

9        Answer: We could make 600 each of us.  So 1,200 or

10:13:46AM 10 700 a day each of us.

11        Question: So if -- say each of you made 700, that

12 meant combined you would have 1,400 between the two of you?

13        Answer: Yes.

14        Sir, did I accurately reflect your answers that you

10:14:05AM 15 gave to those questions?

16 A.   Yes.

17 Q.   So in a typical shift you would split with Obed the money

18 and you'd make about 6 or $700, correct?

19 A.   Yes.

10:14:20AM 20 Q.   And that's not 2,000 or $3,000, right?

21 A.   You're asking me a question about testimony that I gave

22 earlier where I was talking about my average sales of 2,000 or

23 3,000.  It was my average weekly sales.

24 Q.   Yes.

10:15:14AM 25 A.   So I testified then when the prosecutor asked me how much

1  I made a week, I said from 2,000 to 3,000.

2  Q.   Sir, do you recall talking about the number of times you

3  had worked at the tables at the various locations?

4  A.   Yes, I was asked that, yes.

10:15:47AM 5  Q.   Okay. And I just want to confirm some information with

6  you.  My notes indicated that you worked the table at the

7  general hospital apartment 80 to 90 times; is that right?

8  A.   Yes, that was an estimate, yes.

9  Q.   Okay. And what time period did you work at the general

10:16:14AM 10  hospital apartment?

11  A.   You mean the times that I was there, the actual time of

12  the day?

13  Q.   Sir, what I'm asking is you indicated that you estimated

14  you worked at the general hospital apartment 80 to 90 times.

10:16:38AM 15  So what I'm asking you is what time period did that cover?

16  A.   So from like 9 a.m. until 4 or 5 a.m.

17  Q.   When I ask time period, I'm saying from May to a certain

18  time or June to a certain time.

19  A.   I think it was from around May to October or November I

10:17:25AM 20  think.

21  Q.   Of what year?

22  A.   2015.

23  Q.   My notes indicated you did tables at East Main Street 20

24  to 30 times; is that right?

10:17:46AM 25  A.   Yes.

1   Q.   And what time period did you do the work at East Main

2   Street?

3   A.   From October until around the end of 2015.

4   Q.   Okay. All right. And my notes indicated as to Liberty

10:18:19AM 5   Pole, you worked at the table 15 to 20 times; is that right?

6           **THE INTERPRETER:** Can you repeat the address?

7   **BY MR. VERRILLO:**

8   Q.   Liberty Pole.

9   A.   Yes.

10:18:29AM 10   Q.   And what time period did that cover?

11   A.   Around beginning of 2016.

12   Q.   And then you also testified about working the tables at

13   Culver.  Do you recall that?

14   A.   Yes.

10:18:56AM 15   Q.   And my notes indicated that you had worked the tables 50

16   times there?

17   A.   Something like that, yes.

18   Q.   And what time period did you work at the Culver area?

19   A.   I was there for about six months.  I think it was until I

10:19:29AM 20   stopped working there.

21   Q.   Okay. When was that?

22   A.   I stopped working around October.

23   Q.   Okay. So with my count looking at the minimum numbers that

24   are in that range, you had worked the tables at least 165

10:19:59AM 25   times; is that right?

1  A.    Something like that, yes.

2  Q.    And you got paid $500 each time?

3  A.    Yes, unless we only did a 31 of *perico*, cocaine.

4  Q.    And how often did that occur?

10:20:39AM 5  A.    It depended.  Sometimes we -- we packaged two to three

6  times a week; sometimes we only dealt with cocaine.

7  Q.    Out of the 165 times that the minimum number that I

8  referenced working at the tables, how many times did you earn

9  the $500?

10:21:09AM 10  A.    More often than not.  Almost all the time.

11  Q.    Okay. And you also were selling drugs at one point,

12  correct?

13  A.    Yes.

14  Q.    And you also were barbering, correct?

10:21:26AM 15  A.    Yes, for a while, yes.

16  Q.    And how much did you make as a barber?

17  A.    1,200 or 1,000 a week.

18  Q.    How many weeks did you do that?

19  A.    I don't know.  I worked from around April of 2015 until I

10:22:07AM 20  left in November of 2015.  I left because I got into an

21  argument with the owner and then I came back around January

22  and then I was there for another approximately four months.

23  Q.    Okay. So considering all those various numbers, you would

24  agree that you had made over $90,000 doing these various

10:22:44AM 25  things?

1  A.    I don't know honestly.

2  Q.    And you were asked on direct whether you had assets and

3  things of that nature.  And I believe your explanation was you

4  spent the extra money on clothes and shoes.  Do you recall

10:23:00AM 5  that?

6  A.    Yes.

7  Q.    And how much did you spend on clothes and shoes?

8  A.    I don't know.

9  Q.    Okay. Sir, you also were asked on direct about guns being

10:23:31AM 10  present at the Culver Road location.  Do you recall that?

11          THE INTERPRETER: Can you repeat the question?

12  BY MR. VERRILLO:

13  Q.    Do you recall being asked questions on direct related to

14  the guns at the Culver Road location?

10:23:45AM 15  A.    Yes.

16  Q.    Did everyone have access to the guns or just Javi?

17  A.    Javi and Tapon.

18  Q.    Okay. Isn't it true that Javi did not want anyone to

19  borrow guns?

10:24:16AM 20  A.    You had to ask him for permission first.

21  Q.    Okay. And did he tell you that he was concerned someone

22  would do something stupid with the guns?

23  A.    Not to me, but he told Robert one time.

24  Q.    Okay. You had testified on direct about an incident when a

10:24:48AM 25  black guy stole a Dominican's necklace.  Do you recall that?

1  A.    Yes.

2  Q.    What was the Dominican's name?

3  A.    I don't know.

4  Q.    When did you tell the Government about this incident?

10:25:20AM 5  A.    I don't know.  I think it was in the beginning when I came

6  for the proffer around 2017.

7  Q.    Where did the Dominican live?

8  A.    On Burbank.

9  Q.    And you referenced during this incident that there was an

10:25:40AM 10  abandoned car in the area?

11  A.    Yes, the car had been parked there for a very long time.

12  Q.    And what kind of car was it?

13  A.    I don't know.

14  Q.    When did this incident occur?

10:26:05AM 15  A.    In 2015.

16  Q.    Okay. When in 2015?

17  A.    I don't know what month.

18  Q.    You testified about an incident when Robert got out of a

19  safe 100,000 in cash.  Do you recall that?

10:26:34AM 20  A.    Yes.

21  Q.    Did you count the cash?

22  A.    No.

23  Q.    Was the 100,000 given to the attorney for Yankee?

24  A.    Javi said that it was for Yankee's attorney, but I don't

10:26:55AM 25  know if they gave it to him or not.

```
 1   Q.   Okay. But it was your understanding that the 100,000 was
 2   going to be given to the attorney for Yankee; is that right?
 3   A.   Yes.
 4   Q.   For representation in a criminal case?
 5   A.   I think that's what it was for because he had gotten a
 6   case at that time.
 7   Q.   Okay. But you didn't see Robert or Javi pay the attorney
 8   for Yankee, correct?
 9   A.   No.
10        MR. VERRILLO: I have no further questions.  Thank
11   you.
12        MR. MARANGOLA: May I, Your Honor?
13        THE COURT: Yes.
14        MR. MARANGOLA: Thank you.
15                    REDIRECT EXAMINATION
16   BY MR. MARANGOLA:
17   Q.   Mr. Aponte Camacho, Mr. Verrillo asked you questions
18   regarding testifying at a previous trial.  Do you recall that?
19   A.   Yes.
20   Q.   Who was the defendant at that trial?
21   A.   Javi.
22   Q.   Okay. It wasn't Pistolita?
23   A.   No.
24   Q.   And he asked you questions about meeting before you
25   testified at the first trial.  Do you remember that?
```

1    A.    Yes.

2    Q.    And he asked you questions about me before testifying at

3    this trial; is that right?

4    A.    Yes.

10:28:46AM 5    Q.    Can you tell the jury what would happen at those meetings

6    between you and members of the Government, meaning myself or

7    the agents?

8    A.    I told them things that I knew of the time that I was

9    working in the organization.

10:29:11AM 10    Q.    Did they ask you questions about your involvement?

11    A.    Yes.

12    Q.    Did they ask you questions about other people's

13    involvement?

14    A.    Yes.

10:29:23AM 15    Q.    Did they show you pictures?

16    A.    Yes.

17    Q.    Did you listen before the first trial to wiretap calls?

18    A.    Yes.

19    Q.    And did you in preparation for that first trial also watch

10:29:41AM 20    pole camera footage?

21    A.    Yes.

22    Q.    And in those meetings what's the one thing that we told

23    you we wanted from you?

24    A.    Can you repeat?  I didn't understand the question.

10:29:58AM 25    Q.    Yeah.  In the meetings that you had with the Government,

1    what's the one thing that we told you we wanted from you?

2    A.   That I say the truth.

3    Q.   I'm going to put up what's not in evidence as Government's

4    341.  Mr. Aponte Camacho, do you see Government's 341 on your

10:30:29AM 5    screen?

6    A.   Yes.

7    Q.   And this is your plea agreement; is that right?

8    A.   Yes.

9    Q.   And this plea agreement contains the cooperation agreement

10:30:42AM 10   between you and the Government; is that right?

11   A.   Yes.

12           **MR. MARANGOLA:** At this time, Your Honor, based on

13   the cross-examination I would offer Government's 341.

14           **MR. VERRILLO:** Your Honor, I would not object if the

10:31:01AM 15   section -- the factual section would be redacted as previously

16   had been done.

17           **MR. MARANGOLA:** No problem with that, Your Honor.

18           **THE COURT:** With that understanding Exhibit 341 will

19   be received with the redaction of the factual colloquy.

10:31:15AM 20          (**WHEREUPON**, Government Exhibit 341 was received

21   into evidence).

22   **BY MR. MARANGOLA:**

23   Q.   Mr. Aponte Camacho, Mr. Verrillo asked you about if you

24   were seeking benefits from the Government.  Can you explain to

10:31:26AM 25   this jury what you're hoping to get as a result of your

1  cooperation with the Government?

2  A.   With the information that I provide, that it would be

3  substantial assistance that I am providing.  That way if I

4  provide substantial assistance, the prosecutor is gonna

10:32:04AM 5  request the judge if I could get a reduction in my sentence.

6  Q.   All right. What's the one thing you have to do?

7  A.   Say the truth.

8  Q.   Now, who is ultimately going to decide if you receive a

9  lower sentence than the 20 years mandatory minimum in your

10:32:29AM 10  plea agreement?

11  A.   The judge.

12  Q.   All right. Now, in these meetings that you had with the

13  Government, Mr. Verrillo asked you if you had reviewed prior

14  grand jury testimony.  Do you recall that?

10:32:48AM 15  A.   Yes.

16  Q.   And did you read prior grand jury testimony in those

17  meetings with the Government?

18  A.   Yes, before the beginning of the first trial.

19  Q.   Whose grand jury testimony did you read?

10:33:12AM 20  A.   Mine.

21  Q.   Did you read Roberto Figueroa's grand jury testimony?

22  A.   No.

23  Q.   Did you read Jose Figueroa's grand jury testimony?

24  A.   No, I don't even know who Jose Figueroa is.

10:33:35AM 25  Q.   So -- and with respect to your trial testimony, how many

1    days were you -- did you testify under oath at the trial

2    against Javi?

3    A.    I think it was around four days I think.

4    Q.    Did you read anyone else's trial testimony in the trial

10:34:02AM 5    against Javi?

6    A.    No.

7    Q.    Did we give you any notes or information provided to us by

8    other witnesses in this case during any of those meetings?

9    A.    No.

10:34:14AM 10    Q.    So we didn't say to you, well, Roberto Figueroa said this,

11    maybe you should say the same thing?

12              **MR. VERRILLO:** Objection.

13              **THE COURT:** Sustained.

14    **BY MR. MARANGOLA:**

10:34:26AM 15    Q.    All right. Mr. Verrillo asked you if you began selling on

16    LaForce because there had been someone killed in the area of

17    Leo Street and Burbank.

18    A.    Yes.

19    Q.    Tell the jury were there any other reasons why Javi moved

10:34:54AM 20    things from Burbank over to LaForce Street?

21    A.    Yes.

22    Q.    Can you tell the jury what those things were?

23    A.    Gargola -- a guy by the name who was called Gargola had

24    been killed and Pistolita had been arrested on Burbank and

10:35:26AM 25    Yankee had also been arrested on Burbank and Burbank was

1   really hot.

2   Q.   All right. And I think you described in your previous

3   testimony that when you say Burbank was really hot, you mean

4   there was a lot of law enforcement presence or activity in the

10:35:45AM 5   area?

6   A.   Yes.

7   Q.   All right. Defense counsel asked you questions about

8   seeing Pistolita every day for a period of time when you were

9   on Burbank?

10:36:03AM 10   A.   If I had seen him every day on Burbank?

