1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NEW YORK

3

4

5  - - - - - - - - - - - - -X
   UNITED STATES OF AMERICA              18-CR-6094(G)
6
   vs.
7                                         Rochester, New York
   XAVIER TORRES,                         November 2, 2021
8              Defendant.                 8:30 a.m.
   - - - - - - - - - - - - - -X
9                                         **VOLUME 10**

10                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                 UNITED STATES DISTRICT JUDGE

12

                   JAMES P. KENNEDY, JR., ESQ.
13                 United States Attorney
                   BY: ROBERT A. MARANGOLA, ESQ.
14                     CASSIE M. KOCHER, ESQ.
                   Assistant United States Attorneys
15                 500 Federal Building
                   Rochester, New York 14614
16                 Appearing on behalf of the United States

17

                   MAURICE J. VERRILLO, ESQ.
18                 3300 Monroe Avenue
                   Suite 301
19                 Rochester, New York 14618
                   Appearing on behalf of the Defendant
20

21

22

23  COURT REPORTER:      Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                         Christimacri50@gmail.com
24                       Kenneth B. Keating Federal Building
                         100 State Street, Room 2640
25                       Rochester, New York 14614

880

1                          **I N D E X**

2

**WITNESS FOR THE GOVERNMENT**

3

Ronald Standish

4       Direct examination by Ms. Kocher              Page   881
        Cross-examination by Mr. Verrillo            Page   970

5       Redirect examination by Ms. Kocher           Page   993
        Recross-examination by Mr. Verrillo          Page  1002

6

7   Allen Smith
        Direct examination by Mr. Marangola          Page  1004

8       Cross-examination by Mr. Verrillo            Page  1023
        Redirect examination by Mr. Marangola        Page  1024

9

10

**EXHIBIT**              **RECEIVED**

11

Government 206              889

12  Government 225A             891
    Government 217              918

13  Government 224              919
    Government 208, 209         921

14  Government 216, 218         921
    Government 227              927

15  Government 205              931
    Government 228-229          933

16  Government 220-221          934
    Government 64               943

17  Government 197              954
    Government 187-188         1006

18  Government 189-191         1014
    Government 193             1017

19  Government 200             1019
    Government 195             1021

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2                    *    *    *

3              **(WHEREUPON**, the defendant is present).

4              **THE COURT:** Good morning.  .

08:51:52AM 5              **MS. KOCHER:** Good morning, Judge.

6              **MR. VERRILLO:** Good morning, Your Honor.

7              **MR. MARANGOLA:** Good morning.

8              **THE COURT:** I understand you want to discuss

9    scheduling before we begin?

08:55:39AM 10              **MR. MARANGOLA:** Yes, Judge.  We anticipate after

11   Mr. Standish this morning we'll have two additional

12   witnesses -- they're Buffalo police officers, Detective Shawn

13   Adams and Lieutenant Allen Smith; they will be pretty brief

14   witnesses.

08:55:54AM 15              But we advised defense counsel that they're going

16   to be our last two witnesses, so we would plan -- if we can

17   get to them today, that would be great since they will be

18   coming from Buffalo -- but we plan to rest after they are

19   finished testifying.

08:56:10AM 20              **THE COURT:** Okay.

21              **MR. MARANGOLA:** So if we do finish them today, I

22   spoke to Mr. Verrillo in terms of proceeding forward.  I

23   think assuming -- I guess we have to have a confirmation from

24   the defendant about his position if he wishes to testify, but

08:56:28AM 25   if not, then I don't believe there will be a defense case.  So

1    maybe we could have a charge conference tomorrow at some point

2    and then possibly plan to close and charge the jury on

3    Thursday, if that would work for the Court?

4              **THE COURT:** Okay.  I think we have a short schedule

08:56:47AM 5    tomorrow, don't we?

6              **MR. MARANGOLA:** I don't remember tomorrow.  I know

7    we start a little bit later tomorrow, 9:30.  I can't remember

8    what the end time is.

9              **THE COURT:** We got four hours.

08:56:59AM 10             We can do that, Mr. Verrillo?

11             **MR. VERRILLO:** Yes, that's fine.

12             **THE COURT:** What do you think --

13             **MR. VERRILLO:** Well, I had one witness, Your Honor.

14   Because there's no issue as to the statement, he's not going

08:57:08AM 15   to be necessary because that was related to that.

16             So the final issue will be just confirming my

17   client his wishes, and we can maybe do that at the end of

18   today to verify that.

19             **THE COURT:** Great, that makes sense.

08:57:20AM 20             **MR. MARANGOLA:** Thank you.

21             **THE COURT:** I'll step down and we'll bring the jury

22   up and we can proceed.  Your witness is here?

23             **MR. MARANGOLA:** Yes.

24             **MS. KOCHER:** Yes.

09:02:06AM 25             (**WHEREUPON**, there was a pause in the proceeding).

1           (**WHEREUPON**, the jury is present; the defendant is

2 present).

3        **THE COURT:** Good morning, members of the jury.

4 Ready to proceed, you may recall your witness.

09:04:25AM 5        **MS. KOCHER:** Thank you, Your Honor.  The Government

6 recalls Ron Standish.

7        **THE WITNESS:** Good morning, Your Honor.

8        **THE COURT:** Good morning.  Mr. Standish, I remind

9 you you remain under oath and you may remove your mask since

09:05:04AM 10 you're behind plexiglas.  You may proceed.

11        **MS. KOCHER:** Thank you.

12 **BY MS. KOCHER:**

13 Q.   Good morning, Mr. Standish.  Welcome back.

14 A.   Thank you.

09:05:14AM 15 Q.   Yesterday you were telling the jury about a time you were

16 on Kohlman Street and you had some interaction with the

17 defendant.  Do you recall that?

18 A.   Yes.

19 Q.   Now, you talked about how you were meeting Cano on Kohlman

09:05:28AM 20 Street that day?

21 A.   That's correct.

22 Q.   How did you come to meet Cano on Kohlman Street?

23 A.   He was walking around the block.  I don't recall whether I

24 texted him or not, but I picked him up and we were circling

09:05:43AM 25 the block.

1  Q.    Okay.  Why did you pick him up and circle the block?

2  A.    He got into my vehicle so that I could purchase heroin and

3  cocaine from him.

4  Q.    Okay. And that's when you found out he didn't have enough

09:05:56AM 5  for you?

6  A.    That's correct.

7  Q.    Was it a common occurrence for you to buy on Kohlman

8  Street like that?

9  A.    No, no.

09:06:05AM 10  Q.    Okay. Do you know about how many times that happened?

11  A.    I believe just the once.

12  Q.    Just that one time?

13  A.    Yes.

14  Q.    Now, was that -- you also mentioned you saw the defendant

09:06:17AM 15  in an Altima that day?

16  A.    That's correct.

17  Q.    Had you seen him in other vehicles during your frequent

18  trips to Burbank?

19  A.    I recall a maroon 300 -- Chrysler 300 with tinted windows.

09:06:35AM 20  Q.    Okay. And did you see him driving that car?

21  A.    I did, yes.

22  Q.    Okay. Now, while you were on Kohlman Street that day the

23  defendant made some comment like we got to stop meeting like

24  this or something to that effect; is that correct?

09:06:51AM 25  A.    That's correct.

1   Q.   Okay. So what happened or how did you meet to buy cocaine

2   and heroin after that incident on Kohlman Street?

3   A.   I would -- I'm not quite sure I understand.

4   Q.   Sure.  So after the defendant told you we have to stop

09:07:09AM 5   meeting on the street like this, did you change how you bought

6   heroin and cocaine from the defendant and others?

7   A.   Yeah.  I started going to a house that was on Thomas

8   Street --

9   Q.   Okay.

09:07:23AM 10   A.   -- at that point.

11   Q.   How did you end up going to a house on Thomas Street?

12   A.   I was directed to go there by Pepe.

13   Q.   Okay. After that incident on Kohlman Street did you

14   continue to buy cocaine and heroin on Burbank?

09:07:40AM 15   A.   No, I did not.

16   Q.   Okay. You started going to the Thomas Street area?

17   A.   Yes.

18   Q.   Okay. I believe yesterday you had made reference that you

19   got some phone numbers from some of the people that you were

09:07:53AM 20   buying cocaine and heroin from; is that correct?

21   A.   That is correct.

22   Q.   Who were some of the people that gave you phone numbers to

23   contact them at?

24   A.   I believe everyone.  I had a number for Rafi; a number for

09:08:10AM 25   Cano; a number for Cono; and a number for Pepe which that

```
 1  phone number was shared between him and who I believed was his
 2  brother.
 3  Q.   I'd like to pull up Government's Exhibit 1 that's been
 4  received into evidence.  Mr. Standish, can you see
 5  Government's Exhibit 1?
 6  A.   Yes.
 7  Q.   Would you mind circling the people that you received
 8  contact numbers from?  So you've circled five individuals.
 9  You circled the defendant's photo and that's in the third row
10  fourth from the left?
11  A.   That's correct.
12  Q.   Okay. And you also circled the individual next to him in
13  the black shirt.  Who was that individual?
14  A.   I knew him as Pepe's brother.
15  Q.   Okay. Did you have an actual name for him?
16  A.   I did not, no.
17  Q.   Okay. Do you know if the defendant and the male in the
18  black T-shirt -- in the black shirt were actually brothers?
19  A.   I do not, no.
20  Q.   Were they together often?
21  A.   Quite, yes, quite often.
22  Q.   How often would you say you saw them together?
23  A.   More than 75% of my encounters.
24  Q.   They were together?
25  A.   Yes.
```

09:08:54AM (line 5)
09:09:22AM (line 10)
09:09:37AM (line 15)
09:09:50AM (line 20)
09:10:05AM (line 25)

1  Q.   And when you say your "encounters," is that your

2  encounters on Burbank Street?

3  A.   Yes, to purchase drugs.

4  Q.   Okay. Now, you've also circled in the bottom row the male

09:10:20AM 5  to the left in the blue hooded sweatshirt.  Who did you know

6  that person as?

7  A.   As Rafi.

8  Q.   Okay. And the individual to the right of him in the red

9  T-shirt?

09:10:30AM 10  A.   As Flaco.

11  Q.   And Flaco also gave you a phone number?

12  A.   Yes.

13  Q.   And finally the person in the bottom row to the far right,

14  who was that person?

09:10:41AM 15  A.   Cono.

16  Q.   And he also gave you a phone number to reach him at to

17  purchase drugs?

18  A.   That's correct.

19  Q.   Now, did you actually see what type of phones these

09:10:53AM 20  individuals that you've circled used?

21  A.   It was always like a flip phone, like a -- I don't know, a

22  prepaid-type flip phone.

23  Q.   Okay.

24  A.   Cheap one.

09:11:07AM 25  Q.   And you mentioned earlier one number that you were given

1  was actually shared between Pepe and his brother?

2  A.    Yes.

3  Q.    Did that happen with any of the other numbers that you had

4  been given by the other individuals you circled?

09:11:22AM 5  A.    No.

6  Q.    All right. Now, yesterday -- I'd like to show you what's

7  been received as Exhibit 214.   Thank you, Ms. Rand.

8            You recognize the phone in Exhibit 214?

9  A.    Yes.

09:11:46AM 10  Q.    And how do you recognize that phone?

11  A.    That is my cell phone.

12  Q.    That's an iPhone?

13  A.    Yes.

14  Q.    And was that one of the phones that you used while you

09:11:57AM 15  went to purchase cocaine and heroin from Burbank?

16  A.    It is, yes.

17  Q.    I'd like to show you what's not been received into

18  evidence as Exhibit 206.   Do you recognize the phone in this

19  photograph?

09:12:13AM 20  A.    I do.   That is -- it was at the time my wife's phone which

21  I began using.

22  Q.    Okay. And what type of phone is this?

23  A.    It's a Samsung.   I'm not sure the model.

24  Q.    Okay.   So was this another phone that you would use when

09:12:30AM 25  you were purchasing cocaine and heroin in the Burbank Street

1  area?

2  A.   Yes.

3  Q.   Okay. Now, yesterday you mentioned a few phone numbers.

4  The iPhone that we reviewed yesterday had the phone number

09:12:45AM 5  590-1860?

6  A.   Yes.

7  Q.   And do you know what phone number was associated with this

8  Samsung in Exhibit 206?

9  A.   For the blue phone here?

09:12:58AM 10  Q.   Yes.

11  A.   585-281-1806.

12  Q.   Now, is the phone in Exhibit 206 fairly and accurately

13  depicted the way that the Samsung looked when you used it?

14  A.   Yes.

09:13:14AM 15          **MS. KOCHER:** Your Honor, I'd offer Exhibit 206.

16          **MR. VERRILLO:** No objection.

17          **THE COURT:** Exhibit 206 will be received.

18          (**WHEREUPON**, Government Exhibit 206 was received

19  into evidence).

09:13:22AM 20  **BY MS. KOCHER:**

21  Q.   All right. Now, you mentioned that your wife used this

22  phone for a time?

23  A.   Yes, that's correct.

24  Q.   And those text messages that we reviewed yesterday between

09:13:38AM 25  you and your wife, the phone number she was using, was that

1    the 281-1806?

2    A.    That's correct.

3    Q.    Okay. And at some point you began using that phone number

4    and this phone?

09:13:52AM 5    A.    Yes.

6    Q.    Why did you start using this phone?

7    A.    My -- the 590-1860 number was shut off due to not paying

8    the bill.

9    Q.    Okay. Now, did you come to find out that law enforcement

09:14:09AM 10    collected this phone when you were arrested in June of 2016?

11    A.    Yes.

12    Q.    And did you also learn that they performed an extraction

13    on this phone?

14    A.    I did, yes.

09:14:18AM 15    Q.    Now, I'd like to show you what's not been received into

16    evidence as Exhibit 225A.  If we could zoom in on the center

17    portion so we can see some of the identifying information here

18    a little better.  Do you recognize the report that's marked as

19    Exhibit 225A?

09:14:51AM 20    A.    Yes, I do.

21    Q.    Okay. And how do you recognize this report?

22    A.    It is the extraction from the blue cell phone with the

23    281-1806 number.

24    Q.    Okay. This is the extraction report for that blue phone

09:15:06AM 25    that was depicted in Exhibit 206?

1  A.    Yes.

2  Q.    Okay. And this was a phone that you were using when you

3  were purchasing drugs in the Burbank area and after?

4  A.    Correct.

09:15:18AM 5  Q.    Okay.

6              **MS. KOCHER:** Your Honor, at this time I'd like to

7  read from the stipulation, which states Government Exhibit 225

8  is a blue Samsung flip phone with phone number 585-281-1806

9  that was seized in Albion, New York on June 8th, 2016.

09:15:42AM 10         Government Exhibit 225A is the device data report

11  containing the data forensically retrieved from Government

12  Exhibit 225.

13              Your Honor, at this time I would offer

14  Exhibit 225A.

09:15:56AM 15              **MR. VERRILLO:** No objection.

16              **THE COURT:** Exhibit 225A will be received.

17              (**WHEREUPON**, Government Exhibit 225A was received

18  into evidence).

19  **BY MS. KOCHER:**

09:16:14AM 20  Q.    Now, Mr. Standish, you see we have a section of the front

21  page blown up that includes the categories logical and

22  physical.  Do you see under the logical category where it says

23  user name?

24  A.    Yes.

09:16:35AM 25  Q.    Okay. Can you circle that on your monitor?  And what is

1  the user name for this extraction report?

2  A.   585-281-1806.

3  Q.   Okay. And that was your phone number?

4  A.   Yes.

09:16:51AM 5  Q.   Now, I'd like to turn to page 3 of Exhibit 225A.  Can you

6  tell what's listed on page 3?

7  A.   Appears it is a contact list.

8  Q.   And is this the contact list from that blue Samsung phone?

9  A.   It is, yes.

09:17:19AM 10  Q.   If we could zoom in on entries -- entry 13.  Now, what is

11  the contact entry No. 13 for this phone?

12  A.   The name is Cono.  It was created 11/30/2015.

13  Q.   Okay. And there's a phone number listed there as well?

14  A.   With a phone number 635-6291.

09:17:48AM 15  Q.   Okay. Do you recognize who gave you that -- do you know

16  who gave you that contact phone number?

17  A.   Cono.

18  Q.   If we could go back to Exhibit 1.  Is Cono who gave you

19  that contact name on Exhibit 1?

09:18:05AM 20  A.   Yes.

21  Q.   Could you circle his photo?  You've circled the individual

22  in the bottom row to the far right; is that correct?

23  A.   That's correct.

24  Q.   About how long were you dealing with Cono?

09:18:17AM 25  A.   Not very long.  Approximately a month or so.

1  Q.   Okay. And was that on Burbank Street?

2  A.   It was, yes.

3  Q.   Do you recall where on Burbank Street you bought drugs

4  from him?

09:18:37AM 5  A.   I believe it was at the end, like in the -- there was an

6  empty lot at the end just before you come to Clinton.

7  Q.   Okay. If we could go to Government's Exhibit 35.  Do you

8  see that empty lot on Exhibit 35?

9  A.   I do, yes.  Yes, I do.

09:19:01AM 10  Q.   Could you make an X in the general area?  So you've made a

11  mark that would be on the north side of Burbank Street to the

12  right -- I'm sorry, to the left of the house with the 6 on it

13  and to the right of a larger building at the corner of North

14  Clinton Avenue?

09:19:24AM 15  A.   That's correct, yes.

16  Q.   Okay. Now, yesterday you talked about purchasing cocaine

17  and heroin from a U-Haul?

18  A.   That's correct.

19  Q.   Is that about the general area where the U-Haul was

09:19:36AM 20  parked?

21  A.   Yes, fairly close.  Would you like me to mark?

22  Q.   Sure.

23  A.   The U-Haul was like up in here.

24  Q.   Okay. Make sure you can keep that microphone close to you.

09:19:48AM 25  A.   Okay.

1  Q.   It's hard when you're looking at the monitor.  So you've

2  made a mark just to the right of where your first mark was and

3  the second mark is to the left of the house with the 6 on the

4  roof; is that correct?

09:20:02AM 5  A.   That's correct.

6  Q.   Okay. So when you buy -- when you would buy from Cono was

7  it just out on the street?

8  A.   Yes.

9  Q.   Okay. I'd like to go back to Exhibit 225A, page 3 and if

09:20:20AM 10  we could highlight entry No. 11.  What is the contact entry

11  No. 11 in this phone?

12  A.   The name is Bur, it was created March 22nd, 2016.  And the

13  phone number is 851-4728.

14  Q.   Bur is spelled B-U-R?

09:20:47AM 15  A.   Correct.

16  Q.   Okay. And do you recall who gave you that contact

17  information?

18  A.   I do not, no.

19  Q.   How do you know this was a contact number for -- to

09:21:00AM 20  purchase cocaine or heroin from the Burbank area?

21  A.   Bur is short, it's short for Burbank.  It's just -- it's

22  the way I entered it into the phone.

23  Q.   Okay. That's how you saved it into the phone, that's how

24  you know?

09:21:18AM 25  A.   Correct.

1    Q.    Okay. Next I'd like to go on to entry 28, which I believe

2    is on page 4 of Exhibit 225.  Do you recognize the contact

3    entry No. 28?

4    A.    I do, yes.

09:21:35AM 5    Q.    And what is that entry?

6    A.    The name is Thomas, created April 26th, 2016, the phone

7    number is 585-203-2998.

8    Q.    Okay. And is that another contact that you saved into the

9    phone so that you could purchase cocaine and heroin?

09:21:54AM 10    A.    It is, yes.

11    Q.    Do you recall who gave you that contact info?

12    A.    Pepe.

13    Q.    Okay. When you say Pepe, who is that?

14    A.    The defendant.

09:22:04AM 15    Q.    Now, when you would call this Thomas number, who would

16    answer?

17    A.    It was either Pepe or who I believed to be his brother.

18    Q.    Okay. If we could go back to Exhibit 1.  Could you please

19    circle Pepe and his brother?  You've circled two individuals

09:22:38AM 20    in the third row.  Who is who?

21    A.    The third row down, third photograph in is who I believed

22    to be his brother; and the fourth photograph in is Pepe.

23    Q.    All right. Now, if we could go to Exhibit 225A, page 4,

24    I'd like to zoom in on entries 24 and 25.  Starting with entry

09:23:14AM 25    No. 24, what is that contact information?

1  A.    The name is P, created 5/26/2016, the phone number is

2  585-287-0240.

3              And contact No. 25 the name is Pepe, created

4  6/6/2016, the phone number is 716-468-0306.

09:23:42AM 5  Q.    Okay. Now, who gave you those contact names and phone

6  numbers?

7  A.    The defendant gave me both of those contact names.

8  Q.    And both of those phone numbers?

9  A.    Yes.

09:23:53AM 10  Q.    So starting with entry No. 24, the name P, when you would

11  contact or use that phone number who would answer the phone?

12  A.    The defendant himself.

13  Q.    Okay. And entry No. 25 was created on June 6th, 2016?

14  A.    Correct.

09:24:19AM 15  Q.    When were you arrested?

16  A.    June 8th, 2016.

17  Q.    So just two days later?

18  A.    Yes, this is two days prior to me being arrested.

19  Q.    Okay.  And the defendant gave you that 716-468-0306 phone

09:24:38AM 20  number?

21  A.    That's correct.

22  Q.    I'd next like to show you or zoom in on entry No. 26.  You

23  mentioned that you were using this phone.  Entry No. 26

24  contact name is Ron?

09:24:58AM 25  A.    That's correct.

1  Q.   There's a different phone number there?

2  A.   Yes.  That's actually -- that's my father.

3  Q.   So you're a junior?

4  A.   I am a junior, yes.

09:25:12AM 5  Q.   All right. Now, Mr. Standish, you mentioned that that time

6  on Kohlman Street where the defendant told you we got to stop

7  meeting like this was the last time that you went to the

8  Burbank area to purchase cocaine and heroin?

9  A.   That's correct, yes.

09:25:24AM 10  Q.   So where did you start going after Burbank Street?

11  A.   I began going to Thomas Street.

12  Q.   Okay. And why did you -- who told you to go to Thomas

13  Street?

14  A.   The defendant.

09:25:38AM 15  Q.   Did he tell you why?

