1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NEW YORK

3

4

5   - - - - - - - - - - - - -X
    UNITED STATES OF AMERICA              18-CR-6094(G)

6   vs.

7                                         Rochester, New York
    XAVIER TORRES,                        November 4, 2021
8            Defendant.                   8:30 a.m.
    - - - - - - - - - - - - - -X

9                                         **VOLUME 12**

10                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                 UNITED STATES DISTRICT JUDGE

12

                    JAMES P. KENNEDY, JR., ESQ.
13                  United States Attorney
                    BY: ROBERT A. MARANGOLA, ESQ.
14                      CASSIE M. KOCHER, ESQ.
                    Assistant United States Attorneys
15                  500 Federal Building
                    Rochester, New York 14614
16                  Appearing on behalf of the United States

17

                    MAURICE J. VERRILLO, ESQ.
18                  3300 Monroe Avenue
                    Suite 301
19                  Rochester, New York 14618
                    Appearing on behalf of the Defendant

20

21

22

23  COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                        Christimacri50@gmail.com
24                      Kenneth B. Keating Federal Building
                        100 State Street, Room 2640
25                      Rochester, New York 14614

1

**I N D E X**

2

3   Closing argument by Ms. Kocher                Page 1086

4   Closing argument by Mr. Verrillo              Page 1116

5   Rebuttal by Mr. Marangola                     Page 1130

6   Jury charge by Judge Geraci                   Page 1139

7   Verdict                                       Page 1215

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

\*     \*     \*

**(WHEREUPON**, the defendant is present).

**THE COURT:** Good morning.

08:10:44AM **MR. MARANGOLA:** Good morning, Your Honor.

**MR. VERRILLO:** Good morning, Judge.

**MS. KOCHER:** Good morning.

**THE COURT:** A couple things before we begin.  First of all, Mr. Verrillo you indicated you wanted to renew your

08:47:29AM Rule 29 motion.

**MR. VERRILLO:** Yes, Your Honor.  The defendant has rested so I wish to renew the motion for the Judgment of Acquittal based on the reasons previously noted on the record.

**THE COURT:** Mr. Marangola?

08:47:40AM **MR. MARANGOLA:** Government maintains its prior opposition, Judge.

**THE COURT:** Yes, based upon the Court's prior ruling, there being no additional evidence, the Court finds there are issues of fact for the jury on each of the elements

08:47:52AM on both charges.  Therefore, the motion for Judgment of Acquittal pursuant to Rule 29 is denied.

Secondly, we talked yesterday about a limiting instruction request by Mr. Verrillo.  The Court drafted the following:  You have heard evidence that the defendant

08:48:14AM Xavier Torres is known by the nickname Pistolita.  I instruct

1    you that this evidence is admitted only for the limited

2    purpose of identifying the person referenced as Pistolita as

3    being Xavier Torres.  Therefore, you must consider it only for

4    that limited purpose, not for any other purpose.

08:48:35AM  5         Any objection to that?

6         **MR. MARANGOLA:** Judge, the only request I had not --

7    it's not so much an objection, the only request I had is that

8    the Court add P and Pepe to that because there was testimony

9    that the defendant Xavier Torres was known by P as well as by

08:48:50AM 10   Pepe.

11        **THE COURT:** Any objection to that, Mr. Verrillo?

12        **MR. VERRILLO:** Well, I just wanted to say that the

13   obvious reason Pistolita was raised was because of the

14   inference that that might mean something, so -- but I don't

08:49:12AM 15   see any prejudice in adding those two in there.

16        **THE COURT:** Okay, I will add that then.  Indicate

17   known by the nicknames Pistolita, P or Pepe.

18        And then the second limiting instruction regarding

19   photographs:  Members of the jury, received in evidence in

08:49:37AM 20   this case were certain photographs that were gruesome and

21   difficult to view.  These photographs were received because

22   they are relevant to some of the issues involved in this case.

23   It is required that you view these photographs without passion

24   or emotion and give them whatever weight you deem appropriate.

08:49:56AM 25        **MR. MARANGOLA:** No objection to that, Your Honor.

1    **THE COURT:** Mr. Verrillo?

2    **MR. VERRILLO:** Yes, Judge.

3    **THE COURT:** Okay.  We've already discussed the

4    forfeiture issue.  Neither party is requesting that that be

08:50:09AM 5    submitted to the jury in the event of a conviction and that

6    that will be determined by the Court.

7    Have you had a chance to review the substantive

8    charges? Any additions?

9    **MR. MARANGOLA:** No, Your Honor, we have no requests

08:50:23AM 10    or objections regarding the substantive charge.

11    **THE COURT:** Mr. Verrillo?

12    **MR. VERRILLO:** Nothing further, Your Honor.

13    **THE COURT:** Same with the verdict sheet,

14    Mr. Marangola?

08:50:30AM 15    **MR. MARANGOLA:** No, Your Honor.  I don't remember --

16    **THE COURT:** It's attached, it should be.

17    **MR. MARANGOLA:** I remember the instruction on it.  I

18    don't believe -- I don't believe we had any objection to the

19    verdict sheet.

08:50:41AM 20    **THE COURT:** Okay.  Mr. Verrillo?

21    **MR. VERRILLO:** No, Your Honor, I have no objection.

22    **THE COURT:** Again I'll give you a chance to look at

23    it again if you haven't really looked at it carefully --

24    **MR. MARANGOLA:** It is attached, Judge.

08:50:50AM 25    **THE COURT:** -- before we submit it to the jury.

1          **MR. MARANGOLA:** Thank you.

2          **THE COURT:** Okay, other than that we're ready to

3   begin.

4          **MR. VERRILLO:** One issue, Judge, if I could?

08:50:57AM 5          **THE COURT:** Sure.

6          **MR. VERRILLO:** I had asked Mr. Standish about his

7   testimony at the Buffalo Police Department and I read certain

8   portions and he acknowledged that he had made those statements

9   at that time. So I wanted to refer to a portion of that in my

08:51:12AM 10  closing.

11          Do I have to come back and put it on the computer

12   or can I just read it from the transcript that I have in terms

13   of how -- I mean, obviously they know what exhibit I'm talking

14   about.

08:51:24AM 15          **THE COURT:** Say that again.  What do you want --

16          **MR. VERRILLO:** I have a transcript of Mr. Standish

17   when he was at the Buffalo Police Department and I read that

18   in the trial and he admitted that he had said certain things.

19   So I wanted to refer to that in my closing statement.  I was

08:51:38AM 20  prepared to just bring it up and read it.

21          Do I have to publish it on the machine or --

22          **THE COURT:** Either way.

23          **MR. VERRILLO:** I would prefer just to read it.  I'll

24   give them notice of what it is.

08:51:47AM 25          **THE COURT:** That's fine.  If it's exactly as it was

1    quoted in the record.

2              **MR. VERRILLO:** Right, correct.

3              **THE COURT:** That's fine.  Thank you.  One other

4    issue that I had, was Mr. Standish offered formal immunity on

08:52:01AM 5    federal charges?  He was only charged in state court?

6              **MR. MARANGOLA:** Only charged in state court, yes.

7              **THE COURT:** Not charged federally?

8              **MR. MARANGOLA:** I don't know if that was -- there

9    was no formal agreement with him with respect to that, and I

08:52:13AM 10   don't recall that being elicited as part of the testimony,

11   Judge.

12             **THE COURT:** Okay.  Was there any testimony he was

13   promised in exchange for testifying truthfully he would not be

14   prosecuted federally?

08:52:23AM 15             **MR. MARANGOLA:** Not that I recall, no.

16             **THE COURT:** Okay, then I won't read that.

17             **MR. MARANGOLA:** Judge, with respect to Mr.

18   Verrillo's question on the prior testimony of Mr. Standish, he

19   asked Mr. Standish if he had given that prior testimony.

08:52:36AM 20             That testimony wasn't offered as evidence, though,

21   and he never offered that and it was never received as

22   evidence to the Court.

23             He did ask the witness if he had given that

24   testimony before, and I think Mr. Verrillo asked the witness

08:52:49AM 25   if he had accurately read that portion of the transcript.  But

1  it was not received as evidence.  He didn't offer it as formal

2  evidence of a prior sworn inconsistent statement so --

3         **THE COURT:** What was the witness's answer?

4         **MR. MARANGOLA:** He said Mr. Verrillo had read it

08:53:04AM 5  accurately.  That was the question.  If he had -- he read a

6  portion of the transcript and said did I read the prior

7  testimony you gave accurately?  And the witness said yes.

8         **THE COURT:** He didn't acknowledge that he actually

9  made that statement?

08:53:18AM 10         **MR. MARANGOLA:** I think he acknowledged that he made

11  the statement, yes, yeah, he acknowledged that was his prior

12  testimony.  I don't think there was any -- he didn't offer it

13  as substantive evidence.

14         **THE COURT:** I don't think he needs to, does he?

08:53:31AM 15         **MR. VERRILLO:** It was impeachment.

16         **THE COURT:** If it's in the question and it's part of

17  the question -- part of the answer, I think it's fair for him

18  to read it, okay?  Okay.

19         **MR. MARANGOLA:**  Judge, Ms. Kocher is going to do

08:53:42AM 20  the main closing, Your Honor, and I'll do the rebuttal for the

21  Government.

22         **THE COURT:** Okay, thank you.  Anything further?

23         **MR. VERRILLO:** Nothing further, Your Honor.

24         **MR. MARANGOLA:** No, thank you.

08:53:52AM 25         **THE COURT:** Okay.  We can bring in the jury.

1        (**WHEREUPON**, the jury is present).

2        **THE COURT:** Good morning, members of the jury.

3    We're ready to proceed.  Ms. Kocher.

4        **MS. KOCHER:** Thank you, Your Honor.

09:03:16AM 5        During opening statements defense counsel said we

6    have a fundamental disagreement on who the defendant is.

7        And that may be true, but who the defendant is is

8    not what this case was about.  This case is about what the

9    defendant did and who he did it with.

09:03:40AM 10        This case was about the defendant distributing

11   cocaine and heroin.  It was about the defendant delivering

12   drugs to workers and picking up money from them on Burbank

13   Street.

14        It's about the defendant hiring and firing those

09:03:56AM 15   workers and running the block.  It's about the defendant's

16   participation in Carlos Javier Figueroa's drug trafficking

17   organization.

18        Now, throughout this trial you learned about the

19   scope of the conspiracy, who some of the members were, and

09:04:15AM 20   about the violent shootings and murders that members of the

21   conspiracy committed in furtherance of their drug trafficking.

22        I told you during opening statements that you

23   probably wouldn't like some of the witnesses that we called,

24   and now you've had a chance to meet them, you know they

09:04:34AM 25   include drug dealers and convicted felons.  But who better to

1  tell you about the innerworkings of a drug trafficking

2  organization than its very members?

3          Now, you heard from Roberto Figueroa, who was

4  Javi's brother, and one of the upper-level members of the

09:04:54AM 5  organization.

6          You also heard from Axel Aponte Camacho, somebody

7  who helped bag and work the tables and also sold drugs for the

8  conspiracy.

9          You heard from another worker or seller -- Jose

09:05:09AM 10  Figueroa, also known as Che Che.  I'll refer to him as Che Che

11  throughout this closing because we have quite a few Figueroas

12  so I don't want any confusion.  But Che Che sold from houses

13  on Burbank Street, and was also struggling with addiction.

14          And you heard from Ronald Standish, a former

09:05:28AM 15  corrections officer who was a customer of the organization and

16  a heroin addict.

17          Now, I'm sure that Mr. Verrillo during his closing

18  argument to you will point out some of the inconsistencies

19  between those witnesses.  But, remember, they all had very

09:05:46AM 20  different roles in this organization.  And because they had

21  different roles, they had different perspectives on what was

22  going on.

23          So because they had different perspectives,

24  wouldn't you expect that there might be some inconsistencies

09:06:01AM 25  about what they saw and what they heard throughout the ongoing

1  conspiracy?  Not to mention that some of the events these

2  people testified about happened years ago.

3          The big things that the witnesses testified about

4  were generally consistent.  And when you consider what they

09:06:22AM 5  told you and the totality of the evidence, they make sense.

6          Now, during my closing here I'd like to take this

7  time to hopefully give you a better understanding of some of

8  the evidence that you heard and discuss how we have proven the

9  defendant's guilt beyond a reasonable doubt of both counts in

09:06:41AM 10  the indictment.

11          Now, starting with Count 1, the narcotics

12  conspiracy, we have shown beyond a reasonable doubt that there

13  was an agreement to sell cocaine and heroin in the Burbank

14  Street area of Rochester.

09:06:56AM 15          We have shown beyond a reasonable doubt that the

16  defendant participated in that conspiracy knowingly and

17  willfully.

18          And we have shown that that conspiracy involved at

19  least distributing 1 kilogram of heroin or more, and at least

09:07:13AM 20  5 kilograms of cocaine.

21          Now, let's start with that first element, was there

22  an agreement or an understanding to sell cocaine and heroin?

23  Absolutely.  Look at Government's Exhibit 1.  That's our

24  people chart.  This was clearly an organization and a group of

09:07:31AM 25  people working together to distribute cocaine and heroin.

1       You have on the bottom row people that were selling

2  and worked as lookouts; the next row are people that bagged,

3  were runners, shooters for the organization; the next row

4  above that is Leitscha Poncedeleon and Roberto Figueroa, they

09:07:54AM 5  were the upper-level management that worked to get the kilos

6  from Puerto Rico to Rochester, and he also worked the table

7  and did other things for the boss, who is at the very top,

8  Carlos Javier Figueroa or Javi.

9       Now, you heard about how the organization was

09:08:14AM 10  getting kilogram quantities of cocaine from Puerto Rico, and

11  Leitscha was responsible for talking to the people from

12  Puerto Rico and organizing what addresses they would be

13  shipped to and getting them picked up.  She, along with

14  Roberto, would make sure that those kilos got to the stash

09:08:33AM 15  spots.

16       Here we have just two packages that were seized on

17  January 29th, 2018 on takedown day.  Each one of these

18  packages contained 4 kilograms of cocaine -- I'm sorry, 2

19  kilograms of cocaine.  So four total.

09:08:50AM 20       Once those arrived they would go to the stash spot.

21  You heard about some of those locations.  That included the

22  hospital or the RGH apartment that it was referred to in the

23  bottom right; 699 Main Street; the Liberty Pole apartment; and

24  the Culver Road apartment.  That's where the kilos would be

09:09:08AM 25  stored, that's where they would work the table and break them

 1   down to be sold on the street.  That's also where they stored

 2   their guns.

 3            Once the larger quantities of heroin and cocaine

 4   were packaged, they would be delivered to these houses.  And

09:09:26AM 5   that's where runners like the defendant Pistolita; Vic, Victor

 6   Nunez, who Ron knew only as the defendant's brother; and Tapon

 7   would take the packages from the delivery men like Roberto or

 8   Yankee and take them to these sale spots.  That's including 14

 9   Burbank, the house that was ultimately burned; 11 Burbank; 5

09:09:56AM 10  Thomas Street; and 16 LaForce.

 11            Now, once the drugs got to these locations, even

 12   the people working in the houses were working together.  You

 13   heard about how they had lookouts to make sure that there

 14   weren't any police in the area and nobody was selling that

09:10:14AM 15  shouldn't be selling.

 16            You heard about how they would use cell phones to

 17   communicate.  They referred to those as *maracas*, those little

 18   flip phones.  Here we have one of the flip phones that was

 19   recovered from 11 Burbank on August 12th, 2015.

09:10:30AM 20           And you can see some familiar names here.  There's

 21   Rey, R-E-Y, which would be Green Eyes, Reynaldo Figueroa; and

 22   then you've got Javi in this next slide here; P and Pepe.

 23   Those are all names you've heard throughout this trial and

 24   further proof that these individuals were working together.

09:10:54AM 25           Now, in addition to the phones, you also heard some

1   consistencies between the different locations:  Hiding the

2   drugs under the siding at 16 LaForce Street; and you also

3   heard that happened at 5 Thomas Street.

4           How they would keep the drugs in a fanny pack.  One

09:11:11AM 5   pocket for the drugs, one was for the money.  Those were

6   consistent things at each location.

7           You heard about how they would talk in code.  C

8   meant coffee or heroin because they were both tan or dark

9   colored; L meant *leche*, which in Spanish is milk, which is

09:11:30AM 10   white, just like cocaine.  They would also use terms like boy

11   and girl, and that was all in an effort to evade police

12   detection.

13           You had some of the same people that were found in

14   these different houses when the police searched.  Starting on

09:11:47AM 15   April 22nd of 2015, that was the first time 14 Burbank was

16   searched, the house that ultimately ended up being burned.

17   When the police entered that day, Rafi was inside.  You can

18   see him in the plaid pants and the chair.

19           A few months later across the street at 11 Burbank

09:12:06AM 20   Rafi and Flaco -- or some people called him Palito, his real

21   name was John Gonzalez, were both in the house.  This is all

22   evidence of a group working together in furtherance of drug

23   trafficking.

24           Now, when one of these houses would get searched,

09:12:24AM 25   they would close it up and move locations.  Now, 11 Burbank

1 | was searched on August 12th of 2015.  We have some text
2 | messages here from Exhibit 226B.  You didn't see these
3 | throughout the trial, but they were received, these are the
4 | text messages between Ron and his wife where he was telling
09:12:47AM 5 | her about going to Burbank.  And this message says bringing
6 | him around to the corner, said they got hit yesterday.  The
7 | date of this text message is August 13th, one day after 11
8 | Burbank was searched.

9 | Similarly another text message from Ron to his wife
09:13:05AM 10 | on July 30th, the house did get hit, it's all boarded up.  You
11 | heard July 30th the police hit 14 Burbank and 6 Burbank on the
12 | same day.

13 | We'll talk a little bit about the search at 6
14 | Burbank where the defendant was with drugs and money a little
09:13:25AM 15 | bit later, but you heard from Investigator Briganti that when
16 | they went into 14 Burbank they didn't get anything.  But Che
17 | Che told you it was searched, too, and when it was searched
18 | they moved across the street to 11 Burbank.

19 | Here's a text message from Ron to his wife just a
09:13:42AM 20 | few days later August 2nd of 2015, there's a new house to go
21 | to.  This all shows you that this was a group working together
22 | on Burbank Street to sell drugs.

23 | Now, we also know it's a conspiracy because the
24 | consistent product that they were selling.  Roberto and Axel
09:14:03AM 25 | described how Javi would mix the heroin with horse

1    tranquilizer or an anesthetic.  Ron liked the product so much

2    he followed the defendant all the way to Buffalo to get it.

3              You heard about how it was packaged consistently in

4    those little black ziplock bags.  And they had their stamps;

09:14:21AM 5    Roberto described that as their brand.

6              Javi would go find a stamp he liked and he would

7    buy all of them, or tell the sales clerk you can't sell those

8    to anybody else.  That was the Burbank brand.

9              Javi didn't want anybody selling off brand heroin

09:14:40AM10   and pretending like it was Burbank drugs.  Those were Burbank

11   drugs with those stamps.

12             And customers would look for it too.  They were

13   comfortable with it, they knew the stamp, they knew the logo,

14   they knew the brand.  So stamps were very important.

09:14:57AM15   And they would change over time.  If there was an

16   overdose or a house got hit, they would mix it up so that law

17   enforcement might not know that it was their stamp at that

18   time; they try to distance themselves from it.

19             Here we have Obed was arrested at 16 LaForce Street

09:15:15AM20   on July 13th of 2016 and caught with that blue Magoo stamp.

21   You saw that -- I'm sorry, the blue magic stamp.

22             You saw that very same stamp a few months later

23   when Axel was arrested in December of 2016 at Miller Street.

24   Those drugs he was caught with he had stolen from this Culver

09:15:35AM25   Road stash spot.  Again, the blue magic stamp was on them.

1   Ron recognized that stamp as one that he had bought on Burbank

2   Street.

3            This was a partnership in crime.  Running the

4   organization with many people with compartmentalized jobs and

09:15:56AM 5   using these various locations allowed the organization to do

6   more than just one person selling drugs on Burbank Street.

7            And it also made it harder for law enforcement to

8   know what the organization was doing.  Quite frankly, it

9   worked.  You heard from Investigator Briganti they were

09:16:14AM 10   investigating this organization for years before the takedown

11   on January 29th of 2018.

12            Now, people did get arrested.  And when they did

13   there was an agreement for that, too.  Somebody got arrested

14   selling Javi's drugs, Javi would get them a lawyer.  Mark

09:16:37AM 15   Young here.  And he would pay their bail.

16            Now, you heard about several incidents where the

17   defendant was arrested on Burbank after his house was searched

18   where he was living at 6 Burbank in July of 2015.

19            Yankee was arrested on Burbank selling -- with

09:16:55AM 20   drugs in his car and Obed was arrested on LaForce Street with

21   those blue magic stamps.  Each time Mark Young represented

22   each one of those people.  Javi paid for it.  He was basically

23   an in-house counsel.  And Javi liked Mark Young because he

24   didn't represent rats.

09:17:15AM 25            Clearly there's an agreement between two or more

1    people to distribute heroin and cocaine in the Burbank area.

2    And when I say "distribute," I mean sell.

3              All right.  Now, how was the defendant a knowing

4    and willful participant in this organization?  I submit he

09:17:32AM 5    certainly was.  He wasn't participating by accident or

6    mistake.  He worked the table and he worked as a runner.

7              Now, Axel told you about his first time working the

8    table, Javi said welcome to the family.  That was his first

9    time bagging.  Javi might as well said welcome to the

09:17:54AM 10   conspiracy because that's exactly what it was.

11             Working the table was a group of people sitting

12   around for hours and hours bagging bulk quantities of cocaine

13   and heroin into those little envelopes and those little

14   plastic bags and putting them into packages that could be sold

09:18:14AM 15   on the street or from houses.

16             And the defendant did just that.  He worked the

17   table at those stash spots.

18             The defendant was also a runner.  He was the

19   lynchpin between working the table and getting the drugs to

09:18:31AM 20   the sellers.  Without the defendant, the drugs wouldn't have

21   gotten to the Rafis, the Che Ches, the Green Eyes or the

22   Flacos of the group.

23             And there's ample evidence that he was a runner and

24   worked in that capacity.  You heard from, I think, six

09:18:49AM 25   different witnesses that they saw the defendant on Burbank

1  Street.   That includes Investigator Briganti; Investigator

2  Luciano; Roberto; Axel; Che Che; and Ron.

3          The defendant wasn't just hanging out on Burbank

4  Street.   He wasn't just visiting friends.   He was working.

09:19:12AM 5  You heard from the entire supply chain that the defendant was

6  a runner in 2015 and into 2016.

7          Roberto, who was one of the upper-level guys,

8  basically delivered from the table to the runner; told you

9  that he would bring the defendant about three or four packages

09:19:34AM 10  two or three times a day.

