1

```
 1                    UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF NEW YORK

 3

 4

 5   - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA            18-CR-6094(G)
 6
     vs.
 7                                       Rochester, New York
     XAVIER TORRES,                      March 16, 2022
 8             Defendant.                3:10 p.m.
     - - - - - - - - - - - - -X
 9

10                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                    UNITED STATES DISTRICT JUDGE

12

                       JAMES P. KENNEDY, JR., ESQ.
13                     United States Attorney
                       BY: ROBERT A. MARANGOLA, ESQ.
14                         CASSIE M. KOCHER, ESQ.
                       Assistant United States Attorneys
15                     500 Federal Building
                       Rochester, New York 14614
16                     Appearing on behalf of the United States

17
                       MAURICE J. VERRILLO, ESQ.
18                     3300 Monroe Avenue
                       Suite 301
19                     Rochester, New York 14618
                       Appearing on behalf of the Defendant
20

21   ALSO PRESENT:        Jennifer Fish, U.S. Probation Office
                          Nick Bavaria, U.S. Probation Office
22

23
     COURT REPORTER:      Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
24                        Christimacri50@gmail.com
                          Kenneth B. Keating Federal Building
25                        100 State Street, Room 2640
                          Rochester, New York 14614
```

2

1                               **I N D E X**

2

   **WITNESS FOR THE GOVERNMENT**

3

   Victor Nunez
4        Direct examination by Mr. Marangola          Page  8
         Cross-examination by Mr. Verrillo            Page 38
5

6

7

8  **EXHIBIT                    RECEIVED**

9  Government 18              17

10 Defendant 103              49

11 Defendant 102              51

12 Defendant 115              54

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*    \*    \*

1
2
3    **(WHEREUPON**, the defendant is present).
4    **THE CLERK:** This is 18-CR-6094,
03:10:34PM 5    U.S. vs. Xavier Torres.
6    Rob Marangola and Cassie Kocher are here for the
7    Government.
8    Maurice Verrillo is here for defendant.
9    Jennifer Fish and Nick Bavaria are here from
03:10:46PM 10    Probation.
11    Mr. Torres appears today for a sentencing hearing.
12    **THE COURT:** Are you Xavier Torres?
13    **THE DEFENDANT:** Yes, Your Honor.
14    **THE COURT:** Okay.  This matter's on for a sentencing
03:10:53PM 15    hearing.  Is the Government ready to proceed?
16    **MR. MARANGOLA:** Yes, Your Honor, we are.
17    **THE COURT:** Defense is ready?
18    **MR. VERRILLO:** Judge, I had filed a motion related
19    to some records I know the Court held in seal, but I did want
03:11:04PM 20    a decision.  We did ask for some records related to this
21    witness' mental health, so forth, counseling records, which we
22    think are relevant to his credibility and his recall,
23    et cetera.  So I did have a few comments on that.  I don't
24    know if the Court wants to hear that.
03:11:20PM 25    **THE COURT:** Go ahead.

1          **MR. VERRILLO:** I did file a motion -- okay, Your

2    Honor, I did file a motion with respect to the disclosure of

3    jail and mental health records of the Government's witness,

4    Victor Nunez, for the issuance of subpoena duces tecum

03:11:39PM 5    relative to the mental health records.  I also asked for the

6    subpoena for Investigator Briganti regarding his contacts and

7    interview of Mr. Nunez.

8          The Government provided letters from Mr. Nunez in

9    his own words indicating mental breakdowns, he's losing his

03:11:55PM 10   mind in jail, and other concerning statements.

11         I did attach the pretrial note that he has

12   untreated bipolar disorder; and his grand jury testimony where

13   he says his memory is not great.

14         Subsequently as a part of this hearing I did

03:12:09PM 15   receive *Jencks* disclosure that he had a 2014 motorcycle

16   accident; he wasn't wearing a helmet and had multiple

17   fractures, had some hallucinations after the accident and

18   received -- has been receiving mental health counseling at

19   various facilities.

03:12:26PM 20         So it's my position, Your Honor, that I'm not able

21   to adequately question and confront him as a witness absent

22   disclosure of these records.  The information is relevant to

23   his recall, memory and credibility.  We have a right to

24   request this under the due process compulsory process and

03:12:42PM 25   confrontation claims.

1            So our request of the Court is that there be

2 disclosure of this information to the Court in camera, and

3 that there be a disclosure of relevant information to the

4 defense.  So that deals with my first motion.

03:12:56PM 5            If you want me to go to the next or however you

6 want me to proceed.

7            **THE COURT:** Government's response -- they did file a

8 response.  Mr. Marangola?

9            **MR. MARANGOLA:** Yes, Judge.  With respect to the

03:13:07PM 10 subpoenas, Your Honor, we argue that the defendant hasn't

11 established the three hurdles that he must clear under *United*

12 *States vs. Nixon*, that is, demonstrating that the records are

13 relevant, admissible, and that his request is specific.

14            In this case it's our position that his request is

03:13:27PM 15 akin to a general fishing expedition since (a) he hasn't

16 established that there are records; (b) he hasn't established

17 what's in the records; and (c) he hasn't established that if

18 there are records, that the contents of those records would,

19 in fact, be admissible.

03:13:45PM 20            So we'd ask the Court deny the general request for

21 what we submit is a fishing expedition for potential

22 impeachment material.

23            **THE COURT:** Okay.  At this time I'm going to deny

24 the motion, however, without prejudice.  We'll hear from the

03:14:05PM 25 witness in this case and if matters do arise that gives the

1    Court reason to re-examine that decision, I'll do that.

2              Regarding the subpoena for the witness?

3         **MR. VERRILLO:** Yes, Your Honor, I did want to have

4    Investigator Briganti available.  As the Court knows, this is

03:14:22PM 5    a sentencing hearing which has different standards of

6    admission and rules of evidence.

7              I cited the Sentencing Guidelines 6A1.3.  We have

8    disputed facts here.  We would submit that Investigator

9    Briganti was present during the interviews of this witness,

03:14:41PM 10   and that there were inconsistent statements -- a number of

11   inconsistent statements that he made, most specifically with

12   regard to the September 9th versus the 23rd proffers, which he

13   felt was necessary to do a memo on that issue.

14             So we believe that that information is relevant to

03:14:59PM 15   the Court in its assessment, and we would ask that the Court

16   allow a subpoena for the testimony of Investigator Briganti.

17             **THE COURT:** You don't need Investigator Briganti to

18   ask those questions.

19             **MR. VERRILLO:** I'm going to ask the questions.  I

03:15:12PM 20   don't know what the answers are going to be.

21             **THE COURT:** You don't need him.

22             **MR. VERRILLO:** I have to ask the questions and see

23   what the answers are.  Presumably the answers are --

24             **THE COURT:** Let's wait and see what the answers are

03:15:21PM 25   and then I'll revisit that as well.  Okay, thank you.

1          You may proceed.

2          **MR. MARANGOLA:** Thank you, Judge.  Government calls

3 Victor Nunez.

4          Judge, while we're waiting for Mr. Nunez to

03:15:53PM 5 approach from the lockup, I wanted to let the Court know my

6 plan with Mr. Nunez today is to -- after getting into some

7 brief background, how -- that he's pled guilty and that -- how

8 he knows the defendant, and how he began working in this drug

9 organization, to ask him about a particular murder he

03:16:16PM10 committed and that he's admitted to; and then a second

11 murder -- the second murder is the John Gonzalez murder in

12 Buffalo and the relationship of that second murder to the

13 first murder that he committed.

14          I have a handful of photographs that I'll use with

03:16:32PM15 him that we have on the computer that we're prepared to

16 display to him.  We just -- we marked them separately for

17 today since it was a different proceeding, a sentencing

18 hearing as opposed to the trial.

19          To the extent some of these exhibits have been

03:16:46PM20 already admitted at trial, I'll let the Court know what their

21 trial exhibit number was because the Court would have already

22 had copies of those from when they were received initially.

23          **THE COURT:** Did you make a separate exhibit list for

24 this hearing?

03:17:01PM25          **MR. MARANGOLA:** Yes.

1          **THE COURT:** Do we have that?  Was it filed?

2          **MR. MARANGOLA:** I can provide one.  I thought we

3    sent one.

4          **THE COURT:** We received the defense exhibit list.

03:17:30PM 5    We don't have a Government exhibit list.  Okay, thank you.

6          **MR. MARANGOLA:** Judge, Investigator Briganti is here

7    in court.  I wanted to let the Court know that.

8          **THE COURT:** Thank you.

9          **GOVERNMENT'S WITNESS, VICTOR NUNEZ, SWORN**

03:17:50PM 10                   **DIRECT EXAMINATION**

11          **THE CLERK:** Please state your name and spell your

12    last name for the record.

13          **THE WITNESS:** Victor Nunez, N-U-N-E-Z.

14          **THE REPORTER:**  Thank you.

03:18:21PM 15          **THE CLERK:** Thank you.  You can have a seat.

16          **THE COURT:** You may proceed.

17    BY MR. MARANGOLA:

18    Q.   Good afternoon, Mr. Nunez.

19    A.   Good afternoon.

03:18:55PM 20    Q.   If you could slide -- tip that microphone down a little

21    bit more, we might be able to hear you a little bit better.

22    A.   Good afternoon.

23    Q.   That's better.  Mr. Nunez, how old are you?

24    A.   28.

03:19:08PM 25    Q.   And where were you born and raised?

1    A.    Puerto Rico.  And I was raised in Buffalo, New York.

2    Q.    Can you tell the Court how far did you get in school?

3    A.    10th grade.

4    Q.    And is English your first language?

03:19:26PM 5    A.    Spanish is my first language.

6    Q.    All right.  But do you feel you can proceed here today

7    speaking English?

8    A.    Yes, sir.

9    Q.    All right.  If I ask you any questions or the judge or

03:19:37PM 10   defense counsel asks you questions that you don't understand,

11   let us know, okay?

12   A.    Okay.

13   Q.    Mr. Nunez, while you were growing up did you suffer any

14   injuries?

03:19:49PM 15   A.    Yes.  Got a broken arm and a broken right femur.

16   Q.    And how did you get those injuries?

17   A.    From a motorcycle accident.

18   Q.    About how old were you?

19   A.    Can't really recall.  Probably like around 18, 19.

03:20:09PM 20   Q.    All right.  Did you have any other accidents where you

21   were injured as a child?

22   A.    Yes, when I was 10 years old I had a firework injury.  I'm

23   missing three fingers in my left hand.

