1                    UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF NEW YORK

3

4

5    - - - - - - - - - - - - -X
     UNITED STATES OF AMERICA            18-CR-6094(G)
6
     vs.
7                                        Rochester, New York
     XAVIER TORRES,                      March 24, 2022
8              Defendant.                10:07 a.m.
     - - - - - - - - - - - - -X
9

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE FRANK P. GERACI, JR.
11                 UNITED STATES DISTRICT JUDGE

12
                     JAMES P. KENNEDY, JR., ESQ.
13                   United States Attorney
                     BY: ROBERT A. MARANGOLA, ESQ.
14                       CASSIE M. KOCHER, ESQ.
                     Assistant United States Attorneys
15                   500 Federal Building
                     Rochester, New York 14614
16                   Appearing on behalf of the United States

17
                     MAURICE J. VERRILLO, ESQ.
18                   3300 Monroe Avenue
                     Suite 301
19                   Rochester, New York 14618
                     Appearing on behalf of the Defendant
20

21

22

23   COURT REPORTER:     Christi A. Macri, FAPR-RMR-CRR-CSR(NY/CA)
                         Christimacri50@gmail.com
24                       Kenneth B. Keating Federal Building
                         100 State Street, Room 2640
25                       Rochester, New York 14614

1                          **I N D E X**

2

3      **WITNESS FOR THE GOVERNMENT**

Victor Nunez

4           Cross-examination by Mr. Verrillo          Page  7
            Redirect examination by Mr. Marangola      Page 24

5

6

7

| EXHIBIT | RECEIVED |
|---------|----------|

8

| Defendant 116 | 23 |
| Defendant 117 | 23 |
| Government 1-7 | 29 |
| Government 9-10 | 29 |
| Government 15 | 29 |
| Government 17 | 29 |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**P R O C E E D I N G S**</u>

\*     \*     \*

**(WHEREUPON**, the defendant is present).

**THE COURT:** Good morning.  This matter's on for
continuation of a hearing.

Are you Xavier Torres?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Mr. Verrillo, do you want to be heard
first?

**MR. VERRILLO:** Judge, I did want to raise a few
issues.  We did have some testimony from Mr. Nunez last week,
and I would like to renew my request for mental health
records, records for Mr. Nunez.

He did testify to having an incident involving a
minibike or motorcycle as a result of which he had
hallucinations.

He's been treated at various facilities for mental
health issues.  I think there's issues related to his
testimony and recall, so I want to renew my motion that the
Court allow subpoenas to be issued related to that issue of
mental health and consider that as a part of this hearing.

**THE COURT:** Mr. Marangola?

**MR. MARANGOLA:** Judge, the only thing additional
I'll respond indicating is that I think Mr. Nunez indicated he
saw a mental health counselor.  I think he's indicated they

1   were to discuss -- that those conversations centered around

2   his discussing his future goals.  So I have nothing further to

3   add to my initial response on it.

4          **THE COURT:**  Okay.  I think the initial objection was

10:09:12AM 5   based upon it being speculation, a fishing expedition.

6          At this point based upon the testimony that's been

7   received, I'll grant the application for an in camera

8   inspection of those records.  They will not be released to the

9   defense until the Court determines that they are relevant.

10:09:29AM 10          I don't know what more, quite frankly, you can

11   learn from those records, but --

12          **MR. VERRILLO:**  Yes.  Judge, I also had asked to be

13   able to examine Investigator Briganti related to Mr. Nunez and

14   his discussions with him, and also related to this

10:09:44AM 15   investigation related to this Prospect Street, et cetera.  So

16   I want to renew that request as well.

17          **THE COURT:**  Do you want to call him as a witness?

18          **MR. VERRILLO:**  Yes.

19          **THE COURT:**  Mr. Marangola?

10:09:54AM 20          **MR. MARANGOLA:**  Judge, well, Mr. Briganti -- Mr.

21   Verrillo has cross-examined the witness about statements he

22   made.  So at this point I'm not sure what calling Investigator

23   Briganti to testify about, what the purpose of that would be.

24          He hasn't denied making the statements, and he's

10:10:15AM 25   been -- to the extent that there has been any inconsistency

1   with testimony and prior notes, the witness has -- the witness

2   has admitted making them.