11   Q.   Yeah.

12   A.   Yes.

13   Q.   And there were months where you saw the defendant every

14   day on Burbank?

10:36:15AM 15          **THE INTERPRETER:** Can you repeat the question?

16   **BY MR. MARANGOLA:**

17   Q.   Yes.  Were there months that you saw the defendant every

18   day on Burbank?

19   A.   Yes.

10:36:22AM 20   Q.   And defense counsel asked you if you knew when Pistolita

21   left Rochester?

22   A.   I didn't understand your question.

23   Q.   Defense counsel asked you if you knew when Pistolita left

24   Rochester?

10:36:45AM 25   A.   Yes.

1  Q.   And you said that at one point he left and quickly came

2  back?

3  A.   Yes.

4  Q.   All right. Do you recall when it was that he left and then

10:36:58AM 5  quickly came back?

6  A.   In 2015, but I don't know what month.

7  Q.   All right. So at some point in 2015 the defendant left

8  Rochester but then he came back?

9  A.   Yes.

10:37:19AM 10  Q.   All right. And you continued to see him in Rochester for a

11  period of time after that?

12  A.   Yes.

13  Q.   And then at some point I think you previously testified at

14  the end of the summer of 2016 that you didn't see the

10:37:37AM 15  defendant after that?

16  A.   Sorry, I couldn't hear the interpretation well.

17  Q.   Do you recall when it was that you stopped seeing the

18  defendant?

19  A.   Yes.  The last time it was at the end of the summer of

10:38:11AM 20  2016.

21  Q.   Okay. When the last time you saw the defendant, did he say

22  to you anything about not working for Javi anymore?

23  A.   No.

24  Q.   Do you recall testifying that when you decided not to work

10:38:36AM 25  for Javi anymore, you told Tapon that you were done?

1    A.    Yes.

2    Q.    Did Pistolita ever say that?

3              **MR. VERRILLO:** Objection.

4              **THE COURT:** Overruled.  Go ahead.  You can answer

10:38:50AM 5    it.

6              **THE WITNESS:** No.

7    **BY MR. MARANGOLA:**

8    Q.    And Mr. Verrillo asked you questions about if at any point

9    Roberto Figueroa was a runner.  Do you recall that?

10:39:02AM10    A.    Yes.

11    Q.    At any point during the -- between 2015 and 2016 when you

12    were on Burbank Street was the defendant ever a runner?

13    A.    Yes, in 2015.

14    Q.    Mr. Aponte Camacho, defense counsel asked you a number of

10:39:38AM15    questions about your average salary or the average amount of

16    money you made on different days.  Do you recall that?

17    A.    Yes.

18    Q.    And then he showed you one of the pages of your transcript

19    where it said typical day how much did you make.  Do you

10:39:56AM20    recall that?

21    A.    Yes.

22    Q.    Now, did you review any pay stubs before testifying?

23    A.    I don't know what pay stubs are.  No.

24    Q.    Did you ever receive a paycheck while you were working for

10:40:27AM25    Javi?

```
 1   A.    No.
 2   Q.    He never gave you a check for working at the table?
 3   A.    No.
 4   Q.    Did you get paid a check for working on the street on
 5   LaForce?
 6   A.    No.
 7   Q.    All right. So the figures that you gave about the amount
 8   of money that you made, were those estimates based on your
 9   recollection?
10   A.    Yes.
11   Q.    All right. Mr. Verrillo also asked you about guns that
12   were present at Culver Road.  Do you recall that?
13   A.    I don't remember those questions.
14   Q.    All right.
15   A.    Or if he asked me those questions.
16   Q.    Okay. Well, let's clarify some things.  Which apartments
17   that you worked the table at for this organization with the
18   defendant did you see firearms?
19   A.    At the apartment by the hospital, at Leitscha's apartment,
20   at Liberty Pole, and at Culver.
21   Q.    All right. And did you have keys -- well, let me withdraw
22   that.
23              Who had keys to each of those apartments?
24              MR. VERRILLO: Objection.
25              THE COURT: Overruled.  You can answer that.
```

1   **THE WITNESS:** Javi had them, Robert, Obed,

2   Pistolita, and Tapon.

3   **BY MR. MARANGOLA:**

4   Q.   So if you have a key to the apartment, then you can unlock

10:42:49AM 5   and open the door, correct?

6   A.   Yes.

7   Q.   And if you can unlock and open the door and then enter the

8   apartment, don't you have access to what's inside the

9   apartment?

10:43:04AM 10   A.   Yes.

11   Q.   All right. Now, who was in charge of the drugs and the

12   guns?

13   A.   Javi.

14   Q.   All right. So you couldn't just help yourself to a 62 of

10:43:19AM 15   cocaine if you wanted it?

16   A.   I had to ask Javi.

17   Q.   All right. And if you wanted to take a firearm, you

18   couldn't just take it yourself?  You would have to do what?

19   A.   I had to ask Javi.

10:43:44AM 20   Q.   All right. Was there an understanding between you and the

21   other members of this organization, including the defendant,

22   that if you needed a firearm you could get one from Javi?

23   **MR. VERRILLO:** Objection.

24   **THE COURT:** Overruled.  If he knows.

10:44:02AM 25   **THE WITNESS:** Yes.

1      **MR. MARANGOLA:**  Nothing further, Your Honor.  Thank

2  you.

3                    <u>**RECROSS-EXAMINATION**</u>

4  BY MR. VERRILLO:

10:44:32AM 5  Q.   Mr. Aponte Camacho, you were just asked some questions

6  about your contacts with the Government.  Do you recall that?

7  A.   Yes.

8  Q.   And as a part of your contacts with the Government you had

9  listened to wiretaps; is that right?

10:44:52AM 10  A.   Yes.

11  Q.   And did you hear any conversations on those wiretaps

12  involving Pistolita?

13  A.   No.

14  Q.   Did you hear Pistolita speak on any of those wiretap

10:45:08AM 15  calls?

16  A.   No.

17  Q.   How many calls did you listen to?

18  A.   Maybe 100 or 50.  I'm not sure.

19  Q.   And during your cooperation with the Government you also

10:45:30AM 20  looked at pole cameras; is that right?

21  A.   Yes.

22  Q.   And in any of those pole cameras did you see Pistolita,

23  videos or pictures?

24  A.   No.

10:45:46AM 25  Q.   Now, you were asked about your --

1   A.   The cameras?

2   Q.   I'm sorry?

3   A.   The cameras?

4   Q.   Yes.

10:45:57AM 5   A.   No.

6   Q.   How many pole cameras did you review?

7   A.   I don't know how many cameras.

8   Q.   You were also asked about your agreement with the

9   Government that was set forth in the plea agreement.  Do you

10:46:16AM 10   recall that?

11   A.   Yes.

12   Q.   Isn't it true that the Government has to make a motion

13   that you provided substantial assistance before getting any

14   credit?

10:46:34AM 15   A.   Sorry, I didn't understand.

16   Q.   Isn't it true that the Government would need to make a

17   motion that you provided substantial assistance before getting

18   any credit?

19   A.   Honestly, I don't know if they have to present a motion.

10:47:00AM 20   I don't know.

21   Q.   Okay. You would agree that it would be required that the

22   Government indicated you provided substantial assistance

23   before the Court could consider giving you credit?

24   A.   He decides if I provide substantial assistance.

10:47:32AM 25   Q.   Okay. Who is "he"?

809

1  A.    The prosecutor.

2  Q.    Okay. All right.

3              **MR. VERRILLO:** I have nothing further.

4              **MR. MARANGOLA:** Judge, if I could just briefly?

10:47:55AM 5              **REDIRECT EXAMINATION**

6  **BY MR. MARANGOLA:**

7  Q.    Mr. Aponte Camacho, tell the jury what you understand will

8  happen if you don't tell the truth?

9  A.    He's gonna take the plea, he's not gonna make the motion

10:48:24AM 10  for the judge to reduce my sentence, and he's gonna charge me

11  with perjury.

12              **MR. MARANGOLA:** Thank you.  Nothing further.

13              **MR. VERRILLO:** Nothing further, Judge.

14              **THE COURT:** Thank you.  Thank you, you may step

10:48:38AM 15  down.

16              (**WHEREUPON**, the witness was excused).

17              **THE COURT:** Ladies and gentlemen, at this time we'll

18  take a recess.  In the meantime, I'd ask you not discuss the

19  matter or allow anybody to discuss the matter with you.  The

10:49:05AM 20  jury may step down, we'll stand in recess.

21              (**WHEREUPON**, there was a pause in the proceeding).

22              (**WHEREUPON**, the defendant is present; the jury is

23  present).

24              **THE COURT:** Ready to proceed, call your next

11:23:07AM 25  witness.

1    **MS. KOCHER:** Thank you, Your Honor.  The Government

2 called Ronald Standish.

3         **GOVERNMENT'S WITNESS, RONALD STANDISH, SWORN**

4                    **DIRECT EXAMINATION**

11:23:14AM 5    **THE CLERK:** Please state your full name and spell

6 your last name for the record.

7         **THE WITNESS:** Ronald Standish, S-T-A-N-D-I-S-H.

8         **THE REPORTER:** Thank you.

9         **THE CLERK:** Thank you.  Have a seat right up here.

11:24:11AM 10    **THE COURT:** Good morning.  Mr. Standish, based upon

11 the fact you're testifying behind plexiglas, you can remove

12 your mask while you testify.

13         **THE WITNESS:** Thank you.

14         **THE COURT:** You may proceed.

11:24:19AM 15    **MS. KOCHER:** Thank you.

16 **BY MS. KOCHER:**

17 Q.   Good morning.

18 A.   Good morning.

19 Q.   Could you please introduce yourself to the jury?

11:24:24AM 20 A.   My name is Ronald Standish.  I am 37 years old.  I live in

21 Orleans County.

22 Q.   Mr. Standish, make sure those microphones are close to you

23 so everybody can hear.  How are you this morning?

24 A.   I'm well.

11:24:42AM 25 Q.   You little nervous?

811

1    A.    Nervous, absolutely.

2    Q.    You mentioned that you live in Orleans County?

3    A.    Yes, I do.

4    Q.    How long have you lived in Orleans County?

11:24:51AM 5    A.    My entire life besides two years I attended Monroe

6    Community College.

7    Q.    Okay. Did you get a degree from Monroe County -- Community

8    College?

9    A.    I did, in business administration.

11:25:04AM 10    Q.    And did you graduate from high school?

11    A.    I did.

12    Q.    What high school?

13    A.    Albion Central.

14    Q.    What year did you graduate?

11:25:13AM 15    A.    2002.

16    Q.    Mr. Standish, are you married or single?

17    A.    I am married.

18    Q.    And do you have any children?

19    A.    I have two boys, yes.

11:25:23AM 20    Q.    How old are your sons?

21    A.    12 and 8.

22    Q.    Mr. Standish, are you currently employed?

23    A.    Yes.

24    Q.    Could you please tell the jury where you're employed?

11:25:34AM 25    A.    I work for Christine's Cleaning With Care.  I clean both

1  residential and commercial properties in Rochester and

2  Pittsford areas.

3  Q.   How long have you been doing that?

4  A.   For just about three and a half years.

11:25:46AM 5  Q.   Now, before starting your employment with the cleaning

6  company, where did you work?

7  A.   I'm a former New York State correctional officer.

8  Q.   And what did you do as a correctional officer?

9  A.   I maintained the safety and well-being of the inmates that

11:26:04AM 10  I was assigned to.

11  Q.   You worked in state prisons?

12  A.   I did, yes.

13  Q.   What were some of the prisons that you worked at?

14  A.   The first prison I started at was Sullivan Correctional

11:26:17AM 15  Facility down in the New York City area.  I transferred from

16  there to Five Points Correctional Facility.  Then to Attica

17  Correctional Facility.  And back to my home jail, which was

18  Orleans Correctional Facility.

19  Q.   When you were working in the Sullivan County Correctional

11:26:34AM 20  Facility did you live down there?

21  A.   I did.  I traveled.  I would go for a week at a time and

22  come home on the weekends.

23  Q.   Okay. How long of a drive?

24  A.   Yes, I did live down there.

11:26:43AM 25  Q.   How long of a drive was that?

813

A.    Four and a half hours or so.

Q.    Okay. And when did you start your work as a corrections officer?

A.    In June of 2012.

11:26:54AM Q.    How many hours a week were you working?

A.    At the bare minimum 40 or 50 or so, sometimes 50.

Q.    What hours did you work?

A.    I worked all of them at some point.  Day shift, I did a lot of overnights into the day shift.  When I returned to my 11:27:15AM home jail I was mainly overnights.

Q.    Okay. And your home jail being Orleans County?

A.    Correct.

Q.    Now, you mentioned you began working as a corrections officer about June of 2012?

11:27:29AM A.    That's correct.

Q.    How long were you a corrections officer?

A.    For about just about four years to the day.

Q.    And why did your employment end with the New York State Department of Corrections?

11:27:41AM A.    I resigned from my position on June 8th, 2016.