16  A.   I was told that Burbank Street was hot and they were

17  moving, they were relocating.

18  Q.   All right. When he said Burbank Street is hot, what did

19  you take that to mean?

09:25:55AM 20  A.   Meaning that law enforcement was present.

21  Q.   Were you ever aware of any houses on Burbank being

22  searched by the police?

23  A.   I was aware that there was a search, yes.

24  Q.   How did you know that?

09:26:12AM 25  A.   I was told by the defendant.

1  Q.   I'd like to show you what's not been received -- I'm

2  sorry, it is in evidence, Exhibit 63.  Do you recognize the

3  building in this photograph?

4  A.   I do, yes.

09:26:40AM 5  Q.   And how do you recognize that house?

6  A.   That is the house that I was buying drugs from.

7  Q.   Okay. And when I say the house, I'm referring to the

8  yellow and brown house in the center of the photo.

9  A.   That's correct.

09:26:54AM 10  Q.   Okay. Now, when you say that's the house you were buying

11  drugs from, where is that house located?

12  A.   That house is located on Thomas Street.

13  Q.   Okay. Do you recall about when you started going to Thomas

14  Street to purchase cocaine and heroin?

09:27:10AM 15  A.   The end of April, early May.

16  Q.   Okay. Now, before testifying have you had a chance to

17  review some text messages and those phone extractions that we

18  were just looking at?

19  A.   I did, yes.

09:27:26AM 20  Q.   Okay. And have those helped you remember the timeline of

21  events and when you moved to buy cocaine and heroin at

22  different locations?

23  A.   Yes.

24  Q.   Okay. Now, when the defendant told you they were moving up

09:27:40AM 25  to Thomas Street, why did you follow them and go to Thomas

1  Street?

2  A.    I said it before, I was used to the drugs that -- the

3  heroin that he had in particular; the other places that I had

4  tried, it made me cough and sneeze and I didn't like it.

09:28:03AM 5  Q.    Okay.

6  A.    It was consistent.

7  Q.    Now, when you were going to this house on Thomas Street

8  what would you purchase?

9  A.    Both heroin and cocaine.

09:28:12AM 10  Q.    And how were they packaged?

11  A.    The same exact way that they were on Burbank Street.

12  Q.    What was the same about the drugs that you purchased on

13  Thomas Street as the drugs you purchased on Burbank?

14  A.    They were the same wax paper bags, they were folded and

09:28:29AM 15  taped the same way, within a black ziplock bag.

16  Q.    Okay. And when you described the wax paper bag and the

17  black ziplock bag, is that the heroin you're talking about?

18  A.    Yes.

19  Q.    How about the cocaine?  Did you notice any similarities

09:28:44AM 20  about how the cocaine that you bought on Thomas Street was

21  packaged as compared to the cocaine that you purchased on

22  Burbank?

23  A.    Cocaine was the same as well.  The little clear bags with

24  the little dice on them, and they were sealed at the top.

09:29:01AM 25  Q.    And how were they sealed?

1   A.   It appeared that -- it looked like a lighter was -- it was

2   burnt.

3   Q.   The top had been melted?

4   A.   Correct.

09:29:11AM 5   Q.   Do you recall what type of stamps, if any, were on the

6   heroin that you would buy from Thomas Street?

7   A.   I know that the blue magic stamp was around at that time.

8   Q.   Okay. So some of the heroin that you purchased from Thomas

9   Street had that blue magic stamp on it?

09:29:34AM 10   A.   Correct.

11   Q.   Had you purchased -- did you recognize the blue magic

12   stamp from anywhere else?

13   A.   I did.  From Burbank Street.

14   Q.   So you also bought heroin with the blue magic stamp on

09:29:46AM 15   Burbank Street?

16   A.   Correct.

17   Q.   By the way, I showed you quite a few different stamps or

18   logos yesterday?

19   A.   Right.

09:29:59AM 20   Q.   Was that all of the stamps that you saw when you were

21   buying on Burbank Street?

22   A.   No, no.

23   Q.   Okay. That was just some of them?

24   A.   That was some of them.

09:30:08AM 25   Q.   Now, for about how long were you purchasing cocaine and

1 heroin from Thomas Street?

2 A.   About a month or so.

3 Q.   Not too long?

4 A.   No.

09:30:22AM 5 Q.   Who would you purchase from at this location?  What

6 people?

7 A.   Either Cono, Pepe or his brother.

8 Q.   Okay. And how often were you going to Thomas Street to buy

9 cocaine and heroin?

09:30:39AM 10 A.   Every -- just about every day, every other day.

11 Q.   You mentioned you would buy from the defendant at this

12 location?

13 A.   Correct, yes.

14 Q.   Did you see him there often?

09:30:52AM 15 A.   Yes.

16 Q.   About how often when you went?

17 A.   More than -- more than 80% of the time.

18 Q.   Okay. Now, how would it work when you would go to Thomas

19 Street?  Where would you go to purchase the cocaine and

09:31:07AM 20 heroin?

21 A.   I bought both outside and inside of the house.  When I

22 bought outside, they would either walk -- they would walk to

23 the side of the house and it was underneath the siding; and

24 when I bought inside the house I would go through the door and

09:31:28AM 25 there was a stairwell there and it was at the bottom of the

1  stairs.

2  Q.    Okay. Now, you mentioned when you were outside you would

3  watch who go to the side of the house?

4  A.    Either Pepe, his brother or Cono.  All three of them.

09:31:46AM 5  Q.    Okay. Where would they go?

6  A.    Right there.

7  Q.    Okay. So you placed a green mark on the right side of the

8  house?

9  A.    Correct.

09:31:57AM 10  Q.    And what would they do when they went to the side of the

11  house?

12  A.    They would reach -- like reach up in underneath the

13  siding, the siding would pull out a little bit and they could

14  reach up in there.

09:32:08AM 15  Q.    And then what would happen?

16  A.    They would pull out a bag of drugs and sell me the drugs.

17  Q.    Okay. You would give them money for the drugs?

18  A.    Correct.

19  Q.    Now, those people that you purchased cocaine and heroin

09:32:26AM 20  from at this location -- the defendant, the person you know as

21  his brother, and Cono -- were those the same people you had

22  dealt with on Burbank Street?

23  A.    Yes, yes.

24  Q.    Okay. Did you recognize any other people when you were up

09:32:44AM 25  at Thomas Street?

1  A.   I recognized vehicles in passing, people that I had seen

2  on Burbank, users.

3  Q.   So you saw some of the same users up on Thomas Street?

4  A.   Yes.

09:33:00AM 5  Q.   That you had seen on Burbank; is that correct?

6  A.   Yes, that is correct.

7  Q.   All right. Now, you mentioned that you were only

8  purchasing cocaine and heroin at Thomas Street for -- I think

9  you said about a month.  Did you go somewhere after Thomas

09:33:25AM 10  Street?

11  A.   After Thomas Street I began going to an apartment complex

12  on North Clinton Avenue, and that's where I began buying

13  drugs.

14  Q.   I'd like to show you what's been received into evidence as

09:33:41AM 15  Exhibit 62.  Do you recognize the buildings in this

16  photograph?

17  A.   I do, yes.

18  Q.   And how do you recognize them?

19  A.   I bought both heroin and cocaine from this apartment

09:33:59AM 20  complex.

21  Q.   Is this the apartment complex that you were just

22  describing that you started buying from after Thomas Street?

23  A.   Yes, that's correct.

24  Q.   Okay. How did you end up going to this apartment complex?

09:34:10AM 25  A.   I was directed by the defendant to go there.

1    Q.    And did he tell you why --

2    A.    He did not.

3    Q.    -- to go there?

4    A.    No.

09:34:21AM  5    Q.    And, again, why did you follow the defendant to these

6    apartments from Thomas Street?

7    A.    Same reason.  I was used to the heroin and cocaine that I

8    was getting.

9    Q.    Okay. Who would you meet with when you would go buy

09:34:40AM 10    cocaine and heroin at this location?

11    A.    At this location I bought from Flaco, Pepe and who I

12    believed to be his brother.

13    Q.    Okay. I'd like to go back to Government's Exhibit 1.  The

14    individual that you knew as Flaco, could you please circle

09:35:02AM 15    him?  And you've circled the male in the bottom row with the

16    red T-shirt on -- or the red shirt on?

17    A.    Correct.

18    Q.    Now, had you purchased from Flaco on Burbank Street as

19    well?

09:35:15AM 20    A.    I did, yes.

21    Q.    What areas on Burbank Street did you buy cocaine and

22    heroin from Flaco at?

23    A.    I bought from him out of the U-Haul truck and I believe

24    the burnt house as well.

09:35:33AM 25    Q.    Okay. And do you know about how many times you purchased

1  from Flaco?

2  A.   Not specifically.  Maybe approximately ten or so.

3  Q.   Okay. Was he somebody that you saw regularly on Burbank

4  Street?

09:35:54AM 5  A.   Yes, yeah.

6  Q.   Okay. And I think he was somebody you identified as having

7  given you a contact number?

8  A.   Correct.

9  Q.   Did you ever see the defendant interact with Flaco?

09:36:08AM 10  A.   Yes.

11  Q.   Can you describe some of those interactions?

12  A.   I couldn't understand what they were saying.

13  Q.   Why not?

14  A.   It was in Spanish.  But it appeared like the defendant was

09:36:28AM 15  telling him what to do or yelling at him --

16           **MR. VERRILLO:** Objection.

17           **THE WITNESS:**  -- kind of.

18           **THE COURT:** Sustained.  That will be stricken.

19  **BY MS. KOCHER:**

09:36:38AM 20  Q.   Specifically what did you see the defendant do when he was

21  interacting with Flaco?

22  A.   Just his tone, his body language appeared to be in a

23  controlling-type manner.

24  Q.   Okay. If we go back to Exhibit 62 -- now, were you buying

09:37:10AM 25  both cocaine and heroin from this location?

1  A.    I was, yes.

2  Q.    And how was the cocaine and heroin that you bought at this

3  apartment complex packaged?

4  A.    I bought both -- both bundles as well as grams.

09:37:31AM 5  Q.    Okay. Now, the bundles, how were the bundles of heroin

6  packaged?

7  A.    The same exact way.  Ten individual bags folded with black

8  ziplock style bag.

9  Q.    Okay. When you say the same way, the same as what?

09:37:48AM 10  A.    The same as both Burbank Street and Thomas Street.

11  Q.    Do you recall any of the stamps on the heroin that you

12  purchased from this apartment complex?

13  A.    I do recall the blue magic, yes.

14  Q.    Okay. And that blue magic was the same stamp that you had

09:38:04AM 15  purchased at Thomas Street and Burbank?

16  A.    That's correct, yes.

17  Q.    How about the cocaine?  How were the bundles of cocaine

18  packaged?

19  A.    The bundles of cocaine they were loose, they would just

09:38:18AM 20  count them out.

21  Q.    Okay. How was the cocaine bagged, though?

22  A.    In the little -- small little ziplock-type bags.

23  Q.    Okay. And was there anything that appeared to be the same

24  about those little ziplock bags of cocaine as the Thomas

09:38:36AM 25  Street and Burbank bags?

1  A.    They were all like burnt --

2  Q.    Okay.

3  A.    -- the top.

4  Q.    Okay. Now, when you were purchasing heroin and cocaine

09:38:46AM 5  from this apartment complex, and it looks like they're called

6  the Lofts apartment complex, from the time --

7  A.    Yes, that's correct.

8  Q.    -- as well as Thomas Street, would you call or text before

9  you would go?

09:39:03AM 10  A.    I would, yes.

11  Q.    Why would you do that?

12  A.    So that -- so that they knew I was coming.  I was driving

13  45 minutes one way and I was trying to get in to the city and

14  out of the city as quick as possible.

09:39:21AM 15  Q.    Okay. I'd like to go to Exhibit 225A, page 57.  And if we

16  could zoom in on line 45 -- I'm sorry, 345.  Now,

17  Mr. Standish, does this page appear to contain text messages

18  that were extracted from the blue Samsung phone?

19  A.    That's correct.

09:39:54AM 20  Q.    Now, we've zoomed in on entry 345.  Now, the second and

21  third columns are blank, but that third column what does that

22  say?

23  A.    The contact name is Thomas, the phone number 203-2998.

24  The time stamp is 5/13/2016 and it appears it's an outgoing

09:40:26AM 25  message.  It's 32 B and 4 G.

1  Q.   So this would be an outgoing text message to that Thomas

2  Street contact?

3  A.   That's correct.

4  Q.   And this Thomas contact, that was the number that you

09:40:45AM 5  would use to contact the defendant or who you knew as his

6  brother?

7  A.   That's correct.

8          **MR. VERRILLO:** Objection, asked and answered.

9          **THE COURT:** Overruled.  The answer will stand.

09:40:52AM10  **BY MS. KOCHER:**

11  Q.   Now, the body of that text message says 32 B and 4 G, what

12  did you mean?

13  A.   32 B stands for boy, which is referring to heroin; and 4 G

14  is referring to cocaine, four bags of cocaine.

09:41:20AM15  Q.   Okay. So the B stands for boy and the G stands for girl?

16  A.   Correct.

17  Q.   Okay. If we could actually go to page 4 of Exhibit 225.

18  This is the beginning of the text messages that were extracted

19  from the phone?

09:41:47AM20  A.   Yes.

21  Q.   Okay. And can you see if we can zoom in on the column, the

22  top column there that will tell us what each column means.

23  The first column there's a number sign; is that correct?

24  A.   Correct.

09:42:03AM25  Q.   And that just delineates the number of entry in the

909

```
 1  extract report?
 2  A.    Correct.
 3  Q.    Then the second column says source; is that correct?
 4  A.    Yes.
 5  Q.    The third says from; is that correct?
 6  A.    Yes.
 7  Q.    That would be whatever number was sending the message or
 8  call?
 9  A.    That's correct.
10  Q.    And then the fourth column says to; is that correct?
11  A.    Yes.
12  Q.    And then there's a time stamp column and a content column?
13  A.    That's correct.
14  Q.    Okay. Thank you.  If we could go to page 56 of the
15  extraction report and zoom in on lines 343 to 339.  Okay, Mr.
16  Standish, does this appear to be another series of text
17  messages between you and that Thomas Street contact?
18  A.    It does, yes.
19  Q.    And what's the time stamp on these messages?
20  A.    Line 339 the time stamp is 5/17/2016.
21             Line 340 the time stamp is 5/17/2016.
22             Line 341 the time stamp is 5/16/2016.
23             And line 342 the time stamp is 5/16/2016.
24  Q.    Okay. So these are actually in reverse chronological
25  order?
```

09:42:12AM   (line 5)
09:42:22AM   (line 10)
09:42:42AM   (line 15)
09:43:11AM   (line 20)
09:43:38AM   (line 25)

1   A.   It does appear that way, yes.

2   Q.   So the bottom entry would actually be the first message --

3   A.   Correct.

4   Q.   -- in the string?

09:43:46AM 5   A.   Yes, correct.

6   Q.   Now, starting at the bottom there, line 342, actually I

7   think if we could include 343 as well.  Okay, so that bottom

8   entry starting at line 342 looks like you got an incoming text

9   from the Thomas number that says 24 ND 2 question mark; is

09:44:25AM 10   that correct?

11   A.   Yes.

12   Q.   What did you take that message to mean?

13   A.   I was being asked if I wanted 24 bags of heroin and 2 bags

14   of cocaine.

09:44:38AM 15   Q.   Okay. And how do you know that it was heroin first and

16   cocaine second, 24 bags of heroin versus 24 bags of cocaine?

17   A.   I always bought more heroin than cocaine.

18   Q.   Okay. And you responded yeah to that message?

19   A.   Correct.

09:44:54AM 20   Q.   And then on May 16th at about 3:06 p.m. you sent a

21   text message that said I'm here?

22   A.   Correct.

23   Q.   To the Thomas number?

24   A.   That's correct.

09:45:11AM 25   Q.   Okay. And line -- entry line 340 it appears that the

1 Thomas contact texted you; is that correct?

2 A.    Yes.

3 Q.    And what did -- what was that text message?

4 A.    It said don't let this white dude see you.  He is in the

09:45:27AM 5 one driveway.

6 Q.    And you responded okay?

7 A.    Yes.

8 Q.    Is this a typical kind of conversation you would have when

9 you were going to Thomas Street or the Loft apartments to buy

09:45:42AM 10 heroin and cocaine?

11 A.    Yes.

12 Q.    All right. About how long were you purchasing heroin and

13 cocaine from the defendant, the person you knew as the

14 defendant's brother and Flaco at the Loft apartments?

09:46:03AM 15 A.    It wasn't long.  A couple weeks.

16 Q.    Okay. Did there come a time you stopped meeting the

17 defendant in Rochester to buy cocaine and heroin?

18 A.    There was, yes.

19 Q.    And how did that come about?

09:46:17AM 20 A.    I had a conversation with the defendant at the Loft

21 apartment.  I was told that he was leaving the City of

22 Rochester and that if I wanted to continue to deal directly

23 with him, I would have to come to Buffalo.

24 Q.    Okay. Now, we have Exhibit 62 up on the monitors.  Is this

09:46:40AM 25 the apartment complex where you had that conversation with the

1  defendant?

2  A.   It is, yes.

3  Q.   Okay. Did he tell you why he was leaving Rochester?

4  A.   He told me that he had a war going on in Rochester.

09:46:55AM 5  Q.   Okay. Was there anybody else present during this

6  conversation?

7  A.   Who I believed to be his brother and I recall a small

8  child in the back seat of the vehicle.

9  Q.   Okay. So were you in the parking lot when you spoke with

09:47:09AM 10  the defendant?

11  A.   We were, yes.

12  Q.   Okay. Do you recall about when that conversation occurred?

13  A.   Approximately mid-May.

14  Q.   Okay. 2016?

09:47:24AM 15  A.   Yes, 2016.

16  Q.   Now, did the defendant tell you how to contact him when he

17  went to Buffalo?

18  A.   He did through a phone, he gave me a contact number.

19  Q.   Okay. If we could go to Exhibit 225A, page 4, I believe

09:47:55AM 20  it's entry 24.  Now this is that contact that you made for the

21  name P?

22  A.   Correct.

23  Q.   And the creation date was May 26th, 2016; is that correct?

24  A.   That's correct.

09:48:11AM 25  Q.   And who gave you this phone number?

1   A.    The defendant.

2   Q.    Now, if we could go to -- well, actually, Mr. Standish,

3   that day when you met with the defendant and he told you he

4   was going to Buffalo, did you purchase any drugs from him?

09:48:37AM 5   A.    I did, yes.

6   Q.    What did you buy?

7   A.    I bought both heroin and cocaine.

8   Q.    Okay. I'd like to go to page 52 of the extraction, lines

9   316 and 315.  If we could zoom in on those.  Thank you.  Now,

09:48:58AM 10   what is the day of these two messages, Mr. Standish?

11   A.    Both of which occurred on May 26th, 2016.

12   Q.    Okay. Is that the same day that the -- you created the

13   contact P in your phone?

14   A.    It is, yes.

09:49:17AM 15   Q.    Now, starting with line 316, looks like you sent an

16   outgoing text message to P the defendant; is that correct?

17   A.    That is correct, yes.

18   Q.    And what did you say to the defendant in that

19   text message?

09:49:34AM 20   A.    I said now that's what I'm talking about homey, LOL.  I'll

21   be talking to you soon.  Appreciate it man.

22   Q.    And the defendant responded shortly thereafter.  What did

23   he say?

24   A.    He responded no problem pa.  You already know.

09:49:51AM 25   Q.    Okay. What were you telling -- or talking about when you

1  told the defendant now that's what I'm talking about homey?

2  A.   He -- the drugs I bought that day were not in bundle form.

3  They were -- they were in grams.

4  Q.   Okay. Do you recall about how many grams you purchased

09:50:12AM 5  from the defendant that day?

6  A.   I do not, no.

7  Q.   Was it grams amount of heroin and cocaine?

8  A.   Yes.

9  Q.   Okay. Had you purchased gram amounts from the defendant

09:50:26AM 10  before this day?

11  A.   No.

12  Q.   Okay. It had always been in bundle form?

13  A.   It had always been in bundles.

14  Q.   Why did you purchase a gram amount that day?

09:50:43AM 15  A.   I had been asking for gram amounts because I wanted to

16  start getting it cheaper.  So I kind of pushed for that.

17  Q.   Okay.  Now, when you were given a gram amount, how was

18  that packaged?

19  A.   Like a sandwich bag, twisted and knotted up.

09:51:09AM 20  Q.   So it would be loose powder?

21  A.   Correct.

22  Q.   As opposed to being in those individual bags already?

23  A.   That's correct.

24  Q.   Now, after the defendant told you he was going to Buffalo,

09:51:21AM 25  did you actually go to Buffalo to meet with him?

1  A.   I did, yes.

2  Q.   About how many times did you go out there?

3  A.   Four times I believe.

4  Q.   And when you went to Buffalo to buy drugs from the

09:51:36AM 5  defendant, were you buying -- did you continue buying gram

6  amounts?

7  A.   I did, yes.

8  Q.   Do you recall what he would charge for a gram of heroin or

9  cocaine?

09:51:46AM 10  A.   I do not, no.

11  Q.   Okay. Do you recall what the largest amount of heroin or

12  cocaine was that you bought from the defendant?

13  A.   I believe it was an ounce of heroin.

14  Q.   Okay. How about cocaine?

09:52:02AM 15  A.   Half ounce, I believe.

16  Q.   Do you recall what an ounce would cost of heroin?

17  A.   I do not, no.

18  Q.   Now, when you were buying these larger amounts of cocaine

19  and heroin from the defendant, were you paying full price for

09:52:20AM 20  them upfront?

21  A.   No.  I would bring some money and then owe some money.

22  Q.   Okay. So he would front you some of the drugs?

23  A.   That's correct.

24  Q.   Did you talk with the defendant about how you would pay

09:52:37AM 25  him back for the portion of drugs that you had not paid for?