11         You also heard from Axel who worked the table and

12  sold, that the defendant was a runner.   He knew the defendant

13  was a runner before he even started working for Javi because

14  he would hang out with his friend Obed, who was right to his

09:19:52AM 15  left in this exhibit, who was selling for Javi.   And when he

16  would hang out with Obed, the defendant would bring Obed drugs

17  to sell.

18         You heard from another seller Che Che who worked at

19  14 Burbank and 11 Burbank selling.   He told you when their

09:20:10AM 20  supply would get low, they would call the defendant, he would

21  bring drugs, and he'd take money from the drugs that they had

22  sold.   That's a runner, ladies and gentlemen.

23         You also heard from Ron Standish, a customer who

24  even picked up on the fact the defendant was a runner.   He

09:20:29AM 25  told you how there were times he would go to Burbank and ask

1   for an amount, the seller might not have it.  So hang on, I

2   got to call the boss, gets on the phone, the defendant would

3   show up, and then magically the seller would have drugs to

4   sell to Ron.

09:20:48AM 5          Now, the runner's job wasn't just to deliver drugs.

6   It was also to run the block.  He was in charge.  You heard

7   from Che Che that he needed approval to work at 14 Burbank

8   with his stepdad Rafi, and he had to get that approval from

9   the defendant and Javi, the boss.

09:21:08AM 10          Roberto told you something similar.  He said he got

11  to tell my brother who he got working.  They wanted to know

12  who was working for the organization.

13          Roberto also told you if a house was short on

14  money, that the defendant was responsible for that.  He had to

09:21:25AM 15  establish order.  And, again, even Ron -- who was kind of an

16  outsider being a customer -- was able to tell the defendant

17  was in charge, and that's based upon his repeated trips to

18  Burbank Street, over a year's worth, he would go multiple

19  times a week.

09:21:43AM 20          I think he told you he saw the defendant over 100

21  times on Burbank Street, and during that time he had the

22  chance to see the defendant interact with some of the workers,

23  had a chance to view his demeanor, and he could tell from how

24  he spoke with those people he was the boss.  I think his exact

09:22:00AM 25  words were he controlled the workers.

1       All of that testimony is evidence the defendant was

2   in charge and working to distribute cocaine and heroin with

3   other members of the conspiracy.

4       Now, in addition to the testimony that you heard,

09:22:18AM 5   we also presented seized evidence that proved the defendant

6   was involved in this conspiracy.

7       Now, you remember way back when Investigator

8   Briganti talked to you about how they did a lot of controlled

9   buys with informants to try to get search warrants from some

09:22:37AM 10   of these houses?   One day in particular, on July 21st, 2015,

11   Investigator Briganti was surveilling the informant and

12   watched the defendant walk the informant from 6 Burbank, where

13   he was living -- the defendant was living, to 14 Burbank,

14   which was one of the drug spots.

09:22:59AM 15       And then the informant came back to Investigator

16   Briganti having bought these skeleton pirate stamped bags of

17   heroin.  You can see the CI buy on July 21st, 2015.  Those

18   were the same exact envelopes that were seized by law

19   enforcement across the street about just a few weeks later at

09:23:24AM 20   11 Burbank.

21       That shows that there's a partnership, a group of

22   people working together.  And the defendant was involved.  He

23   walked the confidential informant to 14 Burbank to get that

24   pirate stamp envelope of heroin.

09:23:45AM 25       All right.  Now, you also heard about the

1   July 30th, 2015 search of the defendant's house at 6 Burbank.

2   When law enforcement went there, the defendant was home.  They

3   found over $3,000 in cash; they found a scale; baggies; over

4   70 rounds of ammunition; and bags of heroin stamped with the

09:24:11AM 5   devil bag.

6            We have the search warrant on July 30th of 2015.

7   You can see those little red devils.  Those are the same bags

8   that a confidential informant bought on July 10th of 2015,

9   just about 20 days earlier.  This shows the defendant was

09:24:32AM 10   involved in the conspiracy.

11           Now, you only heard about two drug dealers' homes

12   that were searched during this trial, that being the defendant

13   at 6 Burbank and also Ron Standish's home in June of 2016.

14           Now, Mr. Standish got up on the stand and admitted

09:24:58AM 15   to you that he sold cocaine and heroin at the end of his

16   addiction to support his habit and you got to see some of that

17   video footage from two of those buys.

18           Now, when they searched Ron Standish's house he had

19   some of the very same things the defendant had at 6 Burbank:

09:25:17AM 20   Scale, some baggies.  Ron didn't have any drugs and he

21   certainly didn't have any money.

22           Defendant had over $3,000 in his house.  You've

23   heard no evidence that he had any sort of legitimate

24   employment.  Ron Standish, on the other hand, worked

09:25:34AM 25   full time, sometimes overtime as a corrections officer, and

1     they didn't find any money in his house.  So where do you

2     think that $3,000 came from?

3              I think probably the most incriminating thing found

4     in Mr. Standish's house was Exhibit 224, this box with the

09:25:56AM 5   black mamba envelopes in it that he got from the defendant.

6              Now, I think Ron Standish was a pretty bad drug

7     dealer to be quite frank.  Like I said to you, you got to see

8     some of the video of him selling to an informant.  He was

9     really slow and had a hard time counting out those little

09:26:19AM 10  bags.  That was basically a robbery waiting to happen: Sitting

11    in his car turned away, no awareness of what's going on around

12    him.

13             He had customers showing up to his house

14    unexpectedly.  He had printed directions to his supplier's

09:26:39AM 15  house, Mapquest directions to a supplier's house in his car on

16    the day of his arrest.

17             I think it was pretty evident from that video that

18    he was not a seasoned drug dealer.  This was something he was

19    getting into, something that was new to him, and he had the

09:26:57AM 20  defendant as a mentor.

21             The defendant gave him those black mamba envelopes

22    to help him with his drug sales and showed him how to cut a

23    straw so he could get a more consistent amount of drugs in the

24    bags.

09:27:13AM 25            Why do you think Ron was asking the defendant for

1    help in some of those text messages?  I think he said I want

2    to show you what I've been doing, see if I can do better,

3    something like that.  Because the defendant was a seasoned

4    drug dealer and knew what he was doing.  Ron was trying to

09:27:30AM 5    figure it out and keep his addiction going.

6            Now, another incident where the defendant was found

7    to have dominion and control over some bags associated with

8    this organization was on February 6th, 2016.  Axel told you

9    that morning he, the defendant and Obed were at the Liberty

09:27:55AM10    Pole apartments, they woke up, and the defendant is saying,

11    oh, I got to go to work.

12            He wasn't going to go punch a time clock anywhere.

13    He went to Burbank because he was running the block.  And he

14    took the car, that red Honda registered to Obed, to get there.

09:28:12AM15    Obed, another conspirator in this organization.

16            And you heard from Investigator Luciano.  He saw

17    the defendant get out of the driver's seat of that car.  He

18    ultimately found a key to that car on the defendant's person

19    and the car was searched and they found all those Magoo bags

09:28:31AM20    ready to go to the houses for sale.

21            Now, those Magoo bags are significant not just

22    because of the amount, that it was consistent with the intent

23    to sell, but because of the stamp.  Just a few months earlier

24    Yankee was found with the exact same stamp also on Burbank

09:28:53AM25    Street not far from where the defendant was found in that red

1    Honda.  Yankee had over 200 bags of heroin with that Magoo

2    stamp.  Yankee, who was described as another runner in the

3    organization.

4            So here you have it, ladies and gentlemen, Yankee

09:29:09AM 5    and the defendant, both runners for the organization, both

6    stopped with vehicles on Burbank Street in close proximity to

7    one another with the same stamp on the bags.

8            Now, when the defendant was arrested on February

9    6th he also had over $500 in cash on him and was with one of

09:29:32AM10    the other co-conspirators, Cano, who Ron told you he had

11    purchased from.

12            Now, we also have some cell phone evidence linking

13    the defendant to this organization.  Again back to this *maraca*

14    or flip phone that was seized from 11 Burbank.  You can see

09:29:53AM15    the name P and Pepe saved in the phone.

16            And you heard from Che Che, who was in this house,

17    actually called Investigator Briganti telling him drugs were

18    going to be delivered, that he used that phone to call the

19    defendant to get reupped, and he knew he was saved as P in

09:30:10AM20    that phone and he also knew that Rafi referred to the

21    defendant as P.

22            So given the totality of the evidence, this was not

23    a series of unrelated events.  The defendant participated in

24    this conspiracy with his own conduct and action and through

09:30:29AM25    the reasonable foreseeable actions of his co-conspirators in

1 | 2015 and '16.

2 |     Now, all that the law requires is proof of his

3 | participation at any point during the conspiracy.  So at any

4 | point from 2015 to the takedown day January 29th, 2018.  And

09:30:51AM 5 | you have heard ample evidence that the defendant participated

6 | during that timeframe.

7 |     Now, the third element of the narcotics conspiracy

8 | is the drug amount.  Let's talk about the scope of the

9 | conspiracy and the quantity of drugs that were involved and

09:31:08AM 10 | reasonably foreseeable to the defendant.

11 |     Now, remember I told you during opening statements

12 | the defendant is charged with conspiracy, which is an

13 | agreement between two or more people to commit a crime.

14 |     He is not charged with possession of drugs on one

09:31:25AM 15 | particular day.  He's charged with agreeing to distribute that

16 | amount of heroin and cocaine, the 1 kilo of heroin or 5 kilos

17 | or more of cocaine, and that's exactly what he did over the

18 | course of time, consistently working the table where they were

19 | bagging bulk amounts of cocaine and heroin and delivering

09:31:47AM 20 | those thousands of bags to Burbank Street for sale.

21 |     The defendant even had a key to some of those stash

22 | spots where they stored the kilogram quantities of drugs and

23 | the drugs that were packaged for sale.  He had dominion and

24 | control over those apartments, just like how he had dominion

09:32:08AM 25 | and control over Obed's car February 6th, 2016, and the

1    contents of it.

2              Now, you heard from cooperators that this

3    organization was moving kilo quantities of heroin and cocaine

4    each week and that's corroborated by what we found at

09:32:26AM 5    Barrington on January 29th, 2018.  That's one day in this

6    conspiracy.  The police seized over 4 kilograms of cocaine in

7    one day at one location.  This exact same thing was happening

8    for years.

9              You heard about working the table and how they

09:32:49AM 10   would bag 31 or 62 grams of cocaine at a time, and I believe

11   the heroin amount was about 250 to 300 grams of heroin at a

12   time.  And they bagged multiple times a week for years.

13             That's corroborated by what we found at Miller

14   Street.  This is the stuff that Axel stole from Javi from that

09:33:14AM 15   Culver Road apartment.  What was seized from Miller Street is

16   an example again of just one day of what the organization was

17   doing and how they were bagging the drugs and what was

18   reasonably foreseeable to the members of that conspiracy.

19             Because when Axel broke into that Culver Road

09:33:34AM 20   apartment, he knew what was going to be there.  It wasn't a

21   guess, it wasn't luck that he just stumbled upon that amount

22   of heroin.  He knew that that amount of heroin would be in

23   that stash spot because it was always there because he was a

24   member of the conspiracy and he worked the table just like the

09:33:53AM 25   defendant.

1        Now, in addition to the kilogram and cocaine

2  quantities of drugs at the stash spot, they would keep

3  materials to package them.  These are some of the things we

4  found at 292 Barrington as well, the spoons and the scales;

09:34:10AM 5  and they also kept guns there.

6        Now, the defendant is responsible for the drug

7  quantities that were reasonably foreseeable to him, and what

8  was kept at those stash spots was absolutely reasonably

9  foreseeable to him.

09:34:25AM 10        But you've also heard evidence of him directly

11  possessing quantities of heroin.  I have Exhibit 251 here.

12  Ron Standish told you when he went to see the defendant at

13  Prospect Avenue, there was a time where the defendant pulled

14  out a bag that had 2 kilogram quantities of heroin.

09:34:48AM 15        Now, what I have in my hand here is what was seized

16  from Miller Street, but this is a kilogram of heroin.  And the

17  defendant showed Ron two of these.  That is direct evidence

18  that the defendant was in a conspiracy that dealt with more

19  than a kilo of heroin.

09:35:10AM 20        So I think it's clear that the defendant was

21  involved in a conspiracy, there was a conspiracy, and that

22  we've met the threshold amount that there was a kilogram or

23  more of heroin and 5 or more kilograms of cocaine.

24        So moving on to Count 2, the firearms charge, I

09:35:28AM 25  submit to you that we have proven the defendant is guilty of

1 this count as well.  We've established that he was a member of

2 the conspiracy and that the accomplices or co-conspirators

3 possessed firearms, brandished or displayed them or

4 discharged -- meaning fired firearms -- in furtherance of that

09:35:48AM 5 narcotics conspiracy.

6 Now, these are some of the firearms that were

7 seized from 292 Barrington Street.  And the one in the upper

8 left is the gun that was seized from 54 Miller Street when

9 Axel was arrested.  This is the arsenal that I talked about in

09:36:05AM 10 opening statement.

11 Now, Axel described this arsenal -- I think he was

12 asked why did you have it or something to that effect, but he

13 said to protect if there was any problem while someone was

14 selling or someone sold where we sold.

09:36:24AM 15 Now, these guns were moved around to the different

16 stash spots and if you had a problem, you go ask Javi for a

17 gun.

18 Now, having these guns to protect while someone was

19 selling or if someone sold while they sold, that's possession

09:36:40AM 20 of firearms in furtherance of drug trafficking.  And these

21 were kept at a stash spot.  Everybody knew it.

22 Now, I mentioned if you wanted a gun, you just go

23 ask Javi for it.  Axel saw the defendant do just that.  You

24 heard about there was one time the defendant went and asked

09:37:01AM 25 Javi for a tool because a Dominican guy had his necklace

1    stolen.  Javi said get it from the car, and the defendant went

2    to the car and came back with a silver handgun.

3            You also heard from Roberto, Che Che, and Ron that

4    they've seen the defendant with a gun.  Roberto told you about

09:37:20AM 5   how the defendant pistol whipped a guy who got a blow job

6    instead of money for selling drugs.  I think his name was

7    Shorty.  After that Shorty didn't come back to work.

8            You heard about Che Che who told you the defendant

9    rolled up on a motorcycle one time with a .45 caliber handgun;

09:37:37AM 10  and then Ron told you about that very same time the defendant

11   showed him 2 kilos of heroin, in that same bag with the heroin

12   were three guns: A shotgun, what he described as an Uzi, and

13   then this Soviet style gun was also in the bag.

14           When Ron saw that gun he said that is identical --

09:38:03AM 15  looks identical to the gun I saw.  He described it as old,

16   beat up, with a wood stock, an old Soviet style gun.  And

17   that's one of the guns we got out of 292 Barrington Street in

18   January of 2018.

19           You remember how Ron looked when he was telling you

09:38:22AM 20  about that experience when the defendant walked out with a bag

21   of heroin and guns?  He looked terrified.

22           When I asked him how he felt when the defendant

23   showed him those things, he said he was shocked.  And I

24   believe he said I realized I was in way over my head and I

09:38:43AM 25  just wanted to go.

1          Now, you might be wondering how the gun got from

2   Buffalo to Rochester in January of 2018.  Well, Roberto told

3   you there was a time he and Javi went to Buffalo to get guns

4   from Pistolita.  And although Roberto didn't look inside the

09:39:04AM 5   bag, that's what Javi told him they were going to do.  And

6   then they picked up a bag that looked like one that would hold

7   guns.

8          This group had an arsenal to protect their drugs

9   and their money, but also to protect their turf where they

09:39:20AM 10   were selling.  That was just as important.  And pretty much

11   all the witnesses were consistent:  That everybody knew there

12   were no independent drug dealers on Burbank Street.

13          Roberto said that's gonna be a problem if there

14   was.  And you heard about several homicides in the area.  And

09:39:40AM 15   we have them marked here.  You can see how close they all are

16   to Burbank Street and some of the people that were involved in

17   them.

18          Now, starting with -- well, there's three here.

19   Two of them were reasonably foreseeable to the defendant, and

09:39:55AM 20   I'll explain that in a bit.  One of them he was directly

21   involved with.

22          So starting with the January 20th, 2016 murder of

23   Luis Garcia, Pepe's brother -- by the way, Pepe is Victor

24   Garcia.  Ron referred to the defendant as Pepe.  When I say

09:40:12AM 25   Pepe now, that's who I'm referring to.

1           So you heard that Vic and Obed told Javi that Pepe,

2  Victor Garcia, was trying to move the block or take customers.

3  Javi gave that thumb's down.

4           Then Victor Garcia ends up dead in front of 15 Leo

09:40:35AM 5  Street.  After that homicide Vic told Javi he shot Pepe's

6  brother because he had Pepe's jacket on.  Case of mistaken

7  identity.  He confused who he was shooting.

8           Ladies and gentlemen, that is a discharge in

9  furtherance of narcotics trafficking: Trying to kill somebody

09:40:52AM 10  that was moving the block.

11           Same thing with Walter Ross.  He was trying to sell

12  on Burbank Street, and because of that Tapon shot and killed

13  him on September 9th, 2016.  That is a discharge in

14  furtherance of drug trafficking.  If you did something to

09:41:12AM 15  compromise the conspiracy, you get that thumb's down, which

16  means you were gonna get shot.

17           And that was reasonably foreseeable to every member

18  of this conspiracy because they all knew you were not allowed

19  to sell on Burbank without Javi's permission.

09:41:30AM 20           Now, the death of Gargola on March 31st, 2016, the

21  defendant was directly involved with.  You heard that

22  Gargola's people had stolen 10 or 12 grams of heroin from one

23  of the defendant's workers.  Javi gave that thumb's down.  And

24  the defendant took that robbery very personally.  He told Javi

09:41:51AM 25  I'm gonna get them.

1          March 31st, 2016, Gargola's shot and killed in his

2    car.  And after that the defendant and Vic told Javi that Vic

3    was a lookout and the defendant shot Gargola through the car

4    window.  Again, that is a discharge in furtherance of drug

09:42:10AM 5    trafficking.

6          Now, in addition to these murders on Burbank

7    Street, you heard about Buffalo, you heard about the death of

8    Flaco or Palito.  Flaco was a member in this organization as

9    well.  He was the tester of drugs, he sold out of houses or

09:42:31AM 10   that U-Haul that was parked on the street.  He was found in 11

11   Burbank on August 12th, 2015.  That's him in the lower right

12   photograph on the floor.

13         Che Che told you about two separate incidents where

14   Flaco got into a little bit of trouble with the defendant.

09:42:51AM 15         First the defendant was mad at Flaco for bringing

16   some drugs from Lang Street over to Burbank.  For that the

17   defendant told Flaco he couldn't come work for a while.

18         The next incident Flaco was working on Burbank and

19   left for a little bit, the defendant found out he left without

09:43:11AM 20   his permission, and beat him with a broomstick -- so hard that

21   the broomstick broke.

22         Now, Flaco was killed on June 16th, 2016.  He was

23   shot nine times in Osborn Alley in Buffalo, which is just four

24   blocks from 299 Prospect Street.  It's about a quarter of a

09:43:36AM 25   mile.

1        Roberto told you about how he was working the

2   table.  Javi was there and some others, and the defendant and

3   Vic came and told Javi Flaco was talking to a victim's family;

4   he was playing both sides, and that they were suspicious of

09:43:56AM 5   Flaco.

6        Flaco, just like Pepe, Gargola and Walter Ross had

7   become a problem for the organization.  Although he wasn't

8   trying to steal customers, they didn't trust him anymore.

9        This organization was built upon trust.  You heard

09:44:13AM 10   about how Javi had to approve Che Che working there; you heard

11   why Javi liked Mark Young as a lawyer so much -- because he

12   didn't represent rats.  Trust was a critical component to this

13   organization's success.

14        Now, Flaco had become enough of a problem that the

09:44:31AM 15   defendant and Vic went to Javi, and just like Axel told you:

16   If there was a problem and you needed a gun, you went to Javi.

17        That's how you know Flaco's murder was in

18   furtherance of a drug trafficking crime.  A threat to one

19   member of the conspiracy was a threat to all members.  You

09:44:52AM 20   take one person down, the whole thing could come crashing down

21   like a house of cards.

22        Now, when Vic and the defendant went to Javi, he

23   gave that thumb's down.  That shows that that murder was

24   reasonably foreseeable to the members of the conspiracy,

09:45:09AM 25   especially the defendant who was there for the thumb's down

1  and saw it happen because that's not the first thumb's down

2  you heard about.

3          Now, after the murder Vic came to the RGH apartment

4  I think it was and told Roberto while Leitscha and Javi were

09:45:28AM 5  there that kind of what had happened.  He was mad.  He said

6  that he and the defendant got Flaco to Buffalo, they lured him

7  to that alley, Vic was the one that pulled the trigger, but he

8  was mad because he thought the defendant was gonna try and

9  take credit for it.

09:45:45AM 10         Now, a little bit later the defendant shows up and

11  they continue to talk about what happened and how Flaco tried

12  to fight, how he tried to reach for the gun, how the last

13  words he said were I knew this was fucking gonna happen, and

14  how they were laughing about it.

09:46:05AM 15         Now, we have the medical examiner's report here

16  that shows nine gunshot wounds.  VIII says perforating gunshot

17  wound of right finger, and you can see the photograph of his

18  damaged finger there.  Isn't that consistent with somebody

19  that tried to fight or grab the gun?

09:46:25AM 20         It wasn't just Roberto that you heard from about

21  this murder.  You heard from Ron Standish, and he told you he

22  was visiting the defendant to buy drugs on Prospect Avenue and

23  he pulled up this article: Man found dead in west side

24  shooting, dated June 6th, 2016, 11:30 a.m.

09:46:52AM 25         And when the defendant showed that article to Ron,

1    he said he fucked with the wrong people, that cat was begging

2    for his life.  Those are the words of somebody that saw Flaco

3    try and fight.  Those are the words of somebody that knew what

4    was going to happen to Flaco.

09:47:15AM 5          And the defendant showed Ron that article on the

6    very day it happened -- June 6th, 2016 -- while they were just

7    a few blocks away from where it happened.

8            Now, Ron knew these people.  We had the extraction

9    from his Samsung phone, he had contacts for some of them.

09:47:36AM 10  Here we have Cono; P and Pepe was used by the defendant; and

11   Thomas, who was shared between the defendant and Victor Nunez

12   who Ron knew as the defendant's brother.

13           Ron's phone number, the 1860 phone number, was

14   saved into the *maraca* at 11 Burbank.  We know that Ron was at

09:47:59AM 15  Prospect Avenue on June 6th, 2016, from his text messages as

16   well.

17           Now, here's a message from the defendant on May

18   28th says okay pa 299 Prospect Avenue.  The defendant told Ron

19   where to go to meet him to buy cocaine and heroin in Buffalo.