24   Q.    Mr. Nunez, do you go by any nicknames?

03:20:27PM 25   A.    Yes, Tuco.

```
 1  Q.    Tuco?
 2  A.    Yes.  And Vic.
 3  Q.    What does Tuco mean?
 4  A.    It's a -- it's a name in Spanish for the missing fingers.
```
03:20:43PM 5  Q.    All right.  Who has referred to you as Tuco?
```
 6  A.    Members of my drug organization.  And the defendant
 7  sitting over there, Xavier Torres.
 8  Q.    All right.  And since you just mentioned the defendant and
 9  said over there, the person you know as Xavier Torres do you
```
03:21:01PM 10  see him in court today?
```
11  A.    Yes.
12  Q.    Would you point to him and describe an article of
13  clothing?
14  A.    Sitting over there, he's wearing orange.
```
03:21:13PM 15         MR. MARANGOLA: Your Honor, may the record reflect
```
16  the witness's identification of the defendant?
17         THE COURT: Yes, the record will note the
18  identification of the defendant Xavier Torres.
19  BY MR. MARANGOLA:
```
03:21:22PM 20  Q.    Mr. Nunez, what did you refer to Xavier Torres as?  What
```
21  did you call him?
22  A.    Pistolita.
23  Q.    All right.  You're currently in custody; is that correct?
24  A.    Yes.
```
03:21:33PM 25  Q.    In federal custody?

1  A.    Yes.

2  Q.    When were you arrested?

3  A.    June 12th, 2019.

4  Q.    And did you eventually plead guilty under a plea agreement

03:21:44PM 5  that contained a cooperation provision?

6  A.    Yes.

7  Q.    I'd like you to look on your monitor there and show you

8  Government's Exhibit 1.  Do you see the first page of

9  Government's Exhibit 1 there?

03:22:01PM10  A.    Yes, sir.

11  Q.    All right.  Is that -- is this a copy of the plea

12  agreement that you entered into with the Government?

13  A.    Yes, sir.

14         **MR. VERRILLO:** I'm sorry, Your Honor, my monitor

03:22:10PM15  isn't on, I'm not seeing anything.

16  **BY MR. MARANGOLA:**

17  Q.    Mr. Nunez, did you plead guilty to a conspiracy to possess

18  with intent to distribute and distribute 5 kilograms or more

19  of cocaine and 1 kilogram or more of heroin in connection with

03:22:45PM20  your federal arrest?

21  A.    Yes, sir.

22  Q.    And is it true that you face a sentence of up to life

23  imprisonment on that charge?

24  A.    Yes, sir.

03:22:53PM25  Q.    Under the terms of your plea agreement have you and the

```
 1  Government agreed to a guidelines calculation?
 2  A.   Yes, sir.
 3  Q.   And what's the agreed recommended sentence under your plea
 4  agreement for the guidelines?
 5  A.   292 months to 365 months.
 6  Q.   All right.  And is it true that the Government and you
 7  have agreed to recommend a sentence that the Court impose a
 8  sentence of between 292 and 365 months with one exception?
 9  A.   Yes, sir.
10  Q.   And what's that one exception?
11  A.   Cooperation section.
12  Q.   All right.  And before we get to the cooperation section
13  as part of your plea agreement, Mr. Nunez, I want to ask you
14  to take a look at page 3 starting at the bottom of paragraph
15  letter (e).  As part of your plea agreement did you admit to
16  committing two murders in connection with your involvement in
17  the drug organization?
18  A.   Yes, sir.
19  Q.   All right.  And are those admissions contained in the
20  paragraph (e) at the bottom of page 3?  Do you see that?
21  A.   Yes, sir.
22  Q.   And then going into the next page, page 4, paragraphs (f)
23  and (g) as well?
24  A.   Yes, sir.
25  Q.   And specifically with regard to paragraph (f), did you
```

03:23:08PM 5
03:23:25PM 10
03:23:42PM 15
03:23:56PM 20
03:24:10PM 25

1  admit, in sum and substance, that on January 20th, 2016, that

2  you unlawfully killed an individual whose initials are LG and

3  that you did so with the assistance of co-conspirator Obed

4  Torres Garcia by shooting and killing LG in the area of 15 Leo

03:24:35PM 5  Street in Rochester?

6  A.   Yes, sir.

7  Q.   And did you admit that Carlos Javier Figueroa directed the

8  killing of LG's brother based on Figueroa's belief that the

9  brother VG was stealing drug customers from the drug

03:24:51PM 10  trafficking organization?

11  A.   Yes, sir.

12  Q.   And at the time you killed LG you mistook him for the

13  brother whose initials were VG; is that correct?

14  A.   Yes, sir.

03:25:03PM 15  Q.   All right.  Did you also admit in connection with your

16  plea agreement and as set forth in paragraph (g) that on or

17  about June 6th, 2016, you unlawfully killed an individual

18  whose initials are JG, and that specifically with the

19  assistance of co-conspirator Xavier Torres a/k/a Pistolita

03:25:27PM 20  that you intentionally shot and killed JG in the area of 403

21  Busti Avenue, Buffalo, New York?

22  A.   Yes, sir.

23  Q.   And did you also admit that Carlos Javier Figueroa

24  directed that killing based on Figueroa's belief that JG was

03:25:44PM 25  providing the police with information about the drug

1    trafficking organization?

2    A.   Yes, sir.

3    Q.   All right.   In addition to entering this plea agreement

4    that's been marked as Government's -- a copy of which has been

03:25:59PM 5    marked as Government's 1, fair to say that you have also

6    received letters of immunity from the Monroe County District

7    Attorney's Office and the Erie County District Attorney's

8    Office for state prosecutions related to the two murders that

9    we just talked about?

03:26:19PM 10   A.   Yes, sir.

11   Q.   And were those immunity letters conditioned upon you

12   pleading guilty to the federal plea agreement that is marked

13   Government's Exhibit 1?

14   A.   Yes, sir.

03:26:29PM 15   Q.   And, finally, the base offense level as part of the

16   guideline calculations that are set forth in the plea

17   agreement 1, you'll see those in paragraph -- you'll see that

18   in paragraph 7, it indicates a base offense level of 43; is

19   that correct?

03:26:44PM 20   A.   Yes, sir.

21   Q.   That's based on the cross-reference under Guideline

22   Section 2A1.1(a) based on your involvement in these murders;

23   is that right?

24   A.   Yes, sir.

03:26:59PM 25   Q.   Okay. Mr. Nunez, can you tell the Court -- you've

1  identified the defendant.  How long have you known him?

2  A.   Know him for eight years.

3  Q.   And what nicknames did the defendant go by?

4  A.   Pistolita, Barboo and P.

03:27:13PM 5  Q.   How did you meet the defendant?

6  A.   I met him through a friend and a cousin of mines on

7  Dearborn Street in Buffalo, New York.

8  Q.   And what were the circumstances under which you met him?

9  A.   To buy heroin off him because he had good heroin.

03:27:30PM 10  Q.   Are you addicted to heroin?

11  A.   Yes.

12  Q.   How long have you been addicted to heroin?

13  A.   Ever since I was 16 years old.

14  Q.   So the first time you met the defendant was to buy heroin

03:27:42PM 15  from him?

16  A.   Yes.

17  Q.   Can you describe how your relationship with him developed

18  after you first met him?

19  A.   I started to buy heroin off him and I started to sell

03:27:55PM 20  heroin and do heroin.  And I was homeless.  And after that he

21  gave me a place to stay, gave me food, and we became -- we

22  built a relationship and I started to sell drugs for him.

23  Q.   All right. Where did you begin to sell drugs for the

24  defendant?

03:28:15PM 25  A.   In Buffalo.

1   Q.    Specifically where?

2   A.    7th Street.

3   Q.    All right.  If I can show you Government's Exhibit 18.  Do

4   you recognize what's shown in Government's 18?

03:28:29PM 5   A.    Yes.

6   Q.    Is Government's 18 an aerial photograph from Google Earth?

7   A.    Yes.

8   Q.    Do you recognize the streets shown in it?

9   A.    Yes.

03:28:39PM 10   Q.    What are the -- what's the area shown in this exhibit?

11   A.    7th Street.

12   Q.    7th Street in Buffalo?

13   A.    Yes.

14   Q.    Does it show -- can you circle on your screen where 7th

03:28:52PM 15   Street is?  All right.  And is that an area that you're

16   familiar with?

17   A.    Yes.

18   Q.    How often were you on 7th Street during your time in

19   Buffalo?

03:29:04PM 20   A.    Quite a while.

21   Q.    How often would you be on 7th Street?

22   A.    Couple months.

23   Q.    All right. So you're familiar with the street and the

24   street names surrounding it?

03:29:13PM 25   A.    Yes.

1    Q.    Do you see the pin in the center toward the right of the

2    photograph next to 299 Prospect Avenue?

3    A.    Yes.

4    Q.    Are you familiar with that location?

03:29:23PM 5    A.    Yes.

6    Q.    And what's that location?

7    A.    That's his father's house, the defendant's father's house.

8    Q.    Xavier Torres' father's house?

9    A.    Yes.

03:29:31PM 10    Q.    Do you see Busti Avenue and Osbourne Alley shown on

11    Government's Exhibit 18?

12    A.    Yes.

13    Q.    Can you circle Osbourne Alley?  All right.  Do the streets

14    for 7th Street and the locations of 299 Prospect Avenue and

03:29:57PM 15    Osbourne Alley accurately reflect locations that you're

16    familiar with based on the time that you spent in Buffalo, New

17    York?

18    A.    Yes.

19    Q.    All right.

03:30:06PM 20             **MR. MARANGOLA:**  Judge, I'd offer Government's 18

21    for purposes of the hearing.

22             **MR. VERRILLO:** No objection.

23             **THE COURT:** Exhibit 18 will be received.

24             (**WHEREUPON**, Government Exhibit 18 was received into

03:30:15PM 25    evidence).

1   **BY MR. MARANGOLA:**

2   Q.   Mr. Nunez, I'd like to now show you Government's

3   Exhibit 17.   Do you recognize what's shown in Government's

4   Exhibit 17?

03:30:35PM 5   A.   Yes.

6   Q.   And what do you recognize?

7   A.   Pistolita's father's house.

8   Q.   Now, there's a couple of buildings in this photograph

9   marked Government's 17; is that right?

03:30:47PM 10   A.   Yes.

11   Q.   And which of them specifically do you recognize to be the

12   defendant's father's house?