3            THE COURT:  What are you going to accomplish?

4            MR. VERRILLO:  Judge, the other issue I wrote to you

10:10:29AM 5   yesterday about related to this claim that my client's dad was

6   at the residence shortly before the shooting, Mr. Luis --

7            THE COURT:  That has nothing to do with

8   Investigator Briganti.

9            MR. VERRILLO:  It does relate to their investigation

10:10:42AM 10   to who lived there.  I assume they investigated who lived

11   there.

12            THE COURT:  I'm going to deny the application for

13   Investigator Briganti.

14            Now you're requesting also another witness?

10:10:53AM 15            MR. VERRILLO:  Yes, Judge.

16            THE COURT:  Luis Rosario?

17            MR. VERRILLO:  My client's father.  Mr. Nunez

18   testified that my client's father was present shortly before

19   the shooting, was at the residence -- at a residence there on

10:11:06AM 20   Prospect Street, was using oxygen tanks, et cetera.

21            I've talked to Mr. Rosario, talked to his

22   girlfriend, and he has lived at Mariner Tower in Buffalo for

23   11 years or so, which would have covered this time period.

24            He didn't reside there, he didn't have any contact

10:11:26AM 25   with Mr. Nunez, and would be a witness to rebut or contest

1  these claims as relates to his presence being there shortly

2  before the shooting.

3          So I want -- it's going to be relatively brief

4  questioning, but I would like to be able to question him.  He

10:11:42AM 5  is a Spanish speaking individual, so he would need an

6  interpreter, and that would be my request.

7          **THE COURT:** This voucher is getting large and larger

8  every day, I'll tell you.

9          All right, I'll allow you to call Mr. Rosario.

10:11:56AM 10         **MR. VERRILLO:** The other request, Judge, is he's in

11  Buffalo.  I don't know if we can --

12         **THE COURT:** Put him on a bus.

13         **MR. VERRILLO:** So we would have to have a date to

14  get him here, okay.

10:12:18AM 15        **THE COURT:** He's going to be short?

16        **MR. VERRILLO:** Yes, I would say so, yes.

17        **THE COURT:** You're going to make sure it is.  March

18  31st, 11 a.m. for continuation of the hearing.

19        **MR. VERRILLO:** I'm sorry, Judge, what time?

10:12:28AM 20        **THE COURT:** 11 a.m.

21        **MR. VERRILLO:** March 31st, okay.  March 31st, 11

22  a.m., okay.

23        **THE COURT:** Thank you.  Ready to proceed?

24        **MR. MARANGOLA:** Yes, Your Honor.

10:12:47AM 25        **MR. VERRILLO:** Yes, Judge.

1            **THE COURT:** We were in cross of the witness the last

2  time we were here.

3            **MR. MARANGOLA:** It was, Judge.

4            **THE COURT:**  You will need an interpreter for --

10:13:30AM 5            **MR. VERRILLO:**  Yes, Judge, I will need one for

6  Mr. Rosario.

7            **THE CLERK:** Maurice, how do you spell his last name,

8  Rosario?

9            **MR. VERRILLO:** L-U-I-S, Luis, Rosario,

10:13:40AM10  R-O-S-A-R-I-O.

11            **THE CLERK:** Okay, I'll get an interpreter.

12            **MR. VERRILLO:** Thank you very much.

13            <u>**GOVERNMENT'S WITNESS, VICTOR NUNEZ, SWORN**</u>

14                    <u>**CROSS-EXAMINATION**</u>

10:14:58AM15            **THE CLERK:** Please state your name and spell your

16  last name for the record.

17            **THE WITNESS:** Victor Nunez, N-U-N-E-Z.

18            **THE REPORTER:**  Thank you.

19            **THE WITNESS:** 28 years old.

10:18:51AM20            **THE COURT:** You may proceed.

21  **BY MR. VERRILLO:**

22  Q.   Mr. Nunez, can you hear me okay?

23  A.   Yeah, I can hear you.

24  Q.   Okay.  When you testified last week you had indicated that

10:19:10AM25  you had met at Pistolita's father's house at 299 Prospect

1  Street prior to the shooting of Paulo?

2  A.   Yes, sir.

3  Q.   And during the time that you were at Pistolita's father's

4  house, you testified that Paulo had to leave because he cannot

10:19:28AM 5  smoke in the father's residence, correct?

6  A.   Correct.

7  Q.   And when you were at the residence you saw a number of

8  oxygen tanks at the home?

9  A.   Yeah.

10:19:36AM 10  Q.   And when you were at the residence you saw the father

11  using an oxygen tank, correct?