Q.    I'm sorry, what day?

A.    June 8th, 2016.

Q.    And why did you resign?

A.    I was arrested for criminal possession of a controlled 11:27:55AM substance in the third degree, five counts, and criminal sale

1  of a controlled substance in the third degree also five

2  counts.

3  Q.   Okay. I'd like to show you what's not been received into

4  evidence as Government's Exhibit 30.  Can you see that photo

11:28:14AM 5  on your monitor, Mr. Standish?

6  A.   Yes.

7  Q.   And do you recognize the individual in that photograph?

8  A.   That is myself.

9  Q.   Okay. Does that photograph fairly and accurately depict

11:28:25AM 10  the way that you looked when you were arrested back in June of

11  2016?

12  A.   Yes.

13         **MS. KOCHER:** Your Honor, I'd offer Government's 30.

14         **MR. VERRILLO:** No objection.

11:28:35AM 15         **THE COURT:** Exhibit 30 will be received.

16         (**WHEREUPON**, Government Exhibit 30 was received into

17  evidence).

18  **BY MS. KOCHER:**

19  Q.   Ms. Rand, could we publish that for the jury?  Oh, thank

11:28:50AM 20  you.

21         All right, now, Mr. Standish had you ever been

22  arrested before June of 2016?

23  A.   No, I had not.

24  Q.   Now, when you were arrested on those drug charges were

11:29:09AM 25  those state or federal offenses?

```
 1   A.    They were state charges.
 2   Q.    Did you ultimately plead guilty to a charge?
 3   A.    I ended up pleading guilty to possession in the seventh
 4   degree which is a Class A misdemeanor.
 5   Q.    Were you originally charged with felony offenses?
 6   A.    Yes.
 7   Q.    Now, when you were arrested did you agree -- what did you
 8   do when you were arrested?  Did you agree to cooperate?
 9   A.    I did agree to cooperate.
10   Q.    Okay. And did you sign a cooperation agreement?
11   A.    I did, yes.
12   Q.    And what was your understanding of that cooperation
13   agreement?
14   A.    To speak the truth of what led up to my arrest.
15   Q.    Okay. Now, was there a time limit on that cooperation
16   agreement?
17   A.    Nine months.
18   Q.    Okay. And did you ultimately complete that time period?
19   A.    I did, yes.
20   Q.    And once you completed the time period and the terms of
21   the cooperation agreement were you allowed to plead guilty to
22   the lesser charge, that misdemeanor?
23   A.    Yes.
24   Q.    Were you sentenced or what was your sentence on that
25   charge?
```

1    A.    I was sentenced to a one year conditional discharge.

2    Q.    Now, the terms of that cooperation agreement, have those

3    been completed today?

4    A.    Yes, they have.

11:30:33AM 5    Q.    Are you testifying here today pursuant to a subpoena that

6    you received?

7    A.    Yes, that's correct.

8    Q.    All right. Now, we'll discuss your arrest in a bit more

9    detail later, but at the time of your arrest were you

11:30:47AM 10   struggling with drug addiction?

11   A.    Yes, yes.

12   Q.    What drug?

13   A.    I was addicted to both heroin and cocaine.

14   Q.    For about how long were you addicted to heroin and

11:30:59AM 15   cocaine?

16   A.    Approximately 15 months or so.

17   Q.    Okay. Have you been sober now?

18   A.    Yes.

19   Q.    What is your clean date?

11:31:10AM 20   A.    September 13th of 2017.  So a little over four years.

21   Q.    Now, how did your drug addiction begin?

22   A.    It began -- I began taking Oxycodone and OxyContin prior

23   to the first time I used heroin.  I was taking it for pain.

24   Q.    All right. You said you were taking it for pain.  Did you

11:31:34AM 25   have any injuries?

1    A.    I did.   I broke my pelvis when I was 17 years old playing

2    baseball sliding into third base.   And I had a lower back

3    injury from when I was working.

4    Q.    All right. Now, you broke your pelvis when you were 17?

11:31:53AM  5    A.    Yes.

6    Q.    Can you tell us about that?

7    A.    I was sliding into third base playing in a league for --

8    it was ages like 14 to 16 or so, and an ambulance had to come

9    pick me up off the field.   I was taken to the hospital.

11:32:12AM 10    Q.    Did you stay in the hospital for a bit?

11    A.    For the day.

12    Q.    What was the treatment like to recover from that injury?

13    A.    It was total bed rest.   I believe it was eight to 12

14    weeks.

11:32:25AM 15    Q.    Now, you also mentioned a lower back injury?

16    A.    Yes.

17    Q.    How did you injure your lower back?

18    A.    I was pulling a pallet jack through a warehouse company

19    that I had worked for at the time and the front wheels of the

11:32:45AM 20    pallet jack fell into like a hole and it ripped my back and I

21    shifted two disks in my lower back.

22    Q.    You mentioned that was on the job?

23    A.    Yes.

24    Q.    Where were you working at that time?

11:32:57AM 25    A.    It was a company called BMP.   It's in Medina.

1   Q.   What does BMP do?

2   A.   They manufacture like medical equipment.

3   Q.   Okay. Now, the pallet jack, what is that that you were

4   pulling?  Can you describe what it looked like?

11:33:20AM 5   A.   It's used to pick up pallets.  There's two wheels on the

6   front, two wheels on the back side of it, almost looks like a

7   fork almost.

8   Q.   And was that full that you were pulling through the

9   warehouse?

11:33:33AM 10   A.   It was, yes.

11   Q.   Was this a job that you had before becoming a corrections

12   officer?

13   A.   Yes.

14   Q.   And what -- were you diagnosed with an injury after that?

11:33:47AM 15   A.   I was.  I went to the doctor, I was told that I had

16   shifted two disks.  There's really not much they can do.  It

17   wasn't severe enough to call for surgery.  I still to this day

18   have problems with it.

19   Q.   Okay. Can you describe the pain that you experienced from

11:34:04AM 20   the lower back injury and your fractured pelvis?

21   A.   It was moderate to severe.  I mean, at times when the

22   weather changed it was worse than other times.

23   Q.   Okay. Did you have ongoing pain after those injuries

24   occurred?

11:34:22AM 25   A.   Yes.

1    Q.    Now, when you became a corrections officer in June of 2012

2    did you have to go through some training for that job?

3    A.    I did.  It was an eight week training program, took place

4    in Albany.  I would go Monday through Friday and come home on

11:34:39AM 5    the weekends.

6    Q.    What were some of the things that you had to do for that

7    training period?

8    A.    There was both physical and academic training, testing,

9    running, defensive tactics.  Just getting physically in shape.

11:34:59AM 10    Q.    Okay. Did that training aggravate the injuries that you

11    had experienced to your lower back and pelvis?

12    A.    It did, yes.

13    Q.    And what did you do to alleviate that pain?

14    A.    I began taking Oxycodone and OxyContin at that time.

11:35:14AM 15    Q.    Do you remember about when you started taking the pills?

16    A.    Around 2013, '14, early '14 maybe.

17    Q.    So you were working as a corrections officer at that time?

18    A.    I was, yes.

19    Q.    Where were you getting the pills from?

11:35:37AM 20    A.    I was getting them from friends and family.

21    Q.    Okay. Did you ever ask a doctor for a prescription?

22    A.    I did not.

23    Q.    Why not?

24    A.    I was afraid of it effecting my job.  I didn't want a

11:35:55AM 25    record of it.

820

1  Q.   A record of what?

2  A.   Of being on a controlled substance and working within a

3  correctional facility.

4  Q.   Now, you mentioned you would get the pills from friends

11:36:07AM 5  and family?

6  A.   Yes.

7  Q.   Would they pay or would you pay for it or would they just

8  give them to you?

9  A.   I would mostly pay for them.  Sometimes they would be

11:36:19AM 10  given to me.

11  Q.   And when you started getting the pills from friends and

12  family how often were you getting oxys?

13  A.   I was taking them every day.

14  Q.   How many times a day?

11:36:32AM 15  A.   At first one or two.  And it progressed to eight to ten a

16  day.

17  Q.   Okay. And how much were they charging you for the pills?

18  A.   They were $15 when I first started taking them and at the

19  end they were $30 apiece.

11:36:49AM 20  Q.   How would you consume the pills?

21  A.   I would snort them.

22  Q.   How would you do that?

23  A.   I would crush them up and use a straw to snort it.

24  Q.   Can you pull those mics closer to you?  I think your voice

11:37:05AM 25  might be trailing off a bit.

1          All right.  Now, over time did it become more

2  difficult to get the pills from friends and family?

3  A.    It did.

4  Q.    And why was that?

11:37:17AM 5  A.    They became more regulated.  They were being highly abused

6  throughout our country, it became a problem, a serious

7  problem.

8  Q.    They had a harder time getting their prescription?

9  A.    Yes.

11:37:30AM 10  Q.    How would you feel if you didn't get the pills on a daily

11  basis?

12  A.    Awful.  Withdrawal, sick, restlessness, vomiting,

13  diarrhea.  It wasn't a pretty sight.

14  Q.    All right. Now, as it became more difficult to get the

11:37:53AM 15  pills from your friends and family, what did you do?

16  A.    I rode out to the City of Rochester with my brother and we

17  -- our intentions to come to the city were to buy pills.  And

18  we ended up with heroin.

19  Q.    Okay. Did your brother also use prescription medication at

11:38:14AM 20  the time?

21  A.    He did, yes.

22  Q.    Why did you come to the City of Rochester for that?

23  A.    We've always known that in particular the Clinton Avenue

24  area was -- there was a lot of drugs.  I mean, you can drive

11:38:30AM 25  the down the street and people wave you down and it's fairly

1 easy to get drugs if you want them.

2 Q.    And where did you go that first time you came to Rochester

3 with your brother?

4 A.    The first time we ended up at the Valero gas station on

11:38:46AM 5 North Clinton Avenue.

6 Q.    And what happened when you got there?

7 A.    I was driving.  I pulled into the parking lot and my

8 brother got out of the vehicle.  When he returned to the

9 vehicle he had heroin and we then headed back home.

11:39:06AM 10 Q.    Okay. And what did you do on the ride back home?

11 A.    On the ride back my brother put two lines out on a CD

12 case that I had in my vehicle and we both snorted a line of

13 heroin.

14 Q.    When you snorted the heroin did it have similar effects to

11:39:22AM 15 the Oxycodone and OxyContin pills you had taken?

16 A.    It did, yes.

17 Q.    Now, after that did you continue going back to the city to

18 buy heroin?

19 A.    I did, yes.

11:39:34AM 20 Q.    Did there come a time that you started buying drugs on

21 Burbank Street?

22 A.    Yes.

23 Q.    And how did that come about?

24 A.    By mistake.  I was turning around -- I drove -- I got off

11:39:51AM 25 490 and headed down North Clinton Avenue to the gas station

1  where I had previously been able to buy heroin.  I continued

2  down North Clinton and went to turn around and ended up on

3  Burbank Street.

4  Q.   Can you describe Burbank Street?

11:40:10AM 5  A.   It's a one-way street, residential one-way street off of a

6  main road.

7  Q.   Okay. I'd like to show you what has already been received

8  into evidence as Exhibit 35.  Do you recognize the area

9  depicted in this map?

11:40:28AM 10  A.   Yes.

11  Q.   And what do you recognize this area as?

12  A.   I recognize Burbank Street.  I recognize it all -- all of

13  it.

14  Q.   Okay. You recognize Burbank Street and the surrounding

11:40:45AM 15  streets?

16  A.   Yes.

17  Q.   Now, that day when you were trying to get to the Valero,

18  are the streets that you took on this map?

19  A.   Yes.

11:40:54AM 20  Q.   You should be able to mark the monitor.  If you could just

21  draw an arrow about the general direction that you drove?

22  A.   I turned off of Clinton Avenue down Oscar Street and then

23  I turned right onto Remington Street and then a right onto

24  Burbank Street.

11:41:14AM 25  Q.   Okay. So you've made an arrow from North Clinton onto

1    Oscar Street and then another arrow from Oscar Street turning

2    right onto Remington, and then a third arrow turning right

3    from Remington onto Burbank Street?

4    A.    That's correct.

11:41:31AM 5    Q.    Okay. Do you recall about when it was that you went to

6    Burbank Street by mistake that day?

7    A.    It was early -- early 2015.

8    Q.    And what happened as you drove down Burbank Street back

9    towards North Clinton Avenue?

11:41:48AM 10    A.    When I turned onto Burbank Street there was -- I noticed a

11    group of people on the sidewalk.  I made it halfway down the

12    street and somebody on the street was hollering boy and girl

13    which boy means heroin.

14                MR. VERRILLO: Objection.

11:42:09AM 15                THE COURT: Overruled.  Go ahead.  You can finish

16    your answer.

17                THE WITNESS: Girl means cocaine.

18    BY MS. KOCHER:

19    Q.    And when that person started yelling boy and girl at you,

11:42:19AM 20    what did you do?

21    A.    I stopped.

22    Q.    Okay. What happened?

23    A.    I stopped and told them -- told him what I wanted and he

24    gave me the drugs, I gave him the money and I continued.