1  A.   I'm not sure.  I believe there was a text message that --

2  that I had sent saying -- asking if I were to bring some money

3  out, but I'm not completely sure without seeing it.

4  Q.   Okay. So you would pay for part of the drugs, but he would

09:53:11AM 5  give you more than what you had paid for?

6  A.   That's correct.

7  Q.   How did you plan on covering the cost of what you owed the

8  defendant?

9  A.   Both myself and my wife worked full-time jobs, so I paid

09:53:28AM10  him when I got paid.

11  Q.   Were you doing anything else to supplement your income?

12  A.   I was selling to my brother and a couple close friends to

13  try to pay for my habit.

14  Q.   Okay. Did you ever talk to the defendant about how you

09:53:44AM15  were selling drugs to cover the cost?

16  A.   I did, yes.

17  Q.   And what were those conversations like or what did you

18  talk about?

19  A.   We had a conversation about how much to put in the bags

09:54:02AM20  and how to get the most out of the quantity that I had.

21  Q.   Okay. Can you explain to the jury about what he told you

22  about getting the most out of what you had and how to package

23  them?

24  A.   I was shown to cut a straw on like an angle and he used it

09:54:27AM25  like a scoop; that's how much you put into each individual

1  bag.

2  Q.   Okay. Did you have bags that you were using to package the

3  heroin?

4  A.   I did not at that time.

09:54:39AM 5  Q.   Okay. Did you acquire some bags that you were using to

6  package and sell the heroin?

7  A.   I did, yes.

8  Q.   Where did you get those bags from?

9  A.   I received those from the defendant.

09:54:49AM 10  Q.   Okay. Can you explain that?

11  A.   It was while I was in Buffalo in an apartment on Prospect

12  Avenue.

13  Q.   What did the bags look like that he gave you?

14  A.   I remember them being in a cardboard box.  I believe that

09:55:12AM 15  the bags said black mamba, I believe.

16            **MR. VERRILLO:** Objection.

17            **THE COURT:** Overruled.

18  **BY MS. KOCHER:**

19  Q.   I'm sorry?

09:55:20AM 20            **THE COURT:** The answer will stand.

21  **BY MS. KOCHER:**

22  Q.   You believe the bags said what?

23  A.   Black mamba.

24  Q.   Okay. When you were arrested on June 8th, 2016, did the

09:55:31AM 25  police search your house?

1  A.    They did, yes.

2  Q.    What were some of the items that they recovered?

3  A.    They recovered empty bags with residue, straws, marijuana

4  bowl I believe.

09:55:49AM 5  Q.    Okay.

6  A.    There was no quantity of drugs, though, in the residence.

7  Q.    Why not?

8  A.    I was out.  I was planning on going out that morning to

9  get more.

09:56:00AM 10  Q.    Okay. Now, Mr. Standish, I'd like to show you what's not

11  been received into evidence as Exhibit 224 -- I'm sorry,

12  Exhibit 217 that's not in evidence.  Do you recognize what

13  this is a photograph of?

14  A.    I do, yes.

09:56:29AM 15  Q.    And what do you recognize this photograph as?

16  A.    This is what was recovered from my house.

17  Q.    And what is it a photograph of?

18  A.    Of the yellow black mamba wax paper bags used for heroin,

19  cut straws -- orange one would have been used for sniffing

09:56:55AM 20  heroin and cocaine; and the purple one, being that it was cut

21  like that, was used to scoop -- as a scoop.

22  Q.    Does this photograph fairly and accurately depict the way

23  that those bags and straws in the box were in your house when

24  they were seized?

09:57:13AM 25  A.    Yes.

1          **MS. KOCHER:** Your Honor, I'd offer Exhibit 217.

2          **MR. VERRILLO:** No objection.

3          **THE COURT:** Exhibit 217 will be received.

4          (**WHEREUPON**, Government Exhibit 217 was received

09:57:25AM 5   into evidence).

6    **BY MS. KOCHER:**

7    Q.   Now, Mr. Standish, this photograph appears to be quite

8    zoomed in on the straws and bags; is that correct?

9    A.   Yes.

09:57:36AM 10   Q.   I have in my hand here what's Exhibit 224.  Are you able

11   to see that from here?

12   A.   I do, yes, I can see it.

13   Q.   Do you recognize what this item is?

14   A.   It's what's in the photograph.

09:57:49AM 15   Q.   Okay. Have you had a chance to view this item before

16   testifying?

17   A.   I did, yes.

18   Q.   Is Exhibit 224 fair and accurate -- is this what was

19   seized from your home on June 8th, 2016?

09:58:01AM 20   A.   It is, yes.

21   Q.   It's the same items depicted in Exhibit 217?

22   A.   That's correct.

23          **MS. KOCHER:** Your Honor, I'd offer 224 at this time.

24          **MR. VERRILLO:** No objection.

09:58:13AM 25          **THE COURT:** Exhibit 224 will be received.

1          (**WHEREUPON**, Government Exhibit 224 was received

2    into evidence).

3    **BY MS. KOCHER:**

4    Q.   Now, Mr. Standish, the box in Exhibit 224 and the yellow

09:58:27AM 5    envelopes with the black mamba on them, where did you get

6    those items from?

7          **MR. VERRILLO:** Objection, asked and answered.

8          **THE COURT:** No, overruled.  Go ahead.

9          **THE WITNESS:** I got them from the defendant.

09:58:39AM 10   **BY MS. KOCHER:**

11   Q.   And where were you when you got them from the defendant?

12   A.   In an apartment on Prospect Avenue in Buffalo.

13   Q.   Okay. And this box also contains the straws that are

14   photographed in Exhibit 217?

09:58:54AM 15   A.   It appears so, yes.

16   Q.   Okay.  Now, before the photo was admitted you were

17   explaining how some of the straws were different?

18   A.   Yes.

19   Q.   Let's start with the orange straw.  What was that straw

09:59:11AM 20   used for?

21   A.   For sniffing cocaine and heroin.

22   Q.   Okay. And the purple straw that appears to have an angle

23   on the end of it, what was that straw used for?

24   A.   That was used to fill the bags --

09:59:26AM 25   Q.   How do you know -- I'm sorry.

1  A.    -- with heroin and cocaine.

2  Q.    How do you know the purple straw was used to fill bags

3  with heroin as opposed to the orange one?

4  A.    Because the purple straw is cut at an angle.

09:59:46AM 5  Q.    All right. Now, I'd next like to show you what's not been

6  received into evidence and maybe we can flip through these for

7  you.  Starting at Exhibit 208.  209.  216.  And 218.  Do you

8  recognize the items that were depicted in those four

9  photographs?

10:00:24AM 10  A.    I do, yes.

11  Q.    And how do you recognize those items just generally?

12  A.    They were items that were in my home.

13  Q.    Were those items that the police collected when they

14  searched the house on June 8th, 2016?

10:00:36AM 15  A.    They are, yes.

16  Q.    And do those photographs fairly and accurately depict some

17  of the items that were collected by police?

18  A.    Yes.

19            **MS. KOCHER:** Your Honor, I'd offer Exhibits 208,

10:00:47AM 20  209, 216 and 218.

21            **MR. VERRILLO:** No objection.

22            **THE COURT:** Exhibits 208, 209, 216 and 218 will be

23  received into evidence.

24            (**WHEREUPON**, Government Exhibits 208, 209, 216 and

10:01:04AM 25  218 were received into evidence).

**BY MS. KOCHER:**

Q.   Mr. Standish, what is -- what are we looking at here in Exhibit 208?

A.   DVD case, a card, a straw I used for sniffing both heroin and cocaine.  It appears empty bags of cocaine, bags of residue of some sort.

Q.   Okay. Those are bags that would have been used already?

A.   Yes.

Q.   Okay. Was this a photograph taken inside your home?

A.   It is, yes.

Q.   Okay. Next I'd like to go to 209.  What is depicted in this photo?

A.   Empty bags in my dresser drawer.

Q.   Okay. Now, were these bags that you would have used to package cocaine and heroin for sale?

A.   No.  These are bags that appear to have had drugs in them --

Q.   Okay.

A.   -- that I used.

Q.   These are used empty bags?

A.   Correct.

Q.   Now, looks like there's some of those yellow black mamba bags or envelopes in this photo?

A.   That's correct.

Q.   Are those bags you would have gotten from the defendant?

1  A.    That's correct.

2  Q.    All right. Moving on to Exhibit 216.  What is this a

3  photograph of?

4  A.    It's a digital scale.

10:02:48AM 5  Q.    Okay. And why did you have a digital scale in your house?

6  A.    Used for weighing cocaine and heroin.

7  Q.    Next I'd like to show you Exhibit 218.  What's depicted in

8  this photo?

9  A.    Looks like two marijuana bowls, the rest empty bags,

10:03:14AM 10  couple paper clips, like a little storage bag.

11  Q.    Is this a bag that was in your house when the police

12  searched?

13  A.    Yes.

14  Q.    All right. Now, in your dealings with the defendant did

10:03:32AM 15  you ever tell him what you did for a living?

16  A.    I told him that I was a manager at Walmart.

17  Q.    Okay. So he didn't know you were a corrections officer?

18  A.    No, he did not.

19  Q.    Did you tell him where you lived?

10:03:45AM 20  A.    He knew that -- I told him I lived in Orleans County.

21  Q.    Okay.  Did you give him anymore detail than that?

22  A.    I did not, no.

23  Q.    Why didn't you give any details about where you lived or

24  what your real job was?

10:03:59AM 25  A.    I didn't -- I didn't want him knowing where I lived; and I

 1  definitely didn't want him to know I was a correctional

 2  officer.

 3  Q.   Why not?

 4  A.   I shouldn't have been in any of these situations.  And I

10:04:23AM 5  didn't want it to -- I'm not sure how to answer that.  I was

 6  uncomfortable.  I didn't want him to know where I was.  I

 7  didn't want him to know anything about me.

 8  Q.   You didn't want people to find out you were a corrections

 9  officer?

10:04:39AM10  A.   That's right.

11  Q.   All right. Now, you mentioned when you started buying the

12  larger amounts of drugs from the defendant in Buffalo you also

13  began selling I think you said to your brother and some

14  friends?

10:04:57AM15  A.   That's correct.

16  Q.   Now, did you come to find out that one of the individuals

17  you were selling to was actually a confidential informant for

18  the Orleans County Police Department?

19  A.   I did, yes.

10:05:17AM20  Q.   All right. Did you also learn that some of your

21  interactions with that confidential informant were recorded

22  on -- with audio and video recording?

23  A.   That's correct.

24  Q.   Mr. Standish, do you have a disk up in front of you that's

10:05:42AM25  marked Exhibit 227?

1  A.    I do, yes.

2  Q.    Do you recognize that disk?

3  A.    I do.

4  Q.    How do you recognize it?

10:05:49AM 5  A.    My initials are on it with the date that I watched it.

6  Q.    Okay. So you've had a chance to watch the contents of

7  Exhibit 227?

8  A.    I have, yes.

9  Q.    And generally what is depicted on that disk?

10:06:02AM 10  A.    Sales of both heroin and cocaine.

11  Q.    Okay. And who was doing the selling in those?

12  A.    I was doing the selling.

13  Q.    Okay. Do those -- are there two clips on that disk?

14  A.    I believe so, yes.

10:06:19AM 15  Q.    Okay. Do those two clips fairly and accurately depict some

16  of the sales that you made in June of 2016?

17  A.    They do.

18  Q.    Okay.

19          **MS. KOCHER:** Your Honor, I'd offer Exhibit 227 at

10:06:33AM 20  this time.

21          **MR. VERRILLO:** Your Honor, if we could have a

22  sidebar?

23          **THE COURT:** Sure.

24          (**WHEREUPON**, a discussion was held at side bar out

10:06:44AM 25  of the hearing of the jury.)

1          **MR. VERRILLO:** Your Honor, I don't recall seeing

2 those excerpts.  So I'm not familiar with them.

3          **THE COURT:** The DVD?

4          **MR. VERRILLO:** DVD or whatever it is.

10:06:57AM 5          **MS. KOCHER:** Your Honor, defense counsel has had

6 these videos.  We turned over paperwork and these videos

7 because -- with our *Jencks*; they go to Mr. Standish's arrest.

8          **MR. VERRILLO:** They're not mentioned in the exhibit

9 list that I have.  227 you said?

10:07:11AM 10          **MS. KOCHER:** Yes.

11          **THE COURT:** They're on my exhibit list.

12          **MR. VERRILLO:** Are they on there?  Okay.

13          **THE COURT:** You haven't had a chance to look at

14 these?

10:07:21AM 15          **MR. VERRILLO:** That's correct.

16          **THE COURT:** How long are these?

17          **MS. KOCHER:** Judge, I was only going to show two or

18 three minutes from each.

19          **THE COURT:** How long in total?

10:07:28AM 20          **MS. KOCHER:** In total they start when the CI gets

21 the buy money.  I mean, I think they're like a half hour each

22 if he wanted to watch the full thing.  I wasn't going to play

23 the whole thing.

24          **THE COURT:** You want to view them?

10:07:43AM 25          **MR. VERRILLO:** Yes, please.

1          **THE COURT:** Okay, we'll take a break, let him view

2    as much as he wants to view.

3          **MS. KOCHER:** Okay.

4          (**WHEREUPON**, side bar discussion concluded.)

10:07:51AM 5          **THE COURT:** Ladies and gentlemen, at this time we're

6    going to take a recess.  In the meantime, I'd ask you not

7    discuss the matter or allow anybody to discuss the matter with

8    you.  The jury may step down.

9          (**WHEREUPON**, there was a pause in the proceeding).

10:41:57AM 10          (**WHEREUPON**, defendant is present; the jury is

11   present).

12          **THE COURT:**  You may continue.

13          **MS. KOCHER:** Thank you, Your Honor.

14   **BY MS. KOCHER:**

10:44:44AM 15   Q.   Now, Mr. Standish, before the break we were discussing

16   that you had sold drugs to a confidential informant?

17   A.   That's correct.

18   Q.   And did you learn that those buys were recorded with audio

19   and video?

10:44:56AM 20   A.   I did, yes.

21          **MS. KOCHER:** Your Honor, at this time I would offer

22   again Exhibit 227.

23          **MR. VERRILLO:** No objection.

24          **THE COURT:** Exhibit 227 will be received.

10:45:05AM 25          (**WHEREUPON**, Government Exhibit 227 was received

1 | into evidence).

2 |      **MS. KOCHER:** Your Honor, Mr. Standish has the disk

3 | which is the exhibit, but we have uploaded that onto our trial

4 | laptop for ease of play.  Thank you.

10:45:19AM 5 | **BY MS. KOCHER:**

6 | Q.  We're going to play the first clip dated June 3rd, 2016.

7 | Mr. Standish, I have the video stopped at time stamp 8:18:50.

8 | The date is June 3rd, 2016.  Do you recognize the location in

9 | this freeze frame?

10:45:40AM 10 | A.  I do.  That is my home.

11 | Q.  Okay. And do you recognize the vehicle in the driveway?

12 | A.  That is the vehicle I was -- that is my vehicle, yes.

13 | Q.  Okay.  What kind of car was that?

14 | A.  A 2012 Chevy Malibu.

10:45:53AM 15 | Q.  Okay.  I'd like to fast forward the clip a bit to about

16 | two minutes and 55 seconds in.  If we can hit play.  We've

17 | paused the video at time stamp 8:21:47.  Can you tell where

18 | this video is being filmed right now?

19 | A.  Inside of the house.

10:46:23AM 20 | Q.  Whose house?

21 | A.  My house.

22 | Q.  Okay. All right, we'll let this play for a bit.

23 |      (**WHEREUPON**, the video was played).

24 | **BY MS. KOCHER:**

10:46:39AM 25 | Q.  We've paused it at time stamp 8:21:58 .  Do you recognize

1  the individual in the white T-shirt in this freeze frame?

2  A.   Yes, that is myself.

3  Q.   Okay. We'll continue to play the video.

4        (**WHEREUPON**, the video was played).

10:46:54AM 5  **BY MS. KOCHER:**

6  Q.   All right.  Now, I stopped the video at time stamp

7  8:23:09.  Can you explain to the jury what happened during

8  that clip?

9  A.   I sold both heroin and cocaine to a confidential informant

10:48:17AM 10  inside of my home.

11  Q.   Okay. Now, at one point I believe the informant said give

12  me two boy and four girl or something to that effect?

13  A.   Correct.

14  Q.   What did you take that to mean?

10:48:37AM 15  A.   Heroin and cocaine.

16  Q.   Which is which?

17  A.   The boy is heroin, the girl is cocaine.

18  Q.   The informant gave you money for the cocaine and heroin

19  you gave to him?

10:48:51AM 20  A.   That's correct.

21  Q.   Also sounded like the informant was calling you Joey?

22  A.   It did, yes.

23  Q.   Who is Joey?

24  A.   Joey is my brother.  I'm not sure why he was calling me

10:49:03AM 25  Joey, though.

1  Q.    Okay. Also during that clip did you give the informant

2  your phone number?

3  A.    I did, yes.

4  Q.    Why did you give him a phone number?

10:49:16AM 5  A.    So that he could contact me rather than just showing up to

6  my home.

7  Q.    On this occasion had he just shown up to your house?

8  A.    He did, yes.

9  Q.    All right. Now, I'd like to show you what's not been

10:49:30AM 10  received into evidence as Exhibit 205.  Do you recognize the

11  photograph in Exhibit 205?

12  A.    I do, yes.

13  Q.    And what do you recognize that to be?

14  A.    That is myself holding a bag of individual bags of heroin.

10:50:09AM 15  Q.    Okay. Does this appear to be a still image from the video

16  we just watched?

17  A.    It does, yes.

18  Q.    And looks like the date is a little bit cut off, but it

19  has June 3rd as the date and there's a time stamp as well?

10:50:23AM 20  A.    Correct.

21  Q.    Okay. Does this photograph fairly and accurately depict a

22  freeze frame from the video we just watched and your

23  interaction with the informant that day?

24  A.    Yes.

10:50:34AM 25            **MS. KOCHER:** Your Honor, I'd offer Exhibit 205.

1          **MR. VERRILLO:** No objection.

2          **THE COURT:** Exhibit 205 will be received.

3          (**WHEREUPON**, Government Exhibit 205 was received

4    into evidence).

10:50:48AM 5    **BY MS. KOCHER:**

6    Q.   Now, Mr. Standish, in this photograph you're holding a

7    sandwich bag it looks like with little yellow envelopes?

8    A.   Correct.

9    Q.   And what was contained in those envelopes?

10:51:03AM 10   A.   Heroin.

11   Q.   Okay. Where did you get the heroin and the envelopes that

12   contained the heroin on this day?

13   A.   Both of which from Buffalo on Prospect Avenue from the

14   defendant.

10:51:18AM 15   Q.   He gave the bags to you and sold the heroin to you?

16   A.   Correct.

17   Q.   All right. Now, did you sell to that same informant on a

18   later date as well?

19   A.   I did, yes.

10:51:34AM 20   Q.   Okay. So this incident that we just watched was on

21   June 3rd of 2016?

22   A.   Yes.

23   Q.   Okay. Now, I'd like to play the second clip on

24   Exhibit 227.  That is dated June 6th, 2016.

10:51:54AM 25          (**WHEREUPON**, the video was played).

**BY MS. KOCHER:**

Q.   All right.  Now, we've paused the video right at the beginning.  The time stamp is June 6th, 2016, at 16:34:57.  Do you recognize any of the vehicles in this shot?

10:52:18AM A.   The white Chevy Malibu is my car.

Q.   Okay. If we could let this play for a bit?

     (**WHEREUPON**, the video was played).

**BY MS. KOCHER:**

Q.   Now, we've stopped the clip at the time stamp 16:37:18.

10:54:53AM Can you explain to the jury what was happening during that video?

A.   I was selling heroin and cocaine to a confidential informant.

Q.   Okay. Now, at some point during the video I thought I

10:55:06AM heard you say this is the same shit, just a different bag or something to that effect?

A.   That's correct.

Q.   What did you mean when you said that?

A.   It was the same heroin, just in a different type of bag.

10:55:20AM Q.   Okay.  And you also said here's 13 and 5 I believe; is that correct?

A.   That's correct, yes.

Q.   What did you mean when you told the informant here's 13 and 5?

10:55:35AM A.   It was 13 bags of heroin and 5 bags of cocaine.

1    Q.    Okay. And is that what you sold to the informant that day?

2    A.    It is, yes.

3    Q.    Okay. And did he give you anything in exchange for the

4    cocaine and heroin that you gave him?

10:55:49AM 5    A.    He gave me cash.

6    Q.    Now, the drugs that you sold to the informant on June 3rd

7    and June 6th of 2016, were those collected by law enforcement?

8    A.    They were, yes.

9    Q.    Okay. Have you had a chance to view those items before

10:56:11AM 10    your testimony today?

11    A.    I did, yes.

12              **MS. KOCHER:** Your Honor, at this time I'd like to

13    read from the stipulation regarding Exhibits 228 and 229.

14              The stipulation which has been agreed to by the

10:56:27AM 15    parties states Government Exhibit 228 is 10 plastic bags

16    containing heroin seized during a controlled buy on June 3rd,

17    2016.

18              Government Exhibit 228 also contains four plastic

19    bags containing cocaine seized during a controlled buy on

10:56:51AM 20    June 3rd of 2016.

21              Exhibit 229 is 13 plastic bags containing heroin

22    seized during a controlled buy on June 6th, 2016.

23              Government Exhibit 229 also contains 5 plastic bags

24    containing cocaine during a controlled buy on June 6th, 2016.

10:57:16AM 25              Your Honor, at this time I would offer Exhibits 228

1  and 229.

2            MR. VERRILLO: No objection.

3            THE COURT: Exhibit 228 and 229 will be received.

4            (WHEREUPON, Government Exhibits 228-229 were

10:57:29AM 5  received into evidence).

6  BY MS. KOCHER:

7  Q.   Mr. Standish, I'd also like to show you what's not been

8  received into evidence as Exhibit 220 and Exhibit 229.  I'm

9  sorry, Mr. Standish, I would like you to take a look at

10:58:46AM 10 Exhibits 220 and 221 that have not been received.  Do you

11  recognize the drugs that are photographed in those two

12  exhibits?