09:48:19AM 20          And now Ron told you that he would actually go into

21   that house to the right behind the tree, which ends up being

22   297.  But when Ron would show up the defendant would walk him

23   in. Ron wasn't there, you know, bee-bopping around the

24   neighborhood looking at house numbers.  He followed the

09:48:39AM 25  defendant into whatever house he wanted him to go into.

1          And the defendant clearly had some ties to 297
2    Prospect.  Do you remember that envelope that was photographed
3    at 6 Burbank when the defendant was arrested on July 30th,
4    2015?  The return address is Xavier Torres, 297 Prospect
09:49:00AM 5    Avenue, Buffalo, New York.  And that was just not even a year
6    before Flaco's homicide.

7          Now, June 6th, 2016, we have a text message from
8    Ron to the defendant, I'm here.  Meaning I'm on Prospect
9    Avenue ready to buy cocaine and/or heroin.

09:49:20AM 10         I'm not sure -- I don't remember what he bought
11    that day.  It would take Ron a little under an hour to get
12    back to Orleans County.

13         So you heard about -- you saw video of that buy of
14    the sale to the confidential informant that Ron did on
09:49:38AM 15    June 6th, 2016.  That was at about 4:35 p.m., so about an hour
16    and a half after he sent the message to the defendant saying
17    I'm here.

18         And I don't know if you caught it when we played it
19    the first time, but Ron apologized to the informant, said I'm
09:49:55AM 20    sorry for taking so long, I tried to call your wife and tell
21    her why.  So I'd like to play that little clip again for you.

22         I called her to tell her I was going to Buffalo.
23    Not only do you have the text messages that Ron is saying I'm
24    here, he also told the informant that he had just been to
09:50:19AM 25    Buffalo.

1          Now, that was also the same day that the defendant
2     gave Ron a new phone number for him.  Ron saved it as Pepe.
3     The creation date is June 6th, 2016, and the phone number was
4     716-468-0306.
09:50:41AM 5          That's the exact same phone number that was in the
6     phone that the defendant had on his person two days later when
7     Detective Adams went to Prospect Avenue and saw the defendant
8     out on the street, he searched him, found a phone, that was
9     the phone number for that phone.
09:50:59AM 10          These are things that Ron could not make up or make
11     happen.  The fact that he had the defendant's phone number in
12     his phone.  The fact that his phone number was in one of the
13     drug houses on Burbank.  The fact that there was an envelope
14     at 6 Burbank almost a year earlier with 297 Prospect Avenue
09:51:19AM 15     and the defendant's name as the return address.
16          The only way to view this evidence is that the
17     defendant sold drugs to Ron Standish.  The only thing linking
18     Ron and the defendant is Burbank Street.
19          Now, as I told you in openings, there's no DNA or
09:51:40AM 20     fingerprint proof or testimony, and you didn't hear any of
21     that through this trial.  But would that really prove what the
22     defendant agreed to do and who he agreed to do it with?
23          I submit to you that accomplice testimony, the very
24     people the defendant worked with, is the best way to show the
09:52:00AM 25     defendant agreed to show what the defendant agreed to do and

1 | who he agreed to do it with.

2 |      I submit that the evidence of the defendant's

3 | involvement in this conspiracy is overwhelming, just like the

4 | evidence that the defendant, his co-conspirators and

09:52:18AM 5 | accomplices possessed, brandished and discharged firearms in

6 | furtherance of the conspiracy.  The evidence is overwhelming.

7 |      When you use your common sense and consider all of

8 | the evidence together as one big picture and apply it to the

9 | law that Judge Geraci will give you later today, there's only

09:52:38AM 10 | one reasonable, logical conclusion that you can reach, and

11 | that is that the defendant is guilty of both counts in the

12 | indictment.  Thank you.

13 |      **THE COURT:** Thank you, Ms. Kocher.

14 |      **MS. KOCHER:** Thank you, Judge.

09:53:15AM 15 |      **THE COURT:** Mr. Verrillo, you may proceed.

16 |      **MR. VERRILLO:** Good morning, ladies and gentlemen.

17 | Before commenting to you about the evidence, I wanted to thank

18 | you, along with Mr. Torres, thank you for giving us the

19 | opportunity to talk to you and to agree to be jurors in this

09:53:43AM 20 | case.

21 |      We know you're jurors in this case because you have

22 | a civic obligation to be, but we also understand you want to

23 | see a just and fair verdict in this case.  So we appreciate

24 | your consideration.

09:53:56AM 25 |      You're being asked to judge Xavier Torres.  That's

1    what you're being asked to do, and we would ask you to treat

2    Mr. Torres as you'd treat anybody that you would evaluate in

3    your normal life experience.

4            You evaluate people all the time, whether it's in

09:54:09AM 5    your job, in your dealings, your personal dealings, et cetera.

6    So we ask you to do that.

7            Mr. Torres is presumed to be innocent of the

8    charges and he's entitled to full and fair consideration of

9    the evidence.  Reasonable doubt is at issue here.  You have

09:54:29AM 10   reason to doubt.  We'll be touching on some of the items which

11   we feel raise reasonable doubt.

12           You as jurors should consider all matters that come

13   to mind with reasonable doubt, and I'll be raising issues with

14   you, but my list is not exhaustive.

09:54:45AM 15   What the attorneys say is not evidence and pointing

16   fingers at Mr. Torres doesn't make it evidence.  When you see

17   people pointing fingers at people, you should say to yourself

18   prove it.  And that's what we're here to see, whether the

19   Government can prove their case beyond a reasonable doubt.

09:55:07AM 20   As in life, in solving life's problems, evidence

21   that we would seek would be reliable, would be credible, would

22   be corroborated to give us a comfort that we can make a

23   decision.

24           Who is Xavier Torres?  He's 37 years old.  He has

09:55:24AM 25   children.  He's a simple person.  Five foot one, a slight

1  person.  You can look at that and say he's not physically

2  intimidating to anybody.

3           What evidence did you have that you would say is

4  reliable, that is uncontroversial? They claim that they did an

09:55:47AM 5  investigation from 2015 to January of 2018, and yet they could

6  not during all that time take a video of Mr. Torres happening

7  out on Burbank.  Mere presence is not illegal, and you'll hear

8  some instructions on that.

9           They say they had a confidential source involved in

09:56:07AM 10  a sale on July 21st, yet we don't have an audio, we don't have

11  the confidential source here.

12          They did extensive pole camera -- watching people

13  what they're doing.  Obviously they didn't know they were

14  being watched unannounced.  We don't have that.

09:56:24AM 15          Extensive hours of wiretaps of various phones, not

16  mentioned Mr. Torres.  They claim he had keys to various

17  places.  We don't have any keys.

18          So things which we would agree are reliable, worthy

19  of belief and we don't have them.  We have an absence of that

09:56:39AM 20  in this case.

21          The Government will say we don't have to do that,

22  but it would be relatively easy to do the things that I just

23  said to you.  And the concept of reasonable doubt, which the

24  judge will instruct you on, includes reference to the absence

09:56:54AM 25  of proof that you would find credible or worthy of belief, and

 1   what you find sufficient to justify a conviction.

 2            The essence of the Government's case is based on

 3   cooperators, people who are seeking a benefit from the

 4   Government and seeking the Government's seal of approval as a

09:57:14AM 5   precondition to filing a motion for substantial assistance.

 6   They say these people are reliable and worthy of belief, and

 7   we disagree.

 8            Inconsistent statements, false statements before

 9   you.  Let's start with Mr. Standish.  Mr. Standish made an

09:57:33AM 10   oath as a corrections officer not to commit crimes and he did

11   so, he committed crimes by his own admission.

12            He claims to have received a clip off a phone or

13   computer involving the shooting, and he told the police

14   upfront when he met with Investigator Adams and the police on

09:57:50AM 15   June 8th of what he claimed.  That's what he testified to.

16            The problem is on June 8th, two days after he

17   allegedly had this encounter with Mr. Torres, he goes before

18   Judge Fiorella, Buffalo City Court judge, who thoroughly

19   examines him and he talks about the two occasions.  Remember,

09:58:11AM 20   he said he had two occasions at Prospect involving Mr. Torres.

21            When he talked to the judge, and Investigator Adams

22   was with him, he talked about two instances:  One was on June

23   4th he had a controlled buy, and ten days prior to that he

24   went to Prospect and saw some assault rifles.  Didn't say

09:58:32AM 25   anything about seeing anything on June 6th about any article

1   about a shooting.

2           Remember, at that time, which was June 8th, he told

3   you he was facing ten charges of possession and sale, each

4   facing 25 years.  He doesn't have any federal charges in this

09:58:54AM 5   case.  The Government met with him 40 times.

6           When he talked to Judge Fiorella he said the

7   following beginning on page 6, this is what we talked about in

8   his questioning.  I'm going to begin on line 2, page 6.

9           Question: Okay.  When you approached this property

09:59:18AM 10   the second occasion, what happened then?

11           Answer: It was also to purchase.

12           Question: Same guy?

13           Answer: Same guy.

14           Question: Do you know when you went there?

09:59:30AM 15           Answer: Approximately ten days ago.

16           What happened on that day?

17           He came out of the back room with a couple assault

18   rifles, an AK-47.

19           Question: What was the purpose of him showing you

09:59:44AM 20   these weapons?

21           Answer: He trusts me.

22           Question: All right. Why does he go to that door,

23   do you know?

24           Answer: I don't know.  I don't know.  I believe

09:59:57AM 25   that back door is where drugs are stashed.

1          Question: And you are coming forward today for what
2    purpose?

3          Answer: To help the police, to help myself.

4          That's what he told the judge two days after he
10:00:14AM  5    allegedly had an encounter with Mr. Torres.  Didn't say
6    anything about 2 kilos of drugs, didn't say anything about
7    seeing an ad, newspaper article.

8          He cooperated.  He's not facing 25 years in state
9    prison.  He has no felonies.  He has no federal drug charges.
10:00:41AM 10    That's what this case is about.

11          He also claims to have spoken to Pepe as the
12    defendant.  No one else has said Mr. Torres is Pepe.  Didn't
13    recall what other people said while they were together.  We
14    know there's another person named Pepe in the neighborhood.

10:00:59AM 15          Investigator Adams relied upon what Mr. Standish
16    said, brought him to the judge and testified.  A search
17    warrant was granted of 299 Prospect, and no drugs or weapons
18    were found there as alleged by Mr. Standish.  He's not
19    credible, he's not worthy of belief.

10:01:18AM 20          Then we go to Roberto Figueroa, who has a prior
21    conviction for manslaughter.  He denies committing any acts of
22    violence on Burbank.  Yet Axel confirmed his possession of
23    weapons and violence.  He's the muscle on the street.

24          Roberto told us about the term fiend.  Fiend is a
10:01:38AM 25    drug user, not trusted for other parts of the operation.  Yet

1    from the testimony, Jose Figueroa and Mr. Torres allegedly

2    were involved in working the tables, had drugs problems.

3    Doesn't make sense.

4             We also had the event that Roberto claimed that

10:02:00AM 5   Mr. Torres had possessed a weapon and hit Shorty with a gun,

6    yet when he testified before the grand jury he was

7    specifically asked about Pistolita.

8             Did you ever see him with a gun?

9             Answer: Naw, I ain't seen him with a gun.

10:02:18AM 10  He says one thing to the grand jury, he says one

11   thing to you.

12            We would submit that's a false statement.

13            Gargola shooting.  Axel told you that the

14   Dominican, Domi, was the one who shot Gargola.  No evidence

10:02:32AM 15  has been presented relative to the Gargola shooting,

16   scientific or medical evidence.

17            Leitscha was the other person that Roberto talked

18   about who kept track of the ins and outs of drugs and their

19   payments.  The witnesses have tried to give very elaborate,

10:02:54AM 20  extensive allegations related to drug activities.

21            And just as in any business, if you're selling --

22   whatever you're selling -- pens, you want to sell pens,

23   pencils, whatever -- you got to keep track of the ins and outs

24   of the business, right?

10:03:11AM 25            Leitscha was the one keeping track of the ins and

1  outs of the drugs and the payments.  That's what was alleged.

2  Yet when we go to the searches that have occurred, there were

3  purported drug ledgers at 14 Burbank and 11 Burbank during the

4  searches in April and August 2015, and no ledgers at

10:03:30AM  5  Mr. Torres' residence.  These are matters that we would ask

6  you to consider.

7           Axel Camacho.  All of the witnesses have

8  inconsistent statements of what Mr. Torres allegedly was

9  involved in.  He told you he listened to wiretaps.  There's

10:03:47AM 10  nothing involving Mr. Torres.

11          Look at pole cameras.  Nothing involving

12  Mr. Torres.

13          And he told you, contrary to what Robert said, that

14  Robert had committed acts of violence, had two guns.  He told

10:04:00AM 15  you that Domi shot Gargola.  Pepe was Victor Garcia, not

16  Mr. Torres.  The bags were blue magic and gladiator helmets,

17  none other.

18          Then Axel told you about an incident where he said

19  that Rafi -- he went to Rafi's wake.  Jose Figueroa told you

10:04:22AM 20  he didn't know about Rafi dying for one month, but this person

21  Axel said he went to the wake.

22          Axel also told you that he made an extensive amount

23  of money working in this operation and insinuated that

24  Mr. Torres had similar involvement at the tables.  He claims

10:04:49AM 25  he made over 90,000 at the tables, drug sales and barbering.

1   And his answer to what he did with the money was -- obviously

2   if any of us has 90 or $100,000 that we accumulated without

3   Uncle Sam and New York State taking a share of it, that would

4   be something of some significance to us.

10:05:08AM 5          And his answer is he spent the money on shoes and

6   clothes and he went to the clubs on occasion.  That doesn't

7   make sense.  So that's who we have in Axel Camacho.

8          We also had the inconsistency on his exaggerated

9   sales.  He said he made $3,000 in a 24-hour period, yet when

10:05:32AM 10   he testified before the grand jury he made $600 to $700,

11   sharing that with Obed.

12          Jose Figueroa was a drug user who worked the tables

13   despite the policy that drug users were not trusted in

14   dealing -- with working at the tables.

10:05:51AM 15          Didn't know Obed and Victor as shown by the

16   pictures.  Then he claimed that -- Jose claimed that he was

17   introduced to Javi by Rafi and Pistolita, yet we went over the

18   grand jury testimony where he said he was introduced by Loco,

19   who had a business relationship with Javi.  Had nothing to do

10:06:10AM 20   with Mr. Torres.

21          Jose has a problem following the rules as we heard.

22   He had a prior felony of attempted weapon second.  He violated

23   his probation.  Had a false name, false address, used illegal

24   drugs, violated parole as a term of his cooperation, didn't

10:06:33AM 25   follow the instructions of law enforcement.

1           If you accept his testimony, he was in this
2   arrangement with the Government where he was cooperating at
3   the same time he had a side deal selling drugs.  That's who
4   you had before you in Jose.  Kept selling despite law
5   enforcement supervision without their approval.
6           You also heard from Jose claiming that Mr. Torres
7   had struck Rafi, yet the prior testimony that we reviewed was
8   that Javi worked with Robert or Yankee to strike Rafi.
9   Obviously, we would submit, a false statement.  He also said
10  it was rare for Mr. Torres being in the house selling drugs.
11          So what we have here, ladies and gentlemen, when we
12  get down to it, is we have cooperating witnesses and we have
13  no objective, independent evidence corroborating what is
14  alleged.
15          Each of them have an interest in this case.  We
16  would submit there's a lack of credible evidence.  Number one,
17  evidence of wealth.  They have tried to pump this operation up
18  as high as possible, kilos here, kilos there.  Well, if that's
19  the case and Mr. Torres is playing some role in that, he
20  should be doing very well financially.
21          Mr. Torres has nothing to show for this alleged
22  conduct.  When he was arrested he had no funds on him.
23          We saw that the search of Javi's residence he had
24  100,000 in cash at his residence.  Search of Javi's mother's
25  residence, $400,000 in cash.

1            If it were true that Mr. Torres was making 90,000

2    or 100,000, 120,000, whatever number you want to come up with,

3    if that was true, then there would be some evidence to

4    substantiate that.  It's not there.

10:08:25AM 5            Mr. Torres had no control of any bags in his

6    possession dealing with any blue Magoo or blue magic design,

7    which is what we heard the design was.  That wasn't the design

8    that he had July 30th of 2015 that was found at his home.  It

9    was the red devil designation.

10:08:46AM10            Lack of any ledger reference.  Again, if you view a

11   drug operation as a business, it's a business.  And you're

12   selling many thousands of dollars, you have to have someone to

13   keep track of what you produced, what you sold, and who gets

14   credit for it.  That's just common sense, right?  There are no

10:09:09AM15  ledgers here.  Not one that show Mr. Torres was involved in

16   this operation.  Various searches, not one of this major

17   operation.

18            This Leitscha lady was the one keeping the records.

19   We don't have anything.  That lack of any ledger records is a

10:09:27AM20  lack of credible evidence, is an absence of proof in this case

21   that would naturally flow if you had such a major operation.

22            Investigator Briganti told you ledgers are common

23   in the drug business.  We have no evidence of that.  And it's

24   also important by concept, right?  If you are a drug seller

10:09:49AM25  that you'd want to keep a record of what you sold because if

1   you know how many you sold, you have a right to payment, that

2   $1 a bag if that was truly the case.

3            There was an insinuation that Mr. Torres was a

4   muscle or a physical threat.  I previously pointed out -- you

10:10:08AM 5   can look at him.  He's no Arnold Schwarzenegger or Sylvester

6   Stallone.  He's not intimidating to anybody.

7            No tapes of these controlled buys that they allege

8   occurred.

9            When this search occurred on February 6th, 2016,

10:10:26AM10   there were no fingerprints in the car, no objective evidence

11   of involvement.  The car was registered to Obed.

12            And Investigator Luciano told you there was no

13   evidence of criminal activity in his presence.  There were no

14   drugs found on Mr. Torres.

10:10:42AM15            All we have is inconsistent statements from

16   cooperators, which you wouldn't rely on in your every day life

17   experiences, and you shouldn't rely on here.

18            They claim that -- Mr. Standish said that there

19   were 2 kilos of drugs in Buffalo when the -- when he allegedly

10:11:04AM20   had this get together on June 6th.  Well, they did a search on

21   June 8th and there were no drugs there.  There were no weapons

22   there.  You heard Investigator Adams say.

23            Let me ask you this question: If you're a drug user

24   of heroin and if I left 2 kilos of heroin with you, what do

10:11:25AM25   you think would happen?  Do you think you'd still be here if

1  you had all those drugs?  Does that make sense to you?  We

2  would submit it doesn't make sense.  We would ask you not to

3  accept it as credible.

4         The Government witnesses had plea contracts for the

10:11:43AM 5  most part.  Testifying against the defendant was a part of

6  that, and the Government will decide the credit.  Some cases

7  had no charges.  Others had reduced charges.

8         Whether or not the witness has given substantial

9  assistance to the Government is determined by the people at

10:12:03AM 10  this table.  They make that determination before a motion is

11  made.

12         They have a lot of power over each cooperator.

13  Each witness is under contract.  Each witness has had multiple

14  meetings with the Government, and you will hear as a part of

10:12:18AM 15  the Court's instructions to you that false statements or

16  statements made by a witness of a material fact can be the

17  basis to disregard their entire testimony.

18         The Government has failed to prove that Mr. Torres

19  was a member of a conspiracy.  We have no agreement to that

10:12:40AM 20  effect, nothing in writing that he intended to participate or

21  knew the objectives of the organization.  No evidence was

22  presented as to what the alleged agreement was.

23         The Government has failed that Mr. Torres -- they

24  failed to prove Mr. Torres possessed a weapon and any

10:12:56AM 25  possession had any connection to a drug trafficking crime.

1           No witness was presented establishing any

2   knowledge, personal knowledge that Mr. Torres participated in

3   the shooting of Flaco.  He wasn't charged with a homicide.

4           The Government has the burden of proving their case

10:13:14AM 5   by reliable and credible evidence beyond a reasonable doubt.

6           Now, we acknowledge that Mr. Torres resided on

7   Burbank Street.  You have before you a lease which his

8   girlfriend had signed, that he had a residence and they were

9   paying rent.  We acknowledge that.

10:13:32AM10           We acknowledge that Mr. Torres knew some of the

11   people that are involved here, but mere presence doesn't mean

12   that you're guilty by association.

13           Mr. Torres also acknowledges that he used heroin,

14   and there were occasions when he sold heroin independent of

10:13:48AM15   this group as established by the distinctive markings on

16   July 30th, and also established by the fact that he has no

17   assets to establish any kind of extensive drug activity as the

18   Government claims.  It's consistent with a person who would

19   sell on occasion to maintain his drug habit.

10:14:09AM20           Mr. Torres was never found with a weapon.  He

21   wasn't found with kilos of drugs.  There's a lot we can say

22   about this case, and you have been very attentive to the case

23   and to the circumstances and obviously you will make

24   determinations of what you would rely on or not, what's

10:14:30AM25   credible or not.

1          There's going to come a time when this case is

2   over -- I'll be wrapping up shortly -- and we ask you to take

3   the time to invest in the deliberations, consider all the

4   evidence, and the lack of evidence that you would think would

10:14:44AM 5   be reasonably available.

6          For Mr. Torres, this is a very important day for

7   him.  We ask you, the jurors, to ask the tough questions, to

8   think about the issues that I've raised and any issues I may

9   have not raised that would come to your attention.  We ask you

10:15:00AM 10   to consider all the evidence or lack of evidence.

11          In this case we would submit that the Government

12   has failed to meet its burden of persuasion, of producing

13   reliable and credible evidence, we ask that you -- after you

14   carefully and thoughtfully consider this case, that you make

10:15:18AM 15   findings the Government has not proven its case and find that

16   Mr. Torres is not guilty on each charge.  Thank you very much.

17          **THE COURT:** Thank you, Mr. Verrillo.

18          Mr. Marangola, you may proceed.

19          **MR. MARANGOLA:** Thank you, Your Honor.

10:16:12AM 20          He may not be intimidating just sitting there, but

21   when he's got one of these, he's pretty intimidating.  When

22   he's got a handgun on his waist or pistol whipping workers,

23   he's pretty intimidating.

24          Mr. Verrillo said when people point, you should ask

10:16:39AM 25   them to prove it.  Well, I'm going to point at the defendant,

1  but I'm not the only person that pointed at him.  Seven people

2  got on that witness stand, seven of them, and pointed at him.

3  Seven witnesses.

4          Now, Mr. Verrillo stood up here and he said you're

10:17:02AM 5  here to judge the defendant.  That's not true.

6          The judge is going to tell you you're here to judge

7  the facts and apply the facts as you find them to the law that

8  the judge gives you.

9          Now, I'm going to criticize some of Mr. Verrillo's

10:17:18AM 10  arguments, not all of them, I don't think it's necessary, but

11  please don't take the fact that I'm criticizing some of his

12  arguments as me attacking him personally.  He's got a job to

13  do and I respect that, and I respect that he's making those

14  efforts in this case.