13   A.   Do you want me to circle it?

14   Q.   Sure.   You circled the house in the middle of Government's

03:31:04PM 15   Exhibit 17?

16   A.   Yes.

17   Q.   And how were you familiar with that being the defendant's

18   father's house?

19   A.   The house is in the back of the house.

03:31:14PM 20   Q.   How do you access it?

21   A.   You got to walk through the alleyway right there.

22   Q.   All right.   Does Government's Exhibit 17 -- have you ever

23   been in the house?

24   A.   Yes.

03:31:25PM 25   Q.   Okay.

1    **MR. MARANGOLA:** Judge, Government's Exhibit 17 was

2 Trial Exhibit No. 64, it was received, just for the Court's

3 information.

4    **THE COURT:** Thank you.

03:31:35PM 5 BY MR. MARANGOLA:

6 Q.   Did the defendant stay at that location as well during the

7 time you knew him?

8 A.   Yes.

9 Q.   All right.  Did there come a time, Mr. Nunez, where you

03:31:48PM 10 came to Rochester?

11 A.   Yes.

12 Q.   And was that in connection with the defendant?

13 A.   Yes.

14 Q.   Can you tell the Court how that came about?

03:32:01PM 15 A.   After I built the relationship with the defendant, he end

16 up moving to Rochester.  And he later came back and told me

17 that there was better heroin and a better life in Rochester

18 and that I should come live with him out there.  So I decided

19 to move out there with him.

03:32:16PM 20 Q.   About when was that?

21 A.   2015.

22 Q.   And did you do that?  In fact, move to Rochester and began

23 staying with the defendant?

24 A.   Yes.

03:32:26PM 25 Q.   You said yes?

1  A.   Yes.

2  Q.   All right.  Did you become involved in selling drugs for a

3  particular organization after moving to Rochester?

4  A.   Yes.

03:32:35PM 5  Q.   And how long did you become involved until?

6  A.   About a year and a half.

7  Q.   When you started what was the primary area in Rochester

8  that that organization operated in?

9  A.   Burbank.

03:32:53PM 10  Q.   All right.  And I'm going to show you now, Mr. Nunez,

11  Government's Exhibit 15, which was received in trial as

12  Government's Exhibit 35.

13          Mr. Nunez, do you recognize what's shown in

14  Government's 15?

03:33:11PM 15  A.   Yes.

16  Q.   What do you recognize this to be?

17  A.   Burbank Street.

18  Q.   Is this the area where you worked for an organization in

19  Rochester after you came here with the defendant in 2015?

03:33:24PM 20  A.   Yes.

21  Q.   Who was the head of that organization?

22  A.   Carlos Javier Figueroa.

23  Q.   How did you become involved in selling drugs for that

24  organization?

03:33:38PM 25  A.   Xavier introduced me to him.

1    Q.   All right. Did you become familiar with the other

2    individuals who worked as members of that organization?

3    A.   Yes.

4    Q.   I'd like to show you Government's Exhibit 2.  I believe

03:33:57PM 5    this was Government's Exhibit 1 at the trial.  Mr. Nunez, do

6    you recognize the individuals or some of the individuals shown

7    in Government's Exhibit 2?

8    A.   Yes.

9    Q.   Do you see yourself in Government's Exhibit 2?

03:34:12PM 10    A.   Yes.

11    Q.   All right.  Starting at the top, can you tell us the names

12    of the individuals that you know in Government's Exhibit 2?

13    A.   Carlos Javier Figueroa.

14    Q.   Touch the screen when you identify the person, okay.

03:34:27PM 15    A.   Leitscha Poncedeleon.  Robert Figueroa.  Obed Torres.

16    Axel.  Me.  Pistolita Xavier Torres.  Jean Karlos.  Jonathan

17    Cruz Carmona.  Jonathan Gonzalez.  That's all I know.

18    Q.   All right.  And you identified those people from the left

19    to the right in each of those rows; is that right?

03:34:57PM 20    A.   Yes.

21    Q.   And the person you identified as Jonathan Gonzalez is in

22    the bottom row wearing a red T-shirt?

23    A.   Yes.

24    Q.   What was his -- what did you refer to him as?

03:35:08PM 25    A.   Paulo.

```
 1  Q.   Paulo?
 2  A.   Yes.
 3  Q.   All right.  And what was your role in this drug
 4  organization?
 5  A.   I used to sell drugs on Clinton and Burbank, package
 6  drugs.  If there was a problem, I would handle a problem.
 7  Q.   All right.  I don't know if you actually said this yet,
 8  who was the boss of this drug organization?
 9  A.   Carlos Javier Figueroa.
10  Q.   What was the defendant's role in Carlos Javier Figueroa's
11  drug organization?
12  A.   He had numerous roles.  He would package drugs, pick up
13  money, handle situations, any problems that needed to be
14  handled; he would -- he was my supervisor, he will overlook
15  any situation that I was in.
16  Q.   When you say your supervisor, did that mean he was in
17  charge of you?
18  A.   Yes, he was in charge of anything that had to do with me.
19  Q.   All right.  All right.  Was he in charge of other
20  individuals as well?
21  A.   Yes.
22  Q.   The person you identified as Paulo in the red shirt, what
23  was his role?
24  A.   He was a drug tester.
25  Q.   All right.  And what drug did he test specifically?
```

```
 1 | A.    Heroin and cocaine.
 2 | Q.    All right.  If we can clear your marks and go back to
 3 | Government's Exhibit 15.  Mr. Nunez, we talked about the two
 4 | murders that you committed in furtherance of this drug
 5 | organization's activities.
 6 |      Let's talk first about the January 20th, 2016 murder.  The
 7 | killing, what was the individual's name -- street name that
 8 | you killed on January 20th, 2016?
 9 | A.    Meno.
10 | Q.    Who were you intending to kill that day?
11 | A.    Pepe.
12 | Q.    And is the location that you killed Pepe shown on
13 | Government's Exhibit 15?
14 | A.    Yes.
15 | Q.    Can you circle it?  Mr. Nunez, what was the reason that
16 | you were intending to kill Pepe that day?
17 | A.    Because Pepe sold -- he sold a drug to a customer of ours
18 | that was not a drug from the drug organization, and that was a
19 | direct violation to our organization.
20 | Q.    All right.  And so who directed you to kill Pepe?
21 | A.    Carlos Javier Figueroa.
22 | Q.    All right.  And who participated in that murder with you
23 | that day?
24 | A.    Obed Torres and Paulo.
25 | Q.    Obed Torres and Paulo?
```

1  A.   Yes.

2  Q.   What was Paulo's role?

3  A.   Driver.

4  Q.   He drove the car?

03:38:06PM 5  A.   Yes.

6  Q.   And you killed Pepe by shooting him?

7  A.   Yes.

8  Q.   Where did you get the guns from?

9  A.   699 Main Street.

03:38:17PM 10  Q.   After you shot and killed Pepe -- I'm sorry, Meno,

11  intending to shoot Pepe, where did you and Obed go?

12  A.   Back to 699 Main Street.

13  Q.   At some point did you go to 6 Burbank Street?

14  A.   Yes.

03:38:39PM 15  Q.   And whose house was that?

16  A.   Javi's house.

17  Q.   Was there a conversation about what you and Obed did on

18  Leo Street?

19  A.   Yes.

03:38:48PM 20  Q.   Can you tell the Court about that conversation?

21  A.   I explained to Javi that I had killed the wrong person,

22  and that Obed had left a glove behind at the scene and that

23  that the police might recover the glove, which would be a

24  potential, you know, bad thing for all of us.

03:39:06PM 25  Q.   When you say Obed left a glove at the scene, I assume that

1    was unintentionally?

2    A.   Yes.

3    Q.   What was Javi's reaction to you telling him this?

4    A.   He was mad.  He said that we were some dumb motherfuckers

03:39:19PM 5    and that we didn't know how to kill people.

6    Q.   After that what did you do?

7    A.   I went back to 699 Main Street.

8    Q.   All right.  Did you stay in Rochester?

9    A.   No.

03:39:38PM 10    Q.   Where did you go?

11    A.   I went to Buffalo.

12    Q.   Why did you leave Rochester after the murder on

13    January 20th, 2016?

14    A.   Because Obed wanted me to pick up a drug package that

03:39:52PM 15    Javier told him to pick -- that he wanted me to pick up, which

16    I never was ever requested to ever pick up a drug package.  So

17    I thought they were trying to kill me.

18    Q.   All right.  So you went to Buffalo?

19    A.   Yes.

03:40:08PM 20    Q.   All right.  Did you stay in Buffalo or did there come a

21    time where you eventually came back to Rochester?

22    A.   There was a time I came back.

23    Q.   All right.  And did you go back and forth to Buffalo and

24    Rochester in those months after January of 2016?

03:40:21PM 25    A.   Yes.

1   Q.   Where was Pistolita during that time?

2   A.   Back and forth.

3   Q.   Between?

4   A.   Buffalo and Rochester.

03:40:30PM 5   Q.   All right.   During that time did you have any conversation

6   with Javi about Pistolita?

7   A.   Yes.

8   Q.   Can you tell the Court some of that conversation?

9   A.   Javi wanted me to kill Pistolita because he thought

03:40:42PM 10   Pistolita was working with the police on the low.

11   Q.   On the low?

12   A.   Yes.

13   Q.   Meaning what?

14   A.   Meaning behind closed doors.

03:40:54PM 15   Q.   All right.   Did you -- obviously you didn't kill

16   Pistolita?

17   A.   No.

18   Q.   Did you tell Pistolita about your conversation with Javi?

19   A.   Yes.

03:41:03PM 20   Q.   What was Pistolita's reaction?

21   A.   He was mad.   He was mad, but he didn't want to do nothing

22   about it.

23   Q.   Did there come a time after that that you stayed in

24   Buffalo?

03:41:18PM 25   A.   Yes.

1  Q.  And while you were staying in Buffalo -- and now I'm

2  talking about in June of 2016 -- where was Pistolita?

3  A.  He was in Buffalo.

4  Q.  All right.  Did there come a time where Pistolita talked

03:41:30PM 5  to you about conversations he had with Javi and about --

6  specifically about you and Paulo?

7  A.  Yes.

8  Q.  What did Pistolita tell you?

9  A.  Told me that -- say that again.

03:41:48PM 10  Q.  In June of 2016, did Pistolita talk to you about

11  conversations he had with Javi about you and Paulo?  Do you

12  not understand my question?

13  A.  No, I don't.

14  Q.  Did there come a time when Pistolita came to see you in

03:42:16PM 15  Buffalo and talked to you about Paulo?