12  A.   Yes.

13  Q.   Now, with respect to the shooting of Paulo, did that occur

14  on the same day that you were at the father's residence?

10:19:57AM 15  A.   Yes.

16  Q.   And you indicated that afterwards you took the gun back to

17  Javi, correct?

18  A.   Correct.

19  Q.   How long after the shooting did you take the gun back to

10:20:07AM 20  Javi?

21  A.   The next day.

22  Q.   And you had your girlfriend drive you to Javi's apartment,

23  correct?

24  A.   I had her drove me to the brick building on 699 Main

10:20:21AM 25  Street.

1  Q.   Okay.  And what is the name of your girlfriend?

2  A.   Kitayne Tharp.

3  Q.   You were present with the girlfriend because you were in

4  fear of being killed by Javi, correct?

10:20:42AM 5  A.   Yes.

6  Q.   And after that meeting you had traveled to Pennsylvania,

7  correct?

8  A.   Yes.

9  Q.   And you testified last week that you went back to buy

10:20:56AM 10  drugs from Javi a few weeks later, correct?

11  A.   I went back a couple months later.

12  Q.   Okay, a couple months later.  Do you recall testifying

13  before the grand jury on September 10th, 2020?

14  A.   September 10th, 2020?

10:21:12AM 15  Q.   Yes.

16  A.   I don't recall the date, but I remember testifying against

17  the grand jury.

18          THE COURT: Can you speak up a little?  It's hard to

19  hear you.  Pull the microphone closer.  Thank you.

10:21:23AM 20          THE WITNESS: Can you hear me now?

21          THE COURT: Better.

22  BY MR. VERRILLO:

23  Q.   Sir, do you recall testifying before the grand jury,

24  correct?

10:21:32AM 25  A.   Yes, sir.

```
 1   Q.   And do you remember being asked a series of questions
 2   about the Paulo shooting and what you did after the shooting
 3   at the grand jury?
 4   A.   Yes, sir.
 5   Q.   And did you take an oath like you took an oath here to
 6   tell the truth?
 7   A.   Yes, sir.
 8   Q.   And did you testify truthfully at the grand jury?
 9   A.   No, sir.
10   Q.   I'm sorry?
11   A.   No, sir.
12   Q.   You did not testify truthfully before the grand jury?
13   A.   No, sir.
14   Q.   Why do you say that?
15   A.   Because there are things I left out.
16   Q.   Okay. And you'll recall that before you discussed what
17   happened, you were reminded that you were obligated to provide
18   the complete truth as a part of your cooperation with the
19   Government, correct?
20   A.   Correct.
21   Q.   Now, I'm showing you what is marked as Exhibit 100 and I'd
22   ask you -- I'll show this to you.  I'd like to show the
23   witness Exhibit 100, beginning with page 71.
24        Are you able to see that?
25   A.   No.
```

1        **THE CLERK:** I don't have you up here.  Hold on one

2 second.  I don't have you hooked up, Maurice.

3        **MR. VERRILLO:**  Judge, I have the transcript as

4 well.  However you want me to proceed.

10:23:54AM 5        **THE LAW CLERK:** It appears to be hooked up correct

6 to me.

7        **THE COURT:**  Can you move on to a different line of

8 questions and get back to this?

9        **MR. VERRILLO:** You want me to go to a different

10:24:28AM 10 area?  Okay.

11 **BY MR. VERRILLO:**

12 Q.   Sir, you sold and bagged drugs for Javi?

13 A.   Yes, sir.

14 Q.   I'm sorry?

10:24:35AM 15 A.   Yes, sir.

16 Q.   Did Javi want baggers to have a drug addiction?

17 A.   Say that again.

18 Q.   Were the baggers that Javi had, were they allowed to have

19 a drug addiction or use drugs?

10:24:49AM 20 A.   No.

21 Q.   Why is that?

22 A.   Because it was against the rules.

23 Q.   Were you piss tested?

24 A.   They attempted to piss test me.  Javi attempted to piss

10:25:07AM 25 test me.

1   Q.    Why was that?

2   A.    Because I was using.

3   Q.    Did Pistolita use drugs?

4   A.    Yes.

10:25:16AM 5   Q.    How often did he use drugs?

6   A.    I don't know that.  I wasn't with him every time he used

7   drugs.

8   Q.    Okay.  Do you know what -- whether he used heroin?

9   A.    Yes.

10:25:26AM 10   Q.    And do you know whether other people on Burbank Street

11   were aware he was using drugs?