11:42:33AM 25    Q.    What did you tell him that you wanted?

1  A.    I don't recall specifically.  It was a few bags.

2  Q.    A few bags of what?

3  A.    Of heroin.

4  Q.    Okay. All right.  Now, after that did you continue going

11:42:51AM 5  back to Burbank Street to buy heroin?

6  A.    I did, yes.

7  Q.    Why wouldn't you go back to the Valero?

8  A.    I -- I felt safer I guess.  It was off of the main road.

9  It wasn't -- I felt like there was less of a chance that I

11:43:10AM 10  would be spotted or seen by a police officer.

11  Q.    Okay. How often would you go back to Burbank to buy drugs?

12  A.    At first it was every couple days.  Then it progressed to

13  every day, sometimes twice a day.

14  Q.    And for how long were you going to the Burbank area to buy

11:43:35AM 15  drugs?

16  A.    For about 15 months or so.

17  Q.    Okay. Now, you mentioned this first time that you were on

18  Burbank Street you purchased heroin?

19  A.    That's correct.

11:43:44AM 20  Q.    Did you buy any other drugs on Burbank Street?

21  A.    I bought cocaine as well.

22  Q.    And why were you buying cocaine as well?

23  A.    At that point I wasn't -- I began to start mixing it

24  together.  It's called speed balling.  You mix heroin and

11:44:08AM 25  cocaine together and snort it together.

1  Q.   And who told you about that?

2  A.   My brother actually introduced me to that.

3  Q.   Do you remember about when you started buying cocaine

4  along with the heroin on Burbank Street?

11:44:27AM 5  A.   After a couple weeks or so.  It wasn't long.

6  Q.   So when you were going to Burbank Street several times a

7  week over -- for over a year, most of that time you were

8  buying both cocaine and heroin?

9  A.   Yes.

11:44:41AM 10  Q.   And you mentioned that you would mix the cocaine and

11  heroin together.  How would you then consume the mixture?

12  A.   I would also snort it.

13  Q.   All right. Now, during this time were you still living in

14  Orleans County?

11:44:58AM 15  A.   Yes.

16  Q.   How would you get to Burbank Street?

17  A.   I would drive.

18  Q.   What car were you using?

19  A.   I was -- I was driving my -- I owned a 2012 Chevy Malibu,

11:45:09AM 20  white Chevy Malibu.

21  Q.   How long was your drive from Orleans County to Burbank?

22  A.   45 minutes one way.

23  Q.   So about an hour and a half round trip?

24  A.   Hour and a half round trip.

11:45:21AM 25  Q.   Did you have any other reasons to come to the City of

1 Rochester at that time?

2 A.   No.

3 Q.   All right. Now, you mentioned you would consistently go to

4 Burbank Street for over a year.  Can you explain just

11:45:38AM 5 generally what your trips to Burbank were like?  What would

6 happen when you got there?

7 A.   As far as?  I don't understand.

8 Q.   Sure.  I can rephrase that.  So typically when you would

9 go to Burbank Street to buy cocaine and heroin, what would

11:45:58AM10 happen?

11 A.   I would -- I would arrive and it was always a quick

12 process.  In and out.  I would pull up, give the money, get

13 the drugs and off on my way home.

14 Q.   Okay. Were there ever times that you went and there was

11:46:16AM15 nobody to buy from or they didn't have enough product for you?

16 A.   There was -- I was working overnights, so I would try to

17 go out in the morning when I got out of work.  I worked until

18 7 in the morning and then I would drive to the city.  I would

19 get out to the city around 8 or so.  And it was early.  At

11:46:39AM20 that time nobody was out selling at that point.

21 Q.   So what would you do then?

22 A.   I would wait.  I didn't want to drive all the way back to

23 Orleans County and then have to make the same trip again.  I

24 tried to wait it out.

11:46:56AM25 Q.   Where would you wait?

828

1   A.    Right on Burbank Street.

2   Q.    In your car?

3   A.    Yes.

4   Q.    About how long would you have to wait sometimes?

11:47:05AM 5   A.    Sometimes an hour, sometimes two at most.

6   Q.    Doing your regular visits to Burbank were you able to make

7   observations of the area?

8   A.    Yes, yes.

9   Q.    Did you make observations of the people in the area as

11:47:21AM 10  well?

11  A.    Yes.

12  Q.    Did you speak with people in the area?

13  A.    Yes.

14  Q.    Okay. What were some of the observations that you made

11:47:29AM 15  during your regular visits to Burbank for over a year?

16  A.    There was a lot of traffic for being a one-way street.  It

17  was -- I recognized a lot of the same faces over the time that

18  I was going there.  I learned a few names of people that I was

19  buying from while I was going there.  It didn't appear to be

11:48:05AM 20  the safest neighborhood.

21  Q.    Why do you say that?

22  A.    It just -- there are a lot of drug users wandering,

23  walking the streets.  I mean, I -- I was worried I'd get

24  robbed or -- it wasn't smart.

11:48:26AM 25  Q.    What wasn't smart?

1   A.   To even be out there smart.

2   Q.   You mentioned you learned some people's names and observed

3   some of the same faces while you were there?

4   A.   Yeah.

11:48:35AM 5   Q.   What were some of the things you saw people doing on the

6   street?

7   A.   I'm not quite sure.  There were times I'd pull on the

8   street and there would be a person standing at each end of the

9   street looking; they're watching for law enforcement.

11:48:58AM 10            The reason I know that is because I'd watch them.

11   When a cop would drive by, they would throw their hands up or

12   yell down to the middle of the road, whoever it was at the

13   time was standing.

14   Q.   What was going on in the middle of the road?

11:49:12AM 15   A.   That's usually where you could -- where the workers -- I

16   refer to them as the workers would have drugs to sell.

17   Q.   When you say "workers," were those the people you would

18   buy from?

19   A.   Yes.

11:49:27AM 20   Q.   You mentioned the middle of the street.  Could you circle

21   on Government's Exhibit 35 the approximate area that you're

22   referring to when you say the middle of the street?

23   A.   It would be somewhere in this area.

24   Q.   Okay. So you've drawn a mark on Burbank Street just in

11:49:46AM 25   front of the house with the number 14 on it?

830

1   A.   Yes.

2   Q.   All right. Now, do you see anybody that you dealt with on

3   Burbank Street in court today?

4   A.   I do, yes.

11:50:00AM 5   Q.   Could you please identify that person by an article of

6   clothing that they're wearing?

7   A.   Blue shirt.

8   Q.   Where is that person seated?

9   A.   Behind yourself.

11:50:11AM 10   Q.   There's a couple blue shirts back there.  Any other

11   descriptive --

12   A.   The blue mask.

13        **MS. KOCHER:** Your Honor, could you let the record

14   reflect the witness has identified the defendant?

11:50:20AM 15        **THE COURT:** Yes, the record will note the

16   identification of the defendant.

17   **BY MS. KOCHER:**

18   Q.   Mr. Standish, how did you know the defendant?

19   A.   I recognize him from when I was going to Burbank.  Most of

11:50:35AM 20   the time he would be present and over time I learned his name

21   and began buying drugs from him.

22   Q.   Okay. What did you know his name as?

23   A.   Pepe.

24   Q.   Now, you mentioned that he was usually there when you went

11:50:53AM 25   to Burbank?

1  A.   Yes.

2  Q.   What were some of the things that you saw him do on

3  Burbank?

4  A.   I watched him bring drugs to the workers.  I watched him

11:51:10AM 5  interact with the people I saw on Burbank.  He was familiar

6  with the area.

7  Q.   You say you saw him interact with other people on Burbank?

8  A.   Yes.

9  Q.   Can you describe those interactions?

11:51:25AM10  A.   He appeared to be in control of the people that I was

11  buying drugs from at the time.

12  Q.   And why do you say that?

13  A.   His tone, his demeanor, his -- he always appeared to be

14  very serious, paranoid.

11:51:49AM15  Q.   You also mentioned that you ended up buying drugs from him

16  at some point?

17  A.   I did, yes.

18  Q.   What kind of drugs did you buy from the defendant?

19  A.   Both heroin and cocaine.

11:52:04AM20  Q.   All right. I'd like to show you what's been received into

21  evidence as Government's Exhibit 1.  Mr. Standish, if you hit

22  the upper right of your monitor a little arrow should pop up.

23  If you hit the arrow a menu should appear.  I'm sorry,

24  Ms. Rand beat you to it.  All right, sorry about that.  I was

11:52:25AM25  going to have you clear your marks, but Ms. Rand was on it.

1          All right, are you able to see Government's Exhibit
2    1?
3    A.    Yes.
4    Q.    And do you see the individual you just identified as the
11:52:35AM 5    defendant in Government's Exhibit 1?
6    A.    I do, yes.
7    Q.    Could you please circle his photo?  Okay, so you've
8    circled in the third row the photograph fourth from the left?
9    A.    Correct.
11:52:51AM 10    Q.    Now, do you recognize anyone else on Government's Exhibit
11    1?
12    A.    I do, yes.
13    Q.    And where do you recognize those individuals from?
14    A.    From -- all from Burbank Street.
11:53:05AM 15    Q.    Okay. Could you please circle the photographs of the
16    individuals that you recognize from Burbank in addition to the
17    defendant?  Okay.
18          So we now have five photographs that are circled in
19    addition to the defendant.  You circled the individual to the
11:53:36AM 20    left of the defendant in the black T-shirt; is that correct?
21    A.    That's correct.
22    Q.    And in the bottom row you've circled every individual
23    except the male in the white shirt; is that correct?
24    A.    That's correct.
11:53:51AM 25    Q.    Okay. Now, starting with the individual to the defendant's

1  left, the male in the black T-shirt in the third row, how do

2  you know that person?

3  A.   I knew him as Pepe's brother.  I never -- I never knew a

4  name, though.

11:54:10AM 5  Q.   Okay. And what were your interactions with him like?

6  A.   I also bought heroin and cocaine from him.

7  Q.   Okay. Was that in the area of Burbank Street?

8  A.   Yes.

9  Q.   Any other areas that you purchased heroin and cocaine from

11:54:25AM 10  the individual you knew as Pepe's brother?

11  A.   Yes.  I bought drugs from him on Thomas Street as well.

12  And also an apartment complex on North Clinton Avenue.

13  Q.   Okay. All right. Now, the bottom row, the first individual

14  you circled appears to be in a blue hooded sweatshirt?

11:54:50AM 15  A.   Yes.

16  Q.   Who was that person?

17  A.   That is Rafi.  I learned to be Rafi.

18  Q.   How did you know Rafi?

19  A.   He was the first contact that I had on Burbank Street.

11:55:07AM 20  Q.   Okay. What do you mean by that?

21  A.   That I -- he was the first person to give me a phone

22  number.

23  Q.   Okay. Now, you've described the day that you began buying

24  on Burbank when you accidently drove down the street.  Is the

11:55:23AM 25  individual that sold to you that day in Government's Exhibit

1  1?

2  A.   Yes.

3  Q.   And who was that person?

4  A.   That is who I knew as Rafi, the fourth row down, first

11:55:33AM 5  photograph.

6  Q.   All right.  In the blue hooded sweatshirt?

7  A.   Yes.

8  Q.   So describe your interactions with Rafi.

9  A.   I bought -- I bought drugs from him, heroin and cocaine.

11:55:51AM 10  I dealt with him for a few months or so.

11  Q.   Okay. And would you see him consistently during those few

12  months?

13  A.   Yes.

14  Q.   Did Rafi have any sort of physical ailments?

11:56:02AM 15  A.   He had a -- like a really big open wound on one of his

16  legs.  It looked like it was like very infected.

17  Q.   Do you know whether or not Rafi was a drug user?

18  A.   Yeah, absolutely, yes.

19  Q.   How do you know that?

11:56:22AM 20  A.   I watched him stick a needle into that open wound on his

21  leg.

22  Q.   And what was in the needle?

23  A.   Heroin.

24  Q.   All right. Moving on to the individual to Rafi's right in

11:56:38AM 25  the red shirt, who was that person?

835

1   A.   I knew that person as Flaco.

2   Q.   And how did you know Flaco?

3   A.   I also bought drugs both, heroin and cocaine from him.

4   Q.   On Burbank Street?

11:56:52AM 5   A.   Yes.

6   Q.   And finally the last person in the bottom row in the

7   yellow shirt, how did you know that person?

8   A.   I knew him as Cono, which I also bought heroin and cocaine

9   from on Burbank Street.

11:57:11AM 10   Q.   And when you say Cono, is that C-O-N-O?

11   A.   Yes.

12   Q.   Mr. Standish, I'd next like to show you what's already

13   been received into evidence as Government's Exhibit 15.  Do

14   you recognize the individual in this photo?

11:57:37AM 15   A.   I do, yes.

16   Q.   How do you recognize this gentleman?

17   A.   I recognize -- I knew his name as Kano, also from Burbank

18   Street.

19   Q.   How would you spell that name?

11:57:51AM 20   A.   K-A-N-O.