13  A.   I do, yes.

14  Q.   And how do you recognize them?

10:59:02AM 15 A.   They're the drugs that I sold to the confidential

16  informant.

17  Q.   Okay. And do those photographs fairly and accurately

18  depict the way the drugs looked when you sold them?

19  A.   They do, yes.

10:59:11AM 20           MS. KOCHER: Your Honor, I'd offer Exhibit 220 and

21  221.

22            MR. VERRILLO: No objection.

23            THE COURT: Exhibit 220 and 221 will be received

24  into evidence.

10:59:21AM 25           (WHEREUPON, Government Exhibits 220-221 were

1   received into evidence).

2   **BY MS. KOCHER:**

3   Q.   I guess we could start with Exhibit 220.  Is this just a

4   photograph of the items that are depicted -- that are in

10:59:37AM 5   Exhibit 228, the drugs that were seized that day?

6   A.   Yes.

7   Q.   Okay. Can you describe the way the drugs were packaged

8   that you sold to the informant on June 3rd?

9   A.   The heroin was in yellow wax paper bags with the stamp

10:59:56AM 10   black mamba.  And the cocaine was packaged in small ziplock

11   bags, clear ziplock bags.

12   Q.   Okay.  Now, I believe you previously testified the

13   defendant sold you that heroin and gave you those black mamba

14   bags?

11:00:15AM 15   A.   Correct.

16   Q.   How about the cocaine?  Do you know where the cocaine came

17   from that you sold the informant that day?

18   A.   Those cocaine bags came from Rochester.

19   Q.   Okay.

11:00:24AM 20   A.   And not Buffalo.

21   Q.   So while you were seeing the defendant in Buffalo, did you

22   continue to come to Rochester?

23   A.   I did, yes.

24   Q.   And why were you doing that?

11:00:34AM 25   A.   At the time the defendant wasn't able to get cocaine on a

936

1    regular basis, so I had to travel to Rochester to get the

2    cocaine.

3    Q.    Okay. And where did you go in Rochester to buy the

4    cocaine?

11:00:49AM 5    A.    I went to the apartment complex on North Clinton Avenue.

6    Q.    Okay.  That was the complex with the sign the Lofts I

7    think?

8    A.    Correct, as well as Thomas Street.

9    Q.    Okay. Who was it that directed you to go to those

11:01:03AM 10    locations to get the cocaine?

11    A.    Pepe.

12    Q.    The defendant?

13    A.    Yes.

14    Q.    All right. Next if we could take a look at Exhibit 221.

11:01:18AM 15    Can you describe the packaging of the cocaine and heroin in

16    this photograph?

17    A.    The cocaine is on the top with the clear plastic bags.

18    And the heroin is on the bottom with the tan powder substance.

19    Q.    All right. So the heroin is the tan substance?

11:01:39AM 20    A.    Correct.

21    Q.    The cocaine is white?

22    A.    That's right.

23    Q.    What's different about the way the heroin is packaged in

24    this photo versus the last photo we viewed?

11:01:50AM 25    A.    The heroin is now in clear plastic ziplock bags.

1  Q.    Okay.   Instead of those black mamba envelopes?

2  A.    Correct.

3  Q.    Okay. Where did the -- where did you get the cocaine and

4  the heroin that are depicted in Exhibit 221?

11:02:07AM 5  A.    I got the heroin from Buffalo, and the cocaine from

6  Rochester.

7  Q.    Okay. When you say you got the heroin from Buffalo, who in

8  particular did you see in Buffalo to get --

9  A.    The defendant.

11:02:20AM 10  Q.    He sold you that heroin?

11  A.    Correct.

12  Q.    And where did you go in Rochester to get the cocaine?

13  A.    To Thomas Street.

14  Q.    All right. Now, this last video and these drugs that we're

11:02:54AM 15  looking at in Exhibit 221, that sale to the informant happened

16  on June 6th, 2016?

17  A.    Correct.

18  Q.    And what happened two days later?

19  A.    I was arrested.

11:03:05AM 20  Q.    Mr. Standish, did you ever purchase cocaine or heroin from

21  anyone other than the defendant in Buffalo?

22  A.    No.

23  Q.    I'm sorry, I couldn't hear you.

24  A.    No.

11:03:32AM 25  Q.    Now, you mentioned that you went to Buffalo about four

1    times I think you said?

2    A.    That's correct.

3    Q.    I'm sorry, if I can go back to Exhibit 221.  Why was the

4    heroin packaged in clear bags in this exhibit?

11:03:58AM 5    A.    I'm not sure to be honest with you.  I don't know.

6    Q.    Do you know if you bagged that heroin?

7    A.    I did, yes.

8    Q.    Okay. All right.  So you mentioned you went to see the

9    defendant in Buffalo about four times?

11:04:19AM 10    A.    Yes.

11    Q.    How did you know where to go in Buffalo?

12    A.    I was told where to go by the defendant.

13    Q.    Okay. And how did he tell you where to go?

14    A.    On the phone; either through a text message or verbally.

11:04:41AM 15    Q.    Did there come a time he gave you a specific address?

16    A.    There was, yes.

17    Q.    Okay. I'd like to go to Exhibit 225A, the Samsung

18    extraction, and we can start on page 51.  If we can zoom in on

19    lines 308 and 307.  All right.  Now entry 308 is this outgoing

11:05:22AM 20    text message from you to the P contact?

21    A.    Yes.

22    Q.    And that was a phone number you used to contact the

23    defendant?

24    A.    It is.

11:05:30AM 25    Q.    What's the time stamp of this text message?

939

1    A.    May 28th, 2016.

2    Q.    And what did you text to the defendant that day?

3    A.    I texted what's up buddy.  Was thinking of coming to see

4    you today.

11:05:46AM 5    Q.    And how did the defendant respond to that?

6    A.    He responded okay pa 299 Prospect Avenue.

7    Q.    Now, if we could go to page 50 of this exhibit and lines

8    306 up to 301.  I think that might be the whole page.  Let's

9    do the bottom half first.  All right.  Starting with the next

11:06:19AM10    entry, which is line 306, is this another outgoing

11    text message from you to the defendant?

12    A.    It is, yes.

13    Q.    And what did you say to the defendant?

14    A.    I'll let you know when I'm headed out.  Got a few things

11:06:31AM15    to do before I can leave.

16    Q.    And did you send another outgoing message after that?

17    A.    I did, yes.

18    Q.    What did you say?

19    A.    I wrote just left my place a few minutes ago.  Be there in

11:06:47AM20    about an hour.

21    Q.    Okay. And that is on May 28th at about 1:02 p.m.?

22    A.    That's correct.

23    Q.    Did the defendant then send an incoming message to you?

24    A.    He did.  He responded what you need.

11:07:05AM25    Q.    Okay. If we could zoom in on the top half of page 50.

1    Line 303, what did you tell the defendant that you needed?

2    A.    I responded same as last.

3    Q.    Okay. And that was at about 1:16 p.m. on May 28th, 2016?

4    A.    Yes.

11:07:33AM 5    Q.    Okay. About how long would it take you to get from Orleans

6    County to Buffalo?

7    A.    Just about an hour.

8    Q.    Okay. Now, can you explain what you and the defendant were

9    discussing in those text messages that we just reviewed where

11:07:49AM 10    he asked what you need and you say same as last?

11    A.    I was referring to the quantity -- the quantity of heroin

12    and cocaine that I wanted.

13    Q.    Okay. Now, he also sent you an address of 299 Prospect?

14    A.    That's correct.

11:08:06AM 15    Q.    Is that in Buffalo or Rochester?

16    A.    That is in Buffalo.

17    Q.    So when you were going out to Buffalo about -- what was

18    the amount that you were purchasing from the defendant?

19    A.    Anywhere from half ounce to an ounce at a time.

11:08:24AM 20    Q.    Of what?

21    A.    Of mainly heroin, but there was a time that I did purchase

22    cocaine as well.

23    Q.    Okay. Was the cocaine that you purchased also a bulk

24    amount?

11:08:36AM 25    A.    It was, yes.

1  Q.   All right. Now, the next message in this thread here,

2  entry 302, is on the same day May 28th, 2016, but at 3:30

3  p.m.; is that right?

4  A.   Correct.

11:08:51AM 5  Q.   And that's an outgoing message from you to the defendant;

6  is that correct?

7  A.   That is correct.

8  Q.   What did you say?

9  A.   I responded I am home, bro.  Talk to you in a couple days.

11:09:03AM 10  Q.   Okay. And he responded cool bro?

11  A.   Correct.

12  Q.   Cool with a K?

13  A.   That's correct.

14  Q.   All right. Now, if we could go to page 49, line 300.  Is

11:09:24AM 15  this also a message on May 28th, 2016?

16  A.   It is, yes.

17  Q.   And who is this a message to?

18  A.   That's who I believe to be Pepe's brother.

19  Q.   That's the Thomas contact in your phone?

11:09:40AM 20  A.   Correct.

21  Q.   And what did you message who you believed to be the

22  defendant's brother?

23  A.   Is that girl around buddy.

24  Q.   And what did you mean when you were asking that?

11:09:51AM 25  A.   I was asking if I can come to get cocaine.

1   Q.   Now, if you had just been to see the defendant in Buffalo,

2   why were you then asking about getting cocaine from his -- who

3   you thought was his brother?

4   A.   On that particular day the defendant didn't have cocaine

11:10:11AM 5   in Buffalo.

6   Q.   So what would you do?

7   A.   I would then drive from Buffalo to Rochester to get

8   cocaine.

9   Q.   And then back home to Orleans County?

11:10:21AM 10   A.   And back home to Orleans County.

11   Q.   Now, did you talk to the defendant about how you were

12   going to Rochester to buy cocaine?

13   A.   Yes.

14   Q.   Can you explain the conversation that you had with him

11:10:37AM 15   about that?

16   A.   I had asked for cocaine and he said that I could always go

17   back to Rochester and that they had the cocaine in Rochester.

18   Q.   When he said "they," who did you think he was referring

19   to?

11:10:52AM 20   A.   To his brother and Flaco.

21   Q.   All right. Now, you mentioned that you received that

22   address of 299 Prospect?

23   A.   Correct.

24   Q.   From the defendant?

11:11:10AM 25   A.   Yes.

1    Q.    Did you actually go to that area to meet with him?

2    A.    I did, yes.

3    Q.    All right. I'd like to show you what -- like to show you

4    what's not in evidence as Exhibit 64.  Do you recognize the

11:11:31AM 5    location in this photograph?

6    A.    I do.

7    Q.    Okay. How many houses are in this photo?

8    A.    You can -- there's two in the center, and you can see half

9    of a house on the left, and a portion of the house on the

11:11:46AM10    right side.

11    Q.    Where do you recognize these houses from?

12    A.    From Prospect Avenue in Buffalo.

13    Q.    Does this photograph fairly and accurately depict the way

14    that the houses on Prospect Avenue looked when you would go

11:12:01AM15    meet with the defendant to buy cocaine and heroin?

16    A.    They do, yes.

17              **MS. KOCHER:** Your Honor, I'd offer Exhibit 64.

18              **MR. VERRILLO:** No objection.

19              **THE COURT:** Exhibit 64 will be received.

11:12:11AM20              (**WHEREUPON**, Government Exhibit 64 was received into

21    evidence).

22    **BY MS. KOCHER:**

23    Q.    Mr. Standish, did you ever -- when you would go meet with

24    the defendant on Prospect Avenue what would generally happen?

11:12:36AM25    A.    I would go there to buy both heroin and cocaine and I

944

1  would enter one of the houses to do so.

2  Q.   Is either of the houses that you would enter in this

3  photograph?

4  A.   Yes.

11:12:53AM 5  Q.   Could you please mark with an X the house that you would

6  enter?  Okay.  So you've marked the house with the front porch

7  on the right side of the photograph?

8  A.   Correct.

9  Q.   And there's a tree kind of covering the top half of it?

11:13:13AM 10  A.   That's correct.

11  Q.   Okay. Now, how did you get into that house?

12  A.   I followed the defendant into the house.

13  Q.   Okay. So when you would arrive would you just walk up to

14  the door and knock on the door?

11:13:28AM 15  A.   No.  I would park and wait for him to arrive.

16  Q.   Okay. And he would lead you into the house?

17  A.   Yes.

18  Q.   When you were going into that house did you know what

19  house number it was?

11:13:40AM 20  A.   I did not, no.

21  Q.   About how many times did you go into that house on the

22  right?

23  A.   I went into that house twice.

24  Q.   Okay. And can you tell us about those times?

11:13:53AM 25  A.   The first encounter I went into the back apartment, I

1   would walk down the sidewalk to the right all the way to the

2   back and there was a back door and I would enter an apartment

3   in the back.

4   Q.   And what happened when you went into that back apartment?

11:14:13AM 5   A.   I followed the defendant into the house and I stood -- I

6   closed the door behind myself and stood in a kitchen area.

7   Q.   Okay. And what happened next?

8   A.   The defendant told me to stay in the kitchen and I watched

9   him go to the back of the house into a back bedroom and when

11:14:36AM 10   he returned he had a duffle bag that he brought back into the

11   kitchen area.

12   Q.   Okay. Did the defendant show you what was inside the

13   duffle bag?

14   A.   He did, yes.

11:14:47AM 15   Q.   And can you explain to the ladies and gentlemen of the

16   jury what was in the duffle bag?

17   A.   Three firearms and two kilos of heroin.

18   Q.   Can you describe what the kilos of heroin looked like?

19   A.   Approximately the size of a brick, rectangular.

11:15:10AM 20   Q.   Were they packaged in any kind of way?

21   A.   They were wrapped in -- like tape wrapped around them.

22   Q.   I'm sorry, I couldn't hear you.

23   A.   They were like wrapped in tape.

24   Q.   What, if anything, did the defendant say about the heroin?

11:15:28AM 25   A.   He suggested that I leave with one or two.  I wasn't --

1  I'm not sure even if he was serious or not.  I had no

2  intentions to leave there with a kilo or two at all, though.

3  Q.   Why not?

4  A.   It was -- I think it was -- I realized I was in way over

11:15:55AM 5  my head, the situation that I was in.

6  Q.   Did you buy heroin from the defendant that day?

7  A.   I did, yes.

8  Q.   Can you explain to the jury how that happened?

9  A.   After he returned to the kitchen with the duffle bag, he

11:16:12AM 10  placed the bag on the table, took out a kilo, cut into one of

11  the kilos and took a chunk off of it and put it on a scale and

12  then into a bag, which I purchased.

13  Q.   So he gave you a portion of the heroin right off of the

14  brick?

11:16:29AM 15  A.   Correct.

16  Q.   You said he placed it on a scale?

17  A.   That's correct.

18  Q.   How much heroin did you buy that day?

19  A.   I don't recall specifically, but it was close to an ounce.

11:16:47AM 20  Q.   Okay. Now, what did you do with that heroin you purchased

21  that day?

22  A.   I returned to Orleans County to my home.

23  Q.   Did you use any of it?

24  A.   I did, yes.

11:16:58AM 25  Q.   Did it have the same effect as the heroin that you had

1 purchased before from the defendant?

2 A.    Yes.

3 Q.    Okay. Can you describe what the substance looked like?

4 A.    It was tan, more chunkier, though, than what I had

11:17:16AM 5 previously -- it wasn't as powdery; it was more of a chunk.

6 Q.    Okay.  When you say tan, was it kind of a similar color to

7 the heroin we just viewed in Exhibit 221 I believe it was?

8 A.    Yes, that's correct.

9 Q.    Now, you also mentioned there were three guns in that bag

11:17:37AM10 with the two kilos of heroin?

11 A.    There were.

12 Q.    So you were a corrections officer for a time, right?

13 A.    Yes.

14 Q.    Did you receive any firearms training to become a

11:17:48AM15 corrections officer?

16 A.    I did.

17 Q.    What was some of that training?

18 A.    I -- it was both academic and physical training.  It was

19 an eight week program that I attended in Albany.

11:17:59AM20 Q.    Did you receive any training specific to firearms?

21 A.    Yes.

22 Q.    Can you explain that training?

23 A.    I had to qualify with a .38 special, which is a revolver,

24 as well as an AR-15, which is a rifle.

11:18:14AM25 Q.    And when you say "qualify," what does that mean?

1   A.   You have to score a certain percentage on your accuracy as

2   far as what you're shooting at -- the targets you're shooting

3   at.

4   Q.   So you actually had to test fire or fire those guns?

11:18:31AM 5   A.   Correct.

6   Q.   Other than your training to become a corrections officer,

7   do you have any other experience with firearms?

8   A.   I grew up -- I've hunted with my father.  My father has a

9   pistol permit still to this day.  So I've been around guns for

11:18:49AM 10   most of my life.

11   Q.   Okay.  And you mentioned that you hunt?  You hunted?

12   A.   Yes, I do.

13   Q.   What sort of guns do you use when you hunt?

14   A.   Either a shotgun or a rifle.

11:19:00AM 15   Q.   Okay. Can you describe what the three guns were in the bag

16   with the two kilos of heroin?

17   A.   There was a shotgun; an Uzi style, I remember -- I believe

18   it was a 9 millimeter; as well as an AK-47.

19   Q.   Okay. Can you describe the AK-47 and what that looked

11:19:22AM 20   like?

21   A.   It had a wood stock, kind of beat up, and the only way I

22   can really describe it is like what you would see like in an

23   old Soviet movie.

24   Q.   Like an old Soviet movie?

11:19:47AM 25   A.   Right.  That's the only way I can -- I'm not quite sure

1    how to describe it.

2    Q.    Okay. And the 9 millimeter Uzi, what did that look like?

3    A.    It was a pistol.  Black, smaller -- smaller, shorter than

4    the rifle.

11:20:06AM 5    Q.    And the shotgun was the third?

6    A.    Correct.

7    Q.    Okay. Mr. Standish, I'm showing you what's been received

8    into evidence as Exhibit 323.  Have you had a chance -- well,

9    do you recognize this item?

11:20:21AM10   A.    I do, yes.

11   Q.    How do you recognize this?

12   A.    It looks identical to the firearm I had seen the day in

13   Buffalo.

14   Q.    And what is identical about this gun and the one you saw?

11:20:35AM15   A.    That's the wood stock, kind of beat up, older.

16   Q.    Okay. And I'd like to read from the stipulation that

17   states Government's Exhibit 323 is one 7.62 by 39 millimeter

18   caliber Norinco MAK 90 Sporter semi-automatic rifle with

19   serial number 9496997, seized from 292 Barrington Street,

11:21:25AM20   Rochester, New York on January 29th, 2018.

21            All right. Now, Mr. Standish, did the defendant say

22   anything to you about the guns that were with those kilos of

23   heroin that day?

24   A.    He had pulled the AK out and was just holding it, kind of

11:22:01AM25   gestured for me to hold it.  I just -- I refused.  I didn't --

1 I didn't touch any of the guns.

2 Q.   Okay.  Why not?

3 A.   I didn't want anything to do with it.  I didn't want my

4 fingerprints on them.  I didn't want any type of connection to

11:22:19AM 5 the guns.

6 Q.   Okay. How did you feel when the defendant showed you two

7 kilos of heroin and three firearms?

8 A.   It was definitely a shock.  I wasn't expecting it, that's

9 for sure.

11:22:36AM 10 Q.   Okay. How did you leave things with the defendant that

11 day?

12 A.   After he showed me the guns and the drugs, he gave me my

13 bag of drugs and I returned to my vehicle and headed home.

14 Q.   Okay. Were there any other times that the defendant took

11:22:55AM 15 you into the house on the right of Government's Exhibit 64?

16 A.   There was one other occasion, yes.

17 Q.   Can you tell the jury about that time?

18 A.   I -- it was in the front apartment on the second occasion.

19 I used the same sidewalk to the right of the house, there was

11:23:18AM 20 also a side porch and I followed the defendant into the front

21 apartment of the same house.

22 Q.   Okay. And what happened when you got to the front

23 apartment?

24 A.   I followed him into the residence, I closed the door

11:23:36AM 25 behind me, and it was also another like kitchen/dining room

951

1  area.

2  Q.   Okay. When you went into the rear in the front apartment

3  with the defendant, was there anybody else around for either

4  of those occasions?

11:23:49AM 5  A.   In the front apartment there was a Hispanic woman that

6  entered the kitchen and the defendant spoke to her in Spanish

7  and she then exited the kitchen.  She was there for 10 seconds

8  or so.

9  Q.   What did she look like?

11:24:12AM 10  A.   Long hair, tan complexion, kind of heavy set.

11  Q.   Older, younger?

12  A.   Maybe approximately my age, approximately.

13  Q.   Okay. So what happened when you got into that front

14  apartment with the defendant?

11:24:37AM 15  A.   I bought the heroin on that particular day.

16  Q.   Okay. Anything else happen that day?

17  A.   I was shown a news clipping article on his -- he showed me

18  a news article on his phone in regards to Buffalo, a west side

19  shooting.

11:25:02AM 20  Q.   What exactly did he show you?

21  A.   He -- it said Buffalo west side shooting, and he started

22  to play through it.  That was kind of where it ended.

23  Q.   Buffalo west side shooting, was that the headline of the

24  article he showed you?

11:25:22AM 25  A.   That was the headline, yes.

1   Q.   And did he say anything to you when he showed you the

2   article?

3            MR. VERRILLO: Objection.

4            THE COURT: Overruled.  You can say what he said.

11:25:34AM 5            THE WITNESS: He said this is what happens when you

6   fuck with the wrong people.  And the next thing he said was

7   this cat was begging for his fucking life.

8   BY MS. KOCHER:

9   Q.   What was his demeanor as he said this is what happens when

11:25:49AM10   you fuck with the wrong people and this cat was begging for

11   his life?

12   A.   Serious.  Like -- almost like he was proud of it, like he

13   was --

14            MR. VERRILLO: Objection.

11:26:01AM15            THE COURT: Sustained.  That will be stricken.

16   BY MS. KOCHER:

17   Q.   What observations did you make of him as he made those

18   statements to you?