10:17:37AM 15          I'd like to talk about some of these arguments that

16  he's raised.  He said that the defendant is in front of a

17  judge in Buffalo, he's not telling the judge in this thorough

18  examination about all these things.

19          Ladies and gentlemen, he gave you a snippet of that

10:18:00AM 20  testimony.  That's it.  And trying to ask you to judge -- make

21  a judgment based on that.

22          He's suggesting that Mr. Standish lied either to

23  the judge about what he saw or to the cops about when he saw

24  because he didn't give him the right date because instead of

10:18:21AM 25  June 4th, it was June 6th.

1        Ladies and gentlemen, we don't need Mr. Standish's

2   recollection at that time and whether he said June 4th or

3   June 6th.  And I don't think he said a date, I don't think he

4   actually said a day, regardless, when he had been up for 24

10:18:41AM 5   hours and was withdrawing -- went through withdrawal from

6   heroin, gave them the wrong date.

7        We have the exact date, we know when he talked to

8   the defendant because the text messages on June 6th say I'm

9   coming up to see you, and then he says I'm here.  We know that

10:19:04AM 10   from his text messages.

11        Now, I'm not sure if this is actually being argued

12   or not, but is there really a doubt that the man over there

13   who I'm pointing to, Xavier Torres, was identified as

14   Pistolita by people in this courtroom, and as Pepe by Mr.

10:19:28AM 15   Standish?  Is there any doubt that the person Mr. Standish

16   dealt with and knew as Pepe is that man right here?

17        He saw him over 100 times, dealt with him

18   face-to-face buying drugs from him for over a year, and drove

19   to Buffalo to meet him.

10:19:55AM 20        You heard Mr. Verrillo starting to question Mr.

21   Standish saying so the defendant, the defendant, the defendant

22   and then he phrased a question, he said this person Pepe that

23   you bought from, and Mr. Standish said wait a minute.  This

24   person?  That's the guy sitting right next to you.  That's who

10:20:12AM 25   this person is.

1              Mr. Verrillo wants to point out, oh, they didn't

2    get anything at 299 Prospect when the police raided it.  Yeah,

3    they hit the wrong house.  They hit the wrong house.

4              Standish described how he went into -- it's 297.

10:20:35AM 5    The defendant texted him 299, and he got there and when the

6    defendant brought him between 299 and 297, he went into 297.

7              What is completely ignored by the defense here is

8    that when he was arrested there, what did he have in his

9    pocket?  What did he have in his pocket?  He had the phone --

10:21:01AM 10   the defendant had the phone with the same number for the

11   contact Pepe in the drug addict's phone, trying to become a

12   drug seller, Ron Standish's phone.

13             Independent, corroborating evidence.  It doesn't

14   get better than that.  Mr. Standish couldn't make up a number

10:21:24AM 15   and just put it in the defendant's phone and have it be in his

16   pocket on the very same day the police go there.  There's no

17   stronger tie, no stronger tie.

18             And as Ms. Kocher said, the only tie between Ron

19   Standish, a corrections officer who became a heroin addict

10:21:46AM 20   from Albion, and this drug dealer is Burbank Street.  That's

21   all the case is about, folks, is his participation in the drug

22   selling operation on Burbank Street.

23             Now, Mr. Verrillo talked to you about pole camera

24   footage.  He said there's no pole camera footage showing the

10:22:07AM 25   defendant on Burbank Street.

1          What's that going to -- you had six people testify

2    to seeing him on Burbank Street:  Investigator Briganti,

3    Investigator Luciano, they saw the defendant on Burbank Street

4    multiple times.  You had four other people testified to his

10:22:25AM 5    presence on Burbank Street.

6          He said there's no wiretaps of the defendant.  You

7    got text messages from the defendant to his customer in Ron

8    Standish's phone.  That's what you get on a wiretap.  Now, I

9    would submit to you that those are invitations by the defense

10:22:45AM 10   to speculate.

11          I'm a little confused by the statement that the

12   defense acknowledges Xavier Torres sold some drugs

13   independently on Burbank.  I'm not sure what he's

14   acknowledging because there was no proof whatsoever of the

10:23:08AM 15   defendant selling drugs independently on Burbank.  None

16   whatsoever.

17          The defendant -- and he has no burden to prove

18   this, but if he's -- as the judge will tell you, what counsel

19   says is not evidence.  So simply stating he sold drugs

10:23:27AM 20   independently on Burbank doesn't make it so.  And I think

21   everyone in this room knows there are no freelance drug

22   dealers on Burbank, there's no independent contractors, no

23   stand alones, no one just walking up the street going I'm

24   gonna sell here today.

10:23:49AM 25          He talks about mere presence.  Folks, this is not a

1    case of mere presence.  Did we put Investigator Briganti on

2    and he testified I saw the defendant on Burbank Street a

3    number of times and we arrested him and said you know what,

4    folks?  If he's on Burbank Street, he must be a drug dealer.

10:24:05AM 5   That's mere presence.

6            Do we say we saw him talking to Roberto Figueroa,

7    he must be a drug dealer and you should find that?   That's

8    mere association.

9            That's not what this case was.  You heard from the

10:24:22AM 10  people that he dealt drugs with and told you the nature of

11   their relationship, the nature of their partnership in crime.

12           We're not coming in here saying, oh, he was simply

13   there so he must be guilty.  That's mere presence.  That's not

14   anything close to what this case is.

10:24:44AM 15         Now, a word about the cooperating witnesses that

16   Mr. Verrillo attacked so vigorously.  They're cooperating in

17   the hopes of a reduced sentence, and we acknowledge that.

18   Each one of them acknowledged that.

19           Ask yourself, though -- and you heard it from

10:25:05AM 20  them -- do these witnesses have a motive to lie and to

21   exaggerate and to falsely implicate Xavier Torres under the

22   cooperation agreement, or do they have a motivation to tell

23   the truth?

24           How are they going to best be served in this case?

10:25:26AM 25  They told you.  Telling the truth.  And if they don't, their

1    chance, their hope for a reduced sentence goes down the

2    toilet.

3          Also in evaluating their credibility Mr. Verrillo

4    talked about corroboration.  I think there's tons of

10:25:49AM 5    corroboration in this case.  We talked about it a little bit

6    with Mr. Standish.  The defendant has got the key to the car

7    with 300 bags of this conspiracy's heroin, 300 bags of Magoo,

8    the Magoo heroin, same heroin Yankee has.  That's how you know

9    they're in the same partnership.

10:26:20AM10          We spent a lot of time talking about those stamps.

11    And in the beginning I'm sure you were sitting here going who

12    cares what the little designs are on the bags?  Well, now you

13    know.  The stamps show their partnership, the partnership with

14    all of these other individuals from bagging up these bags,

10:26:41AM15    from selling these bags.  It's a coincidence that Yankee's got

16    the same bags on the same street six weeks earlier as he has?

17    That's called corroboration.

18          So the -- give me one second.  I think there was

19    one other thing I just wanted to mention here.  Mr. Verrillo

10:27:26AM20    talked about these witnesses' prior testimony between Roberto

21    Figueroa testifying at a trial against Javi about this

22    conspiracy for some five or six days, Axel Aponte Camacho for

23    about four days testifying about this conspiracy, prior grand

24    jury testimony, hundreds of pages of transcripts from

10:27:52AM25    Ms. Macri.

1        And what are they impeached with?  Was it 1,500 a

2   week or 2,500 a week you made when you were selling drugs?

3   That's what they're coming after them for?

4        Ladies and gentlemen, Ron Standish didn't even know

10:28:14AM 5   Roberto Figueroa.  These guys didn't cross paths.  But they're

6   testifying to the same activity that Xavier Torres engaged in.

7        And you heard these witnesses.  We didn't know --

8   Mr. Verrillo says the Government has a lot of power over these

9   cooperating witnesses.  You heard each one of them testify.

10:28:34AM 10        I didn't show Roberto Figueroa what Ronald Standish

11   told us and say, hey, he said he's a runner, so maybe you

12   should say he's a runner.  Didn't happen.  Yet they said the

13   same thing.

14        Axel Aponte wasn't shown Che Che's testimony, yet

10:28:54AM 15   they described the same conduct of this man.

16        These high school dropouts from Puerto Rico

17   testified to the same thing.  Not a coincidence.  I'd ask you

18   to consider all of that in evaluating their credibility.

19        Mr. Verrillo made mention about ledgers, right?  He

10:29:18AM 20   says Leitscha's, you know, we tried to compare this to like a

21   Fortune 500 company, Leitscha took ledgers -- there were

22   records of these drug transactions.

23        There was not a single piece of testimony that I

24   recall that said Leitscha was keeping track of the money that

10:29:36AM 25   this defendant was making, that she was keeping track of the

1    packages this defendant was delivering.  There was no

2    testimony about that whatsoever.

3           And, finally, with respect to the drug sales,

4    Mr. Verrillo knocked Mr. Aponte Camacho and said you were

10:29:57AM 5    making all that money.  I think he exaggerated and made it

6    sound like Axel Aponte was walking around with $90,000 in his

7    pocket, which of course he wasn't.

8           And what did he do with it?  He said he spent it on

9    clothes, sneakers, and the clubs.  Now, maybe that's not

10:30:18AM 10   believable, maybe Mr. Verrillo wouldn't spend his cash on

11   clothes or sneakers or going to the clubs, but that's what 20

12   something year old Axel Aponte did with all that cash.  I

13   think that is believable.

14          Ladies and gentlemen, in the end I would ask that

10:30:38AM 15   you use your common sense, reject the invitations to speculate

16   about other evidence, what is or is not there, apply the law

17   the judge gives you, and hold the defendant accountable for

18   his involvement in this conspiracy, for his role in possessing

19   and exercising dominion and control and constructive

10:31:04AM 20   possession over these firearms that were possessed and

21   discharged in furtherance of the conspiracy, and find him

22   guilty as charged because, ladies and gentlemen, under the law

23   of conspiracy, the hand of one is the hand of all.

24          Thank you very much.

10:31:26AM 25          **THE COURT:** Thank you, Mr. Marangola.

1        Members of the jury, at this time we're going to
2   take a recess.  When we return I will then instruct you on the
3   laws, the rules and the principles that will guide your
4   deliberations.  In the meantime, please do not discuss the
10:31:38AM 5   matter or allow anybody to discuss the matter with you.  The
6   jury may step down, we'll stand in recess.

7            (**WHEREUPON**, there was a pause in the proceeding).

8            (**WHEREUPON**, the defendant is present; the jury is
9   present).

11:09:39AM 10       **THE COURT:** Good morning, members of the jury.
11   Before I begin I want to take this opportunity to commend the
12   attorneys on the able way in which they represented their
13   individual clients and also to you, members of the jury, for
14   the care and the attention that you've given this case over
11:12:56AM 15   the course of several days we've been here.

16            Over the next hour or so I'm going to be reading to
17   you the law that applies to this case, the rules that will
18   apply to your deliberations, and the substantive charges in
19   this case.

11:13:13AM 20       I apologize in advance, but I'll be reading a lot,
21   so I won't be ad libbing this, but I will be reading the law
22   to you.  You have to get it exactly as it provides.

23            Members of the jury, now that you've heard all the
24   evidence in the case as well as the final arguments of
11:13:30AM 25   counsel, it becomes my duty to instruct you on the rules, the

1      laws and the principles that will guide your deliberations.

2                    In any jury trial there are in effect two judges.

3      I am one of the judges, the judge of the law; you are the

4      judges of the facts.

11:13:48AM 5          It is my duty to preside over this case to

6      determine what testimony and evidence is relevant under the

7      law for your consideration.  It is also my duty at the end of

8      the trial to instruct you on the law.

9                    You, the jury, are the judges of the facts, but in

11:14:08AM 10   determining the facts, in reaching your decision as to the

11     facts, it's your sworn duty to follow the law as I give it to

12     you.

13                   You must follow my instructions as a whole.  You

14     are not to single out any one instruction as stating the law,

11:14:24AM 15   but rather you must consider the instructions entirely.

16                   You have no right to question the wisdom or the

17     correctness of any rule I'm about to state to you.  That is,

18     you must not substitute or follow your own notion or opinion

19     as to what the law is or what you think it ought to be.

11:14:44AM 20        Justice through trial by jury must always depend

21     upon the willingness of each juror to seek the truth as to the

22     facts from the same evidence presented to all the jurors and

23     arrive at a verdict by applying the same rules of law.

24                   You are to perform your duty without bias or

11:15:03AM 25   prejudice.  It is expected you will carefully and impartially

1    consider all the evidence in the case, follow the law and

2    reach a just verdict regardless of the consequences.

3            The evidence in this case consists of the sworn

4    testimony of witnesses who took the witness stand regardless

11:15:24AM 5    of who may have called them; and all exhibits that were

6    received in evidence regardless of who may have produced

7    those; and any facts in this case have been admitted or

8    stipulated to by the parties.

9            Statements and arguments of counsel are not

11:15:40AM 10   evidence.  Any evidence to which an objection was sustained by

11   the Court and any evidence ordered stricken by the Court must

12   be disregarded.

13           Anything you may have seen or heard outside this

14   courtroom is not evidence and must be entirely disregarded.

11:16:00AM 15   Throughout the course of the trial there have been

16   certain exhibits that were simply marked for identification

17   but not received in evidence, and those are not evidence for

18   your consideration.

19           You are to consider only the evidence in the case,

11:16:15AM 20   but in your consideration of the evidence you are not limited

21   to the bald statement of the witnesses.  In other words, you

22   are not limited solely to what you saw or heard the witnesses

23   testify.  You are permitted to draw from facts which you find

24   have been proven such reasonable inferences that you feel are

11:16:35AM 25   justified in light of your experience.

1          In deciding whether or not the Government has met

2    its burden of proof, you may consider both direct and

3    circumstantial evidence.  Direct evidence is evidence that

4    proves a disputed fact directly.  For example, when a witness

11:16:55AM 5    testifies what they saw, heard, observed, that is direct

6    evidence.

7          Circumstantial evidence is evidence which tends to

8    prove a disputed fact by proof of other facts.  To give a

9    simple example, suppose when you came into the courthouse

11:17:13AM 10    today the sun was shining, it was a nice day, but you cannot

11    see outside.  Later as you're sitting here somebody walks into

12    the courtroom with a dripping wet umbrella, and soon after

13    somebody walks in with a dripping wet raincoat.

14          Now in the assumed facts you cannot look outside

11:17:33AM 15    the courtroom, so you cannot see whether or not it's raining.

16    So you have no direct proof or evidence of that fact.

17    However, based upon the combination of facts about the

18    umbrella and the raincoat, it would be reasonable for you to

19    infer that it had been raining.

11:17:52AM 20          That is really all there is to circumstantial

21    evidence: Using your reason, experience, you infer from

22    established facts the existence or non-existence of another

23    fact.  Please note, however, it is not a matter of speculation

24    or guess.  It's a matter of logical inference.

11:18:11AM 25          The law makes no distinction between direct and

circumstantial evidence.  Circumstantial evidence is of no
less value than direct evidence, and you may consider either
or both and give them such weight as you conclude is
warranted.

11:18:29AM    If an attorney asks a witness a question which
contains an assertion of fact, you may not consider the
assertion as evidence of that fact unless the witness agrees
with or adopts the assertion.

A lawyer's statements are not evidence whether the
11:18:45AM statements are made during openings or closing arguments or
during the course of the case.

If any reference is made by the Court or counsel to
matters of evidence that does not coincide with your
recollection, it is your recollection which should control.

11:19:05AM I'm not sure I did, but during the course of the
trial if I occasionally asked a question of a witness, it was
only in order to bring out facts not then fully covered.  Do
not assume that I hold any opinion on the matters to which my
questions were addressed.

11:19:23AM Remember, at all times you as jurors are at liberty
to disregard all comments of the Court concerning the facts in
arriving at your own findings of the facts.

In short, you should not view anything the Court
did or said as an indication the Court has any opinion on a
11:19:41AM fact issue in this case.  It's your province to decide the

1    issues in the case, not the Court's.

2              It is the duty of the attorneys on each side to

3    object when the other side offers testimony or other evidence

4    the attorney believes is not properly admissible.

11:20:01AM 5    Counsel also have the right and duty to ask the

6    Court to make rulings of law and request conferences at

7    sidebar.  All those questions of law must be decided by the

8    Court.  You should not show any prejudice toward an attorney

9    or their client because they have objected to the

11:20:21AM 10   admissibility of evidence or asked for a conference.

11             As I already indicated, my rulings on the

12   admissibility of evidence do not indicate any opinion about

13   the weight and effect of the evidence.  You are the sole

14   judges of the credibility of the witnesses.

11:20:41AM 15   Under your oath as jurors you are not to be swayed

16   by sympathy.  You are to be guided solely by the evidence in

17   the case, and the critical hard core question that you must

18   ask yourself as you sift through the evidence is has the

19   Government proven the guilt of the defendant beyond a

11:21:00AM 20   reasonable doubt.

21             It's for you alone to decide whether the Government

22   has proven that the defendant is guilty of the crimes charged

23   solely based on the evidence and subject to the law.

24             It must be clear to you that if you let fear,

11:21:19AM 25   prejudice, bias or sympathy interfere with your thinking,

1   there's a risk that you will not arrive at a true and just

2   verdict.

3          If you have a reasonable doubt as to the

4   defendant's guilt, you should not for any reason -- excuse me,

11:21:36AM 5   you should not hesitate for any reason to find a verdict of

6   acquittal.

7          If you should find the Government has met its

8   burden of proving the defendant's guilt beyond a reasonable

9   doubt, you should not hesitate because of sympathy or any

11:21:50AM10   other reason to render a verdict of guilty.

11          The question of possible punishment of the

12   defendant is of no concern to the jury and should not in any

13   sense enter into or influence your deliberations.  The duty of

14   imposing sentence rests exclusively with the Court.

11:22:12AM15          Your function is to weigh the evidence in the case

16   and determine whether the defendant is guilty beyond a

17   reasonable doubt solely based upon the evidence.

18          Under your oath as jurors you cannot allow a

19   consideration of the punishment that may be imposed upon the

11:22:30AM20   defendant if he is convicted, and it should not in any way

21   influence your deliberations.

22          Every defendant in a criminal case is presumed to

23   be innocent, so in this case the defendant is presumed to be

24   innocent.  That presumption remains with the defendant

11:22:52AM25   throughout the trial and it may only be overcome by evidence

1  which establishes his guilt beyond a reasonable doubt.

2            The defendant has pled not guilty in this case and,

3  therefore, has put into issue each of the elements of the

4  crimes charged.  Accordingly, the Government must prove each

11:23:13AM 5  of the elements of the crimes charged beyond a reasonable

6  doubt.

7            The burden of proof is always on the Government to

8  prove beyond a reasonable doubt every essential element of the

9  crimes charged.  The law never imposes upon a defendant in a

11:23:29AM 10  criminal case the burden or duty of calling any witnesses or

11  producing any evidence.

12            Since the law presumes the defendant to be

13  innocent, any defendant begins a trial with a clean slate,

14  that is, with no evidence against him.

11:23:46AM 15            Furthermore, the law permits nothing but legal

16  evidence presented before the jury to be considered in support

17  of the charge against the defendant.

18            So the presumption of innocence alone is sufficient

19  to acquit a defendant unless the jury is satisfied beyond a

11:24:06AM 20  reasonable doubt of the defendant's guilt after careful and

21  impartial consideration of all the evidence in the case.

22            Now, I've said that the Government has the burden

23  to prove the defendant guilty beyond a reasonable doubt.  What

24  do we mean by reasonable doubt?

11:24:27AM 25            A reasonable doubt is a doubt based on reason

1    arising out of the evidence or the lack of evidence.  A

2    reasonable doubt is a real doubt based upon reason and common

3    sense after careful and impartial consideration of all the

4    evidence in the case.  A reasonable doubt is a doubt which

11:24:48AM 5    appeals to your reason, to your judgment, to your common sense

6    and to your experience.

7              A reasonable doubt does not arise from mere

8    conjecture, speculation or whim, nor from reluctance to

9    convict through feelings of sympathy for the defendant.

11:25:05AM 10              A reasonable doubt is a conscientious and reasoned

11    belief arising only after calm and impartial consideration of

12    all the evidence in the case.

13              While the Government's burden of proof is a strict

14    and heavy burden, it is not necessary that a defendant's guilt

11:25:24AM 15    be proven beyond all possible doubt.  It is not required that

16    the Government prove a defendant's guilt to an absolute or

17    mathematical certainty.  It is only required that the

18    Government's proof exclude any reasonable doubt concerning a

19    defendant's guilt.

11:25:46AM 20              As stated, the burden is always upon the Government

21    to prove guilt beyond a reasonable doubt.  This burden never

22    shifts to a defendant since the law never imposes upon a

23    defendant in a criminal case the burden or duty of calling any

24    witnesses or producing any evidence.

11:26:07AM 25              You are to perform your duty of finding the facts

1  without bias or prejudice to any party.  You are to perform

2  your final duty in an attitude of complete fairness and

3  impartiality.

4           The case is important to the Government for the

11:26:23AM 5  enforcement of criminal laws.  It is a matter of prime concern

6  to the community.  Equally it is important to the defendant

7  who is charged with a serious crime.

8           The fact that the prosecution is brought in the

9  name of the United States of America entitles the Government

11:26:42AM 10 to no greater consideration than that accorded to any other

11 party to a litigation.  By the same token, it is entitled to

12 no less consideration.  All parties, whether the Government or

13 individuals, stand as equals at the bars of justice.

14           Next I want to talk to you about witnesses and how

11:27:04AM 15 to evaluate their testimony.  You, as jurors, are the sole

16 judges of the credibility of the witnesses and the weight

17 their testimony deserves.  You should carefully scrutinize all

18 the testimony given, the circumstances under which each

19 witness has testified, and every matter in evidence which

11:27:25AM 20 tends to show whether a witness is worthy of belief.

21           Consider a witness's age, intelligence, motive,

22 state of mind, their demeanor and manner while on the stand.

23 Consider a witness's ability to observe the matters to which

24 they testified and whether they impress you as having an

11:27:48AM 25 accurate recollection of these events.

1              Consider any relationship a witness may bear to

2    either side of the case, the manner in which each witness

3    might be effected by the verdict and whether, if at all, each

4    witness is either supported or contradicted by other evidence

11:28:09AM 5    in the case.

6              In deciding whether you believe or do not believe

7    any witness, I suggest you ask yourself a few questions.  Did

8    the person impress you as being one who was telling the truth?

9    Did they have any particular reason not to tell the truth?

11:28:27AM10   Did they have a personal interest in the outcome of the case?

11   Did the witness seem to have a good memory?  Did the witness

12   have the opportunity and ability to observe accurately the

13   things about which they testified?  Did they appear to

14   understand the questions clearly and answer them directly?