16  A.  A time he came to Buffalo?

17  Q.  Pistolita.

18  A.  I don't understand your question because you just asked me

19  if he was in Buffalo and I said yes.

03:42:34PM 20  Q.  All right.  Did there come a time when you and Pistolita

21  were in Buffalo that he talked to you about Paulo?

22  A.  Yes.

23  Q.  Can you tell the Court about those conversations?

24  A.  He told me that Paulo was in Buffalo and he needed a place

03:42:48PM 25  to stay.

1  Q.   And what happened?

2  A.   And I told him that okay, to bring him to me and that I

3  will find him a place to stay and I found him a place to stay

4  with me.

03:43:00PM 5  Q.   Did Pistolita tell you why Paulo was in Buffalo?

6  A.   No.

7  Q.   At the time Paulo began staying with you; is that right?

8  A.   Yes.

9  Q.   What happened after that?

03:43:13PM 10  A.   Told me give him drugs and to give him food.

11  Q.   Who told you to give who?

12  A.   Pistolita.

13  Q.   Told you to give?

14  A.   Paulo drugs and food and whatever that he needed while --

03:43:27PM 15  the time that he was staying with me.

16  Q.   All right.  Did Pistolita provide those drugs at all?

17  A.   Yes.

18  Q.   And what happened after that?

19  A.   After that one day he came, he told me -- he told me and

03:43:44PM 20  Paulo to get in the car and told us that we had to go do a job

21  with him and that he would explain to us more about it when we

22  get to his father's house.

23        When we got to his father's house, Paulo wanted to

24  smoke a cigarette, and he told Paulo to go outside to smoke a

03:44:00PM 25  cigarette.  And --

1  Q.   When you say the father's house, are you referring to the

2  house on Prospect Avenue?

3  A.   Yes.

4  Q.   The house you marked in Government's Exhibit 17?

03:44:14PM 5  A.   Yes.

6  Q.   All right.  When Paulo went out for a cigarette, did you

7  and the defendant have a conversation?

8  A.   Yes.

9  Q.   Tell the judge about that conversation.

03:44:24PM 10  A.   So when Paulo went outside to have his cigarette, he told

11  me that Javier had told him that Paulo had to be killed

12  because Paulo was talking about the Leo Street murder and

13  about other things that the organization had done.  So he had

14  to be hushed up, so that we had to kill him.

03:44:45PM 15         So I knew that I had to kill him because it was my

16  mistake that I made on the Leo Street homicide where I

17  mistaken the person that I killed and Paulo was my driver.

18         So he told me to take him to the alleyway on

19  Osbourne Alley and to tell him to go in front and to act like

03:45:05PM 20  he was going to buy some drugs off some rival people that he

21  had problems with, and then that was where I was supposed to

22  kill him.

23  Q.   All right.  After Pistolita told you about what Javi

24  wanted and about how you should do it, tell the Court what

03:45:28PM 25  happened.

1  A.   We got in the car and --

2  Q.   What car?

3  A.   Red Mustang.

4  Q.   Whose red Mustang was it?

03:45:36PM 5  A.   Red Mustang that Pistolita had.  It was a client from --

6  from the drug organization from Rochester, a guy named Big

7  Truck owned the car, and Pistolita had it.

8         So we got in the car and he told us to get

9  everything out of our pockets and he drove us down Prospect

03:45:56PM 10  Street to Pennsylvania and that's where he dropped me and

11  Paulo off.  Me and Paulo got off --

12  Q.   Hold on one second.  Let's pull up Government's Exhibit 18

13  so you can show us.  You see 299 Prospect?

14  A.   Yes.

03:46:14PM 15  Q.   All right.  That's where the three of you were initially?

16  A.   Yes.

17  Q.   And then Pistolita drove you and Paulo along Prospect to

18  where?

19  A.   Up to Pennsylvania Street.

03:46:27PM 20  Q.   If you want to draw an arrow with a direction on it

21  showing -- all right, you're drawing an arrow pointing toward

22  the top of that photograph; is that right?

23  A.   Yes.

24  Q.   And is this the street that you intersected on Prospect at

03:46:44PM 25  Pennsylvania?  Is that shown -- a portion of Pennsylvania

1  shown on this?

2  A.   Yes.

3  Q.   All right.  What happened when you got to the corner of

4  Prospect and Pennsylvania?

03:46:54PM 5  A.   Me and Paulo got out of the car and walked down

6  Pennsylvania across Niagara Street and continued to walk to

7  Osbourne Alley.

8  Q.   All right.  Before you and Paulo got out of the car, had

9  Pistolita said -- did Pistolita say what he was gonna do?

03:47:09PM 10  A.   Yeah, he was gonna meet me up after everything was done on

11  7th Street to pick me up.

12  Q.   Had you and Pistolita talked in front of Paulo about what

13  job you guys were going to do?

14  A.   No.  He just told Paulo in the car that he had to go cop

03:47:31PM 15  drugs from the guy that we were supposed to initially fake

16  rob.

17  Q.   All right.  Before you got out of the car, out of the red

18  Mustang, did you have a weapon?

19  A.   Yes.

03:47:44PM 20  Q.   What did you have?

21  A.   I had a black compact pistol.

22  Q.   Do you recall what caliber it was?

23  A.   .40 caliber.

24  Q.   Where did you get it?

03:47:53PM 25  A.   I got it from Pistolita.

1  Q.    When did Pistolita give you the .40 caliber pistol?

2  A.    At his father's house.

3  Q.    Was that while Paulo was there?

4  A.    No.  Paulo was outside.

03:48:06PM 5  Q.    All right.  When Pistolita gave you that gun, what did he

6  say?

7  A.    That was the murder weapon.

8  Q.    For you to use that to shoot Paulo?

9  A.    Yes.

03:48:19PM 10  Q.    All right.  After you and Paulo got out at the corner of

11  Prospect and Pennsylvania, show us the first area on

12  Government's 18 where you and Paulo walked.

13  A.    Say that again.

14  Q.    Show us the area where you and Paulo were walking after

03:48:36PM 15  you got out of Pistolita's car.  You're showing going toward

16  the left side of the photograph along Pennsylvania?

17  A.    Yes.

18  Q.    And where did you turn up Pennsylvania?

19  A.    Won't let me turn into Osbourne Alley.

03:49:07PM 20  Q.    The screen won't?

21  A.    Yeah.

22  Q.    All right.  I think -- will it let you circle Osbourne

23  Alley?  All right, I think we can.  Do you see Osbourne Alley

24  is written on there?

03:49:20PM 25  A.    Yeah.

1  Q.    All right. So you turned left off of Pennsylvania on to

2  Osbourne Alley?

3  A.    Yes.

4  Q.    You and Paulo?

03:49:27PM 5  A.    Yes.

6  Q.    And at the time what happened after you turned left on

7  Osbourne Alley?

8  A.    I tell Paulo to go in front of me and I tell him that once

9  he sees the guys, that that's when I'm gonna come behind him

03:49:43PM 10  and rob them, which was a lie.

11        Once he started to walk a little bit a distance in

12  front of me, that's when I pulled out the gun and I shot the

13  first shot.  After I shot the first shot, I missed, then I

14  shot the second shot and I struck him.

03:50:00PM 15        When I shot the second shot, I struck him, he

16  turned around and said "I knew this was what you guys had

17  planned," he tried to grab the gun from me.

18        I pushed him and continued to keep shooting at him

19  and I said, "I'm sorry, I'm sorry."  And then he tried to run

03:50:16PM 20  away and I kept shooting him until he fell, and I emptied the

21  rest of the magazine into him.

22        I jumped through a fence, I got tangled up in the

23  fence, I untangled myself from the fence, and then I jumped

24  another fence and Pistolita was there waiting for me in the

03:50:33PM 25  car -- in the red Mustang and I got in the car and --

1  Q.   On what street was he waiting for you?

2  A.   7th Street.

3  Q.   All right.  What happened after you got in the car?

4  A.   We left to -- we sped up 7th Street, and then made a right

03:50:53PM 5  on to Jersey Street, and then after that we made another right

6  on to some other street into somebody's driveway where he told

7  me to take off my hoodie and the shirt that I had on and put

8  it in a bag.

9         He told me clean off the gun and take the gun back

03:51:11PM 10  to Javi and to tell Javi that he had killed Paulo, which I

11  told him didn't make sense why he wanted me to do that, but he

12  told me that just to do that, that he wanted to play with

13  Javi's head.

14  Q.   Pistolita told you he wanted you to say that Pistolita

03:51:26PM 15  killed Javi -- I'm sorry, killed Paulo?

16  A.   Yes.

17  Q.   Instead of you?

18  A.   Yes.

19  Q.   All right.  I'm going to show you some photographs here,

03:51:44PM 20  Government's 3, 4, 5, 6, and 7.

21         **MR. MARANGOLA:**  Each of these, Judge, was received

22  at trial.  They were Government's 187 through 191.

23  **BY MR. MARANGOLA:**

24  Q.   Mr. Nunez, do you recognize what's shown in each of these

03:52:05PM 25  photographs?

```
 1  A.    Yes.
 2  Q.    Do these show what happened after you started shooting
 3  Paulo in Osbourne Alley in Buffalo on June 6th, 2016?
 4  A.    Yes.
 5  Q.    What time of day or night was it that this occurred?
 6  A.    It was nighttime.
 7  Q.    Describe the lighting in Osbourne Alley at the time.
 8  A.    Pitch black.
 9  Q.    All right.  And when you said that Paulo tried to grab the
10  gun, can you describe what he tried to do when he grabbed the
11  gun?
12  A.    Tried to grab the gun with his hand.
13  Q.    Put his hand up on it?
14  A.    Yeah.
15  Q.    All right.  And did you keep pulling the trigger?
16  A.    Yes.
17  Q.    All right.
18         MR. MARANGOLA:  And, Judge, I'd offer also --
19  BY MR. MARANGOLA:
20  Q.    -- let me show first Mr. Nunez Government's Exhibit 8.  Is
21  that the individual you shot and killed on June 6th, 2016?
22  A.    Yes.
23  Q.    And that you knew as Paulo?
24  A.    Yes.
25  Q.    All right. Is that, in fact, tattooed on the side of his
```

03:52:19PM 5
03:52:38PM 10
03:52:48PM 15
03:52:55PM 20
03:53:12PM 25

1    neck?

2    A.    Yes.

3    Q.    Is that the individual that the defendant told you Javi

4    wanted to be killed?

03:53:21PM 5    A.    Right.