12              **MR. MARANGOLA:** Objection, form, other people were

13   aware.

14              **THE COURT:** Sustained.

10:25:39AM 15   **BY MR. VERRILLO:**

16   Q.    Okay.  Do you know whether Javi knew that Pistolita used

17   drugs?

18   A.    Yes.

19   Q.    Okay. Okay.  Since June of 2019, how many times have you

10:25:58AM 20   met with the Government?

21   A.    I don't know how many times I met with the Government, but

22   I met with them quite -- a couple times.

23   Q.    Do you have an estimate of how many times?

24   A.    Probably more than ten.

10:26:09AM 25   Q.    Had you met with them regarding -- strike that.

```
 1            Had you met with them with regard to the trial of
 2  Carlos Figueroa?
 3  A.   Had I met with them for the trial of Carlos Figueroa?
 4  Q.   Yes.
10:26:35AM 5  A.   No.
 6  Q.   Okay. And how many times have you met with them regarding
 7  your testimony here today?
 8  A.   A couple times.
 9  Q.   Okay. And what time period would that have been?
10:26:49AM 10  A.   Like I said, sir, I don't recall the time period on that.
11  Q.   Now, Mr. Nunez, you were aware that you were required to
12  be completely truthful in all dealings with the Government,
13  correct?
14  A.   Correct.
10:27:28AM 15  Q.   And you knew that when you did your first proffer in
16  December of 2019?
17  A.   Correct.
18  Q.   And you entered a plea of guilty to conspiracy to possess
19  with intent to distribute and distribute 5 kilos or more of
10:27:43AM 20  cocaine, and one kilo or more of heroin, correct?
21  A.   Correct.
22  Q.   And you have a sentencing range of 292 to 365 months,
23  correct?
24  A.   Correct.
10:27:53AM 25  Q.   And what sentence are you seeking from the judge?
```

1  A.   What do you mean what sentence am I seeking from the

2  judge?

3  Q.   Do you know what you're requesting of the judge as it

4  relates to a sentence?

10:28:04AM 5  A.   It's gonna be up to the judge to give me whatever time he

6  wants to give me.

7         **MR. VERRILLO:**  Judge, do you want me to continue?

8  I know they're working on the IT stuff.  Do you want me to

9  continue or --

10:28:27AM 10         **THE COURT:** Yes, if you would.  Yes, go ahead.

11         **MR. VERRILLO:** Okay.

12  **BY MR. VERRILLO:**

13  Q.   All right.  Mr. Nunez, what names have you been known by?

14  A.   Tuco, Tornado and Vic.

10:28:47AM 15  Q.   Have you ever been known by the name Carl?

16  A.   No.

17  Q.   Do you recall being charged with false impersonation in

18  the Buffalo City Court in 2013?

19  A.   Yes.

10:29:04AM 20  Q.   And did you plead guilty to that charge?

21  A.   Yes, I did.

22  Q.   And why were you charged with false impersonation?

23         **MR. MARANGOLA:** Objection, Judge, form.  And we

24  covered this last week.

10:29:16AM 25         **MR. VERRILLO:** I haven't discussed that.

1        **MR. MARANGOLA:** That he had a conviction for false

2 impersonation.

3        **MR. VERRILLO:** That wasn't covered.

4        **THE COURT:** Go ahead, overruled.

10:29:28AM 5 **BY MR. VERRILLO:**

6 Q.   Okay.

7 A.   Yeah, I pleaded guilty to it.

8 Q.   Were you stopped by law enforcement and they asked you

9 what your name was?

10:29:40AM 10 A.   Yes.  And I gave them a different name.

11 Q.   And you told them your name was Carl?

12 A.   No.

13 Q.   What name did you tell them?

14 A.   I gave them my brother's name.

10:29:47AM 15 Q.   What name is that?

16 A.   Jonathan Nunez.

17        **MR. VERRILLO:** Is it published now, Your Honor?  Is

18 everything up?

19        **THE COURT:** I don't know.

10:30:09AM 20        **MR. VERRILLO:** I'm asking --

21        **THE COURT:** There you go.

22 **BY MR. VERRILLO:**

23 Q.   Okay.  I'd like to go back to my questions about your

24 testimony, sir, at the grand jury.  And I'm showing you what

10:30:19AM 25 is marked as Exhibit 100.  I want to refer to page 71.

1    Do you see this section beginning with question

2  okay?