21   Q.   Okay. So similar to Cono, but a little different?

22   A.   Yes, yes.

23   Q.   Okay. And how did you know Cano?

24   A.   I bought heroin and cocaine from him as well.

11:58:06AM 25   Q.   And where did you buy from him?

1  A.   Burbank Street and Kohlman Street and Thomas Street.

2  Q.   All right. Next I'd like to show you Government's Exhibit

3  19 that's been received.  Do you recognize the individual in

4  this photo?

11:58:35AM 5  A.   I do.

6  Q.   And how do you recognize this person?

7  A.   Also from Burbank Street.

8  Q.   How do you know him from Burbank Street?

9  A.   I remember him -- his face specifically, but from a house

11:58:53AM 10  that was on Burbank Street.

11  Q.   Okay. Did you ever buy from this individual if you recall?

12  A.   I don't recall if I actually bought from him, but I know

13  that he was present at times that I did buy.

14  Q.   Okay. The house that you would see him at, was that one of

11:59:09AM 15  the houses you would go to to purchase cocaine and heroin?

16  A.   Yes.

17  Q.   Did you know this individual's name?

18  A.   I did not, no.

19  Q.   All right. I'm going to pull Government's Exhibit 35 back

11:59:27AM 20  up.  Mr. Standish, you mentioned the first time you bought

21  from Rafi on Burbank Street you were out on the street?

22  A.   Yes.

23  Q.   Is that typically how it would work?

24  A.   At first when I first began going down to Burbank Street.

11:59:45AM 25  But as I continued going, I did begin going to a house.

1   Q.    Okay. And how did that come about?

2   A.    Rafi -- I knew him as Rafi, told me to walk up the -- when

3   I showed up, just to walk up the driveway to the back of a

4   residence.

12:00:03PM 5   Q.    Did he tell you what house?

6   A.    Yes.

7   Q.    Was that the only house that you purchased cocaine and

8   heroin from?

9   A.    No, there was one other house.

12:00:13PM 10   Q.    Okay. I'd like to show you what's been received into

11   evidence as Government's Exhibit 45.  Do you recognize any of

12   the houses in Exhibit 45?

13   A.    The house to the far left.  This one.

14   Q.    You've circled -- you've circled the white and black house

12:00:40PM 15   on the left of the photograph?

16   A.    Yes.

17   Q.    Okay. And how do you recognize that house?  That white

18   house?

19   A.    I would walk up -- you can't see it in this photo, but

12:00:51PM 20   there's a driveway to the left of the house, I would walk to

21   the back of the house up that driveway.

22   Q.    Okay. And what would happen when you would get to the back

23   of the house?

24   A.    In most cases Rafi would be -- he would either be

12:01:05PM 25   standing -- he had like -- it was an office chair back there

838

1  that he would sit in.

2  Q.   And what would happen when you got to Rafi in his office

3  chair?

4  A.   I would buy heroin and cocaine from him.

12:01:17PM 5  Q.   Did you see where he would keep the supply of heroin and

6  cocaine?

7  A.   He mostly -- he always wore a fanny pack around his waist.

8  But if I -- if I needed or I wanted more than what he had on

9  him, then he would yell over -- there's a fence line that runs

12:01:40PM 10  on the back of that house.

11  Q.   Can you see the fence line in this photograph?

12  A.   Just barely.  It's like right here.

13  Q.   Okay. So you've placed a green mark on what looks like a

14  tall wooden fence; is that correct?

12:01:54PM 15  A.   Yes.

16  Q.   And that's at the back of the driveway behind the blue and

17  white house?

18  A.   That's correct.

19  Q.   Okay. And what would happen when he didn't have enough?

12:02:05PM 20  A.   He would just yell out -- he would yell over the fence and

21  somebody would come out the back porch of the white and blue

22  house and pass it over the fence line.

23  Q.   Okay. The white and blue house, is that the one in the

24  center of the photo?

12:02:21PM 25  A.   Yes, this one.

1  Q.   Okay.  You've circled the white and blue house in the

2  center of the photo now?

3  A.   Yes.

4  Q.   When the person would come out of the back porch of that

12:02:34PM 5  middle house, what would happen?

6  A.   They would pass it over the fence and Rafi would then give

7  me what I wanted and I would leave.

8  Q.   What would they pass over the fence?

9  A.   Heroin and cocaine.

12:02:47PM 10  Q.   Now, when you were buying from this location about how

11  much were you purchasing?

12  A.   A couple -- a few bundles or so.  A bundle is ten separate

13  bags within another bag.  They were -- when I was first going

14  I was being charged $10 a bag, and I later was told that they

12:03:23PM 15  were actually supposed to be $5 bags.

16  Q.   Okay. So a bundle -- originally you were paying $100 for a

17  bundle?

18  A.   That's correct.

19  Q.   Ten individual bags?

12:03:34PM 20  A.   Right.

21  Q.   And then the price dropped to $50 a bundle?

22  A.   That's correct.

23  Q.   Okay. Were you buying bundles of both heroin and cocaine?

24  A.   Yes, I was.

12:03:44PM 25  Q.   Okay. Would you purchase more heroin versus more cocaine

840

1  or vice versa?

2  A.   Always more heroin than cocaine.

3  Q.   Why is that?

4  A.   I felt at the time that I needed the heroin.  I could go

12:03:58PM 5  without the cocaine, but without the heroin I was -- I was

6  sick and going through withdrawal.

7  Q.   Okay. All right, next I'd like to show you what's been

8  received into evidence as Exhibit 44.  Do you recognize any of

9  the buildings in this photo?

12:04:22PM 10  A.   I do, yes.

11  Q.   Which houses do you recognize?

12  A.   The house that appears to be burned.

13  Q.   You've placed a circle around the house in the middle of

14  the photo?

12:04:33PM 15  A.   Yes.

16  Q.   How do you recognize this house?

17  A.   I also bought drugs, both heroin and cocaine, from that

18  house as well.

19  Q.   When you were purchasing heroin and cocaine from this

12:04:46PM 20  location, was it in this condition?

21  A.   No, it was not.

22  Q.   All right. It wasn't burned?

23  A.   It wasn't burned.

24  Q.   When you would buy from this location, how would it work?

12:04:58PM 25  A.   There were times that I would walk up this side right

1  here; I would always go in a side door over here; there were

2  times that they would pass it out of a basement window; and

3  there were times that I went into the house as well.

4  Q.   Okay. So you've drawn a line on the right side of the

12:05:18PM 5  house?  There's a little sidewalk.  Is that where you would

6  walk?

7  A.   Yes.

8  Q.   Okay. And what were you purchasing from this location?

9  A.   Both heroin and cocaine.

12:05:27PM 10  Q.   Who were some of the people you purchased from at this

11  house?

12  A.   Mainly Rafi.  I believe Rafi was living in this house.

13  Q.   Why do you think Rafi was living there?

14  A.   There was one time where I went into the house and I

12:05:49PM 15  actually had to go upstairs with him and it was a bedroom.  I

16  saw his like dirty laundry.  It appeared to me that he was

17  living there.

18  Q.   Okay. Now, other than those two houses that we just

19  discussed, did you buy drugs from anywhere else on Burbank

12:06:11PM 20  Street?

21  A.   I also bought out of a U-Haul truck.

22  Q.   Okay. Where was that?

23  A.   It was a little further down past this burned house.

24  Q.   Okay. If I could show you Government's Exhibit 35, the

12:06:27PM 25  map.  Do you see the general area where the U-Haul would be

1   parked on the map?

2   A.   This area.

3   Q.   Okay. You've placed a green mark to the left of the house

4   with the 6 on top?

12:06:47PM 5   A.   Yes.

6   Q.   And how did it work at the U-Haul when you were purchasing

7   drugs there?

8   A.   I would just pull up and I just would park on the side and

9   who I knew as Flaco or Flaco would get out of the vehicle, out

12:07:03PM 10   of the passenger side of the truck and walk up to my vehicle

11   and sell me both heroin and cocaine.

12   Q.   Okay. Was it usually just Flaco that you would purchase

13   from the U-Haul?

14   A.   Out of the U-Haul, yes.

12:07:21PM 15   Q.   Okay. Now, I'd next like to show you what's been received

16   into evidence as Government's Exhibit 36.  Do you recognize

17   this house?

18   A.   I do, yes.

19   Q.   And how do you recognize that house?

12:07:35PM 20   A.   I recognize this -- whoever lived in this house, I watched

21   them communicate with the people that were in the house across

22   the street.  And there were times I would try to pull up and

23   actually park in front of this house and I would be told to

24   leave.

12:07:58PM 25   Q.   Okay. Now, you saw them communicate with people in the

1  house across the street?

2  A.    Yes.

3  Q.    Is that one of the houses that we were just discussing?

4  A.    Yes.

12:08:06PM 5  Q.    If I could show you Exhibit 45.  Is that the house you

6  were referring to in this photograph?

7  A.    Yes, the house in the middle here.

8  Q.    Okay. You've circled the blue and white house in the

9  middle on the photograph?

12:08:34PM 10  A.    Yes.

11  Q.    If we can go back to Government's Exhibit 36.  Did you

12  ever see any vehicles parked in the driveway of that house?

13  A.    I remember a nice SUV, a newer nice SUV.  I don't recall

14  exactly what type -- what type of SUV it was.  But I

12:08:57PM 15  remembered it was nicer, and the reason I say that is because

16  it was the nicest vehicle on the whole street.

17  Q.    Okay. Did it stand out a bit?

18  A.    It stood out, yes.

19  Q.    Okay. What were most of the cars in the area like?

12:09:12PM 20  A.    They were more so rundown, rusty.  You know, maybe worth a

21  couple hundred bucks.

22  Q.    All right. Now, you mentioned that you ended up getting

23  some contact -- well, I think you said Rafi gave you a contact

24  number?

12:09:37PM 25  A.    Yes.

1  Q.   As time went on and you continued going to Burbank Street,

2  did you get contact or contact numbers for multiple people or

3  different people?

4  A.   Yeah, over time, yes.

12:09:52PM 5  Q.   Okay. Did you get a phone number the first time you went

6  to Burbank?

7  A.   No.

8  Q.   About how much time past before you got a phone number?

9  A.   Maybe a few weeks.

12:10:02PM 10  Q.   At that point you had been going consistently?

11  A.   Yeah, Rafi had recognized my face at that point and was

12  comfortable with me.

13  Q.   Okay. What phone numbers were you using when you were

14  buying cocaine and heroin on Burbank Street?

12:10:21PM 15  A.   There were a few different numbers.

16  Q.   Okay.  Do you remember any of them?

17  A.   Not off the top of my head, no.  I'd have to see them.

18  Q.   Sure.  If I can show you what -- show you 137A that's been

19  received into evidence on direct.  If we can go to page 6.  Do

12:10:58PM 20  you see a screen shot of a contact in this phone?

21  A.   Yes.

22  Q.   Do you see at the very bottom the name Ron?

23  A.   I do, yes.

24  Q.   And can you make out the phone number below the name Ron?

12:11:14PM 25  A.   585-590-1860.

1  Q.    And do you recognize that phone number?

2  A.    That was my phone number, yes.

3  Q.    Just to orient the jury, I'd like to read from the

4  stipulation that's been agreed to by the parties.

12:11:37PM 5          Government's Exhibit 137 is a black Kyocera flip

6  phone with phone number 585-851-6540 that was seized from 11

7  Burbank Street, Rochester, New York, on August 12th, 2015.

8          Government Exhibit 137A is the device data report

9  containing the data forensically retrieved from Government

12:12:03PM 10  Exhibit 137.

11          Mr. Standish, this phone number 590-1806 was a

12  number that you were using when you were buying cocaine and

13  heroin on Burbank Street?

14  A.    That's correct.

12:12:16PM 15  Q.    Were there other phone numbers and phones that you used at

16  the same time?

17  A.    I was also using 585-281-1806 number.  That phone was

18  actually my wife's.

19  Q.    Okay.  Now, you mentioned your wife.  Were you the only

12:12:50PM 20  one in your family that was struggling with addiction at the

21  time?

22  A.    My wife also was struggling and my brother as well.

23  Q.    Okay. What sort of drugs was your wife addicted to?

24  A.    She was using what I was using, both heroin and cocaine,

12:13:10PM 25  snorting it.

846

1   Q.   Would she ever go to Burbank Street with you?

2   A.   Yes.

3   Q.   Okay. Did she usually go with you or was it just you?

4   A.   Not often.  But there were times that she did, yes.

12:13:23PM 5   Q.   Okay. When you would go to Burbank without your wife,

6   would you share what you purchased?

7   A.   Yes.

8   Q.   She knew you were going to the Burbank area?

9   A.   She did, yes.

12:13:34PM 10   Q.   How many bundles of cocaine and heroin do you think you

11   and your wife were going through each week?

12   A.   Maybe 20 or so.

13   Q.   Okay. And did it start out as 20 a week or did it progress

14   to that?

12:13:57PM 15   A.   No, no, it progressed to that.

16   Q.   And you mentioned earlier that a bundle was $50 apiece?

17   A.   That's correct.

18   Q.   So that's quite a bit of money you were spending each

19   week?