19   A.   I'm not quite sure how to answer that.

11:26:23AM20   Q.   Okay.

21   A.   It was -- I'm not sure how to answer that question.

22   Q.   All right. Can you describe what his tone was like as he

23   said those words to you?

24   A.   Casual.  It wasn't -- it was very -- it was very casual in

11:26:46AM25   the way that the conversation was taking place.

1  Q.   Okay. And when he told you this cat was begging for his

2  life, what did you take that to mean?

3  A.   That he -- he was there.  He knew what happened --

4          **MR. VERRILLO:** Objection.

11:27:02AM 5          **THE WITNESS:** -- in reference to that article.

6          **THE COURT:** Hang on, there's an objection.

7  Overruled.  Finish your answer.

8          **THE WITNESS:** That he knew what happened in that

9  particular article.

11:27:11AM 10  **BY MS. KOCHER:**

11  Q.   Okay.  I think the first part of your question was --

12  answer was that he was there?

13  A.   Yes.

14          **MR. VERRILLO:** Objection.

11:27:19AM 15          **THE COURT:** Yes, sustained.

16          **MS. KOCHER:** Your Honor, I was just repeating

17  because of defense counsel's objection.

18          **THE COURT:** Move on.

19  **BY MS. KOCHER:**

11:27:28AM 20  Q.   All right. Now, Mr. Standish, I'd like to show you what's

21  not been received into evidence as Exhibit 197.  Can you see

22  that exhibit on your monitor?

23  A.   I do, yes.

24  Q.   And do you recognize what's been marked as Exhibit 197?

11:27:51AM 25  A.   I do, yes.

1    Q.    What do you recognize that to be?

2    A.    I recognize that to be the article that I viewed on

3    Prospect Avenue that day.

4    Q.    Who showed you the article in Exhibit 197?

11:28:08AM 5    A.    The defendant.

6    Q.    Okay. Does this appear to be the exact article that the

7    defendant showed you that day in the apartment in Buffalo?

8    A.    It does.

9              **MS. KOCHER:** Your Honor, I'd offer Exhibit 197.

11:28:20AM 10             **MR. VERRILLO:** Objection, hearsay, lack of

11   foundation.

12             **THE COURT:** Overruled.  Exhibit 197 will be

13   received.

14             (**WHEREUPON**, Government Exhibit 197 was received

11:28:36AM 15   into evidence).

16   **BY MS. KOCHER:**

17   Q.    Mr. Standish, what do you recognize in this article from

18   the one the defendant showed you in the apartment?

19   A.    The headline.  The news up in the corner of it.

11:28:54AM 20   Q.    The news channel logo?

21   A.    Yes.  And also the time -- the time stamp as well.

22   Q.    Okay.  What is the time stamp on this article?

23   A.    June 6th, 2016 at 11:30 a.m..

24   Q.    Okay. Now, did there come a time that you learned who the

11:29:21AM 25   victim of this shooting was?

1    A.    I did later find out, yes.

2    Q.    I'd like to show you what's not been received into

3    evidence as Exhibit 193.  Do you recognize the individual in

4    Exhibit 193?

11:29:42AM 5    A.    I do, yes.

6    Q.    And who do you recognize that person to be?

7    A.    That's Flaco.

8    Q.    If we could go to Government Exhibit 1, which has been

9    received.  All right, could you please circle the individual

11:30:03AM 10   that you knew as Flaco?  You've circled the male on the bottom

11   row, second from the left in the red shirt; is that correct?

12   A.    That's correct.

13   Q.    All right. Now, after the defendant showed you the article

14   about the homicide, what happened?

11:30:25AM 15   A.    I then left and returned back home.

16   Q.    Okay. Did you purchase drugs from him that day as well?

17   A.    I did, yes.

18   Q.    Do you remember what you bought?

19   A.    I don't.  I don't recall specifically.  At that point I

11:30:44AM 20   was just ready to go.

21   Q.    Why were you just ready to go?

22   A.    The video -- the news clipping, I was just -- I guess I

23   was scared.  I don't know, scared.

24   Q.    Why were you scared?

11:31:04AM 25            **MR. VERRILLO:** Objection.

1          **THE COURT:** Overruled.

2          **THE WITNESS:** For my family, my family and I was

3     deep into an addiction that I was being fronted drugs for and

4     I was in a bad spot.

11:31:24AM 5  **BY MS. KOCHER:**

6     Q.   And who were you scared of at that time?

7     A.   The defendant; the whole -- the whole situation.

8     Q.   Okay.  Now, did you see the defendant after he showed you

9     that article about the homicide again?  Let me rephrase that.

11:31:45AM 10         Did you purchase drugs from him again after?

11    A.   I did not, no.

12    Q.   Okay. Now, I'd like to go back to Exhibit 225A, the

13    extraction.  If we could go to page 49.  And lines 295 and up.

14    So 295 is the top entry on page 49.  Mr. Standish, is this a

11:32:26AM 15  text message from the defendant to you?

16    A.   It is, yes.

17    Q.   All right. What's the time stamp on this message?

18    A.   May 31st, 2016.

19    Q.   Okay. And what did the defendant text you that day?

11:32:41AM 20  A.   I had an incoming text that said what up bro just making

21    sure you okay.

22    Q.   If we could go to page 48.  And zoom in on the bottom half

23    of that page.  All right, entry 294 also a time stamp from

24    May 31st of 2016?

11:33:08AM 25  A.   That's correct.

1  Q.   Did you respond to the defendant in that entry?

2  A.   I did.  I responded yeah bro, I wanted to come see you

3  today but I think I'm gonna have to wait until tomorrow, I've

4  got the money I owe, but I don't have any money to put with it

11:33:26AM 5  until I get my paycheck tomorrow.

6  Q.   Then in entry 293 the defendant sends you a text message

7  and what does he say?

8  A.   He responded you know you don't need to have money pa, you

9  know I got you.  But anyways I was just making sure you safe.

11:33:43AM 10  Q.   Okay.  And then the next entry 292 you texted the

11  defendant?

12  A.   I did.

13  Q.   What did you say?

14  A.   I said I'm gonna come out and see you in a little bit

11:34:00AM 15  then.

16  Q.   If we could do the top half of page 48.  Entry 291, did

17  you then text the defendant I want to show you what I've been

18  doing and see what you think.  I feel like I could be doing

19  better.  I'll write you when I'm on my way.

11:34:21AM 20  A.   Correct.

21  Q.   Okay. And how did the defendant respond to that in entry

22  290?

23  A.   290, and I have that white chick to (sic).

24  Q.   Okay. What were you and the defendant discussing in that

11:34:36AM 25  series of text messages?

1  A.    Line 291 I was referring to filling the bags with heroin

2  and I wanted to see what he thought, to see if I could do

3  better, to see if I could get more out of what I had.

4  Q.    How were you filling the bags of heroin?

11:35:10AM 5  A.    I was using a little -- like a metal -- a similar -- a

6  little scoop-type thing.

7  Q.    Okay. In this text message were you asking the defendant

8  or hoping the defendant could show you a better way to do it?

9  A.    Correct.

11:35:26AM 10  Q.    Okay. Did he, in fact, show you a better way to fill the

11  bags with heroin?

12  A.    He did.  He showed me the way that -- I don't know if it's

13  a better way.  He cut a straw at an angle and told me I should

14  use the straw to fill them.

11:35:50AM 15  Q.    Okay. So he showed you how he would use or fill the bag?

16  A.    Correct.

17  Q.    Okay. And is that straw the one that we discussed in

18  Exhibit 294 that was seized from your house?

19  A.    It is, yes.

11:36:00AM 20  Q.    The purple one?  The purple straw?

21  A.    Yes, it is.

22  Q.    Okay. And in the beginning of that conversation where you

23  were talking about money, can you explain that conversation?

24  We can go back if you'd like.

11:36:22AM 25  A.    If you could?

1  Q.   Sure.  We can go back to the bottom half of page 48, I

2  believe.  All right, so entry 294 where you say yeah bro I

3  wanted to come to see you today but I'm going to have to wait

4  until tomorrow, I've got the money I owe, but I don't have any

11:36:46AM 5  money to put with it until I get my paycheck, can you explain

6  what you meant in that message?

7  A.   I meant that I had the money to pay him and be to the

8  point where I didn't owe anything.  But it was a long ride

9  like for me to go out there and not get anything back -- to go

11:37:07AM10  back home with.

11  Q.   When you say "not get anything back," what would you --

12  A.   To not come back with heroin.

13  Q.   Okay.

14  A.   I wanted -- I was either going to wait unless I could be

11:37:21AM15  fronted.

16  Q.   Where the defendant texted you in entry 293 says you know

17  you don't have to have money pa, you know I got you, but

18  anyways I was just making sure you safe, what did you take

19  that to mean when he said you know you don't need to have

11:37:36AM20  money pa?

21            **MR. VERRILLO:**  Objection.

22            **THE COURT:**  Overruled.  Go ahead.

23            **THE WITNESS:**  That he would front it to me.

24  **BY MS. KOCHER:**

11:37:43AM25  Q.   Front what?

1  A.   He would send me with heroin and/or cocaine without

2  having -- without having cash.

3  Q.   Okay. If we could go to the top half of page 48.   Entry

4  290 where the defendant texted and I have that white chick to

11:38:05AM 5  (sic), what did you take that to mean?

6  A.   That he had cocaine.

7  Q.   Okay. Now, if we could move to -- so this is all on

8  May 31st of 2016?

9  A.   Correct, that's correct.

11:38:20AM 10  Q.   If we could move to page 44.   Should be lines 272 to 270.

11  So we've zoomed in on line 272, this is on page 45 of

12  Exhibit 227A -- I'm sorry, 225A.

13             Mr. Standish, what is this entry the line 272?

14  A.   This is an outgoing message from myself to the defendant,

11:39:04AM 15  I wrote yo, I got to come out and see you.   You around.

16  Q.   Okay. And this is on June 2nd of 2016?

17  A.   That's correct.

18  Q.   Okay. If we can move to page 44.   And lines 271 and 270.

19  We've zoomed in on those.   Now, line 271, is this an outgoing

11:39:33AM 20  message from you to the defendant?

21  A.   It is.

22  Q.   And you said I'm here bro?

23  A.   Correct.

24  Q.   Okay. Now, when you say I'm here bro, where were you?

11:39:46AM 25  A.   I was in front of 299 Prospect in Buffalo.

1   Q.    Okay. So at this time you had already received that

2   address and that's where you would go meet the defendant?

3   A.    Correct.

4   Q.    Okay. I believe the next day June 3rd is when you sold the

11:40:09AM 5   quantity of heroin and cocaine to the informant?

6   A.    Yes.

7   Q.    And that was in your house?

8   A.    That's correct.

9   Q.    Okay. Now, next I'd like to move to page 21, line 114.

11:40:34AM 10   All right, is this another text message between you and the

11   defendant with that P contact?

12   A.    It is, yes.

13   Q.    And what's the date on this message?

14   A.    June 6th, 2016.

11:40:44AM 15   Q.    Okay. And the time stamp is 11:14:18 a.m.?

16   A.    That's correct.

17   Q.    Okay. And what did you text to the defendant at that time?

18   A.    I texted hey buddy question for you.  If I come out today

19   with like 600, would you be willing to send me with something

11:41:04AM 20   today to keep going til Thursday and I can come back out then

21   to square up with you.  My brother is giving me 500 on

22   Thursday when he gets paid, and I get a 2,000 check on

23   Thursday also.  Unless you would rather me just wait until

24   Thursday when I have it all.

11:41:21AM 25   Q.    And what did you mean in that text message?

1  A.    I owed him money for the drugs.

2  Q.    That he had fronted you previously?

3  A.    Yes.

4  Q.    Okay. All right.  The next line is entry 113.  Did the

11:41:45AM 5  defendant respond to your message?

6  A.    He did.  He responded I can work something out, yeah.

7  Q.    Okay. If we could turn to page 20, line 112.  This is

8  another outgoing text message from you to the defendant?

9  A.    It is.

11:42:03AM 10  Q.    And what did you text to him?

11  A.    I texted all right brother, you can trust me man.  I'm not

12  a shit bag.  LOL.  We'll talk when I get out there.  I've got

13  a few things to do before I can leave.  Just got to catch up

14  with a few people.

11:42:22AM 15  Q.    Okay. All right. Now, did you, in fact, meet with the

16  defendant that day on June 6th, 2016?

17  A.    I did, yes.

18  Q.    If we could go to page 19, line 101 and up to the top.

19  Okay.  Now, line -- these three lines 99 to 101, are these

11:42:50AM 20  text messages between you and the defendant?

21  A.    Yes, they are.

22  Q.    Now, starting at line 101, what is the time stamp on that?

23  A.    June 6th, 2016 at 2:40.

24  Q.    P.m.?

11:43:05AM 25  A.    P.m..

1    Q.    Okay. And was this an outgoing text message from you to

2    the defendant?

3    A.    It is, yes.

4    Q.    And what did you text him?

11:43:13AM 5    A.    I texted 15 minutes away buddy.

6    Q.    And did the defendant respond to that?

7    A.    He responded K.

8    Q.    And that's entry 100?

9    A.    Correct.

11:43:26AM 10    Q.    Okay. And entry No. 99, is that another outgoing message

11    from you to the defendant?

12    A.    It is, yes.

13    Q.    And that's on June 6th, 2016 at about 3:07 p.m.?

14    A.    Correct.

11:43:41AM 15    Q.    And what did you text the defendant at that time?

16    A.    I texted I'm here.

17    Q.    When you said I'm here, where were you?

18    A.    On Prospect Avenue in Buffalo.

19    Q.    Waiting to meet with the defendant?

11:43:53AM 20    A.    Correct.

21    Q.    All right. If we could go to page 18 and zoom in on line

22    98.  Is this an incoming message from the defendant to you on

23    June 6th at about 3:07 p.m.?

24    A.    It is.

11:44:13AM 25    Q.    And what did he text to you?

964

1  A.   He texted OMW, which I understand is on my way.

2  Q.   Okay. All right. Now, you described two incidents earlier

3  where you went into the house on Prospect Avenue?

4  A.   Correct.

11:44:42AM 5  Q.   Okay. If we could pull up Exhibit 64.  And it was the

6  house on the right that you went into?

7  A.   It is, yes.

8  Q.   These text messages on June 6th, 2016, were either of

9  those incidents that you described to us earlier where you

11:45:03AM10  went to the front or the rear apartment, do they happen on

11  that day on June 6th, 2016?

12  A.   Yes.

13  Q.   Which incident?

14  A.   The news clipping incident.

11:45:14AM15  Q.   Where the defendant showed you the article about the

16  homicide?

17  A.   Correct.

18  Q.   Did you get any other contact information from the

19  defendant at that time?

11:45:30AM20  A.   I believe so, yes.

21  Q.   Okay. I'd like to go to Exhibit 225A, page 4, line 25.

22  All right.  Now, this is the contact listing from the blue

23  Samsung phone?

24  A.   Yes.

11:45:51AM25  Q.   And entry 25 on the contact listing is the name Pepe?

1   A.   Correct.

2   Q.   Who was that person that you saved this contact as?

3   A.   The defendant.

4   Q.   Now, the phone number associated with the contact Pepe,

11:46:08AM 5   what number was it?

6   A.   716-468-0306.

7   Q.   And who gave you that phone number?

8   A.   The defendant himself.

9   Q.   All right. Now, two days after the defendant gave you this

11:46:34AM 10   716 phone number, you were arrested?

11   A.   That's correct.

12   Q.   Now, after you were arrested -- where were you arrested

13   specifically?

14   A.   I was arrested pulling into a school.  I was actually

11:46:51AM 15   bringing my son lunch money.

16   Q.   And were you in the white Chevy Malibu?

17   A.   I was, yes.

18   Q.   What, if anything, did you have in the car with you that

19   day?

11:47:03AM 20   A.   I had a Mapquest printed out on my front seat directions

21   from my house to 299 Prospect Avenue.

22   Q.   And why did you have directions to 299 Prospect Avenue

23   with you that day?

24   A.   I had printed it out because I was going back and forth.

11:47:27AM 25   I was planning on going to Buffalo.

1    Q.    Okay. When were you planning on going to Buffalo?

2    A.    It was before the trips that I had taken, I believe.

3    Q.    Okay. Now, when the police searched your house that day,

4    did they find any drugs?

11:47:45AM 5   A.    No, no.  They found a lot of empty bags with residue, but

6    there was not a quantity of drugs.

7    Q.    Did you have any plans to get more drugs that day?

8    A.    I was planning on going that morning.

9    Q.    Going where?

11:48:01AM 10  A.    To Buffalo to meet the defendant.

11   Q.    Okay. Now, after you were arrested what happened?

12   A.    I was pulled over as I was pulling into the school parking

13   lot.  The officer had me step out of the vehicle and I got

14   into the back of an undercover vehicle.  Another officer got

11:48:26AM 15  into my vehicle and we followed my car to my residence which

16   at the time they were executing the search warrant on my home.

17   Q.    Okay. Did you agree to cooperate with police that day?

18   A.    I did, yes.

19   Q.    And how did you cooperate?

11:48:46AM 20  A.    Started speaking the truth.

21   Q.    What did you tell the police?

22   A.    I told them that I may have some information in regards to

23   a murder and a large quantity of drugs.

24   Q.    Okay. What murder were you referring to?

11:49:02AM 25  A.    To the Buffalo west side shooting.

1    Q.   If we could show you Exhibit 197 that's been received.  We

2    have Exhibit 197, which is the news article.  Was this the

3    murder that you were referring to?

4    A.   It is, yes.

11:49:26AM 5    Q.   Why did you think you had some information on that to give

6    to the police?

7    A.   Because I believed that the defendant --

8                **MR. VERRILLO:** Objection.

9                **THE COURT:** Sustained.

11:49:38AM 10   **BY MS. KOCHER:**

11   Q.   This is the article the defendant had showed you?

12   A.   It is, yes.

13   Q.   Just a few days earlier on June 6th?

14   A.   Correct.

11:49:51AM 15   Q.   All right. Now, after you told the police that you had

16   some information about a homicide and a quantity of drugs,

17   what happened?

18   A.   I then rode to -- I rode in the back of an undercover

19   vehicle to Buffalo.

11:50:08AM 20   Q.   Okay.  Where in Buffalo?

21   A.   To Prospect Avenue and then to the Buffalo Police

22   Department.

23   Q.   What happened when you got to Prospect Avenue?

24   A.   I was in the back seat of a Tahoe, Chevy Tahoe with an

11:50:27AM 25   investigator, and when we -- we arrived we pulled up to a stop

1   sign.  As we pulled up to the stop sign, the defendant pulled

2   up to the same stop sign coming from a different direction.

3   He was driving a red Mustang at the time.  And I was told to

4   get down in the back seat.  And as the defendant drove past, I

11:50:54AM 5   sat back up and as we were driving by 299 Prospect, I pointed

6   to the house that I had bought drugs from.

7   Q.   Okay. Did you point the defendant out to the police

8   officers?

9   A.   Yes.

11:51:16AM 10   Q.   Okay. We can go to Exhibit 64.  Now, when you pointed --

11   which house did you point out to the police officers, the one

12   on the right that you'd been going into?

13   A.   I pointed to the right house, yes.

14   Q.   And could you place an X at the house that you pointed at?

11:51:31AM 15   All right, so you put an X on the house to the right ?

16   A.   Correct.

17   Q.   When the officers took you down Prospect Avenue, can you

18   explain how that went and how you pointed the house out?

19   A.   It was very -- it was quick.  There was one officer

11:51:48AM 20   driving the vehicle and myself in the back seat.  So it was

21   very brief.

22   Q.   Did they stop in front of each house on the street?

23   A.   They did not, no.

24   Q.   You were moving down the street?

11:52:04AM 25   A.   Correct.

1  Q.   All right. Now, you mentioned that you had planned to go

2  see the defendant in Buffalo that day, but you got arrested?

3  A.   That's correct.

4  Q.   What number would you have used to contact the defendant

11:52:23AM 5  on June 8th if you had not been arrested?

6  A.   I would have used the most recent contact that I had for

7  the defendant.

8  Q.   Okay. If we can go back to Exhibit 225A, page 4 and zoom

9  in on lines 24 and 25.  Now, are these the two contact numbers

11:52:47AM 10  that you had for the defendant, P and Pepe?

11  A.   Yes.

12  Q.   And which is the more recent one?

13  A.   The most recent one is line 25, the 716-468-0306.

14  Q.   All right. Thank you, Mr. Standish.

11:53:11AM 15        **MS. KOCHER:**  I don't have anymore questions.

16        **THE COURT:** This is a good time to take a recess.

17  Ladies and gentlemen, at this time we'll take a recess.  In

18  the meantime, I'd ask you not discuss the matter or allow

19  anybody to discuss the matter with you.  The jury may step

11:53:21AM 20  down.

21        (**WHEREUPON**, there was a pause in the proceeding).

22        (**WHEREUPON**, the defendant is present; the jury is

23  present).

24        **THE COURT:** Bring the witness back.  Mr. Verrillo,

12:32:37PM 25  you may proceed.

1          MR. VERRILLO: Thank you.

2              **CROSS-EXAMINATION**

3  **BY MR. VERRILLO:**

4  Q.    Mr. Standish, can you hear me okay?

12:32:46PM 5  A.    Yes.

6  Q.    All right. Isn't it true that you previously testified at

7  the grand jury?

8  A.    I did, yes.

9  Q.    And when you were arrested on June 8th, 2016, did you talk

12:32:59PM 10 to the Buffalo Police Department?

11 A.    I did, yes.

12 Q.    And on June 8th, 2016, did you testify in Buffalo City

13 Court regarding 299 Prospect?

14 A.    I did, yes.

12:33:16PM 15 Q.    Okay. And was your testimony before the grand jury

16 truthful?

17 A.    I believed it to be, yes.

18 Q.    And was your testimony before the Buffalo City Court judge

19 truthful?

12:33:27PM 20 A.    I believed it to be, yes.

21 Q.    Since your arrest on June 8th, 2016, have you spent any

22 time in jail?

23 A.    No, I have not.

24 Q.    And you've --

12:33:40PM 25 A.    I apologize.  I'm sorry, I might have misunderstood.