11:28:47AM15   Did the witness' testimony differ from the testimony of other

16   witnesses?

17              Inconsistencies and discrepancies in the testimony

18   of a witness or between different witnesses may or may not

19   cause the jury to discredit such testimony.  Two or more

11:29:06AM20   persons witnessing an incident or transaction may see or hear

21   it differently.  An innocent misrecollection, like the failure

22   of recollection, is not an uncommon experience.

23              In weighing the effect of a discrepancy always

24   consider whether it pertains to a matter of importance or an

11:29:24AM25   unimportant detail, and whether the discrepancy results from

1    innocent error or intentional falsehood.

2              After making your own judgment, you will give the

3    testimony of each witness such credibility that you feel it

4    deserves.

11:29:42AM 5              In evaluating the credibility of the witnesses you

6    should take into account any evidence that the witness who

7    testified may benefit in some way from the outcome of the

8    case.  Such an interest in the outcome creates a motive to

9    lie, testify falsely, and may sway the witness to testify in a

11:30:00AM 10   way that advances their own interest.

11              Therefore, if you find that any witness whose

12   testimony you are considering may have an interest in the

13   outcome of the trial, then you should bear that fact in mind

14   when evaluating the credibility of their testimony and accept

11:30:17AM 15   it with great care.

16              That's not to suggest that every witness who has an

17   interest in the outcome of the case will testify falsely.

18   It's for you to decide to what extent, if any, the witness's

19   interest is effected or colored their testimony.

11:30:36AM 20              If you find that a witness has willfully testified

21   falsely about any material fact, you have the right to

22   conclude that the witness has lied about other matters.  You

23   may either disregard all the witness's testimony or accept

24   whatever part of it you feel deserves to be believed.

11:31:06AM 25              You have heard witnesses who testified in this

1    trial that they were actually involved in some of the criminal

2    activity charged in the indictment.  There's been a great deal

3    said about these so-called accomplices.

4            The Government argues, as it is permitted to do so,

11:31:24AM 5    that it must take the witnesses as it finds them.  It argues

6    only people who themselves take part in criminal activity have

7    the knowledge required to show criminal behavior by others.

8            For those very reasons the law allows the use of

9    accomplice testimony.  Indeed, it is the law in federal court

11:31:44AM 10   that testimony of accomplices may be enough in itself for

11   conviction if a jury finds that the testimony establishes

12   guilt beyond a reasonable doubt.

13           However, it's also the case that accomplice

14   testimony is of such nature that it must be scrutinized with

11:32:03AM 15   great care and viewed with particular caution when you decide

16   how much of the testimony to believe.

17           I've given you some general considerations on

18   credibility.  However, let me say a few things that you may

19   want to consider during your deliberations on the subject of

11:32:21AM 20   accomplices.

21           You should ask yourself whether these so-called

22   accomplices would benefit more by lying or by telling the

23   truth.  Was their testimony made up in any way because they

24   believed or hoped that they would somehow receive favorable

11:32:37AM 25   treatment by testifying falsely, or did they believe that

1  their interest would be best served by testifying truthfully.

2           If you believe that a witness was motivated by

3  hopes of personal gain, was the motivation one which would

4  cause them to lie or was it one that would cause them to tell

11:32:57AM 5  the truth?  Did this motivation color their testimony?

6           In sum, you should look at all evidence in deciding

7  what credence and weight you'll want to give to accomplice

8  testimony.

9           In this case there's been testimony from Government

11:33:19AM 10  witnesses that entered into cooperation or plea agreements

11  with the Government.  You are instructed that you are to draw

12  no conclusion or inference of any kind about the guilt of the

13  defendant on trial from the fact that a prosecution witness

14  pled guilty to similar charges.

11:33:36AM 15           That witness's decision to plead guilty was a

16  personal decision about their own guilt and it may not be used

17  by you in any way as evidence against or unfavorable to the

18  defendant on trial.

19           The Government is permitted to enter into this kind

11:33:53AM 20  of plea agreement.  You, in turn, may accept the testimony of

21  such a witness and convict the defendant on the basis of this

22  testimony alone if it convinces you of the defendant's guilt

23  beyond a reasonable doubt.

24           However, you should bear in mind that a witness who

11:34:11AM 25  has entered into such an agreement has an interest in the case

1   different from an ordinary witness.  A witness who realizes

2   that they may be able to receive a lighter sentence by giving

3   testimony favorable to the prosecution has a motive to testify

4   falsely.  Therefore, you must examine their testimony with

11:34:31AM 5   caution and weigh it with great care.

6            I've given you some general considerations on

7   credibility.  I will not repeat those at this time.

8            You should ask yourself whether the witness would

9   benefit more by lying or by telling the truth.  Was their

11:34:47AM 10   testimony made up in any way because they believed or hoped

11   that they would somehow receive favorable treatment by

12   testifying falsely?  Or did they believe that their interest

13   would be best served by testifying truthfully.

14            If you believe that the witness was motivated by

11:35:03AM 15   hopes of personal gain, was the motivation one which would

16   cause them to lie or was it one which would cause them to tell

17   the truth?

18            In sum, you should look at all the evidence in

19   deciding what credence and what weight, if any, you'll want to

11:35:18AM 20   give to such a witness.

21            If after scrutinizing their testimony you decide to

22   accept it, you may give it whatever weight that you feel it

23   deserves.

24            In this case I have allowed as admitted into

11:35:40AM 25   evidence against the defendant the acts and statements of

1    others because these acts and statements were committed by

2    persons who the Government charges were also co-conspirators

3    with the defendant.

4            The reason for allowing this evidence to be

11:35:56AM 5    received against the defendant has to do with the nature of

6    the crime of conspiracy.  A conspiracy is often referred to as

7    a partnership in crime.

8            Thus, as in other types of partnerships, when

9    people enter into a conspiracy to accomplish an unlawful end,

11:36:14AM 10   each and every member becomes an agent of the other

11   co-conspirators in carrying out the conspiracy.

12           Accordingly, the reasonably foreseeable acts,

13   declarations, statements, and admissions of any member of the

14   conspiracy and in furtherance of the common purpose of the

11:36:36AM 15   conspiracy are deemed under the law to be the acts of all the

16   members and all the members are responsible for the acts,

17   declarations, statements and admissions.

18           If you find beyond a reasonable doubt that a

19   defendant was a member of the conspiracy as charged in the

11:36:54AM 20   indictment, then any acts done or statements made in

21   furtherance of the conspiracy by persons also found by you to

22   have been members of the conspiracy  may be considered against

23   the defendant.  This is so even if such acts were done and

24   statements were made in the defendant's absence and without

11:37:17AM 25   his knowledge.

1           However, before you may consider the statements or

2    acts of the co-conspirator in deciding the issue of the

3    defendant's guilt, you must first determine that the acts and

4    statements were made during the existence and in furtherance

11:37:34AM 5    of the unlawful scheme.

6           Acts were done or the statements made by someone

7    who you do not find to have been a member of the conspiracy,

8    or if they were not done or said in furtherance of the

9    conspiracy, they may not be considered by you as evidence

11:37:53AM10    against the defendant.

11           There was testimony at trial that the attorneys for

12    the Government interviewed witnesses when preparing for and

13    during the trial.  There's nothing improper in conducting such

14    interviews.  You should not draw any unfavorable inference

11:38:14AM15    from that conduct.

16           There's also been testimony in this case with

17    respect to the use of undercover agents and informants.

18    Undercover agents and informants are frequently used by the

19    Government to obtain leads and gain introduction to persons

11:38:33AM20    suspected of violating the law.

21           There are certain types of crimes where without the

22    use of undercover agents and informants detection would be

23    extremely difficult.  The Government's use of this technique

24    is entirely lawful as long as the defendant's rights were not

11:38:51AM25    violated, and the defendant has not claimed that his rights

1 | were violated in this case.

2 |          Your personal view on the use of informants or

3 | undercover agents to detect unlawful activity, whether you

4 | approve or disprove, is not to enter into your deliberations

11:39:08AM 5 | in any way.

6 |          If you are satisfied beyond a reasonable doubt that

7 | the defendant committed the offenses charged, you should find

8 | him guilty and the circumstances that the Government made use

9 | of an informant or an undercover agent is irrelevant to your

11:39:28AM 10 | determination.

11 |          You've heard testimony of a witness who has been

12 | promised in exchange for testifying truthfully, completely and

13 | fully they will not be prosecuted for other federal crimes

14 | related to this case, either narcotics conspiracy or firearms

11:39:51AM 15 | violations occurring during the course of this agreement,

16 | during the course of the commission of these acts up to the

17 | date of the agreement.

18 |          The Government's permitted to make these kinds of

19 | promises and is entitled to call as witnesses people to whom

11:40:08AM 20 | these promises were given.  You're instructed you may convict

21 | the defendant on the basis of such witness's testimony alone

22 | if you find that the testimony proves the defendant's guilt

23 | beyond a reasonable doubt.

24 |          However, the testimony of a witness who has been

11:40:25AM 25 | promised they will not be prosecuted should be examined by you

1    with greater care than the testimony of an ordinary witness.

2    You should scrutinize it closely to determine whether or not

3    it is colored in any way as to place guilt upon the defendant

4    in order to further the witness's own interest.

11:40:45AM 5          For such a witness confronted with the realization

6    that they can win their own freedom by helping to convict

7    another has a motive to falsify his testimony.  Such testimony

8    should be received by you with suspicion and you may give it

9    such weight as you believe it deserves.

11:41:07AM 10          The testimony of a witness may be discredited or

11    impeached by evidence showing that the witness has been

12    convicted of a felony, a crime for which a person may receive

13    a prison sentence of more than one year.  For a conviction of

14    a crime that is a felony is one of the circumstances which you

11:41:26AM 15    may consider in determining the credibility of that witness.

16          It is the sole and exclusive right of the jury to

17    determine the weight to be given to any prior conviction as

18    impeachment and the weight to be given to the testimony of

19    anybody who has been previously convicted of a felony.

11:41:47AM 20          In connection with your evaluation of the

21    credibility of the witnesses you should specifically consider

22    evidence of resentment or anger that a witness may have toward

23    the defendant or that a witness may have against another

24    witness.

11:42:03AM 25          Evidence that a witness is biased, prejudiced or

1   hostile toward the defendant requires you to view that

2   witness' testimony with caution and weigh it with care and

3   subject it to close and searching scrutiny.

4            In this case you heard the testimony of law

11:42:23AM 5   enforcement officers.  The fact that a witness may be employed

6   by a state, local or federal entity as a law enforcement

7   officer does not mean that their testimony is necessarily

8   deserving of consideration of greater or lesser weight than

9   that of any other witness.

11:42:41AM 10            At the same time it's quite legitimate for defense

11   counsel to try to attack the credibility of a law enforcement

12   officer on the ground their testimony may be colored by their

13   personal or professional interest in the outcome of the case.

14            It's your decision after reviewing all the evidence

11:42:58AM 15   whether to accept the testimony of a law enforcement witness

16   and to give that testimony whatever weight you feel it

17   deserves.

18            In this case the defendant did not testify.  The

19   law does not compel a defendant in a criminal case to take the

11:43:24AM 20   witness stand and testify and no presumption of guilt may be

21   raised, no inference of any kind may be drawn from the fact

22   the defendant has not testified.

23            As previously stated, the law never imposes upon a

24   defendant in a criminal case the burden or duty of calling any

11:43:43AM 25   witnesses or producing any evidence.  This is a very important

1  principle which you must be aware of and must follow.  It is a

2  basic rule of our criminal justice system.

3          As I advised you in the beginning of this case, you

4  may have noticed the defendant is in custody.  That fact has

11:44:04AM 5  nothing to do with your determination on the issues in this

6  case.  You're not to speculate on his custodial status or in

7  any way let it effect your determination.

8          The law does not require the Government to call as

9  witnesses all persons who may have been present at any time or

11:44:33AM 10  place involved in the case or who may appear to have some

11  knowledge of the matters in issue in this trial.  Nor does the

12  law require the Government to produce all exhibits, all papers

13  and all things mentioned in the evidence.

14          However, in judging the credibility of the

11:44:50AM 15  witnesses who have testified and in considering the weight and

16  the effect of all the evidence that has been produced, the

17  jury may consider the failure to call other witnesses or

18  produce other evidence shown by the evidence in the case to be

19  in existence and available.

11:45:07AM 20          The jury again will always bear in mind that the

21  law never imposes upon a defendant in a criminal case the

22  burden or duty of calling any witnesses or producing any

23  evidence, and no adverse inference may be drawn from his

24  failure to do so.

11:45:26AM 25          During the trial you have heard testimony of

1    witnesses and argument by counsel that certain investigative

2    techniques were not used by the Government.  You may consider

3    these facts in deciding whether the Government has met its

4    burden of proof.  You should look at all the evidence or the

11:45:42AM 5    lack of evidence in deciding whether the defendant is guilty.

6         However, you are also instructed there's no legal

7    requirement that the Government use any specific investigative

8    techniques to prove its case.  For example, there's no

9    requirement to attempt to take fingerprints or that it offer

11:46:02AM 10    fingerprints in evidence.

11         While you are to carefully consider the evidence

12    brought before you by the Government, you are not to speculate

13    as to why they used the techniques they did and why they did

14    not use other techniques.  The Government is not on trial.

11:46:19AM 15    Law enforcement techniques are not your concern.

16         Your concern, as I stated, is to determine whether

17    or not on the evidence or lack of evidence the guilt of the

18    defendant has been proven beyond a reasonable doubt.

19         In this case you've heard evidence about evidence

11:46:39AM 20    obtained through the execution of court-authorized search

21    warrants.  Evidence obtained from such search warrants was

22    properly admitted in this case and may be properly considered

23    by you.

24         Whether you approve or disapprove of how it was

11:46:56AM 25    obtained should not enter into your deliberations.  You must,

1 therefore, regardless of your personal opinions, give this

2 evidence full consideration along with all the other evidence

3 in the case in determining whether the Government has proved

4 the defendant's guilt beyond a reasonable doubt.

11:47:20AM 5          In this case there were read throughout the course

6 of the trial a number of stipulations between the parties

7 regarding certain pieces of evidence.  A stipulation simply

8 means the parties have agreed that if a particular witness

9 were called to testify and testified, they would give certain

11:47:41AM 10 stated testimony.

11          You must accept as true the fact that the witness

12 would have given that testimony. However, it's for you to

13 determine the effect and the weight to be given to that

14 testimony.

11:47:58AM 15          Members of the jury, received in evidence in this

16 case were certain photographs that were gruesome and difficult

17 to view.  These photographs were received because they were

18 relevant to some of the issues involved in this case.

19          It is required that you view these photographs

11:48:15AM 20 without passion or emotion and give them whatever weight you

21 deem appropriate.

22          During the course of the trial you heard evidence

23 that the defendant Xavier Torres is known by the nicknames

24 Pistolita, P and Pepe.  I instruct you that this evidence is

11:48:38AM 25 admitted only for the limited purpose of identifying the

1 | person referred to as Pistolita, P and Pepe as being

2 | Xavier Torres.  Therefore, you must consider each nickname

3 | only for that limited purpose and not for any other purpose.

4 | Ladies and gentlemen, at this time we're going to

11:49:05AM 5 | turn to the specific charges in this case, the two counts, and

6 | the elements of those counts.

7 | First of all, I want to indicate to you I'll be

8 | citing from the indictment.  The indictment is not evidence.

9 | When I do cite it, remember, it's nothing more than -- the

11:49:26AM 10 | indictment is nothing more than a formal method of accusing

11 | the defendant of a crime.  It is not evidence of any kind

12 | against the defendant.

13 | And also the charges in the indictment refer to

14 | various dates in which the crimes are alleged to have taken

11:49:42AM 15 | place.  Nevertheless, it does not matter if the charges in the

16 | indictment occurred on or about a certain date, or between on

17 | or about certain dates and the evidence indicates that, in

18 | fact, it was on another date or between other dates.

19 | The law only requires substantial similarity

11:50:03AM 20 | between the dates alleged in the indictment and the dates

21 | established by the testimony and/or exhibits.

22 | Count 1 of the indictment charges the defendant

23 | Xavier Torres with participating in a conspiracy to violate

24 | the drug laws of the United States in violation of Title 21,

11:50:27AM 25 | United States Code, Section 846.

1          Count 1, narcotics conspiracy, reads as follows:

2    Beginning in or about 2015 and through on or about January 29,

3    2018, in the Western District of New York and elsewhere, the

4    defendant Xavier Torres a/k/a Pistolita did knowingly,

5    willfully and unlawfully combine, conspire and agree together

6    and with others, to commit the following offenses, that is, to

7    possess with intent to distribute and to distribute 5

8    kilograms or more of a mixture and substance containing, a

9    Schedule II controlled substance; and 1 kilogram or more of a

10   mixture and substance containing heroin, a Schedule I

11   controlled substance, in violation of Title 21, United States

12   Code, Section 841(a)(1) and 841(b)(1)(A), all in violation of

13   Title 21, United States Code, Section 846.

14         The essence of the crime of conspiracy is an

15   agreement or understanding between two or more persons to

16   violate some other law or laws, in this case the law

17   pertaining to possession of cocaine with intent to distribute,

18   and distribution of cocaine, and the law pertaining to the

19   possession of heroin with intent to distribute and

20   distribution of heroin.

21         A conspiracy is sometimes referred to as a

22   partnership in crime because it involves collective or

23   organized action.  It presents a greater potential threat to

24   the public interest than the illegal activity of a single

25   individual since it often makes it possible to attain ends

1    more complex than those an individual acting alone could

2    accomplish, increases the likelihood that the criminal object

3    will be successfully realized, and makes detection more

4    difficult.

11:52:46AM 5              It is for these reasons that Congress authorized

6    conspiracy to be charged as its own crime, entirely separate

7    and distinct from the violations of law that may be the object

8    of the conspiracy.

9              The commission of the crime, as distinguished from

11:53:05AM 10   the agreement to commit the crime, is called a substantive

11   offense.  If a conspiracy exists to violate a federal drug

12   law, even if it should fail in its purpose, it is still

13   punishable independently of the substantive offense, and the

14   Government need not prove an actual violation of the laws

11:53:25AM 15   pertaining to possession with intent to distribute and

16   distribution of cocaine and/or heroin for you to find that the

17   offense of conspiracy has been proven.

18              In other words, a conspiracy to violate federal

19   drug laws may be proven even though the specific substantive

11:53:46AM 20   offenses are not.

21              Of course, the fact that the conspiracy charged is

22   separate from the substantive offense does not preclude you

23   from considering proof of actual violations as evidence that a

24   conspiracy existed.

11:54:00AM 25              Indeed, the Government contends in this case that

1    it has introduced evidence of actual violations demonstrating

2    the conspiracy charged in the indictment.

3            To sustain its burden of proof with respect to the

4    charge of narcotics conspiracy, the Government must prove

11:54:20AM 5    beyond a reasonable doubt the following two elements:

6            First, the existence of the conspiracy, that is, an

7    agreement or understanding to violate those provisions of the

8    law that make it illegal to distribute cocaine and/or heroin

9    and/or to possess cocaine and/or heroin with intent to

11:54:40AM 10   distribute cocaine and/or heroin.

11           The first element then is: Did the conspiracy

12   alleged in the indictment exist?  Was there such a conspiracy?

13           Second, the Government must prove beyond a

14   reasonable doubt that beginning in or about 2015 and through

11:55:02AM 15   on or about January 29, 2018, in the Western District of

16   New York, the defendant Xavier Torres knowingly became a

17   member of the conspiracy, that is, that he knowingly and

18   willfully associated himself with and participated in the

19   alleged conspiracy to distribute and/or possess with intent to

11:55:19AM 20   distribute cocaine and/or heroin.

21           I will now discuss the two elements of this charge.

22   First, the existence of the conspiracy and, second, whether

23   the defendant Xavier Torres knowingly associated himself with

24   and participated in the conspiracy.

11:55:47AM 25           Starting with the first element , what is a

1   conspiracy?  A conspiracy is a combination, an agreement, or

2   an understanding of two or more persons to accomplish by

3   concerted action a criminal or unlawful purpose.

4            In this instance the unlawful purposes alleged to

11:56:05AM 5   be the object of the conspiracy were the distribution of

6   cocaine and/or heroin, and/or the possession of cocaine and/or

7   heroin with intent to distribute cocaine and/or heroin.

8            The gist or the essence of the crime of conspiracy

9   is the unlawful combination or agreement to violate the law.

11:56:28AM 10   The success of the conspiracy or the actual commission of the

11   criminal act that is the object of the conspiracy is not an

12   essential element of that crime.

13           The conspiracy alleged here is, therefore, the

14   agreement to distribute or to possess a controlled substance

11:56:49AM 15   with intent to distribute and it is an entirely distinct and

16   separate offense from the actual distribution of a controlled

17   substance and from the actual possession with intent to

18   distribute a controlled substance.

19           Now, to establish a conspiracy the Government is

11:57:09AM 20   not required to show that two or more people sat around a

21   table and entered into a solemn packet orally or in writing

22   stating that they had formed a conspiracy to violate the law

23   and spelling out all the details.

24           Common sense tells you that when people, in fact,

11:57:26AM 25   agree to enter into a criminal conspiracy, much is left to the

1    unexpressed understanding.  It is rare that a conspiracy can

2    be proven by direct evidence of an explicit agreement.

3              To show that a conspiracy existed the evidence must

4    show that two or more persons in some way or manner came to a

11:57:44AM 5    mutual understanding, either spoken or unspoken, to violate

6    the law and to accomplish an unlawful plan.

7              If you find beyond a reasonable doubt that two or

8    more persons came to such an understanding, express or

9    implied, to violate the law and to accomplish an unlawful

11:58:12AM10   plan, then the Government will have sustained its burden of

11   proof as to this element.

12             In determining whether there has been an unlawful

13   agreement as alleged, you may consider the actions and the

14   statements of all those you find to be co-conspirators as

11:58:25AM15   proof that a common design existed to carry out the criminal

16   purpose.

17             Often the only evidence that is available with

18   respect to the existence of a conspiracy is that of

19   disconnected acts and conduct on the part of the alleged

11:58:46AM20   individual co-conspirators.

21             When taken all together and considered as a whole,

22   however, those acts and conduct may warrant the inference that

23   a conspiracy existed as conclusively as would direct proof.

24             So you must first determine whether the proof

11:59:03AM25   established beyond a reasonable doubt the existence of the

1    conspiracy.  In considering this first element, you should

2    consider all the evidence that has been admitted with respect

3    to the conduct and statements of each alleged co-conspirator

4    and such inferences as may be reasonably drawn from them.

11:59:20AM  5          It is sufficient to establish the existence of the

6    conspiracy as I have already said, if from the proof of all

7    the relevant facts and circumstances you find beyond a

8    reasonable doubt that at least two alleged co-conspirators

9    came to a mutual understanding to accomplish the objectives of

11:59:36AM 10   the conspiracy by the means alleged.