6    Q.    And let me also show you Government's Exhibit 9.  All

7    right.  Then finally let me show you Government's Exhibit 10.

8    Do you see the alley shown in Government's Exhibit 10?

9    A.    Yes.

03:53:46PM 10           **MR. MARANGOLA:** Judge, Government's Exhibit 10 was

11   received as 197 at trial, and 9 was received as 195.

12   **BY MR. MARANGOLA:**

13   Q.    Is that alley behind the police car shown in Government's

14   Exhibit 10 the same alley that you shot Paulo in on June 6th,

03:54:09PM 15   2016?

16   A.    Yes.

17   Q.    And that's the same person you previously identified as

18   wearing the red shirt in Government's Exhibit 2?

19   A.    Yes.

03:54:22PM 20   Q.    All right.  After you gave Pistolita your clothes and he

21   told you to bring the gun to Javi and tell Javi that Pistolita

22   killed Paulo, what did you do?

23   A.    I went -- I got droven to the house I was staying at on

24   Thompson Street, burn the remainder of my clothes, then called

03:54:44PM 25   my girlfriend, who was the mother of my son, and told her I

1  needed a ride to Rochester to go deliver the gun to Javi.

2  Q.   Did you, in fact, go to Rochester with the .40 caliber

3  pistol that Pistolita had given you?

4  A.   Yes.

03:54:59PM 5  Q.   And that you used to kill Paulo with?

6  A.   Yes.

7  Q.   What happened when you went to Rochester with that gun?

8  A.   When I got there, I saw Javi and I told him I had

9  something for him.  He said keep that and follow me.  And I

03:55:15PM 10  followed him to another brick building.

11          And when I got there I told my girl, I said, if I

12  don't come back out in 15 minutes, call the cops and tell them

13  that Javi killed me.  So she said okay.

14          I got out of my car, followed him into an apartment

03:55:34PM 15  in the brick building, and I told him here's the gun and I'm

16  the one that killed Paulo.

17          And he said how you're the one that killed Paulo?

18  Pistolita is the one that called me and told me that he's the

19  one that killed Paulo.

03:55:47PM 20          I said I'm the one that killed Paulo, and here's

21  the gun.  And after that I left and went to Pennsylvania.

22  Q.   What building did this occur in?

23  A.   It's a brick building on the right-hand side.  There's a

24  Papa John.

03:56:01PM 25  Q.   Is that Main Street in Rochester?

1  A.    Yes.

2  Q.    All right. You said after that you left for?

3  A.    Pennsylvania.

4  Q.    When you say Pennsylvania, you're talking about the State

03:56:15PM 5  of Pennsylvania?

6  A.    Yes.

7  Q.    And is that where you were arrested in 2019?

8  A.    Yes.

9  Q.    All right.  I'm sorry, you said when you came back with

03:56:49PM 10  the gun, you first went to one building, then you went to a

11  second building?

12  A.    Yes.

13  Q.    What was the first building you went to?

14  A.    699 Main Street.

03:56:57PM 15  Q.    Okay.  The second building was near Papa John's?

16  A.    Yeah.

17  Q.    Do you remember if that was on Main Street or Culver?

18  A.    I don't know the street name.

19  Q.    Okay.

03:57:10PM 20       **MR. MARANGOLA:**  All right.  Nothing further, Your

21  Honor.  Thank you.

22       **THE COURT:** Thank you.

23                      <u>**CROSS-EXAMINATION**</u>

24  **BY MR. VERRILLO:**

03:57:25PM 25  Q.    Mr. Nunez, can you hear me okay?

```
 1   A.    Yes.
 2   Q.    I'm sorry.  Can you hear me okay?
 3   A.    Yeah.
 4   Q.    All right.  Do you suffer from any mental illness?
 5   A.    Depression.
 6   Q.    Okay. Have you previously been diagnosed as suffering from
 7   bipolar disorder?
 8   A.    Yes.
 9   Q.    And have you had any treatment for that?
10   A.    Not since I've been in jail.
11   Q.    Okay. Now, prior to your incarceration you had used
12   marijuana on a daily basis?
13   A.    Yes.
14   Q.    And how much had you used?
15   A.    Every day.
16   Q.    And how much?
17   A.    Blunt a day.
18   Q.    And did you use heroin?
19   A.    Yes.
20   Q.    And how often did you use that?
21   A.    Every day.
22   Q.    And how much?
23   A.    Five or six grams a day.
24   Q.    Did you use cocaine?
25   A.    Yes.
```

1  Q.    And how often did you use that?

2  A.    On the weekends.

3  Q.    Okay. Had you overdosed on heroin in 2015?

4  A.    Yes.

03:58:37PM 5  Q.    Did your use of drugs effect your recall of what happened

6  on a particular day?

7  A.    I don't understand what you're trying to ask me.

8  Q.    Okay. You said you used heroin on a regular basis,

9  correct?

03:58:55PM 10  A.    Right.

11  Q.    Did you using heroin effect your ability to remember

12  things?

13  A.    No.

14  Q.    And you used marijuana on a daily, on a regular basis,

03:59:00PM 15  correct?

16  A.    Right.

17  Q.    Did you have a motorcycle accident in June of 2014?

18  A.    Yes.

19  Q.    And did you crash into a parked car with a motorcycle?

03:59:21PM 20  A.    Yes.

21  Q.    And how fast were you going?

22  A.    I don't know the speed limit that I was going.  I don't

23  know the speed limit I was going.

24  Q.    Okay. Do you know how fast you were going?

03:59:33PM 25  A.    Pretty fast.

```
 1   Q.    Okay. What do you mean by that?
 2   A.    Pretty fast.  I don't -- it wasn't -- it was a dirt bike,
 3   it wasn't a actual motorcycle.
 4   Q.    And you were not wearing a helmet; is that right?
 5   A.    Correct.
 6   Q.    And did you have any kind of brain injury?
 7   A.    No.
 8   Q.    Okay. As a result of that incident did you have problems
 9   remembering things?
10   A.    No.
11   Q.    Are there times you've forgot what you've done in the
12   past?
13   A.    No.
14   Q.    When you had this motorcycle crash did your head hit
15   anything?
16   A.    Yes.
17   Q.    What did it hit?
18   A.    Telephone pole.
19   Q.    And as a result of the motorcycle crash did you have any
20   hallucinations?
21   A.    Yes.
22   Q.    And what kind of hallucinations did you have?
23   A.    I had hallucination of a girl taking care of me after I
24   was released from the hospital from the pain that I was
25   enduring from not having pain medication.
```

03:59:48PM 5
03:59:59PM 10
04:00:12PM 15
04:00:30PM 20
04:00:46PM 25

```
 1  Q.   Okay. Was that woman there?  Actually there?

 2  A.   No, she was not.

 3  Q.   Okay. So you hallucinated she was taking care of you?

 4  A.   Right.

 5  Q.   Did you also have hallucinations about a hospital burning?

 6  A.   Yes.

 7  Q.   And what did that involve?

 8  A.   Come again?

 9  Q.   What did you mean by saying hospital was burning?

10  A.   It was from the pain that I was enduring.  I didn't have

11  my pain medication, so I was having those hallucinations.

12  Q.   Okay. And did you also have hallucinations of seeing

13  clowns?

14  A.   Yes.

15  Q.   And how often did these hallucinations occur?

16  A.   For two weeks.

17  Q.   Okay. I believe you testified in direct that you've been

18  in jail since June 12th of 2019?

19  A.   Yes.

20  Q.   And you've been in jail continuously since then, correct?

21  A.   Yes.

22  Q.   Did you have a nervous breakdown while you were in jail?

23  A.   Yes.

24  Q.   How many did you have?

25  A.   Two.
```

04:01:00PM (line 5)
04:01:13PM (line 10)
04:01:28PM (line 15)
04:01:44PM (line 20)
04:01:59PM (line 25)

1   Q.    Okay. And when did those nervous breakdowns occur?

2   A.    I can't recall them.

3   Q.    Did those occur while you were at the Livingston County

4   Jail?

04:02:12PM 5   A.    Yes, one did.

6   Q.    And the other breakdown occurred where?

7   A.    Chautauqua County.

8   Q.    Can you describe what you mean when you say you had a

9   nervous breakdown?

04:02:33PM 10   A.    Just, you know what I mean?  Just the world felt like it

11   was ending.

12   Q.    How did that effect you?

13   A.    Just fell into a depression.

14   Q.    Then you had a nervous breakdown at Chautauqua County

04:02:55PM 15   Jail?

16   A.    Right.

17   Q.    What did that nervous breakdown involve?

18   A.    I wrote a letter.

19   Q.    Okay. And can you describe what you were going through at

04:03:08PM 20   that time?

21   A.    I was going through a lot of things:  My girl was leaving

22   me, my mother's health was declining, my grandfather was in

23   the hospital bed, my freedom obviously was being taken from

24   me, my son was being diagnosed with autism.

04:03:34PM 25   Q.    You have been at a number of jail facilities since you

1  were arrested; is that right?

2  A.   Correct.

3  Q.   And have you received counseling for mental health issues

4  at each of those facilities?

04:03:51PM 5  A.   Yes.

6  Q.   And what kind of mental health counseling did you receive?

7  A.   Trying to focus on my goals outside of -- outside of when

8  I get out of my incarceration and during my incarceration.

9  Q.   Okay. You were initially at FDC Philadelphia?

04:04:14PM 10  A.   Yes.

11  Q.   And did you receive mental health counseling there?

12  A.   Probably like one time.

13  Q.   Okay. And what did that involve?

14  A.   Just a general assessment.

04:04:25PM 15  Q.   Okay. And then you were next at Northeast Ohio?

16  A.   Correct.

17  Q.   And that was from June 24th to July 8th of 2019?

18  A.   I can't recall the dates.

19  Q.   Okay. And did you receive mental health treatment there?

04:04:42PM 20  A.   No.

21  Q.   And you were at Livingston County Jail from July 8th of

22  2019 to January 8th of 2020?

23  A.   Yes.

24  Q.   And did you receive mental health treatment there?

04:04:56PM 25  A.   Yes.

1  Q.   And what kind of treatment did you receive?

2  A.   Just regular, just venting.

3  Q.   You did have a breakdown when you were at the Livingston

4  County Jail; is that right?

04:05:11PM 5  A.   Correct.

6  Q.   And after you had the breakdown what treatment did you

7  have at the jail?

8  A.   I just had counselor come to see me twice -- twice a week

9  instead of once a week.