3  A.   Mm-hmm, yes, sir.

4        **THE COURT:** Go ahead, line 19.

10:30:39AM 5  **BY MR. VERRILLO:**

6  Q.   Line 19 on page 71.  Ask you to read it to yourself.  I'm

7  going to go down to the next page once you're ready.

8  A.   Okay.

9  Q.   Next page is page 72.  I'm just going to ask you to read

10:31:08AM 10  the remainder of that answer, which is page 72, lines 1 to 8.

11  Do you see that?

12  A.   1 to 8 you said?

13  Q.   Yes, sir.

14  A.   Okay.  Okay.

10:31:40AM 15  Q.   Okay. Now, the question and answer relate to when you met

16  with Javi and returned the gun and what happened after,

17  correct?

18  A.   Mm-hmm.

19  Q.   And with respect to your answer, referring to line 4, page

10:31:54AM 20  72, you testified the people that was in that room when I saw

21  that was Robert, Yankee, Flaca, Javier's wife and Javi.  So

22  after I said what I said, I left out of there quick, ran down

23  the stairs, got in the car and after that I went straight

24  directly to Pennsylvania and never saw that again.

10:32:15AM 25    Did I accurately read your response?

1  A.   Never saw them again, yes.

2  Q.   Was that true?

3  A.   No.

4  Q.   So you lied to the grand jury, correct?

10:32:23AM 5  A.   Correct.

6  Q.   And how was that not true?

7  A.   Because I did come back and saw Javi again.

8  Q.   Okay. You lied to the grand jury even after the Government

9  earlier told you that you were required to give the complete

10:32:42AM10  truth as a part of your cooperation, correct?

11  A.   Correct.

12  Q.   You testified earlier that you lied multiple times to the

13  grand jury, right?

14  A.   Yeah, I lied about a couple things.  I lied about a couple

10:32:57AM15  things.

16  Q.   Okay. So your testimony is that the period of time after

17  you had dropped the gun off and went to Pennsylvania, that you

18  came back to buy drugs from Javi, correct?

19  A.   Yeah.

10:33:17AM20  Q.   And that was the case even after he threatened to kill you

21  or you thought he was going to kill you, right?

22  A.   Right.

23  Q.   Okay. All right.  Now, sir, there was a period of time

24  that you resided with Pistolita at the Livingston County Jail,

10:33:33AM25  correct?

1    A.    Mm-hmm.

2    Q.    Is that yes?

3    A.    Yes.  Yes.  Sorry.

4    Q.    And you were in Cell No. 34?

10:33:45AM 5    A.    I don't recall what cell I was in.

6    Q.    Okay. But you were within two cells of each other,

7    correct?

8    A.    I don't recall how many cells I was from him, but I recall

9    being there with him.

10:33:57AM10    Q.    Okay. And Obed Torres was in your pod as well, right?

11    A.    Yes.

12    Q.    And did you talk on a daily basis to Pistolita?

13    A.    Yes, talked to both him and Obed.

14    Q.    And during the course of your time there at the Livingston

10:34:11AM15    County Jail, did you tell Pistolita that you were very

16    distressed about your case?

17    A.    Yes.

18    Q.    And did you cry on a daily basis?

19    A.    No, I didn't cry on a daily basis, but I told him about my

10:34:23AM20    case.  I was stressed out about it.

21    Q.    You were upset that your son was in Pennsylvania and you

22    were not able to see him, correct?

23    A.    Yeah.

24    Q.    And in November or December of 2019, you had discussed

10:34:38AM25    this case with Pistolita, correct?

1  A.   Yes.

2  Q.   And you had asked him to make a statement on your behalf?

3  A.   I asked him to make a statement?

4  Q.   Yes, sir.

10:34:49AM 5  A.   No.

6  Q.   Now, during the course of the time period October to

7  November of 2019, were you aware that Obed had gone to court

8  on his case?

9  A.   Can you repeat that again for me?

10:35:01AM 10  Q.   Did Obed tell you he had gone to court in October or

11  November of 2019?

12  A.   Obed didn't tell nobody he went to court.  He just went to

13  court.

14  Q.   Okay. Did you discuss with him what happened in court?

10:35:14AM 15  A.   No.

16  Q.   Did you discuss Leo Street with Pistolita?

17  A.   Yes.

18  Q.   And did you ask him to make a statement to law enforcement

19  that Obed and Tacon were involved in the killing on Leo

10:35:33AM 20  Street?