12:14:07PM 20   A.   It is, yes.

21   Q.   How were you paying for the drugs you were buying on

22   Burbank?

23   A.   I made decent money as a correctional officer.  And my

24   wife also had a state job and we were spending just about

12:14:24PM 25   every dollar of that on drugs; and I was also pawning things

1    that I owned, things that my parents owned, things that her

2    parents owned.

3    Q.   How did the pawning work?

4    A.   I would take an item to a pawn shop out here in Rochester

12:14:42PM 5    and I would be given a loan on the item that I brought in.

6    Q.   So you would give them an item and they would give you

7    cash?

8    A.   Yes.

9    Q.   What would happen after that?

12:14:54PM 10   A.   I would leave the pawn shop and go directly to Burbank

11   Street.

12   Q.   Would you try and buy the item back?

13   A.   Yeah, I tried always to do a loan so that I could get the

14   items back.

12:15:05PM 15   Q.   Would they charge you interest at the pawn shop?

16   A.   Yes.

17   Q.   What was the interest rate they were charging?

18   A.   I'm not sure what the interest rate was exactly, but say I

19   did a $100 loan and I went back a week later, it may be $125,

12:15:24PM 20   $130 I'd have to pay back.

21   Q.   And would you tell your wife when you were going to

22   Burbank Street?

23   A.   Yes.

24   Q.   Why?

12:15:32PM 25   A.   So she knew where I was.  I always told her so she knew

848

1   where I was.

2   Q.   All right. Now, I'd like to show you what's not been

3   received into evidence as Exhibit 226A.  Do you recognize what

4   this document is?

12:15:58PM 5   A.   It's an extraction report from my cell phone.

6   Q.   I'm sorry, I couldn't hear you.

7   A.   An extraction report from my cell phone, the 590 number.

8   Q.   Okay. The 590 --

9   A.   -- 1860.

12:16:17PM 10   Q.   Okay. All right, so when you -- you mentioned that you

11   were arrested in June of 2016.  Did the police seize some

12   phones from you?

13   A.   Yes, they did.

14   Q.   Okay. And what were some of the phones that they seized?

12:16:29PM 15   A.   They seized the 590-1860 number phone; they seized the 585

16   -- the 281-1806 number; and another cell phone that was -- it

17   was an old phone that was my wife's mother's phone.

18   Q.   Okay. Now, you mentioned this is an extraction report from

19   one of those phones?

12:16:54PM 20   A.   Yes.

21   Q.   Is this the iPhone extraction report?

22   A.   This is, yes.

23   Q.   I'd like to show you what's not been received into

24   evidence as Exhibit 214.  Do you recognize the phone in this

12:17:17PM 25   photograph?

1   A.   That's my iPhone, yes.

2   Q.   Okay. And the extraction report that we were just viewing,

3   is that an extraction of the contents of the phone in

4   Exhibit 214?

12:17:29PM 5   A.   It is, yes.

6   Q.   Does Exhibit 214 fairly and accurately depict the way that

7   your phone looked when it was seized by law enforcement in

8   June of 2016?

9   A.   Yes.

12:17:41PM 10                 **MS. KOCHER:** Your Honor, I'd offer Exhibit 214.

11                 **MR. VERRILLO:** No objection.

12                 **THE COURT:** Exhibit 214 will be received.

13                 (**WHEREUPON**, Government Exhibit 214 was received

14   into evidence).

12:17:54PM 15   **BY MS. KOCHER:**

16   Q.   So this is the one of the phones that you were using when

17   you were purchasing drugs on Burbank from the defendant and

18   others?

19   A.   It is, yes.

12:18:13PM 20   Q.   All right. All right. If I could again show you what's not

21   been received into evidence as Exhibit 226A, the iPhone

22   extraction report.  Now, does this have a cover sheet with the

23   phone number and identifies it as an iPhone?

24   A.   It does, yes.

12:18:35PM 25   Q.   Okay. Next I'd like to show you what's also not been

1    received into evidence as Exhibit 226B.  Does this appear to

2    be some select text messages from the iPhone extraction?

3    A.   Yes, that's correct.

4            **MS. KOCHER:** Your Honor, if I may, at this time I'd

12:19:02PM 5    like to read from the stipulation.

6            Government's Exhibit 226 is a black iPhone with

7    phone number 585-590-1860 that was seized from Albion,

8    New York on June 8th, 2016.

9            Government Exhibit 226A is the device data report

12:19:24PM 10   containing the data forensically retrieved from Government

11   Exhibit 226.

12           And, Your Honor, we've pulled just some select text

13   messages that we've marked as Exhibit 226B instead of rifling

14   through the entire extraction; it is over 1,000 pages long.

12:19:44PM 15           At this time I would offer Exhibit 226A and B.

16           **THE COURT:** Any objection?

17           **MR. VERRILLO:** Your Honor, if we could have a

18   sidebar?

19           **THE COURT:** Sure.

12:19:59PM 20           (**WHEREUPON**, a discussion was held at side bar out

21   of the hearing of the jury.)

22           **MR. VERRILLO:** 226B is something I haven't seen.  I

23   did have 226A.  So how many pages is this exhibit?

24           **MS. KOCHER:** 47.  And these are text messages that

12:20:22PM 25   are contained in 226A.  We just pulled these select ones out

1   because 226A is so big.  It would be easier to maneuver.

2            I don't anticipate going through all these messages

3   with Mr. Standish, but I would like them received and I

4   thought it would be easier to manage in a shorter document.  I

12:20:45PM 5   don't know if Your Honor wants to take a brief recess and Mr.

6   Verrillo can view the --

7            **MR. VERRILLO:** I haven't seen this.

8            **MS. KOCHER:** They are contained in 226A.

9            **THE COURT:** I'll give you a chance to look at those.

12:20:54PM 10   226 is received?

11            **MS. KOCHER:** It's not.  I wasn't going to offer the

12   actual phone, just the photograph.

13            **THE COURT:** All right.

14            (**WHEREUPON**, side bar discussion concluded.)

12:21:05PM 15            **THE COURT:** Ladies and gentlemen, at this time we're

16   going to take a short recess.  In the meantime, I'd ask you

17   not discuss the matter or allow anybody to discuss the matter

18   with you.  Jury may step down, we'll stand in recess.

19            (**WHEREUPON**, there was a pause in the proceeding).

12:51:26PM 20            (**WHEREUPON**, the defendant is present; the jury is

21   present).

22            **THE COURT:** You may continue.  Oh, we need a

23   witness, though.

24            **MS. KOCHER:** While Mr. Standish is returning, can we

12:54:52PM 25   sidebar?

1          **THE COURT:** Sure.

2          (**WHEREUPON**, a discussion was held at side bar out

3    of the hearing of the jury.)

4          **MS. KOCHER:** Judge, I just wanted to put on the

12:55:02PM 5    record Mr. Verrillo had a chance to view the selected text

6    messages that we pulled out.  He did have a copy of those so I

7    directed him to where those are in the copy that he had

8    before.  So I just wanted to make sure it was clear he has had

9    a copy of them; he just pulled out a select few.

12:55:19PM 10         **THE COURT:** Mr. Verrillo.

11         **MR. VERRILLO:** Yes, it was 1,700 pages -- there were

12   1,700 pages that I did have and I know they took 47 or

13   whatever, how many pages that is, but I have reviewed that.

14         **THE COURT:** Okay, great, thank you.

12:55:41PM 15         (**WHEREUPON**, side bar discussion concluded.)

16         **THE COURT:** The witness can come back.  Go ahead.

17         **MS. KOCHER:** Thank you, Your Honor.  And 226A and B

18   have now been received?

19         **THE COURT:** I'm sorry?

12:56:30PM 20         **THE COURT:** 226A and B.

21         **THE COURT:** I think we already did that.

22         **MS. KOCHER:** I offered those.

23         **THE COURT:** No objection?

24         **MR. VERRILLO:** No objection.

12:56:37PM 25         **THE COURT:** 226A and 226B will be received.

1              (**WHEREUPON**, Government Exhibits 226A and 226B were

2   received into evidence).

3   **BY MS. KOCHER:**

4   Q.   All right, Mr. Standish, we've pulled up on the monitor

12:56:48PM 5   what's now been received into evidence as Exhibit 226B.   These

6   appear to be text messages from the iPhone you were using

7   while you were buying drugs on Burbank Street?

8   A.   Yes, that's correct.

9   Q.   Okay. If you could pull that microphone right close to

12:57:08PM 10   you, both of them.  Thank you.

11   A.   Yup.

12   Q.   Now, before we took our break you mentioned you would tell

13   your wife when you were going to Burbank?

14   A.   That's correct.

12:57:21PM 15   Q.   And why was that?

16   A.   So she knew where I was out in the city in case something

17   were to happen or my phone or for whatever reason, so she knew

18   where I was.

19   Q.   Okay.  Now, we're looking at the first page of

12:57:38PM 20   Exhibit 226B.  Ms. McCreedy, if you could zoom in on the top

21   half?  Thank you.

22              Mr. Standish, you see the phone number at the top

23   of that green bubble there, it's 585-590-1860, and then

24   there's parentheses the word owner afterwards?

12:58:05PM 25   A.   Yes.

854

1  Q.   Is that the phone number that you were using at the time?

2  A.   It was, yes.

3  Q.   Now, in the gray bubble just below the green one it has

4  the phone number 585-281-1806.  Whose phone number was that at

12:58:23PM 5  the time?

6  A.   At the time that was my wife's phone number.

7  Q.   Okay. And was there also a time that you used that phone

8  number, the one ending in 1806?

9  A.   There was, yes.

12:58:35PM 10  Q.   Okay. But at this point she was using that number?

11  A.   That's correct.

12  Q.   Now, have you had a chance to review some of these text

13  messages?

14  A.   Yeah, I have read them, yes.

12:58:46PM 15  Q.   Okay.  Which communication are you?  Would you be in the

16  green or the gray bubbles?

17  A.   I would be in the green bubbles.

18  Q.   Okay. If you wouldn't mind just reading the first green

19  bubble there and then your wife's response?

12:59:05PM 20  A.   I wrote -- I sent an outgoing message to her, it says

21  yeah, going to Burbank, almost there, just got off Clinton.

22  And she responded shit, you have the diaper bag with the

23  jammies.  I then responded damn.

24  Q.   Okay.  Now, at this time you had two sons?

12:59:25PM 25  A.   Yes.

1  Q.    Okay. What is the date of this text message?

2  A.    March 21st, 2015.

3  Q.    Okay.  Now, you said in the first message going to Burbank

4  almost there, but there is spell T-G-E-R-E, correct?

12:59:45PM 5  A.    Correct.

6  Q.    Then you said just got off Clinton.  What route would you

7  typically take to get from Orleans County to Burbank?

8  A.    I would take Route 531 to 490 and then I would get off the

9  Plymouth Avenue exit, I believe was the exit.

01:00:06PM 10  Q.    Okay.  And would you eventually end up on Clinton?

11  A.    Yes.

12  Q.    So that's another street in the city?

13  A.    That's correct.

14  Q.    Now, I'd like to move to the bottom half of the first page

01:00:17PM 15  of Exhibit 226B.  All right. Your wife sends a text message

16  and she says you headed back?

17  A.    Yes, correct.

18  Q.    And what was your response to that?

19  A.    I responded yeah, got 19 and five.

01:00:34PM 20  Q.    And what did you say after that?

21  A.    Was like 50 cheaper.  Would either save the 50 for T,

22  though, ya know, I'm not quite sure what to make out of that

23  last one.

24  Q.    So the first message there yeah, got 19 and 5, what did

01:00:57PM 25  you mean when you said got 19 and 5?

856

1  A.   19 I would have been referring to 19 bags of heroin, and

2  five would be five bags of cocaine.

3  Q.   Okay. And how do you know it was 19 bags of heroin as

4  opposed to 19 bags of cocaine?

01:01:12PM 5  A.   I always got more heroin than coke.

6  Q.   And where would you have purchased the 19 bags of heroin

7  and the five bags of coke on March 21st, 2015?

8  A.   From Burbank Street.

9  Q.   Okay. Now, in the next text you said was like 50 cheaper.

01:01:31PM 10  What would you referring to there?

11  A.   The cost of a bundle.

12  Q.   Okay.

13  A.   Which was ten separate bags of heroin.

14  Q.   And then the rest of that message there appeared to be

01:01:44PM 15  some typos?

16  A.   Correct.

17  Q.   Okay. If we could move to the second page of Exhibit 226B?

18  The first few messages there.  This starts out you say I

19  think, though, for literally 50 less didn't do to (sic) bad.

01:02:03PM 20  And then what does your wife respond?

21  A.   You got like eight less.  He definitely -- he definitely

22  didn't hook it up or anything.

23  Q.   What did you say to that?

24  A.   I responded back we usually fly through the girl anyways.

01:02:20PM 25  Q.   Okay. And what were you talking about during this portion

1   of the conversation?

2   A.   When I responded we usually fly through the girl anyways,

3   I was referring to the cocaine.  And the message before I'm

4   not exactly sure what I meant there.