971

```
  1  Could you please repeat?
  2  Q.   Okay. You were arrested on June 8th, 2016?
  3  A.   Correct.
  4  Q.   And since then have you spent any time in jail?
  5  A.   I did, yes.
  6  Q.   Okay.  How much time did you spend?
  7  A.   I spent 16 days in Orleans County Jail.
  8  Q.   Okay.  And then you were released as a part of this
  9  cooperation you had with the Government?
 10  A.   I bonded out of jail at that time.
 11  Q.   Okay.  Were you a correction officer for approximately
 12  four years?
 13  A.   That's correct.
 14  Q.   And you talked about in your direct testimony that you had
 15  some training as a corrections officer; is that right?
 16  A.   I did, yes.
 17  Q.   And was one of the elements of your training how you would
 18  deal with inmates in the facility?
 19  A.   That's correct, yes.
 20  Q.   And as part of your job as a corrections officer did you
 21  deal with inmates in the facilities?
 22  A.   I did, yes.
 23  Q.   On a daily basis?
 24  A.   Yes.
 25  Q.   I believe you indicated you've worked at Attica and
```

12:33:52PM (line 5)
12:34:03PM (line 10)
12:34:21PM (line 15)
12:34:32PM (line 20)
12:34:40PM (line 25)

972

1    Orleans as some examples, correct?

2    A.    Correct.

3    Q.    And can you tell us what it's like to live in a state

4    prison?

12:34:53PM 5            MS. KOCHER: Objection.

6            THE COURT: To live in a state prison?

7            MR. VERRILLO: To reside there, what does it

8    involve.

9            THE COURT: Sustained.

12:35:04PM 10           THE WITNESS: I --

11           THE COURT: Sustained.  You don't have to answer.

12   BY MR. VERRILLO:

13   Q.    As a term of your employment did you promise not to commit

14   any crimes while employed with New York State Department of

12:35:14PM 15  Corrections?

16   A.    I did, yes.

17   Q.    And Orleans correctional is what kind of prison?

18   A.    It is a state correctional facility.

19   Q.    Okay. What level prison is that?

12:35:23PM 20  A.    Which one are you referring to?

21   Q.    Wherever you were working.

22   A.    I worked at a few different facilities.

23   Q.    Okay. I'm talking about in Orleans.

24   A.    Orleans correctional facility is a medium security

12:35:34PM 25  facility.

```
 1  Q.   Okay. And as a corrections officer do you take an oath?

 2  A.   I did, yes.

 3  Q.   What does that oath entail?

 4  A.   To respect the law.  I took an oath as a peace officer.

 5  Q.   And to obey the law?

 6  A.   Correct.

 7  Q.   And you testified that you and your wife had drug habits

 8  during the times that we've talked about?

 9  A.   That is correct, yes.

10  Q.   And when you were working at the correctional facility,

11  Orleans correctional facility, did you have a drug problem?

12  A.   I did, yes.

13  Q.   And did you sell drugs to anyone at the correctional

14  facility?

15  A.   No, I did not.

16  Q.   You testified you had sold drugs to your brother and some

17  close friends; is that correct?

18  A.   That's correct, yes.

19  Q.   And yet you were caught selling drugs to an undercover

20  officer, correct?

21  A.   That is correct.

22  Q.   You testified on your direct that you were facing five

23  felony charges?

24  A.   Five felony charges of possession and five felony charges

25  of sale.
```

974

```
 1   Q.   Okay. So you had ten charges?

 2   A.   Yes.

 3   Q.   And those were Class B felonies?

 4   A.   That's correct.

 5   Q.   And you were aware that you faced up to 25 years in prison

 6   for each offense, correct?

 7   A.   That is correct, yes.

 8   Q.   And you indicated you have two children.  They were

 9   roughly 7 and 10 years old in 2016?

10   A.   That's incorrect.

11   Q.   How old were they?

12   A.   My youngest in 2017 you asked?

13   Q.   I said '16.

14   A.   2016 my youngest would have been two years old.

15   Q.   Okay.  And the older one was how old?

16   A.   He would have been five at the time.

17   Q.   Okay. And you didn't want to go to state prison, correct?

18   A.   That's correct, yes.

19   Q.   And the outcome that you worked out was one misdemeanor

20   offense and a conditional discharge?

21   A.   Correct.

22   Q.   And you were not charged with any federal crimes as a term

23   of your agreement to cooperate?

24   A.   That's correct.

25   Q.   And are you testifying today under a cooperation agreement
```

1  with the Government?

2  A.   At this point in time, no.  My agreement has expired.

3  Q.   When did your agreement expire as it related to the

4  cooperation agreement?

12:38:06PM 5  A.   I believe it was nine months after my initial arrest date.

6  Q.   So when would that be?

7  A.   Approximately March of 2017.

8  Q.   Do you recall testifying in the grand jury in November of

9  2018?

12:38:35PM 10  A.   I do recall that, yes.

11  Q.   And when you testified before the grand jury were you

12  testifying under a cooperation agreement?

13  A.   I am not -- to be honest with you, I'm not sure at that

14  point.

12:38:50PM 15  Q.   You said your cooperation agreement ended about nine

16  months after your arrest, correct?

17  A.   Correct.

18  Q.   Okay. So when you testified in November of 2018, that

19  would have been after your cooperation agreement had expired?

12:39:05PM 20  A.   That is correct.

21  Q.   Okay. And is it your testimony that your cooperation

22  agreement was not in effect as of November of 2018?

23  A.   I would -- is it possible to see my cooperation agreement?

24  Q.   I don't know if I have that.  Well, do you recall talking

12:39:33PM 25  about that in your testimony before the grand jury on November

1  8th, 2018?

2  A.   I guess I'm not understanding.  Talking -- talking about

3  what?

4  Q.   When you testified before the grand jury on November 8th,

12:39:48PM 5  2018, do you recall being asked questions about whether you

6  were testifying under a cooperation agreement?

7  A.   I don't recall specifically, no.

8  Q.   Okay. Okay.  All right. I would like to have shown for

9  identification Exhibit 526.  Sir, if you could look at

12:40:29PM 10  Exhibit 526, which is going to be on your screen for

11  identification.  Do you see that on your screen?

12  A.   I do, yes.

13  Q.   Okay.  And going down to page 2, line 23, do you recall

14  the question being asked --

12:40:51PM 15       MS. KOCHER: Objection, Your Honor, he hasn't said

16  any inconsistent statement.  He said he doesn't recall.  If

17  Mr. Verrillo wants to give him a chance to review his grand

18  jury testimony and see if it refreshes his recollection, that

19  would be fine.

12:41:02PM 20       THE COURT: Yes, that would be the proper way to

21  proceed.

22       MR. VERRILLO: Okay, I'll show him.  I'm sorry, Your

23  Honor, do you want me to show him the exhibit?

24       THE COURT: Yes, he's got it.

12:41:12PM 25  BY MR. VERRILLO:

1  Q.   Beginning with line 23 on page 2 and continuing -- first

2  of all, you can read line 23 to 25 to yourself.  And

3  continuing on page 3, lines 1 through 3.  Do you see that?

4  A.   I do see that, yes.

12:41:37PM 5  Q.   Okay. After seeing those portions, does that refresh your

6  memory whether you were under a cooperation agreement when you

7  testified before the grand jury?

8  A.   I understand that if I lie, that I -- I could -- charges

9  could be brought against me is the way I understand that.

12:42:06PM 10  Q.   Because you were under a cooperation agreement at that

11  time, right?

12  A.   Correct, yes.

13  Q.   That was as of November of 2018?

14  A.   Yes.

12:42:16PM 15  Q.   So your cooperation agreement didn't end in 2017, did it?

16  A.   Apparently not.

17         **MS. KOCHER:** Your Honor, if he's trying to refresh

18  Mr. Standish's recollection, I think page 4 would probably be

19  more poignant.

12:42:36PM 20         **THE COURT:** I think he's doing his own examination.

21  **BY MR. VERRILLO:**

22  Q.   Okay.  Now, you were asked some questions about when the

23  defendant left for Buffalo.  Do you recall that?

24  A.   Yes.

12:42:57PM 25  Q.   And do you recall talking to the Buffalo Police Department

1  about when the defendant left Buffalo?

2  A.    When the defendant left Buffalo?

3  Q.    I'm sorry, left Rochester for Buffalo.

4  A.    I do, yes.

12:43:16PM 5  Q.    Okay. Do you recall telling them that he left three months

6  prior to your interview?

7  A.    I do not recall that, no.

8  Q.    And when you testified on direct you indicated that you

9  knew a particular reason why the defendant left Rochester for

12:43:34PM 10  Buffalo; is that right?

11  A.    Yes.

12  Q.    You did know a particular reason?

13  A.    I was told by the defendant that he was leaving Rochester

14  because he was in a war.

12:43:48PM 15  Q.    Okay. All right. Let me just see here, okay, sir, do you

16  recall being asked at the grand jury whether there was a

17  particular reason why the defendant left Rochester for

18  Buffalo?

19  A.    I don't recall the specific conversation, no.

12:44:41PM 20  Q.    All right.  Now, you testified that there were two

21  occasions that you went inside the Prospect Avenue apartment;

22  is that right?

23  A.    Yes.

24  Q.    And do you know when that was?  What dates those were?

12:45:02PM 25  A.    If I could go back to my text messages, I could tell you

979

1  exact.

2  Q.   I'm asking if you recall as you sit here today.

3  A.   I wouldn't feel comfortable answering that question

4  without seeing -- seeing it on paper.

12:45:21PM 5  Q.   Was your last purchase of drugs from Pepe at Prospect

6  Avenue on June 4th, 2016?

7  A.   It was June 6th, 2016.

8  Q.   Okay. And what was the other date -- strike that.

9         But there were two occasions that you -- you're

12:45:50PM 10  recalling, correct?  That you went into the apartment?

11  A.   Correct.

12  Q.   And you had testified about those events on June 8th, 2016

13  when you went to Buffalo City Court, correct?

14  A.   That is correct, yes.

12:46:01PM 15  Q.   And did you tell the Court that two instances that you

16  went into the apartment was on May 29th and on June 4th, 2016?

17  A.   I believe I did, yes.

18  Q.   I'm sorry?

19  A.   I believe I did, yes.

12:46:18PM 20  Q.   Okay.  Those were the two dates that you went in?

21  A.   They -- after reading the text messages, I was -- I'm able

22  to be more accurate with my date.

23  Q.   All right. All I'm asking -- sir, let me ask you this: On

24  June 8th, 2016, you went to Buffalo City Court to testify

12:46:43PM 25  regarding the times that you went into 299 Prospect Avenue,

1  correct?

2  A.   Correct.

3  Q.   And the dates that you gave at that time were May 29th and

4  June 4th, 2016?

12:46:55PM 5  A.   That is correct, that's the way it appears, yes.

6  Q.   And on May 29th, 2016, was the date that you indicated you

7  had seen some rifles and some drugs, correct?

8  A.   That is correct, yes.

9  Q.   And on June 4th was a controlled buy?

12:47:17PM 10  A.   It was not a controlled buy.

11  Q.   Okay. All right. Well, I want to show you what is marked

12  as Exhibit 525.  And I'm going to ask you -- and you see

13  Exhibit 525?

14  A.   I do, yes.

12:47:51PM 15  Q.   And this is just for identification.  I'm going to show

16  you -- this is page -- looks like page 2 of the document, page

17  4 it says on top, but I'm going to ask you -- I'm going to

18  read the question and ask you if these responses are accurate.

19         Question: All right.  We're here to talk about a

12:48:12PM 20  search warrant application for Prospect Avenue.  Are you

21  familiar with that property?

22         Answer: Yes, I am.

23         Question: Tell me about the outside first.

24         Answer: It is gray with black shutters, has a

12:48:25PM 25  sidewalk, shutters, also a sidewalk to the right of the house,

1  a porch downstairs and a porch upstairs.

2          Question: Okay.  Ronald, when did you go to this

3  property?

4          Answer: Last Saturday.

12:48:36PM 5          Question:  All right.  What was your purpose in

6  going there?

7          Answer: To buy drugs.

8          Question: Okay.  Was this a controlled buy?

9          Answer: Yes.

12:48:44PM 10          Question: And you were there Saturday.  What date

11  was that?

12          Answer: June 4.

13          Question: All right, 6/4/16.  What time?

14          Answer: About 1:30 in the morning.

12:49:07PM 15          Question: Okay.  And when you went there, what

16  happened?  Did you go up on the sidewalk and ring the

17  doorbell?

18          Answer: I called him, he said that he was there, he

19  came out on the sidewalk and then I followed him in.

12:49:23PM 20          Question --

21          **MS. KOCHER:** Objection.  Is there a question, Your

22  Honor?

23          **MR. VERRILLO:** I'm reading to him about the event.

24          **MS. KOCHER:** I think we've gotten to the

12:49:31PM 25  inconsistent part.

982

1              **MR. VERRILLO:** I just had one more section.

2              **THE COURT:** Go ahead.

3              **MR. VERRILLO:** Can I finish the section?

4              **THE COURT:** Yes.

12:49:39PM 5   BY MR. VERRILLO:

6   Q.   Okay.  I think I finished at line 7.

7              Question: Okay.  And when you went there what

8   happened?  Did you go up on the sidewalk and ring the

9   doorbell?

12:49:53PM 10             Answer: I called him, he said that he was there, he

11  came out on the sidewalk and then I followed him in.

12             Question: Once inside did you see where the drugs

13  were stored?

14             Answer: Not on that particular day, no, but before

12:50:05PM 15  that, yes.

16             Sir, did I correctly read the questions and answers

17  that you gave on the date that you were before the Buffalo

18  City Court judge?

19  A.   Yes.  I believe line 6 was a typo.  I had never been out

12:50:24PM 20  there at 1:30 in the morning.  I believe that that is supposed

21  to be 11:30.

22  Q.   Sir, did I correctly read the answers that are reflected

23  in the transcript?

24  A.   Yes.

12:50:35PM 25  Q.   That was one event you testified to which was June 4th,

983

1  2016; and then the other event that you testified before the

2  Buffalo City Court related to an event on May 29th, 2016; is

3  that right?  That was the date when you saw a firearm and some

4  drugs, correct?

12:51:07PM 5  A.   I later learned it was an incorrect date.

6  Q.   Let me just see here, okay, sir, do you recall being asked

7  questions -- and I'm referring to page -- this would be page

8  6, I believe, let me see here.  Page 6, do you recall being

9  asked the questions?  This begins on line 21.

12:52:00PM 10          **MS. KOCHER:** Objection.

11          **THE COURT:** Overruled.  Go ahead.

12  **BY MR. VERRILLO:**

13  Q.   Question: Okay.  When you approached this property the

14  second occasion, what happened then?

12:52:12PM 15          Answer: It was also to purchase.

16          Question: Same guy?

17          Answer: Same guy.

18          Question: Do you know when you went there?

19          Answer: Approximately ten days ago.

12:52:23PM 20          Question: What happened on that day?

21          Answer: He came out of the back room with a couple

22  assault rifles, an AK-47.

23          Question: What was the purpose of him showing these

24  weapons?

12:52:34PM 25          Answer: He trusts he (sic).

984

1          Question: All right.  Why does he go to that door,

2     do you know?

3          Answer: I don't know.  I don't know.  I believe

4     that back door is where drugs are stashed.

12:52:46PM 5          Question: And you are coming forward today for what

6     purpose?

7          Answer: To help the police, to help myself.

8          Did I correctly read the questions and the answers

9     you gave to those questions?

12:53:00PM 10    A.   I'm not sure exactly what the question was, to be honest

11    with you.

12    Q.   Well, did I accurately -- there were questions that were

13    asked of you before the judge on June 8th, 2016 and there were

14    answers given, correct?

12:53:15PM 15    A.   That's correct.

16    Q.   And did I accurately read what your answers were?

17    A.   That is correct, yes.

18    Q.   When you testified on June 8th, 2016, you were testifying

19    because you wanted to help the police and help yourself,

12:53:30PM 20    right?

21    A.   That's fair to say, yes.

22    Q.   When you testified on June 8th, 2016, you would have known

23    of seeing an ad -- or seeing a newspaper article on June 6th,

24    2016, right?

12:53:44PM 25    A.   Correct.

1  Q.   And you didn't say anything about that to the judge, did

2  you?

3  A.   I did not, no.

4  Q.   Because the last date that you said you had contact with

12:53:54PM 5  the defendant was June 4th, 2016, right?

6  A.   At this time, yes.

7  Q.   Well, today is November 2nd, 2021, correct?

8  A.   Correct.

9  Q.   Has your memory improved from when you testified on

12:54:08PM 10  June 8th, 2016?

11  A.   Has my memory improved?

12  Q.   Yes, sir.

13  A.   I have had a chance to review text messages from cell

14  phone extractions.  During this time my whole world flipped

12:54:26PM 15  upside down.  I was a state correctional officer that was

16  arrested.  I was scared.  I -- I don't recall -- I don't even

17  recall being asked these questions specifically.

18  Q.   But let me ask you this question: If you had a

19  conversation or an interaction with this defendant two days

12:54:58PM 20  before you testified, would you agree that's something you

21  should remember?

22          **MS. KOCHER:** Objection.

23          **THE COURT:** Overruled.  You can answer that.

24          **THE WITNESS:** I don't believe so, no.

12:55:09PM 25  **BY MR. VERRILLO:**

1  Q.   You wouldn't remember something that allegedly happened

2  two days before you went to court and talked about what

3  happened on Prospect Street?

4          **MS. KOCHER:** Objection to what "something" is.

12:55:18PM 5          **THE COURT:** Yes, sustained to the form of the

6  question.

7  **BY MR. VERRILLO:**

8  Q.   When you went before the judge in Buffalo City Court on

9  June 8th, 2016, did you know that you were going to be

12:55:37PM 10 discussing your activities or your contacts with 299 Prospect

11 Street at that time?

12 A.   Yes.

13 Q.   Okay. You were with an agent or investigator at that time?

14 A.   Correct.

12:55:52PM 15 Q.   And that discussion with the judge occurred after you had

16 talked to the Buffalo Police Department officers?

17 A.   Correct.

18 Q.   So you had already talked to them and told them what you

19 knew about this case?

12:56:06PM 20 A.   Correct.

21 Q.   Okay. Now, you indicated at one of these occasions you saw

22 two kilos of heroin.  Do you recall that?

23 A.   I do.

24 Q.   How did you know how much it was?

12:56:25PM 25 A.   There were two bricks.  They were two bricks of heroin.

987

1    Q.   Well, you didn't weigh them, did you?

2    A.   I did not weigh them, no.

3    Q.   Okay. Okay.  Now, when you talked to the Buffalo Police

4    Department on June 8th, 2016, did you tell them that you --

12:56:58PM 5    that Pepe had a computer in the apartment?

6    A.   I don't recall saying that, no.

7    Q.   Do you recall telling them that you saw an advertisement

8    or a newspaper article on a computer when you were in the

9    apartment?

12:57:14PM 10   A.   I don't remember saying computer, no.

11   Q.   How about a laptop?

12   A.   No.

13   Q.   Did you see a laptop or computer in the apartment?

14   A.   I don't believe so, no.

12:57:22PM 15   Q.   What did you see in the apartment when you had this

16   conversation that you talked about with the defendant?

17   A.   As far as what I -- what did I see the news clipping on?

18   Q.   No.  What I'm asking is, you said you were in an

19   apartment, if I understand correctly?

12:57:39PM 20   A.   Correct.

21   Q.   When you had this conversation you talked about with the

22   defendant, correct?

23   A.   Correct.

24   Q.   Was the apartment furnished or unfurnished?  Can you

12:57:49PM 25   describe it?

988

1    A.    It was furnished.

2    Q.    It was fully furnished?

3    A.    Yes.

4    Q.    What else did you observe in the apartment?

12:58:02PM 5    A.    It appeared to be a livable apartment.

6    Q.    Okay. Did you see any mail in the apartment?

7    A.    I did not, no.

8    Q.    Did you see any food?  Did you see any food around in the

9    apartment?

12:58:16PM 10    A.    No.

11    Q.    Okay. When you spoke to the person you said is Pepe on

12    Burbank Street, were there times that you talked in the

13    presence of other people with Pepe?

14    A.    This person Pepe is the defendant that is sitting right

12:58:47PM 15    next to you so --

16    Q.    I'm asking a question, if I can.  The question I asked

17    you, was the person that you refer to as Pepe, did you ever

18    have occasions on Burbank where this person was with other

19    people?

12:59:07PM 20    A.    I guess I don't understand why you keep saying "this

21    person."  I'm not quite -- I'm not following.  I apologize.

22    Q.    Let me ask it a different way.  You say this person is

23    Pepe, right?

24    A.    Correct.

12:59:20PM 25    Q.    Okay. Can we start with that?  You agree with that, right?

989

1    A.    Yes.

2    Q.    Okay. So you testified that there were times you went to

3    Burbank where you saw Pepe, correct?

4    A.    Correct.

12:59:31PM 5    Q.    And were there occasions that other people were in the

6    presence of Pepe?

7    A.    Correct.

8    Q.    Okay. And what did those other people say when they talked

9    to this person that you refer to as Pepe?  How did they

12:59:43PM 10    describe him or what name did they use when they talked to

11    him?

12    A.    It would depend on the specific conversation or incident

13    that we're referring to.

14    Q.    Okay. How many times did you have conversations with Pepe

01:00:01PM 15    that there were other people present?

16    A.    Several.

17    Q.    Ten?  20?  Give me a rough number.

18    A.    At least 40.

19    Q.    Okay. Did any of the people that you -- that you heard

01:00:16PM 20    ever identify this person as Pepe?

21    A.    I'm not sure.  I'm not sure.

22    Q.    Okay.  Now, when you spoke to the police on June 8th,

23    2016, did you tell them that you saw guns at 299 Prospect?

24    A.    I did, yes.

01:00:44PM 25    Q.    And you told them that you saw drugs at 299 Prospect

1  correct?