11          The indictment here charges two objectives of the

12   conspiracy, namely, distribution of a mixture or substance

13   containing cocaine and/or heroin, and/or possession with

14   intent to distribute a mixture or substance containing cocaine

12:00:01PM 15   and/or heroin.

16          You are instructed as a matter of law that cocaine

17   and heroin are each a controlled substance.

18          The word "distribute" means to deliver a controlled

19   substance.

12:00:16PM 20           "Deliver" is defined as the actual, constructive

21   or attempted transfer of a controlled substance.

22          Simply stated, the words "distribute" and "deliver"

23   mean to pass on, or to hand over to another, or to cause to be

24   passed on or handed over to another, or to try to pass on or

12:00:35PM 25   hand over to another controlled substances.

1       Distribution does not require a sale.  Activities

2  in furtherance of the ultimate sale, such as vouching for the

3  quality of the drugs, negotiating for or receiving the price,

4  and supplying or delivering the drugs may constitute

12:00:54PM 5  distribution.  In short, distribution requires a concrete

6  involvement in the transfer of the drugs.

7       Actual possession is what most of us think of as

8  possession, that is, having physical custody or control of an

9  object.  For example, if someone had drugs on his person, you

12:01:13PM 10  may find that he had possession of the drugs.

11       The law recognizes that possession may be sole or

12  joint.  If one person alone possesses a controlled substance,

13  that is sole possession.  It is possible, however, that more

14  than one person can have control over the same drugs.  If this

12:01:30PM 15  is so, then these people have was called joint possession.

16       A person need not have actual physical custody of

17  an object to be in legal possession of it.  If an individual

18  has the power and the intention to exercise substantial

19  control over an object that he does not have in his physical

12:01:56PM 20  custody, then he is in possession of that item.

21       Although the person does not have physical custody

22  of those items , he has the ability and the intention to

23  exercise substantial control over them and, thus, has what is

24  known as constructive possession of them.

12:02:14PM 25       Your decision about the defendant Xavier Torres'

1    intention to distribute controlled substances involves a

2    decision about the defendant Xavier Torres' state of mind.

3                It is obviously impossible to directly prove the

4    operation of the defendant Xavier Torres' mind, but a wise and

12:02:32PM 5    intelligent consideration of all the facts and circumstances

6    shown by the evidence and the exhibits in the case may enable

7    you to infer what the defendant's state of mind was.  Since

8    you cannot read a defendant's mind, you must make inferences

9    from his behavior.

12:02:47PM 10                In our every day affairs we are continuously called

11    upon to decide from the actions of others what their state of

12    mind is.  Therefore, you may well rely in part on

13    circumstantial evidence in determining the defendant

14    Xavier Torres' state of mind.

12:03:11PM 15                It is sufficient in determining intent to

16    distribute if you find that the defendant Xavier Torres

17    intended to cause or assist the distribution of the drugs.

18                Basically what you are determining is whether the

19    drugs possessed were for personal use or for the purpose of

12:03:30PM 20    distribution.  Often it is possible to make this determination

21    from the quantity of drugs found in a person's possession.

22                The possession of a large quantity of narcotics

23    does not necessarily mean that a person intended to distribute

24    them.  On the other hand, a person may have intended to

12:03:49PM 25    distribute narcotics even if he did not possess large amounts

1      of them.

2             Other physical evidence, such as paraphernalia for

3      the packaging or processing of drugs, can show such an intent.

4      There might also be evidence of a plan to distribute.

12:04:03PM  5      You should make your decision whether a person

6      intends to distribute any narcotics in his possession from all

7      of the evidence presented.

8             The conspiracy count charges that the controlled

9      substances involved were cocaine and/or heroin.  In this

12:04:15PM 10      regard I instruct you that the purity of the drugs involved is

11      not an element of this crime.  The mixture or substance need

12      only contain a detectable amount of the controlled substance.

13             If you find that the conspiracy, if you have found

14      one to exist, had either of the charged objectives, the

12:04:51PM 15      illegal purpose element will be satisfied.

16             However, you must be unanimous as to the objective,

17      that is, you must all be in agreement with respect to at least

18      one of the alleged objectives of the conspiracy.

19             If you conclude that the Government has proven

12:05:10PM 20      beyond a reasonable doubt that the conspiracy existed, you

21      must next determine the second question, that is, whether the

22      defendant Xavier Torres participated in the conspiracy with

23      knowledge of at least some of its unlawful purposes and with

24      the intent to advance one or more of its unlawful objectives.

12:05:27PM 25             The Government must prove beyond a reasonable doubt

1    that the defendant Xavier Torres knowingly and willfully

2    entered into the conspiracy, into the agreement, with a

3    criminal intent, that is, with a purpose to violate the law

4    and agreed to take part in the conspiracy to further promote

12:05:41PM 5    and cooperate in its unlawful objectives.

6            The defendant Xavier Torres is charged with having

7    committed an offense unlawfully, willfully or intentionally

8    and knowingly.

9            "Unlawfully" simply means contrary to law.

12:06:06PM 10           A person acts "intentionally" if he acts purposely

11   and deliberately and not because of ignorance, mistake,

12   accident or some other innocent reason.

13           A person acts "knowingly" if he acts intentionally

14   and voluntarily and not because of ignorance, mistake or

12:06:24PM 15   accident or carelessness.

16           A person acts "willfully" if he acts voluntarily

17   and intentionally and with a purpose to do something the law

18   forbids, in other words, with a bad purpose either to disobey

19   or to disregard the law.

12:06:40PM 20           Knowledge and intent are matters that exist in the

21   mind.  Science has not yet devised a way to permit us to enter

22   into a person's mind and to know exactly what he thinks.

23           Therefore, knowledge and intent are rarely, if

24   ever, proven by direct evidence.  Rather, they are matters of

12:06:57PM 25   inference to be determined by an examination of all of the

1 surrounding facts and circumstances.

2          The intent with which an act is done is often more

3 clearly and conclusively shown by the act itself or by a

4 series of acts than by words or explanations of the act

12:07:16PM 5 uttered long after its occurrence.  Frequently the acts of an

6 individual tell us more about his intentions than do his

7 words.

8          Accordingly, intent and knowledge are usually

9 established by the surrounding facts and circumstances as of

12:07:30PM 10 the time the acts in question occurred or the events took

11 place and the reasonable inferences to be drawn from those

12 facts, circumstances and events.

13          You should apply your common sense and draw such

14 reasonable inferences as may be warranted by the facts proved

12:07:48PM 15 to your satisfaction.

16          In determining these issues you may consider any

17 statements that the defendant Xavier Torres made and acts that

18 he did or failed to do together with all of the other facts

19 and circumstances in evidence that reasonably relate to a

12:08:01PM 20 determination of his state of mind.

21          You must be satisfied beyond a reasonable doubt

22 that in joining the conspiracy, if you find that the defendant

23 Xavier Torres did join the conspiracy, he knew what he was

24 doing, that he took the actions in question deliberately and

12:08:14PM 25 voluntarily.

1          It is important for you to note that the defendant

2    Xavier Torres' participation in the conspiracy must be

3    established by independent evidence of his own acts or

4    statements, as well as those of the other alleged

12:08:28PM 5    co-conspirators and the reasonable inferences that may be

6    drawn from them.

7          A conspiracy, once formed, is presumed to continue

8    until either its objective is accomplished or there is some

9    affirmative act of termination by its members or it is

12:08:59PM 10   otherwise terminated.

11          Mere cessation of activities without more is not an

12   affirmative act of termination.  So once a person is found to

13   be a member of a conspiracy, he is presumed to continue his

14   membership in the venture until its termination unless it is

12:09:17PM 15   shown by some affirmative proof that he withdrew and

16   disassociated himself from it.

17          It is not necessary that the defendant be fully

18   informed as to the details or full scope of the conspiracy to

19   justify an inference of knowledge on his part.  To have guilty

12:09:34PM 20   knowledge the defendant need not have known the full extent of

21   the conspiracy or all of its activities or all of its

22   participants.

23          It is not even necessary that the defendant know

24   every other member of the conspiracy.  In fact, the defendant

12:09:47PM 25   may know only one other member of the conspiracy and still be

1  a co-conspirator.

2         Nor is it necessary that the defendant receive any

3  monetary benefit from his participation in the conspiracy,

4  have a financial stake in the outcome so long as he, in fact,

12:10:01PM 5  participated in the conspiracy in the manner I have explained.

6         The duration and extent of the defendant

7  Xavier Torres' participation has no bearing on the issue of

8  the defendant's guilt.  He need not have joined the conspiracy

9  at the outset.  He may have joined it for any purpose at any

12:10:24PM 10  time in its progress, and he will still be held responsible

11  for all that was done before he joined and all that was done

12  during the conspiracy's existence while he was a member.

13         Each member of the conspiracy may perform separate

14  and distinct acts and may perform them at different times.

12:10:41PM 15         Some conspirators play major roles, while others

16  play minor roles in the scheme.  An equal role is not what the

17  law requires.  In fact, even a single act may be sufficient to

18  draw the defendant Xavier Torres within the ambit of the

19  conspiracy, provided the proof establishes that the defendant

12:11:01PM 20  Xavier Torres was aware of the conspiracy, knowingly

21  associated with it and participated in it.

22         However, I want to caution you that the mere

23  association by one person with another does not make that

24  person a member of the conspiracy even when coupled with

12:11:16PM 25  knowledge that a conspiracy is taking place.

1           Mere presence at the scene of a crime, even coupled

2   with knowledge that a crime is taking place, is not sufficient

3   to support a conviction.

4           In other words, knowledge without participation is

12:11:29PM 5   not sufficient.  What is necessary is that the defendant

6   Xavier Torres has participated in the conspiracy with

7   knowledge of its unlawful purposes and with an intent to aid

8   in the accomplishment of its unlawful objectives.

9           In sum, the defendant Xavier Torres, with an

12:11:49PM 10   understanding of the unlawful character of the conspiracy,

11   must have intentionally engaged, advised or assisted in it for

12   the purpose of furthering an illegal undertaking.

13           The defendant Xavier Torres thereby becomes a

14   knowing and willing participant in the unlawful agreement,

12:12:05PM 15   that is to say, a conspirator.

16           If you find that the Government has proven beyond a

17   reasonable doubt the two necessary elements for the narcotics

18   conspiracy charged in Count 1, then there is one more issue

19   that you must decide.

12:12:17PM 20           I have provided you with a special verdict form

21   asking you to fill in the amount of drugs for which the

22   defendant Xavier Torres is responsible.

23           The burden is on the Government to establish the

24   type and amount of drugs beyond a reasonable doubt.  For a

12:12:28PM 25   narcotics conspiracy charge, a member of the conspiracy is

responsible for the amount of drugs that he himself agreed to
distribute or possess with intent to distribute.

In addition, that co-conspirator is also
responsible for all reasonably foreseeable amounts of drugs
that the other conspirators agreed to distribute or possess
with intent to distribute in furtherance of the criminal
activity that the co-conspirator jointly undertook with them.

In other words, a defendant is responsible for drug
amounts that are within the scope of the conspiracy that he
joined and that are reasonably foreseeable to him.

Remember, you should address this issue only if you
find that the defendant Xavier Torres guilty of conspiracy to
possess with intent to distribute and/or to distribute cocaine
and/or heroin.  If you did not find that the Government has
proven both elements of Count 1, then do not complete this
form as to the amount of drugs.

If you find beyond a reasonable doubt the following
elements:

First, that within the Western District of New York
and elsewhere two or more persons entered into the unlawful
agreement charged in the indictment beginning in or about 2015
and through on or about January 29, 2018;

And, second, that the defendant Xavier Torres
knowingly and willfully became a member of the narcotics
conspiracy as charged in Count 1, then you must find the

1  defendant Xavier Torres guilty of narcotics conspiracy as

2  charged in Count 1.

3         On the other hand, if you find that the Government

4  has failed to prove any one of those elements beyond a

12:14:04PM 5  reasonable doubt, then you must find the defendant

6  Xavier Torres not guilty of narcotics conspiracy as charged in

7  Count 1.

8         In Count 2 the defendant Xavier Torres is charged

9  with using or carrying a firearm during and in relation to a

12:15:21PM 10  drug trafficking crime, or possessing a firearm in furtherance

11  of a drug trafficking crime.

12         Count 2 reads as follows: Beginning in or about

13  2015 and through on or about January 29, 2018, in the Western

14  District of New York, the defendant Xavier Torres a/k/a

12:15:40PM 15  Pistolita during and in relation to a drug trafficking crime

16  for which he may be prosecuted in a court of the United

17  States, that is, a violation of Title 21 of the United States

18  Code, Section 846, committed in the manner set forth in

19  Count 1, did knowingly and unlawfully use, carry, brandish,

12:16:06PM 20  and discharge and in furtherance of such crime did knowingly

21  and unlawfully possess, brandish and discharge, all in

22  violation of Title 18, United States Code, Section

23  924(c)(1)(A)(i), 924(c)(1)(A)(ii) , 924(c)(1)(A)(iii), and

24  Section 2.

12:16:39PM 25         The statute on this subject is Title 18, United

1   States Code, Section 924(c)(1), which reads as follows: Any

2   person who during and in relation to any drug trafficking

3   crime for which a person may be prosecuted in a court of the

4   United States uses or carries a firearm or who in furtherance

12:16:58PM 5   of any such crime possesses a firearm, shall be guilty of a

6   crime.

7         The Government must prove beyond a reasonable doubt

8   the following elements to sustain its burden of proving the

9   defendant Xavier Torres guilty of Count 2.

12:17:20PM 10         First, that the defendant Xavier Torres committed

11   the drug trafficking crime as charged in Count 1.

12         Second, that beginning in or about 2015 and through

13   on or about January 29, 2018, in the Western District of

14   New York, the defendant Xavier Torres knowingly used or

12:17:35PM 15   carried a firearm during and in relation to the commission of

16   the drug trafficking crime charged in Count 1, or that the

17   defendant Xavier Torres knowingly possessed a firearm in

18   furtherance of the drug trafficking crime charged in Count 1.

19         The first element the Government must prove beyond

12:18:00PM 20   a reasonable doubt is that the defendant Xavier Torres

21   committed a drug trafficking crime for which he might be

22   prosecuted in a court of the United States.

23         In connection with Count 2 the defendant

24   Xavier Torres is charged in Count 1 with conspiracy to possess

12:18:17PM 25   with intent to distribute, and/or to distribute cocaine and/or

1   heroin.

2            I instruct you that the offense of narcotics

3   conspiracy is a drug trafficking crime.

4            However, it is for you to determine whether the

12:18:29PM 5   Government has proven beyond a reasonable doubt that the

6   defendant Xavier Torres committed the crime of narcotics

7   conspiracy as charged in Count 1.

8            The second element the Government must prove beyond

9   a reasonable doubt in connection with Count 2 is that the

12:18:50PM 10   defendant Xavier Torres knowingly used or carried a firearm

11   during and in relation to the predicate crime or knowingly

12   possessed a firearm in furtherance of the commission of the

13   predicate crime.

14            A "firearm" is any weapon which will or is designed

12:19:06PM 15   to or may be readily converted to expel a projectile by the

16   action of an explosive.

17            In order to prove that the defendant Xavier Torres

18   used a firearm, the Government must prove beyond a reasonable

19   doubt an active employment of the firearm by the defendant

12:19:29PM 20   during and in relation to the commission of the drug

21   trafficking crime.

22            This does not mean that the defendant Xavier Torres

23   must actually fire or attempt to fire the weapon, although

24   those would obviously constitute use of the weapon.

12:19:43PM 25            Brandishing, displaying, or even referring to the

1   weapon so that others present knew that the defendant

2   Xavier Torres had the firearm available, if needed, all

3   constitute use of the firearm.

4          However, the mere possession of a firearm at or

5   near the site of the crime without active employment as I just

6   described is not sufficient to constitute a use of the

7   firearm.

8          In order to prove that the defendant Xavier Torres

9   carried a firearm the Government must prove beyond a

10  reasonable doubt that the defendant had the weapon within his

11  control in such a way that it furthered the commission of the

12  drug trafficking crime or was an integral part of the

13  commission of the crime.

14         The defendant Xavier Torres did not necessarily

15  have to hold the firearm physically, that is, have actual

16  possession of it on his person.

17         If you find that the defendant Xavier Torres had

18  dominion and control over the place where the firearm was

19  located and had the power and intention to exercise control

20  over the firearm in such a way that it furthered the

21  commission of the drug trafficking crime, you may find that

22  the Government has proven that the defendant Xavier Torres

23  carried the weapon.

24         As I mentioned earlier, the term "possess" means to

25  exercise authority, dominion or control over something.  The

1     law recognizes different kinds of possession.  In that regard,

2     possession includes both actual and constructive possession.

3                A person who has direct physical control of

4     something on or around his person is then in actual possession

12:21:26PM 5     of it.

6                A person who is not in actual possession but who

7     has both the power and the intention to exercise control over

8     something is in constructive possession of it.

9                Whenever the term "possess" is used in these

12:21:41PM 10    instructions, it means either actual or constructive

11    possession.

12                The law also recognizes that possession may be sole

13    or joint.  If one person alone possesses it, that is sole

14    possession.

12:21:54PM 15                However, it is possible that more than one person

16    may have the power and intention to exercise control over a

17    firearm.  That is called joint possession.

18                If you find that the defendant Xavier Torres had

19    such power and intention, then he possessed a firearm under

12:22:07PM 20    this element, even if he possessed it jointly with another.

21                Proof of ownership of the firearm is not required.

22                The term "in furtherance of" means in the act of

23    furthering or helping forward, promoting, advancing, or

24    assisting.  The mere presence of a firearm in the area where a

12:22:29PM 25    criminal act occurs is not sufficient.  Rather, the Government

1    must prove that the firearm was possessed to advance or

2    promote the specified criminal activity.

3              In deciding whether the Government has proven that

4    a firearm was possessed to advance or promote that criminal

12:22:45PM 5    activity, you may consider all of the evidence presented.

6              To satisfy the element, you must also find that the

7    defendant Xavier Torres knowingly possessed a firearm.  This

8    means that he possessed the firearm purposely and voluntarily

9    and not by accident or mistake.

12:22:58PM 10              It also means that he knew that the weapon was a

11    firearm as we commonly use the word.  However, the Government

12    is not required to prove that the defendant Xavier Torres knew

13    that he was breaking the law.

14              As you will see from the verdict sheet which I will

12:23:13PM 15    discuss in more detail later in these instructions, if you

16    find the defendant guilty of Count 2, you will also be

17    required to make findings as to whether the firearm was

18    brandished or discharged.

19              To "brandish" a firearm means to display all or

12:23:35PM 20    part of the firearm or otherwise make the presence of the

21    firearm known to another person in order to intimidate the

22    that person regardless of whether the firearm is directly

23    visible to that person.

24              To "discharge" a firearm means that the firearm is

12:23:51PM 25    actually fired.

1          If you find that the Government has proven beyond a

2   reasonable doubt the following elements:

3          First, that the defendant Xavier Torres committed

4   the drug trafficking crime as charged in Count 1;

12:24:05PM 5          And, second, that the defendant Xavier Torres

6   knowingly used or carried a firearm during and in relation to

7   the commission of the drug trafficking crime charged in

8   Count 1, or that the defendant Xavier Torres knowingly

9   possessed a firearm in furtherance of the drug trafficking

12:24:17PM 10  crime charged in Count 1, then you must find the defendant

11  Xavier Torres guilty of using or carrying a firearm during and

12  in relation to the commission of the drug trafficking crime or

13  possessing a firearm in furtherance of a drug trafficking

14  crime as charged in Count 2.

12:24:32PM 15         On the other hand, if you find that the Government

16  has failed to prove any one of those elements beyond a

17  reasonable doubt, then you must find the defendant

18  Xavier Torres not guilty of using or carrying a firearm during

19  and in relation to the commission of the drug trafficking

12:24:45PM 20  crime or possessing a firearm in furtherance of a drug

21  trafficking crime as charged in Count 2.

22         As an alternative method to determine the defendant

23  Xavier Torres' guilt for Count 2, using or carrying a firearm

24  during and in relation to the commission of a drug trafficking

12:25:49PM 25  crime charged in Count 1 or knowingly possessing a firearm in

1   furtherance of the drug trafficking crime charged in Count 1,

2   you should determine whether the defendant aided and abetted

3   another to commit that crime.

4          The aiding and abetting statute, Section 2 of Title

12:26:11PM 5   18 of the United States Code provides that whoever commits an

6   offense against the United States or aides or abets or

7   counsels, commands, or induces, or procures its commission or

8   willfully causes an act to be done is punishable as a

9   principal.

12:26:32PM 10          You should give these words their ordinary meaning.

11          To "counsel" means to give advice or recommend.

12          To "induce" means to lead or move by persuasion or

13   influence as to some action or state of mind.

14          To "procure" means to bring about an unscrupulous

12:26:50PM 15   or indirect means.

16          To "cause" means to bring something about, to

17   affect something.

18          The meaning of the term "willfully causes" can be

19   found in the answers to the following questions.

12:27:05PM 20          First, did the defendant take some action without

21   which the crime would not have occurred?

22          Second, did the defendant intend that the crime

23   would actually be committed by others?

24          If you are persuaded beyond a reasonable doubt that

12:27:18PM 25   the answer to both of these questions is yes, then the

1    defendant is guilty of the crime charged just as if he had

2    actually committed it.

3            Under the statute a defendant may be convicted of

4    aiding and abetting a given crime where the Government proves

12:27:34PM 5  that the underlying crime was committed by a person other than

6    the defendant, the defendant knew of the crime, and the

7    defendant acted with the intent to contribute to the success

8    of the underlying crime.

9            As a result, it is not necessary for the Government

12:27:47PM 10  to show that the defendant himself physically committed a

11   crime with which he is charged in order for you to find that

12   the defendant is guilty of the crime.

13           A person who aides or abets another to commit an

14   offense is just as guilty of that offense as if he committed

12:28:01PM 15  it himself.

16           The first requirement is that you find that another

17   person committed the substantive offense charged in the count.

18   Obviously, no one can be convicted of aiding and abetting the

19   criminal acts of another if no crime was committed by the

12:28:26PM 20  other person in the first place.

21           But if you do find that the substantive crime

22   charged in a count was committed, then you must consider

23   whether the defendant Xavier Torres aided and abetted the

24   commission of the crime.

12:28:38PM 25           To aid and abet another to commit a crime it is

1   necessary that the defendant Xavier Torres willfully and

2   knowingly associated himself in some way with the crime, and

3   that he willfully and knowingly sought by some act to make the

4   crime succeed.

12:28:53PM 5          To establish that the defendant participated in the

6   commission of the crime, the Government must prove that the

7   defendant Xavier Torres engaged in some affirmative conduct or

8   overt act for the specific purpose of bringing about that

9   crime.