04:05:25PM 10  Q.   Okay. Did you receive any medications at that time?

11  A.   Not that I can recall.

12  Q.   And then you were next at the Chautauqua County Jail?

13  A.   Correct.

14  Q.   You had a mental breakdown there?

04:05:41PM 15  A.   Yes.

16  Q.   And did you receive any mental health counseling there?

17  A.   Yes.

18  Q.   And what treatment did you receive?

19  A.   I just saw a person just to talk to.

04:05:50PM 20  Q.   Then you were next at the Allegany County Jail, correct?

21  A.   Correct.

22  Q.   And did you receive mental health counseling there?

23  A.   Yes.

24  Q.   And what kind of treatment did you receive there?

04:06:03PM 25  A.   I just talked to a person about, like I said, about just

1  future goals.

2  Q.   Okay. And after that you were at the Seneca County Jail?

3  A.   Correct.

4  Q.   And did you receive any mental health counseling there?

04:06:19PM 5  A.   Yes.

6  Q.   And what kind of treatment did you receive there?

7  A.   Same thing.

8  Q.   And you're currently at the Orleans County Jail?

9  A.   No.  I'm at currently in Livingston.

04:06:32PM 10  Q.   Okay. But you were at Orleans County for a period of time?

11  A.   Yes.

12  Q.   And did you receive any mental health treatment there?

13  A.   No.

14  Q.   Do you take any medications now?

04:06:48PM 15  A.   No.

16  Q.   Have you had prior thoughts of suicide?

17  A.   No.

18  Q.   I'm sorry?

19  A.   No.

04:07:27PM 20  Q.   Okay. Sir, I want to show you what's been marked as

21  Exhibit 109.  I'm sorry, wrong exhibit.  I want to show you

22  what's been marked as Exhibit 113.  Are you familiar with

23  Exhibit 113?

24  A.   Yes.

04:08:02PM 25            **THE COURT:** What exhibit is this now?

1          **MR. VERRILLO:** 113.

2          **THE COURT:**  You mentioned 109 and 113.

3          **MR. VERRILLO:** I'm sorry.  It's 113.

4          **THE COURT:**  Okay, thank you.

04:08:09PM 5  BY MR. VERRILLO:

6  Q.   I can continue to show you the exhibit.  You say you're

7  familiar with this exhibit?

8  A.   Yes.

9  Q.   What is it?

04:08:31PM 10  A.   It's my PSR.

11  Q.   And that was prepared after you had talked to the

12  Probation Department?

13  A.   Yes.

14  Q.   I'm going to show you paragraph 109.  If you could read

04:08:44PM 15  that to yourself?

16  A.   Okay.

17  Q.   Have you read paragraph 109?

18  A.   Yes.

19  Q.   Okay. Did you tell Probation that you had prior thoughts

04:09:12PM 20  of suicide, but had never attempted it?

21  A.   Yes.

22  Q.   Is that correct?

23  A.   Yes.

24  Q.   Okay. When had you had prior thoughts of suicide?

04:09:35PM 25  A.   At the beginning of my incarceration.

1    Q.    Did you attempt suicide at the Livingston County Jail?

2    A.    No.

3    Q.    Okay.  Sir, I'd like to show you at this time what is

4    marked as Exhibit 103.  Are you familiar with Exhibit 103?

04:10:21PM 5    A.    Yes.

6    Q.    What is Exhibit 103?

7    A.    A letter I wrote.

8    Q.    Who did you write it to?

9    A.    To the District Attorney's Office.

04:10:30PM 10    Q.    Do you know approximately when that was?

11    A.    I can't recall the date that I wrote it.

12    Q.    Was that written after your first meeting with the

13    Government?

14    A.    I can't recall the time that I wrote it.

04:10:44PM 15    Q.    Okay. This is two pages, correct?

16    A.    Yes.

17    Q.    And is this an accurate copy of what you wrote the

18    Government?

19    A.    Yes.

04:10:53PM 20    Q.    Okay.

21              **MR. VERRILLO:** Your Honor, I would offer

22    Exhibit 103.

23              **MR. MARANGOLA:** No objection, Judge.

24              **THE COURT:** Exhibit 103 will be received for

04:11:01PM 25    purposes of this hearing.

1          (**WHEREUPON**, Defendant Exhibit 103 was received into

2  evidence).

3  **BY MR. VERRILLO:**

4  Q.   Sir, can you explain why you wrote Exhibit 103?

04:11:13PM 5  A.   It was a mental breakdown I had in Chautauqua County and I

6  wrote that letter.

7  Q.   And I'm looking at the first line there.  Do you see that?

8  A.   Yes.

9  Q.   You indicated I'm writing to you because I don't know what

04:11:31PM 10  happening with life -- with my life?

11  A.   Yes.

12  Q.   Why did you say that?

13  A.   Because I didn't know what was gonna happen with my life

14  as far as my incarceration.

04:11:46PM 15  Q.   That was during a time period that you had suffered a

16  mental breakdown?

17  A.   Correct.

18  Q.   Okay.  Then going farther down here you see this line

19  where it begins and I'm not lying to you?  Please help me, I'm

04:12:21PM 20  losing my mind in here?

21  A.   Yeah.

22  Q.   Why did you say that?

23  A.   It's a general statement, like I'm losing my mind.  You

24  know what I mean?

04:12:40PM 25  Q.   Then farther down in this letter you see where it begins

1    I'll work for you, do anything to be with them again.  Do you

2    see that?

3    A.   Yes.

4    Q.   And what did you mean by that?

04:12:57PM 5    A.   Mean that I would do anything to go home to my family.

6    Q.   What did you mean by do anything?

7    A.   Tell the truth.

8    Q.   Okay. Did the Government respond to your letter?

9    A.   No.

04:13:22PM 10   Q.   Did you write a second letter to them?

11   A.   Not that I recall.

12   Q.   Sir, I'm showing you what is marked as Exhibit 102.  Are

13   you familiar with this exhibit?

14   A.   Yes.

04:13:50PM 15   Q.   What is this exhibit?

16   A.   It's another letter.

17   Q.   And did you send another letter to the Government?

18   A.   Yes.

19   Q.   And who did you send the letter to?

04:14:01PM 20   A.   D.A.

21   Q.   And why did you send that second letter?

22   A.   Because I didn't get no response.

23   Q.   Now, you see the first sentence in that letter -- strike

24   that.

04:14:17PM 25           This is an accurate copy of the letter you sent to

1  the Government?

2  A.   Say that question again, please.

3  Q.   Do you see Exhibit 102?  Is that your handwriting?

4  A.   Yes.

04:14:35PM 5  Q.   And is this an accurate copy of what you sent the

6  Government?

7  A.   Yes.

8           **MR. VERRILLO:** I would offer Exhibit 102.

9           **MR. MARANGOLA:** No objection, Judge.

04:14:48PM 10           **THE COURT:** Exhibit 102 will be received for

11  purposes of this hearing.

12           (**WHEREUPON**, Defendant Exhibit 102 was received into

13  evidence).

14  **BY MR. VERRILLO:**

04:14:58PM 15  Q.   Now, sir, looking at the first line, do you see where it

16  says I'm clueless to why I got moved from Livingston when I

17  told ya to move Xavier, that I didn't want to move no more?

18           Do you see that?

19  A.   Yeah.

04:15:15PM 20  Q.   Can you explain what you meant by that?

21  A.   I didn't want to get moved.

22  Q.   Had you talked to the Government before that, that you

23  didn't want to be moved from Livingston County?

24  A.   How do I say this?  I don't recall if I had a meeting with

04:15:41PM 25  the Government before I wrote this letter.

```
 1  Q.   You see further down it says I don't see how any of this
 2  is helping me in any way?  Do you see that?
 3  A.   Yes, I see that.
 4  Q.   And what did you mean by that?
 5  A.   I don't understand.  What are you trying to ask me?
 6  Q.   Sir, I'm asking -- you say that I don't see how this is
 7  helping me in any way.
 8  A.   I don't understand your question.
 9  Q.   What is that referring to?  Your mental state?
10  A.   I don't know what -- what you're trying to say I'm
11  referring to, sir.
12  Q.   Okay. Well, you wrote the letter, correct?
13  A.   Correct.
14  Q.   Okay. And when you wrote that sentence what did you intend
15  by that?
16  A.   I was referring to the expense of -- my expense to
17  communicate with my family at that facility.
18  Q.   Okay. Now, going farther down -- I'll use the pointer
19  here.  It says I had a mental breakdown recently and ya
20  driving me to another one.  Do you see that?
21  A.   Yeah.
22  Q.   Can you explain what you meant by that?
23  A.   You know, I had a mental breakdown and I fell into
24  depression.  I was about to fall into another depression.
25  Q.   Okay. When you had the mental breakdowns that you talked
```

1  about, how does that effect your day-to-day functioning?

2  A.   I just stay in my room.

3  Q.   I'm sorry, I want to go back to Exhibit 102.  Do you see

4  the section here -- you see the section where it says please

04:18:55PM 5  fix this, I did what ya wanted for me, why am I getting

6  punished?

7  A.   Yes, I see that.

8  Q.   Okay. So what did you mean by I did what ya wanted for me?

9  A.   Told the truth.

04:19:14PM 10  Q.   So after reviewing Exhibit 102, does that refresh your

11  memory whether you had met with the Government as of -- prior

12  to that time?

13  A.   Yes, it refreshing my memory of meeting with the

14  Government.  I just don't recall the time that I did.

04:19:29PM 15  Q.   Sir, there came a time that you did meet with the

16  Government regarding this case; is that right?

17  A.    Yes.

18  Q.   And on the first date that you met with them, did you sign

19  an agreement with them?

04:19:59PM 20  A.   Yes, I did.

21  Q.   Okay. I'm going to show you what is marked as Exhibit 115

22  and ask you if you're familiar with this exhibit.  Are you

23  familiar with this exhibit?

24  A.   Yes, it's a proffer agreement.

04:20:34PM 25  Q.   Okay. And that's a document that you signed on

1   December 23rd, 2019?

2   A.   Yes, sir.

3   Q.   And this is an accurate copy of what you signed?

4   A.   Yes.

04:20:43PM 5   Q.   And you had reviewed that with your attorney prior to

6   signing it, correct?

7   A.   Correct.

8   Q.   And you had a discussion with the Government about the

9   document prior to signing it?

04:20:55PM 10   A.   Yes.

11   Q.   And you signed it before you had any discussions with the

12   Government about the case; is that right?

13   A.   Correct.

14          MR. VERRILLO: I would offer Exhibit 115.

04:21:08PM 15          MR. MARANGOLA: No objection, Judge.