21  A.   No.

22  Q.   Did you ask him to make a statement that Robert and Obed

23  killed Paulo?

24  A.   No.

10:35:40AM 25  Q.   Did you tell Pistolita that you did not want to be held

1  responsible for any of the shootings?

2  A.   Yes.

3  Q.   You told him that more than one time, correct?

4  A.   No.  I told him one time.

10:35:53AM 5  Q.   And you were trying to find a way to get out of the

6  shootings, right?

7  A.   Right, which he came up with an idea for me to put the

8  shootings on him.

9  Q.   But, sir, the Leo Street shooting --

10:36:11AM 10  A.   Has nothing to do with him, sir.

11  Q.   Correct.

12  A.   Right.  Which is -- which is why he told me to put it on

13  him because he would end up beating it if he went to trial for

14  it.

10:36:24AM 15  Q.   Sir, isn't it true that after you had this discussion with

16  Pistolita, that he told you he wasn't going to lie for you?

17          Do you recall that testimony?

18  A.   No.

19  Q.   Talking to you?

10:36:36AM 20  A.   No.

21  Q.   Now, after you had this conversation with Pistolita,

22  within a few days of that you requested to be moved to another

23  pod in the Livingston County Jail, correct?

24  A.   Correct.

10:36:50AM 25  Q.   And then you had no further communication with him --

1   A.    Correct.

2   Q.    -- at the Livingston County Jail, correct?

3   A.    Correct, no physical communication with him.

4   Q.    Okay. And during this conversation that you had with

10:37:06AM 5   Pistolita at the Livingston County Jail, did you remind him

6   that you did not kill him as requested by Javi?

7   A.    Yeah.

8   Q.    And did you tell him that he owed you because you did not

9   kill him?

10:37:19AM 10   A.    No.

11   Q.    Sir, you met Pistolita in 2013 at the Erie County Jail

12   bullpen; isn't that right?

13   A.    We were on our way to the Erie County bullpen.

14   Q.    Okay. That was in 2013?

10:37:39AM 15   A.    I don't recall what year it was.

16   Q.    And at some point you got out of the Erie County Jail?

17   A.    Yes.

18   Q.    And did he help you with food and a place to stay after

19   you got out of the Erie County Jail?

10:37:49AM 20   A.    Yes, after I was properly introduced to him.

21   Q.    Okay. And you lived with him for a period of time in 2015

22   on Burbank Street, correct?

23   A.    Yes.

24   Q.    And he helped you with food and a place to stay there,

10:38:07AM 25   right?

1  A.    Javi did.

2  Q.    You had a conversation with Javi some time in early 2016

3  and you agreed to kill Pistolita, correct?

4  A.    Yes.

10:38:21AM 5  Q.    And that was the same person that helped you previously,

6  correct?

7  A.    What you mean?

8  Q.    He helped you with food --

9  A.    Yes.

10:38:35AM 10  Q.    -- correct?  He helped you with a place to stay, correct?

11  A.    Correct.

12  Q.    And you had agreed with Javi to kill Pistolita, correct?

13  A.    Correct.

14  Q.    Okay. We can go back -- sorry, I got to go back to this.

10:39:01AM 15  Sir, I'm going to show you what is marked as Exhibit 116 and

16  ask you if you're familiar with this?

17              Are you familiar with this?

18  A.    It's immunity from the State.

19  Q.    That's a letter from the Monroe County District Attorney?

10:39:46AM 20  A.    Yes.

21  Q.    Okay. And that relates to this case, correct?

22  A.    Yes.

23  Q.    All right.

24              MR. VERRILLO: I would offer Exhibit 116.

10:39:54AM 25              MR. MARANGOLA: No objection, Judge.

1          **THE COURT:** Exhibit 116 will be received.

2          (**WHEREUPON**, Defendant Exhibit 116 was received into

3  evidence).

4  **BY MR. VERRILLO:**

10:40:04AM 5  Q.   Sir, I'm also going to show you what is marked as

6  Exhibit 117.  Are you familiar with this exhibit?

7  A.   Yes.

8  Q.   What is this exhibit?

9  A.   It's the same as the one from Monroe County, immunity from

10:40:21AM 10  the State.

11  Q.   And that's from Erie County District Attorney, correct?

12  A.   Correct.

13  Q.   That relates to this case, correct?

14  A.   Correct.

10:40:30AM 15          **MR. VERRILLO:** Your Honor, I offer Exhibit 117.