01:02:45PM 5   Q.   What you meant where?

6   A.   In the message -- I'm sorry, that was the message from

7   her.  You got like eight less, he definitely didn't hook it up

8   or anything.

9   Q.   Okay. Where you say I think, though, for literally 50 less

01:03:00PM 10   didn't do to (sic) bad what did you mean?

11   A.   That it was cheaper.

12   Q.   What was cheaper?

13   A.   The cost of a bundle of heroin.

14   Q.   Okay. If we could go to the bottom half of page 2 and zoom

01:03:12PM 15   in on that -- the last three messages?  So right before this

16   you said we usually fly through the girl anyways.  And now the

17   bubbles that we have zoomed in you say cause we add it.  What

18   did you mean by that?

19   A.   That we add -- we add it to the heroin.

01:03:33PM 20   Q.   Okay.

21   A.   We mix it together.

22   Q.   All right. Then what does your wife say?

23   A.   She responded he always says that.  And then every time.

24   Q.   If we can move to the third page of Exhibit 226B, I'd like

01:03:51PM 25   to zoom in on the first three green bubbles.  What did you say

1  in the top bubble here?

2  A.   I responded, I said no, he didn't hook it up but says that

3  he was there when it was bagged and their (sic) nice.  Says he

4  would get a 10 -- he would get 10 apiece to people that don't

01:04:12PM 5  come out regularly.

6  Q.   Okay. And you can continue reading the next two bubbles.

7  A.   So in a way he kinda did but didn't.  Then the next

8  message he's only been saying that since the yellow ones,

9  though, I don't know, they look decent.

01:04:28PM 10  Q.   Okay. What were you talking about in these text bubbles?

11  A.   I was talking about the bags of heroin, the cost of the

12  bags.  When I say the yellow ones, that would have been the

13  color of the bag.

14  Q.   Okay. Okay.  If we can move to the bottom half of the

01:04:50PM 15  third page, your wife says how far away are you?  Kids are in

16  the bath.  I found sweatpants for Gavin but you have his PJs.

17  A.   Correct.

18  Q.   Is that your son that she's referring to?

19  A.   Yes.

01:05:10PM 20  Q.   Okay. All right.  Now, Mr. Standish, have you had a chance

21  to review other text messages between you and your wife where

22  you're discussing your trips to Burbank?

23  A.   I have read other text messages, yes.

24  Q.   Okay. I'm not going to go through all of them, but how

01:05:25PM 25  many do you think you looked at?

859

1   A.    A lot.

2   Q.    What's a lot?

3   A.    Over the course of a year, hundreds, possibly a thousand

4   messages.

01:05:36PM 5   Q.    You and your wife were in constant communication with one

6   another?

7   A.    Yes.

8   Q.    The other messages that you've had a chance to review, did

9   you discuss similar things with your wife about your trips to

01:05:48PM 10   Burbank?

11   A.    Yes.

12   Q.    So that being the price that you were paying and the

13   quantity that you purchased?

14   A.    That's correct.

01:05:53PM 15   Q.    Did you also discuss some of the people that you dealt

16   with on Burbank?

17   A.    Yes.

18   Q.    All right. Now, when you first started going to Burbank to

19   purchase cocaine and heroin, you said you were buying a

01:06:14PM 20   smaller amount initially?

21   A.    Yes, that's correct.

22   Q.    Okay. Then you started buying bundles?

23   A.    Yes.

24   Q.    Okay. Can you describe -- I think you did a little bit

01:06:23PM 25   earlier, but the bundles, how were those bagged?

860

1    A.    They -- a bundle is ten separate bags within a ziplock, a

2    smaller ziplock bag.   They were always like tri-folded with

3    tape on them, like taping them shut.

4    Q.    Is that the heroin or the cocaine we're talking about?

01:06:49PM 5    A.    The heroin.

6    Q.    The heroin?

7    A.    Yes.

8    Q.    Was the cocaine packaged a little bit differently?

9    A.    It was.   The cocaine was always in clear -- really small

01:06:59PM 10   clear plastic bag, like ziplock-type bag.

11   Q.    Would the bundles or groups of ten bags of cocaine also be

12   in a larger bag?

13   A.    Not usually, no.

14   Q.    Okay. The bag that held the bundles of heroin, was there

01:07:16PM 15   anything unique about that?

16   A.    It was always a black bag.

17   Q.    Okay. How about the little individual envelopes

18   themselves?   Did those have any sort of markings on them?

19   A.    There were a few different logos I guess would be the way

01:07:38PM 20   to say it.

21   Q.    Okay. Do you remember what some of those logos were?

22   A.    I remember like a flaming skull; a pirate; like a skeleton

23   pirate; a bag that said Magoo like up and down the bag; I'm

24   sure there were others.

01:08:07PM 25   Q.    Okay.

1              **MS. KOCHER:** Your Honor, if I may use the

2    visualizer?  I'd like to show the witness a few items.

3              **THE COURT:** Yes.

4    BY MS. KOCHER:

01:08:21PM 5    Q.   First, Mr. Standish, I'd like to show you what's been

6    received into evidence as Government's Exhibit 106.  Our

7    stipulation which the parties have agreed to states Government

8    Exhibit 106 is four wax paper envelopes with red devils with

9    tan powder containing heroin seized from 6 Burbank Street,

01:08:42PM 10   Rochester, New York on July 30th, 2015.

11              Mr. Standish, I've zoomed in on Exhibit 106.  Are

12   you able to make out any of the items contained in

13   Exhibit 106?

14   A.   That is -- that's how it was packaged.  I recognize the

01:09:17PM 15   logo itself and the black ziplock bag.

16   Q.   Okay. And what logo are you referring to?

17   A.   The red like skeleton devil-type witch.

18   Q.   Where do you recognize the red devil and the black ziplock

19   bag that is holding the red devil envelopes from?

01:09:43PM 20   A.   Can you repeat that?  I'm not quite sure --

21   Q.   Sure.  Where do you recognize the red devil from?

22   A.   From Burbank Street.

23   Q.   Okay.  Now, you mentioned the black bag that's holding the

24   red devil envelopes.

01:09:59PM 25   A.   Correct.

1   Q.    Okay. Is that typically how the bundles were bagged?

2   A.    Yes.

3   Q.    Okay. All right.  Next I'd like to show you what's been

4   received into evidence as Exhibit 135.

01:10:18PM 5            The stipulation states Government Exhibit 135 was

6   seized from 11 Burbank Street, Rochester, New York, on

7   August 12th, 2015.

8            Government Exhibit 135 contains 28 plastic bags

9   with white powder containing cocaine.  There's an aggregate

01:10:37PM 10  weight given.

11           And Exhibit 135 also contains 40 wax paper

12  envelopes with pirates with tan powder containing heroin.

13           All right, Mr. Standish, are you able to see

14  Exhibit 135?

01:11:18PM 15  A.    Yes.

16  Q.    Okay. I've zoomed in on a portion of it.  Do you recognize

17  any of the items contained in Exhibit 135?

18  A.    I recognize both -- I recognize the pirate wax paper-type

19  bag, and I do also recognize the bag -- ziplock bag with the

01:11:40PM 20  dice on it because I purchase that too.

21  Q.    You made a little mark on one of the plastic bags with the

22  red dice?

23  A.    That's correct.

24  Q.    Where do you recognize the, like, skull pirate and the red

01:11:53PM 25  dice bags and envelopes from?

863

1 A. Both of which from Burbank.

2 Q. Those are similar to items that you would have purchased

3 on Burbank Street?

4 A. They're identical.

01:12:04PM 5 Q. Now, the clear bag with the red dice on it, what

6 typically -- what type of drug would that contain?

7 A. That would always be cocaine.

8 Q. Okay. Was there anything else unique about the small

9 cocaine baggies?

01:12:24PM 10 A. On the top right corner you can see that -- like this edge

11 up top of the bag is sealed, almost as if it was burnt to keep

12 it closed.

13 Q. When you would purchase cocaine from Burbank Street, was

14 that a consistent thing that you would see on the cocaine

01:12:40PM 15 packaging?

16 A. Yes.

17 Q. And the skull pirates, what drug would be contained in

18 that bag?

19 A. That would be heroin.

01:12:57PM 20 Q. All right. Now, next I'd like to show you what's been

21 received into evidence as Exhibit 179.

22    The stipulation agreed upon by the parties states

23 Government Exhibit 179 was seized from a 2001 red Honda Civic

24 bearing New York registration HDN 5250 at 2 Burbank Street,

01:13:20PM 25 Rochester, New York, on February 6th, 2016.

1          Government's Exhibit 179 contains 25 yellow plastic

2    bags with white powder containing cocaine.  There's an

3    aggregate weight in the stipulation.

4          Government Exhibit 179 also contains 174 gray

01:13:43PM 5    plastic bags with white powder containing cocaine.  Again

6    there's an aggregate weight listed.

7          And, finally, Government Exhibit 179 also contains

8    266 glassine bags stamped Magoo with tan powder containing

9    heroin.

01:14:16PM 10          Mr. Standish, I've placed Exhibit 179 on the

11    visualizer.  It was cut off and I've pulled a portion of that

12    out.  Do you recognize any of the packaging contained in

13    Exhibit 179?

14    A.    I do.

01:14:29PM 15    Q.    What do you recognize?

16    A.    Same type of wax paper bag, that with the Magoo imprint.

17    Q.    Where do you recognize this envelope with the Magoo stamp

18    on it?

19    A.    Also from Burbank Street.

01:14:45PM 20    Q.    What type of drug would be contained in this package when

21    you would buy it on Burbank Street?

22    A.    Heroin.

23    Q.    Next I'd like to show you Exhibit 252.  Per the

24    stipulation, this item was seized from 54 Miller Street on

01:15:10PM 25    December 8th, 2016.

1             Government's Exhibit 252 contains a sealed plastic

2   bag with tan powder containing heroin and 1,300 glassine bags

3   marked the king.  There's an aggregate weight listed.

4             Government Exhibit 252 also contains 1,006 glassine

01:15:34PM 5   bags stamped blue magic with tan powder containing heroin.

6             Mr. Standish, I've removed two bags from

7   Exhibit 252.  Are you able to make those out on the

8   visualizer?

9   A.    The one on the right I can.  The one on the left it's -- I

01:16:31PM 10  can't really -- I can't see it clearly.

11  Q.    Okay. So we're zoomed in just on the one item on the

12  right.  Do you recognize that item?

13  A.    I do, yes.

14  Q.    What do you recognize?

01:16:51PM 15  A.    They're also from Burbank Street.  Heroin bags.

16  Q.    Okay. And what kind of stamp or marking was on that?

17  A.    It's like a gorilla and I think it says king, I believe it

18  says king on it.

19  Q.    Okay. Is that the type of packaging that you would

01:17:09PM 20  purchase when you were going to Burbank Street?

21  A.    Yes.

22  Q.    And that would contain heroin?

23  A.    Yes.

24  Q.    Okay. Are you better able to see this other bag that I've

01:17:33PM 25  zoomed in on?

1  A.   It's a really bad glare to it.  I can't see an imprint on

2  it.

3           **MS. KOCHER:** Your Honor, may I approach the witness

4  so there's no glare?

01:17:47PM 5           **THE COURT:** Thank you.

6           **MS. KOCHER:** Thank you.

7           **THE WITNESS:**  Yes.  I also recognize these from

8  Burbank Street as well as Thomas Street.

9  **BY MS. KOCHER:**

01:18:13PM 10 Q.   Okay.  Where do you recognize that bag that I just handed

11 you from?

12 A.   From Burbank Street as well as Thomas Street.

13 Q.   Okay.  What do you recognize about the item that I just

14 handed to you?

01:18:24PM 15 A.   The blue magic stamp.

16 Q.   Is that another type of logo or stamp that was on the

17 heroin you would purchase from Burbank Street?

18 A.   It was, yes.

19 Q.   You also mentioned Thomas Street?

01:18:37PM 20 A.   Yes.

21 Q.   We'll discuss Thomas Street a little bit later.  Now,

22 Mr. Standish, when you were buying these bundles of cocaine

23 and heroin, would you just walk up to anybody that was out on

24 Burbank Street?

01:19:04PM 25 A.   Earlier on, yes.  But after -- after I had been going a

1  couple months, I would start to look for certain faces.

2  Q.   Okay. People that you recognized?

3  A.   Right.

4  Q.   Who were some of the people that you recognized on Burbank

01:19:19PM 5  that you would purchase from?

6  A.   I recognized Rafi, Cano, Cono, Pepe himself, and his --

7  who I knew as his brother.

8  Q.   When you say "Pepe himself," is that who you previously

9  identified as the defendant?

01:19:39PM 10  A.   That's correct.

11  Q.   Okay. Earlier you had described how you would see people

12  on the ends of Burbank Street that appeared to be lookouts or

13  watchmen?

14  A.   Correct.

01:19:50PM 15  Q.   Would you ever buy from those people?

16  A.   No.

17  Q.   And you also described when you would go buy cocaine and

18  heroin on Burbank Street it would generally be a quick

19  transaction?