2  A.   I did, yes.

3  Q.   That would have been on June 8th, 2016?

4  A.   That's correct.

01:00:52PM 5  Q.   And do the properties on Prospect, do they have numbers on

6  the outside of them?

7  A.   I am not sure.

8  Q.   Okay. Okay.  Now, you indicated when you had this drug

9  habit, you and your wife had a drug habit, you were spending

01:01:25PM 10  $1,000 a week on drugs; is that correct?

11  A.   Yeah, that's -- yes.

12  Q.   And what was your income from as a correctional officer?

13  What kind of income did you have?

14  A.   Approximately $1,600 every two weeks or so.  And my wife

01:01:42PM 15  was bringing home approximately $1,000 every two weeks.

16  Q.   Okay. So on a monthly basis that would be a little over

17  $5,000 a month?

18  A.   That's correct.

19  Q.   And you were spending a thousand a week on drugs is what

01:02:00PM 20  you testified to, correct?

21  A.   Correct.

22  Q.   And you owned a home or rented a home?

23  A.   We were renting the home.

24  Q.   Okay.  How much did that cost?

01:02:11PM 25  A.   I'm not sure.  I'm not sure what we were paying at that

1  time to be honest with you.

2  Q.   Well, you were renting?

3  A.   We were renting a full house, yes.

4  Q.   How many bedrooms did you have?

01:02:25PM 5  A.   Two bedrooms.

6  Q.   You also had two children that you were taking care of,

7  right?

8  A.   Correct.

9  Q.   And how were you making up the difference between the

01:02:34PM 10  money that you made and the expenses that you had?

11  A.   I was pawning items, borrowing money from my parents,

12  borrowing money from my wife's parents, and I began selling

13  heroin and cocaine to support my habit.

14  Q.   Okay. What time period were you selling drugs?

01:03:07PM 15  A.   A couple weeks leading up to my arrest.

16  Q.   I'm sorry, I missed that.

17  A.   A couple weeks leading up to my arrest.

18  Q.   That was when you started selling drugs?

19  A.   Correct.

01:03:28PM 20  Q.   Okay. When did you stop using drugs?

21  A.   September 13th, 2017.

22  Q.   Okay. Did Pepe use drugs?

23  A.   I -- I'm not sure.

24  Q.   You testified on direct that you were nervous when you

01:03:58PM 25  came into the courtroom.  Do you recall that?

1  A.   That's fair to say, yes.

2  Q.   Have you taken any drugs to help you with your

3  nervousness?

4  A.   No.

01:04:06PM 5  Q.   How many times have you met with the Government concerning

6  your testimony?

7  A.   I don't know.  At least ten times or so.

8  Q.   When was the last time you met with the Government

9  concerning your testimony?

01:04:32PM 10  A.   Yesterday.

11  Q.   You've referenced texts that you received from P or Pepe.

12  Isn't it true that you don't know who sent the texts back to

13  you?

14  A.   I suppose.

01:04:52PM 15  Q.   You had an incident with an undercover -- two incidents

16  with undercover officers that you testified to earlier,

17  correct?

18          **MS. KOCHER:** Objection.

19          **THE COURT:** I'm sorry, what?

01:05:09PM 20          **MS. KOCHER:** Objection, undercover officer.

21          **THE COURT:** Sustained.

22  **BY MR. VERRILLO:**

23  Q.   You had two incidents with a confidential informant?  Two

24  sales, correct?

01:05:21PM 25  A.   Correct.

1    Q.    With a confidential informant?

2    A.    That's correct.

3    Q.    One on June 3rd and one on June 6th, correct?

4    A.    Correct.

01:05:27PM 5    Q.    What time on June 6th did you have the incident with the

6    confidential informant?

7    A.    On June 6th you said?

8    Q.    Yes, sir.

9    A.    I would have to look at the video again.

01:05:44PM 10   Q.    Do you know whether it was in the morning?  In the

11   afternoon or evening?

12   A.    On June 6th it was in the afternoon.

13   Q.    You testified on direct that you only would sell to close

14   friends and your brother, correct?

01:05:59PM 15   A.    Correct.

16   Q.    But on these two occasions you sold to someone who was a

17   confidential source, correct?

18   A.    That's correct.

19   Q.    You also testified that you did not want Pepe to know

01:06:13PM 20   where you lived?

21   A.    That is correct.

22   Q.    But this person that was a confidential informant, you let

23   them know where you lived?

24   A.    That confidential informant showed up at my home not

01:06:24PM 25   because I told him to do so, because he was led there by a

1  close friend who I thought was a close friend at the time.

2          **MR. VERRILLO:** Your Honor, if I could just have a

3  moment?

4          **THE COURT:** Sure.

01:07:04PM 5  **BY MR. VERRILLO:**

6  Q.   When you had contact with Pepe in the Burbank area, did

7  you know where he lived?

8  A.   I did not, no.

9          **MR. VERRILLO:** I have nothing further.

01:07:30PM 10          **MS. KOCHER:** May I, Your Honor?  Thank you.

11                  **REDIRECT EXAMINATION**

12  **BY MS. KOCHER:**

13  Q.   Mr. Standish, Mr. Verrillo was just asking you about your

14  interactions with the confidential informant?

01:07:39PM 15  A.   Correct.

16  Q.   And the videos that we watched earlier today?

17  A.   Yes.

18  Q.   How did you -- do you now know who that confidential

19  informant is?

01:07:46PM 20  A.   I do, yes.

21  Q.   How were you introduced to that person?

22  A.   Through my brother and a guy that I went to high school

23  with.

24  Q.   So your brother.  Was the guy you went to high school with

01:07:58PM 25  the close friend?

1  A.   Yes.

2  Q.   Now, that first video clip we watched that was at your

3  home, you testified on cross-examination that you did not tell

4  him to come to your house?

01:08:14PM 5  A.   Correct.

6  Q.   What was your reaction when he showed up at your house

7  that morning?

8  A.   I was -- I was pissed off I guess.  My father would pick

9  up my youngest son and take him to school, and it was early in

01:08:33PM 10  the morning that he showed up to my home.  My youngest child

11  was still in the house, and my father had just pulled out of

12  the driveway and he was -- I can still see his truck driving

13  down the road as the confidential informant pulled into my

14  driveway.

01:08:52PM 15  Q.   Okay. And you didn't want your dad to see him coming to

16  the house?

17  A.   Correct.

18  Q.   Now, Mr. Verrillo also asked you about some testimony that

19  you gave to a judge in Buffalo?

01:09:02PM 20  A.   Yes.

21  Q.   That was on June 8th of 2016?

22  A.   Correct.

23  Q.   The day you were arrested?

24  A.   That's correct.

01:09:10PM 25  Q.   Okay. Now, on that day were you addicted to heroin and

996

1  cocaine at that point?

2  A.   I was, yes.

3  Q.   Do you remember about what time it was that you met with

4  the judge?

01:09:23PM 5  A.   I do not, no.

6  Q.   Okay. Was it right after your arrest or some time had

7  passed?

8  A.   Time had passed.  I believe I had already been out there

9  most of the day.

01:09:34PM 10  Q.   How were you feeling by the time that you met with the

11  judge?

12  A.   I was exhausted.  I worked the night shift the night

13  before, so I was up all night long and was arrested early in

14  the morning.  So I was up for the entire day as well.

01:09:53PM 15  Q.   Okay.

16  A.   Until I went -- until I arrived at Orleans County Jail.

17  Q.   Had you had any heroin that day?

18  A.   No, I did not.

19  Q.   And were you feeling the effects of that?

01:10:03PM 20  A.   Absolutely.

21  Q.   What were you feeling?

22  A.   I was tired, I just wanted to be -- I wanted to be done.

23  I wanted to lay down and just -- it was like a bad dream.

24  Q.   Okay. Now, when the judge was questioning you, Mr.

01:10:19PM 25  Verrillo brought up a question where the judge asked about you

1    doing a controlled buy.  Did you know what a controlled buy

2    was at that time?

3    A.    I would have known what a controlled buy was, but I

4    don't -- I don't know why I would have answered that way.

01:10:35PM 5    Q.    Okay.  Did the judge ever -- well, that day when you were

6    arrested did you tell the police about the homicide news

7    article that the defendant had shown you?

8    A.    I'm not sure.  Honestly, I don't remember.

9    Q.    Did the judge ever ask you about that homicide?

01:10:56PM 10    A.    I don't believe so.

11    Q.    All right.  So if the judge didn't ask you, you wouldn't

12    have brought it up?

13                 **MR. VERRILLO:** Objection.

14                 **THE COURT:** Overruled.  He can answer that.

01:11:05PM 15                 **THE WITNESS:** I'm not sure.  I don't -- I don't

16    believe I would have answered a question that I wasn't asked.

17    **BY MS. KOCHER:**

18    Q.    Okay.  Now, during Mr. Verrillo's questions he referred to

19    a person Pepe or the person Pepe.  Who do you know is Pepe?

01:11:35PM 20    A.    The individual sitting next to Mr. Verrillo in the white

21    shirt with the blue mask.

22    Q.    Okay. The defendant?

23    A.    The defendant.

24    Q.    Okay. How many -- I think you had testified yesterday that

01:11:48PM 25    you consistently saw the defendant over 100 times on Burbank

998

1   Street; is that correct?

2   A.   That's correct.

3   Q.   In your dealings with the defendant did you have the

4   chance to speak with him?

01:11:58PM 5   A.   Yes.

6   Q.   When you spoke with the defendant how close were you to

7   him?

8   A.   Couple feet.

9   Q.   Okay. You had also purchased drugs from him?

01:12:10PM 10   A.   Yes.

11   Q.   And how close would you be when you purchased drugs from

12   the defendant?

13   A.   Right face-to-face.

14   Q.   Was there anything blocking your view of the defendant's

01:12:21PM 15   face?

16   A.   No.

17   Q.   Would you meet with him in daylight hours?

18   A.   Yes.

19   Q.   When you went into houses was there lighting?

01:12:29PM 20   A.   Yes.

21   Q.   Was he wearing a mask when you would meet with him?

22   A.   No.

23   Q.   Okay. How sure are you that the defendant is the person

24   that you knew as Pepe who you bought cocaine and heroin from

01:12:39PM 25   on Burbank Street and other places?

1  A.   100%.

2  Q.   Mr. Verrillo also asked you if you ever saw the defendant

3  with other people on Burbank Street.  Do you recall that?

4  A.   Yes.

01:12:55PM 5  Q.   And I think he asked if you ever heard those people call

6  the defendant by any other names or called him Pepe.  Do you

7  recall that?

8  A.   Yes.

9  Q.   Do you recall any of the workers or people you bought

01:13:08PM 10  drugs from referring to the defendant in a certain with a

11  certain word, term?

12  A.   I remember them calling him P.  But I'm not sure where --

13  where Pepe came from.

14  Q.   Okay. So you had heard him called P before?

01:13:26PM 15  A.   Yes.

16  Q.   When you would go to Burbank and one of the workers or

17  sellers didn't have enough drugs for you to buy, what would

18  happen?

19  A.   They would call the defendant or they would make a phone

01:13:39PM 20  call, they said they were calling the boss and shortly later

21  the defendant would arrive.

22  Q.   So when they said "the boss," you believed them to be

23  referring to the defendant?

24  A.   Yes.

01:13:50PM 25          **MR. VERRILLO:** Objection.

1          **THE COURT:** Overruled.  Go ahead.  You can answer.

2    **BY MS. KOCHER:**

3    Q.   I'm sorry, I didn't hear the answer if there was one.

4          **THE COURT:** He answered yes.

01:13:58PM 5          **THE WITNESS:** Correct, yes.

6    **BY MS. KOCHER:**

7    Q.   And the phone numbers that we viewed in the Samsung cell

8    phone extraction, the P and the Pepe names --

9    A.   Yes.

01:14:19PM 10   Q.   -- who gave you those phone numbers?

11   A.   The defendant.

12   Q.   When you were using the P contact, who -- did you actually

13   speak with him on the phone at times?

14   A.   Yes.

01:14:29PM 15   Q.   Who would answer the phone?

16   A.   The defendant.

17   Q.   And when you would text that message or text that contact

18   number, who would you ultimately end up meeting with?

19   A.   The defendant.

01:14:39PM 20   Q.   Did you have much of a chance to use the Pepe contact to

21   reach out to the defendant?

22   A.   No, I don't believe so.

23   Q.   Okay. Why not?

24   A.   The newest contact, the most recent that I received from

01:14:54PM 25   him, and I was arrested.

1   Q.   Now, Mr. Verrillo asked you you didn't know who actually

2   sent text messages to you over the P or Pepe contact.  Do you

3   recall that question?

4   A.   Yes.

01:15:14PM 5   Q.   Did you actually see who sent the text messages?

6   A.   I did not, no.

7   Q.   And that's because you weren't with the person sending the

8   text messages?

9   A.   Correct.

01:15:26PM 10   Q.   Now, Mr. Verrillo also asked you about the cooperation

11   agreement that you had following your arrest.  Do you recall

12   those questions?

13   A.   I do, yes.

14   Q.   All right.  So what was your understanding of the

01:15:56PM 15   cooperation agreement -- what did you have to do to get the

16   misdemeanor conviction?

17   A.   Tell the truth.

18   Q.   Okay.

19   A.   And I would be offered to plead guilty to a possession in

01:16:09PM 20   the seventh degree.

21   Q.   Okay. With a conditional discharge?

22   A.   With a conditional discharge, yes.

23   Q.   There was a time limit on that cooperation agreement; is

24   that correct?

01:16:17PM 25   A.   There was, yes.

1  Q.   Is that cooperation agreement expired at this point?

2  A.   It is, yes.

3  Q.   When you testified in the grand jury, was the cooperation

4  agreement still in effect?

01:16:29PM 5  A.   I believe so, yes.

6  Q.   Okay. Now, by coming in to testify today, you've already

7  gotten the benefit of the cooperation agreement; is that

8  right?

9  A.   I'm done with everything.  I pled guilty and went a year,

01:16:46PM 10  I didn't get in any trouble and it's over.

11           **MS. KOCHER:** Thank you, Mr. Standish.

12           **THE WITNESS:** Thank you.

13                     <u>**RECROSS-EXAMINATION**</u>

14  BY MR. VERRILLO:

01:17:01PM 15  Q.   Sir, did you hear other persons refer to him as Pepe?

16           **MS. KOCHER:** Objection.

17           **THE COURT:** Overruled.  Go ahead.

18           **THE WITNESS:** I don't believe so.  I don't recall.

19           **MR. VERRILLO:** I have nothing further.

01:17:17PM 20           **THE COURT:** Anything further?

21           **MS. KOCHER:** No, thank you.

22           **THE COURT:**  You may step down.  Thank you.

23           **THE WITNESS:** Thank you.

24           (**WHEREUPON**, the witness was excused).

01:17:23PM 25           **THE COURT:** Sidebar.

1               (**WHEREUPON**, a discussion was held at side bar out

2   of the hearing of the jury.)

3               **THE COURT:** Can you hear me?

4               **MR. VERRILLO:** Yes.

01:17:44PM 5    **THE COURT:** I believe you wanted to get another

6   witness on, but I think it's kind of late for that, don't you

7   think?

8               **MR. MARANGOLA:** Judge --

9               **THE COURT:** I can't hear you.

01:17:52PM 10   **MR. MARANGOLA:** It's obviously up to the Court.  We

11  have two more.  They're relatively short and both from

12  Buffalo.  I think one of them may have a potential issue

13  coming tomorrow morning, it's one of the Buffalo lieutenants.

14  So it's up to the Court.

01:18:10PM 15   **THE COURT:** When you say "short," how short are you

16  talking about direct?

17              **MR. MARANGOLA:** I think one of them will be 15

18  minutes; the other I think I will be about 10 minutes.

19              **THE COURT:** Okay, let's get the one on anyways that

01:18:28PM 20  may have a problem tomorrow.

21              **MR. MARANGOLA:** Okay.  Thanks, Judge.

22              (**WHEREUPON**, side bar discussion concluded.)

23              **THE COURT:** We're going to take a short recess.

24  We're trying to get a couple witnesses in, or one anyway.

01:18:44PM 25  We'll take a short recess.  In the meantime, I'd ask the jury

1    not discuss the matter or allow anybody to discuss the matter

2    with you.  The jury may step down.

3                  (**WHEREUPON**, there was a pause in the proceeding).

4                  (**WHEREUPON**, the defendant is present; the jury is

01:32:44PM 5   present).

6                  THE COURT: Call your next witness.

7                  MR. MARANGOLA: Thank you, Your Honor.  The

8    Government calls Lieutenant Allen Smith.

9              <u>**GOVERNMENT'S WITNESS, ALLEN SMITH, SWORN**</u>

01:43:06PM 10                    <u>**DIRECT EXAMINATION**</u>

11                  THE CLERK: Please state your full name for the

12   record and spell your last name.

13                  THE WITNESS: Allen Smith, A-L-L-E-N, S-M-I-T-H.

14                  THE CLERK: Thank you.  You can have a seat right up

01:43:31PM 15  here.

16                  THE COURT: Good afternoon.  You may remove your

17   mask since you're behind plexiglas.

18                  THE WITNESS: Thank you, Judge.

19                  THE COURT: Thank you.

01:44:03PM 20                  You may proceed.

21                  MR. MARANGOLA: Thank you, Your Honor.

22   BY MR. MARANGOLA:

23   Q.   Good afternoon, sir.

24   A.   Good afternoon.

01:44:08PM 25  Q.   Would you please introduce yourself to the jury?

1005

1    A.    Hello.  My name is Allen Smith.  I'm with the City of

2    Buffalo Police Department.

3    Q.    And how long have you been with the City of Buffalo Police

4    Department?

01:44:18PM 5    A.    For 13 and a half years.

6    Q.    In what capacity do you work for the Buffalo Police

7    Department?

8    A.    I'm a lieutenant right now of a district.

9    Q.    And how long have you been a lieutenant with the Buffalo

01:44:30PM10    Police Department?

11    A.    I've been a lieutenant for right now three and a half

12    years.

13    Q.    And prior to that what was your rank with the Buffalo

14    Police Department?

01:44:39PM15    A.    I was a patrolman.

16    Q.    All right. Lieutenant, I'd like to direct your attention

17    to June 6th of 2016.  Were you working that day?

18    A.    Yes, I was.

19    Q.    In what capacity?

01:44:52PM20    A.    I was on patrol in Bravo District downtown.

21    Q.    Can you describe when you say Bravo District downtown,

22    what that means?

23    A.    Bravo District has a radius, certain streets make a

24    perimeter through the downtown area.

01:45:07PM25    Q.    Downtown in the City of Buffalo?

1   A.    Yes.

2   Q.    All right.  What was your shift that day on June 6th,

3   2016?

4   A.    The morning shift, which is 6 a.m. to 4 p.m.

01:45:18PM 5   Q.    Can you describe some of your duties as a patrol officer

6   while you were a patrolman for the Buffalo Police Department?

7   A.    The capacity is you answer the 911 calls in that area.

8   Q.    All right. Did you respond to any particular location

9   during the morning of June 6th, 2016 as a patrol officer?

01:45:38PM 10   A.    Yes, I did respond to Osborn Alley for a call that

11   morning.

12   Q.    All right. Is Osborn Alley in the City of Buffalo?

13   A.    Yes, it is, City of Buffalo.

14   Q.    All right. I'd like to show you what is not in evidence

01:45:53PM 15   and if you could take a look on your monitor there you should

16   see Government's 187.  And Government's 188.  Do you see those

17   two photographs?

18   A.    Yes, I do.

19   Q.    Do you recognize the area shown in those photographs?

01:46:16PM 20   A.    Yes, I do.

21   Q.    Do both of those photographs fairly and accurately show

22   the area that you responded to on the morning of June 6th,

23   2016?

24   A.    Yes, it does.

01:46:25PM 25             MR. MARANGOLA: At this time I'd offer Government's

1   187 and 188.

2          **MR. VERRILLO:** No objection.

3          **THE COURT:** Exhibits 187 and 188 will be received in

4   evidence.

01:46:39PM 5          (**WHEREUPON**, Government Exhibits 187-188 were

6   received into evidence).

7   **BY MR. MARANGOLA:**

8   Q.   Thank you.  Lieutenant, can you tell the jury where is

9   Osborn Alley located in the City of Buffalo?

01:46:51PM10  A.   Osborn Alley is located near the downtown area of Buffalo.

11  It's between 7th Street and Busti Avenue, and it's also

12  between two streets called Hudson and a street called

13  Pennsylvania.  The alley runs between those four streets.

14  Q.   All right. And the intersection we have here shown in

01:47:12PM15  Government's 187 is the intersection of what?

16  A.   That would be Hudson and Osborn Alley.

17  Q.   All right.  And Osborn Alley is in which portion of the

18  photograph marked Government's 187?  If you touch your screen

19  it will leave a mark for us.

01:47:27PM20  A.   Osborn Alley is where the patrol vehicle is that says --

21  excuse me, Hudson is the street where the patrol vehicle is,

22  and this right here is the alley.

23  Q.   All right.  The first mark you made was where the police

24  car is; is that correct?

01:47:43PM25  A.   Yes, and that's Hudson Street.

1    Q.    The police SUV, that's Hudson Street.  And the second mark

2    you made is in the center of the photograph sort of from front

3    to back that's Osborn Alley?

4    A.    Yes, here.

01:47:55PM 5    Q.    All right.  And you made a couple more marks in that same

6    area of the photograph, correct?

7    A.    Yes.

8    Q.    Why did you respond to -- actually, if we can go to

9    Government's 188.  And is that another shot of Osborn Alley?

01:48:10PM 10    A.    Yes, it is.

11    Q.    Can you tell the jury why you responded to Hudson and

12    Osborn Alley on the morning of June 6th, 2016?

13    A.    There was a call for a found body.

14    Q.    A 911 call for a found body?

01:48:25PM 15    A.    Yes.

16    Q.    About what time did you respond to Osborn Alley?

17    A.    It was between, I would say, 6:45 to 7 o'clock.

18    Q.    All right. Now, can you describe what you observed when

19    you responded to Osborn Alley between 6:45 and 7 o'clock on

01:48:45PM 20    June 6th?