12:29:06PM 10          Participation in a crime is willful if action is

11   taken voluntarily and intentionally or in the case of a

12   failure to act, with the specific intent to fail to do

13   something the law requires to be done, that is to say, with a

14   bad purpose either to disobey or to disregard the law.

12:29:24PM 15          Mere presence of the defendant Xavier Torres where

16   a crime is being committed, even coupled with knowledge by the

17   defendant that a crime is being committed or the mere

18   acquiescence by the defendant in the criminal conduct of

19   others, even with the guilty knowledge, is not sufficient to

12:29:42PM 20   establish aiding and abet.

21          An aider and abetter must have some interest in the

22   criminal venture.  To determine whether the defendant

23   Xavier Torres aided or abetted the commission of a substantive

24   crime charged in a count of the indictment, ask yourself these

12:30:02PM 25   questions for Count 2, using or carrying a firearm during and

1    in relation to the commission of the drug trafficking crime

2    charged in Count 1, or knowingly possessing a firearm in

3    furtherance of the drug trafficking crime charged in Count 1.

4           Did the defendant participate in the crime charged

12:30:21PM 5    as something he wished to bring about?  Did he associate

6    himself with the criminal venture knowingly and willfully?

7    Did he seek by his actions to make the criminal venture

8    succeed?

9           If the answer to those questions is yes with

12:30:37PM 10   respect to Count 2, using or carrying a firearm during and in

11   relation to the commission of the drug trafficking crime

12   charged in Count 1, or knowingly possessing a firearm in

13   furtherance of the drug trafficking crime charged in Count 1,

14   then the defendant Xavier Torres is an aider and abetter and,

12:30:56PM 15   therefore, guilty of using or carrying a firearm during and in

16   relation to the commission of the drug trafficking crime

17   charged in Count 1, or knowingly possessing a firearm in

18   furtherance of the drug trafficking crime charged in Count 1.

19          If, on the other hand, your answer to any of these

12:31:14PM 20   three questions is no with respect to Count 2, then the

21   defendant Xavier Torres is not an aider and abetter and you

22   must find that the Government has failed to establish his

23   guilt on Count 2 based on this theory of liability.

24          There is another method which you may evaluate the

12:31:36PM 25   possibility of guilt of the defendant Xavier Torres for the

1  substantive crime charged in Count 2, using or carrying a

2  firearm during and in relation to the commission of the drug

3  trafficking crime charged in Count 1, or knowingly possessing

4  a firearm in furtherance of the drug trafficking crime charged

12:31:52PM 5  in Count 1, even if you do not find that the Government has

6  satisfied its burden of proof with respect to each element of

7  that count as to the defendant.

8          If in light of my instructions you find beyond a

9  reasonable doubt that the defendant Xavier Torres was a member

12:32:07PM 10  of the conspiracy charged in Count 1 of the indictment and,

11  thus, guilty on the narcotics conspiracy, then you may also

12  but you are not required to find the defendant guilty of the

13  substantive crime for which he is charged in Count 2 provided

14  you find beyond a reasonable doubt each of the following

12:32:21PM 15  elements with respect to the substantive count:

16          First, that the crime charged in Count 2 was

17  committed;

18          Second, that the person or persons you find

19  actually committed the crime were members of the narcotics

12:32:40PM 20  conspiracy you found existed;

21          Third, that the crime charged in Count 2 was

22  committed pursuant to the common plan and understanding you

23  found to exist among the conspirators;

24          Fourth, that the defendant Xavier Torres was a

12:33:04PM 25  member of the narcotics conspiracy charged in Count 1 at the

1  time the crime charged in Count 2 was committed;

2         And, fifth, that the defendant Xavier Torres could

3  have reasonably foreseen that the substantive crime in Count 2

4  might be committed by his co-conspirators.

12:33:24PM 5         If you find all five of these elements to exist

6  beyond a reasonable doubt with respect to the substantive

7  count charged in Count 2, then you may find the defendant

8  Xavier Torres guilty of the substantive crime charged against

9  him even though he did not personally participate in the acts

12:33:38PM 10  constituting the crime or did not have actual knowledge of it.

11         The reason for this rule is simply that a

12  co-conspirator who commits a substantive crime pursuant to the

13  conspiracy is deemed to be the agent of the other

14  conspirators.

12:33:53PM 15         Therefore, all of the co-conspirators must bear

16  criminal responsibility for the commission of the substantive

17  crimes.

18         If, however, you are not satisfied as to the

19  existence of any of these five elements with respect to

12:34:06PM 20  Count 2, then you may not find the defendant Xavier Torres

21  guilty of Count 2 unless the Government proves beyond a

22  reasonable doubt that the defendant personally committed or

23  aided and abetted the commission of Count 2.

24         Good news is we're almost done.  Members of the

12:34:51PM 25  jury, you may not draw any inference, favorable or

1 unfavorable, toward the Government or the defendant from the

2 fact that any persons in addition to the defendant are not on

3 trial here.

4          You may also not speculate as to the reasons why

12:35:06PM 5 other persons are not on trial.  Those matters are wholly

6 outside your concern and have no bearing on your function as

7 jurors.

8          You're about to decide this case on whether or not

9 the Government has proven beyond a reasonable doubt the guilt

12:35:25PM 10 of this defendant.  You're not being asked whether any other

11 person has been proven guilty.  Your verdict should be based

12 solely upon the evidence or lack of evidence as to this

13 defendant in accordance with my instructions to you on the law

14 and without regard to the guilt of other persons that have or

12:35:44PM 15 have not been proven.

16          You have to consider these crimes separately and

17 the evidence related to the crimes separately, but as I've

18 specified a number of times, you must find the defendant

19 guilty beyond a reasonable doubt of Count 1 before you can

12:36:02PM 20 find him guilty under any theory on Count 2.

21          I remind you that when you deliberate it will be

22 your duty to weigh and to evaluate all the evidence received

23 in this case to the facts as you find them, you apply the law

24 as I instructed you whether you agree with it or not.

12:36:23PM 25          You must decide this case solely on the evidence

1    and the law before you.  And you must not be influenced by any

2    personal likes or dislikes, opinions, prejudices, sympathies

3    or biases, including unconscious bias.

4              Unconscious bias are stereotypes, attitudes or

12:36:43PM 5    preferences that people may consciously reject but may be

6    expressed without conscious awareness, control or intention.

7    Like conscious bias, unconscious bias, too, can effect how we

8    evaluate information and make decisions.

9              I'm going to provide you a special verdict sheet

12:37:03PM 10   which will outline your options during your deliberations.  As

11   I've said, Count 1 charges the defendant Xavier Torres also

12   known as Pistolita with conspiracy to possess with intent to

13   distribute, and/or to distribute, 5 kilograms or more of

14   cocaine and/or 1 kilogram or more of heroin.

12:37:25PM 15             The amount of the controlled substances involved is

16   unrelated to the issue of whether the defendant Xavier Torres

17   is, in fact, guilty of narcotics conspiracy as charged in

18   Count 1.

19             You will note, however, that the verdict form

12:37:40PM 20   requires that in the event you determine the defendant

21   Xavier Torres to be guilty of the conspiracy charged in

22   Count 1, you must determine whether the weight was, one , for

23   a mixture or substance containing cocaine, either at least 5

24   kilograms, or at least 500 grams but less than 5 kilograms, or

12:38:05PM 25   less than 500 grams;

1        And, two, for a mixture or substance containing

2   heroin either at least 1 kilogram, or at least 100 grams but

3   less than 1 kilogram, or less than 100 grams.

4        Count 2 charges the defendant Xavier Torres with

12:38:28PM 5   using or carrying firearms during and in relation to, or

6   possessing firearms in furtherance of a drug trafficking

7   crime.

8        The verdict form also requires that in the event

9   you determine the defendant Xavier Torres to be guilty of the

12:38:42PM10   violation charged in Count 2, you must also determine whether

11   the firearm was brandished or discharged.

12        The verdict form has a place for you to indicate

13   your findings in this regard.

14        Your verdict with regard to all of the questions

12:38:56PM15   that you answer on the verdict sheet must be unanimous.

16        I think once you see the verdict sheet it will make

17   a lot more sense to you once you read through the verdict

18   sheet.  But if after doing so you have any questions about the

19   verdict sheet, don't hesitate to ask the Court and I'll

12:39:19PM20   explain that to you.

21        Your verdict must represent the considered judgment

22   of each juror.  In order to return a verdict it is necessary

23   that each juror agree to the verdict.  Your verdict must be

24   unanimous.

12:39:34PM25        The punishment provided by law for the offense

1    charged in the indictment is a matter exclusively within the

2    province of the Court.  It should never be considered by the

3    jury in any way in arriving at an impartial verdict.

4              Your verdict must be based solely on the law as

12:39:50PM 5   I've explained it to you and the evidence as you've heard it.

6    Your verdict must not be effected by sympathy or prejudice you

7    may have for or against the defendant or the Government.

8              It's your duty as jurors to consult with each

9    other, to deliberate with a view toward reaching an agreement

12:40:08PM 10  if you can do so without violation to your individual

11   judgment.  Each of you must decide the case for yourselves but

12   only after an impartial consideration of the evidence in the

13   case with the fellow jurors.

14             In the course of your deliberations you should not

12:40:23PM 15  hesitate to re-examine your views and change your opinion if

16   convinced it is erroneous.

17             But do not surrender your honest conviction as to

18   the weight and effect of the evidence solely because of the

19   opinion of your fellow jurors or for the mere purpose of

12:40:39PM 20  returning a verdict.

21             Remember, at all times you are not partisans.  You

22   are judges, judges of the facts.  Your sole interest is to

23   seek the truth from the evidence in the case.

24             Now, during your deliberations if you want to see

12:40:55PM 25  any of the exhibits received in evidence, that can be provided

1   to you.  Although both the weapons and the narcotics

2   themselves will be presented to you only in the courtroom.

3            You want to see any of the photographs, those can

4   be presented to you or some of the other tangible evidence

12:41:11PM 5   that's not either narcotics or weapons.

6            If you want to have any testimony read back to you,

7   I'd ask you to specify with as much detail as possible.  That

8   can be read back to you.  Please specify the particular

9   witness and the part of the testimony you want read back to

12:41:29PM 10   you.

11            If you want any of the law read back to you, that

12   can be done as well.

13            If you ask any questions either for law, evidence,

14   or testimony, do not indicate the status of your

12:41:45PM 15   deliberations.  Simply ask your questions.

16            While you deliberate you may not use any electronic

17   devices such as a cell phone, iPhone, computer, iPad and any

18   such materials will be collected by the court security

19   officers.

12:42:06PM 20            You're not to communicate with anybody outside this

21   case regarding this case or conduct any research about the

22   case.  You cannot talk to anybody except the other jurors

23   during the course of the deliberations.

24            If for any reason you become separated and all 12

12:42:23PM 25   jurors not together, you have to stop your deliberations and

1    only continue those when all 12 jurors are reassembled.

2              I noticed some of you took notes.  Your notes are

3    only an aid to your memory.  They must not take precedence

4    over your independent recollection.  The jurors who chose not

12:42:42PM 5  to take notes must rely on their own independent recollection

6    and must not be influenced by the notes that a juror took.

7              Notes are not a substitute for the recorded

8    transcript of the testimony or any exhibits received in

9    evidence.  If you have any discrepancy or question regarding

12:42:58PM 10 your notes and your recollection, you want that read back,

11   that can be done.

12             Notes are confidential.  They will not be available

13   for inspection or review by any party.  After the jury has

14   rendered its verdict, the notes will be collected and they

12:43:14PM 15 will be destroyed.

16             Juror No. 1, since you were the first person

17   selected you will serve as the foreperson of the jury.  It

18   will be your duty to announce the verdict of the jury if and

19   when you do reach a verdict.  It will be also your duty to

12:43:29PM 20 sign any communications from the jury to the Court.

21             The signature of the foreperson indicates that the

22   note comes from the jury.

23             Again, I remind you that your verdict on each of

24   the counts must be unanimous.

12:43:48PM 25            And, again, I'll provide you with a special verdict

1    form.  If you have any questions about that, I can respond to

2    that.

3            We have in this case four alternate jurors.  You

4    will be kept in a private and convenient room to await the

12:44:00PM 5   rendition of the trial jury's verdict.  While you await that

6    verdict I would ask you not discuss the case or allow anybody

7    to discuss the case with you.

8            Can we have a sidebar?

9            (**WHEREUPON**, a discussion was held at side bar out

12:44:20PM10   of the hearing of the jury.)

11           **THE COURT:** Government have any objections or

12   requests?

13           **MR. MARANGOLA:** No, Your Honor.  Thank you.

14           **THE COURT:** Mr. Verrillo?

12:44:27PM15           **MR. VERRILLO:** Judge, I just want to note that I had

16   originally objected to the *Pinkerton* charges and I continue

17   that objection.

18           **THE COURT:** Yes, you've particularly objected to the

19   *Pinkerton* charge and aiding and abetting charge, and any

12:44:42PM20   previous objections will be noted for the record.

21           **MR. VERRILLO:** Thank you.

22           (**WHEREUPON**, side bar discussion concluded.)

23           **THE COURT:** Please swear in the court security

24   officer.

12:44:59PM25           (**WHEREUPON**, the court security officer was sworn).

1         **THE COURT:** Members of the jury, I'm about to submit

2    this case to you for your final determination.  As I

3    previously stated, the law and your oath require that you

4    render a fair and impartial verdict without fear, favor or

12:45:33PM 5    sympathy.  Now take this case in fulfillment of your oath in

6    accordance with the instructions I provided to you a true and

7    impartial verdict render.

8         Jury may step down and begin your final

9    deliberations.  I believe that lunch should be here or will be

12:45:50PM 10   here shortly for you as well.  The jury may step down.

11        (**WHEREUPON**, the jury was excused at 12:47 p.m.)

12        **THE COURT:** Both parties indicated they have no

13   objection to the verdict sheet we marked as Court Exhibit 2

14   and will submit it to the jury.  I think we did in the

12:46:48PM 15   previous case where there were photographs, everything was

16   done electronically here.

17        Do you have hard copies of the photographs?

18        **MR. MARANGOLA:** We do, Your Honor, yes.

19        **THE COURT:** Okay.

12:46:56PM 20   **MR. MARANGOLA:** Ms. McCreedy put the hard copies

21   that have been received into evidence in a binder.

22        **THE COURT:** Okay.  Any objection providing those

23   photographs to the jury if they request them?

24        **MR. MARANGOLA:** No, Your Honor.

12:47:08PM 25   **MR. VERRILLO:** That's all right, Your Honor, yes.

1          **THE COURT:** So the photographs -- there was also an

2    aerial map, I believe, can be provided to the jury.  The

3    narcotics, as I indicated, will be shown in open court, and

4    the weapons in open court.

12:47:25PM 5          There's also, I think, some certificates of

6    conviction.  Do you have those in hard copies as well?

7          **MR. MARANGOLA:** We do, Judge.

8          **THE COURT:** Those can be provided to the jury.

9          There's a couple cell phones, just one maybe.  A

12:47:40PM 10   couple cell phones.

11          **MR. MARANGOLA:** A few extractions.  Those are -- we

12   have those as well.

13          **THE COURT:** Okay.  Those as well can be presented to

14   the jury.  We'll wait and see what the requests are, but just

12:47:50PM 15   so we know in advance.  Okay.

16          **MR. MARANGOLA:** Judge, the only additional thing is

17   we have Court Exhibit 1, the stipulation.  So I think if they

18   ask for it we should allow them to have it since it was read

19   into evidence and referred to on a number of separate

12:48:11PM 20   occasions.

21          I did right before the Court began its charge look

22   and there were four items, four exhibits listed in the

23   stipulation that were not referred to in court, we didn't

24   offer them.  So we can redact those four items and then

12:48:29PM 25   provide that copy to the Court and a copy to defense counsel

1  so that that can also be provided.

2           THE COURT: I want to confirm what I have is not

3  received.

4           MR. MARANGOLA: I can tell the exhibit numbers.

12:48:47PM 5    THE COURT: 230 on page 4?

6           MR. MARANGOLA: Yes.

7           THE COURT: Right?

8           MR. MARANGOLA: Yes.

9           THE COURT: Is the first one --

12:48:54PM 10   MR. MARANGOLA: The first one is actually on page 1,

11  347.

12           THE COURT: Okay.  347 on page 1 of the stipulation.

13           MR. MARANGOLA: Yes.

14           THE COURT: Page 4, 230.  Then page 8, 353; is that

12:49:31PM 15  correct?

16           MR. MARANGOLA: Yes.  And 355.

17           THE COURT: And 355 also on page 8.

18           MR. MARANGOLA: Yes.

19           THE COURT: Mr. Verrillo, do you have any objection,

12:49:46PM 20  if the jury requests it, the stipulation being presented to

21  them for their review with those redactions?

22           MR. VERRILLO: Probably be more expeditious to do it

23  that way than to have it read from the transcript.  So I'm

24  okay with that.

12:50:00PM 25           THE COURT: If they make that request we will

1  provide to them a redacted copy of Court Exhibit 1, which

2  would eliminate the last paragraph on page 1 regarding

3  Exhibit 247; third paragraph on page 4 related to Exhibit 230;

4  and the first and second paragraphs on page 8 relating to

12:50:52PM 5  Exhibits 353 and 355.

6          Thank you, we'll stand in recess.

7        **MR. MARANGOLA:** Thank you, Your Honor.

8        (**WHEREUPON**, there was a pause in the proceeding).

9        (**WHEREUPON**, the defendant is present).

03:15:36PM10      **THE COURT:** We have a note from the jury reads as

11  follows: Could we please have Count 2 of the law reread to us?

12        We need clarification on the three ways the burden

13  of proof can be met.  Do these charges such as brandishing

14  need to be committed directly by Torres or only someone

03:21:23PM15  involved in the conspiracy?

16        I think rereading the charge will answer both of

17  the questions, both the charges, aid and abet and *Pinkerton*.

18        **MR. MARANGOLA:** Agreed, Your Honor.

19        **THE COURT:** Mr. Verrillo?

03:21:35PM20      **MR. VERRILLO:** Yes, I understand.

21        **THE COURT:** Bring the jury out and I'll reread that.

22        (**WHEREUPON**, the jury is present).

23        **THE COURT:** Members of the jury, I do have your

24  question which reads as follows: Could we please have Count 2

03:25:10PM25  of the law reread to us?  We need clarification on the three

1  ways the burden of proof can be met.  Do these charges such as

2  brandishing need to be committed directly by Torres or only

3  someone involved in the conspiracy?

4          I'm going to reread you those charges, alternative

03:25:34PM 5  theories, and I think that should answer both your questions.

6  Please don't hesitate to send a second note after I read these

7  if you need clarification.

8          The defendant Xavier Torres is charged in Count 2

9  with using or carrying a firearm during and in relation to a

03:25:52PM 10  drug trafficking crime or possessing a firearm in furtherance

11  of a drug tracking crime.

12          Count 2 reads as follows: Beginning in or about

13  2015 and through on or about January 29th, 2018, in the

14  Western District of New York, the defendant Xavier Torres also

03:26:16PM 15  known as Pistolita, during and in relation to a drug

16  trafficking crime for which he may be prosecuted in a court of

17  the United States, that is a violation of Title 21, United

18  States Code, Section 846, committed in the manner set forth in

19  Count 1 did knowingly and unlawfully use, carry, brandish and

03:26:43PM 20  discharge and in furtherance of such crime did knowingly and

21  unlawfully possess, brandish and discharge firearms all in

22  violation of Title 18, United States Code, Section

23  924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), and

24  Section 2.

03:27:12PM 25          The statute on this subject is Title 18, United

1 States Code, Section 924(c)(1), which reads as follows: Any

2 person who during and in relation to any drug trafficking

3 crime for which a person may be prosecuted in a court of the

4 United States uses or carries a firearm or who in furtherance

03:27:36PM 5 of any such crime possesses a firearm shall be guilty of a

6 crime.

7 The Government must prove each of the following

8 elements beyond a reasonable doubt to sustain its burden of

9 proving the defendant Xavier Torres guilty of Count 2.

03:27:54PM 10 First, that the defendant Xavier Torres committed

11 the drug trafficking crime as charged in Count 1.

12 And, two, that beginning in or about 2015 and

13 through on or about January 29, 2018, in the Western District

14 of New York, the defendant Xavier Torres knowingly used or

03:28:13PM 15 carried a firearm during and in relation to the commission of

16 the drug trafficking crime charged in Count 1, or that the

17 defendant Xavier Torres knowingly possessed a firearm in

18 furtherance of the drug trafficking crime charged in Count 1.

19 The first element the Government must prove beyond

03:28:40PM 20 a reasonable doubt is that the defendant Xavier Torres

21 committed a drug trafficking crime for which he might be

22 prosecuted in a court of the United States.

23 In connection with Count 2 the defendant

24 Xavier Torres is charged in Count 1 with conspiracy to possess

03:28:57PM 25 with intent to distribute, and/or to distribute, cocaine

1   and/or heroin.

2            I instruct you that the offense of narcotics

3   conspiracy is a drug trafficking crime.

4            However, it is for you to determine whether the

03:29:08PM 5   Government has proven beyond a reasonable doubt that the

6   defendant Xavier Torres committed the crime of narcotics

7   conspiracy as charged in Count 1.

8            The second element the Government must prove beyond

9   a reasonable doubt in connection with Count 2 is that the

03:29:31PM 10   defendant Xavier Torres knowingly used or carried a firearm

11   during and in relation to the predicate crime, or knowingly

12   possessed a firearm in furtherance of the commission of the

13   predicate crime.

14            A "firearm" is any weapon which will or is designed

03:29:47PM 15   to or may be readily converted to expel a projectile by the

16   action of an explosive.

17            In order to prove that the defendant Xavier Torres

18   used a firearm, the Government must prove beyond a reasonable

19   doubt an active employment of the firearm by the defendant

03:30:10PM 20   during and in relation to the commission of the drug

21   trafficking crime.

22            This does not mean that the defendant Xavier Torres

23   must actually fire or attempt to fire the weapon, although

24   those would obviously constitute use of the weapon.

03:30:28PM 25            Brandishing, displaying, or even referring to the

1    weapon so that others present knew that the defendant

2    Xavier Torres had the firearm available, if needed, all

3    constitute use of the firearm.

4         However, the mere possession of a firearm at or

03:30:42PM 5    near the site of the crime without active employment as I just

6    described is not sufficient to constitute a use of the

7    firearm.

8         In order to prove that the defendant Xavier Torres

9    carried a firearm, the Government must prove beyond a

03:30:56PM 10   reasonable doubt that the defendant had the weapon within his

11   control in such a way that it furthered the commission of the

12   drug trafficking crime or was an integral part of the

13   commission of the crime.

14        The defendant Xavier Torres did not necessarily

03:31:09PM 15   have to hold the firearm physically, that is, have actual

16   possession of it on his person.