16          THE COURT: Exhibit 115 will be received for the

17   purposes of this hearing.

18          (WHEREUPON, Defendant Exhibit 115 was received into

19   evidence).

04:21:19PM 20   BY MR. VERRILLO:

21   Q.   Now, sir, you see paragraph 1 of that proffer agreement?

22   I'm saying No. 1, where it says No. 1.

23   A.   Yeah, I see it.

24   Q.   Did you agree to provide complete and truthful information

04:21:35PM 25   regarding any and all criminal matters of which you had

1 | knowledge?

2 | A.   Yes, sir.

3 | Q.   And you understood that you were obligated to give

4 | truthful statements to the Government throughout the

04:21:47PM 5 | cooperation, correct?

6 | A.   Yes, sir.

7 | **MR. MARANGOLA:** Objection, Judge, that's not what

8 | the agreement -- doesn't say he's under any obligation.  It

9 | says he agrees.

04:21:55PM 10 | **MR. VERRILLO:** That's what an obligation is.

11 | **THE COURT:** Reread it.

12 | **MR. VERRILLO:** I'm sorry?

13 | **THE COURT:** Reask your question.

14 | **BY MR. VERRILLO:**

04:22:01PM 15 | Q.   Okay.  Sir, did you have an obligation to provide complete

16 | and truthful information to the -- related to this case?

17 | **MR. MARANGOLA:** I'm sorry, I didn't hear the last

18 | part of the question.

19 | **MR. VERRILLO:**  Do you want me to repeat that?

04:22:17PM 20 | **THE COURT:** Please.

21 | **BY MR. VERRILLO:**

22 | Q.   Sir, in signing Exhibit 115, was it your understanding

23 | that you had to provide complete and truthful information to

24 | the Government regarding this case?

04:22:28PM 25 | A.   Yes.

```
 1  Q.   And you had also agreed to, as a part of your cooperation
 2  with the Government, to not be involved in any criminal
 3  activity?
 4  A.   As far as criminal activity, what do you mean?
 5  Q.   Well, committing any crimes.
 6  A.   I can't commit any crimes.  I'm incarcerated.
 7  Q.   Okay. Well, you agreed not to commit crimes, correct?
 8  A.   Right.
 9  Q.   And you had multiple proffers with the Government since
10  your first proffer on December 23rd, 2019, correct?
11  A.   Correct.
12  Q.   And on each proffer did you give complete and truthful
13  information to the Government?
14  A.   No.
15  Q.   Now, your first proffer, as we said, was December 23rd of
16  2019.  Did you tell the Government on the first proffer
17  session that Jonathan Gonzalez did the shooting on Leo Street?
18  A.   Yes.
19  Q.   And was that statement a lie?
20  A.   Yes.
21  Q.   And that was on the same day that you promised to give
22  complete and truthful information to the Government, correct?
23  A.   Yes.
24  Q.   You also referred in your first session to getting in an
25  argument with Javi and him paying for a taxi for you to go to
```

Timestamps: 04:22:41PM (5), 04:22:59PM (10), 04:23:10PM (15), 04:23:35PM (20), 04:23:51PM (25)

1    Buffalo.  Do you recall that?

2    A.   What -- what is the question that you're trying to ask me

3    here?

4    Q.   You're confused by the question, is that it?

04:24:07PM 5    A.   Yes.

6    Q.   What I'm asking is when you had your first proffer

7    session.

8    A.   Okay.

9    Q.   You were aware that law enforcement was there, correct?

04:24:17PM 10   There was police there, representatives of law enforcement,

11   right?

12            **THE COURT:** You have to say yes or no.  You have to

13   say yes or no.

14            **THE WITNESS:** Yes.

04:24:25PM 15   **BY MR. VERRILLO:**

16   Q.   Okay.  And you're aware they were taking notes of what you

17   said, correct?

18   A.   Correct.

19   Q.   And have you reviewed those notes?

04:24:32PM 20   A.   Yes.

21   Q.   Okay. And you've reviewed the notes of all your proffer

22   sessions?

23   A.   Correct.

24   Q.   Okay. And did those notes generally accurately say what

04:24:41PM 25   you had said at that time?

1  A.   Yes.

2  Q.   Okay. My question to you was on the first proffer session,

3  which is December 23rd, 2019, did you tell law enforcement

4  that you had gotten into an argument with Javi and Javi paid

04:25:00PM 5  for a taxi for you to go to Buffalo?

6  A.   Can you show me that?  Because --

7  Q.   Sure, I'll show you.  So we're talking about the

8  December 23rd proffer notes, which is Exhibit 104.  So we're

9  looking at page -- this would be the second page section where

04:26:27PM 10  it says Javier told him to come to his house on Burbank.  He

11  got into an argument with Javier and that's when Javier paid a

12  taxi to take him to Buffalo.

13          Do you see that section?

14  A.   Yes, I see that section.

04:26:41PM 15  Q.   Does that refresh your memory as to what happened with

16  regard to a taxi?

17  A.   Yes.

18  Q.   What happened?

19  A.   I was caught using heroin, and the punishment was

04:26:53PM 20  delivered by Xavier Torres.  And then after that punishment

21  was delivered by Xavier Torres, Javi kicked me out and paid a

22  taxi to the Greyhound for me to go back to Buffalo.

23  Q.   Was that after the Leo Street shooting?

24  A.   I don't recall the timeframe on that.

04:27:30PM 25  Q.   Okay. Now, during the course of your first meeting --

1  that's the December 23rd, 2019 meeting -- did law enforcement

2  ask you about murders that you were familiar with?

3  A.   Yes.

4  Q.   And isn't it true that you did not mention the shooting of

04:27:46PM 5  Jonathan Gonzalez in Buffalo?

6  A.   Say that again.

7  Q.   When you spoke to the Government the first time --

8  A.   Okay.

9  Q.   -- that was December 23rd, 2019, isn't it true you did not

04:27:57PM 10  mention the shooting of Jonathan Gonzalez in Buffalo during

11  that session?

12  A.   Correct.

13  Q.   But you were asked by law enforcement what your knowledge

14  was of murders, correct?

04:28:18PM 15  A.   I was asked about law enforcement questions of the murder

16  of Leo Street.

17  Q.   Okay. You were asked about the murder of Walter Ross;

18  isn't that true?

19  A.   Yes.

04:28:47PM 20  Q.   That was in addition to the Leo Street shooting, correct?

21  A.   I was asked if I knew about the Walter Ross shooting.

22  Q.   The next time you spoke to -- I'm sorry, do you recall

23  speaking to law enforcement on September 9th, 2020?

24  A.   I don't recall the date, sir, but you can show me the...

04:29:24PM 25  Q.   All right.  Well, the date I'm asking about would be one

```
 1  day before your grand jury testimony, which was on
 2  September 10th -- be September 10th of 2020.  Do you recall
 3  that?
 4  A.    No.
 5  Q.    Okay. So that's Exhibit 101.  I'll show you Exhibit 101.
 6  This is a total of ten pages.  I'm going to show you this,
 7  sir, and ask you if you recall these notes.
 8              Prospect Avenue, sir, do you recall seeing these
 9  notes related to your September 9th, 2020 proffer?
10  A.    Yeah, I recall seeing these notes.
11  Q.    Okay. And that was one day before your grand jury
12  testimony?
13  A.    Okay.
14  Q.    Correct?
15  A.    Yes.
16  Q.    And during this September 9th, 2020 proffer, you had
17  discussed the Leo Street shooting, correct?
18  A.    Yes.
19  Q.    And you also discussed the Gonzalez shooting, correct?
20  A.    Yes.
21  Q.    And with respect to your interview on September 9th, 2020,
22  as it related to the Leo Street shooting, isn't it true that
23  you did not mention that Pepe was selling drugs on Burbank
24  Street prior to the murder?
25  A.    I didn't say that in these notes here?
```

Timestamps: 04:29:43PM (line 5), 04:31:54PM (line 10), 04:32:05PM (line 15), 04:32:17PM (line 20), 04:32:39PM (line 25)

Q. Right.

A. Can you show me where it says that here?

Q. You indicated -- you're indicating you had seen these notes before, correct?

04:32:51PM A. Correct.

Q. All right. My question to you is as you sit there today, do you recall that you did not tell --

A. I recall seeing these notes, but I can't tell you word-for-word what's in these notes. I don't recall like -- 04:33:09PM you know what I mean? Exactly like...

Q. Do you recall during your September 9th, 2020 proffer indicating that Paulo was talking to the police about Leo Street?

A. Can you repeat that question, please?

04:33:29PM Q. Do you recall during your proffer on September 9th telling law enforcement that Paulo was talking to the police about Leo Street?

A. I don't recall the dates, like I said, sir, but, yes, I'm not 100% sure that I said that.

04:33:51PM Q. All right. And during the interview on September 9th, 2020, did you indicate that Javi ordered Pistolita to kill you and Paulo?

A. That was a lie, sir.

Q. But that's what you said, right?

04:34:08PM A. Yes, that's what I said.

1  Q.    That was on September 9th of 2020?

2  A.    I don't recall the date, sir.

3  Q.    You would agree it was after the time that you signed the

4  proffer agreement, correct?

04:34:21PM 5  A.    I don't recall these dates, sir.

6  Q.    Okay. Did you indicate during your September 9th, 2020

7  proffer that the last time you saw Javi was when you returned

8  the gun to Rochester after the shooting?

9  A.    Yes, I said that.

04:34:46PM 10  Q.    Okay. And then you had a meeting with the Government on

11  September 23rd, 2020.  Do you recall that?

12  A.    I don't recall the date, sir.

13  Q.    Okay. Let me show you what has been marked as Exhibit 105.

14  Going to show you these pages, sir, and then I'll ask you a

04:35:20PM 15  question.

16          Sir, are you familiar with Exhibit 105?

17  A.    I'm familiar with it.

18  Q.    And that was a summary of your September 23rd, 2020

19  proffer with the Government?

04:36:22PM 20  A.    Correct.