16          **MR. MARANGOLA:** No objection, Judge.

17          **THE COURT:** Exhibit 117 will be received.

18          (**WHEREUPON**, Defendant Exhibit 117 was received into

19  evidence).

10:40:42AM 20  **BY MR. VERRILLO:**

21  Q.   Sir, you had seen Pistolita prior to court last week; is

22  that right?  In the bullpen?

23  A.   Yeah.

24  Q.   And did you say to him -- did you say something to him

10:40:58AM 25  when he was back there?

1  A.   Say he was wrong.

2  Q.   Did you tell him why did he do you wrong?

3  A.   I said he's wrong.

4  Q.   Okay.

10:41:08AM 5  A.   That's what I said.

6  Q.   All right.

7            **MR. VERRILLO:** I have nothing further.  Thank you.

8                   <u>**REDIRECT EXAMINATION**</u>

9  **BY MR. MARANGOLA:**

10:41:29AM 10  Q.   Mr. Nunez, when you testified before, you testified that

11  the defendant delivered a punishment to you because Javi

12  caught you using heroin?

13  A.   Yes.

14  Q.   Can you tell the Court what that punishment that the

10:41:44AM 15  defendant delivered to you was?

16  A.   He beat me up in front of everybody on Burbank Street.

17  Q.   All right.  Mr. Verrillo asked you questions about the

18  defendant's father?

19  A.   Correct.

10:42:02AM 20  Q.   Do you know what the defendant's father's name is?

21  A.   No.

22  Q.   Do you know the person that Mr. Verrillo is referring to

23  as the defendant's father when he says it?

24  A.   Yes.

10:42:13AM 25  Q.   How do you know that the person he's referring to is the

1  same person you think is the defendant's father?

2  A.   Because of the oxygen machines.

3  Q.   Pardon?

4  A.   The oxygen machines, and recalling the night before -- I

10:42:26AM 5  mean, the night that the murder occurred.

6  Q.   All right.  When did you meet the defendant's father?

7  A.   When we was hanging out in Buffalo, went there a couple

8  times with him to just get drugs from him and stuff like that.

9  Q.   Drugs from who?

10:42:46AM10  A.   From Pistolita.

11  Q.   Okay. So you don't know the father's name?

12  A.   No, sir.

13  Q.   And Mr. Verrillo showed you a part of the grand jury

14  testimony today?

10:43:03AM15  A.   Correct.

16  Q.   And when you said the statement that you said was a lie,

17  in there was the part that you said you never saw them again?

18  A.   Right.

19  Q.   Now, earlier in that testimony you had referred to several

10:43:16AM20  people, correct?

21  A.   Yes.

22  Q.   When you came back to buy drugs months after that incident

23  where you returned the gun, did you see all of those people?

24  A.   No.

10:43:26AM25  Q.   You just saw Javi?

```
 1  A.    Javi and Yankee.

 2  Q.    Javi and Yankee?

 3  A.    Yes, sir.

 4  Q.    Okay. And, finally, I wasn't clear from the testimony, but

 5  did you meet the defendant in jail or did you meet him on the

 6  street buying drugs?

 7  A.    I met him on the way to jail, but I didn't know him

 8  personally or even have a conversation with him.  I met him

 9  personally and built the relationship on the streets.

10  Q.    So when you -- when did you -- is that different than when

11  you met him to buy drugs from him?

12  A.    Yes.

13  Q.    Tell us what the difference is.

14  A.    Difference is I didn't know him at all.  I just met him on

15  the bus and he was Pistolita and that's it.  Never exchanged

16  words or never said we were gonna meet or anything like that.

17          When I got properly introduced by my cousin and a

18  friend of mines, that's when we started to exchange money and

19  buy drugs.

20  Q.    And when you say the proper introduction, that occurred

21  where?

22  A.    That occurred on Dearborn Street when we were both out

23  of -- being in custody.

24  Q.    When you were going to buy drugs?

25  A.    Yes.
```

1   Q.    Okay.

2                   **MR. MARANGOLA:** If I could just have one moment,

3   Judge?

4                   **THE COURT:** Sure.

10:44:53AM 5        **MR. MARANGOLA:** I have nothing further.  Thank you,

6   Mr. Nunez.   Thank you, Judge.

7                   **MR. VERRILLO:** Nothing further, thank you.

8                   **THE COURT:** Thank you, you may step down.

9                   (**WHEREUPON**, the witness was excused).