01:20:06PM 20  A.   Yes.

21  Q.   So how did it get to the point where you got phone numbers

22  for some of the people you were buying from?

23  A.   It just -- after going there repeatedly they became more

24  familiar with my face, I became more familiar with their face,

01:20:25PM 25  and they -- I was given numbers.

868

1   Q.    Okay. Now, as a customer what, if anything, was

2   significant about the stamps or logos that we've just

3   discussed?

4   A.    I'm not sure I understand --

01:20:43PM 5   Q.    Okay.

6   A.    -- what you're --

7   Q.    When you were going to buy cocaine and heroin, were you

8   looking for anything in particular when you were making

9   purchases?

01:20:52PM 10   A.    I was looking for the logos that I was familiar with and

11   the black ziplock bag.

12   Q.    Why were you looking for logos you were familiar with and

13   the black ziplock bags that held the bundles together?

14   A.    It was -- I was used to it I guess.  I was familiar with

01:21:12PM 15   it.  I guess I was familiar with it.

16   Q.    Okay. Had you purchased heroin or gotten heroin from

17   anywhere else in the City of Rochester?

18   A.    I did, yes.

19   Q.    How did that come about?

01:21:27PM 20   A.    A lot -- down in the innercity and off Clinton Avenue,

21   people drive by, they will try to give you samples, which are

22   free bags.  They want you to start going to them to purchase

23   the drugs.

24   Q.    Okay. Did you notice a difference in the quality of the

01:21:46PM 25   heroin or cocaine from those samples that you got from people

1   on Clinton as opposed to the cocaine and heroin you purchased

2   on Burbank?

3   A.   Anything that I tried outside of Burbank made me cough,

4   sneeze.  My nose would run.  It was -- I didn't care for it.

01:22:05PM 5   I didn't like it.

6   Q.   Okay. So you liked the quality of the drugs on Burbank?

7   A.   Correct.

8   Q.   As opposed to others?

9   A.   That's correct.

01:22:12PM 10   Q.   All right.  Now, over time you began purchasing larger

11   quantities of cocaine and heroin?

12   A.   That's correct.

13   Q.   Why was that?

14   A.   I wanted to get -- I was trying to get it cheaper.  The

01:22:31PM 15   more you buy, the cheaper it will get.

16   Q.   Okay. So bundles were $50 a bundle?

17   A.   Bundles were always $50.  Didn't matter how many you

18   bought.

19   Q.   Okay.

01:22:45PM 20   A.   When you start buying by the gram, it begins to get

21   cheaper.

22   Q.   Okay.  Did there come a point where you did, in fact,

23   start buying by the gram?

24   A.   I did, yes.

01:22:52PM 25   Q.   And when you were -- were you buying cocaine and heroin by

1  the gram?

2  A.   Mainly heroin.   The cocaine was more so still by the bags.

3  Q.   Okay.   And who did you buy gram amounts of heroin from?

4  A.   From Pepe.

01:23:08PM 5  Q.   The defendant?

6  A.   That's correct.

7  Q.   How were the grams packaged as opposed to the bundles?

8  A.   It was just in like a regular sandwich bag twisted and

9  like knotted kind of.

01:23:25PM 10  Q.   So it would be loose powder in a bag?

11  A.   Right.

12  Q.   Okay. Now, while you were still buying the bundle

13  quantities on Burbank Street, did there ever come a time that

14  you described when you would go down the driveway towards that

01:23:44PM 15  back fence they wouldn't have enough and they would get it

16  from next door?

17  A.   I'm not sure what the question is.

18  Q.   Sure.   Let me show you Exhibit -- I'm sorry, that was a

19  bad question.   Let me go to Exhibit 45.   Okay, so could we

01:24:05PM 20  switch to the computer?   Thank you, Ms. Rand.

21        All right, so earlier you told us when you were

22  purchasing from the white house on the left you would walk

23  down the driveway; is that correct?

24  A.   That's correct.

01:24:18PM 25  Q.   And you mentioned if Rafi didn't have enough, he would

1  call to the people next door?

2  A.    Yes.

3  Q.    And then you would have drugs to buy from them?

4  A.    That's correct.

01:24:29PM 5  Q.    Were there other times that you would go to either this

6  house or the house across the street or anywhere else where

7  there wouldn't be enough drugs from the person you were buying

8  from?

9  A.    Across -- across the street as well as the next street

01:24:49PM 10 over, which was Kohlman.

11 Q.    Okay. What would happen if you went to buy from say Rafi

12 and he didn't have the quantity of cocaine or heroin that you

13 wanted?

14 A.    He would say that he had to call the boss.

01:25:04PM 15 Q.    Okay. And after that what would happen?

16 A.    A few minutes later the defendant would arrive.

17 Q.    And what would happen after the defendant would arrive?

18 A.    He would give it to Rafi or Cano and they would then bring

19 it over to me.

01:25:22PM 20 Q.    Bring what over to you?

21 A.    The heroin and the cocaine.

22 Q.    Okay. And then what would happen?

23 A.    I would leave.

24 Q.    Would you pay for the cocaine and heroin?

01:25:32PM 25 A.    Yes.

1  Q.   Okay. So you would give the worker, the seller money and

2  they would give you the cocaine and heroin?

3  A.   Correct, yes.

4  Q.   All right. Do you know about -- well, you saw the

01:25:46PM 5  defendant regularly on Burbank Street?

6  A.   Yes.

7  Q.   About how many times do you think you saw the defendant on

8  Burbank Street while you were going there regularly for over a

9  year?

01:25:59PM 10  A.   A lot.  Well over 100 times for sure.

11  Q.   Okay. And about how many times did it happen that Rafi or

12  whoever you were buying from didn't have the drugs and they

13  would say I got to call the boss and the defendant would

14  arrive?

01:26:21PM 15  A.   It was quite often later on like when my addiction really

16  was kind of at the peak.

17  Q.   You said quite often.  Do you know about -- can you put a

18  number on it?

19  A.   Most of the time.  It would be tough to put a number on

01:26:47PM 20  it.

21  Q.   Okay.

22  A.   It was quite often, though.

23  Q.   A regular --

24  A.   More than two-thirds of the time.

01:26:53PM 25  Q.   Okay.  So a regular occurrence?

873

1   A.   Yes.

2   Q.   And at that point you were going to Burbank several times

3   a week if not more?

4   A.   That's correct.

01:27:01PM 5   Q.   Did you ever buy cocaine or heroin in a bundle form from

6   the defendant on Burbank Street?

7   A.   Yes.

8   Q.   Can you describe those interactions?

9   A.   Very brief.  One of the mornings that I had shown up out

01:27:24PM 10   there, there wasn't anybody out there.  I saw Pepe and I

11   bought from him out on the street.

12   Q.   Okay.  You said you got to Burbank in the morning and no

13   one was out there?

14   A.   That's correct.

01:27:41PM 15   Q.   You mean no people around or people you didn't know?

16   A.   There was nobody -- nobody else -- no people at all.

17   Q.   Okay. Can you describe the interaction with the defendant

18   on that occasion?

19   A.   Very brief.  He was irritable.  It was quick.  I gave him

01:28:06PM 20   the money and he kind of tossed it on my lap as if he was

21   annoyed.

22   Q.   What did he toss on your lap?

23   A.   Heroin and cocaine.

24   Q.   Okay. Did you ever have any direct dealings with the

01:28:21PM 25   defendant on Kohlman Street?

874

1  A.   Yes.

2  Q.   If we could go to Exhibit 35?  Do you see Kohlman Street

3  on Exhibit 35?

4  A.   I do, yes.

01:28:36PM 5  Q.   Okay.  And where is that on the map?

6  A.   Right here.

7  Q.   Okay. So you've made a green line on the street that says

8  Kohlman Street that's just below Burbank Street?

9  A.   That's correct.

01:28:48PM 10  Q.   And what happened that day on Kohlman Street?

11  A.   I -- I met -- I was meeting Cano on that particular day

12  and when I arrived he didn't have what I -- what I wanted at

13  the time.

14  Q.   Who didn't have what you wanted?

01:29:13PM 15  A.   Cano didn't have -- I know I wanted at least a few

16  bundles.  Cano didn't have what I wanted on his person.  So he

17  had told me that he had to call the boss.

18  Q.   Okay.

19  A.   A few minutes later Pepe turned the corner off of North

01:29:31PM 20  Clinton Avenue.

21  Q.   I'd like to show you what's been received into evidence as

22  Exhibit 15.  Is this the individual that you knew as Cano?

23  A.   It is, yes.

24  Q.   And is that who you were meeting on Kohlman Street that

01:29:50PM 25  day?

1    A.    Yes.

2    Q.    Okay. If we could go back to 35, please.    Thank you.    All

3    right.    Now, you said the defendant turned off of Clinton

4    Avenue and turned onto Kohlman Street?

01:30:02PM 5    A.    That's correct.

6    Q.    And was that after Cano said I got to call the boss?

7    A.    Yes.

8    Q.    Did Cano make a phone call?

9    A.    He did, yes.

01:30:10PM 10    Q.    What kind of car was the defendant operating?

11    A.    It was a Nissan Altima, grayish color.    It was like kind

12    of a different color.

13    Q.    And what happened when the defendant showed up in that

14    Nissan Altima?

01:30:30PM 15    A.    Just before he had turned on to the street, Cano got out

16    of my vehicle and started to walk towards the end of Kohlman

17    towards North Clinton Avenue.    Pepe had turned the corner, I

18    watched him pass a bag out and then Cano began to walk back

19    towards my vehicle.

01:30:52PM 20    Q.    Okay. So Cano walked to the defendant's car?

21    A.    Yes.

22    Q.    And you said you saw him hand a bag out.    Who handed the

23    bag to who?

24    A.    I saw Pepe hand the bag to Cano.

01:31:07PM 25    Q.    Okay. Pepe meaning the defendant?

876

1  A.    Correct.

2  Q.    Okay. And after the defendant handed the bag to Cano, what

3  happened next?

4  A.    Cano began to walk back towards my vehicle to bring the

01:31:18PM 5  drugs back to me and Pepe began to drive towards me.  I was

6  parked on the side of the road on Kohlman.  And he was headed

7  towards Remington Street.  As he was approaching my vehicle he

8  pulled up and rolled his window down and said that we needed

9  to stop doing this on the side of the street like this.

01:31:42PM 10  Q.    Okay. So before the defendant got to you, did Cano bring

11  you the bag that he had received from the defendant?

12  A.    He didn't make it back to my vehicle yet.

13  Q.    So before Cano got to you the defendant pulled up beside

14  you?

01:31:57PM 15  A.    Yes.

16  Q.    And said we got to stop doing this on the side of the road

17  or something like that?

18  A.    Correct.

19  Q.    What did you take that to mean?

01:32:04PM 20         **MR. VERRILLO:** Objection.

21         **THE COURT:** Overruled.  He can say what he meant.

22  Go ahead.

23         **THE WITNESS:** That he wanted me to start going to

24  like a certain location rather than having to meet me on the

01:32:20PM 25  side of the road.

877

BY MS. KOCHER:

Q.   Okay.  Now, on this occasion were you buying multiple bundles of cocaine and heroin?

A.   Yes.

01:32:30PM  Q.   After the defendant said we got to stop doing it like this, what happened?

A.   He gave me a contact, a phone number.

Q.   Okay. Did you take that to mean you were to deal with him directly?

01:32:43PM  A.   I did, yes.

Q.   Okay. What happened next?

A.   I left.  I went back home.

Q.   Okay. Did Cano bring you anything before you left?

A.   He did, yes.

01:32:56PM  Q.   What did Cano bring you?

A.   He brought me back several -- there were several bundles of heroin and some -- and cocaine as well.

Q.   Okay. Now, at the time of this interaction, how long had you been going to Burbank to buy cocaine and heroin?

01:33:18PM  A.   Over a year.  It was over a year.

Q.   Okay. So it had been quite some time and you were consistently going there?

A.   That's correct, yes.

     **MS. KOCHER:** Judge, I think we're a little past

01:33:30PM  1:30.  I was going to go to a different area.  I'm not sure if

1    this would be a good time to break.

2              **THE COURT:** Ladies and gentlemen, at this time we'll

3    take a recess until tomorrow morning.  Tomorrow morning we'll

4    begin at 8:30 and proceed until 1:30.

01:33:49PM  5              In the meantime, I'd ask you not discuss the matter

6    or allow anybody to discuss the matter with you.  The jury may

7    step down, we'll stand in recess.  Thank you.

8              (**WHEREUPON**, proceedings adjourned at 1:35 p.m.)

9                        *   *   *

10                   __CERTIFICATE OF REPORTER__

11

12              In accordance with 28, U.S.C., 753(b), I certify that

13   these original notes are a true and correct record of

14   proceedings in the United States District Court for the

15   Western District of New York before the Honorable Frank P.

16   Geraci, Jr. on November 1st, 2021.

17

18   S/ Christi A. Macri

19   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
20   Official Court Reporter

21

22

23

24

25