21    A.    I did find --

22    Q.    I'm sorry, on June 6th, 2016.  Thank you.

23    A.    I did find a deceased male in the alley.

24    Q.    You found a deceased male in the alley.  Can you describe

01:48:55PM 25    what else you observed when you first responded?

1    A.    The deceased male had a large amount of blood around his

2    head area, and shell casings around the body.

3    Q.    All right.  What did you do after making those

4    observations of the deceased male and the blood and the

01:49:13PM 5    casings?

6    A.    At that point the job is to notify the district lieutenant

7    which I did.

8    Q.    All right. And did other officers respond?

9    A.    Yes, to assist with the scene.

01:49:23PM 10    Q.    Were you one of the first officers to respond to that

11    morning?

12    A.    I was the first officer to respond that morning.

13    Q.    All right. Then after that other officers and technicians

14    responded?

01:49:33PM 15    A.    Yes.

16    Q.    And is the area that you observed the deceased male shown

17    in this photograph here marked Government's 188?

18    A.    Not in this photo here.

19    Q.    Can you tell us where in relation to this photo here the

01:49:50PM 20    deceased male that you observed in the alley was located?

21    A.    He would have been beyond that vehicle, ahead of it.

22    Q.    All right. On the other side of the police SUV shown in

23    the center of the photograph?

24    A.    Right.  This photo depicts yellow crime scene tape and the

01:50:05PM 25    police vehicle inside the tape and he's on the other side of

1      that tape.

2      Q.   All right. I'd like to show you what is not in evidence as

3      Government's 189.  Do you recognize what's shown in

4      Government's 189?

01:50:23PM 5   A.   Yes, I do.

6      Q.   And what are we looking at in Government's 189?

7      A.   That was the body at the scene that day.

8      Q.   All right. Are there a couple other individuals in this

9      photograph?

01:50:33PM 10  A.   Yes.

11     Q.   And who are the other individuals?

12     A.   One is a crime scene evidence collector, and one is a

13     homicide detective.

14     Q.   All right. I'd like to show you Government's 190.  Do you

01:50:52PM 15  recognize what's shown in Government's 190?

16     A.   Yes, I do.

17     Q.   What does Government's 190 show?

18     A.   That is the deceased male.

19     Q.   All right. Does that photograph also show the yellow

01:51:03PM 20  evidence markers and some orange plastic orange arrows?

21     A.   Yes.

22     Q.   What are those designating?

23     A.   The yellow markers indicate evidence that's located.  The

24     orange markings -- the triangle markings would be -- they're

01:51:22PM 25  used to identify smaller pieces of evidence so we can locate

1    them after someone like the technician arrives on scene.

2    Those are markings right here, two markings, the shell

3    casings.  That's the evidence that's being marked --

4    Q.    All right.

01:51:38PM 5    A.    -- on the ground.

6    Q.    And I'd like to show you Government's 191.  All right.  Do

7    you recognize what's shown in Government's 191?

8    A.    Yes.

9    Q.    What is that?

01:51:50PM 10    A.    That's the deceased male.  That is -- those are our

11    evidence markers and those are the yellow cones to identify

12    how many pieces of evidence is there to be located.

13    Q.    All right. And does Government's 191 show a different side

14    of the deceased male as he existed at the time you responded?

01:52:12PM 15    A.    Yes.

16    Q.    All right. Can you observe a portion of his hand in that

17    photograph?

18    A.    One of the hands, yes.

19    Q.    Okay. I'm sorry, Lieutenant, do the four -- I'm sorry, the

01:52:26PM 20    three photographs, Government's 189, 190 and Government's 191,

21    fairly and accurately show the scene as you observed it on

22    Osborn Alley on June 6th, 2016 in the early morning hours that

23    you responded?

24    A.    Yes, it does.

01:52:41PM 25            **MR. MARANGOLA:** At this time I'd offer Government's

1  189, 190 and 191.

2           **MR. VERRILLO:** Your Honor, if we can have a sidebar.

3           **THE COURT:** Sure.

4           (**WHEREUPON**, a discussion was held at side bar out

01:52:56PM 5  of the hearing of the jury.)

6           **MR. VERRILLO:** I filed some motions previously

7  related to these photographs, they're prejudicial and highly

8  inflammatory.  So I have objections to 89, 90, 91 on that

9  basis.

01:53:09PM 10      They're not necessary for the charges and I would

11  indicate the prejudice and gruesome nature of the photographs

12  is prejudicial to my client's right to a fair trial.

13          **MR. MARANGOLA:** Judge, there's a -- these

14  photographs, first of all, I would disagree that they are

01:53:27PM 15  gruesome in nature.  There's a deceased male.  The photographs

16  show two different angles.  They are from several feet away.

17          And in terms of the relevance to the charges, the

18  defendant is charged with possession and discharge of

19  firearms.  These show a male who is shot to death and it shows

01:53:46PM 20  casings that are surrounding him.

21          There's been testimony the defendant was involved

22  in that murder, and the possession and discharge of firearms

23  is absolutely an element of the crimes here.

24          So I intend to offer them solely to show the --

01:54:00PM 25  identify the person that is at the scene, that he was killed

1    by gunshots, and to identify the casings at the scene.

2           There was another photo that we have shown to a

3    number of witnesses, Government's 193, and that will be the

4    only other photo that we will show members of this jury.  It

01:54:24PM 5    is solely to identify the person who is dead and the nature of

6    the shooting and it corroborates the eyewitness testimony

7    about the nature of the shooting itself.

8           **THE COURT:** The objection as to Exhibits 189, 190,

9    191 is overruled based upon the fact that the exhibits do

01:54:44PM 10   display an individual body within an alley.  There's nothing

11   gruesome about these individual photographs that are

12   ultimately some distance away.

13          **MR. MARANGOLA:** Judge, since while we're here, I'm

14   going to be -- the next photo after these is Government's 193,

01:55:02PM 15   which we had shown to, I think, three or four witnesses

16   already and have identified the defendant -- or identified the

17   person, and that's Flaco.  That's the only other photo.

18          I haven't actually offered that, but I will offer

19   it through this witness and that's part of the stipulation

01:55:17PM 20   that we have that the person depicted in Government's 193 is

21   John Gonzalez and that will be the autopsy report that's been

22   stipulated to.

23          **MR. VERRILLO:** We reserved our right to object to

24   the admission of that exhibit.  That was never waived so --

01:55:32PM 25          **THE COURT:** All right, go ahead.

1          **MR. VERRILLO:** -- obviously I have the same

2     objections and that's a direct photo of the deceased.  And

3     obviously if there's three photographs already offered, I

4     don't see the need for another one to address the issue, and I

01:55:47PM 5     certainly would object to any extensive showing of any

6     photographs due to the prejudicial nature of that.

7          **MR. MARANGOLA:** Judge, we're going to show it to the

8     witness once, and if that's the same person, have him identify

9     the medical examiner number next to the tag and that will be

01:56:05PM 10    consistent with the autopsy report reflecting the autopsy of

11    this individual and that's it.  That's the only time we would

12    display the photograph.

13         **THE COURT:** I'm trying to find the stipulation

14    related to --

01:56:18PM 15         **MR. MARANGOLA:** Last page.

16         **THE COURT:** -- 193.  Okay.

17         **MR. MARANGOLA:** Under autopsy report.

18         **THE COURT:** Yes, 193 has been displayed to a number

19    of individuals to identify a particular individual in that

01:56:33PM 20    photograph as Flaco.  There's been extensive testimony

21    regarding his involvement in this conspiracy.

22          That photo is somewhat disturbing.  I think with an

23    instruction to the jury that they should view that without any

24    type of -- without any type of passion, that the exhibit would

01:56:53PM 25    be admissible, and clearly understand the defense objection,

1   but the objection to 193 will also be overruled.

2             MR. MARANGOLA: All right, thank you.

3             (WHEREUPON, side bar discussion concluded.)

4             MR. MARANGOLA: Your Honor, the Government would

01:57:11PM 5   reoffer Government's 189, 190 and 191.

6             THE COURT: Yes, the objection is overruled.  189,

7   190 and 191 will be received.

8             (WHEREUPON, Government Exhibits 189-191 were

9   received into evidence).

01:57:27PM 10  BY MR. MARANGOLA:

11  Q.   All right, Lieutenant Smith, we have Government's 189 in

12  front of us.  Do you see that on your screen?

13  A.   Yes, I do.

14  Q.   All right.  And is the deceased male in the center of this

01:57:52PM 15  photograph next to the yellow evidence markers?

16  A.   Yes, he is.

17  Q.   And who are the other individuals shown in the photograph?

18  A.   The one I do know.  One is an evidence collector, and one

19  is a homicide detective.

01:58:05PM 20  Q.   All right. And you secured the scene as part of your

21  duties that day?

22  A.   Yes.

23  Q.   To let only police personnel at it?

24  A.   Excuse me?

01:58:11PM 25  Q.   To let only police personnel access the scene?

1016

1    A.    That is correct.

2    Q.    All right. If we could go to Government's 190.   And

3    Government's 191.   The yellow orange arrows, those are

4    pointing to shell casings; is that correct?

01:58:33PM 5    A.    Yes.   The orange arrows are pointing to shell casings.

6    The yellow markers are indicating what number of piece of

7    evidence that is laying there.   So each shell casing is

8    considered one number of -- one piece of evidence.

9    Q.    All right.   And then I would like to show you what has not

01:58:53PM 10    been offered yet as Government's 193.   Do you recognize the

11    individual shown in Government's 193?

12    A.    Yes, I do.

13    Q.    And who is that?

14    A.    That is the defendant -- excuse me, that is the deceased

01:59:13PM 15    in the photograph.

16    Q.    All right. Is the person shown in Government's 193 the

17    same male that you observed in Osborn Alley on the morning of

18    June 6th, 2016?

19    A.    Yes, that is.

01:59:25PM 20    Q.    And is there like a tag next to the face shown in this

21    photograph?

22    A.    Yes, there is.

23    Q.    And the number on that tag, is that a medical examiner's

24    tag; is that right?

01:59:37PM 25    A.    Yes, that is.

1  Q.   And the number on that tag is 1344-16; is that correct?

2  A.   That is correct.

3  Q.   And there's a name next to it.  What's the name next to

4  that tag?

01:59:50PM 5  A.   John Doe.

6  Q.   Do you know why the name John Doe was placed on there?

7  A.   John Doe is the name we use when we have an unidentified

8  victim.

9  Q.   All right.

01:59:59PM 10           **MR. MARANGOLA:** At this time, Your Honor, I offer

11  Government's 193.

12           **MR. VERRILLO:** Your Honor, continued objection as

13  previously noted.

14           **THE COURT:** The objection to 193 is overruled.  193

02:00:12PM 15  will be admitted.  Members of the jury, this is a difficult

16  exhibit to observe.  I would ask you to observe this without

17  any type of passion.  It's being received for the relevancy

18  contained in this case.  You may proceed.

19           **MR. MARANGOLA:** Thank you, Your Honor.

02:00:32PM 20           (**WHEREUPON**, Government Exhibit 193 was received

21  into evidence).

22  **BY MR. MARANGOLA:**

23  Q.   At this time if we could put up Government's Exhibit 200,

24  which is not in evidence.

02:00:44PM 25           **MR. MARANGOLA:** Your Honor, I'd like to read at this

1    time from the stipulation, if I could, regarding Government's

2    200.

3                **THE COURT:** Yes.

4                **MR. MARANGOLA:** The stipulation between the parties

02:00:53PM 5    regarding Government's Exhibit 200 as is follows.

6                Government's Exhibit 200 is the certified copy of

7    the report concerning the autopsy of John Gonzalez a/k/a Flaco

8    a/k/a Palito conducted by Erie County Medical Examiner

9    Dr. Nicole Yarid on June 7th, 2016.

02:01:12PM 10               The person depicted in Government Exhibit 193 is

11   John Gonzalez a/k/a Flaco a/k/a Palito.

12               Government Exhibit 200 reflects that the cause of

13   death of John Gonzalez a/k/a Flaco a/k/a Palito was multiple

14   gunshot wounds.  Government Exhibit 200 is admissible.

02:01:33PM 15               At this time, Your Honor, I'd offer Government's

16   200.

17               **MR. VERRILLO:** Your Honor, if we could have a

18   sidebar, please?

19               (**WHEREUPON**, a discussion was held at side bar out

02:01:42PM 20   of the hearing of the jury.)

21               **MR. VERRILLO:**  Your Honor, that was our agreement.

22   I just wanted to make sure we talked about redacting the

23   manner of death, that was not going to be -- I haven't seen

24   the second page what they're offering.  We said we would

02:01:59PM 25   not -- we would redact the manner of death.

1       **MR. MARANGOLA:** Yes, Judge, we just put up the

2   second page so Mr. Verrillo can see.  We have redacted the

3   manner of death.  The only thing listed on the second page is

4   the cause of death.

02:02:13PM 5       **MR. VERRILLO:** That's fine.

6       **MR. MARANGOLA:** All I plan to publish for the jury

7   is reading the bullet points, not A through D each of them,

8   just the bullet points.

9       **THE COURT:** With that understanding, with those

02:02:23PM 10  redactions regarding the cause of death, Exhibit 200 will be

11  received.

12      **MR. MARANGOLA:** Judge, the redaction is regarding

13  the manner.  Cause of death is listed.

14      **THE COURT:** I'm sorry, manner of death.

02:02:34PM 15      **MR. MARANGOLA:** Thank you.

16      (**WHEREUPON**, side bar discussion concluded.)

17      **THE COURT:** Exhibit 200 is received.

18      (**WHEREUPON**, Government Exhibit 200 was received

19  into evidence).

02:02:43PM 20  **BY MR. MARANGOLA:**

21  Q.   All right, I'm going to read from Government Exhibit 200

22  which states it's the report of examination, name of decedent

23  John Gonzalez.  ME number 1344-16.  Date of exam June 7th,

24  2016.  Examine performed by Nicole A. Yarid, M.D..

02:03:24PM 25      Final diagnosis one, intermediate range penetrating

1    gunshot wound top of head.

2              Two, perforating gunshot wound of right head.

3              Three, intermediate range perforating gunshot wound

4    of left upper back.

02:03:40PM 5          Four, intermediate range perforating gunshot wound

6    of right upper back.

7              Five, perforating gunshot wound of left shoulder.

8              Go to the second page, six, perforating gunshot

9    wound of left buttock.

02:03:57PM 10         Seven, perforating gunshot wound of right buttock.

11             Eight, perforating gunshot wound of right finger.

12             Nine, intermediate range graze gunshot wound of

13   left hand.

14             Ten, blunt force injuries of head, torso and

02:04:15PM 15  extremities.

16             And cause of death:  Multiple gunshot wounds.

17             Lieutenant Smith, did you hear me read from the

18   medical examiner report describing an injury to a finger?

19   A.   Yes, I do see that.

02:04:33PM 20  Q.   All right. Did you make any observations at any point of

21   any of the victim's hands while you were at the scene?

22   A.   Yes, one of the fingers appeared to be injured.  What I

23   will say is injured by one of the bullets, looks like one of

24   the fingers was struck by a bullet, seemed to be broken.

02:04:58PM 25  Q.   All right.  At this time I'd like to show you what is not

1  in evidence as Government's 194.  I'm sorry, 195.  Lieutenant

2  Smith, do you see what's marked as Government's 195 on your

3  screen?

4  A.   Yes, I do.

02:05:23PM 5  Q.   Do you recognize what's shown in that photograph?

6  A.   Yes, I do.

7  Q.   What do you recognize shown in Government's 195?

8  A.   It appears to be the finger that I noticed was injured as

9  part of the homicide.

02:05:40PM 10  Q.   All right. Does Government's 195 fairly and accurately

11  show the hand -- one of the hands of the deceased male you

12  observed at Osborn Alley on June 6th, 2016?

13  A.   Yes, it does.

14         **MR. MARANGOLA:** At this time I'd offer Government's

02:05:53PM 15  195.

16         **MR. VERRILLO:** Your Honor, I'd object based on the

17  prior objections raised.

18         **THE COURT:** 195 will be received.  The objection is

19  overruled.

02:06:04PM 20         (**WHEREUPON**, Government Exhibit 195 was received

21  into evidence).

22  **BY MR. MARANGOLA:**

23  Q.   All right. Lieutenant Smith, the injury that you're

24  referring to is where?

02:06:15PM 25  A.   It would have been on his right index finger.

1022

1    Q.   All right. It appears the second half of that finger is

2    missing; is that right?

3    A.   Actually in the photo I believe it's bent back.  The

4    finger was attached to the hand; it just looked like it was

02:06:31PM 5    broken at some point.

6    Q.   Okay. All right. If we could show you what is in evidence

7    as Government's 197.  Lieutenant Smith, do you recognize

8    what's shown in the photograph accompanying this news article?

9    A.   Yes, it appears to be a news article and seems to be the

02:06:53PM 10   same photograph that we saw earlier which is our Bravo

11   District police car 462 blocking the alley.

12   Q.   All right. Does this photograph that's contained in

13   Government's 197 show the same area that you responded to on

14   the morning of June 6th, 2016?

02:07:11PM 15   A.   Yes, it does.

16   Q.   Is there a date on the article here?

17   A.   Yes, June 6th, 2016.

18   Q.   And is this article in reference to the murder scene that

19   you, in fact, responded to that morning?

02:07:22PM 20   A.   Yes, it is.

21   Q.   All right.

22            **MR. MARANGOLA:** I have nothing further.  Thank you,

23   Lieutenant.

24            **THE WITNESS:** You're welcome.

02:07:33PM 25

**CROSS-EXAMINATION**

**BY MR. VERRILLO:**

Q.   Lieutenant, when you arrived at the scene did you determine whether there were any witnesses at the location?

02:07:43PM A.   Yes.

Q.   Okay. And were there any witnesses there?

       **MR. MARANGOLA:** Objection, Your Honor, calls for hearsay.

       **THE COURT:** Overruled.  He can answer that.  Go 02:07:51PM ahead.

       **THE WITNESS:** Yes, there was a witness.

**BY MR. VERRILLO:**

Q.   Okay.  And the area that -- where the body was, there was a -- on one side is there a garage there?

02:08:02PM A.   Yes, there is a garage.

Q.   And is there a residence in that area, to your knowledge?

A.   Yes, there is.

Q.   Okay. And was there a business in the area as well or a church in that location?

02:08:20PM A.   That I can't say.

Q.   Okay.

       **MR. VERRILLO:** I have nothing further.

       **THE COURT:**  Anything further?

02:08:33PM

1    **REDIRECT EXAMINATION**

2    BY MR. MARANGOLA:

3    Q.   You indicated there was a garage there?

4    A.   Yes.

02:08:35PM 5    Q.   If we can go back to Government's -- I believe it was 190.

6    Maybe it's 189.  Do you see a garage in the vicinity of the

7    deceased here in the alley shown in Government's 189?

8    A.   Yes.

9    Q.   Can you circle that garage?  All right, you circled the

02:09:03PM 10   small structure to the left of the deceased; is that correct?

11   A.   Yes, that's correct.

12   Q.   All right.

13          MR. MARANGOLA: I don't think I have anything

14   further.  Thank you.

02:09:19PM 15          MR. VERRILLO: Nothing further, Judge.

16          THE COURT: Thank you very much.  Thank you, you may

17   step down.

18          THE WITNESS: Thank you.

19          (WHEREUPON, the witness was excused).

02:09:28PM 20          THE COURT: Ladies and gentlemen, thank you for your

21   patience staying a little later today.  We're going to stand

22   in recess.  We're going to break at this time until 9:30

23   tomorrow morning.  In the meantime, I'd ask you not discuss

24   the matter or allow anybody to discuss the matter with you.

02:09:50PM 25   Jury may step down until 9:30 tomorrow morning.  Have a good

1    evening.

2              (**WHEREUPON**, the jury was excused.)

3              **THE COURT:** It's anticipated the Government has one

4    more witness?

02:10:46PM 5              **MR. MARANGOLA:** Yes, Judge.

6              **THE COURT:** Then the defense will decide whether or

7    not they're going to present any evidence?

8              **MR. VERRILLO:** Correct.

9              **THE COURT:** If they do not, we'll do the charge

02:10:54PM 10   conference and have summations shortly thereafter, and charge

11   the jury on Thursday.

12             **MR. MARANGOLA:** Charge -- summations and charge or

13   summations?

14             **THE COURT:** Tomorrow if we only have ten minutes of

02:11:06PM 15   testimony --

16             **MR. VERRILLO:** I think he's longer than that.

17             **THE COURT:** Why would we wait until Thursday?

18             **MR. MARANGOLA:** I guess it would just help us,

19   Judge, if we could have until Thursday morning just to --

02:11:21PM 20   because I figure we'll have a charge conference probably in

21   the afternoon at some point, right?

22             **THE COURT:** If you have a ten minute witness --

23             **MR. MARANGOLA:** No.

24             **THE COURT:** -- we'll be done by 10 o'clock.

02:11:32PM 25             **MR. MARANGOLA:** This one was the ten minute one.

1   The next one is going to be short, he's going to be a little

2   bit more than ten minutes, at least on direct.  And I think

3   Mr. Verrillo indicated to me he had some cross for him.

4            **MR. VERRILLO:** Yes, Judge, obviously for us, I mean,

02:11:46PM 5   we're finishing sooner than we could have been.  So, I mean,

6   if we could have time, it would help us.  That's all.  That's

7   the honest answer.

8            **THE COURT:** All right. We'll sum up on Thursday.  I

9   expect summations to be shorter if you have more time to

02:12:03PM 10   prepare for them.  Do you understand?  Okay, we'll stand in

11   recess until 9:30.

12            (**WHEREUPON**, proceedings adjourned at 2:13 p.m.)

13                        *    *    *

14              **<u>CERTIFICATE OF REPORTER</u>**

15

16            In accordance with 28, U.S.C., 753(b), I certify that

17   these original notes are a true and correct record of

18   proceedings in the United States District Court for the

19   Western District of New York before the Honorable Frank P.

20   Geraci, Jr. on November 2nd, 2021.

21

22   <u>S/ Christi A. Macri</u>

23   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter

24

25