17        If you find that the defendant Xavier Torres had

18   dominion and control over the place where the firearm was

19   located, and had the power and intention to exercise control

03:31:29PM 20   over the firearm in such a way that it furthered the

21   commission of the drug trafficking crime, you may find that

22   the Government has proven that the defendant Xavier Torres

23   carried the weapon.

24        As I mentioned earlier, the term "possess" means to

03:31:44PM 25   exercise authority, dominion or control over something.

1         The law recognizes different kinds of possession.

2  In that regard, possession includes both actual and

3  constructive possession.

4         A person who has direct physical control of

03:32:01PM 5  something on or around his person is then in actual possession

6  of it.

7         A person who is not in actual possession, but who

8  has both the power and the intention to exercise control over

9  something is in constructive possession of it.

03:32:17PM 10        Whenever the term "possess" is used in these

11  instructions, it means either actual or constructive

12  possession.

13        The law also recognizes that possession may be sole

14  or joint.  If one person alone possesses it, that is sole

03:32:38PM 15  possession.  However, it is possible that more than one person

16  may have the power and intention to exercise control over a

17  firearm.  This is called joint possession.

18        If you find that the defendant Xavier Torres had

19  such power and intention, then he possessed a firearm under

03:32:53PM 20  this element, even if he possessed it jointly with another.

21        Proof of ownership of the firearm is not required.

22        The term "in furtherance of" means in the act of

23  furthering or helping forward, promoting, advancing or

24  assisting.  The mere presence of a firearm in the area where a

03:33:13PM 25  criminal act occurs is not sufficient.  Rather, the Government

1 must prove that the firearm was possessed to advance or

2 promote the specified criminal activity.

3          In deciding whether the Government has proven that

4 a firearm was possessed to advance or promote that criminal

03:33:31PM 5 activity, you may consider all of the evidence presented.

6          To satisfy this element, you must also find that

7 the defendant Xavier Torres knowingly possessed a firearm.

8 This means that he possessed the firearm purposely and

9 voluntarily, and not by accident or mistake.

03:33:46PM 10          It also means that he knew that the weapon was a

11 firearm as we commonly use the word.  However, the Government

12 is not required to prove that the defendant Xavier Torres knew

13 that he was breaking the law.

14          As you will see from the verdict sheet which I will

03:34:01PM 15 discuss in more detail later in these instructions, if you

16 find the defendant guilty of Count 2, you will also be

17 required to make findings as to whether the firearm was

18 brandished or discharged.

19          To "brandish" a firearm means to display all or

03:34:23PM 20 part of the firearm, or otherwise make the presence of the

21 firearm known to another person in order to intimidate that

22 person, regardless of whether the firearm is directly visible

23 to that person.

24          To "discharge" a firearm means that the firearm is

03:34:40PM 25 actually fired.

1        If you find that the Government has proven beyond a

2   reasonable doubt the following elements:

3        First, that the defendant Xavier Torres committed

4   the drug trafficking crime as charged in Count 1;

03:34:56PM 5        And, second, that the defendant Xavier Torres

6   knowingly used or carried a firearm during and in relation to

7   the commission of the drug trafficking crime charged in

8   Count 1, or that the defendant Xavier Torres knowingly

9   possessed a firearm in furtherance of the drug trafficking

03:35:09PM 10   crime charged in Count 1, then you must find the defendant

11   Xavier Torres guilty of using or carrying a firearm during and

12   in relation to the commission of the drug trafficking crime or

13   possessing a firearm in furtherance of a drug trafficking

14   crime as charged in Count 2.

03:35:24PM 15        On the other hand, if you find that the Government

16   has failed to prove any one of those elements beyond a

17   reasonable doubt, then you must find the defendant

18   Xavier Torres not guilty of using or carrying a firearm during

19   and in relation to the commission of the drug trafficking

03:35:39PM 20   crime or possessing a firearm in furtherance of a drug

21   trafficking crime as charged in Count 2.

22        As an alternative method to determine the defendant

23   Xavier Torres' guilt for Count 2, using or carrying a firearm

24   during and in relation to the commission of the drug

03:36:30PM 25   trafficking crime charged in Count 1, or knowingly possessing

1    a firearm in furtherance of the drug trafficking crime charged

2    in Count 1, you should determine whether the defendant aided

3    and abetted another to commit that crime.

4               The aiding and abetting statute, Section 2 of

03:36:46PM 5    Title 18 of the United States Code, provides that whoever

6    commits an offense against the United States or aides or abets

7    or counsels, commands, or induces, or procures its commission,

8    or willfully causes an act to be done is punishable as a

9    principal.

03:37:04PM 10              You should give these words their ordinary meaning.

11              To "counsel" means to give advice or recommend.

12              To "induce" means to lead or move by persuasion or

13    influence as to some action or state of mind.

14              To "procure" means to bring about by unscrupulous

03:37:25PM 15    or indirect means.

16              To "cause" means to bring something about, to

17    affect something.

18              The meaning of the term "willfully causes" can be

19    found in the answers to the following questions:

03:37:41PM 20              First, did the defendant take some action without

21    which the crime would not have occurred?

22              Second, did the defendant intend that the crime

23    would be actually committed by others?

24              If you are persuaded beyond a reasonable doubt that

03:37:55PM 25    the answer to both of these questions is yes, then the

1    defendant is guilty of the crime charged just as if he had

2    actually committed it.

3              Under this statute a defendant may be convicted of

4    aiding and abetting a given crime where the Government proves

03:38:10PM 5    that the underlying crime was committed by a person other than

6    the defendant, the defendant knew of the crime, and the

7    defendant acted with the intent to contribute to the success

8    of the underlying crime.

9              As a result, it is not necessary for the Government

03:38:27PM 10   to show that the defendant himself physically committed a

11   crime with which he is charged in order for you to find that

12   the defendant is guilty of the crime.  A person who aides or

13   abets another to commit an offense is just as guilty of that

14   offense as if he committed it himself.

03:38:49PM 15             The first requirement is that you find that another

16   person committed the substantive offense charged in the count.

17   Obviously, no one can be convicted of aiding and abetting the

18   criminal acts of another if no crime was committed by the

19   other person in the first place.

03:39:04PM 20             But if you do find that the substantive crime

21   charged in a count was committed, then you must consider

22   whether the defendant Xavier Torres aided and abetted the

23   commission of the crime.

24             To aid and abet another to commit a crime, it is

03:39:18PM 25   necessary that the defendant Xavier Torres willfully and

1  knowingly associated himself in some way with the crime, and

2  that he willfully and knowingly sought by some act to make the

3  crime succeed.

4       To establish that the defendant participated in the

03:39:31PM 5  commission of the crime, the Government must prove that the

6  defendant Xavier Torres engaged in some affirmative conduct or

7  overt act for the specific purpose of bringing about that

8  crime.

9       Participation in a crime is willful if action is

03:39:44PM 10  taken voluntarily and intentionally or in the case of a

11  failure to act, with the specific intent to fail to do

12  something the law requires to be done; that is to say, with a

13  bad purpose either to disobey or to disregard the law.

14       The mere presence of the defendant Xavier Torres

03:40:01PM 15  where a crime is being committed, even coupled with knowledge

16  by the defendant that a crime is being committed, or the mere

17  acquiescence by the defendant in the criminal conduct of

18  others, even with guilty knowledge, is not sufficient to

19  establish aiding and abetting.

03:40:23PM 20       An aider and abetter must have some interest in the

21  criminal venture.  To determine whether the defendant

22  Xavier Torres aided or abetted the commission of a substantive

23  crime charged in a count of the indictment, ask yourself these

24  questions for Count 2, using or carrying a firearm during and

03:40:40PM 25  in relation to the commission of the drug trafficking crime

1    charged in Count 1, or knowingly possessing a firearm in

2    furtherance of the drug trafficking crime charged in Count 1:

3            Did he participate in the crime charged as

4    something he wished to bring about?  Did he associate himself

03:40:58PM 5    with the criminal venture knowingly and willfully?  Did he

6    seek by his actions to make the criminal venture succeed?

7            If the answer to those three questions is yes with

8    respect to Count 2, using or carrying a firearm during and in

9    relation to the commission of the drug trafficking crime

03:41:18PM 10   charged in Count 1, or knowingly possessing a firearm in

11   furtherance of the drug trafficking crime charged in Count 1,

12   then the defendant Xavier Torres is an aider and abetter and,

13   therefore, guilty of using or carrying a firearm during and in

14   relation to the commission of the drug trafficking crime

03:41:46PM 15   charged in Count 1, or knowingly possessing a firearm in

16   furtherance of the drug trafficking crime charged in Count 1.

17           If, on the other hand, your answer to any of these

18   three questions is no with respect to Count 2, then the

19   defendant Xavier Torres is not an aider and abetter and you

03:42:01PM 20   must find that the Government has failed to establish his

21   guilt on Count 2 based on this theory of liability.

22           There is another method by which you may evaluate

23   the possible guilt of the defendant Xavier Torres for the

24   substantive crime charged in Count 2, using or carrying a

03:42:39PM 25   firearm during and in relation to the commission of the drug

1  trafficking crime charged in Count 1, or knowingly possessing

2  a firearm in furtherance of the drug trafficking crime charged

3  in Count 1, even if you do not find that the Government has

4  satisfied its burden of proof with respect to each element of

03:42:55PM 5  that count as to the defendant.

6          If in light of my instructions you find beyond a

7  reasonable doubt that the defendant Xavier Torres was a member

8  of the conspiracy charged in Count 1 of the indictment and,

9  thus, guilty on the narcotics conspiracy count, then you may

03:43:08PM 10  also but you are not required to, find the defendant guilty of

11  the substantive crime for which he is charged in Count 2

12  provided you find beyond a reasonable doubt each of the

13  following elements with respect to the substantive count:

14          First, that the crime charged in Count 2 was

03:43:25PM 15  committed;

16          Second, that the person or persons you find

17  actually committed the crime were members of the narcotics

18  conspiracy you found existed;

19          Third, that the crime charged in Count 2 was

03:43:35PM 20  committed pursuant to the common plan and understanding you

21  found to exist among the conspirators;

22          Fourth, that the defendant Xavier Torres was a

23  member of the narcotics conspiracy charged in Count 1 at the

24  time the crime charged in Count 2 was committed;

03:43:55PM 25          And, fifth, that the defendant Xavier Torres could

1  have reasonably foreseen that the substantive crime in Count 2

2  might be committed by his co-conspirators.

3          If you find all five of these elements to exist

4  beyond a reasonable doubt with respect to the substantive

03:44:09PM 5  count charged in Count 2, then you may find the defendant

6  Xavier Torres guilty of the substantive crime charged against

7  him, even though he did not personally participate in the acts

8  constituting the crime or did not have actual knowledge of it.

9          The reason for this rule is simply that a

03:44:29PM 10  co-conspirator who commits a substantive crime pursuant to the

11  conspiracy is deemed to be the agent of the other

12  conspirators.  Therefore, all of the co-conspirators must bear

13  the criminal responsibility for the commission of the

14  substantive crimes.

03:44:45PM 15          If, however, you are not satisfied as to the

16  existence of any of these five elements with respect to

17  Count 2, then you may not find the defendant Xavier Torres

18  guilty of Count 2 unless the Government proves beyond a

19  reasonable doubt that the defendant personally committed or

03:45:01PM 20  aided and abetted the commission of Count 2.

21          Ladies and gentlemen, that does complete the read

22  back of Count 2 and the alternate theories that you requested.

23  Again if you have any questions about that or any other

24  portion of the law, don't hesitate to reask your questions.

03:45:52PM 25          At this point the jury may step down and resume

1   your deliberations.

2               (**WHEREUPON**, the jury was excused at 3:47 p.m.)

3               **THE COURT:** We'll stand in recess.

4               (**WHEREUPON**, there was a pause in the proceeding).

04:30:59PM 5   (**WHEREUPON**, the defendant is present).

6               **THE COURT:** The jury's indicated they have reached a

7   verdict.  We'll bring the jury out and get the verdict.

8               (**WHEREUPON**, the jury is present).

9               **THE COURT:** The jury's indicated they have reached a

04:42:22PM10   verdict.  Would the foreperson please rise?  The clerk will

11   read you the questions, just simply answer the questions as

12   she addresses them to you.  Thank you.

13              **THE CLERK:** This is in the United States District

14   Court for the Western District of New York, in the case of

04:42:51PM15   United States of America vs. Xavier Torres, also known as

16   Pistolita, No. 18-CR-6094, this is your verdict.

17              We, the jury, return the following verdicts in

18   United States vs. Xavier Torres, Docket No. 18-CR-6094.

19              Count 1, conspiracy to possess with intent to

04:43:17PM20   distribute and/or to distribute cocaine and/or heroin,

21   beginning in or about 2015 through on or about January 29,

22   2018 in the Western District of New York, in violation of

23   Title 21, United States Code, Section 846.

24              We, the jury, render the following verdict with

04:43:34PM25   respect to Count 1, not guilty or guilty.

1          **JURY FOREPERSON:** Guilty.

2          **THE CLERK:** We, the jury, find the allegation that
3    defendant Xavier Torres conspired to possess with intent to
4    distribute to distribute cocaine is proven or not proven.

04:44:04PM 5          **JURY FOREPERSON:** Proven.

6          **THE CLERK:** We, the jury, find that defendant
7    Xavier Torres conspired to possess with intent to distribute
8    to the following amount of cocaine:

9          5 kilograms or more, 500 grams or more, but less
04:44:26PM10    than 5 kilograms, or less than 500 grams.

11          **JURY FOREPERSON:** 5 kilograms or more.

12          **THE CLERK:** We, the jury, find the allegation that
13    defendant Xavier Torres conspired to distribute cocaine is
14    proven or not proven.

04:44:42PM15          **JURY FOREPERSON:** Proven.

16          **THE CLERK:** We, the jury, find that defendant
17    Xavier Torres conspired to distribute the following amount of
18    cocaine:

19          5 kilograms or more, 500 grams or more, but less
04:44:59PM20    than 5 kilograms, or less than 500 grams.

21          **JURY FOREPERSON:** 5 kilograms or more.

22          **THE CLERK:** We, the jury, find that the allegation
23    that defendant Xavier Torres conspired to possess with intent
24    to distribute heroin is proven or not proven.

04:45:17PM25          **JURY FOREPERSON:** Proven.

1          **THE CLERK:** We, the jury, find the defendant

2     Xavier Torres conspired to possess with intent to distribute

3     the following amount of heroin:

4          1 kilogram or more, 100 grams or more but less than

04:45:35PM 5     1 kilogram, or less than 100 grams.

6          **JURY FOREPERSON:** 1 kilogram or more.

7          **THE CLERK:** We, the jury, find that the allegation

8     that defendant Xavier Torres conspired to distribute heroin is

9     proven or not proven.

04:45:52PM 10          **JURY FOREPERSON:** Proven.

11          **THE CLERK:** We, the jury, find that defendant

12     Xavier Torres conspired to distribute the following amount of

13     heroin:

14          1 kilogram or more, 100 grams or more but less than

04:46:03PM 15     1 kilogram, or less than 100 grams.

16          **JURY FOREPERSON:** 1 kilogram or more.

17          **THE CLERK:** Count 2, knowing and unlawful use or

18     carry of firearms during and in relation to or possession of

19     firearms in furtherance of a drug trafficking crime beginning

04:46:32PM 20     in or about 2015 through on or about January 29, 2018 in the

21     Western District of New York, in violation of Title 18, United

22     States Code, Section 924(c)(1)(A)(i), 924(c)(1)(A)(ii),

23     924(c)(1)(A)(iii), and Section 2.

24          We, the jury, render the follow verdict with

04:46:59PM 25     respect to Count 2, not guilty or guilty.

1          **JURY FOREPERSON:** Guilty.

2          **THE CLERK:** We, the jury, find the allegation that

3    the firearm was brandished during and in relation to or in

4    furtherance of a drug trafficking crime is proven or not

04:47:19PM 5    proven.

6          **JURY FOREPERSON:** Proven.

7          **THE CLERK:** We, the jury, find the allegation that

8    the firearm was discharged during and in relation to or in

9    furtherance of a drug trafficking crime is proven or not

04:47:31PM 10   proven.

11         **JURY FOREPERSON:** Proven.

12         **THE CLERK:** And you certified that the above verdict

13   is true accurate and unanimous and dated it today?

14         **JURY FOREPERSON:** Yes, I did.

04:47:48PM 15        **THE CLERK:** Thank you.

16         **THE COURT:**  You may be seated.

17         Members of the jury, you've indicated through your

18   verdict on the first count, conspiracy to possess with intent

19   to distribute and/or to distribute cocaine and/or heroin

04:48:09PM 20   beginning in or about 2015 through on or about January 29,

21   2018, in the Western District of New York, the jury rendered a

22   verdict of guilty.

23         In addition, we, the jury, find that the

24   allegations that defendant Xavier Torres conspired to possess

04:48:29PM 25   with intent to distribute cocaine, the jury answered that that

1    was proven.

2              We, the jury, find that the defendant Xavier Torres

3    conspired to possess with intent to distribute the following

4    amount of cocaine: 5 kilograms or more.

04:48:46PM 5              We, the jury, find that the allegation that

6    defendant Xavier Torres conspired to distribute cocaine is

7    proven.

8              We, the jury, find that the defendant Xavier Torres

9    conspired to distribute the following amount of cocaine: 5

04:49:03PM 10   kilograms or more.

11             We, the jury, find that the allegation that

12   defendant Xavier Torres conspired to possess with intent to

13   distribute heroin is proven.

14             We, the jury, find that defendant Xavier Torres

04:49:19PM 15   conspired to possess with intent to distribute the following

16   amount of heroin: 1 kilogram or more.

17             We, the jury, find that the allegation that

18   defendant Xavier Torres conspired to distribute heroin is

19   proven.

04:49:37PM 20             We, the jury, find that defendant Xavier Torres

21   conspired to distribute the following amount of heroin: 1

22   kilogram or more.

23             Count 2, knowing and unlawful use and carry of

24   firearms during and in relation to or possession of firearms

04:49:56PM 25   in furtherance of a drug trafficking crime beginning in or

1    about 2015 through on or about January 29, 2018, in the

2    Western District of New York, we, the jury, render the

3    following verdict with respect to Count 2: Guilty.

4            We, the jury, find the allegation that the firearm

04:50:19PM 5    was brandished during and in relation to or in furtherance of

6    a drug trafficking crime is proven.

7            We, the jury, find the allegation that the firearm

8    was discharged during and in relation to or in furtherance of

9    a drug trafficking crime is proven.

04:50:39PM 10           If this is in all respects your verdict, could you

11   please raise your right arm?  All the jurors, all 12 jurors

12   have indicated that this was their verdict.  It is unanimous.

13           Either party asking for a polling of the jury?

14           **MR. MARANGOLA:** No, Your Honor.

04:50:58PM 15           **MR. VERRILLO:** No, Your Honor.

16           **THE COURT:** No?

17           **MR. VERRILLO:** No.

18           **THE COURT:** Ladies and gentlemen, we have received

19   your verdict.  Can we go to sidebar for a second?

04:51:11PM 20           (**WHEREUPON**, a discussion was held at side bar out

21   of the hearing of the jury.)

22           **THE COURT:** Can you hear me?

23           **MR. MARANGOLA:** Yes.

24           **THE COURT:** I want to be clear about the forfeiture

04:51:25PM 25   issue.  It's not something that either party is asking to

1    submit to the jury; is that correct?  First the Government?

2              **MR. MARANGOLA:** Yes, that's correct, Judge.

3              **THE COURT:** Mr. Verrillo?

4              **MR. VERRILLO:** Yes, Your Honor.

04:51:34PM 5   **THE COURT:** Okay.  Then the Court can make that

6    determination.  I just didn't want to discharge them with that

7    being any question.  Thank you.

8              (**WHEREUPON**, side bar discussion concluded.)

9              **THE COURT:** Members of the jury, first of all, I

04:51:47PM 10  want to thank you for the patience, the cooperation you showed

11   during the course of this trial.  It's a lengthy trial, I

12   think it was 17 days or somewhere along that, maybe not that

13   long, 13 or 14 days, seemed like 17.

14             In any event, you did pay careful attention to the

04:52:02PM 15  case, you gave it careful consideration, listened to the law.

16   These are not easy decisions.  We get strangers together in

17   one day and by the end of a couple weeks they come to a

18   unanimous decision on something very important.  As I told you

19   before, this case is important to the Government, very

04:52:20PM 20  important to the defendant as well.

21             And we thank you for giving your care and attention

22   to this case.  You should know that the law of jealousy guards

23   the secrecy of your deliberations -- what you said, what the

24   other jurors said, what you decided may remain locked in that

04:52:34PM 25  secrecy.

1        Please go with the full knowledge you fulfilled

2   your responsibility as jurors.

3        I also want to thank the alternate jurors.  I know

4   you did not get to deliberate; you had to wait in a room and

04:52:45PM 5   not discuss the case during that period of time.  But it's

6   very critical that you were here.  We couldn't conduct these

7   trials without individuals being willing to serve as jurors

8   and alternates, particularly in light of this situation with

9   the COVID infections.  We've had jurors not be able to

04:53:02PM 10   continue in trials and we had to substitute alternates.

11   You've been here every day on time, all of you, so we thank

12   you for your patience and your understanding throughout this

13   trial.

14        At this time the jury will be discharged.  You may

04:53:13PM 15   step down back to the jury room, all 16 can go now.  I'm going

16   to come back and talk to you shortly.  Thank you.

17        (**WHEREUPON**, the jury was discharged at 4:54 p.m.)

18        **THE COURT:** We'll put the matter on for sentencing

19   for January 14th at 3:30.  Obviously if we need more time, we

04:54:55PM 20   can always adjust that.

21        As far as the forfeiture of one Ruger firearm, Mr.

22   Verrillo, do you expect to contest that in any way?

23        **MR. VERRILLO:** Just one second, Your Honor.  There's

24   no claim against that firearm.  My client's not making any

04:55:19PM 25   claim against that.

1    **THE COURT:** Then I believe the Government can just

2    submit an order on that.

3    **MR. MARANGOLA:** Yes, Judge.

4    **THE COURT:** Okay, thank you. The defendant will be

04:55:27PM 5    remanded pending sentencing.  Thank you.

6    **MR. VERRILLO:** Thank you.

7    **MR. MARANGOLA:** Thank you.

8    (**WHEREUPON**, proceedings adjourned at 4:56 p.m.)

9                    *   *   *

10              <u>**CERTIFICATE OF REPORTER**</u>

11

12    In accordance with 28, U.S.C., 753(b), I certify that

13    these original notes are a true and correct record of

14    proceedings in the United States District Court for the

15    Western District of New York before the Honorable Frank P.

16    Geraci, Jr. on November 4th, 2021.

17

18    <u>S/ Christi A. Macri</u>

19    Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
      Official Court Reporter

20

21

22

23

24

25