21  Q.    And you're familiar with this exhibit?

22  A.    I'm familiar with it.

23  Q.    Okay. And isn't it true that during that September 23rd,

24  2020 proffer you told the Government for the first time that

04:36:41PM 25  Javi and Yankee were packaging drugs and Pepe was selling

```
         1  drugs on Leo Street when a message was relayed to Javi about
         2  him selling drugs, correct?
         3  A.    Correct.
         4  Q.    Was that a true statement?
04:36:54PM 5  A.    Yes.
         6  Q.    During this gathering Javi looked at Yankee and said he
         7  had to deal with it.  Do you recall saying that?
         8  A.    Correct.
         9  Q.    And was that true?
04:37:06PM10  A.    Yes.
        11  Q.    You also indicated during this September 23rd, 2020
        12  proffer that Obed Torres and you spent a few weeks looking for
        13  Pepe on the block.  Do you recall saying that?
        14  A.    Yes, I recall saying that.
04:37:20PM15  Q.    Was that true?
        16  A.    Yes.
        17  Q.    You also talked about the Gonzalez shooting with the
        18  Government on September 23rd, 2020.  Do you recall that?
        19  A.    Yes.
04:37:31PM20  Q.    And in that statement you -- to the Government on
        21  September 23rd, 2020, you told them you volunteered that you
        22  would kill Paulo, correct?
        23  A.    Can you repeat that question again?
        24  Q.    When you talked to the Government --
04:37:48PM25  A.    Mm-hmm.
```

1   Q.    -- on September 23rd, 2020, isn't it true that you

2   indicated to the law enforcement, to the Government, that you

3   had volunteered to kill Paulo?

4   A.    Yes.

04:38:00PM 5   Q.    And that wasn't what you said on September 9th, 2020; is

6   that right?

7   A.    Correct.

8   Q.    And Mr. Torres or Pistolita did not tell you that you and

9   Paulo needed to die; is that right?

04:38:16PM 10   A.    Correct.

11   Q.    And that's what you told the Government on September 9th,

12   2020, correct?

13   A.    Correct.

14   Q.    You also said on September 23rd, 2020, that a couple weeks

04:38:31PM 15   after returning the gun to Javi you went back to Rochester to

16   acquire drugs.  Do you recall saying that?

17   A.    Correct.

18   Q.    And that was not true, correct?

19   A.    That was true.

04:38:41PM 20   Q.    I'm sorry?

21   A.    That was true.

22   Q.    Okay. Well, didn't you testify earlier that after you gave

23   the gun to Javi that you went to Pennsylvania?

24   A.    Yes, I went to Pennsylvania.

04:38:53PM 25   Q.    And when you went to Pennsylvania you didn't come back to

1  Rochester, did you?

2  A.   I didn't come back to Rochester after a year later.

3  Q.   I'm sorry?

4  A.   After a year later.

04:39:02PM 5  Q.   Sir, during the course of your drug activity did Yankee

6  provide a ledger for you?

7  A.   A ledger for me?

8  Q.   Yes.

9  A.   No.  He had a ledger for the whole organization.

04:39:27PM 10  Q.   He would complete a drug ledger?

11  A.   Yes.

12  Q.   And he would write down everything, correct?

13  A.   Yes.

14  Q.   And it's your testimony that Obed had keys to all the

04:39:37PM 15  apartments, correct?

16  A.   Correct.

17  Q.   And the guns were at East Main Street?

18  A.   Correct.

19  Q.   Did you ever meet with Robert Figueroa in Buffalo?

04:39:48PM 20  A.   No.

21  Q.   Now, you have referred to the defendant as Pistolita,

22  correct?

23  A.   Correct.

24  Q.   And -- and you had been in his presence with other people,

04:40:04PM 25  correct?  On Burbank Street?

```
 1  A.   I can't hear you.
 2  Q.   When you were on Burbank Street and Pistolita resided on
 3  Burbank Street, correct?
 4  A.   Right.
 5  Q.   You were aware he had a lease with his girlfriend there?
 6  A.   He had a lease with his girlfriend?
 7  Q.   Yes.
 8  A.   No, I didn't know that.
 9  Q.   How did other people that associated with him refer to him
10  as?  What did they call him?
11  A.   Pistolita, P, or Barboo.
12  Q.   Was Pistolita known as Pepe?
13  A.   No.
14  Q.   I'm sorry?
15  A.   No.
16  Q.   And did other people that associated with you on Burbank
17  call him Pepe?
18  A.   No.
19  Q.   Who brought Paulo to Buffalo?
20  A.   Javier and Nishayra Gutieriez.
21  Q.   And you testified that prior to the shooting in Buffalo
22  you went to Xavier's father house.  Do you recall that?
23  A.   Prior to the shooting?
24  Q.   Yes.
25  A.   Before the shooting you mean?
```

```
 1   Q.   Right .

 2   A.   Yes.

 3   Q.   What is the father's name?

 4   A.   I don't know his father's name.

 5   Q.   Do you know whether he was renting or owned the property

 6   on Prospect?

 7   A.   No, I don't know that information.

 8   Q.   How often had you seen him prior to that incident?

 9   A.   Who?  His father?

10   Q.   Yes.

11   A.   Couple times.

12   Q.   Okay. Do you know whether Pistolita was close with his

13   father?

14   A.   He was close with him.

15   Q.   How often did you see them together?

16   A.   When I arrived, came over there to see him.

17   Q.   You talked about the incident in Osbourne Alley that you

18   had initially shot once and missed, correct?

19   A.   Correct.

20   Q.   And Gonzalez had turned around and said "I knew it was

21   going to happen"?

22   A.   Yes.

23   Q.   And you said "I'm sorry," correct?

24   A.   Correct.

25   Q.   And then you continued to shoot him and then you left the
```

1   area?

2   A.   Correct.

3   Q.   And there was nothing else said by either one of you,

4   correct?

04:42:26PM 5   A.   Correct.

6   Q.   Now, your testimony is that -- let me make sure I

7   understand the timing correct.  You're aware that Pistolita

8   left Rochester to go to Buffalo, correct?

9           **MR. MARANGOLA:** Objection, Judge, to the time he's

04:42:49PM 10   talking about.

11          **THE COURT:** Sustained.

12  **BY MR. VERRILLO:**

13  Q.   In early 2016 -- in early 2016, isn't it true that

14  Pistolita was living in Buffalo?

04:43:00PM 15  A.   Yeah, he was living in Buffalo -- in 2016?

16  Q.   Yes.

17  A.   I don't know that.

18  Q.   I thought you were -- you were aware where he was living

19  between Buffalo and Rochester?

04:43:10PM 20  A.   He was back and forth from Buffalo and Rochester.

21  Q.   You spoke to him at some time regarding your -- Javi's

22  statement he wanted to kill Pistolita, correct?

23  A.   Correct.

24  Q.   And when did you tell him that?

04:43:25PM 25  A.   I don't recall when I told him that.  I know it was back

1   and forth, me and him were back and forth from Rochester and

2   Buffalo.

3   Q.   But that was -- that was months before the Gonzalez

4   shooting, right?

04:43:36PM 5   A.   That was what?

6   Q.   Months before the Gonzalez shooting.

7   A.   I don't recall the timeframe on that, sir.

8   Q.   Okay. Well, do you recall whether it was in 2016?

9   A.   No, I don't.  Like I said, I don't recall the timeframe,

04:43:49PM 10   sir.

11   Q.   Well, you recall that -- let me revise that.

12          You became aware that Javi wanted to kill

13   Pistolita, correct?

14   A.   Yeah, I recall the event of Javi wanting to kill him.

04:44:07PM 15   Q.   Okay. And how did you become aware of that intention?

16   A.   Because he asked me to kill him.

17   Q.   Okay. And all that occurred before the shooting of

18   Gonzalez, correct?

19   A.   Like I said, sir, I don't recall the timeframe.

04:44:26PM 20   Q.   Okay. Well, did you speak to or have any contact with

21   Pistolita in Buffalo after June of 2016?

22   A.   Yeah, we stayed in contact before I got arrested, before I

23   got picked up on this indictment.

24   Q.   Okay. And then you indicated that after -- after you -- at

04:44:54PM 25   some point you told Pistolita about Javi wanting to kill him,

1  correct?

2  A.    Correct.

3  Q.    And after you told him that, it's your testimony that

4  Pistolita told you that Javi wanted Gonzalez to be killed,

04:45:05PM 5  correct?

6  A.    I can't hear you, sir.

7  Q.    Okay. I want to make sure I have your testimony correct,

8  that's why I'm asking you.  In your direct testimony wasn't it

9  your testimony that you had told Pistolita that Javi wanted

04:45:36PM 10  him killed, correct?

11  A.    Correct.

12  Q.    And that after that conversation occurred, Pistolita let

13  you know that Javi wanted Gonzalez killed?

14  A.    I'm not 100% sure on that, sir.

04:45:51PM 15  Q.    Okay.  Is it your testimony that the relationship between

16  Pistolita and Javi was rocky in 2016?

17  A.    Yes.

18  Q.    Okay. And you testified in your direct that Paulo lived

19  with you for a period of time in Buffalo, correct?

04:46:24PM 20  A.    Correct.

21  Q.    And he told you that he had heard nothing about the Leo

22  Street investigation?

23  A.    We never talked about the Leo Street investigation.

24          **THE COURT:** We're going to have to stop here.  This

04:46:45PM 25  has gone longer than anybody expected.  We're going to adjourn

1  this until next week.  Put the matter on for March 23rd,

2  3 p.m. for continuation of the hearing.

3            **MR. VERRILLO:** Your Honor, if I could have one

4  moment?  That would be Wednesday?

04:47:04PM 5            **THE COURT:** Wednesday.

6            **MR. VERRILLO:** Judge, I have a sentencing at

7  3 o'clock so...

8            **THE COURT:** What time?

9            **MR. VERRILLO:** 3 o'clock with -- I'm trying to

04:47:23PM 10  remember who I've got here -- with Judge Larimer.  It's a

11  virtual sentencing, but I do have that obligation.

12            **THE COURT:** How much longer are you going to be?

13            **MR. VERRILLO:** Let's see, I think I'm probably --

14  about half hour, 40 minutes or so.

04:47:50PM 15            **THE COURT:** Put it on for 1 p.m., March 23rd,

16  Wednesday, March 23rd, 1 p.m. for continuation of the hearing.

17  Thank you.

18            **MR. MARANGOLA:** Thank you.

19            (**WHEREUPON**, proceedings adjourned at 4:48 p.m.)

20                         *   *   *

21

22

23

24

25

1                        **CERTIFICATE OF REPORTER**

2

3              In accordance with 28, U.S.C., 753(b), I certify that

4    these original notes are a true and correct record of

5    proceedings in the United States District Court for the

6    Western District of New York before the Honorable Frank P.

7    Geraci, Jr. on March 16th, 2022.

8

9    S/ Christi A. Macri

10   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25