10:45:01AM 10       **THE COURT:** Does the Government have any additional

11   proof?

12                  **MR. MARANGOLA:** Judge, no additional testimony.

13   There's possibly some additional exhibits once the defendant's

14   father testifies, but at this point no.

10:45:25AM 15       **THE COURT:** Okay, thank you.

16                  At this point I have as received just Government's

17   Exhibit 18; is that right?

18                  **MR. MARANGOLA:** Yeah, Judge.

19                  **THE COURT:**  And then Defense 115, 116, and 117.

10:45:45AM 20       **MR. VERRILLO:** I had offered 102 and 103 I think

21   last week.   Those are the two.

22                  **THE COURT:** I'm sorry, yes, on the first page, 102

23   and 103.

24                  **MR. MARANGOLA:** Judge, I guess I would offer -- I

10:45:56AM 25   just identified a number of those exhibits, and at this time

1  I'd offer Government's 1, which is the plea agreement for

2  Mr. Nunez; and Government's 2 through 7.

3            THE COURT: Any objection?

4            MR. VERRILLO: Can I look at the list?  I don't have

10:46:14AM 5  a list.

6            MR. MARANGOLA: They were the photographs.  I can

7  show Mr. Verrillo the list.

8            THE COURT: Sure.  1 was the plea agreement.

9            2 was the chart.

10:46:22AM 10           3 through 7 were photographs.

11           MR. VERRILLO: The only issue, Your Honor, I have

12  previously raised about the photographs of the victim and I

13  did have some objections related to the nature of them.  So I

14  think the Court had previously ruled on that, but otherwise I

10:46:55AM 15  don't have an objection.

16           THE COURT: Okay.

17           MR. MARANGOLA: Judge, for the record we're offering

18  2 through 7, 9 and 10.

19           THE COURT: Are you offering 1 or not?

10:47:03AM 20           MR. MARANGOLA: Yes.  I thought the Court had

21  already marked it, sorry.

22           THE COURT: Okay, 1.  Then 2 through 7.

23           MR. MARANGOLA: Yes.

24           THE COURT: Will be received.

10:47:09AM 25           (WHEREUPON, Government Exhibits 1-7 were received

1 | into evidence.)

2 |        **MR. MARANGOLA:** 9 and 10.

3 |        **THE COURT:** Any objection to 9 and 10?

4 |        **MR. VERRILLO:** What is 9 and 10?

10:47:17AM 5 |        **THE COURT:** 9 is the photo of the victim's hand.  10

6 | is the news article.

7 |        **MR. VERRILLO:** For purposes of the hearing, I don't

8 | object, Your Honor.

9 |        **THE COURT:** Exhibits 9 and 10 will be received.

10:47:35AM 10 |        **MR. MARANGOLA:**  Same with 15 and 17, Your Honor.

11 |        **THE COURT:** 15 is an aerial map of Burbank and

12 | Clinton.  That was Exhibit 35 at the trial?

13 |        **MR. MARANGOLA:** Yes.

14 |        **THE COURT:** And 17 is a photo?

10:47:48AM 15 |        **MR. MARANGOLA:** Yes.

16 |        **THE COURT:** Photo of 299-297 Prospect Street.  That

17 | was also an exhibit at the trial, Exhibit 64.

18 |        **MR. MARANGOLA:** Yes.

19 |        **MR. VERRILLO:** No objection.

10:47:58AM 20 |        **THE COURT:** Exhibits 15 and 17 will be received.

21 |        **MR. MARANGOLA:** Thank you, Judge.

22 |        (**WHEREUPON**, Government Exhibits 9-10, 15, and 17

23 | were received into evidence).

24 |        **THE COURT:** All right, so we'll reconvene March

10:48:09AM 25 | 31st, 11 a.m. for continuation of the hearing.  Thank you.

1          **MR. MARANGOLA:** Thank you.

2          **MR. VERRILLO:** Thank you.

3          (**WHEREUPON**, proceedings adjourned at 10:48 a.m.)

4                    *    *    *

5                **CERTIFICATE OF REPORTER**

6

7          In accordance with 28, U.S.C., 753(b), I certify that

8    these original notes are a true and correct record of

9    proceedings in the United States District Court for the

10   Western District of New York before the Honorable Frank P.

11   Geraci, Jr. on March 24th, 2022.

12

13   S/ Christi A. Macri

14   Christi A. Macri, FAPR-RMR-CRR-CSR(CA/NY)
     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25